**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                                        :
IN RE:  ELECTRONIC BOOKS                                                 :
ANTITRUST LITIGATION                                                     :
                                                                        :
                                                                        :
                                                                        :   11-md-02293 (DLC)
                                                                        :
This Document Relates to:                                                :
                                                                        :
ALL ACTIONS                                                             :
                                                                        :
                                                                        :
                                                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


# APPLE INC.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT


GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
T:  213.229.7000; F:  213.229.7520

*Attorneys for Defendant Apple Inc.*

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................ 1

SUMMARY OF ALLEGATIONS ........................................................................................ 3

I.   The Background Surrounding Apple's Entry into the eBooks Market ................................. 3

II.  Apple Enters the eBook Market and Bilaterally Negotiates Vertical Agency
     Agreements with the Publisher Defendants ................................................................... 4

III. Plaintiffs' Allegations Against Apple ........................................................................... 5

LEGAL STANDARD .......................................................................................................... 6

ARGUMENT ...................................................................................................................... 6

I.   Plaintiffs' Allegations Simply Lump All Defendants Together *En Masse* and Fail
     Plausibly to Allege Apple's Involvement as the "Hub" of a Conspiracy ........................... 6

     A.   Plaintiffs Fail to Plead Apple's Individual Participation in Any Alleged
          Conspiracy ....................................................................................................... 6

     B.   Apple's Alleged Conduct Is Consistent with Its Lawful Independent
          Business Interests and Does Not Plausibly Suggest That Apple Acted as
          the Hub of a Horizontal Conspiracy ..................................................................... 8

          1.   Apple's Lawful Agency Agreements Allowed It to Enter a
               Concentrated eBook Market Dominated by Amazon Without
               Requiring It to Incur Losses ......................................................................... 8

          2.   Plaintiffs' "Hub" Allegations Are Implausible and Apple's
               Simultaneously Negotiated Similar Agreements Do Not Suggest a
               Conspiracy ................................................................................................ 11

          3.   Plaintiffs' Pricing Allegations Do Not Plausibly Support a Claim
               of a Horizontal Conspiracy .......................................................................... 14

          4.   Plaintiffs Offer No Plausible Allegations of Apple's Involvement
               in a Conspiracy to Force Amazon to Adopt the Agency Model ............... 17

     C.   Any Attempt by Plaintiffs to Analogize This Case to *Starr v. Sony BMG
          Music Entertainment* Must Fail ........................................................................... 18

II.  Plaintiffs Have Failed to Plead an Unlawful Restraint of Trade by Apple Even
     Assuming *Arguendo* the Existence of a Conspiracy ....................................................... 20

     A.   Apple's Alleged Involvement in Horizontal Agreements Would Not
          Trigger Per Se Treatment ................................................................................... 20

B.      Plaintiffs Have Not Plausibly Alleged That Apple's Vertical Agreements Violate the Rule of Reason .................................................................................. 21

III.    Plaintiffs' State Antitrust and Unjust Enrichment Claims Also Fail ................................ 24

CONCLUSION ...................................................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson News, LLC v. Am. Media, Inc.*,
  732 F. Supp. 2d 389 (S.D.N.Y. 2010) ............................................................... 7, 17

*Arista Records, LLC v. Doe 3*,
  604 F.3d 110 (2d Cir. 2010) ............................................................... 6, 16

*AT/SAT v. Associated Press*,
  181 F.3d 216 (2d Cir. 1999) ............................................................... 7

*Barry Wright Corp. v. ITT Grinnell Corp.*,
  724 F.2d 227 (1st Cir. 1983) ............................................................... 23

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................... passim

*Bennett v. Wal-Mart Stores, Inc.*,
  No. 06-CV-5304, 2011 WL 3878330 (E.D.N.Y. Sept. 2, 2011) ........................... 25

*Blue Cross & Blue Shield United of Wisc. v. Marshfield Clinic*,
  65 F.3d 1406 (7th Cir. 1995) ............................................................... 21

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993) ............................................................... 15, 22, 23, 24

*Capital Imaging Assocs., PC v. Mohawk Valley Med. Assocs., Inc.*,
  996 F.2d 537 (2d Cir. 1993) ............................................................... 20, 22

*Car Carriers, Inc. v. Ford Motor Co.*,
  745 F.2d 1101 (7th Cir. 1984) ............................................................... 10

*Chapman v. N.Y. State Div. for Youth*,
  546 F.3d 230 (2d Cir. 2008) ............................................................... 18

*Cnty. of Tuolumne v. Sonora Cmty. Hosp.*,
  236 F.3d 1148 (9th Cir. 2001) ............................................................... 25

*Day v. Taylor*,
  400 F.3d 1272 (11th Cir. 2005) ............................................................... 1, 20

*Dominguez v. UAL Corp.*,
  -- F.3d --, 2012 WL 251906 (D.C. Cir. Jan. 17, 2012) ........................... 24

*E.I. du Pont de Nemours & Co. v. FTC*,
  729 F.2d 128 (2d Cir. 1984) ............................................................... 22

*Faber v. Metro. Life Ins. Co.*,
  648 F.3d 98 (2d Cir. 2011) ............................................................... 6, 12

*Flash Elecs., Inc. v. Universal Music & Video Distrib. Corp.*,
  No. CV-01-0979, 2009 WL 7266571 (E.D.N.Y. Oct. 19, 2009) ........................... 14

*FTC v. Ind. Fed'n of Dentists,*
  476 U.S. 447 (1986) ............................................................................................ 23

*Grand River Enters. Six Nations, Ltd. v. King,*
  783 F. Supp. 2d 516 (S.D.N.Y. 2011) ................................................................. 19

*Hinds Cnty., Miss. v. Wachovia Bank N.A.,*
  790 F. Supp. 2d 106 (S.D.N.Y. 2011) ........................................................... 16, 20

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.,*
  602 F.3d 237 (3d Cir. 2010) ............................................................................... 12

*Ill. Corp. Travel, Inc. v. Am. Airlines, Inc.,*
  806 F.2d 722 (7th Cir. 1986) ........................................................................ 20, 24

*In re Citigroup ERISA Litig.,*
  662 F.3d 128 (2d Cir. 2011) ............................................................................... 10

*In re Digital Music Antitrust Litig.,*
  2011 WL 2848195 (S.D.N.Y. July 18, 2011) ...................................................... 25

*In re Digital Music Antitrust Litig.,*
  592 F. Supp. 2d 435 (S.D.N.Y. 2008) ................................................................. 25

*In re Elevator Antitrust Litig.,*
  502 F.3d 47 (2d Cir. 2007) ..................................................................... 6, 13, 18

*In re Graphics Processing Units Antitrust Litig.,*
  527 F. Supp. 2d 1011 (N.D. Cal. 2007) .............................................................. 20

*In re Ins. Brokerage Antitrust Litig.,*
  618 F.3d 300 (3d Cir. 2010) ................................................................... 13, 14, 16

*In re Wireless Tel. Servs. Antitrust Litig.,*
  385 F. Supp. 2d 403 (S.D.N.Y. 2005) ................................................................. 23

*Int'l Distrib. Ctrs., Inc. v. Walsh Trucking Co.,*
  812 F.2d 786 (2d Cir. 1987) ............................................................................... 10

*Interstate Circuit, Inc. v. United States,*
  306 U.S. 208 (1939) ............................................................................................ 14

*Kramer v. Pollock-Krasner Found.,*
  890 F. Supp. 250 (S.D.N.Y. 1995) ...................................................................... 25

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.,*
  551 U.S. 877 (2007) .................................................................................. 20, 21, 24

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
  475 U.S. 574 (1986) ............................................................................................ 23

*Monsanto Co. v. Spray-Rite Serv. Corp.,*
  465 U.S. 752 (1984) ..................................................................................... 7, 10

*Port Dock & Stone Corp. v. Oldcastle Ne., Inc.,*
  507 F.3d 117 (2d Cir. 2007) ............................................................................... 18

*Priestly v. Headminder, Inc.*,
  647 F.3d 497 (2d Cir. 2011) ............................................................................ 17

*Russo v. Bruce*,
  777 F. Supp. 2d 505 (S.D.N.Y. 2011) ............................................................. 16

*Starr v. Sony BMG Music Entmt.*,
  592 F.3d 314 (2d Cir. 2010) .................................................................... passim

*State Oil Co. v. Khan*,
  522 U.S. 3 (1997) ............................................................................................... 3

*Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*,
  530 F.3d 204 (3d Cir. 2008) ............................................................................ 21

*United States v. Blue Cross Blue Shield of Mich.*,
  -- F. Supp. 2d --, 2011 WL 3566486 (E.D. Mich. Aug. 12, 2011) .......................... 21

*United States v. Gen. Elec. Co.*,
  272 U.S. 476 (1926) ..................................................................................... 1, 20

*Venture Tech., Inc. v. Nat'l Fuel Gas Co.*,
  685 F.2d 41 (2d Cir. 1982) ................................................................................ 7

**Other Authorities**

Motoko Rich, *Books on iPad Offer Publishers a Pricing Edge*, N.Y. Times (Jan. 27, 2010),
  http://www.nytimes.com/2010/01/28/business/media/28media.html) .................................... 15

**INTRODUCTION**

Apple entered eBook distribution in early 2010 at a time when, on Plaintiffs' own account, nine out of every ten eBooks were sold by Amazon.  Amazon accumulated this "dominant position" based on "aggressive eBook pricing practices" that included pricing popular titles below wholesale cost.[1]  At one stroke, Apple's entry created new competition in eBook distribution and a vastly larger pool of eBook consumers.  Since then, eBook sales have exploded.  Nevertheless, Apple now stands accused of serving as the "core" (Compl. ¶ 11) of a hub and spoke conspiracy to increase eBook prices in parallel to "supracompetitive" levels (¶ 20) all for the ultimate goal of "*slow[ing]* eBook growth" (¶ 77) (emphasis added).  It is axiomatic that to plead a conspiracy, "allegations of parallel conduct" must "be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be *independent* action," and furthermore, "allegations plausibly suggesting (not merely consistent with) agreement" are required.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (emphasis added).  But Plaintiffs' allegations do not plausibly suggest Apple's participation in a conspiracy.

Plaintiffs' claims stem from a set of vertical agency agreements among Apple and the book publisher Defendants (the "Publishers") – agreements well established as lawful and legitimate business conduct.  *See, e.g., United States v. Gen. Elec. Co.*, 272 U.S. 476, 488 *(*1926) (genuine agency arrangements are not unlawful price fixing); *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005) ("In a case of a genuine agency, there can be no combination and conspiracy in restraint of trade, and hence no Sherman Act violation.").  Plaintiffs attempt to extrapolate from these clearly lawful bilateral agency agreements "a 'conspiracy among horizontal competi-

---

[1]  *See* Consolidated Amended Class Action Complaint ("Complaint") ¶ 8 ("If Amazon continued to solidify its dominant position in eBooks . . . ."); ¶ 68 ("[Amazon's] aggressive eBook pricing practices succeeded in fueling Kindle sales," and "as of February 2010, Amazon's Kindle eBooks occupied ninety percent of the market").

tors at the retail level'" (¶ 227) with Apple "acting as a hub" (¶ 11), with the goal "to force Amazon to abandon its [below-cost] pricing" and to force the eBook sales model to be "entirely restructured" (¶ 4).  And this "conspiracy" was purportedly undertaken to protect the Publishers' "long-established brick-and-mortar model" for physical books (¶ 3) by "driv[ing] up" eBook prices which "would likely reduce eBook revenues and slow eBook growth" (¶ 77).  Plaintiffs' "hub" theory implausibly suggests Apple conspired with the Publishers to address economic issues it was not facing, and coordinated actions it did not participate in.  Apple had no market power, was not a horizontal competitor of the Publishers, was never a physical book seller, had no motive to protect such a market, and had no incentive to "slow eBook growth."  Nor do Plaintiffs allege that Apple ever dealt or negotiated with more than one Publisher at a time or had any involvement in the alleged conspiracy's critical step – each Publisher's negotiation of an agency agreement with Amazon.

Plaintiffs instead lump Apple in with the Publishers with regular use of the word "Defendants" in the Complaint's key allegations (e.g., "Defendants conspired" and "[t]heir object was to limit price competition" (¶ 97)).  But where the Complaint (supposedly) addresses a conspiracy, it does not address Apple; where it addresses Apple, it does not plausibly allege a conspiracy to raise eBook prices.  "Guilt by association" and sinister interpretations of Apple's public statements do not make up for basic deficiencies in Plaintiffs' conspiracy theory.

The *facts* depict unilateral – not conspiratorial – action by Apple.  Before Apple entered the eBook market, one competitor, Amazon, the nation's largest bookseller, had taken 90% of the market by pricing key eBooks below their wholesale cost.  Having no desire to incur the losses that would flow from retailing in such an environment, Apple individually negotiated separate vertical agreements with each of the Publishers to serve as a distribution agent in

2

exchange for a 30% commission on eBook sales. Each Publisher set its own prices – and Apple "exercise[d] no discretion" over prices (¶ 224) – but to ensure that Apple's iBookstore would not be undercut by other sellers and that these offerings would be attractive to consumers, Apple negotiated general limits to the prices set by the Publishers, requiring that the Publishers match lower prices on key titles offered elsewhere. These were *competitive*, not conspiratorial, actions.

It would be a perverse use of antitrust law to condemn Apple for successfully entering a market with an innovative new product that "was expected to prompt a surge in eBook purchasing" (¶ 156). As the Supreme Court has held, "the primary purpose of the antitrust laws is to protect interbrand competition," not to penalize it. *State Oil Co. v. Khan*, 522 U.S. 3, 15 (1997). Plaintiffs do not state a plausible claim as to Apple, and the Complaint should be dismissed.

## SUMMARY OF ALLEGATIONS

**I.   The Background Surrounding Apple's Entry into the eBooks Market**

Amazon, "the largest book distributor in the United States" online or otherwise (¶ 109) released its first eReader, the Kindle, in 2007 (¶ 1). Amazon quickly amassed "nearly *ninety percent*" of the eBook market (¶ 14) by setting eBook prices "at or below $9.99 almost immediately after release" (¶ 2) even though "in many instances the wholesale price it paid equaled or even exceeded $9.99" (¶ 65).

Amazon's losses on eBook sales were subsidized through Amazon's other sales (¶ 65) and balanced by the following effects: (1) Amazon could "grow [eBook] market share" (¶ 65) against other retailers, like Barnes & Noble, that could not afford below-cost pricing (¶¶ 63, 67); (2) the strategy would "fuel[] Kindle sales and increas[e] Amazon's share of the eReader market" (¶ 68); and (3) by maintaining a dominant market position, Amazon would (by Plaintiffs' reckoning) soon "have the ability to raise the price of eBooks substantially for a significant period of time without consumers substituting another product" (¶ 200).

According to Plaintiffs, Amazon's pricing strategy threatened the physical book industry where the Publishers generated most of their revenues (¶ 70). Historically, Publishers uniformly used a "wholesale model" where they sold books to a retailer at a standard discount off a book's list price, and the retailer then sold to end customers at prices chosen by the retailer (¶ 59). But since Amazon sold some eBooks below cost – and usually at $9.99 a book – the Publishers allegedly feared that consumers would come to expect such a price point on all books (¶ 75) and that eBook popularity would divert consumers from physical book purchases (¶ 74).

As a result, the Publishers allegedly conspired to "raise . . . eBook prices" beginning "in the fall of 2009," before Apple contemplated entering the market (¶ 99). Four of the Publishers, according to Plaintiffs, each informed Amazon, over a twelve-day span in December (¶ 7), that each of them would delay the release of eBook versions of selected titles until months after the release of the physical version, a technique known as "windowing" (¶¶ 99-109). There are no allegations that Apple participated in, or knew contemporaneously about, these conversations.

## II.    Apple Enters the eBook Market and Bilaterally Negotiates Vertical Agency Agreements with the Publisher Defendants

In January 2010, Apple announced the upcoming release of the iPad (¶ 123), a multi-purpose mobile device for browsing the web, reading and sending email, viewing photos, watching videos, listening to music, playing games, reading eBooks, and more. At that time, Apple "had zero eBook or physical book sales" (¶ 140). At the iPad launch, Apple announced that it had negotiated separate agreements with each of the Publishers to offer electronic books on the iPad through Apple's iBookstore (¶ 123). These were "agency agreements" whereby the Publisher sets an eBook's price and is the seller of record, while Apple acts solely as an agent who distributes eBooks in exchange for a 30% commission (¶ 124). Apple negotiated a "most favored nation," or "MFN," clause that would "guarantee that if anybody else is selling the

books cheaper than we are, then we can sell them at the lower price too" (¶ 18).  This "allow[ed] Apple to obligate publishers to discount eBook prices on bestsellers . . . in order to compete with brick-and-mortar bookstores and competing online sites" (¶ 129 n.17).  While the Complaint alleges the mere *conclusion* that Apple and the Publishers agreed that the Publishers would sell to other vendors under the agency model "exclusively" (¶ 129), when Apple entered into these agency agreements, Amazon was still operating under a wholesale model and the Publishers had not begun any discussions with Amazon concerning adopting an agency model (¶ 137).

Around the time of the iPad's launch, the Publishers allegedly approached Amazon during some 19 meetings and various phone calls (¶¶ 152, 164), with each Publisher allegedly telling Amazon that if it did not switch to an agency model, the Publisher would window eBooks of newly released titles.  Apple is not alleged to have participated in these communications.

## III.    Plaintiffs' Allegations Against Apple

Plaintiffs primarily allege a violation of Section 1 of the Sherman Act, claiming that Apple "act[ed] as a hub" (¶ 11) of a "horizontal" conspiracy (¶ 227) to "artificially inflate the retail price range of eBooks by switching to an Agency model" (¶ 244).  Plaintiffs claim that after Amazon and other retailers adopted the agency model (¶ 165), eBook prices through various retailers became largely identical (¶ 187), and "the Agency 5 increased" prices "approximately thirty to fifty percent" (¶ 19).  Plaintiffs suggest that the purpose of the conspiracy was to protect the physical book market.  Plaintiffs never say (nor could they credibly say) that Apple – a company with no physical book sales – had any interest in protecting the physical book market. Instead, Plaintiffs assert, without factual support, that "Apple believed it was necessary to enter the eBooks market because it viewed Amazon and its Kindle platform as a long-term threat" to Apple's alleged "dominant position" in "mobile devices" (¶ 117).  But Plaintiffs fail to explain how Apple would advance its competitive fortunes by raising the price of eBooks on its new

iPad to supposedly uncompetitive levels.   And though Plaintiffs allege that Apple "brokered" a collective switch to the agency model (¶ 134) and that Defendants "coordinated their activities during January 2010" (¶ 121), Plaintiffs offer no factual allegations concerning any meetings Apple had with any particular Publisher, let alone what was discussed, nor any allegations that Apple played any role in any Publisher's later negotiations with Amazon.

## LEGAL STANDARD

A complaint must plead specific "enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.'"   *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007).   Under Rule 12(b)(6), a court need not "'accept conclusory allegations or legal conclusions masquerading as factual conclusions.'"   *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).   In an antitrust case, where a "complaint's factual allegations describe[] only actions that were parallel [and] consistent with lawful conduct, the conclusory allegation on information and belief that the observed conduct was the product of an unlawful agreement [is] insufficient to make the claim plausible."   *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010).

## ARGUMENT

I.    **Plaintiffs' Allegations Simply Lump All Defendants Together *En Masse* and Fail Plausibly to Allege Apple's Involvement as the "Hub" of a Conspiracy**

A.    **Plaintiffs Fail to Plead Apple's Individual Participation in Any Alleged Conspiracy**

Plaintiffs allege "a 'conspiracy among horizontal competitors at the retail level to fix retail prices'" (¶ 227) with Apple "acting as a hub" (¶ 11).   Plaintiffs contend Apple acted as a coordinating hub – the "core" (¶ 11) – even though they explicitly acknowledge Apple was a new entrant (not a dominant distributor), with no market power, no experience in book distribution, no business relationships with the Publishers, and no vested interest in the success of the physical book market.   Ignoring these differences, Plaintiffs impermissibly lump Apple together

6

with the Publishers indiscriminately in the Complaint's key allegations.  *See, e.g.*, ¶ 244 ("Defendants have unlawfully agreed to artificially inflate the retail price range of eBooks . . . .").

The basis of Apple's alleged liability must be individually evaluated by this Court.  To plead a conspiracy, a complaint's allegations must "be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be *independent* action."  *Twombly*, 550 U.S. at 557 (emphasis added).  A plaintiff "must show more than the existence of a climate in which such a conspiracy may have been formed."  *Venture Tech., Inc. v. Nat'l Fuel Gas Co.*, 685 F.2d 41, 47 (2d Cir. 1982).  Instead, the complaint must allege behavior "that would plausibly contravene each defendant's self-interest 'in the absence of similar behavior by rivals.'"  *Starr v. Sony BMG Music Entmt.*, 592 F.3d 314, 327 (2d Cir. 2010).  Evaluating *each defendant* separately is required here because, as the Complaint itself makes clear, Apple is vertically separated and differently situated from the Publishers.  A complaint survives dismissal as to a particular defendant only if it plausibly alleges how "*each defendant* conspired in violation of the antitrust laws."  *AT/SAT v. Associated Press*, 181 F.3d 216, 234 (2d Cir. 1999) (emphasis added); *Anderson News, LLC v. Am. Media, Inc.*, 732 F. Supp. 2d 389, 396 (S.D.N.Y. 2010) (performing a defendant-by-defendant analysis in dismissing a complaint).

In meeting that burden, the Complaint must allege that Apple had a "'conscious commitment to a common scheme to achieve an unlawful objective.'"  *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984).  That is lacking here.  Plaintiffs allege a "Publisher-centric" scheme of "artificially inflat[ing]" eBook prices to slow their growth (¶ 244) and stop the "decay of hardcover . . . book sales" (¶ 182).  While the Publishers' actions advanced their individual business interests and do not imply a conspiracy at all, Apple's manifest interests (successfully introducing the iPad and the iBookstore) differ so completely from those attributed to the Pub-

lishers (defending brick-and-mortar bookstore sales) that the alleged conspiracy as a whole is simply implausible.  The allegations demonstrate the lack of any logical incentive for Apple to conspire with the Publishers, much less act as a hub for a conspiracy, and highlights Plaintiffs' improper approach of treating all Defendants as one undifferentiated mass.

### B.   Apple's Alleged Conduct Is Consistent with Its Lawful Independent Business Interests and Does Not Plausibly Suggest That Apple Acted as the Hub of a Horizontal Conspiracy

Plaintiffs claim that (1) Apple negotiated substantially identical agency agreements with the Publishers for the collusive purpose of raising eBook prices (*see, e.g.*, ¶¶ 11, 77); and (2) the Publishers' later measures against Amazon (e.g., renewed windowing threats) implemented an overarching conspiracy among the Publishers and Apple (*see, e.g.*, ¶ 184).  But Plaintiffs' supporting allegations show no conduct by Apple at odds with its independent incentives and do not plausibly suggest a conspiracy with the Publishers.

### 1.   Apple's Lawful Agency Agreements Allowed It to Enter a Concentrated eBook Market Dominated by Amazon Without Requiring It to Incur Losses

The distinct and differing business interests of the Publishers and Apple render starkly implausible Plaintiffs' theory of a hub conspiracy – with Apple at its "core" – undertaken to protect the physical book market from competitive change.  Apple's decision to distribute eBooks as an agent earning a 30% commission on all sales, rather than as a retailer facing guaranteed losses on popular titles, is a classic instance of unilateral conduct prompted by valid and independent business justifications.  *See Twombly*, 550 U.S. at 567.

Apple was a "new entrant in the eBook market" with "zero market share" (¶ 120) and "zero eBook or physical book sales" (¶ 140).  As Plaintiffs acknowledge, Apple confronted a dominant competitor, Amazon, "the largest book distributor in the United States" online or otherwise (¶ 10) that had obtained a 90% share of eBook sales through a below-cost pricing

strategy (¶¶ 65, 68) intended to establish a "dominant" Kindle business (¶ 115).  Amazon's below-cost eBook pricing strategy was allegedly employed to gain market share (¶ 64), which in Plaintiffs' view would later allow Amazon to capitalize on its position as a "monopolist that controlled the supply of eBooks" to "raise the price of eBooks substantially" (¶ 200).   Yet Plaintiffs suggest, without irony, that the market and pricing prior to Apple's entry were "competitive" (¶ 4).

The Publishers, however, allegedly faced a different set of issues than Apple.  "Publishers were particularly concerned that Amazon's pro-consumer [below-cost] pricing of eBooks threatened to disrupt the publishers' business model by shifting book purchases away from higher physical copies of books, which had traditionally been the publishers' most profitable product" (¶ 72).  The Publishers allegedly wanted to "increas[e] eBook prices and slow[] down the rate of eBook adoption" to protect the sales and prices of physical books and to avoid permanent adoption of a $9.99 eBook price level (¶ 75).

The Complaint indiscriminately lumps Apple in with the Publishers throughout despite the obvious differences in Apple's business, economic interests, and motivations.  Plaintiffs allege that "Defendants" – Apple included – "decided to drive up . . . prices for eBooks, even though" this "would likely reduce eBook revenues and slow eBook growth" to protect their physical book sales (¶ 77).  This supposedly common anticompetitive objective is facially implausible for Apple, whose incentive as an eBook agent with a 30% commission of eBook revenues was on *maximizing* (not reducing) eBook growth, and who had no countervailing interests in physical book sales.  As a new entrant Apple naturally wanted to sell more eBooks, not less.  This would be the most profitable strategy for both the sale of eBooks and the sale of devices like the iPad, and it would be "inherently implausible" to suggest that Apple, "as a

buyer," would want its suppliers "to charge noncompetitive prices" which would be tantamount to "alleging, in essence, that [Apple] conspired to injure itself." *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1109 (7th Cir. 1984). The Complaint, however, repeatedly alleges that the conspiracy was motivated by the *Publishers*' concern that Amazon's strategies would reduce overall revenue and the market for physical books.[2] Apple undeniably did not share this motivation because it does not sell physical books. The Complaint's assumption that Apple "agreed to assist [the Publishers] in waging a . . . price war" is thus "impermissible speculation." *Int'l Distrib. Ctrs., Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 794-95 (2d Cir. 1987).

Plaintiffs' fallback strategy is to suggest that Apple coordinated a horizontal conspiracy because of a perceived business threat from Amazon. Apple's supposed antipathy, not alleged to be shared by the Publishers, was rooted in an unspecified "belief" that "it was necessary to enter the eBooks market because [Apple] viewed Amazon and its Kindle platform as a long-term threat to its dominant position in the sale and marketing of mobile devices" (¶ 117). But this allegation just strings together antitrust buzzwords and offers the sort of "bald assertion[s], without any supporting allegations," that do not survive a motion to dismiss. *In re Citigroup ERISA Litig.*, 662 F.3d 128, 141 (2d Cir. 2011). It also proves too little since a supposed belief that a market must be entered for competitive reasons hardly shows a "conscious commitment" to "achieve an unlawful objective" of *raising prices* to uncompetitive levels by conspiracy or otherwise. *Monsanto*, 465 U.S. at 764.

Nor does this "Kindle theory" make sense on its own terms. For example, if Amazon was a "threat" that needed to be squelched by means of an illegal conspiracy, why would Apple offer Amazon's Kindle app on the iPad (¶ 140)? Why would Apple conclude that conspiring to

---

[2]  *See, e.g.*, ¶ 3 ("Being hidebound and lacking innovation for decades, the publishers were particularly concerned that Amazon's [below-cost] pricing of eBooks would negatively impact the sale of higher priced physical" books); ¶ 182 (Amazon's pricing was "a direct threat to accelerating the decay of hardcover . . . book sales[.]").

force Amazon to no longer lose money on eBooks (¶ 91) would cripple Amazon's competitive fortunes?  And why would Apple perceive the need for an illegal solution to the "Kindle threat" when it had an obvious and lawful one which it implemented – namely, introducing a multipurpose device (the iPad) whose marketing and sales success was not centered on eBook sales?[3]

Plaintiffs' conclusory allegations of Apple's business competition with Amazon and the Kindle fail to show that Apple was somehow the hub of a purported horizontal publisher conspiracy to raise eBook prices to protect the Publishers' physical book business model for yet another reason:  no such explanation is needed to understand why Apple would want to avoid spilling red ink by matching Amazon's below-cost prices as a retailer.  Amazon's below-cost pricing "meant that to enter the eBooks market, Apple would likely be forced to sell at least some eBooks near or below its wholesale costs for an extended period of time.  *Apple did not want to enter the eBooks market subject to this margin pressure caused by Amazon's pricing*" (¶ 114) (emphasis added).  Given this, it would make perfect sense as a "rational and competitive business strategy" (*Twombly*, 550 U.S. at 554), for Apple not to enter as a retailer incurring losses, but instead as an agent on commission with a competitive offering – which is exactly what the agency agreements negotiated by Apple accomplished (as explained later in I.B.3).

**2.     Plaintiffs' "Hub" Allegations Are Implausible and Apple's Simultaneously Negotiated Similar Agreements Do Not Suggest a Conspiracy**

Apple's status as a new entrant, and the divergent interests of Apple and the Publishers, render the purported "hub and spoke" conspiracy with Apple at its "core" (¶ 11) implausible.  The case law provides (and common sense teaches) that the "hub" of a conspiracy is "'generally

---

[3]   Still, the Complaint alleges that "just as Apple likely anticipated, Amazon very recently launched the Kindle Fire Tablet on September 28, 2011, a competitive tablet product to the iPad" (¶ 116).  Since the Kindle Fire Tablet is more than an eReader (adding color, video and sound capabilities lacking in the original Kindle), this allegation (aside from attributing a striking degree of clairvoyance to Apple) further undermines the plausibility of Plaintiffs' claim that eBook pricing was somehow the fulcrum of Apple's alleged rivalry with Amazon.

the dominant purchaser or supplier in the relevant market,'" who is in a position where others "must deal" with it, and is therefore situated to orchestrate a conspiracy to impose its anticompetitive goals.  *E.g.*, *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 255 (3d Cir. 2010).  But, as a new market entrant, Apple was not the dominant distributor, and postulating Apple as a hub here makes no sense.  Apple lacked any motive to protect physical book prices – and thus would have no incentive at all to serve as a hub for a conspiracy allegedly aimed at that primary goal – nor would Apple's obviously divergent interests give the Publishers reason to have Apple coordinate an alleged conspiracy to protect *their* interests.

Mere allegations that Apple "work[ed] simultaneously with [the Publishers], acting as a hub for Defendants' conspiracy" (¶ 11) and "brokered the simultaneous switch to the Agency model" (¶ 134) are insufficient.  These are particularly thin "conclusory allegations" and "legal conclusions masquerading as factual conclusions."  *Faber*, 648 F.3d at 104.  While the Complaint does not contain any well-pleaded factual allegations of a conspiracy *at all*, the allegations particularly underscore the implausibility of Apple's supposed role as the hub of the alleged conspiracy.  The facts that the Publishers have long-standing business relationships and are in New York (¶¶ 49-53) makes clear that there would be no reason for Apple, a new market entrant based in California, to orchestrate a purported conspiracy to protect the Publishers' business model.  And Plaintiffs' hub allegations involving Apple lack even the superficial detail of other allegations of communications among the Publishers.  *See* ¶¶ 98-109, 152-165, 176-191.

Apart from their hub allegations, Plaintiffs claim that "each Publisher Defendant agreed to substantially identical Agency Agreements – agreements that, it bears repeating, worked a radical change in the business model of each company'" (¶ 133).[4]  But the suggestion that the

---

[4] Plaintiffs (properly) stop short of claiming Apple's agreements with any *individual* Publisher were illegal, a contention that would fail because vertical agency relationships are not illegal (as explained in II.A).

agency agreements supposedly "worked a radical change in the business model of each company" means nothing as to Apple.  There was no radical change in *Apple's* business model as a *new entrant* into the eBook field.  Apple was familiar with the agency model and had used it to great success in its App Store (¶ 118).  And the fact that the agreements with the Publishers were similar is no surprise and raises no untoward inference.  No business interest of Apple would be served by subjecting itself to divergent or inconsistent obligations when performing the same function of distributing eBooks, and Plaintiffs point to no reason why a publisher who preferred the agency model would reject Apple's key terms (particularly given that the "fast approaching" iPad launch (¶ 8) left little time for drawn-out haggling).  *See In re Elevator*, 502 F.3d at 52 ("Similar contract terms can reflect similar bargaining power and commercial goals (not to mention boilerplate)" and "can suggest competition at least as plausibly as it can suggest anti-competitive conspiracy").  Moreover, Plaintiffs allege that the critical terms of the preexisting "wholesale model" were also uniform[5] and never attribute *that* similarity to unlawful collusion.

The Complaint also recites factual allegations tending to *preclude* the inference of a conspiracy.  For example, Plaintiffs allege the Publishers all independently had an incentive to engage Apple as a potential entrant into a concentrated market that was operating contrary to their independent long-term business interests.  Each individual Publisher had *its own* interests in negotiating a deal diverging from the "wholesale model" (*see* ¶ 15).  Nor is there any surprise that the Publishers would want to negotiate with a new entrant in a concentrated distribution environment.  *See, e.g.*, *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 350-51 (3d Cir. 2010)

---

[5] *See, e.g.*, ¶ 59 ("For decades, all major publishing houses have used the same basic distribution model" where "book publishers sold their titles to retailers based on a discount off a book's list price," and the "retailer (*e.g.*, Barnes and Noble) would pay the publisher fifty percent off list price"); ¶ 125 ("under the wholesale distribution model that traditionally has governed their relationships with brick-and-mortar bookstores and other online sellers like Amazon, publishers essentially 'sold' their products to retailers for a fixed (wholesale) price – typically half the list price of the print edition"); ¶ 85 ("under the wholesale model an e-tailer, such as Amazon, typically paid the same – or nearly the same – wholesale price to a publisher regardless of the title's format – electronic or physical").

("allegedly similar confidentiality agreements [in] vertical contracts" simply reflected "brokers' power over their clients" to "adopt[] [provisions] to protect [the brokers'] own, lucrative agreements," and at most suggested an "'industry practice,' but [did] not plausibly imply an industry-wide conspiracy"); *Flash Elecs., Inc. v. Universal Music & Video Distrib. Corp.*, No. CV-01-0979, 2009 WL 7266571, at *13 (E.D.N.Y. Oct. 19, 2009) (similar). Also, the largest publisher, Random House, did not agree to Apple's terms for a year (¶ 170), making it even more implausible that Apple spearheaded a conspiracy, as it indicates that Apple's participation did not depend on unanimity from the Publishers.[6] *See, e.g.*, *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 222 (1939). Plaintiffs' "identical agreements" allegation simply "attempt[s] to bootstrap vertical contracts into horizontal conspiracy," which is "at odds with both 'common economic experience,' and the complaint's own factual allegations." *In re Ins. Brokerage*, 618 F.3d at 340. The notion that Apple was a hub of a conspiracy to protect the Publishers is therefore implausible.

### 3. Plaintiffs' Pricing Allegations Do Not Plausibly Support a Claim of a Horizontal Conspiracy

Plaintiffs allege that supposed eBook price increases after the iBookstore's launch constitute evidence of a conspiracy. But it does not follow that Apple led a conspiracy aimed at such a result or that Apple acted inconsistently with its unilateral business interests. The agency agreements left it to each *Publisher* to set its eBook prices based on competition among the various book titles, with a proviso that if certain eBooks were being sold at a lower retail price elsewhere, the Publisher would match those prices at Apple's iBookstore (¶ 18). This would require each of the Publishers to keep the iBookstore competitive by lowering prices, a fact that

---

[6] While Plaintiffs allege that Apple's unwillingness to do business with Random House except using the agency model suggests a conspiracy (¶ 171), such a theory implausibly ignores the perfectly valid business reasons for a new entrant to avoid adopting conflicting roles and administering simultaneously differing business models.

cannot raise the inference that *Apple* conspired to require *higher* prices.

That prices allegedly went up on some eBooks does not establish a horizontal conspiracy coordinated by Apple. As the Supreme Court has observed, "[e]ven in a concentrated market, the occurrence of a price increase does not in itself permit a rational inference of conscious parallelism" much less outright collusion. *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 237 (1993). That is particularly true here. Plaintiffs simply postulate that Amazon's below-cost $9.99 price represented a long-term *competitive* market price. As discussed below (at pp. 22-24), this is speculative at best and demonstrably implausible at worst. Plaintiffs' allegation that a key purpose of the $9.99 price was protecting Amazon's dominant market position (¶ 64) supports an inference that this ceiling was ripe for reconsideration by Amazon when it failed to deter Apple's entry.

Plaintiffs also allege that Defendants "have unlawfully agreed to artificially inflate the retail price range of eBooks" (¶ 244). This allegation is akin to a mere statement that "defendants 'agreed' to a wholesale price floor," which is "obviously conclusory, and is not accepted as true." *Starr*, 592 F.3d at 319 & n.2. Indeed, Plaintiffs' allegations, along with the sources they rely upon, make clear that the price ranges were *limits* on pricing, not floors.[7]

---

[7] As Plaintiffs observe, each agreement "reportedly contains language allowing Apple to obligate publishers *to discount eBook prices* on bestsellers below the $12.99 to $14.99 range *in order to compete with brick-and-mortar bookstores and competing online sites*." ¶ 129 n.17 (citing Motoko Rich, *Books on iPad Offer Publishers a Pricing Edge*, N.Y. Times (Jan. 27, 2010), http://www.nytimes.com/2010/01/28/business/media/28media.html) (emphases added). And while Plaintiffs contend that under the agency agreements, Publishers were allowed to use a formula to establish higher price levels or price bands (¶¶ 128, 183) which the MFNs in turn supposedly prevented Publishers from lowering (¶ 87), elsewhere the Complaint acknowledges that the agency agreements actually *limited* each Publisher's pricing discretion relative to physical books by "specif[ying] that the publisher will set prices for their eBooks that were offered through the iBookstore based on a formula tied to the list price of physical books" (¶ 127). These limitations actually capped the *maximum price* and did not set a floor. *See* Rich, *supra* (the "formula [in the agency agreements] tethers the *maximum* e-book price to the print price on the same book") (emphasis added). Apple favored such "tethering" provisions precisely to ensure that eBooks remained competitively priced *below* their physical counterparts (which, Plaintiffs, admit, had "diverse competitive pricing" (¶ 203)). And because these provisions set *maximum* prices – not *minimum* prices – the agreements still allowed for $9.99 pricing. *See* ¶ 187 (providing examples of "formula" prices ranging from $9.99 to $14.99).

As for linking Apple to any *concerted action to raise prices*, Plaintiffs merely allege that "[o]n information and belief, in the course of entering into agreements with Apple, Apple and the Agency 5 communicated the terms of the agreements and pricing information with each other" (¶ 131).   This is nothing more than repeating that Apple negotiated simultaneously with the Publishers.   It is well established that use of the common tactic of "disclosure of information" as leverage, such as disclosure of the terms being negotiated with other suppliers, does "not plausibly imply a horizontal agreement" and is "at least equally consistent with unconcerted action." *In re Ins. Brokerage*, 618 F.3d at 330.   What Plaintiffs offer is simply "conclusory allegation[s] on information and belief that the observed conduct was the product of an unlawful agreement [which is] insufficient to make the claim plausible," *Arista*, 604 F.3d at 120, and which is just "speculati[on]" that "cannot 'nudge [a plaintiff's] claims across the line from conceivable to plausible,'" *Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 790 F. Supp. 2d 106, 116 (S.D.N.Y. 2011).

In addition, Plaintiffs offer the generic allegation that Apple "wanted to increase its margins on eBook sales by driving prices" up (¶ 76).   This motivation – assuming it can be accomplished without reducing demand – can be attributed to every capitalist enterprise.   It hardly serves as a foundation for an antitrust violation.   *Twombly* teaches that "natural" business motivations do not show conspiracy; *facts* are required.   550 U.S. at 566; *see also, e.g., Russo v. Bruce*, 777 F. Supp. 2d 505, 520 (S.D.N.Y. 2011) (a "totally conclusory allegation, lacking factual support to buttress it" is "not entitled to be assumed true").

Plaintiffs also rely upon statements of Steve Jobs, Apple's former CEO, which Plaintiffs simply mischaracterize.   Jobs's statement (in response to a reporter's question) that "[t]he prices will be the same" on books sold through Apple or Amazon simply reflects how the MFN works

(¶ 17).  If Amazon sold certain books at $9.99, then the Publishers would match those prices on Apple's iBookstore as well.  The statement attributed to Jobs in his biography that "Amazon screwed it up" when "[i]t paid the wholesale price for some books, but started selling them below cost" which led booksellers "to withhold books from Amazon" (¶ 18), is, if anything, further evidence of Apple rejecting Amazon's approach and employing its own "rational and competitive business strategy" (*Twombly*, 550 U.S. at 554).  Nor is Jobs's prediction as to what might happen to eBook pricing in the market (¶ 18) an admission of a horizontal conspiracy.  *See Anderson News*, 732 F. Supp. 2d at 402 ("The Court cannot infer a conspiracy from [a CEO's] bald statements describing the state of the magazine industry . . . ."); *Twombly*, 550 U.S. at 569 n.13 (conspiracy claim not supported by anticompetitive interpretations of CEO's statements).

Finally, Plaintiffs never point to any specific aspect of the agency model or the MFNs that prohibits price competition.  Instead, Plaintiffs broadly mischaracterize the agency agreements as "eliminat[ing] competitive pricing" for eBooks (¶ 131) and "not allow[ing] [Apple's] eBook titles to compete on a lower price elsewhere" (¶ 130) – mere assertions where "[t]he facts alleged are not only inadequate to support [Plaintiffs'] conclusion, they contradict it," *Priestly v. Headminder, Inc.*, 647 F.3d 497, 506 (2d Cir. 2011).

### 4.    Plaintiffs Offer No Plausible Allegations of Apple's Involvement in a Conspiracy to Force Amazon to Adopt the Agency Model

The final (and critical) step in the alleged conspiracy was "to force Amazon to abandon its [below-cost] pricing" and the wholesale model (¶ 4).  Plaintiffs' attempt to link Apple to this critical part of the alleged conspiracy is (if possible) even more attenuated and illogical than its other allegations.  The first alleged actions that led to purportedly higher eBook prices in the industry – the alleged "windowing" threats against Amazon and the discussions with Amazon to convince it to change its business model – began before Apple had even decided to try to enter

eBook distribution, and were done unilaterally by the Publishers without Apple's involvement.

For example, on the issue of windowing books to Amazon (¶¶ 99-109, 152-164), the Publishers' alleged strategy was employed *before* Apple had even decided to enter the market. It predated any discussions between Apple and Publishers about Apple's potential entry into the eBook distribution (¶¶ 7, 111). As for each of the Publishers' later discussions with Amazon, all occurred after the agency agreements were signed and none during the iBookstore negotiations (¶¶ 145, 152, 164), and none of those discussions are alleged to have involved Apple. And indeed, Apple is not alleged to have had any discussions telling Publishers what they should do or say to Amazon, nor had any input into the individual prices charged by the Publishers.

### C. Any Attempt by Plaintiffs to Analogize This Case to *Starr v. Sony BMG Music Entertainment* Must Fail

The Second Circuit has repeatedly affirmed the dismissal of antitrust claims under the *Twombly* standard. *See, e.g., In re Elevator*, 502 F.3d at 47; *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117 (2d Cir. 2007); *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230 (2d Cir. 2008). Plaintiffs, however, will likely rely here on the Second Circuit's decision in *Starr v. Sony BMG Music Entertainment*, *supra*. Yet the allegations in *Starr* only serve to underscore the deficiencies in this case as they relate to Apple. *Starr* is a case where horizontal competitors (major music labels) controlled digital music distribution through joint ventures selling at high prices, and allegedly refused to deal with independent online music services that profitably charged much lower retail prices. It did not involve an independent entrant into a retail sector dominated by a 90% incumbent pricing below cost. As a result, the inferences about pricing effects that could be drawn in *Starr* – that the labels' prices were "unreasonably high" and inconsistent with a competitive market, *see* 592 F.3d at 323 – cannot be drawn here. The $9.99 price cannot properly be characterized as the "competitive" eBook price level given Plaintiffs'

allegations that it was often below cost and intended to maintain a 90% market share.  In *Starr*, there *were* concrete and plausible allegations of what a competitive price would be; for example, the defendants in *Starr* charged $0.70 per song offered through their own services, even though at the same time independent digital music services profitably sold comparable songs for $0.25 each.  Moreover, the defendants in *Starr* had increased prices "even though earlier that year defendants' costs of providing Internet Music had decreased substantially . . . ."  *Id.* at 324. Here, by contrast, it was Amazon's strategy that failed to tie prices to costs.

The MFNs in *Starr* originated as "seller side" MFNs promulgated by the producers of music (analogous to the Publishers here).  The defendants also "attempted to hide their MFNs" in "secret side letter[s]" because "they knew they would attract antitrust scrutiny."  *Id.*  The defendants in *Starr* agreed to pool revenues together in a joint venture as opposed to allocating revenues based on their respective market shares.  The structure of the arrangement reduced the defendants' incentive to compete against each other on price and suggested that the *Starr* MFN arrangement supported a horizontal conspiracy to raise prices.  *Id.* at 319.

Here, the MFNs allow the Publishers, who are not part of any joint venture or revenue-pooling arrangement, to compete among themselves, including by offering lower prices.  *See, e.g.*, *Grand River Enters. Six Nations, Ltd. v. King*, 783 F. Supp. 2d 516, 535 (S.D.N.Y. 2011) ("no logical explanation" as to how a price-per-product-sold arrangement "transform[s] into a free pass" for manufacturers "to set *supra*-competitive prices" when manufacturers could still compete among themselves).  In fact, not only are the MFNs not concealed here, Plaintiffs try to use Apple's *public* statements, explaining its agency agreements and its business motivations, as "admissions" of a conspiracy.  Finally, unlike in *Starr*, the agency arrangements alleged here *decreased* the per-unit revenue to the Publishers from eBook sales (*e.g.*, ¶ 87), undermining a

19

theory that Apple was protecting the Publishers through a conspiracy.[8]

## II. Plaintiffs Have Failed to Plead an Unlawful Restraint of Trade by Apple Even Assuming *Arguendo* the Existence of a Conspiracy

### A. Apple's Alleged Involvement in Horizontal Agreements Would Not Trigger Per Se Treatment

Plaintiffs do not plead a *per se* violation.  "Conduct considered illegal *per se* is invoked only in a limited class of cases."  *Capital Imaging Assocs., PC v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 542 (2d Cir. 1993).  To the extent that Plaintiffs attempt to invoke a recognized category of *per se* conduct (without ever using the words "*per se*") by presenting their case as a "'garden variety price-fixing claim'" against "horizontal competitors" (¶ 227), they overlook that Apple is *not* a horizontal competitor of any other Defendant.  *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) (*per se* rule applies to "horizontal agreements among competitors to fix prices").

Apple occupies a *vertical* role in the process of distributing eBooks:  It is an agent.  Plaintiffs readily and repeatedly admit this.  *E.g.*, ¶¶ 124, 209, 224.  As the Supreme Court long ago held, "genuine contracts of agency" are not "violations of the Anti-Trust Act" (*per se* or otherwise) as "a matter of principle."  *Gen. Elec.*, 272 U.S. at 488; *Day*, 400 F.3d at 1276; *Ill. Corp. Travel, Inc. v. Am. Airlines, Inc.*, 806 F.2d 722, 729 (7th Cir. 1986) ("Courts have long believed that once a relationship is a *genuine* agency, the manufacturer or supplier has the same uninhibited power to set the agent's price that he has to set the price to be charged by an employee.").  Further, even if Plaintiffs alleged that Apple's vertical agency agreements facilitated price-fixing

---

[8]  Plaintiffs' bare references to government investigations into eBook pricing with sparse details (¶¶ 191-198) also do not satisfy the plausibility standard.  "[P]ending government investigations may not, standing alone, satisfy an antitrust plaintiff's pleading burden" and "cannot replace entirely a plaintiff's independent proffer of facts which would tend to support the illegal conduct alleged.*"  Hinds Cnty.*, 790 F. Supp. 2d at 115; *see also In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007) (Justice Department investigation "carries no weight in pleading an antitrust conspiracy claim" because "[i]t is unknown whether the investigation will result in indictments or nothing at all.").

by a "horizontal cartel among competing manufacturers or competing retailers," to state a claim, Apple's alleged conduct "would need to be held unlawful under the rule of reason." *Leegin*, 551 U.S. at 893; *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 225 (3d Cir. 2008) ("The rule of reason analysis applies even when" a "plaintiff alleges that the purpose of the vertical agreement . . . is to support illegal horizontal agreements . . . .").

Nor would *per se* treatment of Apple's alleged conduct be justified.  Only "'manifestly anticompetitive'" restraints that "'lack . . . any redeeming virtue'" trigger *per se* treatment because "the *per se* rule is appropriate only after courts have had considerable experience with the type of restraint at issue" and "can predict with confidence that it would be invalidated in all or almost all instances under the rule of reason." *Leegin*, 551 U.S. at 886-87.  Plaintiffs are not challenging "garden-variety" price fixing; instead they are challenging Apple's entry into a "rapidly increasing" (¶ 14) and still-nascent industry by means of the "Agency model" (a lawful and legitimate business mode), along with using MFNs (which are afforded rule-of-reason treatment[9]), all of which stoke eBook demand (*see* ¶ 156) and occurred as Amazon attempted "to solidify its dominant position in the sale of eBooks" by pricing below cost (¶ 8).  It is not "'immediately obvious'" that Apple's conduct "'lack[s] any redeeming virtue'" (*Leegin*, 551 U.S. at 886, 887), and thus any *per se* theory fails as to Apple.

### B.    Plaintiffs Have Not Plausibly Alleged That Apple's Vertical Agreements Violate the Rule of Reason

Plaintiffs cannot prevail under the rule of reason (if they even assert such a claim).  Under the rule of reason, "market power [is] a highly relevant factor . . . because market power bears a particularly strong relationship to a party's ability to injure competition" (*Capital Imag-*

---

[9]    *See Blue Cross & Blue Shield United of Wisc. v. Marshfield Clinic*, 65 F.3d 1406, 1415 (7th Cir. 1995) ("'Most favored nations' clauses are standard devices by which buyers try to bargain for low prices, by getting the seller to agree to treat them as favorably as any of their other customers. . . .  It is not price fixing."); *United States v. Blue Cross Blue Shield of Mich.*, -- F. Supp. 2d --, 2011 WL 3566486, at *4 (E.D. Mich. Aug. 12, 2011).

*ing*, 996 F.2d at 546), yet Plaintiffs admit that Apple was a new entrant with "no market share"[10]

(¶ 76).  *See also Capital Imaging*, 996 F.2d at 547 (a firm "with such a *de minimis* market share"

lacks "power to injure competition or force consumers to accept supracompetitive [pricing]").

Plaintiffs assert (despite Apple's zero market share at entry) that market power is "evi-

denced by [Defendants'] ability to raise prices above the competitive level" (¶ 201), but the only

price charged by Apple is its standard commission, which Plaintiffs do not contend is excessive.

Even attributing eBook pricing to Apple, there has been no showing that such prices are now

"above the competitive level."  Simply labeling eBook pricing as "supracompetitive"[11] does not

meet Plaintiffs' pleading burden.  *Cf. E.I. du Pont de Nemours & Co. v. FTC*, 729 F.2d 128, 139

(2d Cir. 1984) ("Labelling [a market structure's] prices as 'supracompetitive[]' hardly converts

its pricing into an 'unfair' method of competition.").  Nor does it suffice to plead merely that

prices have increased, particularly where introduction of Apple's iPad created a vastly larger

pool of consumers and increased demand for eBooks.[12]  "Even in a concentrated market, a price

increase does not in itself permit a rational inference of . . . supracompetitive pricing.  Where, as

here, output is expanding at the same time prices are increasing, rising prices are equally con-

sistent with growing product demand."  *Brooke Group*, 509 U.S. at 237.

Plaintiffs' claim boils down to the contention that any eBook price higher than $9.99 is

"above the competitive level."  But this necessarily implies that the "competitive market price" is

---

[10]  Plaintiffs "do not believe it is necessary to prove a relevant market," but contend that "[t]o the extent one is required the relevant product market is eBooks" (¶ 242).  Solely for purposes of this motion, Apple assumes that the relevant market is "eBooks."

[11]  *See* ¶ 20 (asserting that the "price of the Publisher Defendants' eBooks sold on the iBookstore . . . has remained at supra-competitive levels"); ¶¶ 190, 203(b), 252 (similar); ¶ 283 (referring to "the sale of eBooks at an inflat-ed, anticompetitive monopoly price to consumers").

[12]  Plaintiffs concede the iPad was "a new device that was expected to prompt a surge in eBook purchasing" (¶ 156) through the iBookstore and the iPad's Kindle app, but maintain implausibly that the "iPad would not help a publisher tap into a new customer market" (¶ 140).  The latter is a bare assertion that lacks any factual foundation and that illogically conflates the ability to buy physical books online from Amazon with the ability to consume eBooks through an eReader.  *See also* ¶ 140 ("'If you're an iPad buyer, chances are about 90% that you're also a book buyer on Amazon.'").

routinely *below cost*.  Indeed, it implies that the competitive price is below *marginal* cost, since an eBook's wholesale price, which Plaintiffs admit was generally more than $9.99 (*see* ¶ 65), is part of the incremental cost of every retail sale.  The fixed and variable costs of running a distribution platform would drive the competitive price higher still.  *See In re Wireless Tel. Servs. Antitrust Litig.*, 385 F. Supp. 2d 403, 422 (S.D.N.Y. 2005) ("marginal cost cannot serve as the 'competitive benchmark'" for pricing without accounting for additional fixed costs).  The notion that competitive prices should be below marginal cost makes no sense as a matter of economics or antitrust policy.  As then-Judge Breyer has explained, "competitive industries are typically characterized by prices that are roughly equal to, not below, 'incremental' costs." *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 232 (1st Cir. 1983).  The antitrust laws thus seek to promote "the ability of the market to advance social welfare by ensuring the provision of desired goods and services to consumers at a price approximating the marginal cost of providing them" – not at a price *below* marginal cost as Plaintiffs seek here.  *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 459 (1986).  In short, Plaintiffs cannot condemn pricing above $9.99 as supra-competitive when $9.99 was admittedly a *sub*-competitive price.

Whatever the benefits of short-term prices below cost to consumers, without a plan by the dominant company to recoup losses through later supra-competitive pricing, *see Brooke Group*, 509 U.S. at 224, there is no rational reason to expect below-cost pricing to persist in a market, *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 595 (1986) ("[A]s presumably rational businesses, petitioners had every incentive not to engage in [predatory pricing] for its likely effect would be to generate losses for petitioners with no corresponding gains.").  If there is such a plan, then a dominant firm would be expected to incur losses from below-cost pricing only until the plan succeeds, leading prices to rise to supracompetitive levels, or until it

fails (e.g., does not deter new entry), leading prices to rise to their normal, competitive levels.  In any event, the contention that below-cost pricing was an eternal feature of a "competitive" eBook market (and that any higher price is necessarily supracompetitive) is an inherently speculative premise and cannot support an allegation of market power.  *See Dominguez v. UAL Corp.*, -- F.3d --, 2012 WL 251906, at *4 (D.C. Cir. Jan. 17, 2012) (argument that prices would be lower but for alleged antitrust violation "piles speculation atop speculation" where a defendant "would need to alter its pricing strategy, which may well result in higher average ticket prices").

Plaintiffs' attempt to have the court infer market power from pricing also ignores the procompetitive effects of Apple's conduct.  As the Supreme Court has explained, "prices can be increased in the course of promoting procompetitive effects . . . from which lower prices can later result."  *Leegin*, 551 U.S. at 895-96; *see also Ill. Corp. Travel*, 806 F.2d at 727 ("The question is not whether the arrangement . . . raises today's prices, but whether this effect is associated with potential benefits to consumers that are worth the price.").  Here, these procompetitive effects cannot be understated:  The agency agreements enabled *successful market entry and output expansion* – no small feat when the market features a 90%-dominant incumbent using a below-cost pricing strategy.  They also triggered fierce competition in the device market.  As the Supreme Court has cautioned, the fear that "a largely groundless claim" can lead to "antitrust discovery [which] can be expensive" and an "*in terrorem* increment of the settlement value" (*Twombly*, 550 U.S. at 558-59 (alterations omitted)) means that a plaintiff must offer more than rising prices which "do not themselves permit an inference of a collusive market dynamic" (*Brooke Group*, 509 U.S. at 237).  Plaintiffs do nothing more and their claims against Apple fail.

## III.   Plaintiffs' State Antitrust and Unjust Enrichment Claims Also Fail

Plaintiffs assert antitrust claims under the laws of twenty-seven states and Washington, D.C., all of which fail for the reasons above, since state courts "overwhelmingly look to federal

antitrust decisions to construe their own antitrust statutes," and tag-along state claims rise and fall in particular on whether a plaintiff has alleged a Sherman Act conspiracy.  *In re Digital Music Antitrust Litig.*, 592 F. Supp. 2d 435, 447-50 & nn. 19-21 (S.D.N.Y. 2008) (collecting authorities), *rev'd on other grounds by Starr*, 592 F.3d at 314; *see also, e.g.*, *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001) (observing that "[t]he analysis under California's antitrust law mirrors the analysis under federal law because [it] was modeled after the Sherman Act").  Moreover, because Plaintiffs wage their state claims "[i]n the event Plaintiffs are not a direct purchaser" (¶ 239), they cannot "conceive of themselves as 'indirect purchasers' for purposes of their [alternative state] claims[s]" yet still sue Apple, for "vis-à-vis that defendant, they are direct purchasers."  *Bennett v. Wal-Mart Stores, Inc.*, No. 06-CV-5304, 2011 WL 3878330, at *6 (E.D.N.Y. Sept. 2, 2011).

Lastly, Plaintiffs' unjust enrichment claim fails because it "'hinges [on] practices claimed by plaintiff to be illegal,'" which here are just failed antitrust claims, *Kramer v. Pollock-Krasner Found.*, 890 F. Supp. 250, 257 (S.D.N.Y. 1995), plus "Plaintiffs 'paid their purchase prices and obtained their' products" yet never allege "that 'they failed to receive the benefit of their bargain,'" *In re Digital Music Antitrust Litig.*, 2011 WL 2848195, at *15 (S.D.N.Y. July 18, 2011).

## CONCLUSION

The Consolidated Amended Class Action Complaint should be dismissed as to Apple.

Dated:  March 2, 2012

Respectfully submitted,

/s/ Daniel S. Floyd

Daniel S. Floyd (admitted *pro hac vice*)
Daniel G. Swanson (admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
T:  213.229.7000; F:  213.229.7520
dfloyd@gibsondunn.com
dswanson@gibsondunn.com
*Attorneys for Defendant Apple Inc.*

25