UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE ELECTRONIC BOOKS ANTITRUST LITIGATION | No. 11-md-02293 (DLC) |
| This Document Relates to:<br><br>ALL ACTIONS | |

**MEMORANDUM OF LAW IN SUPPORT OF THE MOTION TO STAY PROCEEDINGS AND COMPEL ARBITRATION BY DEFENDANT PENGUIN GROUP (USA), INC.**

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ...................................................................................1

**BACKGROUND** .........................................................................................................1

    A.    The Federal Arbitration Act ...........................................................................1

    B.    Agreement by Purchasers of eBooks from Amazon and Barnes & Noble
          To Arbitrate Their Claims ..............................................................................2

    C.    The eBooksellers' Dispute Resolution Programs ........................................4

**ARGUMENT** .............................................................................................................5

I.    THE PLAINTIFFS AGREED TO ARBITRATE CLAIMS ARISING FROM
    THEIR PURCHASES OF EBOOKS FROM AMAZON AND BARNES &
    NOBLE .................................................................................................................5

    A.    The Dispute Is Arbitrable Because The Issues Set Forth In The Complaint
          Are Intertwined With The Arbitration Clauses Plaintiffs Agreed To When
          They Purchased eBooks From Amazon And Barnes & Noble ..............................7

    B.    The Relationship Among The Parties Demonstrates That Plaintiffs Agreed
          To, And Should Not Be Allowed To Avoid, Arbitration ........................................10

II.    THE AGREEMENTS' CLASS ACTION WAIVERS ARE ENFORCEABLE................15

    A.    Plaintiffs Cannot Establish That Individual Arbitration Would Preclude
          Vindication Of Their Statutory Claims ................................................................16

    B.    The Second Circuit's Refusal To Enforce Class Action Waivers On The
          Ground That Small-Dollar Claims Would Go Unenforced Does Not
          Survive The Supreme Court's Decision In *AT&T v. Concepcion* ........................19

**CONCLUSION** ........................................................................................................25

# TABLE OF AUTHORITIES

CASES.................................................................................................................PAGE(S)

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997)........................................................................... 24

*Astra Oil Co., Inc. v. Rover Navigation, Ltd.*,
   344 F.3d 276 (2d Cir. 2003) ............................................................. 6

*AT&T Mobility LLC v. Concepcion*,
   131 S. Ct. 1740 (2011) ............................................................ *passim*

*Birmingham Assocs. Ltd. v. Abbott Laboratories*,
   328 F. App'x 42 (2d Cir. 2009) .................................................... 6, 7

*Bradford v. Rockwell Semiconductor Sys., Inc.*,
   238 F.3d 549 (4th Cir. 2001) ......................................................... 21

*Brown v. Wheat First Secs., Inc.*,
   257 F.3d 821 (D.C. Cir. 2001)....................................................... 18

*Carroll v. Leboeuf, Lamb, Greene & MacRae, L.L.P.*,
   374 F. Supp. 2d 375 (S.D.N.Y. 2005) ...........................11, 13, 15

*CD Partners, LLC v. Grizzle*,
   424 F.3d 795 (8th Cir. 2005)......................................................... 10

*Choctaw Generation Ltd. P'ship v. Am. Home Assur. Co.*,
   271 F.3d 403 (2d Cir. 2001) ...................................................... 6, 14

*Cole v. Burns Int'l Sec. Servs.*,
   105 F.3d 1465 (D.C. Cir. 1997)..................................................... 22

*Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*,
   58 F.3d 16 (2d Cir. 1995) .............................................................. 15

*Contec Corp. v. Remote Solution, Co., Ltd.*,
   398 F.3d 205 (2d Cir. 2005) ........................................................... 6

*Dean Witter Reynolds, Inc. v. Byrd*,
   470 U.S. 213 (1985)................................................................. 15, 19

*Denney v. BDO Seidman, L.L.P.*,
   412 F.3d 58 (2d Cir. 2005) ...................................................... 14, 15

*Deposit Guar. Nat'l Bank v. Roper*,
   445 U.S. 326 (1980)....................................................................... 21

ii

*Eisen v. Carlisle & Jacquelin,*
　417 U.S. 156 (1974) .................................................................................... 23

*Gay v. CreditInform,*
　511 F.3d 369 (3d Cir. 2007) ....................................................................... 25

*Gilmer v. Interstate/Johnson Lane Corp.,*
　500 U.S. 20 (1991) ................................................................................ 17, 24

*Green Tree Fin. Corp.-Ala. v. Randolph,*
　531 U.S. 79 (2000) ................................................................. 17, 18, 20, 21

*Grigson v. Creative Artists Agency, L.L.C.,*
　210 F.3d 524 (5th Cir. 2000) ..................................................................... 15

*Hudson v. Michigan,*
　547 U.S. 586 (2006) ................................................................................... 23

*IDS Life Ins. Co. v. SunAmerica, Inc.,*
　103 F.3d 524 (7th Cir. 1996) ..................................................................... 11

*In re Am. Exp. Merchs.' Litig.,*
　__ F.3d ___, 2012 WL 284518 (2d Cir. Feb. 1, 2012) ...................... *passim*

*In re Am. Exp. Merchs.' Litig.,*
　554 F.3d 300 (2d Cir. 2009) ...................................................................... 21

*In re Cotton Yarn Antitrust Litig.,*
　505 F.3d 274 (2007) ................................................................................... 17

*James v. McDonald's Corp.,*
　417 F.3d 672 (7th Cir. 2005) ............................................................... 18, 21

*JLM Indus., Inc. v. Stolt-Nielsen SA,*
　387 F.3d 163 (2d Cir. 2004) .............................................................. 6, 7, 11

*Johnson v. West Suburban Bank,*
　225 F.3d 366 (3d Cir. 2000) ................................................................ 16, 22

*Livingston v. Assocs. Fin., Inc.,*
　339 F.3d 553 (7th Cir. 2003) ..................................................................... 18

*Long v. Silver,*
　248 F.3d 309 (4th Cir. 2001) ....................................................................... 7

*McAllister Bros., Inc. v. A & S Transp. Co.*,
  621 F.2d 519 (2d Cir. 1980) ................................................................................ 7

*McCann v. Royal Grp., Inc.*,
  77 F. App'x 552 (2d Cir. 2003) ........................................................................... 7

*Merrill Lynch Inv. Managers v. Optibase, Ltd.*,
  337 F.3d 125 (2d Cir. 2003) ................................................................................ 6

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
  473 U.S. 614 (1985) ................................................................................... *passim*

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
  460 U.S. 1 (1983) .......................................................................................... 16, 23

*Oldroyd v. Elmira Sav. Bank, FSB*,
  134 F.3d 72 (2d Cir. 1998) ................................................................................. 5

*Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.*,
  369 F.3d 645 (2d Cir. 2004) ................................................................................ 8

*PRM Energy Sys., Inc. v. Primenergy, L.L.C.*,
  592 F.3d 830 (8th Cir. 2010) ............................................................................. 7

*Ragone v. Atl. Video at Manhattan Ctr.*,
  595 F.3d 115, 121 (2d Cir. 2010) ................................................................. *passim*

*Ragone v. Atl. Video at Manhattan Ctr.*,
  No. 07 CIV. 6084 (JGK), 2008 WL 4058480 (S.D.N.Y. Aug. 29, 2008)
  *aff'd*, 595 F.3d 115 (2d Cir. 2010) ..................................................................... 15

*Randolph v. Green Tree Fin. Corp.-Ala.*,
  244 F.3d 814 (11th Cir. 2001) ........................................................................... 21

*Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*,
  490 U.S. 477 (1989) .......................................................................................... 16

*Ross v. Am. Exp. Co.*,
  547 F.3d 137 (2d Cir. 2008) ................................................................. 7, 10, 11, 13

*Shearson/American Exp., Inc. v. McMahon*,
  482 U.S. 220 (1987) ...................................................................................... 5, 19

*Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*,
  198 F.3d 88 (2d Cir. 1999) ................................................................... 6, 8, 11

iv

*Sokol Holdings, Inc. v. BMB Munai, Inc.*,
    542 F.3d 354 (2d Cir. 2008) ................................................................................ 13

*Stolt-Nielsen S.A. v. Animalfeeds Int'l Corp.*,
    130 S. Ct. 1758 (2010) ....................................................................................... 2

*Stutler v. T.K. Constructors Inc.*,
    448 F.3d 343 (6th Cir. 2006) .............................................................................. 18

*Thomson-CSF, S.A. v. Am. Arbitration Ass'n*,
    64 F.3d 773 (2d Cir. 1995) ................................................................................. 6

STATUTES

15 U.S.C.
    § 15 ............................................................................................................. 4, 23, 24
    § 4 ............................................................................................................... 24

Federal Arbitration Act, 9 U.S.C.
    §§ 1-16 ....................................................................................................... 1
    § 2 ............................................................................................................ 1, 5
    § 3 ............................................................................................................ 2

RULES

AAA Commercial Arbitration Rules R-43 ..................................................................... 5

AAA Supp. Procedures C-8 ...................................................................................... 4

Defendant Penguin Group (USA), Inc. respectfully submits this memorandum of law in support of its motion to stay proceedings and compel arbitration. As detailed below, the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16, requires the Court to compel the arbitration of <u>all</u> of the claims of plaintiffs, federal- and state-based, who purchased eBooks from Amazon and Barnes & Noble. At a minimum, the Court should compel the arbitration of plaintiffs' state law claims.

## PRELIMINARY STATEMENT

This case involves claims subject to binding arbitration. Plaintiffs are purchasers of eBooks, and other allegedly similarly situated individuals, who claim that they were injured by paying more for eBooks than they would have paid but for alleged price fixing by Penguin and co-defendants Hachette Book Group, Inc., HarperCollins Publishers L.L.C., Holtzbrinck Publishers, L.L.C., and Simon & Shuster, Inc. (the "Publishers"). Those plaintiffs who purchased their eBooks through Amazon or Barnes & Noble, however, expressly agreed to arbitrate any disputes related to their purchases of eBooks. Plaintiffs are equitably estopped from denying that their claims are subject to arbitration. And enforcement of the arbitration agreements to which plaintiffs themselves consented would not preclude plaintiffs from vindicating their statutory rights. Penguin therefore respectfully requests an order staying the proceedings and compelling arbitration of those claims.

## BACKGROUND

### A.      The Federal Arbitration Act

The FAA provides that any arbitration agreement in "a contract evidencing a transaction involving commerce * * * shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. It establishes a "liberal federal policy favoring arbitration" and reflects "the fundamental principle that

2

arbitration is a matter of contract." *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1745 (2011) (citations and internal quotation marks omitted).  Under the Act, a court must stay its proceedings and compel arbitration "upon being satisfied that the issue involved in [a] suit or proceeding is referable to arbitration" under an agreement governed by the Act.  9 U.S.C. § 3. Moreover, because arbitration is a matter of contract, and class arbitration "changes the nature of arbitration to such a degree that it cannot be presumed the parties consented to it by simply agreeing to submit their disputes to an arbitrator," a party may not be compelled "under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so."  *Stolt-Nielsen S.A. v. Animalfeeds Int'l Corp.*, 130 S. Ct. 1758, 1775 (2010).

### B.   Agreement by Purchasers of eBooks from Amazon and Barnes & Noble To Arbitrate Their Claims

The individual plaintiffs allege that they purchased eBooks from the Publishers for use on the Amazon Kindle, Compl. ¶¶ 22, 25-27, 29, 30-36, 38-46, and the Barnes & Noble Nook, *id*. ¶¶ 24, 28, 37, 41, among other devices.  They made those purchases through so-called "eBook Distributors" like Amazon.  *Id.* ¶ 246.  The plaintiffs also sue on behalf of a putative nationwide class consisting "of all persons in the United States who purchased eBooks published by one of the [Publishers] * * * after the adoption of the Agency model by that publisher."  *Id.* ¶ 238; *see also id*. ¶¶ 239-240 (same allegations with regard to State Classes).

The Amazon Kindle and Barnes & Noble Terms of Use include mandatory arbitration clauses for all disputes arising out of the plaintiffs' purchases.  The Amazon clause, for example, broadly requires "binding arbitration" (or, where claims so qualify, small claims court) for "*Any dispute or claim* relating in *any way* to your use of the * * * Kindle Store, or the goods or services sold or distributed by Amazon or through the Kindle, Reading Applications or Kindle

Store[.]"[1]  The Barnes & Noble clause similarly provides that "Any claim or controversy at law or equity that arises out of the Terms of Use, the Barnes & Noble.com Site or any Barnes & Noble.com Service (each a 'Claim'), shall be resolved through binding arbitration."[2]  The

---

[1] The Amazon Kindle Terms of Use dispute resolution provision provides as follows:

Disputes. Any dispute or claim relating in any way to your use of the Kindle, Reading Applications or Kindle Store, or the goods or services sold or distributed by Amazon or through the Kindle, Reading Applications or Kindle Store, will be resolved by binding arbitration, rather than in court, except that you may assert claims in small claims court if your claims qualify. The Federal Arbitration Act and federal arbitration law apply to this agreement.

\*\*\*

The arbitration will be conducted by the American Arbitration Association (AAA) under its rules, including the AAA's Supplementary Procedures for Consumer-Related Disputes. \*\*\*  Payment of all filing, administration and arbitrator fees will be governed by the AAA's rules.   We will reimburse those fees for claims totaling less than $10,000 unless the arbitrator determines the claims are frivolous.

\*\*\*

You and Amazon each agree that any dispute resolution proceedings will be conducted only on an individual basis and not in a class, consolidated or representative action.  If for any reason a claim proceeds in court rather than in arbitration you and Amazon each waive any right to a jury trial.

Amazon.com Kindle License Agreement and Terms of Use, last revised September 28, 2011, attached as Exhibit A to Declaration of Allison Sheedy.

[2] Barnes & Noble's terms of service provides as follows:

XVIII. DISPUTE RESOLUTION

Any claim or controversy at law or equity that arises out of the Terms of Use, the Barnes & Noble.com Site or any Barnes & Noble.com Service (each a "Claim"), shall be resolved through binding arbitration conducted by telephone, online or based solely upon written submissions where no in-person appearance is required. In such cases, the arbitration shall be administered by the American Arbitration Association under its Commercial Arbitration Rules (including without limitation the Supplementary Procedures for Consumer-Related Disputes, if applicable), and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

Alternatively, at Barnes & Noble.com's sole option, a Claim (including Claims for injunctive or other equitable relief) may be adjudicated by a court of competent jurisdiction located in New York County, New York.

Any Claim shall be arbitrated or litigated, as the case may be, on an individual basis and shall not be consolidated with any Claim of any other party whether through class action proceedings, class arbitration proceedings or otherwise.

Barnes & Noble.com Terms and Conditions of Use, last revised April 18, 2011, attached as Exhibit B to Declaration of Allison Sheedy.

Amazon Kindle and Barnes & Noble Nook Terms of Use in effect in early 2010 include similarly broadly worded arbitration clauses.[3]

The plaintiffs who purchased eBooks for use on the Amazon Kindle or on the Barnes & Noble Nook agreed that they would arbitrate any dispute related to those purchases. Indeed, the majority of the named plaintiffs purchased eBooks for use exclusively on the Kindle, *see* Compl. ¶¶ 22, 25-27, 29-33, 35-36, 38-40, 42-46, and accordingly agreed to arbitrate all of their claims.

### C.      The eBooksellers' Dispute Resolution Programs

The terms and conditions governing sales of eBooks through both Amazon and Barnes & Noble provide for arbitration under the rules of the American Arbitration Association ("AAA"), and specifically the AAA's Supplementary Procedures for Consumer-Related Disputes. Both dispute resolution programs provide for arbitration solely on an individual basis. Under both programs, the arbitration may be conducted by telephone or written submissions. In Amazon's program, arbitration may also be conducted in person at the consumer's choice.

Under the AAA's Supplementary Procedures for Consumer-Related Disputes, for disputes in which the consumer's claim does not exceed $10,000, the consumer's payment for filing fees, administration, and arbitrator fees is limited to a maximum of $125. AAA Supp. Procedures C-8. Under the Amazon agreement, claimants making claims less than $10,000 are entitled to be reimbursed for any "filing, administration and arbitrator fees" so long as the arbitrator does not determine that the claim is frivolous. The arbitrator may award any relief, including an award of attorney's fees, if authorized by law. AAA Commercial Arbitration Rules R-43. Federal antitrust law mandates recovery of treble damages and "the cost of suit, including a reasonable attorney's fee" by prevailing claimants. 15 U.S.C. § 15(a).

---

[3] *See* Amazon Kindle License Agreement and Terms of Use, dated January 19, 2010, attached as Exhibit C to Declaration of Allison Sheedy; Barnes & Noble.com Terms and Conditions of Use, dated March 30, 2010, attached as Exhibit D to Declaration of Allison Sheedy.

**ARGUMENT**

The Federal Arbitration Act "establishes a federal policy favoring arbitration requiring that [courts] rigorously enforce agreements to arbitrate." *Shearson/American Exp., Inc. v. McMahon*, 482 U.S. 220, 226 (1987) (internal quotation marks and citations omitted). Under the FAA, a court must compel arbitration (1) when the parties agreed to arbitrate, (2) when the asserted claims fall within the scope of the arbitration agreement, and, (3) when federal statutory claims are at issue, where Congress did not intend to preclude arbitration of those claims. *See Oldroyd v. Elmira Sav. Bank, FSB*, 134 F.3d 72, 75-76 (2d Cir. 1998). All of those requirements are met here. The plaintiffs expressly agreed to arbitrate claims arising from their purchases of eBooks from Amazon and Barnes & Noble. That agreement can be enforced by Penguin and covers the plaintiffs' claims. And arbitration of plaintiffs' claims according to the terms to which they consented does not present an irreconcilable conflict with the federal antitrust statutes. At the least, even if this Court concludes that individual arbitration of plaintiffs' federal antitrust claims is not enforceable, this Court should compel arbitration of the state law claims.

**I.   THE PLAINTIFFS AGREED TO ARBITRATE CLAIMS ARISING FROM THEIR PURCHASES OF EBOOKS FROM AMAZON AND BARNES & NOBLE**

The FAA, which was enacted to overcome judicial hostility to arbitration, *Concepcion*, 131 S.Ct. at 1745, provides that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract," 9 U.S.C. § 2. This language embodies two policies. The first is a "liberal federal policy favoring arbitration." *Concepcion*, 131 S.Ct. at 1749; *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 121 (2d Cir. 2010) ("[T]his Court has said that 'it is difficult to overstate the strong federal policy in favor of arbitration, and it is a policy we have often and emphatically applied.'") (internal quotation omitted). The second is "the 'fundamental principle that

arbitration is a matter of contract," which means that courts place arbitration agreements on equal footing with other contracts and enforce them according to their terms. *Concepcion*, 131 S. Ct. at 1745.

This latter policy is also why this Circuit has "recognized a number of common law principles of contract law," *Ragone*, 595 F.3d at 126 (quotations omitted), that may allow a willing nonsignatory to an agreement containing an arbitration clause (like Penguin) to enforce such an agreement against unwilling signatories (like plaintiffs) – "including equitable estoppel," *id.* This "alternative estoppel theory," first recognized in *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 779 (2d Cir. 1995), is distinguished from the "more typical" reverse estoppel situation, in which "a signatory to an arbitration agreement seeks to bind a non-signatory to it," *Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 98 (2d Cir. 1999). While that opinion cautioned that "court[s] should be wary of imposing a contractual obligation to arbitrate on a non-contracting party," they "do not face that same concern" where the *signatory* "is the party trying to escape its obligation to arbitrate[.]" *Id.* at 97; *see Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 131 (2d Cir. 2003) ("That first distinction, which Optibase contends is irrelevant, is decisive; it matters whether the party resisting arbitration is a signatory or not."). Accordingly, in a variety of circumstances—including antitrust matters—nonsignatories have successfully compelled arbitration against signatories under estoppel principles in this Circuit. *See JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 178 (2d Cir. 2004) (Sherman Act); *see, e.g., Ragone,* 595 F.3d at 128; *Contec Corp. v. Remote Solution, Co., Ltd.*, 398 F.3d 205, 211 (2d Cir. 2005); *Astra Oil Co., Inc. v. Rover Navigation, Ltd.*, 344 F.3d 276, 282 (2d Cir. 2003); *Choctaw Generation Ltd. P'ship v. Am. Home Assur. Co.*, 271 F.3d 403, 404 (2d Cir. 2001); *Smith/Enron,* 198 F.3d at 98; *see also Birmingham Assocs. Ltd.*

*v. Abbott Laboratories*, 328 F. App'x 42, 44 (2d Cir. 2009); *McCann v. Royal Grp., Inc.*, 77 F. App'x 552, 553-54 (2d Cir. 2003).[4]

Under this alternative estoppel theory, a nonsignatory to an arbitration agreement may compel a signatory to arbitrate when "a careful review of 'the relationship among the parties, the contracts they signed * * * and the issues that had arisen' among them discloses that 'the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed.'"   *Ragone*, 595 F.3d at 127 (quotations omitted).   This inquiry encompasses two "necessary circumstance[s]":  (1) the issues must be arbitrable, such that "the subject matter of the dispute was intertwined with the contract providing for arbitration"; and (2) there must be a close "relationship among the parties" showing either that the party opposing arbitration had consented to arbitrate or that it would otherwise be inequitable for that party to avoid arbitration.  *Id.* (internal quotations omitted); *see JLM Indus.*, 387 F.3d at 178 (relying on the signatory's recognition of the "close relationship among the parties * * * and controversies") (modification in original).  Plaintiffs' own allegations establish such a "close relationship among the parties" and "controversies" here.

### A.   The Dispute Is Arbitrable Because The Issues Set Forth In The Complaint Are Intertwined With The Arbitration Clauses Plaintiffs Agreed To When They Purchased eBooks From Amazon And Barnes & Noble

In this case, the "subject matter" of the dispute for arbitration is intertwined with the agreements plaintiffs entered into when they purchased eBooks using the Amazon and Barnes &

---

[4]   In addition, a number of other circuits have held that a nonsignatory may "invoke an arbitration clause under ordinary state-law principles of agency[.]"  *Long v. Silver*, 248 F.3d 309, 320 (4th Cir. 2001); *see, e.g., PRM Energy Sys., Inc. v. Primenergy, L.L.C.*, 592 F.3d 830, 834 (8th Cir. 2010) (noting that, under "agency and related principles," a nonsignatory may "compel arbitration when, as a result of the nonsignatory's close relationship with a signatory, a failure to do so would eviscerate the arbitration agreement").  Although it remains an "open question" in this Circuit, *Ross v. Am. Exp. Co.*, 547 F.3d 137, 143 (2d Cir. 2008), Second Circuit caselaw strongly suggests that the agency relationship alleged by plaintiffs would be an independent basis for compelling them to arbitrate their claims.  *See McAllister Bros., Inc. v. A & S Transp. Co.*, 621 F.2d 519, 524 (2d Cir. 1980) (holding, in context of signatory attempting to compel arbitration with nonsignatory, that "ordinary principles of contract and agency determine which parties are bound by an agreement to arbitrate").

Noble eBookstores.  Plaintiffs allege that they purchased books from the "Publisher Defendants" for use on, among other devices, the Amazon Kindle, Compl. ¶¶ 22, 25-27, 29, 30-36, 38-46, and the Barnes & Noble Nook, *id.* ¶¶ 24, 28, 37, 41.  They further acknowledged that they purchased those eBooks via "eBook distributors" like Amazon and Barnes & Noble.  Compl. ¶ 246.

In so doing, plaintiffs agreed to the Terms of Use specified by those two eBooksellers, which specifically provide for binding arbitration for any and all disputes arising out of plaintiffs' purchases.  Specifically, the Amazon Kindle Terms require "binding arbitration" for "*Any dispute or claim* relating in *any way* to your use of the * * * Kindle Store, or the goods or services sold or distributed by Amazon or through the Kindle, Reading Applications or Kindle Store[.]"[5]  Barnes & Noble's Terms of Use require that "*Any claim or controversy* at law or equity that arises out of the Terms of Use, the Barnes & Noble.com Site or any Barnes & Noble.com Service * * * shall be resolved through binding arbitration[.]"[6]

Such broad arbitration agreements "create[] a presumption of arbitrability which is only overcome if it may be said with positive assurance that the arbitration clause[s] [are] not susceptible of an interpretation that covers the asserted dispute." *Smith/Enron*, 198 F.3d at 99; *see Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 654 (2d Cir. 2004) (defining similar arbitration agreement as "of the broad type"). Arbitration is accordingly enforced in this Circuit as long as it can be said that plaintiffs' claims "'touch matters' covered by" the agreements, with any "[d]oubts * * * resolved in favor of coverage." *Smith/Enron*, 198 F.3d at 99.

---

[5]  Amazon.com Kindle License Agreement and Terms of Use, last revised September 28, 2011, attached as Exhibit A to Declaration of Allison Sheedy (emphasis added).

[6]  Barnes & Noble.com Terms and Conditions of Use, last revised April 18, 2011, attached as Exhibit B to Declaration of Allison Sheedy (emphasis added).

Plaintiffs' allegations here do far more than merely "touch matters" covered by the agreements; they are fully encompassed within them.  Both clauses cover any claims or disputes arising from goods or services sold through the "Kindle Store" or the "Barnes & Noble Site," and higher prices paid at those stores is the precise "antitrust injury" plaintiffs and the putative class allegedly suffered.  Compl. ¶¶ 204-205.  Similarly, all four of plaintiffs' causes of action stem from the same alleged injury.  *See, e.g.*, *id.* ¶¶ 245-246 (First Cause of Action) (plaintiffs, who purchased eBooks through "eBook distributors," were injured "by paying more for eBooks than they would have [otherwise] paid").[7]  Such causes of action and such alleged injuries plainly "touch matters" covered by the arbitration clauses in the eBooksellers' Terms of Use.

In fact, plaintiffs themselves acknowledge the applicability of those Terms of Use.  They explicitly allege that the eBooksellers' Terms, including not just Apple's (whose terms do not include a mandatory arbitration clause), but also Amazon's—pertain to the lawsuit.  *See* Compl. ¶¶ 220-221 & nn. 32-322 (citing both Apple iBookstore and Amazon Kindle Terms of Use, including portion of latter providing that "this Agreement will govern in the event of a conflict" with any other terms).  Plaintiffs further contend that those Terms *govern* this suit, alleging that "California law applies to [Apple] nationwide with respect to the sale and purchase of eBooks" under the forum-selection and choice-of-law clauses in "Apple's iBookstore terms and conditions."  *Id.* ¶ 237.  Plaintiffs offer no reason why the Terms of Use of Amazon Kindle and Barnes & Noble stores would not govern as well, given the Complaint's allegations that all sales or purchases through Apple's iBookstore were on the same terms as through the other eBookstores.  *See id.* ¶ 169 (alleging that the Publishers "force[d] retailers like Amazon to adopt

---

[7] *See also* Compl. ¶ 250 (Second Cause of Action) (alleging dampened competition in the eBooks market); *id.* ¶ 252 (Third Cause of Action) (alleging that "purchases of eBooks occurred in each of the states at supra-competitive prices due to Defendants' illegal conduct"); *id.* ¶ 283 (Fourth Cause of Action) ("Defendants have unjustly benefited through the sale of eBooks at an inflated, anticompetitive monopoly price to consumers.").

the Agency model under the same terms"); *id.* ¶¶ 202-203 (alleging that "effect of the conspiracy was to increase and standardize pricing for eBooks" across eBooksellers).

In other words, plaintiffs cannot have it both ways.  Having explicitly relied on portions of the Terms of Use in their Complaint (including the Amazon Kindle Terms, which contain an arbitration clause), they cannot ignore those same terms now.  *See CD Partners, LLC v. Grizzle*, 424 F.3d 795, 798 (8th Cir. 2005) (holding arbitration appropriate "when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting [its] claims against the nonsignatory") (internal quotations omitted).

### B.    The Relationship Among The Parties Demonstrates That Plaintiffs Agreed To, And Should Not Be Allowed To Avoid, Arbitration

In order for the signatory plaintiffs to be estopped from avoiding arbitration, there must also be the "further necessary circumstance of a relationship between" them and the Publishers "that justifies sending th[e] entire dispute to arbitration."  *Ragone,* 595 F.3d at 128.  The relationship must be such that the party opposing arbitration had "consented to extend its agreement to arbitrate to" the nonsignatory, or at least that it would be "inequitable" for the party opposing arbitration "to refuse to arbitrate on the ground that it had made no agreement with" the nonsignatory.  *Ross v. Am. Exp. Co.*, 547 F.3d 137, 146 (2d Cir. 2008).  Although the *Ross* court ultimately declined to compel arbitration, it distinguished the facts in that case from several other circumstances in which this Circuit has found the necessary relationship, including where (1) a nonsignatory defendant controls a signatory or (2) a disclosed or otherwise extensive relationship between a contracting party and a nonsignatory defendant existed.  *See id.* at 144-146.  Plaintiffs fit both categories.

*First*, signatory plaintiffs are estopped from avoiding an arbitration agreement with a party they allege to be controlling the counter-signatory.  *See Ross*, 547 F.3d at 144-145 ("A

number of cases from the district courts of our Circuit have * * * held that estoppel is warranted when a non-signatory defendant owns or controls a signatory defendant."); *see also id.* at 144 (noting a "common feature" in many cases in which this Circuit has "applied estoppel against a party seeking to avoid arbitration" was the existence of a "corporate relationship," which includes "agents[] and other related business entities").[8]

For example, in a recent case in this court, the plaintiffs sued various entities, including those entities' agents, on the grounds that the plaintiffs had received bad tax advice. *Carroll v. Leboeuf, Lamb, Greene & MacRae, L.L.P.*, 374 F. Supp. 2d 375, 377 (S.D.N.Y. 2005) (noting that "plaintiffs allege a close relationship among" the parties, including that "myCFO acted as the agent * * * [of the principals] in promoting the tax strategies"). Plaintiffs had signed two agreements with myCFO that included "broad arbitration clauses," and although the principals had not signed the agreements, they nevertheless sought to compel arbitration on an estoppel theory. *Id.* The court agreed, concluding that the necessary "close relationship" between the nonsignatories and the signatory could be ascertained based on the plaintiffs' own contentions regarding the agency relationship, so that plaintiffs' effort "to ignore their repeated allegations that myCFO acted in all relevant respects as movants' agent * * * is of no avail." *Id.* at 377 & n.9. Given those allegations, the court "conclude[d] that plaintiffs are equitably estopped to resist enforcement of the arbitration clauses by" the nonsignatory principal. *Id. at* 378; *see also JLM Indus.,* 387 F.3d at 178 (finding estoppel in Sherman Act case where complaint "'repeatedly

---

[8] Although Plaintiffs have chosen to sue only Apple, such that Amazon and Barnes & Noble are not yet parties to this lawsuit, this Circuit has made clear that a signatory may not avoid arbitration by strategically declining to sue only those parties who signed the agreements containing the arbitration clause. *See Smith/Enron,* 198 F.3d at 98 (concluding that signatory "cannot now shield itself from arbitration by arguing that only the 1994 Agreement contains an enforceable arbitration clause, and that only * * * the parties [the plaintiff] intentionally did not sue * * * would have the right to invoke it"); *see also IDS Life Ins. Co. v. SunAmerica, Inc.*, 103 F.3d 524, 530 (7th Cir. 1996) (strategy by which a party to an arbitration agreement attempts to avoid that agreement by suing a "related party with which it has no arbitration agreement, in the hope that the claim against the other party will be adjudicated first and have preclusive effect in the arbitration * * * should not be allowed to succeed").

alleges that, whatever corporate entities happened to sign the [charter contracts], [signatory plaintiff] was purchasing shipping services directly from the parents and was harmed by the allegedly inflated prices charged by those parents'").

Similarly here, plaintiffs cannot now "ignore" their extensive allegations of the "close relationship" between the Publishers and the eBooksellers in order to avoid their arbitration agreements.  Plaintiffs' Complaint makes plain from the outset that the eBooksellers acted as the sales agents of the "Publisher Defendants" – who are also described, in plaintiffs' telltale terminology, as the "Agency Five" – for all "sale and distribution services."  Compl. ¶¶ 4, 209.  Indeed, plaintiffs could not have been more explicit about this "close relationship":  the "online merchants such as Apple or Amazon are * * * exactly what the agreements denominate them and exactly what they represent themselves as to consumers: *agents*."  Compl. ¶ 224 (emphasis added); *see id.* ¶ 209 ("Amazon or another online merchant * * * undertak[es] to perform *marketing, sale and distribution services as an agent* on behalf of the Publisher Defendant") (emphasis added); *see also id.* ¶¶ 206-225 (detailing agent-principal relationship).  Plaintiffs cannot deny that they were aware of the agency relationship at the time they purchased the books, because "[w]hen a consumer purchases an eBook," Amazon "explicitly states that the price is set by the publisher and that the book is sold by the publisher."  *Id.* ¶ 222.

Nor can plaintiffs ignore their allegations that the Publishers entered these sales-agent relationships in order to "control" the prices and terms for their eBooks, *e.g.,* Compl. ¶ 10, with "Amazon, Apple and other eBook distributors * * * acting only as agents," *id.* ¶ 246.  In short, plaintiffs' Complaint manifests that plaintiffs consented to arbitrate when they purchased eBooks and entered into arbitration agreements with the disclosed sales agents of the Publishers.  *See Carroll*, 374 F. Supp. 2d at 378 (signatory plaintiffs estopped from avoiding arbitration with

nonsignatories where plaintiffs "specifically and repeatedly allege" that signatory defendant "acted at all relevant times [as] the agent" of nonsignatory defendants).[9]

*Second*, this Circuit has also found a sufficiently close relationship for estoppel to apply when there is a disclosed or otherwise extensive relationship between a contracting party and a nonsignatory defendant sufficient to estop the signatory from denying arbitration. *See Ross*, 547 F.3d at 145. For example, the Second Circuit has held that a plaintiff's knowledge of an "extensive[]" relationship between her employer and a nonsignatory before she signed an employment contract was "sufficient to demonstrate the existence of a relationship * * * that allows the [nonsignatory] to avail itself of the arbitration agreement between" the plaintiff and her employer. *Ragone,* 595 F.3d at 128. In that case, the plaintiff had admitted that even though she was entering into an employment contract with one party, she was aware when she signed it that she would interact primarily with the nonsignatory in the ordinary course of her employment. That was sufficient to allow the nonsignatory to compel her to arbitrate her sexual harassment claims, even though the nonsignatory was "not mentioned in the arbitration agreement, or in any other document relating to Ragone's initial employment[.]" *Id.* at 127.

Just as in *Ragone*, although plaintiffs' purchases here were subject to Terms of Use of the eBooksellers, they expected to interact directly with the Publishers, as well. *See* Compl. ¶ 222 ("When a consumer purchases an eBook subject to an Agency Agreement through Amazon, Amazon explicitly states that the price is set by the publisher and that the book is sold by the publisher."). Indeed, they specifically detailed the principal-agent relationship and their

---

[9] Because of this agency relationship, this case is quite different from *Ross*, in which the parties were not affiliated but were rather "competitors," and "Amex's only relation with respect to the cardholder agreements [which contained the arbitration clause] was as a third party allegedly attempting to subvert the integrity of the cardholder agreements." *Ross*, 547 F.3d at 146. For the same reason, this situation is different from the one in *Sokol Holdings, Inc. v. BMB Munai, Inc.*, in which the complaint alleged that the nonsignatory's only relationship to the contract containing the arbitration agreement was as a third-party wrongdoer who "tortiously subverted [the signatory's] rights under th[at] agreement." 542 F.3d 354, 362 (2d Cir. 2008).

14

knowledge of that relationship in the Complaint.  *See id.* ¶ 224 ("Under the Agency model, the Publisher Defendants sell eBooks directly to consumers at prices and terms set by the Publisher Defendants.  Agents perform no functions on behalf of the Publisher Defendants other than securing offers from buyers, and exercise no discretion concerning the price and terms under which the eBooks are sold."); *see generally id.* ¶¶ 206-225 (agency allegations).  As in *Ragone*, such knowledge should be "sufficient to demonstrate the existence of a relationship * * * that allows [the Publishers] to avail [themselves] of the arbitration agreement between" plaintiffs and the eBooksellers.  595 F.3d at 127.

In fact, arbitration is even more appropriate here than in *Ragone* because the agreement containing the arbitration clause is also "linked textually" to the Publishers.  In *Choctaw Generation*, the court "easily" found that a signatory was estopped from avoiding arbitration with a nonsignatory where the dispute the nonsignatory sought to arbitrate was "linked textually" to the terms of the contract that included the arbitration clause, and the signatory invoked portions of that agreement in pleading its case against the nonsignatory.  271 F.3d at 406.  Likewise, the controversy between the plaintiffs and the Publishers here is "linked textually" to the agreement containing the arbitration agreement, given that plaintiffs' own complaint cites and quotes from the portions of the Amazon Kindle Terms of Use defining the Publishers therein as "Content Providers."  *See* Compl. ¶ 221 ("Amazon likewise makes clear in its terms and conditions that the publishers are the entities who are selling use of the content to consumers").

In any event, since plaintiffs themselves have pleaded this close "agency" relationship, it would be inequitable for them to "escape the consequences of those allegations" and avoid arbitration now.  *Denney v. BDO Seidman, L.L.P.*, 412 F.3d 58, 70 (2d Cir. 2005) (having pleaded a close relationship, "plaintiffs cannot now escape the consequences of those allegations by

arguing that the Deutsche Bank and BDO defendants lack the requisite close relationship, or that plaintiffs' claims against the Deutsche Bank defendants are not connected to Deutsche Bank's relationship with BDO"); *see also Ragone v. Atl. Video at Manhattan Ctr.*, No. 07 CIV. 6084 (JGK), 2008 WL 4058480 (S.D.N.Y. Aug. 29, 2008) *aff'd*, 595 F.3d 115 (2d Cir. 2010) ("It would be inequitable to allow the plaintiff to treat ESPN and AVI as intertwined for the purposes of the Complaint, but 'escape the consequences of these allegations by arguing' that there is not a sufficiently close relationship between the two defendants to warrant the Court's application of equitable estoppel."); *Carroll,* 374 F. Supp. 2d at 378 n.9 (plaintiffs' effort "to ignore their repeated allegations that myCFO acted in all relevant respects as movants' agent * * * is of no avail"); *cf. Grigson v. Creative Artists Agency, L.L.C.,* 210 F.3d 524, 527 (5th Cir. 2000) ("[A]pplication of equitable estoppel is warranted when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract."). For those reasons, the plaintiffs have consented to arbitrate all disputes arising from their purchases of eBooks from the Amazon and Barnes & Noble stores.[10]

## II. THE AGREEMENTS' CLASS ACTION WAIVERS ARE ENFORCEABLE

Antitrust claims may be arbitrated, *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985), and arbitration agreements requiring individual arbitration of antitrust claims are not per se unenforceable, *In re Am. Exp. Merchs.' Litig.*, __ F.3d ___, 2012 WL 284518, at *14 (2d Cir. Feb. 1, 2012) ("*AmEx III*"). "Having made the bargain to arbitrate, the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of

---

[10] That only a majority of the claims must be referred to arbitration is no bar to doing so, as the Supreme Court has recognized that courts must "rigorously enforce agreements to arbitrate, even if the result is 'piecemeal' litigation, at least absent a countervailing policy manifested in another federal statute." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985); *see also Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 20 (2d Cir. 1995) (rejecting argument against "bifurcation of proceedings in which some claims are presented to arbitrators and some are decided by a court of law" as "frivolous").

judicial remedies for the statutory rights at issue." *Mitsubishi*, 473 U.S. at 628. Where, as here, Congress intended for statutory claims to be arbitrable, plaintiffs may defeat the enforceability of an arbitration agreement only by showing that arbitration entirely "precludes plaintiffs from enforcing their statutory rights." *AmEx III*, 2012 WL 284518, at \*13. In this Circuit, plaintiffs may make that showing by proving that enforcement of individual arbitration would bar plaintiffs from bringing their claims at all. *Id.* at \*11. But the "evidentiary record necessary to avoid a class-action arbitration waiver is not easily assembled," *id.*, and a court must review any such claim with "a healthy regard for the fact that the FAA 'is a congressional declaration of a liberal federal policy favoring arbitration agreements,'" *id.* at \*14 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)). Moreover, the FAA embodies a liberal federal policy favoring individual arbitration, because "classwide arbitration interferes with fundamental attributes of arbitration" and requiring it "creates a scheme inconsistent with the FAA." *Concepcion*, 131 S. Ct. at 1748.

### A. Plaintiffs Cannot Establish That Individual Arbitration Would Preclude Vindication Of Their Statutory Claims

Under the FAA, "the party opposing arbitration carries the burden of showing that Congress intended in a separate statute to preclude a waiver of judicial remedies, or that such a waiver of judicial remedies inherently conflicts with the underlying purposes of that other statute." *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 483 (1989). And where a statute does not preclude arbitral enforcement, "a party who agrees to arbitrate, but then asserts that his statutory claim cannot be vindicated in an arbitral forum, faces a heavy burden." *Johnson v. West Suburban Bank*, 225 F.3d 366, 369 (3d Cir. 2000).

Plaintiffs cannot meet that burden here. The antitrust statute does not provide a non-waivable right to pursue claims as a class. The Supreme Court has rejected the argument that the

unavailability of class arbitration inherently conflicts with the purposes underlying the Age Discrimination in Employment Act—even though that Act expressly mentions the right to pursue a class action, which the antitrust statutes do not. *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 32 (1991) ("[E]ven if the arbitration could not go forward as a class action or class relief could not be granted by the arbitrator, the fact that the [ADEA] provides for the possibility of bringing a collective action does not mean that individual attempts at conciliation were intended to be barred." (internal quotation marks omitted; second alteration in original)). Accordingly, under this Circuit's law, the plaintiffs must establish that individual arbitration would preclude them from pursuing their specific antitrust claims because "the cost of plaintiffs' individually arbitrating their dispute * * * would be prohibitive." *AmEx III*, 2012 WL 284518, at *12.

A plaintiff seeking to "invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive * * * bears the burden of showing the likelihood of incurring such costs." *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 92 (2000). "This burden is a substantial one and cannot be satisfied by a mere listing of ways that the arbitration proceeding will differ from a court proceeding, or by speculation about difficulties that *might* arise in arbitration." *In re Cotton Yarn Antitrust Litig.*, 505 F.3d 274, 286-87 (2007) (finding plaintiffs had not met burden to show class waiver precluded them from vindicating antitrust claims). A class action waiver can be held unenforceable as "conflict[ing] with congressional purposes" of the antitrust statutes only if it "make[s] it impossible to enforce [the plaintiffs'] rights under the Sherman Act." *AmEx III*, 2012 WL 284518, at *8 n. 5; *see also Mitsubishi*, 473 U.S. at 637 n.19 (indicating in dicta that an arbitration agreement might be "against public policy" if it "operated * * * as a prospective waiver" of antitrust claims). Furthermore, to establish impossibility, the plaintiff "must provide some individualized evidence that [he] will likely face prohibitive costs

in the arbitration at issue and that [he] is financially incapable of meeting those costs." *Livingston v. Assocs. Fin., Inc.,* 339 F.3d 553, 557 n.11 (7th Cir. 2003).   Plaintiffs' complaint provides no information regarding their expected costs, their ability to pay, or their expected recoveries.   Accordingly, plaintiffs have not met their burden to show that arbitration would entirely preclude vindication of their statutory rights within this Circuit's *American Express* rule.

Beyond that, even if plaintiffs could establish that vindicating their federal antitrust claim in arbitration would be cost prohibitive, that showing would not preclude enforcement of plaintiffs' agreement to arbitrate with respect to their state law claims.  *Green Tree*, 531 U.S. at 90 (acknowledging only the possibility "that the existence of large arbitration costs could preclude a litigant * * * from effectively vindicating her *federal* statutory rights in the arbitral forum") (emphasis added).  Most courts of appeal to have considered the question have held that the prohibitive-costs doctrine does not void arbitration agreements with respect to state law claims, or it is at least unclear whether the doctrine applies.  *See Stutler v. T.K. Constructors Inc.*, 448 F.3d 343, 346 (6th Cir. 2006) (prohibitive costs doctrine does not apply when "no federally protected interest is at stake"); *Brown v. Wheat First Secs., Inc.*, 257 F.3d 821, 825-26 (D.C. Cir. 2001) (same); *see also James v. McDonald's Corp.*, 417 F.3d 672, 679 (7th Cir. 2005) ("It remains unclear whether the rationale of *Green Tree* applies to situations that do not involve the assertion of federal statutory rights.").  And the Second Circuit's decision in *AmEx III* relied on the congressional intent underlying the *federal* antitrust statutes – not state law – to override the contrary policy of the FAA favoring individual arbitration.  *AmEx III*, 2012 WL 284518, at *13 ("Eradicating the private enforcement component from our antitrust law scheme cannot be what Congress intended * * *."); *see also Ragone*, 595 F.3d at 126 (noting in dicta that a plaintiff might "be able to demonstrate that these [arbitration] provisions were incompatible with her

ability to pursue her Title VII claims in arbitration, and therefore void under the FAA" without noting potential incompatibility with plaintiff's state law claims). Accordingly, the "rule regarding the arbitrability of federal statutory claims" applied in *AmEx III* does not apply to plaintiffs' state law claims. 2012 WL 284518, at \*10; *see also Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213 (1985) (holding the district court erred by not compelling arbitration on state law claims even though federal claims in suit were non-arbitrable).

### B.   The Second Circuit's Refusal To Enforce Class Action Waivers On The Ground That Small-Dollar Claims Would Go Unenforced Does Not Survive The Supreme Court's Decision In *AT&T v. Concepcion*

While this case is distinguishable from the Second Circuit's decision in *American Express* due to the lack of evidence of impossibility, it bears noting that the court's conclusion that enforcement of individual arbitration under the FAA presents an inherent conflict with the purposes of the substantive federal statute, *see AmEx III,* 2012 WL 284518, at \*8 n.5, any time it would not be "economically feasible" to pursue a federal statutory claim on an individual basis, *id.* at \*13, conflicts with Supreme Court precedent. Specifically, the Second Circuit's economic feasibility rule for class-action waivers is an unwarranted extension of *Green Tree* and *Mitsubishi* and cannot survive the Supreme Court's decision in *Concepcion* prohibiting the invalidation of arbitration agreements on the basis of the unconscionability of class-action waivers under state law.[11]

The liberal federal policy favoring arbitration "may be overridden by a contrary congressional command," although the "burden is on the party opposing arbitration" to demonstrate "an inherent conflict between arbitration and the statute's underlying purposes." *Shearson/Am. Exp.,* 482 U.S. at 226-27. No such conflict exists "so long as the prospective

---

[11] Penguin recognizes that this Court is bound by the Second Circuit's decision in *American Express*, but presents these arguments for the purpose of preserving the issue for appeal.

litigant effectively may vindicate its statutory cause of action in the arbitral forum." *Mitsubishi*, 473 U.S. at 637.   In *American Express*, the Second Circuit held that a party was effectively precluded from vindicating its statutory rights by an arbitration agreement precluding class actions if it was not "economically feasible" to pursue an individual arbitration, or if a claim "cannot reasonably be pursued as individual actions." *AmEx III*, 2012 WL 284518, at *13; *see also id.* at *14 (individual actions are "financially impossible").

The decision relies on two cases in which the Supreme Court suggested, but never held, that some circumstances might prevent a party from being able to effectively vindicate its statutory rights.  *AmEx III*, 2012 WL 284518, at *12 (relying on *Green Tree* and *Mitsubishi* as binding authority unchanged by *Concepcion*).   First, in *Mitsubishi*, the Supreme Court noted in dicta that "in the event the choice-of-forum and choice-of-law clauses [in an arbitration agreement] operated in tandem as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy."  473 U.S. at 637 n.19.   Second, in *Green Tree* the Supreme Court stated that it "may well be that the existence of large arbitration costs could preclude a litigant * * * from effectively vindicating her federal statutory rights in the arbitral forum," but held the record would not sustain any such claim in that case.   531 U.S. at 90.   Neither decision supports adoption of an economic feasibility rule for class-action waivers.

The potential "prospective waiver" at issue in *Mitsubishi* was the possibility that a prospective litigant might be barred altogether from asserting particular causes of action in the arbitral forum.   No such flat bar would apply here or in the *American Express* case.   The plaintiffs here and in *American Express* are able to raise their antitrust claims in the arbitral forum and are entitled to all damages and costs authorized by law, including treble damages.   *See*

21

*In re Am. Exp. Merchs.' Litig.*, 554 F.3d 300, 317-18 (2d Cir. 2009) ("*AmEx I*").  A class-action waiver affects neither the plaintiffs' substantive rights nor the remedies to which they are entitled.  As the Second Circuit recognized, "insofar as a plaintiff may be said to possess a 'right' to litigate an action in federal court as a class action * * *, the right 'is a procedural right only, ancillary to the litigation of substantive claims.'"  *Id.* at 312 (quoting *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 332 (1980)).  Where the substantive claims can be determined, no sufficient impairment of statutory rights arises.

Nor does the class-action waiver create greater costs for accessing the arbitral forum than would exist for litigation.  It is those costs—costs unique to arbitration as compared to the courts—that concerned the Supreme Court in *Green Tree*.  *See* 531 U.S. at 84 (plaintiff's claim about prohibitive costs involved "payment of filing fees, arbitrators' costs, and other arbitration expenses").  Indeed, the Supreme Court expressly declined to reach the question whether a class-action waiver could render the arbitration agreement unenforceable in that case, *id.* at 92 n.7, and the court of appeals concluded that it did not on remand, *Randolph v. Green Tree Fin. Corp.-Ala.*, 244 F.3d 814 (11th Cir. 2001).

Costs unique to arbitration that preclude a litigant, based on her individual situation, from being able to even access the arbitral forum might effectively preclude her ability to vindicate her statutory rights under *Green Tree*.  But a plaintiff that incurs no costs unique to arbitration cannot claim that the arbitral forum is prohibitively expensive.  *See James*, 417 F.3d at 680 ("The cost differential between arbitration and litigation is evidence highly probative to [plaintiff's] claim that requiring her to proceed through arbitration, rather than through the courts, will effectively deny her legal recourse."); *Bradford v. Rockwell Semiconductor Sys., Inc.*, 238 F.3d 549, 556 (4th Cir. 2001) ("[W]e fail to see how a claimant could be deterred from pursuing his statutory rights

in arbitration * * * where the overall cost of arbitration is otherwise equal to or less than the cost of litigation in court."); *see also Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1484 (D.C. Cir. 1997) ("[I]t is unacceptable to require Cole to pay arbitrators' fees, because such fees are unlike anything that he would have to pay to pursue his statutory claims in court.").

The *American Express* decision turned upon costs that are the same between the arbitral forum and the courts—expert witness fees.  The decision thus invalidates class waivers not based on any characteristic unique to the arbitral forum, as in *Green Tree*, but based on its judgment that parties cannot contractually waive their right to pursue a class action (in either forum) when their claims "cannot reasonably be pursued as individual actions."  *AmEx III*, 2012 WL 284518, at *13.  That does not fall within the terms of the vindication doctrine in *Green Tree* and *Mitsubishi*, which is concerned with arbitration characteristics that close the door entirely to claims, not with the economic feasibility of bringing small-dollar, large-cost claims in either arbitration or litigation.  But if there were any doubt whether *Green Tree* and *Mitsubishi* extended to this situation—when a plaintiff's vindication of his rights would be possible, but fiscally suboptimal—the Supreme Court's decision in *Concepcion* settles the matter.  There, the Court rejected exactly the same objection to enforcement of arbitration agreements, albeit arising under state law—that "class proceedings are necessary to prosecute small-dollar claims that might otherwise slip through the legal system."  131 S. Ct. at 1753.  The potential loss of some claims does not override the FAA's policy favoring arbitration.  *Id.*  Moreover, a policy favoring individual arbitration is part and parcel of the policy enacted in the FAA because "classwide arbitration interferes with fundamental attributes of arbitration."  *Id.* at 1748; *see also Johnson*, 225 F.3d at 375 ("Whatever the benefits of class actions, the FAA '*requires* piecemeal resolution

23

when necessary to give effect to an arbitration agreement.'" (quoting *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 20)).

*Concepcion* was, of course, a preemption case.  While States may not override the FAA's mandate to enforce agreements to arbitrate individual claims, other federal statutes can.  But nothing in the antitrust statute or its purposes requires that parties be precluded from waiving the class action procedure simply because that waiver turns out to make some small-dollar claims uneconomical.

In *American Express*, the Second Circuit found inherent conflict between enforcing individual arbitration and the antitrust statute's provision for private enforcement.  *AmEx III*, 2012 WL 284518, at *13 ("Eradicating the private enforcement component from our antitrust law scheme cannot be what Congress intended when it included strong private enforcement mechanisms and incentives in the antitrust statutes.").  But simply because Congress provided substantial incentives for private enforcement—including treble damages, attorneys' fees, and recovery of the cost of suit, 15 U.S.C. § 15(a)—does not mean that Congress intended the antitrust statute's private enforcement statute to override the FAA when a plaintiff's potential heavily incentivized recovery remained so small that the claim was not economically attractive to pursue, although it was available in arbitration.

Class actions can be an effective tool for vindicating small antitrust claims.  *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 161 (1974).  But the Supreme Court has recognized that provision of attorneys' fees and costs, which are available in the arbitration provided for in this case, also serve that purpose.  *See Hudson v. Michigan*, 547 U.S. 586, 597 (2006) (rejecting the argument that "it would be very hard to find a lawyer to take a case such as this" because the provision for attorney's fees "answers this objection").  And simply because the class action

procedure might further some goals of private antitrust enforcement does not mean that Congress precluded waiver of that procedure in order to save private enforcement of all small-dollar claims. *Cf. Gilmer*, 500 U.S. at 32 (rejecting argument that "arbitration procedures cannot adequately further the purposes of [a statute] because they do not provide for broad equitable relief and class actions").

It is particularly inapt to presume that Congress silently intended to override the FAA and require private enforcement by class action in antitrust cases whenever a plaintiff might decide that an individual action would not be worth the candle, because the antitrust statutes do not mention class actions and the modern class action mechanism did not emerge until long after the enactment of the Sherman and Clayton Acts. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997) (noting that Rule 23 "gained its current shape in an innovative 1966 revision"); *see also AmEx III*, 2012 WL 284518, at *13 (quoting law review article noting that "since the 1966 amendments to Rule 23 were adopted" antitrust class actions have been particularly effective).

Moreover, even when waiver of the class mechanism renders some small claims economically unattractive, it does not mean, as the Second Circuit found, that the "defendant will thus have immunized itself against all such antitrust liability[.]" *AmEx III*, 2012 WL 284518, at *14. Private enforcement supplements other avenues for enforcing the federal antitrust laws, such as litigation by the United States, 15 U.S.C. § 4. The unavailability of class procedures is no rationale for overriding the FAA's policy favoring individual arbitration when other avenues of enforcement remain. *Gilmer*, 500 U.S. at 32 ("[I]t should be remembered that arbitration agreements will not preclude the *EEOC* from bringing actions seeking class-wide and equitable relief."); *see also Gay v. CreditInform*, 511 F.3d 369, 382-83 (3d Cir. 2007) ("[T]hese provisions

for administrative enforcement [in the Credit Repair Organizations Act] supply procedures for obtaining remedies reasonably substituting for those available in a class action.").

In short, even when the cost-benefit analysis indicates that pursuing a small claim is uneconomical, the antitrust statutes do not override the FAA and require that a class mechanism be made available despite a plaintiff's agreement otherwise.  Where a plaintiff has agreed to individual arbitration, is not barred from accessing the arbitral forum, incurs no costs unique to arbitration, is able to assert all of his statutory claims in arbitration, and is entitled receive all of the statutory relief that he would receive in court, then he "effectively may vindicate [his] statutory cause of action in the arbitral forum." *Mitsubishi*, 473 U.S. at 637.  The FAA therefore mandates enforcement of the arbitration agreement to which he consented.  The Supreme Court's decision in *Concepcion* ends any doubt that the FAA can be overcome simply because plaintiffs might choose not to bring some "small-dollar claims" in arbitration.  131 S. Ct. at 1753.

## CONCLUSION

For the foregoing reasons, this Court should grant Penguin's motion to stay the proceedings and compel arbitration of the claims arising out of purchases of eBooks through Amazon and Barnes & Noble.

AKIN GUMP STRAUSS HAUER & FELD LLP

By:  /s/ Daniel Ferrel McInnis
Daniel Ferrel McInnis
David A. Donohoe
Allison Sheedy
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036-1564
Telephone: 202-887-4000
Facsimile: 202-887-4288
dmcinnis@akingump.com
ddonohoe@akingump.com
asheedy@akingump.com

*Attorneys for Defendant Penguin Group (USA),
Inc.*

March 2, 2012