UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE ELECTRONIC BOOKS ANTITRUST LITIGATION | No.  11-md-02293 (DLC)<br>ECF Case |
| This Document Relates to:<br><br>ALL ACTIONS | CLASS ACTION |

**PLAINTIFFS' CONSOLIDATED OPPOSITION
TO DEFENDANTS' MOTIONS TO DISMISS**

# TABLE OF CONTENTS

**Page(s)**

I.  SUMMARY OF ARGUMENT ...................................................................................1

    A.  According to the Supreme Court, Plaintiffs' Factual Allegations Are
        Sufficient to State a Claim – and if Proven – Sustain an Antitrust
        Conspiracy Verdict .............................................................................................1

    B.  Plaintiffs Allege Numerous "Plus Factors" Similar to Those the Second
        Circuit Recently Found Sufficient to State a Price-Fixing Claim...........................3

    C.  Plaintiffs Are Not Required to "Win" the Battle of the Inferences at the
        Pleading Stage...................................................................................................4

    D.  Defendants' Conspiracy to Raise eBook Prices Harmed Competition and
        Consumers........................................................................................................6

II.  ARGUMENT .......................................................................................................8

    A.  Legal Standards.................................................................................................8

        1.  Section 1 of the Sherman Act Absolutely Prohibits All Horizontal
            Agreements on Pricing.............................................................................8

        2.  *Twombly* Requires Only that Plaintiffs Plausibly Allege a
            Conspiracy to Restrain Trade.....................................................................8

        3.  A Conspiratorial Agreement Is Commonly Shown Through
            Circumstantial Evidence .........................................................................10

    B.  Plaintiffs Allege Sufficient Circumstantial Facts to Plausibly State a Claim........13

        1.  The Context and Specificity of Plaintiffs' Allegations Plausibly
            Suggest Defendants Coordinated Their Actions.........................................13

             a.  The Coordinated "Windowing" of eBooks...................................13

             b.  The Coordinated Adoption of the Agency Model and Price
                 Increases...................................................................................15

             c.  The Coordinated Restraint of eBook Sales to Other E-
                Retailers ...................................................................................16

             d.  Plaintiffs Detail Overt Acts in Furtherance of Defendants'
                Conspiracy, Such as Who, How and When ..................................17

010260-11  507247 V5
11-md-02293 (DLC)

2.    In a Comparable Context, the Supreme Court Held Proof of Coordinated Activity Similar to the Facts Plaintiffs Allege Here Violates the Sherman Act ........................................................................18

C.    Plaintiffs Allege Additional Plus Factors Supporting the Plausibility of the Alleged Conspiracy Consistent with the Second Circuit's Recent Decision in *Starr* ...............................................................................................................21

1.    Inter-firm Communications and Opportunities to Conspiracy .................23

a.    Defendants Communicate Their Desire and Intent to Increase Industry eBook Prices.......................................................23

b.    Steve Jobs Admitted, Before Selling a Single iPad, that Defendants Succeeded in Agreeing to Raise and Stabilize eBook Industry Prices ..................................................................25

c.    Additional Opportunities to Conspire Through Industry Associations ...................................................................................26

2.    Defendants Raised Prices Simultaneously Under the Agency Model Even Though EBook Costs Were Not Increasing ..........................27

3.    Defendants' Adoption of the Agency Model Was Simultaneous – Not Sequential – and Structural ................................................................29

4.    Defendants Share Motives to Conspire.....................................................31

5.    Without Collective Involvement, the Agency Model Was Against Each Defendant's Short-Term and Long-Term Independent Business Interests................................................................................................32

6.    The Publisher Defendants' Uniform Refusal to Sell EBooks Under the Wholesale Model that Existed for Centuries Supports the Inference of a Conspiracy Here ...............................................................34

7.    The Market for EBooks Is Concentrated ...................................................35

8.    Defendants' Collusive Price-Fixing Is the Subject of Pending Investigations by Multiple Governmental Agencies and a Threatened Civil Complaint by the Department of Justice.......................35

D.    Defendants' Arguments Rely on Facts Contrary to Plaintiffs' Allegations, Misstate the Law, or Improperly Proffer Explanations .........................................36

1.    The Simultaneous Timing and Identical Contract Terms Support the Inference of a Conspiracy ...................................................................38

- ii -

a. The Simultaneous Switch to the Agency Model and Threatened Boycott of Amazon Lends Support to Plaintiffs' Allegations of Collusive Conduct ...................................39

b. Identical Contract Terms Support Plaintiffs' Allegations of Conspiracy ...................................................................................40

2. Plaintiffs' Pricing Allegations Plausibly Support a Claim of a Horizontal Conspiracy ...............................................................41

3. The Publisher Defendants' Counter-Factual Justifications for Their Collusive Behavior Are Factually Incorrect, and in Any Event, Improperly Raised at the Pleading Stage .....................................43

4. Apple's Legal Response to Amazon's Prices Cannot Be an Agreement to Fix Prices.......................................................................45

5. Apple Is Incorrect that the Hub of a Conspiracy Must Be a "Dominant Purchaser or Supplier" in the Market.......................................47

6. Plaintiffs Adequately Allege that Apple Participated in Conspiracy.........48

E. The Alleged Conspiracy Is Subject to *Per Se* Condemnation ..............................50

F. If Analyzed Under the Rule of Reason, the Complaint Sufficiently Alleges Anticompetitive Effects ...........................................................................53

G. Plaintiffs' State Antitrust Claims Should Not Be Dismissed.................................55

H. Plaintiffs' State Unjust Enrichment Claims Should Not Be Dismissed ................56

I. If this Court Finds that Plaintiffs' Complaint Fails to State a Plausible Conspiracy, Plaintiffs Request Leave to Allege Specific Additional Facts..........57

III. CONCLUSION.................................................................................................................58

010260-11  507247 V5
11-md-02293 (DLC)

## TABLE OF AUTHORITIES

<u>Page(s)</u>

### FEDERAL CASES

*Am. Needle, Inc. v. Nat'l Football League,*
    _ U.S. _, 130 S. Ct. 2201 (2010)......................................................................52

*Am. Tobacco Co. v. United States,*
    328 U.S. 781 (1946).......................................................................................11

*Ambook Enters. v. Time Inc.,*
    612 F.2d 604 (2d Cir. 1979)................................................................31, 32, 34

*Anderson News, L.L.C. v. Am. Media, Inc.,*
    732 F. Supp. 2d 389 (S.D.N.Y. 2010)..............................................................20, 21

*Apex Oil Co. v. DiMauro,*
    822 F.2d 246 (2d Cir. 1987)................................................................11, 23, 32

*Ariz. v. Maricopa Cnty. Med. Soc'y,*
    457 U.S. 332 (1982)................................................................................8, 42, 50

*Ashcroft v. Iqbal,*
    129 S. Ct. 1937 (2009).......................................................................................37, 38

*Associated Container Transp. (Austl.), Ltd. v. United States,*
    705 F.2d 53 (2d Cir. 1983)................................................................12, 36

*Atl. Richfield Co. v. USA Petroleum Co.,*
    495 U.S. 328 (1990).......................................................................................54, 55

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)................................................................................ *passim*

*Beltz Travel Serv., Inc. v. Int'l Air Trans. Ass'n,*
    620 F.2d 1360 (9th Cir. 1980) ......................................................................49

*C-O-Two Fire Equip. Co. v. United States,*
    197 F.2d 489 (9th Cir. 1952) ......................................................................27

*CDC Techs., Inc. v. IDEXX Labs., Inc.,*
    186 F.3d 74 (2d Cir. 1999)......................................................................53

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.,*
    370 U.S. 690 (1962)................................................................21, 22, 26, 48

- iv -

*Cool Wind Ventilation Corp. v. Sheet Metal Workers Int'l Ass'n, Local Union No. 28*,
   139 F. Supp. 2d 319 (E.D.N.Y. 2001) ........................................................................54

*Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*,
   637 F.2d 105 (3d Cir. 1980) .......................................................................................11

*Esco Corp. v. United States*,
   340 F.2d 1000 (9th Cir. 1965) ...................................................................................11

*Fears v. Wilhelmina Model Agency, Inc.*,
   2004 U.S. Dist. LEXIS 5045 (S.D.N.Y. Mar. 29, 2004) ...........................23, 34, 48

*FTC v. Ind. Fed'n of Dentists*,
   476 U.S. 447 (1986) ...................................................................................................53

*FTC v. Superior Ct. Trial Lawyers Ass'n*,
   493 U.S. 411 (1990) ........................................................................................ *passim*

*Habitat, Ltd. v. Art of the Muse, Inc.*,
   2009 U.S. Dist. LEXIS 25096 (E.D.N.Y. Mar. 25, 2009) ........................................53

*Hinds Cnty. v. Wachovia Bank N.A.*,
   790 F. Supp. 2d 106 (S.D.N.Y. 2011) .......................................................................49

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*,
   602 F.3d 237 (3d Cir. 2010) .......................................................................................47

*Illinois Brick Co. v. Illinois*,
   431 U.S. 720 (1977) ...................................................................................................56

*In re In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   738 F. Supp. 2d 1011 (N.D. Cal. 2010) .....................................................................49

*In re Currency Conversion Fee Antitrust Litig. v. Am. Express Co.*,
   773 F. Supp. 2d 351 (S.D.N.Y. 2011) .......................................................................11

*In re Digital Music Antitrust Litig.* ("*In re Digital I*"),
   592 F. Supp. 2d 435 (S.D.N.Y. 2008) .................................................................30, 55

*In re Digital Music Antitrust Litig.* ("*In re Digital II*"),
   812 F. Supp. 2d 390 (S.D.N.Y. 2011) .......................................................................56

*In re Ditropan XL Antitrust Litig.*,
   529 F. Supp. 2d 1098 (N.D. Cal. 2007) .....................................................................57

*In re Ethylene Propylene Diene Monomer (EDPM) Antitrust Litig.*,
   681 F. Supp. 2d 141 (D. Conn. 2009) ........................................................................37

*In re Fine Paper Antitrust Litig.*,
  685 F.2d 810 (3d Cir. 1982)................................................................49

*In re Flash Memory Antitrust Litig.*,
  643 F. Supp. 2d 1133 ...............................................................26, 49

*In re Flat Glass Antitrust Litig.*,
  385 F.3d 350 (3d Cir. 2004)................................................31, 32

*In re Ins. Brokerage Antitrust Litig.*,
  618 F.3d 300 (3d Cir. 2010)................................................................51

*In re NASDAQ Market-Makers Antitrust Litig.*,
  929 F. Supp. 723 (S.D.N.Y. 1996).......................................12, 27

*In re Nifedipine Antitrust Litig.*,
  335 F. Supp. 2d 6 (D.D.C. 2004) ..........................................................49

*In re NYSE Specialists Sec. Litig.*,
  503 F.3d 89 (2d Cir. 2007)......................................................4, 12

*In re OSB Antitrust Litig.*,
  2007 U.S. Dist. LEXIS 56573 (E.D. Pa. Aug. 3, 2007).................12, 49

*In re Plywood Antitrust Litig.*,
  655 F.2d 627 (5th Cir. 1981) .............................................................23

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
  580 F. Supp. 2d 896 (N.D. Cal. 2008) ...................................12, 26

*In re Text Messaging Antitrust Litig.*,
  630 F.3d 622 (7th Cir. 2010) ..............................................11, 20

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  2009 U.S. Dist. LEXIS 17792 (N.D. Cal. Mar. 3, 2009)........................12

*In re Transpac. Passenger Air Transp. Antitrust Litig.*,
  2011 U.S. Dist. LEXIS 49853 (N.D. Cal. May 9, 2011) ......................26

*In re WellPoint, Inc. Out-of-Network "UCR" Rates Litig.*,
  2011 U.S. Dist. LEXIS 89512 (C.D. Cal. Aug. 11, 2011)....................26

*Interstate Circuit, Inc. v. United States*,
  306 U.S. 208 (1939)................................................................ *passim*

*James Julian, Inc. v. Raytheon Co.*,
  557 F. Supp. 1058 (D. Del. 1983)...........................................................11

*K.M.B. Warehouse Distribs, Inc.. v. Walker Mfg. Co.*,
    61 F.3d 123 (2d Cir. 1995)..................................................................54

*Kiefer-Stewart Co. v. Joseph E. Seagram & Sons*,
    340 U.S. 211 (1951)................................................................8,42, 50

*Kleen Prods., LLC v. Packaging Corp. of Am.*,
    775 F. Supp. 2d 1071 (N.D. Ill. 2011) ...............................................20

*Koch Indus., Inc. v. Hoechst Aktiengesellschaft*,
    727 F. Supp. 2d 199 (S.D.N.Y. 2010)................................................56

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007)..................................................................8, 52

*MacMillan Bloedel, Ltd. v. The Flintkote Co.*,
    760 F.2d 580 (5th Cir. 1985) ...........................................................56

*Matsushita Elec. Indus. Co., Ltd.. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986).......................................................................37

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
    465 U.S. 752 (1984)................................................................13, 31

*Monument Builders of Greater Kansas City Inc. v. Am. Cemetery Ass'n of Kansas*,
    891 F.2d 1473 (10th Cir. 1989) .......................................................27

*Mylan Labs., Inc. v. Akzo, N.V.*,
    770 F. Supp. 1053 (D. Md. 1991) ....................................................12

*Petruzzi's IGA Supermarkets, Inc. v. Darling- Delaware Co.*,
    998 F.2d 1224 (3d Cir. 1993)..........................................................23

*Porat v. Lincoln Towers Cmty. Ass'n*,
    464 F.3d 274 (2d Cir. 2006)...........................................................57

*Redbox Automated Retail LLC v. Universal City Studios LLP*,
    2009 U.S. Dist. LEXIS 72700 (D. Del. Aug. 17, 2009) .........................54

*Rowe Entm't, Inc. v. The William Morris Agency, Inc.*,
    2000 U.S. Dist. LEXIS 9256 (S.D.N.Y. July 6, 2000) ..........................32

*Sony Elecs., Inc. v. Soundview Techs., Inc.*,
    157 F. Supp. 2d 180 (D. Conn. 2001)...........................................11, 23

*Starr v. Baca*,
    652 F.3d 1202 (9th Cir. 2011) ....................................................38, 40

*Starr v. Sony BMG Music Entm't,*
   592 F.3d 314 (2d Cir. 2010)..................................................................*passim*

*Taxi Weekly, Inc. v. Metro. Taxicab Bd. of Trade, Inc.,*
   539 F.2d 907 (2d Cir. 1976)..............................................................................29

*Theatre Enters., Inc. v. Paramount Film Distrib. Corp.,*
   346 U.S. 537 (1954)..........................................................................................11

*Todd v. Exxon Corp.,*
   275 F.3d 191 (2d Cir. 2001)........................................................................22, 53

*Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.,*
   530 F.3d 204 (3d Cir. 2008)..............................................................................52

*Toys "R" Us, Inc. v. FTC*
   221 F.3d 928 (7th Cir. 2000) ........................................................................*passim*

*U.S. Info. Sys., Inc. v. IBEW Local Union No. 3,*
   2002 U.S. Dist. LEXIS 1038 (S.D.N.Y. Jan. 23, 2002) ....................................54

*United States v. Consol. Packaging Corp.,*
   575 F.2d 117 (7th Cir. 1978) ............................................................................11

*United States v. Socony-Vacuum Oil,*
   310 U.S. 150 (1940)......................................................................8, 46, 50, 51

*United States v. Trans-Mo. Freight Ass'n,*
   166 U.S. 290 (1897)............................................................................................8

*United States v. Trenton Potteries Co.,*
   273 U.S. 392 (1927)............................................................................................8

*Wallach v. Eaton Corp.,*
   2011 U.S. Dist. LEXIS 112480 (D. Del. Sept. 30, 2011) ..................................48

*Wellnx Life Scis., Inc. v. Iovate Health Scis. Research Inc.,*
   516 F. Supp. 2d 270 (S.D.N.Y. 2007)............................................................20, 21

## FEDERAL STATUTES

15 U.S.C. § 1 ....................................................................................................*passim*

15 U.S.C. § 1312 ............................................................................................12, 36

47 U.S.C. § 151................................................................................................9

**FEDERAL RULES**

Federal Rule of Civil Procedure 8 ........................................................................9, 17, 58

Federal Rule of Civil Procedure 12(b)(6) ..................................................................8, 38

## OTHER AUTHORITIES

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ..................................................... *passim*

Richard A. Posner, *Antitrust Law* 88 (2d ed. 2001)....................................................27, 29, 35, 41

010260-11  507247 V5
11-md-02293 (DLC)

# I.    SUMMARY OF ARGUMENT

## A.    According to the Supreme Court, Plaintiffs' Factual Allegations Are Sufficient to State a Claim – and if Proven – Sustain an Antitrust Conspiracy Verdict

In *Bell Atl. Corp. v. Twombly*, the Supreme Court made clear that when pleading an antitrust conspiracy complaint, the plaintiff need only allege "enough factual matter (taken as true) to suggest that an agreement was made."[1]  And the Supreme Court and all parties recognized in *Twombly*:  "***complex and historically unprecedented changes in pricing structure*** made at the very same time by multiple competitors, and made for no other discernible reason, would support a plausible inference of conspiracy."[2]

Here, Plaintiffs allege exactly such conduct in the eBook industry.  Faced with eBook prices Defendants – but certainly not consumers – deemed "too low," Defendants ***simultaneously*** implemented their unprecedented strategy in the book industry to restructure and raise industry prices.  They did it in three coordinated steps.

*First*, four of the Publisher Defendants[3] announced ***within twelve days of each other*** that they would start "windowing" the release of new eBook titles, immediately after Amazon.com, Inc. ("Amazon") refused an invitation to solve the "industry problem" by agreeing to raise its consumer-friendly $9.99 pricing practice.  That is, they decided and informed industry leader Amazon ***at the same time***, that they would punish Amazon's commitment to a $9.99 price

---

[1]    *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  All internal citations and quotations omitted, and all emphasis added, unless otherwise indicated.

[2]    *Id.* at 557.

[3]    "Publisher Defendants" refers to Hachette Book Group, Inc., Hachette Digital, Inc., HarperCollins Publishers, L.L.C. ("collectively, "Hachette"), Holtzbrinck Publishers, LLC d/b/a Macmillan ("Macmillan"), Penguin Group (USA) Inc. ("Penguin"), Simon & Schuster, Inc., and Simon & Schuster Digital Sales, Inc. (collectively, "Simon & Schuster").

- 1 -

ceiling for eBooks by withholding the release of their eBook titles until several months after the release of hardcover titles.  ¶¶ 100-107.[4]

*Next*, because "windowing" only delayed Amazon's low-cost pricing, but would not necessarily force Amazon to raise its eBook prices, the Publisher Defendants seized on the entry of a new participant in eBook sales, Apple Inc. ("Apple"), to implement an unprecedented change to the pricing structure of eBooks.  Through a series of agreements with Apple **negotiated at the same time**, the Publisher Defendants implemented a new pricing model – the agency model – which allowed the Publisher Defendants to set the retail prices of eBooks. ¶¶ 127-129.  This was an unprecedented industry shift in pricing control (and sales model) in the book industry.  ¶ 126.

*Finally*, Defendants **simultaneously** coordinated the enforcement of the agency model on other e-retailers beyond Apple, including Amazon.  The Publisher Defendants uniformly refused to make their newly released eBook titles available to Amazon and other e-retailers besides Apple – unless the e-retailer agreed to switch to the agency model.  Amazon initially attempted to resist the Publisher Defendants' group boycott, but eventually it acquiesced and adopted the agency model.  ¶¶ 137-161.  These facts are not only sufficient to state a claim, if proven, these facts are sufficient to sustain Plaintiffs' verdict at trial.

More than seventy years ago the Supreme Court faced strikingly similar facts.  In *Interstate Circuit*,[5] a group of eight movie distributors simultaneously negotiated and agreed to identical contract terms with a movie exhibitor.  Each of the eight movie distributors knew that its competitors were presented a similar proposal, and the proposed terms would have been

---

[4]    All "¶_" references are to the Consolidated Amended Class Action Complaint, unless otherwise indicated. ECF No. 47, Jan. 20, 2012.

[5]    *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 226-27 (1939).

against each distributor's economic self-interest if it alone agreed.  In holding that these facts established a *per se* violation of the Sherman Act by the film distributors and exhibitor as a matter of law, the Supreme Court observed:  "[I]t taxes credulity to believe that the several distributors would . . . have accepted and put into operation with substantial unanimity such far-reaching changes in their business methods without some understanding that all were to join."[6]

As in *Interstate Circuit*, the facts Plaintiffs allege here are sufficient to sustain a trial verdict – let alone sufficient for Plaintiffs to state a claim.

**B.    Plaintiffs Allege Numerous "Plus Factors" Similar to Those the Second Circuit Recently Found Sufficient to State a Price-Fixing Claim**

In addition to the foregoing, Plaintiffs include "plus factors" recognized by both the Supreme Court in *Twombly* and more recently, the Second Circuit in *Starr v. Sony BMG Music Entm't*, to plausibly suggest that Defendants engaged in price-fixing.[7]  These plus factors include:

- private and public statements made by Defendants suggesting a common view of an "industry problem" that required a coordinated response (¶¶ 99-109);

- opportunities to conspire and signal intentions to one another through trade associations, the media and third-party intermediaries (¶¶ 5, 79-82,  101, 153);

- the date and place of meetings where the price-fixing was coordinated, including the identities of the individuals involved (¶ 152);

- a simultaneous and unprecedented price increase of thirty to forty percent unrelated to an increase in costs (¶¶ 199-203);

- a recent history of engaging in related simultaneous conduct (¶99-109);

- a common motive to price-fix (the elimination of price competition in the retail market for eBooks) (¶ 119);

---

[6]    *Id.* at 223.

[7]    *Starr v. Sony BMG Music Entm't*, 592 F.3d 314 (2d Cir. 2010), *cert. denied*, _U.S. _, 131 S. Ct. 901 (2011).

- action that would have been against each Defendant's self-interest without collective involvement (¶¶ 139-143);

- coercion in the form of simultaneous boycotts and refusals to deal (¶¶ 145-166);

- a highly concentrated market (¶¶ 57, 143, 146); and

- government investigations into Defendants' apparent collusion (¶¶ 191-198).

The plus factors that Plaintiffs allege here are equally, if not more powerful, than those present in *Starr*.

## C.   Plaintiffs Are Not Required to "Win" the Battle of the Inferences at the Pleading Stage

Defendants' fundamental argument is that their actions may ultimately be explained by alternative, non-conspiratorial inferences.  But when deciding a motion to dismiss, the Court must accept all well-pleaded facts, and Plaintiffs are entitled to all reasonable inferences therefrom.[8]  Stated plainly, Plaintiffs are not required to defeat Defendants' proffered competing inferences at this stage.

This standard is the same when analyzing allegations of parallel conduct.  As the Second Circuit recently explained in *Starr*:  although "for purposes of summary judgment a plaintiff must present evidence that tends to exclude the possibility of independent action . . . to survive a motion to dismiss, plaintiffs need only enough factual matter (taken as true) to suggest that an agreement was made."[9]  And even though Plaintiffs are not required to defeat Defendants'

---

[8]   *See, e.g., In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 91 (2d Cir. 2007), *cert. granted*, 260 F.R.D. 55 (S.D.N.Y. 2009)  (at the motion to dismiss stage, the court "must take the facts alleged in the complaint as true, drawing all reasonable inferences in . . . Plaintiffs' favor").

[9]   *Starr*, 592 F.3d at 325 (noting that in *Twombly* "[T]he Supreme Court did not hold that the same standard applies to a complaint and a discovery record . . . . The 'plausibly suggesting' threshold for a conspiracy complaint remains considerably less than the 'tends to rule out the possibility' standard for summary judgment.").

- 4 -

alternative, purportedly innocent explanations, here those explanations are readily belied by the complaint's allegations.

Contrary to Defendants' claims, it was not in each Publisher Defendant's ***independent*** economic interest to enter into agency model contracts with Apple and then refuse to sell Amazon its eBooks under the wholesale model.  For this to be true, each firm would needed to have been better off ***if it alone*** had engaged in the challenged conduct – that is, enter into an agency model contract with Apple, raise its prices for its eBook titles thirty to forty percent, and then refuse to sell to Amazon unless Amazon agreed to the agency model and the price increases. But the complaint clearly shows otherwise.  ¶¶ 13, 15, 19, 139, 142-143.

If only a single firm entered into the agency model with Apple without regard to its competitors doing the same, that individual firm would have:  (1) significantly lowered its eBook per unit revenue – even if retail prices increased thirty to forty percent, as they did (¶ 84); (2) slowed its sales growth of eBooks due to higher prices (¶ 88); (3) acting alone not been able to force Amazon to relent on its commitment to lower prices and the wholesale model by withholding its eBooks (¶¶ 100-109); (4) cut-off eighty to ninety percent of its eBook sales to Amazon in exchange for sales through Apple's iBook store, a market participant with zero percent market sales (¶ 109); (5) almost guaranteed losing substantial sales by raising prices thirty to forty percent above its competitors (¶¶ 187-190); and (6) had no realistic likelihood of achieving its object to slow eBooks from eroding industry physical book sales (¶¶ 70-93).

Apple understood these industry dynamics as well. Apple could not succeed in killing Amazon's competitive eBook pricing advantage without ensuring a sufficient number of publishers would agree to the plan.  ¶ 120.  Thus, if a single firm were to view itself as an independent actor entering an agency model contract with Apple, it would have been clearly

- 5 -

against that firm's independent economic interests to do so.  Instead, the goals hoped to be achieved by agreeing to the agency model (higher industry eBook prices and slowing physical book sales erosion) were only conceivably in the Defendants' economic interests if a critical number of publishers agreed to jump simultaneously.  Defendants were not acting unilaterally – instead they agreed to rely on "safety in numbers."  ¶ 15.

And finally, Defendants' suggestion is flatly wrong that the agency model was simply the natural, independent response necessary in order to stimulate entry into the eBook market to compete with Amazon.  In fact, only two months before Defendants entered into their agency model contracts, Barnes & Noble entered the eBook market with its Nook e-reader – *using the wholesale model*.  ¶ 67.

## D.     Defendants' Conspiracy to Raise eBook Prices Harmed Competition and Consumers

Defendants advance a theme throughout their arguments to justify their conduct based on Amazon's pricing strategy.  Their theme is contrary to fundamental antitrust principles.  This lawsuit is about harm to consumers of eBooks.  It is not about whether Defendants' conduct harmed Amazon.   As this Court well knows, antitrust law protects competition and consumer welfare – not competitors.  Harm to competition unquestionably occurs when competitors work together to increase consumer prices – as the Defendants clearly did here.

Amazon was the innovator in the eBook market.  It spent years investing in eBook technology and developing a successful distribution platform.  Amazon invested in research and development, hardware costs, marketing and its pricing strategy.  As a result of "building a better mousetrap," buyers (consumers) and sellers (book publishers and authors) rewarded Amazon.  Many would describe Amazon's efforts as the consummate example of market competition working to benefit consumers:  Investment in an innovative technology resoundingly adopted by

- 6 -

consumers based on efficiency gains and lower prices.  And the fact that Amazon's efforts were seen as a disruptive force to an aging industry is exactly the lifecycle that has been the hallmark of innovation and competition for centuries.  ¶¶ 1-3, 61-69.

Hand-written books lost sales when Gutenberg invented the printing press, demand for horse-and-buggies dropped after Benz invented the modern automobile, and telegraph companies eventually ceded sales to telephone operators.  And the distribution of audio music via phonographic records, 8-track cassettes, audio tapes and compact discs each phased out the earlier medium, with digital music files transferred to consumers over the internet becoming the dominant distribution medium of the current generation.  We are not sure what innovation will be next; but we are sure there will be a next.  Industries innovate – or they eventually die.

Unsurprisingly, the Publisher Defendants wanted to keep the book industry as it had been for decades – the status quo is exactly what entrenched incumbents hold dear.  And Apple was a late entrant to a nascent and fast-growing market, who of course did not want to pay the price competition rewards to innovators (Amazon in this market).  But the competitive answer to innovation and consumer adoption is not to simultaneously restrain the innovator's competitive advantage, increase consumer prices to slow adoption of the new technology, or "stabilize" a difficult transition.  Incumbent firms are not allowed to work together to impose their will on the market and choose when, how, or under what terms innovation and competition occurs – consumers choose in the free market.

010260-11  507247 V5
11-md-02293 (DLC)

## II.       ARGUMENT

### A.    Legal Standards

#### 1.    Section 1 of the Sherman Act Absolutely Prohibits All Horizontal Agreements on Pricing

Under Section 1 of the Sherman Act, "[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is . . . illegal."[10] From the earliest days of the Sherman Act, it has been plain that this sweeping language absolutely forbids competitors from agreeing on prices.[11]  This prohibition applies no matter the motive for the agreement or the apparent reasonableness of the resulting prices.[12]  Rather, any time horizontal competitors (such as, for example, competing book publishers) agree formally or informally to price their goods at a certain level or according to a certain system, act on that agreement, and thereby affect interstate commerce, they violate the Sherman Act.

#### 2.    *Twombly* Requires Only that Plaintiffs Plausibly Allege a Conspiracy to Restrain Trade

For purposes of a summary judgment motion, a Section 1 plaintiff must offer evidence that "tend[s] to rule out the possibility that the defendants were acting independently."[13] But this is not the standard applied to defeat a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  Rather, at this stage, Plaintiffs need only allege "enough factual matter (taken as true)

---

[10]    15 U.S.C. § 1.

[11]    *See, e.g.*, *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007); *FTC v. Superior Ct. Trial Lawyers Ass'n*, 493 U.S. 411, 421-22 (1990); *Ariz. v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 344-48 (1982); *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons*, 340 U.S. 211, 213 (1951), *overruled on other grounds*, *Copperweld v. Independence Tube*, 467 U.S. 752 (1984); *United States v. Socony-Vacuum Oil*, 310 U.S. 150, 220-24 (1940); *United States v. Trenton Potteries Co*., 273 U.S. 392, 397-98 (1927); *United States v. Trans-Mo. Freight Ass'n*, 166 U.S. 290, 313 (1897).

[12]    *See, e.g.*, *Trial Lawyers*, 493 U.S. at 424 ("[I]t was settled shortly after the Sherman Act was passed that it is no excuse that the prices fixed are themselves reasonable.").

[13]    *Twombly*, 550 U.S. at 554.

to suggest that an agreement was made."[14]  The Supreme Court made clear that the standard

under Rule 8 does not impose a probability requirement:  "Asking for plausible grounds to infer

an agreement does not impose a probability requirement at the pleading stage; it simply calls for

enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal

agreement."[15]

   The complaint that failed to state a claim in *Twombly* was a far cry from the facts

Plaintiffs allege here – both in degree and character.  The Supreme Court's central finding in

*Twombly* turned on allegations that, essentially, plead ***inaction*** by the defendants.  The complaint

in *Twombly* alleged that the Incumbent Local Exchange Carriers ("ILECs") conspired to restrain

trade by both not allowing upstart competitive local exchange carriers ("CLECs") sufficient

access to the ILECs' respective telecommunications infrastructure; and by not moving into other

contiguous markets occupied by other ILECs.[16]

   Importantly, the alleged conduct amounted to maintaining the *status quo*.  Prior to the

enactment of the Telecommunications Act of 1996, 47 U.S.C. §§ 151, *et seq*., the law restrained

companies in the telecommunications industry (including the *Twombly* defendants) from

competing with each other.  Congress enacted the 1996 Act to create conditions conducive for a

monopolistic market to be supplanted by competition.[17]  But the heart of the plaintiffs' claims in

*Twombly* was that the ILECs continued not to compete, just as they had done for years.  This

failure to change their behavior, the *Twombly* plaintiffs alleged, suggested a common agreement

not to compete.  The Supreme Court disagreed, noting that in the decade preceding the 1996 Act,

---

[14]   *Id*. at 556.

[15]   *Id.*

[16]   *Id.* at 551.

[17]   *Id.* at 589.

- 9 -

monopoly was the "norm … not the exception."  So in the wake of the 1996 Act, the ILECs were

simply sitting tight, watching to see if their neighbors would do the same thing:

> The ILECs were born in that world, doubtless liked the world the
> way it was, and surely knew the adage about him who lives by the
> sword.  Hence, a natural explanation for the noncompetition
> alleged is that the former Government-sanctioned monopolists
> were sitting tight, expecting their neighbors to do the same thing.[18]

And so the Supreme Court found that allegations of "noncompetition," coupled with only a

conclusory assertion of an agreement, were not enough.  The plaintiffs' allegations were not

"placed in a context that raises a suggestion of a preceding agreement."[19]

But the Supreme Court at the same time recognized and "[t]he parties in this case

agree[d] that complex and historically unprecedented changes in pricing structure made at the

very same time by multiple competitors, and made for no other discernible reason, would support

a plausible inference of conspiracy."[20]  This is exactly the type of historically unprecedented

structural pricing change that Plaintiffs allege here.  Unlike *Twombly* where the plaintiffs sought

to infer a conspiracy from a failure to change long-standing practices, here Plaintiffs allege

***complex and historically unprecedented changes in pricing structure, made at the very same***

***time by multiple competitors*** – precisely what the *Twombly* Court recognized would raise an

inference of conspiracy.

### 3.    A Conspiratorial Agreement Is Commonly Shown Through Circumstantial Evidence

To demonstrate liability under Section 1 of the Sherman Act, a plaintiff "is not required

to show the existence of a written agreement," but is required to present "direct or circumstantial

evidence that reasonably tends to prove . . . a conscious commitment to a common scheme

---

[18]    *Id.* at 567-68.

[19]    *Id.* at 557.

[20]    *Id.* at 557 n.4.

- 10 -

designed to achieve an unlawful objective."[21]   Direct proof of an illegal agreement is not

required and, indeed, is rarely found.[22]   In fact, "[t]he picture of conspiracy as a meeting by

twilight of a trio of sinister persons with pointed hats close together belongs to a darker age."[23]

"[A]t a minimum, . . . 'the circumstances [must be] such as to warrant a jury in finding

that the conspirators had a unity of purpose or a common design and understanding, or a meeting

of minds in an unlawful arrangement.'"[24]   Thus, a central question in a Section 1 conspiracy case

(or any conspiracy) is therefore whether the challenged conduct "stem[s] from independent

decision[s] or from an agreement, tacit or express."[25]   But an agreement and its object may be

inferred from the circumstances, including the nature, context and continuing course of

Defendants' conduct.[26]   And while parallel business behavior standing alone does not constitute

---

[21]   *In re Currency Conversion Fee Antitrust Litig. v. Am. Express Co.*, 773 F. Supp. 2d 351, 365-66 (S.D.N.Y. 2011).

[22]   *Am. Tobacco Co. v. United States*, 328 U.S. 781, 800 (1946) ("although there was no written or express agreement discovered among [defendants], . . . their practices included a clear course of dealing"); *Id.* at 809 ("[n]o formal agreement is necessary to constitute an unlawful conspiracy"); *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 111 (3d Cir. 1980) ("Direct proof of an express agreement is not required."); *Esco Corp. v. United States*, 340 F.2d 1000, 1008 (9th Cir. 1965) ("It is not necessary to find an express agreement, either oral or written, in order to find a conspiracy, but it is sufficient that a concert of action be contemplated and that defendants conform to the arrangement."); *Sony Elecs., Inc. v. Soundview Techs., Inc.*, 157 F. Supp. 2d 180, 183 (D. Conn. 2001) ("rarely do people write memos saying 'let's violate the law'"); *James Julian, Inc. v. Raytheon Co.*, 557 F. Supp. 1058, 1065-66 (D. Del. 1983) ("The existence of such a conspiracy generally is not conducive of direct proof.").

[23]   *Sweeney*, 637 F.2d at 111.

[24]   *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252 (2d Cir. 1987) (modification in original).

[25]   *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537 540 (1954).

[26]   *See In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010) ("Direct evidence of conspiracy is not a sine qua non, however[,] [c]ircumstantial evidence can establish an antitrust conspiracy."); *United States v. Consol. Packaging Corp.*, 575 F.2d 117, 126 (7th Cir. 1978) (holding that direct evidence is not needed to prove a conspiracy, rather "a common purpose and plan may be inferred from a development and a collocation of circumstances"). The manifestation of Defendants' agreement may have occurred orally or in writing. Ultimately, the evidence dictates how an understanding was formed. As such, Defendants' argument that the complaint lacks direct allegations of an explicit agreement is irrelevant. *See* Memorandum of Law in Support of Publisher Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint ("Publishers Mot."), at 14-17. ECF No. 89, Mar. 2, 2012.

violation of the Sherman Act, such conduct "is admissible circumstantial evidence from which the fact finder may infer agreement."[27]  Moreover, Plaintiffs need not allege facts showing knowledge, on behalf of the Defendants, of every detail of the alleged conspiracy.[28]

In light of these operating principles, it is a fairly common tactic for Defendants to focus their argument on the absence of direct factual allegations of an agreement.  Defendants then offer their own proffered inferences to counter Plaintiffs' inferences from circumstantial facts.  But rarely does a civil litigant have access to a confession or discovery at the initial pleading stage, so Defendants may always create a battle of the inferences.  Fortunately, the law is not blind to this and does not require direct evidence (or allegations) of an agreement – inferences from circumstantial facts alone are sufficient.  And further, at the pleading stage, all well-pleaded facts must be accepted as true, and Plaintiffs are entitled to all reasonable inferences therefrom.[29]

---

[27]   *Twombly*, 550 U.S. at 553-54.  *Twombly's* concern for the imposition and expense that discovery may place on defendants carries little weight here, in light of the U.S. Department of Justice's (" DOJ") investigation.  The DOJ has broad authority to issue civil investigative demands ("CIDs") in the course of an antitrust investigation.  *See* 15 U.S.C. § 1312; *Associated Container Transp. (Austl.), Ltd. v. United States*, 705 F.2d 53, 58 (2d Cir. 1983) (noting "the broad investigatory powers granted to the Justice Department").  The DOJ and European authorities have been investigating anticompetitive behavior in the pricing of eBooks since sometime in 2011 (¶¶ 196-197); according to recent news reports, the investigation is already at an advanced stage, with the DOJ on the verge of bringing suit and in settlement discussions with some or all Defendants.  *See* section II.I, *infra*.  It is reasonable to infer that Defendants have already provided a substantial amount of discovery to the DOJ, and that the initial burden of discovery would be no more than providing copies of that discovery to Plaintiffs.  *See, e.g.*, *In re NASDAQ Market-Makers Antitrust Litig.*, 929 F. Supp. 723 (S.D.N.Y. 1996) (compelling discovery of materials provided in response to a CID).

[28]   *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827, 2009 U.S. Dist. LEXIS 17792, at *14 (N.D. Cal. Mar. 3, 2009) ("Although Plaintiffs will need to provide evidence of each Defendants' participation in any conspiracy, they now only need to make allegations that plausibly suggest that each Defendant participated in the alleged conspiracy."); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 904 (N.D. Cal. 2008) (same); *In re OSB Antitrust Litig.*, No. 06-826, 2007 U.S. Dist. LEXIS 56573, at *12-*14 (E.D. Pa. Aug. 3, 2007) (plaintiffs satisfied post-*Twombly* pleading requirement where complaint contained only "one lone paragraph" that alleged that each named defendant joined the alleged overall price-fixing conspiracy and committed acts in furtherance of it); *Mylan Labs., Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1066 (D. Md. 1991) ("[plaintiff] need not show that each alleged conspirator had knowledge of all of the details of the conspiracy").

[29]   *In re NYSE Specialists*, 503 F.3d at 91 (at the motion to dismiss stage, the court "must take the facts alleged in the complaint as true, drawing all reasonable inferences in . . . Plaintiffs' favor").

**B.**     **Plaintiffs Allege Sufficient Circumstantial Facts to Plausibly State a Claim**

Plaintiffs allege extremely detailed facts, including key dates, events, and participants –
none of which were alleged in *Twombly* – not merely labels and conclusions, from which to infer
Defendants' "conscious commitment to a common scheme designed to achieve an unlawful
objective."[30] Defendants' scheme was ***to raise eBook prices and restrain Amazon's competitive
advantage in eBook sales***.  ¶ 119.  And as Apple's former CEO, Steve Jobs, admitted:  "we
pulled it off."  ¶ 18.

**1.**     **The Context and Specificity of Plaintiffs' Allegations Plausibly Suggest
Defendants Coordinated Their Actions**

Defendants' collusive behavior took place in three stages.  *First*, the Publisher
Defendants coordinated the windowing of eBooks.  *Second*, the Publisher Defendants and Apple
coordinated their adoption of the agency model and eBook price increases.  And *third*,
Defendants coordinated to raise prices for eBook sales purchased through Amazon and other
eBook e-retailers.

**a.**     **The Coordinated "Windowing" of eBooks**

Prior to the conspiracy, for decades, major publishing companies used the "wholesale" or
"retail" model for book sales.  Under this model, publishers sold their titles to retailers based on
a discount off a book's list price.  For example, if a new hardback title's list price was $26, the
retailer (*e.g.*, Barnes & Noble) would pay the publisher fifty percent off list price – $13.  ¶ 59.
After the entrance of Amazon into the eBook market and its consumer-friendly $9.99 pricing on
certain newly released titles, the Publisher Defendants became antagonistic to this pricing and its
potential impact on physical book sales.  ¶¶ 70-83.

---

[30]     *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764, 768 (1984).

The first stage of coordinated activity took place in fall 2009 when the Publisher Defendants threatened to refuse to deal with Amazon in the sale of newly released titles, euphemistically called "windowing."  ¶¶ 99, 100.  Since the release of the Kindle in 2007, it was the ordinary practice (with rare exception) to sell Amazon the eBook version of a title at the same time the physical copy was released to brick-and-mortar stores.  ¶ 100.  The practice suddenly changed in December 2009 soon after Arnaud Nourry, Chairman and CEO of Hachette Livre, SA met for breakfast with an Amazon executive.  Prior to this meeting, Mr. Nourry had discussed with other industry representatives a price point for Amazon's eBooks that would be agreeable to the Publisher Defendants.  ¶ 101.  Mr. Nourry asked whether Amazon was firm in its decision to price eBooks at $9.99, stating it was a "big problem for the industry."  (The industry, of course, included both the publishers – such as Mr. Nourry's company, Hachette – and the retailers.)  Mr. Nourry communicated that if Amazon would agree to increase prices to the level of $11.99 or $12.99, this would solve the "industry" problem.  Amazon rejected this invitation.  ¶¶ 102-103.

The next day, Hachette told Amazon that it would start to window its eBooks – delaying the release of many new titles until months after the release of the hardcover version.  ¶ 103. *Four days later*, a representative (Michael Selleck) of Simon & Schuster, informed Amazon that it was also going to depart from its established business practice and would begin delaying releases of certain eBooks between January and April 2010.  ¶ 104.  Within days, both HarperCollins and Macmillan stated that they too would begin withholding eBook titles releases from Amazon until several months after the hardcover release.  ¶¶ 106-107.

The "windowing" of eBook releases was contrary to the individual economic interests of any individual publisher.  Independent action against Amazon risked antagonizing a company

- 14 -

that is the largest book distributor in the United States, putting any one publisher's catalogue at risk if Amazon removed that publisher's eBook or physical book sales from its website.  ¶ 109. Moreover, unilaterally withholding eBook versions of new releases for months would place any individual publisher at a major competitive disadvantage in a fast-growing segment of the market.  *Id.*  And the sudden and near-simultaneous announcement of this major business change is unlikely a product of chance – such an extensive change in practices certainly took many months of analysis and consideration.  Rather, the timing of this radical shift in business practices only made sense if it was undertaken in concert by the major publishers, having reached an understanding that major competitors would implement the same strategy.  *Id.*  An inference that is more than plausible given Nourry's statement that he was speaking with authority on behalf of the Publisher Defendants.  ¶ 100.

The Publisher Defendants suggest that this allegation pleads nothing more than "follow-the-leader behavior."[31]  But the complaint does not allege that Hachette publicly disclosed its decision to window eBooks prior to Simon & Schuster's announcement four days after Hachette privately told Amazon of its decision.  ¶¶ 103-104.

### b.    The Coordinated Adoption of the Agency Model and Price Increases

Although the Publisher Defendants' coordinated delay in supplying eBook versions of their titles could impact the timing of when Amazon's pro-consumer pricing was made available to consumers, it could not end it.  This would at best blunt head-to-head price competition for the initial offering of a new physical book.  But consumers could simply wait to buy the eBook title until Defendants opened the "window."  Thus, windowing would not achieve the Publisher Defendants' stated desire to raise eBook prices.

---

[31]    Publishers Mot. at 29.

In January 2010 (approaching Apple's announcement for the launch of the iPad on January 27, 2010), the Publisher Defendants simultaneously entered into agreements with Apple to switch from a wholesale pricing model to the agency model for eBook sales.  This was an unprecedented industry shift in pricing (and sales model) in the book industry.  ¶ 126. Defendants admit that not only did a single actor (Apple) present the terms of the agreements to each publisher,[32] but also that Apple "would not proceed with the iBookstore absent a critical mass of publishers agreeing to the proposed agency terms."[33]  And, of course, similar to *Interstate Circuit*, the conditions were actually imposed.  ¶¶ 127-29.

The terms of the agreements between Apple and the Publisher Defendants were nearly identical, including agreeing to:  (a) Apple's thirty percent commission; (b) a common pricing formula; (c) lower prices could not be offered through other eBook retailers; (d)  the Publisher Defendants being only allowed to sell to other eBook retailers exclusively through the agency model; and (e) an April 3, 2010 cut-off for all non-agency sales.  ¶¶ 127-130.

### c.      The Coordinated Restraint of eBook Sales to Other E-Retailers

Remarkably, despite this radical, structural and price transition in the industry, and the complex negotiations, not a single publisher told Amazon – the industry leader in eBook sales – of the pending move to the agency model until a week before Apple's public announcement on January 27, 2010.  By that time, the Publisher Defendants had already committed themselves to refusing to do business with Amazon on any other terms.  ¶ 137.  Four of the Publisher

---

[32]    Publishers Mot. at 24 ("Apple already had indicated that it was discussing agency agreements with other publishers"); *id.* at 25 ("in light of press reports from Apple to that effect, each Publisher Defendant knew or could have known about the negotiations of its competitors").  Regardless, the Publisher Defendants' factual proffer that Apple presented the agency model on a take-it-or-leave-it basis is outside the complaint and improper.  *See* Plaintiffs' Opposition to the Publisher Defendants' Request for Judicial Notice, filed concurrently herewith.

[33]    *Id.* at 24.

Defendants *simultaneously* informed Amazon of the switch to the agency model during meetings that occurred on the same day.  ¶ 147.  And yet even in the face of these coordinated strong-arm tactics, still Amazon tried to resist.

To force Amazon to accept the agency model, each of the Publisher Defendants threatened to withhold from Amazon *seventy-five to eighty-five percent* of fiction titles, and many leading nonfiction titles, just as Apple was entering the market.  ¶ 156.  When Amazon was unable to reach agreement with Hachette or Penguin on the agency model by the April 1, 2010 deadline, both publishers followed through with their threats (and understanding with their co-conspirators) and disallowed the sale of eBooks on Amazon's site until an agency agreement was finalized with Amazon.  ¶¶ 157-58.

And Amazon was not the only target of Defendants' collusive activities.  On the exact same day, March 31, 2010, each of the Publisher Defendants cut off selling their eBook titles to another eBook retailer – BooksOnBoard – because it had not yet agreed to switch to the agency model.  ¶ 163.

> **d.**     **Plaintiffs Detail Overt Acts in Furtherance of Defendants' Conspiracy, Such as Who, How and When**

Although it is not required under Rule 8, Plaintiffs plead many details concerning who engaged in this conspiracy, as well as exactly how and when it was implemented.  Individual participants from each Defendant are pled by name (¶ 98) and the complaint alleges dates, locations and the persons present at key meetings when Defendants executed their plan (¶¶ 153-55, 164).

The Publisher Defendants complain that Plaintiffs fail to allege sufficient specificity (the "who, did what, to whom (or with whom), where, and when."[34]  *First*, this is not the law.  As the

---

[34]   *Id.* at 15-16.

Second Circuit confirmed in *Starr*, "plaintiffs were not required to mention a specific time, place or person involved in each conspiracy allegation."[35]  And *second*, even if this were the law, Defendants are wrong.  Plaintiffs' complaint includes detailed allegations of the names of executives involved in the scheme.  ¶ 98.  Plaintiffs allege the date, time, place and persons present at multiple meetings and telephone calls where the conspiracy was implemented.  *See*, *e.g.*, ¶¶ 5, 79-82, 91, 98, 101-105, 145, 147, 152, 155, 160, 164.  *Third*, to the extent that Defendants complain that Plaintiffs were not in the room at the time of the collusive agreements and therefore cannot plead the substance of conspiratorial communications, or have not pointed to e-mails or a paper trail, Defendants would raise the bar for Sherman Act claims at the pleading stage above even that at summary judgment – requiring direct evidence of a contemporaneous account of the price-fixing conspiracy.  This is not the law.

### 2.    In a Comparable Context, the Supreme Court Held Proof of Coordinated Activity Similar to the Facts Plaintiffs Allege Here Violates the Sherman Act

The Supreme Court has long recognized that an understanding reached between competitors may be inferred from circumstantial evidence.  That is, a plaintiff need not produce evidence in the form of an oral or written express agreement to prove the existence of a conspiracy.  Rather, Defendants' conscious commitment to a common plan may be inferred from the circumstances.  Acting identically at the same time is strong probative evidence of an agreement to do so.

More than seventy years ago, in *Interstate Circuit v. United States*,[36] the Supreme Court found sufficient evidence of an agreement where a movie theater company sent a letter openly addressed to all eight major national film distributors stating that it would show a distributor's

---

[35]    *Starr*, 592 F.3d at 314.

[36]    306 U.S. at 208.

films only if the distributor imposed certain restrictions on later runs of the films in secondary theaters.[37]  The Supreme Court held that even though no direct evidence was offered at trial that the distributors communicated with one another, nonetheless, there was sufficient evidence that the defendants reached a mutual understanding.  The Court held that by acting in accordance with the letter's demands, it was sufficient to infer that defendants reached an agreement because (a) the letter made it clear that all eight had received the letter; (b) the economic context made it clear that all eight needed to act uniformly or all would lose business; and (c) all eight did in fact impose the conditions.[38]  It mattered not that minor variations existed between the various agreements, as the Supreme Court held that it "taxe[d] credulity to believe that the several distributors would, in the circumstances, have accepted and put into operation with substantial unanimity such far-reaching changes in their business methods without some understanding that all were to join."[39]

More recently, in *Toys "R" Us, Inc. v. FTC*,[40] the Seventh Circuit applied *Interstate Circuit* and found that conduct by Toys "R" Us in coordinating vertical agreements with its suppliers violated the Sherman Act.  In *Toys "R" Us*, a retailer defendant faced competition from warehouse clubs such as Costco, which priced toys as much as thirty percent below Toys "R" Us's levels.  In response, Toys "R" Us separately met with and entered into a series of vertical agreements with a number of its upstream toy suppliers.  The vertical agreements required suppliers to sell the warehouse clubs only unique individual items or "combo packs" instead of

---

[37]   *Id*. at 215-19.

[38]   *Id*. at 222.

[39]   *Id.* at 223.

[40]   221 F.3d 928 (7th Cir. 2000).

the best-selling toys they supplied to Toys "R" Us.[41]  The Seventh Circuit agreed with the

Federal Trade Commission ("FTC") that Toys "R" Us had orchestrated a horizontal agreement

among its key suppliers to boycott the warehouse clubs and deny them the specific toys that Toys

"R" Us stocked, by carrying the message "I'll stop if they stop" from supplier to supplier and

acting as a clearinghouse for complaints about "breaches" by co-conspirators.[42]  The FTC

concluded, and the Seventh Circuit agreed, that the Toys "R" Us boycott was illegal both *per se*

and under the rule of reason, and that the *seriatim* vertical agreements between Toys "R" Us and

its suppliers violated Section 1 of the Sherman Act.[43]

Here, Defendants' conduct starkly resembles the conduct sufficient to prove antitrust

conspiracies in *Interstate Circuit* and *Toys "R" Us*, namely:  (a) all Publisher Defendants knew

each was negotiating with Apple to switch to the agency model;[44] (b) the economic context made

clear the need to act uniformly to achieve their goals;[45] and (c) the Defendants did in fact impose

the contemplated restraints.[46]  *Interstate Circuit* and *Toys "R" Us* make clear that more is not

required at trial to sustain a verdict – let alone necessary at the pleading stage.[47]

---

[41]   *Id.* at 932.

[42]   *Id.* at 932-33.

[43]   *Id.* at 933.  *See also In re Text Messaging*, 630 F.3d at 628 (upholding complaint where "allegation that all at once the defendants changed their pricing structures, which were heterogeneous and complex, to a uniform pricing structure, and then simultaneously jacked up their prices by a third"); *Kleen Prods., LLC v. Packaging Corp. of Am.*, 775 F. Supp. 2d 1071, 1078 (N.D. Ill. 2011) ("Even without any parallel capacity reductions, consistent parallel price increases are enough to make a threshold showing of conscious parallelism," and when combined with plus factors, is sufficient to state a claim. ).

[44]   ¶ 133; Publishers Mot. at 24 ("Apple already had indicated that it was discussing agency agreements with other publishers . . . and would not proceed with the iBookstore absent a critical mass of publishers agreeing to the proposed agency terms . . .").

[45]   ¶¶ 138-143; Publishers Mot. at 24.

[46]   ¶¶ 127-129.

[47]   The Publisher Defendants place great weight on two district court cases dismissing antitrust complaints, *Anderson News, L.L.C. v. Am. Media, Inc.*, 732 F. Supp. 2d 389 (S.D.N.Y. 2010), and *Wellnx*

### C.   Plaintiffs Allege Additional Plus Factors Supporting the Plausibility of the Alleged Conspiracy Consistent with the Second Circuit's Recent Decision in *Starr*

The allegations above demonstrate sufficient inferences from the circumstances to defeat Defendants' motion to dismiss. But the complaint does not rest on these allegations alone. Plaintiffs also allege a number of "plus factors." These plus factors, placed in context with the allegations above, are sufficient to establish an unlawful agreement to restrain trade for purposes of ***defeating summary judgment*** and ***sustaining a jury verdict***.[48] Defendants try to dismember Plaintiffs' allegations piece by piece. But again, this is analytically flawed.

As cautioned by the Supreme Court fifty years ago, "[t]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by

---

*Life Scis., Inc. v. Iovate Health Scis. Research Inc*., 516 F. Supp. 2d 270 (S.D.N.Y. 2007). Neither of these cases is remotely comparable to this action.

In *Anderson News*, a wholesaler of retail-store magazines told publishers that it was going to add a $.07 surcharge per magazine. *Id.*, 732 F. Supp. 2d at 394. The publishers had "a variety of reactions," largely consisting of counteroffers of one form or another. *Id.* Despite these discussions, all publishers ultimately cut off supply to Anderson. *Id.* at 395. Judge Crotty dismissed the complaint, ruling that (a) it was implausible that the publishers would conspire to limit the number of wholesalers, forcing themselves to deal with more consolidated and therefore more powerful counterparties (a factor not present here); (b) the defendants had different reactions to Anderson's proposed surcharge (versus the identical response by Defendants here); and (c) the actions of the defendants (cutting off Anderson as a supplier) was easily reversed (contrary to the systemic adjustments and agreements signed by the Defendants here). *Id.* at 397-402.

*Wellnx* is even further afield. In *Wellnx*, a manufacturer of bodybuilding supplements sued a competitor and several bodybuilding magazines, alleging a conspiracy to deprive it of advertising space. Wellnx alleged that one of its many competitors, Iovate, agreed with the leading magazine (which had a forty percent market share) to pay a share of its profits in exchange for favorable coverage and increased advertising space, along with negative coverage of Wellnx and a ban on Wellnx advertising. 516 F. Supp. 2d at 280-81. Iovate then made similar arrangements with other magazines, foreclosing another thirty percent of the market. *Id.* at 281. In dismissing the complaint, the district court noted that the "substantial profit motive" gave each individual publisher a motive to enter into an agreement with Iovate, regardless of what its competitors chose to do. *Id.* at 291. This is exactly opposite to the allegations here, where Plaintiffs detail how the adoption of the agency model required that each individual publisher earn ***less revenue per unit*** than they had on the wholesale model – foregoing financial opportunities individually, rather than taking advantage of them. ¶¶ 90-91.

[48]   *Interstate Circuit*, 306 U.S. at 208; *Toys "R" Us*, 221 F.3d at 928.

- 21 -

looking at it as a whole."[49]  In a highly fact-intensive case like this one, it is even more important

that the ultimate fact-finder "look at the whole picture and not merely at the individual figures in

it."[50]  All of these facts taken together as a whole present "plausible grounds to infer an

agreement" existed.

The Second Circuit most recently addressed "plus factors" in *Starr v. Sony BMG Music*

*Entm't*,[51] where the complaint alleged collusive action by music distributors who controlled over

eighty percent of digital music sold (via the Internet and on compact discs).[52]  Analyzing first the

allegations of parallel conduct, the Second Circuit then extensively addressed the "plus factors"

that supported the inference of collusive activity.  The following plus factors sufficiently met the

*Twombly* standard:  a highly concentrated industry; agreeing to unfavorable economic terms that

would be unprofitable without collusive action; defendants' admitted motive "to stop the

continuing devaluation of music;" defendants charged higher prices than other independent

distributors; government investigations were pending; and the existence of similar price

increases despite a decline in the costs of providing Internet music.[53]

Similar to *Starr*, Plaintiffs here have alleged a variety of "plus factors" accepted by courts

and antitrust scholars as providing sufficient context to support an inference of collusive conduct,

---

[49]    *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962).

[50]    *Id.*

[51]    *Starr*, 592 F.3d at 314; *see also Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) ("even in
the absence of direct 'smoking gun' evidence, a horizontal price-fixing agreement may be inferred on the
basis of conscious parallelism, when such interdependent conduct is accompanied by circumstantial
evidence and plus factors such as defendants' use of facilitating practices").

[52]    *Starr*, 592 F.3d at 318.

[53]    *Id.* at 323-24.  While Defendants all attempt to distinguish the Second Circuit's opinion in *Starr*,
their attempts are unavailing.  Apple Inc.'s Memorandum of Law in Support of Motion to Dismiss the
Consolidated Class Action Complaint ("Apple Mot."), at 18-20, ECF No. 74, Mar. 2, 2012; Publishers
Mot. at 24-25 n.23.  Each of the "plus factors" discussed below is not unique to *Starr*, but is supported by
courts and scholars across the country.

- 22 -

including:  (1) inter-firm communications and opportunities to conspire (¶¶ 99-109); (2) a simultaneous price increases unrelated to an increase in costs (¶¶ 5, 79-82, 101, 152-53); (3) simultaneous structural change (¶¶ 110-165); (4) Defendants shared motives to price-fix (¶¶ 8, 18, 97, 111-124); (5) the implementation of the agency model was against Defendants' short and long-term business interests without collective involvement (¶¶ 70-93, 95, 99-167); (6) coercion in the form of simultaneous boycotts and refusals to deal (¶¶ 145-166); (7) the eBooks market is concentrated (¶¶ 57, 143, 146); and (8) Defendants' price-fixing is the subject of government investigations (¶¶ 191-98).

### 1.    Inter-firm Communications and Opportunities to Conspiracy

Direct and indirect communications are recognized by scholars and courts alike as providing context to a conspiracy and making plausible the allegations of a complaint.[54]  Here, Plaintiffs allege a number of inter-firm communications and opportunities to conspire that support the inference of a conspiracy to increase eBook prices.

#### a.    Defendants Communicate Their Desire and Intent to Increase Industry eBook Prices

The Publisher Defendants publicly and privately communicated to each other their desire to increase industry eBook prices because they believed Amazon's eBook prices were too low. For example, in 2009 (two years after the introduction of Amazon's Kindle), David Young, Chairman and CEO of Hachette told the New Yorker, "The big concern – and it's a massive

---

[54]    Areeda & Hovenkamp, *Antitrust Law* ¶1425a (2d ed. 2003) ("[o]rdinarily . . . it will be necessary to infer from the circumstances that parallel action depends upon advance communication and understanding"); *id*. at ¶1430a.  *See also Apex Oil*, 822 F.2d at 254; *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co*., 998 F.2d 1224, 1242 (3d Cir. 1993); *In re Plywood Antitrust Litig.*, 655 F.2d 627 (5th Cir. 1981); *Sony Elecs*, 157 F. Supp. 2d at 183; *Fears v. Wilhelmina Model Agency, Inc.*, No. 02 Civ. 4911, 2004 U.S. Dist. LEXIS 5045, at *20 (S.D.N.Y. Mar. 29, 2004) ("evidence of discussions and agreements, even related to other pricing strategies, [has] relevance here and [bolsters] an inference that defendants colluded on commissions as well").

- 23 -

concern – is the $9.99 pricing point.  If it's allowed to take hold in the consumer's mind that a book is worth ten bucks, to my mind it's game over for this business."  ¶ 5.

And on December 3, 2009, Nourry, Chairman and CEO of Hachette Livre, met privately for breakfast with an Amazon executive and conveyed that Amazon's pricing was a "big problem for the industry," a problem that would be solved for the industry if Amazon raised eBook prices by a dollar or two.  ¶ 101.  That Mr. Nourry could suggest a specific price increase that would satisfy "the industry" strongly suggests Mr. Nourry was communicating the consensus among publishers.  The Publisher Defendants offer an improper and implausible counter-explanation – that Mr. Nourry was only suggesting what other retailers wanted the prices to be.[55]  It is implausible that Mr. Nourry would be negotiating on behalf of Amazon's competitors.  The more plausible inference is that Mr. Nourry was speaking on behalf of the Publisher Defendants.

In addition, on February 2, 2010, while the Publisher Defendants were negotiating moving to the agency model with Amazon, Rupert Murdoch, the CEO of News Corp., stated that publishers were unhappy with Amazon's low prices and that the agreement with Apple to go to the agency model would help achieve "higher prices."  ¶¶ 79-80.  Two days later, Macmillan's CEO also communicated efforts to increase and stabilize eBook prices by moving to the agency model, when in a blog he stated:

> Over the last few years we have been deeply concerned about the pricing of electronic books.  That pricing, combined with the traditional business model we were using, was creating a market that we believe was fundamentally unbalanced.  In the last three weeks, from a standing start, we have moved to a new business model.  ***We will make less money on the sale of e books, but we will have a stable and rational market.***

---

[55]   Publishers Mot. at 15-16, 29-31.

¶ 82.  These statements evidence Defendants were discussing with and making it known to competitors that Defendants were taking steps to increase and stabilize industry eBook prices. Moreover, such comments are strikingly similar to the "continuing devaluation of music" statement that the Second Circuit explicitly held that strengthens an inference of conspiracy.[56]

### b.   Steve Jobs Admitted, Before Selling a Single iPad, that Defendants Succeeded in Agreeing to Raise and Stabilize eBook Industry Prices

Statements made by Apple's former chief executive confirm that Defendants acted on their plan to raise and stabilize eBook prices.  Public and private statements made by then Apple CEO, Steve Jobs, indicated that Apple knew that its coordinated activities with the Publisher Defendants would increase industry eBook prices – *including eBooks sold through Amazon* – even before the Publisher Defendants and Amazon agreed to move to the agency model.  This foreknowledge plausibly evidences a prior understanding being reached between all Defendants.

On January 27, 2010, the same day Apple announced the iPad's April 2010 launch, Steve Jobs told The Wall Street Journal that Amazon's $9.99 pricing for eBooks was about to end: "The prices will be the same. . . . Publishers are actually withholding their books from Amazon because they're not happy."  ¶¶ 17, 34.  The very next day, he privately explained how he knew prices for Defendants' eBook prices would increase:

> Amazon screwed it up.  It paid the wholesale price for some books, but started selling them below cost at $9.99.  The publishers hated that – they thought it would trash their ability to sell hard-cover books at $28.  So before Apple even got on the scene, some booksellers were starting to withhold books from Amazon.  So we told the publishers, "*We'll go to the agency model, where you set the price, and we get our 30%, and yes, the customer pays a little more, but that's what you want anyway.*"  But we also asked for a guarantee that if anybody else is selling the books cheaper than we are, then we can sell them at the lower price too.  So they went to

---

[56]   *See Starr*, 592 F.3d at 324.

> Amazon and said, "You're going to sign an agency contract or
> we're not going to give you the books."

¶ 18.  Contrary to Defendants' arguments,[57] Mr. Jobs' statement above did not simply acknowledge that a common "most favored nations" clause was in place.  Rather, the statement plausibly evidences Mr. Jobs' knowledge that Defendants had all agreed to a price formula to achieve the purpose of increasing eBook consumer prices, and the Publisher Defendants would ensure those higher prices would be the same higher prices if offered through other distributors – such as Amazon.  ¶¶ 127-29.  In short, Mr. Jobs knew the Defendants had constructed a scheme to ensure consumer prices for eBooks would go up and standardize at these higher price levels.

### c.    Additional Opportunities to Conspire Through Industry Associations

Plaintiffs allege additional opportunities to conspire to increase and stabilize prices of eBooks, including Defendants' participation in industry associations.  Although Defendants may be correct that, standing alone, opportunities to conspire at industry and trade associations are insufficient, Plaintiffs do not leave these allegations to stand on their own.[58]  They are but one part of this complaint, which must be considered in its entirety.[59]  Courts across the country have recognized that evidence of the means and opportunity to effectuate a conspiracy supports an inference of that conspiracy.[60]

---

[57]    *See* Apple Mot. at 16-17; Publishers Mot. at 28.

[58]    Publishers Mot. at 26 n.24.

[59]    *Cont'l Ore*, 370 U.S. at 699.

[60]    *See In re WellPoint, Inc. Out-of-Network "UCR" Rates Litig.,* No. MDL-09-2074, 2011 U.S. Dist. LEXIS 89512, at *46 (C.D. Cal. Aug. 11, 2011) (participation in trade associations and conferences demonstrates how and when defendants had opportunity to conspire); *In re Transpac. Passenger Air Transp. Antitrust Litig.*, No. C 07-05634, 2011 U.S. Dist. LEXIS 49853, at *42-*46, *50-*51 (N.D. Cal. May 9, 2011) (allegations that defendants participated in industry groups that by their nature facilitated information exchange and provided a venue for discussions support the inference of a conspiracy);  *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1142, 1148 (N.D. Cal. 2009) (concentrated market with high barriers to entry can support conspiracy allegations, as can participation in trade groups and other meetings showing of opportunity to share information);  *In re SRAM Antitrust Litig.*, 580 F. Supp. 2d at 902 (same).

- 26 -

Here, Plaintiffs describe the specific time and place of a trade association meeting (San Jose, February 2010) where Defendants discussed the issue of the agency model, and high-level executives from Hachette and Macmillan were seen meeting in a hotel bar.  ¶¶ 153-55.  In addition, Plaintiffs allege that Defendants each participated in the development of the Online Information eXchange or ONIX to create a new standard for the agency model, and use this as a vehicle to coordinate the terms of the agency model.  ¶¶ 175-181.

### 2.    Defendants Raised Prices Simultaneously Under the Agency Model Even Though EBook Costs Were Not Increasing

Pricing behavior that is not explained by business costs is a well-recognized plus factor that together with price parallelism raises an inference of conspiracy.  As Judge Posner explains: "Simultaneous price increases and output reductions unexplained by an increase in cost may therefore be good evidence of the initiation of a price-fixing scheme . . . ."[61]  Courts, including the Second Circuit in *Starr*, confirm that pricing practices with little or no relationship to costs are probative of a conspiracy.[62]  And the majority in *Twombly* remarked that "[t]he parties in this case agree that complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason," would support a plausible inference of conspiracy."[63]

---

[61]    Richard A. Posner, *Antitrust Law* 88 (2d ed. 2001).

[62]    *See Starr*, 592 F.3d at 324 (noting as a "plus factor" that defendants had raised the price of songs simultaneously even though earlier in the year the costs of providing digital music decreased substantially); *NASDAQ*, 894 F. Supp. at 714 (allegations that defendants' pricing bore no reasonable relation to either the operation of defendants' business or market or economic conditions sufficient to create a reasonable inference of conspiracy); *Monument Builders of Greater Kansas City Inc. v. Am. Cemetery Ass'n of Kansas*, 891 F.2d 1473, 1482 (10th Cir. 1989) (allegations of surcharges unrelated to management of cemetery supported reasonable inference of conspiracy); *C-O-Two Fire Equip. Co. v. United States*, 197 F.2d 489, 497 (9th Cir. 1952) ("Price increases which occur in times of surplus or when the natural expectation would be a general market decline, must be viewed with suspicion.").

[63]    *Twombly*, 550 U.S. at 557.

- 27 -

Here, the prices of eBooks for each Publisher Defendant soared at the same moment – completely untethered to a discernible cost increase.  Since the implementation of the agency model, the price of new best-selling eBooks have increased by forty percent on average, even though there has been no increase in costs to justify these higher prices.  ¶ 190.  The following chart vividly depicts the increase in eBook prices for the Publisher Defendants' titles after Defendants implemented their scheme:



¶ 201.  *See also* ¶¶ 199-205 (demonstrating price increases of thirty percent or more under agency model when compared to wholesale model).

Prices of eBooks now approach – or even exceed – the price of the same book in paper, even though there are almost no incremental costs to produce each additional eBook unit.  ¶ 20.  And eBooks offer major cost advantages compared to physical books such as non-existent costs for distribution, storage and returns that do exist for brick-and-mortar sales.  For example, many retailers return twenty-five percent or more of the physical books that have been shipped to them by publishers.  EBook technology eliminates the pricing, binding, shipping, storing and return

- 28 -

expenses involved, as well as the waste incurred when large volumes of physical books are sent back to publishers unsold.  ¶ 66.

And, as remarked by Judge Posner, collusion in a market may result not only in increased price, but also in reduced output.[64]  This effect is certainly seen here, where the switch to the agency model corresponded with slowed unit growth of eBook sales for the Publisher Defendants compared to those publishers who did not switch to the agency model:



¶ 88.

### 3.    Defendants' Adoption of the Agency Model Was Simultaneous – Not Sequential – and Structural

The simultaneous and permanent nature of Defendants' change to the agency model is another plus factor supporting the existence of a conspiracy here.  Courts and scholars alike recognize that "[c]onvincing evidence of conspiracy is *simultaneous* parallel action that is not a plausible coincidence or an expectable response to a common business problem."[65]  Sequential

---

[64]    Posner, *Antitrust Law*, at 88.

[65]    6 Areeda & Hovenkamp ¶ 1425c (emphasis in original).  *See also Taxi Weekly, Inc. v. Metro. Taxicab Bd. of Trade, Inc.*, 539 F.2d 907 (2d Cir. 1976) (sudden unanimity of cancellations of defendant taxi fleet owners within a short time period, coupled with hostile efforts of some of the defendants to

- 29 -

parallelism is where "one firm's price rise . . . becomes known to its rivals, who can then choose whether to imitate the move."[66]  In sequential parallelism, the tacit invitation becomes known to the marketplace within the ordinary course of business and no advance agreement is required.[67]  This is not the case with simultaneous action.  Here, all Defendants simultaneously departed from centuries old practice to adopt the agency model of pricing.  ¶¶ 110-165.  This was not the case where one industry participant publicly announced a price increase and then sat back, waiting to see if other competitors would follow.  Instead, these Defendants acted secretly in concert, as none of the Publisher Defendants even told Amazon of their efforts to move to the agency model until all had agreed.  Then, they announced their movement in concert, rendering highly implausible that the actions were a coincidence.

Moreover, the changes to the pricing structure were not easily reversible.  Unlike a pricing change which can be announced and then quickly retracted if others do not follow, the movement to the agency model involved structural changes to the Publisher Defendants' contracts with e-retailers and methods of pricing.  For example, even when Amazon acquiesced to the agency model with Hachette, books were unavailable for days while structural changes were undertaken to deal with the new pricing model.  ¶ 157.  It becomes even more inconceivable that Defendants' simultaneous adoption of the agency model could take place without coordination, considering the complex structural changes necessary to existing business practices.

---

induce major advertisers to cease advertising with the plaintiff, supported jury's finding that defendants had conspired to boycott the plaintiff); *In re Digital Music Antitrust Litig*., 592 F. Supp. 2d 435, 445 (S.D.N.Y. 2008) ("*In re Digital I*"), *rev'd on other grounds*, *Starr*, 592 F.3d at 314 ("an inference of prior agreement may be warranted from simultaneous parallel price conduct where no actor had prior knowledge of or time to consider the other actors' conduct").

[66]  6 Areeda & Hovenkamp ¶ 1425a.

[67]  *Id.*

### 4.      Defendants Share Motives to Conspire

Defendants who share motives to conspire is a relevant "plus factor."[68]  Here, Defendants'

motives were clear: the Publisher Defendants and Apple wanted to raise eBook prices and

eliminate Amazon's competitive pricing advantage at the same time.  ¶¶ 97, 119.  And, despite

its suggestions otherwise, Apple's motives were aligned with those of the Publisher

Defendants.[69]  Apple did not want to compete with Amazon's low-pricing strategy.  ¶ 119.

Amazon's pricing strategy was a competitive cudgel that could be used against the adoption of

Apple's soon to be launched iPad.  ¶¶ 111-17.  Removing Amazon's ability to compete on price

was a significant benefit to Apple – the standardization of eBook prices neutralized Amazon

from using eBook prices as a key differentiator.  Moreover, Apple of course preferred to enter

the eBook market free from margin pressure caused by Amazon's pricing and receive higher

eBook per unit revenue.  ¶¶ 8, 87, 91.

And so, while Apple protests that it lacks "any interest in protecting the physical book

market" or in "slow[ing] eBook growth," this criticism is wholly irrelevant.[70]  Apple need not

share the exact same motives as its coconspirators; it need only share a "conscious commitment

to a common scheme to achieve an unlawful objective."[71]   There is nothing remotely

implausible about a conspiracy whose objective provides different benefits to different

conspirators.  Apple unquestionably had ***complementary*** motives.  Plaintiffs allege that Apple

wanted to eliminate Amazon's ability to price compete for eBook sales.  Apple told the

---

[68]   *Ambook Enters. v. Time Inc.*, 612 F.2d 604 (2d Cir. 1979); *In re Flat Glass Antitrust Litig.*, 385
F.3d 350, 360 (3d Cir. 2004) ("evidence that the defendant had a motive to enter into a price fixing
conspiracy" considered a plus factor).

[69]   Apple Mot. at 7-11.

[70]   *Id*. at 2, 5-8, 9, 19-20.

[71]   *Monsanto*, 465 U.S. at 764.

publishers, "We'll go to the agency model, where you set the price, and we get our 30%, and yes, the customer pays a little more, but that's what you want anyway." ¶ 18.  Jobs admitted that "[g]iven the situation that existed, what was best for us was to do this aikido move and end up with the agency model.  And we pulled it off."  *Id.*

The "situation that existed" was that Apple was late to the eBook market, Amazon had a very large installed user base, a strong appetite for discount eBook pricing, and Apple wanted to knock out a reason to buy a Kindle versus an iPad – the price of eBooks.  The scheme protected Apple from price competition from other retailers and increased Apple's revenue per eBook unit sold compared to the wholesale model.  ¶¶ 112-124.

Apple cannot help but acknowledge this common goal even in its motion to dismiss, as it acknowledges that its motive in entering into the agency agreements was "to distribute eBooks as an agent earning a 30% commission on all sales, rather than as a retailer facing guaranteed losses on popular titles."[72]

### 5.    Without Collective Involvement, the Agency Model Was Against Each Defendant's Short-Term and Long-Term Independent Business Interests

A commonly recognized "plus factor" is where the performance of the actions are against a defendant's own independent business interest without collective involvement.[73]  Here, the dramatic change to the agency model was against any individual publisher's own economic

---

[72]    Apple Mot. at 8.

[73]    *See In re Flat Glass Antitrust Litig.*, 385 F.3d at 360  ("evidence that the defendant acted contrary to its interests" considered a plus factor); *Apex Oil*, 822 F.2d at 254  (evidence that actions were "against the apparent individual economic self-interest of the alleged conspirators" would tend to exclude the possibility of independent parallel behavior); *Ambook Enters.*, 612 F.2d at 615 ("proof of consciously parallel business behavior is circumstantial evidence from which an agreement, tacit or express, can be inferred but that such evidence, without more, is insufficient unless the circumstances under which it occurred make the inference of a rational, independent choice less attractive than that of concerted action"); *Rowe Entm't, Inc. v. The William Morris Agency, Inc.*, No. 98 Civ. 8272, 2000 U.S. Dist. LEXIS 9256, at *24 (S.D.N.Y. July 6, 2000) (evidence of parallel conduct combined with terms against "apparent individual economic self interest" unless "done in concert with others" supported concerted action by defendants).

interest if it acted alone.  The shift to agency model only made economic sense if the publishers acted in concert.  The Publisher Defendants admit that under the agency model "each Publisher Defendant would receive lower average net revenues per unit for eBooks sold."[74]  The shift to the agency model, if undertaken by any one individual publisher, was against the entity's self-interest because:

- Publishers received significantly less revenue per eBook unit under the agency model, even with the increased prices to consumers.  ¶ 84.

- Sales growth of eBooks slowed due to higher prices.  ¶ 99.

- The shift to the agency model threatened a powerful distributor (Amazon) by demanding control of pricing after Amazon had already indicated it would not agree to raise prices.  ¶¶ 100-109.

- Threatening Amazon with a shift to the agency model could have resulted in Amazon pulling any one individual publisher's entire physical and eBook catalog.  Such a response by Amazon could have devastated any one individual publisher's sales.  ¶¶ 109, 139.

- Any one individual publisher moving to the agency model would not have the long-term effect of stabilizing eBook and physical book prices – it would only put the individual publisher at a pricing disadvantage to its competitors.  ¶¶ 70-93.

- Apple, if only a few publishers moved to the agency model, would be a distributor with higher prices entering a market against an established competitor with lower prices and likely no sales for eBooks.  ¶¶ 110-122.

One executive admitted the negative near-term consequences of the agency model.  In February 2010, Macmillan's CEO, John Sargent, stated that after the move to the agency model, "[w]e will make less money on the sale of e books, but we will have a stable and rational market."  ¶ 82.  For a large percentage of eBook sales, the Publisher Defendants' average revenue-per-unit of eBooks sold decreased by thirty-one percent compared to their longstanding wholesale model.  ¶¶ 84-87.

---

[74]   Publishers Mot. at 2.

In short, to successfully achieve their goal, Defendants' switch to the agency model depended on coordinated efforts – no publisher acting alone would risk selling its eBooks at thirty percent higher than the rest of the competition; nor could a single Publisher Defendant unilaterally force an increase in eBook retail prices.  ¶ 95.  This was evident to the Publisher Defendants when Nourry, Chairman and CEO of Hachette,  asked Amazon to raise its eBook prices on December 3, 2009.  Amazon refused.  ¶ 101.  And so it took the threat of all five Publisher Defendants coordinating with a dominantly positioned 800-pound  ($500 billion market cap) gorilla (Apple) to force Amazon to adopt the new pricing model.  ¶¶ 110-165.

Moreover, each Publisher Defendant was not simply responding independently to a "common stimuli" (a new entrant) as they claim.[75]  This is evidenced by the fact that just a few months before Apple announced it would enter the eBook market, in November 2009, Barnes & Noble entered the eBook market with its eReader device – the Nook.  Yet, not a single publisher responded to Barnes & Noble entering the eBook market by switching to the agency model. ¶ 67.

### 6.    The Publisher Defendants' Uniform Refusal to Sell EBooks Under the Wholesale Model that Existed for Centuries Supports the Inference of a Conspiracy Here

"Evidence of conscious parallelism can be joined with evidence of coercion in further support of an inference of agreement."[76]  As described above (*see* section II.B, *supra*), the Publisher Defendants (simultaneously) approached Amazon and presented a united front, each demanding Amazon switch to the agency model.  Amazon initially resisted.  But to force Amazon to accept the agency model, the Publisher Defendants threatened Amazon with deprivation of seventy-five to eighty-five percent of newly released fiction titles and many

---

[75]    Publishers Mot. at 22-23.

[76]    *Ambook Enters.*, 612 F.2d at 616.  *See also Wilhelmina*, 2004 U.S. Dist. LEXIS 5045, at *12 (evidence of coercion a "plus factor").

leading nonfiction titles, just as Apple was entering the market.  ¶ 156.  As a result, Amazon faced delayed releases of its eBooks from Macmillan.  ¶ 148.  And until Amazon reached agreement with Hachette or Penguin on the agency model, both publishers refused to sell new eBook releases to Amazon.  ¶¶ 157-58.  But Amazon was not the only target of Defendants' joint refusal to sell eBooks under the wholesale model.  On March 31, 2010, each of the Publisher Defendants simultaneously cut off another eBook retailer – BooksOnBoard – because it had not yet agreed to switch to the agency model.  ¶ 163.

### 7. The Market for EBooks Is Concentrated

Multiple scholarly and legal sources have found market concentration on the seller side a condition propitious for the emergence of collusion.[77]  EBooks is a concentrated market.  In 2009, the Publisher Defendants and non-defendant Random House, were responsible for publishing more than ninety percent of all hardcover New York Times bestsellers. ¶ 57.  The Publisher Defendants controlled roughly seventy-five to eighty-five percent of newly released titles in eBook formats, and many leading nonfiction titles.  ¶¶ 143, 146.

### 8. Defendants' Collusive Price-Fixing Is the Subject of Pending Investigations by Multiple Governmental Agencies and a Threatened Civil Complaint by the Department of Justice

Courts recognize pending government investigations as a plus factor.[78]  The Texas Attorney General, the Connecticut Attorney General, the European Union antitrust regulators and the Department of Justice, antitrust division, have all announced investigations into collusive pricing in the eBooks industry.  ¶¶ 191-98.

After Defendants filed their motions, it was reported that the DOJ notified the five Publisher Defendants and Apple that it intends to file a civil complaint against them for

---

[77] *See, e.g.*, Posner, *Antitrust Law*, at 69-70; *Starr*, 592 F.3d at 324.

[78] *Starr*, 592 F.3d at 324.

- 35 -

colluding to raise the price of electronic books.[79]  This threat is not without weight – legally, the

DOJ is entitled to undertake pre-filing discovery.[80]  It is a reasonable inference that the DOJ has

availed itself of this procedure.  Indeed, according to The Wall Street Journal, the DOJ has

deposed at least one executive from book retailer Barnes & Noble in the course of its

investigation.[81]

In addition, public statements by the European Union Competition Commissioner

Joaquin Almunia make clear that the European Commission has firm grounds to suspect

Defendants engaged in wrongdoing: "We are worried about the development of practices that do

not exist for physical books, such as collusion between publishers on prices," Almunia said.

"We are ready to explore a settlement if there is a possibility, but only if all our objections are

eliminated."[82]

**D.    Defendants' Arguments Rely on Facts Contrary to Plaintiffs' Allegations, Misstate the Law, or Improperly Proffer Explanations**

*Twombly* of course neither require Plaintiffs at the pleading stage to **prove** that

Defendants engaged in a conscious commitment to a common plan, nor must Plaintiffs'

allegations rise to the level of being probable, or even likely.  In fact, Plaintiffs need only

"nudge" their allegations across the line from conceivable to plausible.

---

[79]    *See* Thomas Catan and Jeffrey A.Trachtenberg, *U.S. Warns Apple, Publishers*; The Wall Street Journal (Mar. 9, 2012), http://online.wsj.com/article/SB10001424052970203961204577267831767489216.html.  *See also* section II.I, *infra* regarding Plaintiffs' request for leave to amend the complaint to allege additional facts.

[80]    *See* 15 U.S.C. § 1312; *Associated Container Transp.*, 705 F.2d at 58 (noting "the broad investigatory powers granted to the Justice Department").

[81]    *See* Thomas Catan and Jeffrey A.Trachtenberg, *U.S. Warns Apple, Publishers*; The Wall Street Journal (Mar. 9, 2012), http://online.wsj.com/article/SB10001424052970203961204577267831767489216.html.

[82]    *EU Almunia: Concerned About Price Collusion Between E-Book Publishers*, The Wall Street Journal (Mar. 12, 2012), http://online.wsj.com/article/BT-CO-20120312-705388.html.  *See also* section II.I, *infra*.

Defendants' strategy is to try and superimpose a summary judgment standard, such as that set forth in *Matsushita*,[83] on top of Plaintiffs' allegations at the pleading stage. But Plaintiffs are not required to allege facts that tend to exclude independent self-interested conduct as an explanation for Defendants' common behavior. Indeed – even at the summary judgment stage – courts recognize that "[t]he *Matsushita* Court did not hold that if the moving party enunciates ***any*** economic theory supporting its behavior, regardless of its accuracy in reflecting the actual market, it is entitled to summary judgment."[84] Even when determining whether plaintiffs' evidence sufficiently defeats summary judgment, "courts should not weigh conflicting evidence, because that is the job of the jury."[85] Thus, Plaintiffs clearly do not have to disprove Defendants' alternative inferences at the pleading stage. The holding in *Twombly* "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."[86]

The Publisher Defendants claim "a complaint must be dismissed when the court can infer 'obvious alternative explanation[s]' that suggest lawful conduct rather than the unlawful conduct a plaintiff asks the court to infer."[87] *Twombly* and *Iqbal* make clear that the correct inquiry is whether the inference of unlawful conduct is plausible. It is only when nothing in the factual context of a complaint renders that inference more than sheer speculation – when it amounts to

---

[83]   *Matsushita Elec. Indus. Co., Ltd.. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). *See, e.g.*, Publishers Mot. at 19 (claiming that "when a complaint contains no more than allegations of conduct that is equally consistent with rational unilateral behavior, it must be dismissed")

[84]   *In re Ethylene Propylene Diene Monomer (EDPM) Antitrust Litig.*, 681 F. Supp. 2d 141, 167-68 (D. Conn. 2009) (emphasis in original).

[85]   *Id.*

[86]   *Twombly*, 550 U.S. at 556.

[87]   Publisher Mot., at 13 (citing *Twombly* and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009)).

- 37 -

nothing more than an "unadorned, the-defendant-unlawfully-harmed-me accusation"[88] – that the existence of an "obvious alternative explanation" requires dismissal of a complaint.

To the extent that Defendants try to provide counter-factual explanations for events, this must fail under the proper legal standard. *Twombly* does not give a defendant free license to reinterpret the complaint's allegations or provide counter-factual explanations for events: "[i]f there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)."[89] The complaint may be dismissed only "when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is ***implausible***."[90] Defendants' counter-inferences do not come close to rendering Plaintiffs' allegations "implausible."

### 1.     The Simultaneous Timing and Identical Contract Terms Support the Inference of a Conspiracy

Defendants concede – as they must – two key facts: (1) the simultaneous timing of the switch to the agency model; and (2) the identical contract terms between Apple and the five Publisher Defendants.[91] But then Defendants try to propose counter-inferences suggesting "plausible" and non-collusive explanations for their joint conduct. These alternative explanations should not be considered at the pleading stage, but in any event, they are unpersuasive.

---

[88]    *Iqbal*, 129 S. Ct. at 1949.

[89]    *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) ("*Baca*").

[90]    *Id.* (emphasis in original).

[91]    Apple Mot. at 12; Publishers Mot. at 27.

> **a.** **The Simultaneous Switch to the Agency Model and Threatened Boycott of Amazon Lends Support to Plaintiffs' Allegations of Collusive Conduct**

Defendants suggest that the identical timing of the collusive agreements do not support the inference of a conspiracy here.  For example, Apple argues that allegations regarding Apple's working with the Publisher Defendants to broker the "simultaneous" switch to the agency model are insufficient.[92]  It claims that there was no reason for Apple to "orchestrate" a conspiracy to protect the Publisher Defendants' business model.[93]  But this argument just ignores the law and the facts.  As outlined in section II.B.2, *supra*, where a defendant coordinates simultaneously with upstream suppliers (who are aware of the coordination) an abrupt change in an industry's pricing, it is sufficient to demonstrate liability under the Sherman Act.[94]  And Apple's argument again ignores the complaint's allegations – Apple participated in the conspiracy to eliminate Amazon's ability to compete based on price.  ¶ 119.  Apple's then-CEO Steve Jobs admitted this when he publicly stated that Apple (i) proposed the agency model to the publishers; (ii) it meant that consumers would pay more; but (iii) that it was best for Apple.  ¶ 18.  The conspiracy was not just to protect the Publisher Defendants' financial well-being, it was to restrain Amazon as a competitive threat to Apple as well.  Without it, Apple had little chance of succeeding in the eBook market.  Amazon had a dominant position with a cheaper product – Apple needed to fix the game to get a spot on the playing field.

The Publisher Defendants similarly argue that the "coincident timing" of their agreements with Apple do not support the inference of a conspiracy.[95]  But they claim that

---

[92]   Apple. Mot., at 12.

[93]   *Id.*

[94]   *See also Interstate Circuit*, 306 U.S. at 222; *Toys "R" Us*, 221 F.3d at 932-33.

[95]   Publishers Mot. at 24-25.

(1) Apple had already told the Publisher Defendants that it was discussing the agency agreements with other publishers; and (2) that the Publisher Defendants were aware that Apple "would not proceed with the iBookstore absent a critical mass of publishers agreeing to the proposed agency terms."[96]  This argument not only fails to render Plaintiffs' claims implausible, it achieves the exact opposite: It powerfully confirms liability under *Interstate Circuit*.[97]

### b.   Identical Contract Terms Support Plaintiffs' Allegations of Conspiracy

Defendants also argue that the identical contract terms cannot support Plaintiffs' allegations of collusive action.[98]  Apple argues that there was nothing untoward about the near identical terms being entered into between itself and the five Publisher Defendants – that "similar contract terms can reflect similar bargaining power and commercial goals."[99]  This alternative factual inference must be rejected at the pleading stage.[100]  But even if the Court were to consider what inference should be given to near-identical terms being entered into between Apple and the other Defendants on a near-simultaneous basis, the Supreme Court rejected such an argument in *Interstate Circuit*, when it found that it "taxes credulity to believe that the several distributors would, in the circumstances, have accepted and put into operation with substantial unanimity such far-reaching changes in their business methods without some understanding that all were to join."[101]  And so this is true here too.  As demonstrated above, it was not in any one of Publisher

---

[96]   *Id.* at 24; *see also id.* at 25 ("in light of press reports that Apple was negotiating with each of the 'big six' publishers (as well as private statements from Apple to that effect), each Publisher Defendant knew or could have known about the negotiations of its competitors").

[97]   306 U.S. at 222.

[98]   Apple Mot. at 13; Publishers Mot. at 26.

[99]   Apple Mot. at 13.

[100]   *Baca*, 652 F.3d at 1216.

[101]   *Interstate Circuit*, 306 U.S. at 223.

Defendants' independent interest to enter into the agency model and have higher pricing, ***unless the other publishers*** also entered into the same agreement.[102]

### 2. Plaintiffs' Pricing Allegations Plausibly Support a Claim of a Horizontal Conspiracy

Defendants try to explain away the standardized pricing after the implementation of the agency model, suggesting it does not support the inference of a conspiracy.[103]  Each Defendant ignores the legions of case law (and scholarly opinions) holding that "[s]imultaneous price increases . . . unexplained by any increases in cost may therefore by good evidence of the initiation of a price-fixing scheme."[104]  Moreover, the complaint specifically alleges that the agreements between the Publisher Defendants and Apple included a common formula intended to increase the price of eBooks.  ¶¶ 127-28, 131, 149, 187, 243.  More specificity is not required under Rule 8(a), particularly where the truth of the matter – the exact terms of the contracts at issue – is solely within Defendants' knowledge.[105]  Similarly, Defendants argue that the fact that the pricing formula contained multiple price points somehow renders a horizontal agreement implausible.  But there is nothing implausible about competitors agreeing that current prices are too low and setting higher price bands.

Apple tries to suggest that its actions should not be seen as collusive, because the proviso requiring that Publisher Defendants match prices between Apple and other distributors meant this would require publishers to "keep the iBookstore competitive by lowering prices."[106]  Apple

---

[102]  *See* section II.C.5, *supra*.

[103]  Apple Mot. at 15; Publishers Mot. at 32-35.

[104]  *See, e.g.,* Posner, *Antitrust Law*, at 88.

[105]  Nonetheless, Plaintiffs' investigation has revealed more detail about the terms that are apparently in the relevant contracts.  If the Court believes more information is required, Plaintiffs are prepared to amend the complaint to include this information, as indicated at section II.I, *supra*.

[106]  Apple. Mot. at 14.

concludes that this fact cannot raise the inference that Apple conspired to require higher prices. But Apple's argument is not only hypothetical, it is counter-factual. Placed against the complaint's factual back drop, Apple's argument regarding lower prices flounders.

*First*, the complaint alleges that the ***intent*** of the pricing formula was "to increase, standardize and stabilize most first-release general fiction and nonfiction titles." ¶ 128. And the complaint alleges that the ***actual effect*** of the pricing formula was to raise prices. ¶¶ 127-28, 190. *Second*, commentators and case law agree that "[t]he most plausible explanation for a truly 'naked' agreement fixing maximum prices is that the stated maximum also operates as a minimum."[107] This is precisely what happened, as the complaint shows – prices uniformly went up. ¶ 201. *Finally*, the Supreme Court has rejected Apple's argument here (that its price restraint was meant only to set a maximum price, not a minimum price). For example, in *Maricopa Cnty. Med. Soc'y.*, the Supreme Court held that its prior "decisions foreclose the argument that the agreements at issue escape per se condemnation because they are horizontal and fix maximum prices."[108] The Supreme Court went on to explain that the maximum price agreement in that case still violated the Sherman Act because:

> [T]he rule is violated by a price restraint that tends to provide the same economic rewards to all practitioners regardless of their skill, their experience, their training, or their willingness to employ innovative and difficult procedures in individual cases. Such a restraint also may discourage entry into the market and may deter experimentation and new developments by individual entrepreneurs.[109]

---

[107]   Areeda & Hovenkamp, *Antitrust Law* ¶ 2007b2.

[108]   *Maricopa Cnty. Med. Soc'y.*, 457 U.S. at 348.

[109]   *Id.* at 348.  *See also Kiefer-Stewart*, 340 U.S. at 213 ("For such agreements [to fix maximum prices], no less than those to fix minimum prices, cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment.").

And the Publisher Defendants argue that Plaintiffs' pricing allegations fail because after the conspiracy, pricing became *less* uniform (moving from Amazon's $9.99 pricing to fluctuating from $12.99 to $14.99 for best sellers).[110]  Publisher Defendants misconstrue the allegations of the complaint.  The agency model's pricing formula tied the prices of eBooks to physical books.  ¶ 127.  The pricing formula standardized higher prices (whereas before, $9.99 was the ceiling). ¶¶ 202-204.

### 3.  The Publisher Defendants' Counter-Factual Justifications for Their Collusive Behavior Are Factually Incorrect, and in Any Event, Improperly Raised at the Pleading Stage

The Publisher Defendants also suggest that a number of perceived benefits existed which made their decision to enter into the agency model with Apple reasonable.[111]  *First*, as a legal matter, pricing restraints are illegal *per se*.  The Defendants' proffered pro-competitive benefits are irrelevant, as the Sherman Act prohibits pricing restraints outright – it is not the place of the Court to determine the "social utility or political wisdom of price-fixing agreements."[112]

*Second*, Defendants' "pro-competitive" justifications actually demonstrate that it was against each of their *individual* interests to pursue the agency agreements – even if it was to their collective benefit to price-fix.  For example, the Publisher Defendants argue that each individually entered into the agency agreement to "increas[e] or preserv[e] wholesale prices for physical books."[113]  What they are saying is that they wanted to protect what they could charge for physical books by raising the retail prices for eBooks.  But no individual publisher could have effected this end if it were the *only* publisher to enter into the agency agreement with

---

[110]  Publishers Mot. at 33; ¶ 128.

[111]  Publishers Mot. at 22-23.

[112]  *Trial Lawyers*, 493 U.S. at 421-22.

[113]  Publishers Mot. at 23.

010260-11  507247 V5
11-md-02293 (DLC)

Apple.  To preserve the prices of physical books through the retail price agreements on eBooks, *the majority* of publishers had to agree to the agency model with Apple, and then impose the agency agreement on Amazon.  Should any individual publisher be the only one to enter into the agency agreement with Apple (or try to impose that agreement on Amazon), it would likely face ruinous losses because of the higher retail prices and lower-per-unit revenue retained on any one book.  ¶ 84.  This point was graphically demonstrated in the complaint:[114]





*Third*, some of the Publisher Defendants' proffered reasons are just counter-factual to the complaint.  The Publisher Defendants assert that they entered into the agency agreements to increase overall book sales[115] – but of course, the complaint alleges that the growth rate of eBook sales for the Defendant Publisher Defendant s' titles compared to other publishers were slower after the adoption of the agency model.  ¶ 88.

---

[114]   ¶ 84.

[115]   *Id*. at 23.

- 44 -

*Fourth*, the Publisher Defendants list ten purported "potential or perceived benefits of contracting with Apple."[116]  Eight of the ten of these could have been easily achieved under the wholesale model.[117]  The two remaining – "increasing or preserving wholesale prices for physical books" and "support[ing] . . . 'brick-and-mortar' retailers that were . . . subject to Amazon's below-cost pricing" – required industry collusion.[118]  These were industry problems that could not be solved independently, and required concerted action.  Publisher Defendants claim that guaranteeing Apple higher retail prices was necessary to incent Apple's entry.[119]  Of course, any individual publisher could have reduced their wholesale price to increase Apple's margins, and would still have increased their own revenue through increased unit sales.  This option would not have resulted in increased retail prices for consumers.

### 4.  Apple's Legal Response to Amazon's Prices Cannot Be an Agreement to Fix Prices

Apple complains that its response to "margin pressure caused by Amazon's pricing" – entering into the agency agreements with the Publisher Defendants – was a "rational and competitive" business strategy to avoid "spilling red ink by matching Amazon's below-cost prices as a retailer."[120]  In essence, Apple says that it was perfectly rational for Apple to want to avoid price competition.  And in fact, while this may be true for any corporation, what is also true is that Apple cannot escape price competition through unlawful means.  As detailed in

---

[116]  *Id*. at 22-23.

[117]  *See, e.g.*, *id*. at 22-23 ( "introduction of a viable competitor in eBooks distribution," "resisting Amazon's creation/maintenance of monopsony," "reducing reliance on a single retailer," "expanding and diversifying eBook distribution," "valuable partnerships with Apple," "gaining access to Apple's 'huge installed base' of millions of customers," "increasing overall book sales," "improvement of the eReading experience and market-wide innovation").

[118]  *See, e.g.*, *id*. at 23.

[119]  Publishers Mot. at 22-23.

[120]  Apple Mot. at 11.

section II.B, *supra*, coordinated vertical agreements between downstream and upstream firms as a means of effecting a price restraint was declared illegal over seventy years ago by the Supreme Court in *Interstate Circuit*[121] and remains so, as confirmed by the Seventh Circuit in *Toys "R" Us*.[122]

But even accepting, *arguendo*, Apple's assertion that Amazon was engaging in below cost pricing, Apple's suggestions regarding Amazon's pricing are irrelevant.  The Supreme Court held in *Socony-Vacuum Oil* that the legal response to price-cutting cannot be a price-fixing conspiracy:

> ***Ruinous competition, financial disaster, evils of price cutting and the like appear throughout our history as ostensible justifications for price-fixing.*** If the so-called competitive abuses were to be appraised here, the reasonableness of prices would necessarily become an issue in every price-fixing case. In that event ***the Sherman Act would soon be emasculated***; its philosophy would be supplanted by one which is wholly alien to a system of free competition; it would not be the charter of freedom which its framers intended.[123]

Apple is arguing that nothing more than its coordination of a pricing restraint (the agency model) was in Apple's self-interest, because it resulted in Apple maximizing its own profits.  Profit maximization is not an illegal goal, but it must be accomplished through legal means.

But Apple's argument also fails because it is speculative.  Apple does not know at this stage whether or not Amazon was indeed pricing below cost.  *First*, even if Amazon were pricing below cost on some number of books, its $9.99 pricing might still be profitable based on the entire mix of books.  Amazon did not price all books at $9.99, but only certain popular books.

¶ 2.  *Second*, Apple's arguments are incorrect because it assumes a static pricing at $9.99;

---

[121]   306 U.S. at 227.

[122]   221 F.3d at 935 ("this case is a modern equivalent of the old *Interstate Circuit* decision).

[123]   *Socony-Vacuum Oil*, 310 U.S. at 221.  *See also Trial Lawyers Ass'n*, 493 U.S. at 421-422 ("it is not [a court's] task to pass upon the social utility or political wisdom of price-fixing agreements").

whereas, in truth, Amazon may have priced books at $9.99 and paid a higher wholesale price at their initial launch, but paid a lower wholesale price to the publishers as these titles aged.  Thus, the $9.99 price point may have been profitable if one looked at the entire lifespan of the book.

Moreover, Apple with gross speculation predicts that Amazon would raise consumer prices in the future.[124]  In fact, under the wholesale model, prices continued to decrease (while prices under the agency model increased).  ¶ 201.  In contrast, a more plausible concern for Defendants than increased consumer prices was that Amazon would drop prices even further and reduce the prices retailers paid to the Publisher Defendants.  This demonstrates another motive to collusively strip Amazon of control over its pro-consumer price strategy.

And finally, Apple suggests that the agency model was necessary to allow a new entrant into the eBook retail market.[125]  This is, of course, also factually incorrect as Barnes & Noble entered the market with its Nook e-reader without similarly requiring a shift to the agency model.  ¶ 67.

### 5.   Apple Is Incorrect that the Hub of a Conspiracy Must Be a "Dominant Purchaser or Supplier" in the Market

Apple first suggests that to be the "hub" of this hub and spoke conspiracy, it must be a "dominant purchaser or supplier" in the relevant market.[126]  Apple is wrong on the law.  Apple relies solely on the Third Circuit's opinion in *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, but the Third Circuit did not hold that the "hub" of a conspiracy must be a dominant player.[127]  *Dentsply* merely observes that this is the most common situation where a hub-and-spoke conspiracy might arise; neither it nor the sources on which it relies suggest in any way that

---

[124]   Apple Mot. at 3, 9, 18-19, 21-24.

[125]   *Id*. at 8-9.

[126]   *Id*. at 11-12.

[127]   *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc*., 602 F.3d 237, 255 (3d Cir. 2010).

market power by the hub is a requirement for a court to find a hub-and-spoke conspiracy.  The reason that hub-and-spoke conspiracies "generally [involve] a dominant purchaser or supplier" is that such an entity typically has something to offer its co-conspirators: a share of monopoly rents.[128]

Apple's cramped legal claim is also based on cramped facts.  It strains credulity for the world's most valuable company, as measured by its market capitalization of nearly $555 billion, to portray itself merely as an upstart in the digital media distribution market – rather than a market leader and power to be reckoned with by any firm hoping to compete for sales.  Apple is "the most powerful digital content distribution company other than Amazon (¶ 112) and a "leading manufacturer of mobile devices" (¶ 48). To suggest otherwise smacks of desperation, and is completely contradicted by the Publisher Defendants' argument that they had no choice but to accede to the demands of the most powerful distributor of digital content.[129]

### 6. Plaintiffs Adequately Allege that Apple Participated in Conspiracy

Apple next argues that Plaintiffs have offered no facts linking Apple to any concerted action to raise prices or to "force Amazon to abandon its . . . pricing and the wholesale model."[130]  When assessing whether the facts suggest a particular defendant participated in the alleged conspiracy, "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components."[131]  Throughout their motions, Defendants isolate single allegations from the complaint and say that "standing alone" or "without more,"

---

[128]   *See, e.g., Wallach v. Eaton Corp.*, No. 10-260, 2011 U.S. Dist. LEXIS 112480, at *28 (D. Del. Sept. 30, 2011) (parallel conduct against self-interest suggests that truck manufacturers entered into a hub-and-spoke conspiracy with a monopolist transmission supplier to "share in the profits from the resulting monopoly").

[129]   Publishers Mot. at 3.

[130]   Apple Mot. at 16, 17-18.

[131]   *Cont'l Ore Co.*, 370 U.S. at 699.  *See also Wilhelmina Model*, 2004 U.S. Dist. LEXIS 5045, at *12-*13.

that allegation does not support a plausible inference of conspiracy.[132] But the question before the Court is not whether any one allegation **standing alone** puts Defendants' parallel conduct in a context suggesting that there may have been a preceding agreement; it is whether those allegations **viewed together** support that inference.

Moreover, conspiracy allegations "need not be detailed on a 'defendant by defendant' basis."[133] Rather, to survive a motion to dismiss, plaintiffs only need "to make allegations that plausibly suggest that each Defendant participated in the alleged conspiracy."[134] Even "a single overt act by just one of the conspirators is enough to sustain a conspiracy even on the merits."[135] Apple's myopic view of the complaint overlooks key allegations, however, that: (i) Apple's then-CEO admitted that Apple was aware that publishers were withholding their books from Amazon because the publishers were "not happy" (¶ 17); (ii) Apple's then-CEO admitted that part of Apple's proposal to the Publisher Defendants required price uniformity throughout the market (¶¶ 18, 128); and (iii) the agreement agreements between Apple and the Publisher

---

[132] *See, e.g.*, Publishers Mot. at 18, 26, 34; Apple Mot. at 15, 20, 22. In the most egregious example, Apple cites *Hinds Cnty. v. Wachovia Bank N.A.*, 790 F. Supp. 2d 106, 115 (S.D.N.Y. 2011), for the proposition that "pending government investigations may not, standing alone, satisfy an antitrust plaintiff's pleading burden." Apple Mot. at 20. The full sentence, however, reads: "Although pending government investigations may not, standing alone, satisfy an antitrust plaintiff's pleading burden, *government investigations may be used to bolster the plausibility of § 1 claims.*" *Hinds Cnty.*, 790 F. Supp. 2d at 115.

[133] *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d at 1142 n.7. *See also In re Fine Paper Antitrust Litig.*, 685 F.2d 810, 822 (3d Cir. 1982) (district court should not "compartmentalize" a conspiracy claim by conducting "a seriatim examination of the claims against each of five conspiracy defendants as if they were separate lawsuits"); *In re Cathode Ray Tube (CRT) Antitrust Litig.* ("*In re CRT Antitrust Litig.*"), 738 F. Supp. 2d 1011, 1019 (N.D. Cal. 2010) ("Courts in this district do not require plaintiffs in complex, multinational, antitrust cases to plead detailed, defendant-by-defendant allegations"); *In re OSB Antitrust Litig.*, 2007 U.S. Dist. LEXIS 56573, at *13 ("Antitrust conspiracy allegations need not be detailed defendant by defendant.").

[134] *In re CRT Antitrust Litig.*, 738 F. Supp. 2d at 1019.

[135] *In re Nifedipine Antitrust Litig.*, 335 F. Supp. 2d 6, 15 (D.D.C. 2004). *See also Beltz Travel Serv., Inc. v. Int'l Air Trans. Ass'n*, 620 F.2d 1360, 1367 (9th Cir. 1980) ("Participation by each conspirator in every detail in the execution of the conspiracy is unnecessary to establish liability, for each conspirator may be performing different tasks to bring about the desired result.")

Defendants required that the Publisher Defendants imposed the agency model on other retailers, abandoning the wholesale model altogether (¶ 129).  These allegations, combined with the many others in the complaint, are sufficient to withstand a motion to dismiss.

**E.      The Alleged Conspiracy Is Subject to *Per Se* Condemnation**

It is well-settled than any horizontal conspiracy to fix prices is *per se* illegal.[136]  This is so whether the conspiracy fixes minimum prices or maximum prices.[137]  Accordingly, because the complaint alleges a horizontal conspiracy to fix prices, as discussed above, that conspiracy is illegal *per se* if proven at summary judgment or trial.

Both Apple and the Publisher Defendants, however, claim that the rule of reason governs the complaint even if a horizontal conspiracy is shown.  The Publisher Defendants, without any explanation or rationale (let alone citation to precedent), "maintain that any purported conspiracy to change distribution methods from the wholesale to agency model should be analyzed under the rule of reason."[138]  Because this assertion is made without any factual or legal elaboration, it should be disregarded.

To the extent that the Publisher Defendants' reasoning for this claim can be gleaned from the remainder of their brief, it is clear that their argument is meritless.  The Publisher Defendants frequently advert to supposed "procompetitive effects" of their agreements with Apple.[139]  However, justifications such as "[r]uinous competition, financial disaster, evils of price cutting and the like appear throughout our history as ostensible justifications for price-fixing," and have

---

[136]   *See, e.g., Trial Lawyers Ass'n*, 493 U.S. at 421-22 ; *Maricopa Cnty. Med. Soc'y*, 457 U.S. at 344-48 ; *Kiefer-Stewart*, 340 U.S. at 213; *Socony-Vacuum Oil*, 310 U.S. at 220-24.

[137]   *Maricopa Cnty. Med. Soc'y*, 457 U.S. at 348; *Kiefer-Stewart*, 340 U.S. at 213.

[138]   Publishers Mot. at 37.

[139]   *Id*. at 37; *see also, e.g., id*. at 22-23.

- 50 -

uniformly been rejected as defenses to a charge of price-fixing.[140]  In enacting the Sherman Act, Congress refused to allow "genuine or fancied competitive abuses as a legal justification for such schemes."[141]  Even if such claims of righteousness could excuse naked price-fixing, none of the Publisher Defendants have proffered efficiencies relate to the price-fixing agreements themselves.  All of the purported benefits of Apple's entry into the eBook market could have been achieved without the unlawful agreements to set prices throughout the retail sector at higher prices.  In fact, only a few months earlier Barnes & Noble entered the eBook market without the agency model.  ¶ 67.

Apple musters a perfunctory argument that it cannot be subject to *per se* analysis for its role in facilitating because it is in a vertical relationship to each of its other competitors.  This is plainly incorrect.  An entity that knowingly enables horizontal competitors to establish a conspiracy is liable for the conspiracy to the same extent as the competitors themselves.[142]

Apple bases its argument on a misreading of dicta in *Leegin*.  The Supreme Court wrote:

> A horizontal cartel among competing manufacturers or competing retailers that decreases output or reduces competition in order to increase price is, and ought to be, *per se* unlawful.  To the extent a vertical agreement setting minimum resale prices is entered upon

---

[140]  *Socony-Vacuum Oil*, 310 U.S. at 221.

[141]  *Id.* at 221-22.; *see also, e.g.*, *Trial Lawyers Ass'n*, 493 U.S. at 421-22.

[142]  *See, e.g.*, *Toys "R" Us*, 221 F.3d at 932 (retailer that "orchestrated a horizontal agreement among its key suppliers to boycott [rival retailers]" is subject to *per se* condemnation; "the essence of the agreement network [the retailer] supervised was horizontal"); *see also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 337 (3d Cir. 2010) ("The fact that . . . an entity vertically oriented to the [horizontal conspirators] appears to be a sine qua non of the alleged horizontal agreement is not necessarily an obstacle to plaintiffs' claim. . . . [D]efendants cannot escape the per se rule [for certain horizontal restraints of trade] simply because their conspiracy depended upon the participation of a 'middle-man,' even if that middleman conceptualized the conspiracy, orchestrated it . . . and collected most of the booty.") (emphasis and modification in original); Areeda & Hovenkamp, *Antitrust Law* ¶ 1604c2 (rule of reason analysis unnecessary where vertically connected party "was fully implicated in a per se unlawful naked restraint").

- 51 -

to facilitate either type of cartel, *it, too, would need to be held unlawful* under the rule of reason.[143]

Apple ignores the emphasized text, asserting that the Court calls for a full-blown rule of reason analysis.  But read in its full context, the paragraph plainly envisions the opposite.  A vertical agreement to facilitate a horizontal cartel, just like the cartel agreements themselves, must be held unlawful.  That such an inquiry might technically come under the rubric of the rule of reason (like other vertical resale price maintenance agreements) does not change the fact that, under any analysis, "it, too, would need to be held unlawful."[144]  In any event, *Leegin*, which involved a purely vertical claim, did not purport to speak to the situation where a vertically oriented party plays an integral role in the initiation of a horizontal conspiracy.[145]

Apple also argues that any claim against it is subject to the rule of reason because Plaintiffs "are challenging Apple's entry" into the eBook market.[146]  As explained above, this misrepresents the nature of Plaintiffs' claim.  Plaintiffs take no issue with Apple's decision to begin retailing eBooks or to contract with leading publishers, nor with the Publisher Defendants' decision to contract with Apple.  Plaintiffs challenge only the Defendants' agreement to elevate the price of eBooks throughout the retail market to twenty-five to fifty percent above its preexisting price.  Such a conspiracy, if proven, is unquestionably a horizontal price-fixing conspiracy.

---

[143]  *Leegin*, 551 U.S. at 893.

[144]  *Id.*; *cf. Am. Needle, Inc. v. Nat'l Football League*, _ U.S. _, 130 S. Ct. 2201, 2216-17 (2010) ("[D]epending upon the concerted activity in question, the Rule of Reason may not require a detailed analysis; it 'can sometimes be applied in the twinkling of an eye.'").

[145]  For the same reason, *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204 (3d Cir. 2008), is inapposite.  In *Toledo Mack*, the vertical agreement between a manufacturer and its dealers did not come into being until years after the dealers had begun carrying out a conspiracy to eliminate price competition.  *Id.* at 210-11.  The dealers' horizontal conspiracy predated and was entirely independent of any vertical agreement with the manufacturer.

[146]  Apple Mot. at 21.

- 52 -

**F.**     **If Analyzed Under the Rule of Reason, the Complaint Sufficiently Alleges
         Anticompetitive Effects**

Even if the Court were to analyze Plaintiffs' claims under the rule of reason, they would

readily withstand Defendants' motion.  At the complaint stage, a plaintiff need only plead an

anticompetitive effect in a relevant market to state a claim under the rule of reason.[147]  An

allegation that prices have increased satisfies this burden.[148]

Plaintiffs have, indisputably, alleged price increases.  ¶¶ 127-128, 131, 201, 203(b).  The

vast majority of bestselling eBooks were priced at $9.99 or lower before the conspiracy went into

effect; now, the vast majority are priced at $12.99 or higher.  ¶¶ 63, 67-68, 203(b).  This brings

prices to the exact range that was identified by the Publisher Defendants and Apple as the target

price points at the time of the contracts.  ¶¶ 127-28, 131.  The average retail price for all of the

Publisher Defendants' titles has risen by nearly twenty-five percent while the average retail price

for their newly released bestsellers has risen by forty percent.  ¶ 201.  This fact unquestionably

allows a plausible inference of anticompetitive effects in a relevant market at this stage of the

litigation.

Defendants attempt to obscure this plain factual allegation of an anticompetitive effect

with various unpersuasive arguments.  *First*, Defendants claim that Plaintiffs have not alleged

market power.[149]  But the Supreme Court has stated that market power allegations are

unnecessary where an increase in prices has been shown.[150]  In any event, Plaintiffs have clearly

---

[147]   *See, e.g., CDC Techs., Inc. v. IDEXX Labs., Inc.*, 186 F.3d 74, 80 (2d Cir. 1999); *Habitat, Ltd. v.
Art of the Muse, Inc.*, No. 07-CV- 2883, 2009 U.S. Dist. LEXIS 25096, at *10 (E.D.N.Y. Mar. 25, 2009).

[148]   *See, e.g., Todd v. Exxon Corp.*, 275 F.3d at 214.

[149]   Publishers Mot. at 38; Apple Mot. at 21-22.

[150]   *See FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986) ("Since the purpose of the
inquiries into market definition and market power is to determine whether an arrangement has the
potential for genuine adverse effects on competition, proof of actual detrimental effects, such as a
reduction of output, can obviate the need for an inquiry into market power, which is but a surrogate for

- 53 -

defined a relevant market – the U.S. market for eBooks – and alleged that the Publisher

Defendants control "about seventy-five to eighty-five percent" of one of the largest components

of that market, fiction titles.  ¶¶ 70, 242-43.  Apple's lack of market power in the eBooks market

at the outset of the conspiracy is irrelevant, given the market power of its co-conspirators.

Next, the Publisher Defendants claim that plaintiffs must allege that these substantial

price increases outweigh the supposed "procompetitive effects" of Defendants' price-fixing.  But

they provide no support for undertaking such a fact-specific balancing analysis ***on a motion to***

***dismiss***, which is clearly incompatible with the limited review appropriate at that stage.[151]

The Publisher Defendants ostensibly rely on *Atl. Richfield Co. v. USA Petroleum Co.*,[152]

but *Atl. Richfield* supports no such requirement.  Instead, it merely restates the unremarkable

proposition that a rule of reason analysis is directed at determining "whether [a restraint's]

anticompetitive effects outweigh its procompetitive effects."[153]  Indeed, because the plaintiff in

---

detrimental effects."); *see also K.M.B. Warehouse Distribs., Inc.. v. Walker Mfg. Co.*, 61 F.3d 123, 129 (2d Cir. 1995) ("This court has not made a showing of market power a prerequisite for recovery in all § 1 cases.  If a plaintiff can show an actual adverse effect on competition, . . . we do not require a further showing of market power.").

[151]  *See, e.g.*, *Redbox Automated Retail LLC v. Universal City Studios LLP*, No. 08-766, 2009 U.S. Dist. LEXIS 72700, at *15 (D. Del. Aug. 17, 2009) ("The rule of reason analysis that eventually guides the Court's consideration of the merits of Plaintiff's claim requires a broad examination of the multitude of factors bearing on whether Universal's alleged acts are uncompetitive in nature. . . . [T]he Court is satisfied with the sufficiency of Plaintiff's pleading and leaves a more searching inquiry and balancing of competitive factors to the analysis of Plaintiff's claim on the merits."); *U.S. Info. Sys., Inc. v. IBEW Local Union No. 3*, No. 00 Civ. 4763, 2002 U.S. Dist. LEXIS 1038, at *19 (S.D.N.Y. Jan. 23, 2002) (court should consider whether overall competition is diminished only "[a]fter both sides have offered proof"); *Cool Wind Ventilation Corp. v. Sheet Metal Workers Int'l Ass'n, Local Union No. 28*, 139 F. Supp. 2d 319, 328 (E.D.N.Y. 2001) (rule of reason analysis "requires a clear understanding of the factual circumstances of the particular industry alleged to have been harmed" and "[s]uch matters are particularly ill-suited for disposition in the context of a motion to dismiss").

[152]  495 U.S. 328, 342 (1990).

[153]  *Id..* at 342.

*Atlantic Richfield* had not alleged antitrust injury,[154] the Court had no occasion to discuss the showing of anticompetitive effects needed to survive a motion to dismiss.[155]

Finally, Apple argues that the price increases alleged in the complaint should be disregarded because the pre-conspiracy $9.99 price point was too low.  However, "the reasonableness of the resulting price does not excuse a price-fixing conspiracy even if preconspiracy prices were 'too low.'"[156]  Even were Apple's belief that preexisting prices were too low to be legally relevant, its argument boils down to a plea that the Court find it implausible that actual market prices were competitive.  Such an extreme inference in Defendants' favor is utterly inappropriate on a motion to dismiss.

## G.    Plaintiffs' State Antitrust Claims Should Not Be Dismissed

The Plaintiffs' third cause of action pleads antitrust claims under the laws of twenty-seven states and the District of Columbia.  ¶¶ 251-281.  Generally, as Apple acknowledges, state antitrust law largely tracks federal interpretations of the Sherman Act.[157]  Defendants do not argue that any of the state laws at issue differs substantively from the Sherman Act; rather, they merely argue that they fail to the extent that the Sherman Act claim fails.[158]  Because Plaintiffs plausibly allege a cause of action under the Sherman Act, as demonstrated above, they have plausibly alleged a cause of action under state antitrust laws.

---

[154]   *Id.* at 345-46.

[155]   In any event, as discussed above, the purportedly procompetitive effects of Apple's entry into the eBook market could have been readily achieved without an agreement to fix prices.  *See* Areeda & Hovenkamp, *Antitrust Law* ¶ 1505 (to satisfy the rule of reason, "[t]he restraint must not only promote the legitimate objective but must also do so significantly better than the available less restrictive alternatives").

[156]   *Id.* ¶ 1509a.  *See also Trial Lawyers Ass'n*, 493 U.S. at 421.

[157]   Apple Mot. at 25.  *See also In re Digital I*, 592 F. Supp. 2d at 448-50 & nn.20-22 (collecting cases).

[158]   Apple Mot. at 24-25; Publishers Mot. at 40 n.33.

- 55 -

Apple additionally argues that it cannot be liable on the state law claims because they are brought only in the alternative, as indirect purchasers, and plaintiffs who purchased from Apple did so directly.[159]  However, as a coconspirator with the Publisher Defendants, Apple will be liable to the same extent as the Publisher Defendants.[160]  Accordingly, if an action under the Sherman Act against the Publisher Defendants were found to be unsustainable under *Illinois Brick Co. v. Illinois*,[161] but Plaintiffs established that Apple and the Publisher Defendants conspired in violation of state antitrust laws, Apple would be liable to the same extent as the Publisher Defendants.

## H.    Plaintiffs' State Unjust Enrichment Claims Should Not Be Dismissed

Plaintiffs' fourth cause of action pleads state law unjust enrichment claims against all Defendants.  Here again, Defendants primarily argue that the unjust enrichment claims should be dismissed to the extent that the antitrust claims should be dismissed, and do not raise particular arguments as to any given state law.[162]  Because Plaintiffs plausibly allege a cause of action under the Sherman Act, as demonstrated above, they have plausibly alleged a cause of action on state-law unjust enrichment theories.[163]

The Publisher Defendants additionally argue that it is unclear which state laws are implicated by the fourth cause of action.  However, that cause of action incorporates by reference

---

[159]    Apple Mot. at 25.

[160]    *See, e.g.*, *MacMillan Bloedel, Ltd. v. The Flintkote Co.*, 760 F.2d 580, 585 (5th Cir. 1985) (antitrust defendant jointly and severally liable for all damages caused by its co-conspirators); *Koch Indus., Inc. v. Hoechst Aktiengesellschaft*, 727 F. Supp. 2d 199, 210-11 (S.D.N.Y. 2010) (same).

[161]    431 U.S. 720 (1977). Defendants have not argued that *Illinois Brick* bars Plaintiffs' Sherman Act claim in any way.

[162]    Apple Mot. at 25; Publishers Mot. at 39.  The Publisher Defendants correctly observe that an "autonomous" unjust enrichment claim is unavailable.  Publishers Mot. at 39-40.  Plaintiffs do not bring such a claim.

[163]    *See, e.g.*, *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 414 (S.D.N.Y. 2011) ("*In re Digital II*").

- 56 -

the preceding paragraphs, including the enumeration of states and State Classes at issue in the complaint.  ¶¶ 240, 253-280, 282.  The source for the unjust enrichment claim is the common law of the various states identified in the complaint, and that those claims are brought on behalf of the relevant State Classes.[164]

## I.     If this Court Finds that Plaintiffs' Complaint Fails to State a Plausible Conspiracy, Plaintiffs Request Leave to Allege Specific Additional Facts

Plaintiffs declined to amend the complaint after receiving Defendants' motions to dismiss because the existing complaint already meets and exceeds the requirements of Rule 8.  However, should the Court have any doubt about the adequacy of the complaint, Plaintiffs are prepared to amend the complaint to add significant details that further strengthen the inference of conspiracy established by the current allegations.[165]  For example, Plaintiffs would add additional details, referenced above, regarding the DOJ's civil investigation into eBooks, and its intention to file a civil complaint against Apple and the five Publisher Defendants for colluding to raise the price of eBooks.[166]  Plaintiffs would add additional details regarding the DOJ's pre-filing discovery, including its deposition of at least one executive from book retailer Barnes & Noble.[167]  Plaintiffs would also add additional facts about the public statements by the European Union Competition Commissioner Joaquin Almunia to make clear that the European Commission is not willing to

---

[164]   *Cf. In re Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d 1098, 1101 (N.D. Cal. 2007) (dismissing unjust enrichment claims with leave to amend where plaintiff was "not yet aware of which state or states' laws it is moving under").

[165]   *See Porat v. Lincoln Towers Cmty. Ass'n*, 464 F.3d 274, 276 (2d Cir. 2006) ("[T]his circuit strongly favors liberal grant of an opportunity to replead after dismissal of a complaint . . . .").

[166]   *See* Thomas Catan and Jeffrey A.Trachtenberg, *U.S. Warns Apple, Publishers*; The Wall Street Journal (Mar. 9, 2012), http://online.wsj.com/article/SB10001424052970203961204577267831767489216.html.

[167]   *See* Thomas Catan and Jeffrey A.Trachtenberg, *U.S. Warns Apple, Publishers*; The Wall Street Journal (Mar. 9, 2012), http://online.wsj.com/article/SB10001424052970203961204577267831767489216.html.

settle its claims against the publishers and Apple without their agreement to end the agency

pricing model.[168]

### III.   CONCLUSION

For all the reasons stated above, Plaintiffs respectfully request that Defendants' motions

to dismiss be denied.

DATED:  March 30, 2012                    HAGENS BERMAN SOBOL SHAPIRO LLP


                                         By _____/s/ Steve W. Berman_____
                                                STEVE W. BERMAN

                                         1918 Eighth Avenue, Suite 3300
                                         Seattle, WA 98101
                                         Telephone:  (206) 623-7292
                                         Facsimile:  (206) 623-0594
                                         steve@hbsslaw.com

                                         Jeff D. Friedman (*Pro Hac Vice*)
                                         Shana Scarlett (*Pro Hac Vice*)
                                         HAGENS BERMAN SOBOL SHAPIRO LLP
                                         715 Hearst Avenue, Suite 202
                                         Berkeley, CA 94710
                                         Telephone:  (510) 725-3000
                                         Facsimile:  (510) 725-3001
                                         jefff@hbsslaw.com
                                         shanas@hbsslaw.com

                                         Jason A. Zweig (JZ-8107)
                                         HAGENS BERMAN SOBOL SHAPIRO LLP
                                         One Penn Plaza, 36th Floor
                                         New York, NY 10119
                                         Telephone:  (212) 752-5455
                                         Direct:  (212) 786-7347
                                         Facsimile:  (917) 210-3980
                                         jasonz@hbsslaw.com

---

[168]   *EU Almunia: Concerned About Price Collusion Between E-Book Publishers*, The Wall Street Journal (Mar. 12, 2012), http://online.wsj.com/article/BT-CO-20120312-705388.html.

- 58 -

Kit A. Pierson (*Pro Hac Vice*)
Jeffrey Dubner (4974341)
COHEN, MILSTEIN, SELLERS & TOLL, PLLC
1100 New York Avenue, N.W.
South Tower, Suite 500
Washington, D.C.  20005
Telephone:  (202) 408-4600
Facsimile:  (202) 408-4699
KPierson@cohenmilstein.com

Douglas Richards (JR6038)
COHEN, MILSTEIN, SELLERS & TOLL, PLLC
88 Pine Street
14th Floor
New York, NY  10005
Telephone:  (212) 838-7797
Facsimile:  (212) 838-774
DRichards@cohenmilstein.com

*Co-Lead Counsel for Plaintiffs*

- 59 -

## CERTIFICATE OF SERVICE

I hereby certify that on March 30, 2012, I electronically filed the foregoing document using the CM/ECF system which will send notification of such filing to the e-mail addresses registered in the CM/ECF system, as denoted on the Electronic Mail Notice List, and I hereby certify that I have mailed a paper copy of the foregoing document via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice List generated by the CM/ECF system.

/s/ Steve W. Berman
STEVE W. BERMAN

010260-11  507247 V5
11-md-02293 (DLC)