UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
IN RE: ELECTRONIC BOOKS ANTITRUST       :     11 MD 2293 (DLC)
LITIGATION                              :
                                        :        OPINION & ORDER
----------------------------------------:
                                        :
This Opinion and Order applies to the   :
following actions:                      :
                                        :
11 Civ. 5576 (DLC), 11 Civ. 5609 (DLC), :
11 Civ. 5621 (DLC), 11 Civ. 5707 (DLC), :
11 Civ. 5750 (DLC), 11 Civ. 5896 (DLC), :
11 Civ. 5898 (DLC), 11 Civ. 5976 (DLC), :
11 Civ. 6019 (DLC), 11 Civ. 6079 (DLC), :
11 Civ. 7507 (DLC), 11 Civ. 7534 (DLC), :
11 Civ. 7323 (DLC), 11 Civ. 8329 (DLC), :
11 Civ. 8608 (DLC), 11 Civ. 9016 (DLC), :
11 Civ. 9014 (DLC), 11 Civ. 9559 (DLC), :
11 Civ. 9560 (DLC), 11 Civ. 9561 (DLC), :
11 Civ. 9562 (DLC), 11 Civ. 9563 (DLC), :
11 Civ. 9564 (DLC), 11 Civ. 9565 (DLC), :
11 Civ. 9566 (DLC), 11 Civ. 9567 (DLC), :
12 Civ. 0476 (DLC).                     :
                                        :
----------------------------------------X


APPEARANCES:

For Plaintiffs:

Jason Allen Zweig
Hagens Berman Sobol Shapiro LLP (NYC)
One Penn Plaza, 36th Floor
New York, NY 10119

Steve W. Berman
George W. Sampson
Hagens Berman Sobol Shapiro LLP (Seattle)
1918 8th, Avenue
Suite 3300
Seattle, WA 98101

Jeff D. Friedman
Shana Scarlett
Hagens Berman Sobol Shapiro LLP (CA)
715 Hearst Avenue, Suite 202
Berkely, CA 94710

Kit A. Pierson
Emmy L. Levens
Jeffrey B. Dubner
Cohen Milstein Sellers & Toll PLLC (DC)
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC 20005

John Douglas Richards
Cohen Milstein Sellers & Toll PLLC
14th Floor
88 Pine Street
New York, NY 10005

For Defendant Apple, Inc.:

Daniel S. Floyd
Daniel G. Swanson
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197

For Defendant HarperCollins Publishers LLC:

Shepard Goldfein
Clifford H. Aronson
Paul M. Eckles
C. Scott Lent
Matthew M. Martino
Skadden, Armps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036-6522

For Defendants Hachette Book Group, Inc. and Hachette Digital, Inc.:

Walter B. Stuart
Samuel J. Rubin
Freshfields Bruckhaus Deringer US LLP
601 Lexington Avenue

2

New York, New York 10022

For Defendant Holtzbrinck Publishers, LLC d/b/a Macmillan:

Joel M. Mitnick
Alexandra Shear
Sidley Austin LLP
787 Seventh Avenue
New York, New York 10019

For Defendant Penguin Group (USA), Inc.:

Daniel Ferrel McInnis
David A. Donohoe
Allison Sheedy
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036-1564

For Defendants Simon & Schuster, Inc. and Simon & Schuster
Digital Sales, Inc.:

James W. Quinn
Yehudah L. Buchweitz
Weil, Gotshal, & Manges LLP 767 Fifth Avenue
New York, New York 10153-0119

Helene D. Jaffee
Proskauer Rose LLP
Eleven Times Square
New York, New York 10036-8299

Martha E. Gifford
Law Office of Martha E. Gifford
137 Montague Street #220
Brooklyn, New York 11201


DENISE COTE, District Judge:

     Plaintiffs in this class action bring claims for violation

of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1;

violation of California's Cartwright Act, California Business

and Professions Code §§ 16720, <u>et seq.</u>; violation of state antitrust and restraint of trade laws and consumer protection statutes; and unjust enrichment.  The defendants Apple Inc. ("Apple") and five publishing companies -- HarperCollins Publishers LLC ("HarperCollins"), Hachette Book Group, Inc. and Hachette Digital ("Hachette"); Holtzbrinck Publishers, LLC d/b/a Macmillan ("Macmillan"); Penguin Group (USA), Inc. ("Penguin"); and Simon & Schuster, Inc. and Simon & Schuster Digital Sales, Inc. ("Simon & Schuster") (collectively, the "Publisher Defendants") -- have moved for dismissal under Fed. R. 12(b)(6). As described below, certain of the Publisher Defendants are engaged in settlement discussions with governmental authorities and have not submitted a reply brief.  Thus, the reply papers were submitted by Apple, Macmillan, Penguin, and Simon & Schuster.  For the reasons stated below, the motions to dismiss are denied.


                              BACKGROUND

     The following facts are taken from the Consolidated Amended Class Action Complaint ("Complaint" or "CAC") unless otherwise noted, and are taken to be true for purposes of this motion. <u>LaFaro v. New York Cardiothoracic Group, PLLC</u>, 570 F.3d 471, 475 (2d Cir. 2009).  The plaintiffs bring this action on behalf of

themselves and others who paid higher prices for their
electronic books or "eBooks" as a direct and foreseeable result
of defendants' allegedly unlawful conduct.  The plaintiffs
allege that Apple and the Publisher Defendants conspired from
the Fall of 2009 until April 2010 to raise eBooks prices, and
that this conspiracy in fact resulted in higher eBooks prices
that continue to this day.

I.  Facts

   The Publisher Defendants are five of the six largest
publishing companies in the United States.[1]  Together, they
publish a significant portion of the trade books released in the
United States.  For example, along with Random House, Inc.
("Random House"), the Publisher Defendants published more than
ninety percent of all hardcover <u>New York Times</u> bestsellers in
2009.

   Historically, all major publishing houses, including the
Publisher Defendants, have sold their books under a distribution
model known as the "wholesale model" or the "retail model."
Under this model, publishers sell their titles to retailers at
wholesale prices.  Typically, these wholesale prices are
expressed as a percentage discount off of a title's "cover

---

[1] Random House, Inc. is also one of the six largest publishing
companies in the United States, but is not named as a party in
this action.

price" or "list price," which is the price that is printed on the book cover or jacket. The retailers then decide, independently, the retail prices to charge consumers. The wholesale model thus allows each retailer to charge the consumer whatever price it believes will maximize its sales. For decades, the Publisher Defendants have used this model when contracting with physical or "brick-and-mortar" retail book stores. They continued to use it when vendors such as Amazon.com, Inc. ("Amazon") began selling physical books online.

eBooks are digital versions of books. They can be read on a variety of hardware devices, including personal computers, mobile phones, dedicated handheld "eReaders" like the Amazon Kindle, the Sony Reader, and the Barnes & Noble Nook, or multi-functional "tablets" like Apple's iPad. eBooks can be purchased directly through many of these devices or on the Internet.

When Amazon released the Kindle in November 2007, each of the Publisher Defendants decided to sell eBooks to Amazon using the wholesale model. Due to the lower costs associated with distributing eBooks as compared to physical books, the Publisher Defendants typically set the wholesale prices for eBooks slightly lower than those for hardcover books. The basic pricing model remained the same, however: eBook retailers could charge consumers any price they wanted. In most cases, the

Publisher Defendants released the eBook version of a particular title at the same time they released the hardcover version.

After it released the Kindle, Amazon pursued a discount pricing strategy for eBooks, charging consumers $9.99 or lower for newly released eBooks.  This was substantially less than the retail price for hardcover books.  In many cases, it was even less than the wholesale prices for eBooks charged by publishers.

Amazon was able to achieve this price point in part due to the lower costs associated with distributing eBooks as compared to physical books.  Unlike physical books, eBooks do not need to be shipped or stored, and when a title does not sell as well as expected, retailers do not need to send unsold volumes of eBooks back to the publisher.

Amazon pursued its pricing strategy in part to fuel sales of the Kindle and to capture market share.  Kindle sales were brisk from the moment of its release, and the device quickly became the market leader.  Although other booksellers, such as Barnes & Noble and Sony, tried to match Amazon's low prices, by 2010 Amazon had captured 90 percent of eBooks sales volume in the United States.

Overall, the market for eBooks is growing rapidly.  It is the fastest-growing segment of the publishing industry.  In the

second quarter of 2010, Amazon's sales of eBooks surpassed its sales of hardcover books for the first time.

By the Fall of 2009, the Publisher Defendants had come to see the growth of eBooks, combined with retailers' discount pricing strategies, as a significant threat to their business model and to the publishing industry as a whole.  Traditionally, hardcover book sales have been publishers' most profitable product.  Hardcovers typically provide publishers with the highest margins per unit of sale.  Hardcover sales account for a significant portion of the profits of brick-and-mortar book stores -- the publishers' traditional retail partners.  These stores purchase hardcovers from the publishers wholesale often at a discount of 30-60 percent off the list price, and sell them to consumers at the list price or close to it.  The list price for hardcovers often exceeds $26.

The Publisher Defendants feared that low-cost eBooks sales would cannibalize sales of physical books, especially hardcovers, eat into publishers' profit margins, and harm brick-and-mortar retailers.  They also feared that in the future, Amazon might use its market power to reduce publishers' share of the profit margins for eBooks.  Most fundamentally, the Publisher Defendants worried that Amazon's low price point would condition consumers to believe that a book was only "worth"

8

$9.99, and that this consumer expectation would exert powerful downward pressure on prices for eBooks and physical books alike. In the face of these pricing pressures, the Publisher Defendants feared that their business model would prove unsustainable over the long term.

The CAC alleges that the Publisher Defendants believed they could not successfully pressure Amazon and other online retailers to increase prices for eBooks on their own, so they conspired to do so together.  The CAC claims that this conspiracy began in the Fall of 2009 and unfolded in three stages.  First, in December 2009, the Publisher Defendants agreed to "window" eBooks.  To window an eBook means to delay its release date until sometime after the release of the hardcover version.  After this approach proved unsuccessful, the Publisher Defendants each signed contracts to sell eBooks in Apple's iBookstore using a new sales model, the "agency" model, in January 2010.  The complaint alleges that the Publisher Defendants and Apple intended for these contracts -- which also included clauses that granted Apple "most-favored nation" ("MFN") pricing guarantees -- to result in higher prices for eBooks and to eliminate price competition among eBook retailers. Lastly, in April 2010, the Publisher Defendants forced Amazon to abandon the wholesale pricing model and adopt the agency model

9

by threatening to withhold their eBooks from Amazon.  The CAC
alleges that throughout each of these three stages, the
Publisher Defendants were coordinating with each other in
furtherance of the goals of the conspiracy.

A.  Windowing eBooks

Prior to December 2009, the Publisher Defendants' standard
practice was to release eBook and hardcover versions of titles
at the same time.  After a key meeting with an important
industry executive, however, this practice changed abruptly.  In
late November 2009, representatives from a number of publishing
companies met with the Chairman of Barnes & Noble, a major chain
of brick-and-mortar retail bookstores.  During the meeting, the
Chairman of Barnes & Noble complained about the potential for
Amazon's low prices to hurt hardcover sales.

This meeting spurred a sudden and dramatic change in the
business practices of most of the Publisher Defendants.  On
December 3, 2009, the Chairman and CEO of Hachette met with an
Amazon executive and tried to convince Amazon to raise its
prices.  He stated that Amazon's pricing was a "big problem for
the industry," and that this "industry" problem would be solved
if Amazon raised its eBook prices by two or three dollars.
Amazon indicated that it had no plans to raise its prices, at
least in the short term.  On December 4, Hachette informed

Amazon of its intention to begin windowing a large percentage of
its newly released titles for a number of months.  On December
7, Simon & Schuster advised Amazon that it would window at least
twenty-five titles released between January and April 2010.

These developments did not become public until four days
later, when the Wall Street Journal reported on December 8 that
Hachette and Simon & Schuster would begin windowing a number of
their eBook titles and quoted the Chairman and CEO of Hachette
as saying, "We're doing this to preserve our industry."  On
December 10, HarperCollins indicated that it would window five
to ten titles per month for up to six months, and on December
16, Macmillan stated that it would window newly released titles
for several months.  The CAC does not allege that Penguin ever
windowed eBooks.

B.  Contracting with Apple

These publishers' decision to window did not succeed in
persuading Amazon to raise its prices for eBooks.  In the second
stage of the conspiracy, however, the Publisher Defendants
gained additional leverage over Amazon through a new market
entrant: Apple.  In January 2010, Apple was preparing to release
its new tablet device, the iPad.  The CAC alleges that Apple
wanted to enter the business of selling eBooks for use on the
iPad, but did not want to compete with Amazon on price.  Apple

therefore insisted on selling eBooks through the agency pricing model, and negotiated nearly identical contracts with each of the Publisher Defendants in January 2010.  The CAC alleges that these contracts were signed within days of each other and prompted an industry-wide switch to the agency model, which constrained price competition among eBooks retailers.  The CAC also alleges that Publisher Defendants communicated with each other over the course of the negotiations and Apple acted as a conduit for their messages.

Under the wholesale distribution model, the retailer purchases books from the publisher, sets its own retail price, and sells the books to consumers.  Under the agency model, however, retailers do not set prices or make sales.  Instead, the publisher sets the price and sells eBooks to consumers directly.  The retailer acts as the publisher's agent by making the publisher's titles available for sale in the retailer's store.  In exchange for this service, the retailer receives as commission a percentage of the sale price for each eBook sold through its store.

In January 2010, Apple signed nearly identical contracts (the "Agency Agreements") with each of the Publisher Defendants. Each of these Agency Agreements allegedly included four major elements.  First, each Agency Agreement specified that beginning

12

with the launch of Apple's iPad and iBookstore on April 3, 2010,
the publisher would sell its eBooks in the iBookstore under the
agency model.  For each sale in the iBookstore, Apple was to
receive a commission of thirty percent of the sales price.
Second, the contracts included MFN clauses.  These clauses
stipulated that the final sales price for eBooks sold through
other distribution channels could not be lower than the prices
for those titles in the iBookstore.  Third, each Agency
Agreement set the prices for eBooks according to a formula tied
to the list price of physical books.  Under this formula, the
eBook prices would range from $12.99 to $14.99 for most newly-
released general fiction and nonfiction titles.  Lastly, each
Agency Agreement explicitly required the Publisher Defendants to
use the agency model when selling eBooks through other vendors
of any meaningful size beginning on April 1, 2010.

     The Publisher Defendants negotiated the Agency Agreements
with Apple in the weeks leading up to an Apple event on January
27, 2010, in which Apple announced the upcoming launch of the
iPad.  The CAC alleges that the Publisher Defendants signed the
contracts within a few days of each other, that the Publisher
Defendants and Apple communicated the terms of their agreements
with each other over the course of the negotiations, and that
they agreed to go forward with the deals together.  Initially,

at least, Random House did not come to an agreement with Apple to sell its eBooks through the iBookstore.

At the January 27 iPad launch event, Apple announced that it had signed agreements with each Publisher Defendant to sell eBooks under the agency model. Apple also revealed that the prices for eBooks on the iPad would be higher than $9.99. Nevertheless, Apple's CEO, Steve Jobs ("Jobs"), told a reporter at the event, "The prices [on the iPad and the Kindle] will be the same," and "Publishers are actually withholding their books from Amazon because they are not happy." The following day, Jobs told his biographer the following:

> Amazon screwed it up. It paid the wholesale price for some books, but started selling them below cost at $9.99. The publishers hated that -- they thought it would trash their ability to sell hard-cover books at $28. So before Apple even got on the scene, some booksellers were starting to withhold books from Amazon. So we told the publishers, "We'll go to the agency model, where you set the price, and we get our 30%, and yes, the customer pays a little more, but that's what you want anyway." But we also asked for a guarantee that if anybody else is selling the books cheaper than we are, then we can sell them at the lower price too. So they went to Amazon and said, "You're going to sign an agency contract or we're not going to give you the books." . . . Given the situation that existed, what was best for us was to do this aikido move and end up with the agency model. And we pulled it off.

(Emphasis supplied.)

Even though the retail prices for eBooks were higher under the agency model than under the wholesale model, the Publisher

14

Defendants typically made less money per eBook sale under the agency model. This is because, whereas a publisher captures the entire retail price for an eBook under the wholesale model, it captures only 70 percent of the sales price under the agency model. For example, a typical wholesale price for a newly-released eBook might be roughly $13. Even if the retailer sold this eBook for $9.99, the publisher would earn $13 under the wholesale model. Under the agency model, however, the publisher could earn less money even as the consumer paid more. A sales price of $14.99 under the agency model would net the publisher only $10.49, due to the 30 percent commission paid to the sales agent. For these reasons, the CAC alleges that the Publisher Defendants' average per unit revenue for eBook sales decreased by 31 percent following the adoption of the agency model.

In addition, because the sales infrastructure for eBooks that existed in 2009 was adapted to the wholesale model, the Publisher Defendants' switch to the agency model involved substantial transaction costs. For example, the CAC alleges that switching to the agency model required costly revisions to the industry's standard for disseminating pricing and sales information, known as the Online Information eXchange or ONIX. The CAC further alleges that the higher sales prices that

resulted from adoption of the agency model slowed the growth rate of eBooks sales.

The CAC alleges that the Publisher Defendants understood full well that the switch to the agency model would result in higher retail sales prices, and that this outcome was precisely what made the agreements so appealing.  For example, On February 2, 2010, Rupert Murdoch, CEO of HarperCollins corporate parent News Corp., stated the following:

> Yeah we don't like the Amazon model of selling everything at $9.99 they don't pay us that.  They pay us the whole wholesale price of $14 or whatever we charge but we [sic] I think it really devalues books and it hurts all the retailers of the hard cover books. . . . Amazon, sorry, Apple in its agreement with us, which is [sic] not been disclosed in detail, does allow for a variety of slight of [sic] higher prices.  There will be prices very much less than the printed copy of books.  But still it will not be fixed in a way that Amazon has been doing it.  And it appears that Amazon is now ready to sit down with us again and re-negotiate pricing.

(Emphasis supplied.)  The Publisher Defendants also understood that they would earn less money per eBook sale under the agency model, but adopted the new model anyway.  For example, on February 4, John Sargent, CEO of Macmillan, posted a blog stating:

> Over the last few years we have been deeply concerned about the pricing of electronic books.  That pricing, combined with the traditional business model we were using, was creating a market that we believe was fundamentally unbalanced.  In the last three weeks, from a standing start, we have moved to a new business

model.  We will make less money on the sale of eBooks,
but we will have a stable and rational market.

C.  Forcing an Industry Shift

After agreeing to sell eBooks through Apple's iBookstore
under the agency model and agreeing to the MFN clauses, the
Publisher Defendants threatened to withhold eBooks from Amazon
unless Amazon switched to the agency model.  On January 20,
representatives from Hachette, HarperCollins, Simon & Schuster,
and Macmillan each met separately with Amazon representatives,
proposed the agency model to Amazon, and imposed a deadline of
April 1, 2010 for Amazon to switch to the agency model.
Macmillan offered to give Amazon the same thirty percent
commission it was giving to Apple, and threatened to delay the
release of its eBooks to Amazon until seven months after the
launch of the hardcover edition if Amazon did not agree.  Amazon
initially resisted.  It briefly pulled all Macmillan titles off
both the Kindle website and Amazon.com.  Macmillan refused to
change the terms of its ultimatum, however, and Amazon agreed to
the agency model a few days later.  By April 1, Amazon had
concluded negotiations with each of the Publisher Defendants to
sell eBooks under the agency model.

The Publisher Defendants had similar negotiations with
other eBook retailers.  For example, the Publisher Defendants
withheld eBooks from the retailer BooksOnBoard beginning on

17

April 1 because BooksOnBoard had not yet agreed to sell under the agency model.

After adoption of the agency model, the price of new bestselling eBooks increased by forty percent on average, even though there had been no corresponding increase in costs. eBook prices are now identical at the four major eBook distributors, Amazon, Sony, Apple, and Barnes & Noble. And, in some instances, the price of an eBook now exceeds the price of a physical book. In addition, although Random House initially refused to adopt the agency model, and had not been allowed to sell its books in Apple's iBookstore, Random House agreed to begin selling eBooks through the iBookstore under the agency model on March 1, 2011.

Apple and the Publisher Defendants' activities attracted the attention of state, federal, and foreign authorities. European Union antitrust regulators made unannounced raids on eBook publishers in several countries, and the European Commission announced a formal investigation into Apple and the Publisher Defendants on December 6 for colluding to raise eBook prices. On December 7, a representative from the United States Department of Justice ("DOJ") stated that DOJ was investigating antitrust behavior in eBooks pricing. Prior to the filing of the CAC, the Attorneys General of both Texas and Connecticut had

launched similar inquiries.  As discussed in more detail below,
after the filing of the CAC, DOJ, Texas, Connecticut, and
fourteen other states filed complaints against Apple and some or
all of the Publisher Defendants alleging violations similar to
those contained in the CAC.

II.  Procedural History

On August 9, 2011, the first complaint against Apple and
the Publisher Defendants related to this class action was filed
in the Northern District of California.  See Complaint, Anthony
Petru, et al. v. Apple Inc., et al., No. 3:2011CV03892 (N.D.
Cal. Aug. 9, 2011).  The next day, a similar complaint against
Apple, the Publisher Defendants, and Random House was filed in
the Southern District of New York.  See Complaint, Shilpa
Grover, et al. v. Macmillan, et al., No. 11 Civ. 5576 (S.D.N.Y.
Aug. 10, 2011).  A number of similar complaints were filed
shortly thereafter in both the Northern District of California
and the Southern District of New York.

Beginning on December 6, related actions filed in Southern
District of New York were reassigned to this Court.  Beginning
on December 9, the United States Judicial Panel on Multidistrict
Litigation (the "MDL Panel") issued orders transferring related
cases pending in California to the Southern District of New York
and assigning them to this Court.  Following a December 20

conference held before this Court, lead plaintiff's counsel was appointed and a briefing schedule was set by Order of December 21. The CAC was filed on January 20, 2012. Defendants' motions to dismiss the CAC were filed on March 2 and became fully submitted on April 13.

DOJ filed a complaint against Apple and the Publisher Defendants on April 11 (the "DOJ Action"). That same day, the DOJ Action was transferred to this Court, and DOJ filed a consent decree indicating its intention to settle the DOJ Action as to defendants HarperCollins, Hachette, and Simon & Schuster following compliance with the procedures of the Antitrust Procedures and Penalties Act, 15. U.S.C. § 16. Also on April 11, Texas, Connecticut, and fourteen other states filed a similar complaint against Apple, Penguin, MacMillan, and Simon & Schuster in the Western District of Texas (the "State Action") as parens patriae on behalf of consumers.

On April 18, the Court conducted a conference in all actions related to this matter, including the above-captioned class actions and the DOJ Action. Counsel for the plaintiffs in the State Action were also in attendance. By Order of April 23, the Government was given until July 27 to submit a motion with respect to a proposed final judgment as to any settling parties in the DOJ Action, and until August 15 to submit any reply.

On April 26, the MDL issued a conditional transfer order transferring the State Action to the Southern District of New York and assigning it to this Court.  On May 1, the DOJ Action was stayed until July 11 as to defendants HarperCollins and Hachette.  On May 14, the stay was extended so as to include Simon & Schuster.

DISCUSSION

I.  Standard of Review

A trial court considering a Rule 12(b)(6) motion must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party."  McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007).  At the same time, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to defeat a motion to dismiss."  Achtman v. Kirby, McInerney & Squire, LLP, 464 F.3d 328, 337 (2d Cir. 2006) (citation omitted).

Under the pleading standard set forth in Rule 8(a)(2), a complaint must include a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  "[A] plaintiff is required only to give a defendant fair notice of what the claim is and the grounds upon which it

rests." <u>Leibowitz v. Cornell Univ.</u>, 445 F.3d 586, 591 (2d Cir. 2006).  Rule 8 is fashioned in the interest of fair and reasonable notice, not technicality, and therefore is "not meant to impose a great burden upon a plaintiff." <u>Dura Pharms., Inc. v. Broudo</u>, 544 U.S. 336, 347 (2005).

A court considering a Rule 12(b)(6) motion applies a "flexible plausibility standard, which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." <u>Boykin v. KeyCorp</u>, 521 F.3d 202, 213 (2d Cir. 2008) (citation omitted).  "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient to raise a right to relief above the speculative level." <u>ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted).  Dismissal is appropriate "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." <u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937, 1950 (2009).

Although the CAC contains four separate causes of action -- violation of Section 1 of the Sherman Act, violation of California's Cartwright Act, violation of state antitrust and restraint of trade laws and consumer protection statutes, and violation of state unjust enrichment law -- the defendants do

not raise particular arguments in favor of dismissal pursuant to state law.  This Opinion therefore focuses on the alleged Sherman Act violation.

A.  Section 1 of the Sherman Act

Section 1 of the Sherman Act ("Section 1") outlaws "[e]very contract, combination . . . , or conspiracy, in restraint of trade or commerce among the several States."  15 U.S.C. § 1.  Conduct that stems from independent decisions is permissible under this section, see Starr v. Sony BMG Music Entm't, 592 F.3d 314, 321 (2d Cir. 2010), as are "independent responses to common stimuli," and "interdependence unaided by an advance understanding among the parties."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556 n.4 (2007) (citation omitted).  To establish a conspiracy in violation of Section 1, then, proof of joint or concerted action is required.  Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 761 (1984).  Overall, "[c]ircumstances must reveal a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement."  Id. at 764 (citation omitted).

Because unlawful conspiracies tend to form in secret, such proof will rarely consist of explicit agreements.  Rather, conspiracies "nearly always must be proven through inferences that may fairly be drawn from the behavior of the alleged

conspirators." Anderson News, L.L.C. v. Am. Media, Inc., No. 10-4591-cv, 2012 WL 1085948, at *17 (2d Cir. Apr. 3, 2012) (citation omitted).  Thus, to prove an antitrust conspiracy, "the antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the [defendant] and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." Monsanto, 465 U.S. at 764 (citation omitted).

At the pleading stage, a complaint claiming conspiracy must contain "enough factual matter (taken as true) to suggest that an agreement was made." Twombly, 550 U.S. at 556; accord In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007).  This standard does not impose a "probability requirement"; a claim may survive a motion to dismiss even if a judge believes the chances of recovery to be very remote or unlikely.  Twombly, 550 U.S. at 556.  It also does not require a plaintiff to show that the allegations suggesting agreement "are more likely than not true or that they rule out the possibility of independent action." Anderson News, 2012 WL 1085948, at *18.  A court ruling on a motion to dismiss need not choose among plausible interpretations of the evidence. Id. at *24.  A statement of facts that is "merely consistent" with an agreement, however, will not suffice. Twombly, 550 U.S. at 557.  A complaint must

24

contain "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."  <u>Id.</u> at 556.

A complaint that merely alleges parallel conduct among defendants does not successfully state a claim.  Such an allegation "gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of entitlement to relief."  <u>Id.</u> at 557 (citation omitted).  Thus, "allegations of parallel conduct that could just as well be independent action" will not make out a viable Section 1 claim.  <u>Starr</u>, 592 F.3d at 327 (citation omitted).  Rather, such allegations "must be placed in a context that raises a suggestion of a preceding agreement."  <u>Twombly</u>, 550 U.S. at 557.

The Supreme Court has provided a number of examples of the kinds of parallel conduct allegations that may make out a claim under this standard.  These include "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties," and "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason."  <u>Id.</u> at 556 n.4 (citation omitted);

25

see also Starr, 592 F.3d at 322.  A plaintiff may also state a
Section 1 claim if he alleges behavior "that would plausibly
contravene each defendant's self-interest in the absence of
similar behavior by rivals."  Starr, 592 F.3d at 327 (citation
omitted).

    B.  The Rule of Reason

    Section 1 does not disallow any and all agreements; it
disallows only those "in restraint of trade or commerce among
the several States."  15 U.S.C. § 1.  This passage is not to be
read literally, however; it "outlaws only unreasonable
restraints."  Leegin Creative Leather Prods., Inc. v. PSKS,
Inc., 551 U.S. 877, 885 (2007) (citation omitted) (emphasis
supplied).  Thus, in most cases, "antitrust plaintiffs must
demonstrate that a particular contract or combination is in fact
unreasonable and anticompetitive before it will be found
unlawful."  Texaco Inc. v. Dagher, 547 U.S. 1, 5 (2006).
Nevertheless, some agreements "are so plainly anticompetitive
that no elaborate study of the industry is needed to establish
their illegality."  Id. (citation omitted).  Such agreements are
illegal per se, and are not subject to the rule of reason.

    Use of per se rules is limited to restraints "that would
always or almost always tend to restrict competition and
decrease output," and is appropriate "only after courts have had

considerable experience with the type of restraint at issue."
Leegin, 551 U.S. at 886 (citation omitted).  Generally speaking,
price-fixing agreements or agreements to divide markets that are
horizontal in nature -- meaning that the parties to the
agreement are "competitors at the same level of the market
structure," Anderson News, 2012 WL 1085948, at *16 (citation
omitted) -- are per se unlawful.  Starr, 592 F.3d at 326 n.4.
In other words, "they are prohibited despite the reasonableness
of the particular prices agreed upon."  Id.  Similarly, "certain
concerted refusals to deal or group boycotts are so likely to
restrict competition without any offsetting efficiency gains
that they should be condemned as per se violations of § 1 of the
Sherman Act."  Northwest Wholesale Stationers, Inc. v. Pacific
Stationery & Printing Co., 472 U.S. 284, 290 (1985).  By
contrast, vertical price restraints -- meaning price-fixing
agreements among "persons at different levels of the market
structure," such as a manufacturer and a distributor, Anderson
News, 2012 WL 1085948, at *16 (citation omitted) -- are subject
to the rule of reason.  See Leegin, 551 U.S. at 882.

II.  Sufficiency of the Pleadings

    The CAC plausibly alleges that Apple and the Publisher
Defendants took part in a conspiracy in restraint of trade, that
an object of this conspiracy was to raise prices for eBooks, and

that this restraint was unreasonable <u>per se</u>.  The Complaint describes specific conversations from which it is fair to infer that the Publisher Defendants had agreed among themselves to adopt a joint strategy to force an increase in the price of eBooks.  These include Hachette's representation to Amazon on December 3, 2009 that the "industry's" problem with eBook pricing would be solved if Amazon raised its prices by two or three dollars, and the separate meetings on a single day, January 20, 2010, in which four Publisher Defendants each presented Amazon with the identical demand that it adopt the agency model.  There are ample allegations that Apple became an integral member of this conspiracy and well understood that the upshot of its participation would be the elimination of price competition at the retail level, forcing consumers to, in Jobs's words, "pay[] a little more" for eBooks.

As significantly, the CAC contains allegations of parallel conduct "placed in a context that raises a suggestion of preceding agreement." <u>Twombly</u>, 550 U.S. at 557.  More to the point, it has plausibly alleged that each Publisher Defendant's decision to sign its particular agency agreement with Apple and to demand that Amazon accept the agency model would have contravened that defendant's self-interest in the absence of similar behavior by its rivals.  See <u>Starr</u>, 592 F.3d at 327.

And yet the Complaint alleges that each Publisher Defendant signed such an agreement with Apple in the days leading up to the January 27, 2010 iPad Launch event, and made such a demand of Amazon.

The CAC provides much more than these allegations, however. It includes allegations of a rapid and simultaneous switch to the agency model -- a model heretofore unknown in the publishing industry -- by multiple competitors with every major eBook retailer.  This constitutes a "complex and historically unprecedented change[] in pricing structure made at the very same time by multiple competitors," Twombly, 550 U.S. at 556 n.4.  The agency model wrested control over retail pricing of eBooks from retailers and placed it firmly in the hands of the Publisher Defendants.

The CAC also includes public statements indicating a shared motive to conspire.  See Ambook Enters. v. Time Inc., 612 F.2d 604, 616 (2d Cir. 1979) ("[O]ne factor to consider in determining if agreement should be inferred from parallel conduct was whether agreement benefited the alleged conspirators. . . .").  As Steve Jobs acknowledged to his biographer, the agency model benefitted both Apple and the publishers, and while the customer ended up paying more for eBooks, "that's what you want anyway."

29

The central allegation, however, remains the claim that the Publisher Defendants and Apple colluded in signing the Agency Agreements in January 2010.  To understand why this allegation states a plausible claim, it is useful to imagine a "counterfactual" universe in which each Publisher Defendant would have acted without any assurance of "similar behavior by rivals."  Starr, 592 F.3d at 327 (citation omitted).  In this hypothetical universe, each Publisher Defendant would have needed to assume that if it signed an Agency Agreement, it would be doing so on its own.

Each Publisher Defendant in this scenario would face a similar cost-benefit calculus.  The benefits would primarily consist of the opportunity to sell eBooks in Apple's iBookstore, and a reduction in the cannibalization of that publisher's hardcover sales by its eBook sales on the iPad.  Because the majority of publishers would still be selling under the wholesale model, however, most eBooks in the market as a whole would still cost $9.99.

The costs of such a unilateral switch to the agency model would be substantial.  The publisher would be selling its eBooks at a higher price than its competitors and would therefore be losing market share.  This loss in market share would in all likelihood have been large.  Random House gained significant

30

market share from the Publisher Defendants during the months
between their adoption of the agency model and Random House's
capitulation.  The eBook sales by Random House increased 250
percent in 2010 as it continued to sell them at $9.99.  At the
same time that an individual publisher would be losing market
share, it would be taking in less revenue per sale because of
Apple's 30 percent commission.  In addition, the publisher would
probably lack the leverage to force Amazon to accept the agency
model.  Potentially, then, this publisher would be barred from
selling its eBooks to Amazon.

This hypothetical reveals that, from the publishers'
perspective, the switch to the agency model had the hallmarks of
a classic collective action problem.  Whereas many of the
benefits of this switch (like increased consumer perceptions of
book value and a slower industry-wide transition from the brick-
and-mortar retail model) were shared across the publishing
industry and not susceptible to capture by any single publisher,
most of its costs (like decreased revenue per sale and, if a
publisher was a first or sole mover, decreased market share)
were borne individually.  Moreover, in order to compel Amazon to
abandon the retail model, a critical mass of publishers was
needed.  No single publisher would have had the leverage to
force Amazon to make the switch.  For these reasons, it is at

least plausible that no Publisher Defendant would have signed an agency agreement with Apple absent a firm understanding with its rivals that they would do the same.

Apple shared the publishers' interest in solving this collective action problem.  Although the Complaint does not claim that Apple had an interest in higher retail prices, per se, it does plausibly allege that Apple had an interest in limiting retail competition.  The Agency Agreements were a means to accomplish both these goals through a single tool.  The switch to the agency model meant that the Publisher Defendants could control retail prices, whereas the MFN clauses protected Apple and its 30 percent commission from price competition by other retailers.

Moreover, Apple had a strong incentive to encourage the Publisher Defendants to act collectively: If a critical mass of publishers had not agreed to these terms and forced an industry-wide switch to the agency model, Apple would have faced stiff competition in establishing its iBookstore.  Under such a scenario, the iBookstore would have been able to offer only a limited selection of eBooks at higher prices than stores operating under the wholesale model.  Apple would almost certainly have faced a greater challenge in entering the eBooks market and expanding its market share in such circumstances.

32

Faced with similar facts, the Supreme Court upheld an injunction entered against the defendants in Interstate Circuit v. United States, 306 U.S. 208 (1939), for violating Section 1. The defendants in Interstate Circuit consisted of a group of film distributors and a separate group of film exhibitors. Interstate Circuit was one of the exhibitors, and it held a monopoly over the exhibition of movies in first-run theaters in a number of Texas cities. See id. at 214-15. Interstate's general manager sent identical letters to eight branch managers of the distributor companies, each of which included the names of all eight companies as addressees and proposed identical deal terms. In exchange for allowing the distributors to continue showing their films in its cinemas, Interstate Circuit would require that the distributors refuse to sign a deal with any theater that charged below 25 cents for certain films or that showed double features under certain conditions. These restrictions were designed to limit the ability of Interstate's competitors, principally subsequent-run theaters, to compete with Interstate. See id. at 215-18. All eight distributors agreed to the proposal.

In upholding the opinion of the district court, the Court determined that it was not necessary to support its ruling

33

through direct evidence of agreement among the distributors.
Rather,

> It was enough that, knowing that concerted action was
> contemplated and invited, the distributors gave their
> adherence to the scheme and participated in it.  Each
> distributor was advised that the others were asked to
> participate; each knew that cooperation was essential
> to successful operation of the plan.  They knew that
> the plan, if carried out, would result in a restraint
> of commerce, which, we will presently point out, was
> unreasonable within the meaning of the Sherman Act,
> and knowing it, all participated in the plan.

Id. at 226-27.

Similarly, in Toys "R" Us, Inc. v. Fed. Trade Comm'n, 221
F.3d 928 (7th Cir. 2000), the Seventh Circuit upheld a conclusion
by the Federal Trade Commission that Toys "R" Us had coordinated
a horizontal agreement in restraint of trade through signing
identical vertical agreements with a number of toy
manufacturers.  In these agreements, each manufacturer agreed to
restrict the distribution of its products to low-priced
warehouse club stores on the condition that the other
manufacturers would do the same.  Id. at 930.

Apple's actions as alleged in the CAC closely resemble
those of Toys "R" Us and Interstate Circuit.  Just like Toys "R"
Us and Interstate Circuit, Apple coordinated a series of
substantively-identical vertical agreements and made clear to
its vertical partners that it was offering each of them a
similar deal.  Just as with Toys "R" Us and Interstate Circuit,

cooperation among Apple's vertical partners was essential to the success of its plan, and the net effect of its vertical agreements was to limit the ability of its horizontal competitors, such as Amazon, to compete on price.  In short, Apple did not try to earn money off of eBooks by competing with other retailers in an open market; rather, Apple "accomplished this goal by [helping] the suppliers to collude, rather than to compete independently."  Id. at 936.

Apple and the Publisher Defendants' agreement in restraint of trade is unlawful per se because it is, at root, a horizontal price restraint.  "A horizontal cartel among competing manufacturers or competing retailers that decreases output or reduces competition in order to increase price is, and ought to be, per se unlawful."  Leegin, 551 U.S. at 893.  The CAC claims that the Agency Agreements emerged from a horizontal agreement among the Publisher Defendants and reduced competition among retailers in order to raise prices.  It is therefore unnecessary to subject this trade restraint to a rule of reason analysis.

The agreement among Apple and the Publisher Defendants is a horizontal restraint because, as with the toy manufacturers in Toys "R" Us, the "only condition on which" a publisher would agree to Apple's terms "was if it could be sure its competitors were doing the same thing."  Toys "R" Us, 221 F.3d at 936.

Unlike those vertical restraints that are subject to the rule of reason, this agreement "has nothing to do with enhancing efficiencies of distribution from the manufacturer's point of view." Id. Rather, it has everything to do with coordinating a horizontal agreement among publishers to raise prices, and eliminating horizontal price competition among Apple's competitors at the retail level. "That is a horizontal agreement." Id.

III.  Defendants' Arguments

The defendants contend, one, that the Complaint contains no direct allegations of an explicit agreement, and two, that the plaintiffs' allegations of parallel conduct do not give rise to a plausible inference of conspiracy. The Publisher Defendants claim that there were "obvious alternative explanation[s]," besides conspiracy, for their decisions to window eBooks, sign the Agency Agreements, and force Amazon to abandon the retail model. Twombly, 550 U.S. at 567. Each of them had individual, legitimate reasons to engage in these parallel actions such that they simply reflected "independent responses to common stimuli." Starr, 592 F.3d at 322 (citation omitted). Apple argues that it had perfectly legitimate business interests in signing similar Agency Agreements with each Publisher Defendant. Apple also argues that it did not share the Publisher Defendants' interest

36

in raising prices, and that it was not involved in most of the phases of the alleged conspiracy.

Three, the defendants contend that the alleged conspiracy is implausible in its own right because plaintiffs' allegations are inconsistent and inadequate.  Four, the defendants target, specifically, the plausibility of the allegations that Apple served as a "hub" in a "hub-and-spoke" conspiracy.  Five, they target the plausibility of the allegations concerning the pricing agreement.  Six, Apple argues that even if the conspiracy existed as alleged in the complaint, it did not effect an unreasonable restraint on trade.  Lastly, the defendants claim that because plaintiffs' Sherman Act claim fails, the other claims in the CAC must also be dismissed.

A.  Clarifying the Facts and the Law

Prior to engaging with the substance of the defendants' arguments, it is necessary to clarify the facts and the law upon which this Opinion relies.  In arguing in favor of dismissal, the defendants ask the Court to take judicial notice of the complete contents of articles cited in the Complaint.  The Court takes judicial notice of the contents of these articles, but only in order to determine "what statements they contained." Roth v. Jennings, 489 F.3d 499, 509 (citation omitted).  The Court accepts as true for purposes of the motions to dismiss

only those factual allegations that actually appear in the Complaint.  Id.  In addition, the defendants improperly draw inferences against the plaintiffs from those facts that are in the Complaint.  In a 12(b)(6) motion, a court must "draw all reasonable inferences" in plaintiffs' favor.  McCarthy, 482 F.3d at 191.

B.  Direct Allegations of Conspiracy

The defendants argue that the Complaint contains no independent allegations of a direct agreement to raise the price of eBooks.  The defendants claim that the plaintiffs have pleaded no details on how the alleged conspiracy came about, have not identified any informants or witnesses to such an agreement, and have not specified any documents indicating the existence of such an agreement, among other purported deficiencies.

The defendants are incorrect.  The CAC alleges that the CEO of Hachette, in a meeting with an Amazon executive, represented that Amazon's pricing was a "big problem for the industry" and that raising the price of eBooks would solve the "industry's" problem.  Although defendants claim that these representations arose from Hachette's discussions with brick-and-mortar bookstores and not the other Publisher Defendants, "drawing all reasonable inferences" in favor of the plaintiffs, it is

38

plausible to infer that the "industry problem" referred to problems experienced by book publishers and that there had been previous discussions among the Publisher Defendants about increasing prices.  In re NYSE Specialists Secs. Litig., 503 F.3d 89, 91 (2d Cir. 2007).

And there is more.  The CAC describes the separate meetings four of the Publisher Defendants had with Amazon on the very same day in which they made identical demands on Amazon to switch to the agency model.  Finally, Jobs' prescient prediction at the iPad launch that the prices consumers would be paying for eBooks would all "be the same" and the other quotations from Jobs, Murdoch and Sargent, combine to provide ample evidence that the Publisher Defendants had agreed with each other to undertake collective action to raise eBooks' prices and that Apple intentionally and knowingly joined that conspiracy.

Regardless, "[n]o formal agreement is necessary to constitute an unlawful conspiracy," Am. Tobacco Co. v. United States, 328 U.S. 781, 809 (1946), and "plaintiffs [are] not required to mention a specific time, place or person involved in [their] conspiracy allegation" so long as it provides sufficient circumstantial evidence of agreement.  Starr, 592 F.3d at 325. As just discussed, even though the law does not require it, the CAC provides ample allegations of not only parallel conduct

"placed in a context that raises a suggestion of a preceding agreement," Twombly, 550 U.S. at 557, but also more direct evidence of collusion.

C.  Coincidental Parallel Conduct

Ignoring the allegations from which a conspiratorial agreement can be more directly inferred, the defendants claim that the CAC rests solely on allegations of parallel conduct and that those parallel conduct allegations are deficient because they do not allege "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties."  Id. at 556 n.4 (citation omitted).  The Publisher Defendants claim that there are legitimate alternative explanations for their parallel actions that render implausible plaintiffs' conspiracy allegations.

The Publisher Defendants claim that they had independent interests in windowing eBooks in order to protect hardcover book sales and protect brick-and-mortar retailers.  They contend that they signed the Agency Agreements because they each, independently, wanted to facilitate Apple's entry into the eBooks market, and use of the agency model was Apple's condition for entry.  The Publisher Defendants believed this would help expand demand for their eBooks and reduce their reliance on

40

Amazon.  They argue that the CAC established that adopting the agency model could be in a publisher's individual interest because Random House chose to adopt the agency model on its own on March 1, 2011.  And to the extent the Publisher Defendants were aware of their competitors' simultaneous negotiations with Apple, they claim this can be explained by ongoing press reports on the negotiations.

The Publisher Defendants also claim that they each independently pressured Amazon to switch to the agency model in 2010 because the MFN clauses in the Agency Agreements incentivized them to do so, regardless of their competitors' behavior.  Under the terms of the MFN clauses, if a publisher allowed Amazon to continue to set the price of its eBooks and Amazon set this price at $9.99, for example, then the publisher could charge no more than $9.99 for eBooks in the iBookstore. Such a scenario would cause the publisher to lose substantial revenue due to Apple's 30 percent commission for sales in the iBookstore.

Because Apple was driving the switch to the agency model, the defendants claim it makes perfect sense that the publishers would engage in parallel conduct and agree to similar deal terms.  One would expect them to finalize deals with Apple close to the date of Apple's announcement of the iPad, and one would

41

expect these deals to set a deadline for industry-wide adoption
of the agency model close to the launch date of the iPad.

For its part, Apple claims that it signed the Agency
Agreements because it had a legitimate, independent business
interest in entering the market for eBooks without facing margin
pressure from Amazon.  The Agency Agreements were part of a
"rational and competitive business strategy," id. at 554,
because Amazon's monopoly pricing meant that Apple would have
lost money on eBook sales under the retail model.  To the extent
Apple disclosed information to one or more Publisher Defendants
about its ongoing negotiations with other publishers, Apple
contends that these were legitimate disclosures that Apple was
entitled to use in order to gain leverage.  Apple argues that
Jobs's statements that the customer would "pay[] a little more"
and that prices would "be the same" at Apple and Amazon were
simply accurate descriptions of the MFN clauses and accurate
predictions of the consequences of the Agency Agreements.

Besides ignoring many of the allegations in the Complaint,
these arguments misconstrue the standard for pleading an
antitrust conspiracy in this district.  The examination of a
complaint for its purported failure to state a claim under the
law is not the occasion for a court to judge the merits of the
parties' competing claims, including claims about the

42

motivations of critical actors in an alleged price-fixing
conspiracy.  So long as a plaintiff states a plausible claim, a
complaint may not be dismissed on a Rule 12(b)(6) motion even if
a court believes it is more likely than not that the defendants
reacted independently to "common stimuli."  A court ruling on a
Rule 12(b)(6) motion "may not properly dismiss a complaint that
states a plausible version of events merely because the court
finds a different version more plausible." Anderson News, 2012
WL 1085948, at *19.  In short, there is no "probability
requirement at the pleading stage," Twombly, 550 U.S. at 556,
and a plaintiff need not "rule out the possibility of
independent action." Anderson News, 2012 WL 1085948, at *18.

 D.  Plausibility of the Alleged Conspiracy

 The defendants next attack the plausibility of the alleged
conspiracy by pointing to a number of supposed inadequacies and
inconsistencies in the Complaint.  For example, the defendants
claim that one would expect any conspiracy to raise the price of
eBooks to include Random House.  The Publisher Defendants note
that Penguin also is conspicuously absent from a number of
allegations: the CAC does not allege that Penguin ever windowed
eBooks or that Penguin ever demanded that Amazon move to the
agency model, either on January 20 (when the other Publisher
Defendants did) or at any other time.

Similarly, the Publisher Defendants note that Macmillan did not start windowing eBooks until eight days after the Wall Street Journal reported on windowing by Hachette and Simon & Schuster.  Later, Macmillan allegedly offered to allow Amazon to continue with the wholesale model beyond the April 1, 2010 deadline, provided Macmillan could delay the release of new eBooks until seven months after the release of their hardcover editions.  The defendants claim that this behavior is inconsistent with the plaintiffs' description of the terms of the Agency Agreements.

Apple claims that it had no reason to slow eBook growth or to protect brick-and-mortar retailers; it wanted to introduce the iPad and the iBookstore successfully, which entailed selling more eBooks not fewer.  Thus, Apple contends that the CAC does not adequately plead Apple's "conscious commitment to a common scheme to achieve an unlawful objective," as required to state a claim against Apple for participating in an antitrust conspiracy.  Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 764 (1984) (citation omitted).  Moreover, courts must evaluate how "each defendant conspired in violation of the antitrust laws," AT/SAT v. Associated Press, 181 F.3d 216, 234 (2d Cir. 1999), and the CAC does not allege that Apple was involved in the windowing of eBooks or the negotiations forcing

44

Amazon to adopt the agency model, or that Apple ever negotiated with more than one publisher at the same time.

None of these purported deficiencies in the pleading render the CAC's allegations of a price-fixing conspiracy implausible. "The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." Cont'l Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699 (1962) (citation omitted).  As already described, the Complaint survives the tests imposed by Rule 12(b)(6) and states a Sherman Act violation.

In any event, the purported anomalies the defendants have identified do not strike at the heart of the conspiracy alleged by the plaintiffs.  For example, the early efforts to induce Amazon to raise its prices for eBooks, first through Hachette's request on behalf of the "industry" in December 2009, and when that proved unsuccessful, through windowing eBooks, are principally relevant as evidence of the willingness of Publisher Defendants to work together to effect market change, and specifically, to raise the prices of eBooks through collusion. That evidence of earlier jointly undertaken activity renders more plausible the claim that the Publisher Defendants were indeed colluding when they acted to end the wholesale model for distribution of eBooks and thereby to raise the prices of these

books.  In any event, a conspirator may join a conspiracy at any time that it is ongoing; there is no requirement that a conspirator join in a conspiracy from its inception.  And the fact the Random House did not participate in the conspiracy demonstrates only that the conspiracy did not rely upon unanimity among the major publishing houses.  The Complaint plausibly alleges that the conspiracy depended on participation by a critical mass of publishers and that the Publisher Defendants constituted such a critical mass.

Nor does the CAC's Sherman Act claim against Macmillan fail because the CAC includes an allegation that Macmillan offered Amazon the options of accepting the agency model or a seven-month window for the distribution of Macmillan's eBooks.  To the contrary, it is fair to infer that Macmillan's conversation with Amazon would not have occurred unless it had agreed with other publishers to coerce adoption of the agency model and remove price competition at the retail level.  The "option" of no access to any Macmillan eBooks for seven months can only reasonably be viewed as an unpalatable one.  And even if the CAC does not plausibly allege that Agency Agreements required the Publisher Defendants to sell eBooks exclusively through the agency model after April 1, 2010, the MFN clauses still

incentivized such behavior.  The explicit mandate to use the
agency model is essentially a redundant allegation.

Finally, the fact that Apple might have had different
motivations for joining the conspiracy, and was involved in only
a portion of it, does not undermine the existence of the
conspiracy itself or Apple's role as a participant.  Proving
conspiracy requires demonstrating "a unity of purpose or a
common design and understanding, or a meeting of minds in an
unlawful arrangement."  Apex Oil Co. v. DiMauro, 822 F.2d 246,
252 (2d Cir. 1987) (citation omitted).  The CAC plausibly
alleges that each of the defendants shared the twin purposes of
raising the price of eBooks and eliminating retail competition
even though their motives for joining that conspiracy were
different.  Apple's motives for joining this conspiracy are
alleged to have included its desire to enter the eBooks market
and earn a profit, which it could not as easily do when Amazon
had the power to set the market price for eBooks at $9.99.  The
Book Publishers were allegedly motivated by their interest in
protecting the market for higher-priced, higher-margined
hardcover books.  The CAC acknowledges these divergent motives,
but plausibly alleges that these motives converged to cause the
Publishing Defendants and Apple to join a single conspiracy to

eliminate price competition at the retail level and raise the prices consumers would pay for eBooks.

E.  Pleading a Hub-and-Spoke Conspiracy

The defendants argue that the plaintiffs have failed to adequately plead the existence of a hub-and-spoke conspiracy because Apple, the alleged hub, was not a dominant firm, and because the CAC fails adequately to plead the existence of a horizontal agreement among the Publisher Defendants.  A hub-and-spoke conspiracy

> involves a hub, generally the dominant purchaser or supplier in the relevant market, and the spokes, made up of the distributors involved in the conspiracy. The rim of the wheel is the connecting agreements among the horizontal competitors (distributors) that form the spokes.

Howard Hess Dental Laboratories Inc. v. Dentsply Int'l, Inc., 602 F.3d 237, 255 (3d Cir. 2010).  The facts in both Interstate Circuit and Toys "R" Us fit this pattern: Interstate Circuit controlled 75 percent of first-run theaters in six Texas cities, see Interstate Circuit, 306 U.S. at 215, and Toys "R" Us was "giant in the toy retailing industry."  Toys "R" Us, 221 F.3d at 930.  Both companies were dominant purchasers alleged to have coordinated agreements among their distributors.  Apple, by contrast, was a new entrant in the eBooks market competing with a dominant firm and had no market share in eBooks at the time of the alleged agreements.  Like the hubs in Interstate Circuit and

48

Toys "R" Us, however, Apple signed functionally identical agreements with horizontal competitors located upstream in the stream of commerce.

First, the plaintiffs have pleaded the existence of a horizontal agreement, for the reasons described above.  Second, the above-quoted dicta in Dentsply does not establish that a hub must be a dominant purchaser or supplier; it merely states that this is "generally" the case.  This observation should not be surprising: a hub's existing market power provides an obvious incentive to horizontal competitors to sign agreements in restraint of trade.  In this case, however, existing dynamics in the publishing industry provided powerful incentives for the publishers to sign such agreements.  The CAC describes an industry in crisis, characterized by stagnant hardcover sales, declining revenues among brick-and-mortar retailers, and increasing fear that Amazon's $9.99 price point for eBooks would inflict lasting damage on publishers' business model.  Moreover, the CAC describes Apple as the most powerful digital content distributor company other than Amazon and a leading manufacturer of mobile devices.  Although it had no market share in eBooks at the time of the Agency Agreements, its entrance into the eBooks market had been widely anticipated.  Under such conditions, it

49

is plausible that Apple could serve as the hub in a hub-and-spoke conspiracy regardless of its existing market share.

But, the more telling point is that the CAC, when read in its entirety, does not merely accuse the defendants of operating through a hub-and-spoke conspiracy.  Although the CAC refers to Apple as a hub, it more directly alleges a horizontal conspiracy among the Publisher Defendants.  With the fortuitous entry of Apple into the market for eBooks, and the decision by Apple to join the price-fixing conspiracy, that horizontal conspiracy became a potent weapon for engineering a fundamental shift in an entire industry.  This Complaint is not, therefore, properly judged solely through the lens of precedent addressing hub-and-spoke conspiracies.

F.   The Pricing Allegations

Defendants contend that the Complaint's allegations are implausible as to the nature of the pricing agreement.  They point out that prices after the alleged agreement became more varied, not less so, and that the switch to the agency model did not prohibit the publishers from competing on price.  Whereas prior to the agreement the Complaint alleges that prices were mostly stuck at $9.99 across retailers, after the agreement they varied at least from $9.99 to $14.99.  The defendants claim it is implausible that a conspiracy not to compete on price would

have these effects.  The defendants also claim that an alleged conspiracy among publishers to earn less money, as they did through the agency model, is not plausible.

These arguments do not address the fundamental claim in the CAC.  It alleges that the defendants conspired to eliminate retail price competition and to raise the price of eBooks above the $9.99 price set by Amazon.  This states a claim for violation of the law.  That the eBook prices may now fall within a range, albeit one typically well-above $9.99, does not render the Complaint's description of the conspiratorial agreement implausible.  Similarly, as explained in the Complaint, the publishers perceived that their financial interests and business model, taken as a whole, were better protected by raising the prices of eBooks even if it meant reducing their profit margins in that line of their business.  In the words of Macmillan's CEO, the publishers believed the agency model would allow them to "have a stable and rational market," and that the tradeoff was in their long-term business interests.  As for Apple, of course, the CAC alleges that the adoption of the agency model was emphatically in its financial interest.  Under the agency model, Apple took a 30 percent commission from each sale and was no longer confronted with the unpleasant prospect of selling eBooks at $9.99 -- a price often below the wholesale price.

51

G.   Reasonableness of the Restraint

Finally, the defendants claim that the CAC alleges, at most, a series of lawful, vertical agency agreements and a supporting horizontal agreement and that such agreements are subject to the pleading requirements associated with the "rule of reason" test.  Apple argues that, when judged under the rule of reason, the Agency Agreements should be found lawful because they were simply agreements by a principal to set the price charged by its agent, because Apple had no market share, because rising prices in the eBooks market was accompanied by a growth in output, because MFN clauses are customarily subject to the rule of reason, and because Apple's entry into the market had procompetitive effects in light of Amazon's predatory, monopoly pricing.  See, e.g., Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 237 (1993) (where output is increasing, rising prices are equally consistent with growing demand); United States v. Gen. Elec. Co., 272 U.S. 476, 488 (1926) (genuine contracts of agency are not antitrust violations); Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic, 65 F.3d 1406, 1415 (7th Cir. 1995) (MFN clauses do not constitute price-fixing); Capital Imaging Associates, P.C. v. Mohawk Valley Med. Associates, Inc., 996 F.2d 537, 546 (2d Cir. 1993) (under rule of reason analysis,

plaintiff must demonstrate market power if unable to demonstrate substantially harmful actual market effects).

These contentions misconstrue the nature of the agreement described in the Complaint.  Regardless of the nature of the specific terms of the vertical Agency Agreements when examined in isolation, the CAC plausibly alleges a horizontal agreement among the publishers, furthered by Apple, to raise the prices of eBooks and eliminate retail competition.  A horizontal agreement to fix or raise prices is per se unreasonable.  See, e.g., Arizona v. Maricopa County Med. Soc., 457 U.S. 332, 347-48 (1982).

In arguing that vertical agreements like the Agency Agreements are always subject to the rule of reason and never constitute a per se violation of the law, the defendants point to a passage in Leegin Creative Leather Products, Inc. v. PSKS, Inc., 551 U.S. 877 (2007).  Leegin revisited the question of whether vertical price restraints were subject to a per se rule of unlawfulness or the rule of reason, and adopted the rule of reason for such agreements.  Id. at 899.  To arrive at that conclusion, the Court discussed circumstances in which vertical agreements setting minimum resale prices could have procompetitive and anticompetitive effects.  Id. at 892-94.  In

the course of discussing the ways in which vertical agreements
could violate the law, the Court observed,

> A horizontal cartel among competing manufacturers or
> competing retailers that decreases output or reduces
> competition in order to increase price is, and ought
> to be, _per se_ unlawful.  To the extent a vertical
> agreement setting minimum resale prices is entered
> upon to facilitate either type of cartel, it, too,
> would need to be held unlawful under the rule of
> reason.  This type of agreement may also be useful
> evidence for a plaintiff attempting to prove the
> existence of a horizontal cartel.

Id. at 893 (citation omitted).

While the defendants emphasize the second of these three
sentences, read in context, this passage indicates that a
vertical agreement setting resale prices that facilitates a
horizontal cartel would "need to be held" unlawful under the
rule of reason.  In any event, it is difficult to see how this
passage can possibly help the defendants in this case.  Such
conduct would seem to either be _per se_ unlawful, or necessarily
unlawful under the rule of reason.  Regardless, the agreement
alleged here is fundamentally horizontal.

Furthermore, Leegin contemplates that courts will "devise .
. . presumptions where justified, to make the rule of reason a
fair and efficient way to prohibit anticompetitive restraints
and to promote procompetitive ones."  Id. at 898-99.  The
Supreme Court has noted that "the Rule of Reason may not require
a detailed analysis; it can sometimes be applied in the

twinkling of an eye." <u>Am. Needle, Inc. v. Nat'l Football</u>
<u>League</u>, 130 S. Ct. 2201, 2217 (2010) (citation omitted). Here,
where the core of the plaintiffs' allegation is that the
Publisher Defendants engaged in a horizontal conspiracy to raise
prices and decrease retail competition, with Apple as the
central player coordinating and facilitating the agreement, it
is presumed that the conduct by all parties would be unlawful
under the rule of reason.

H.  Additional Claims

The defendants argue that the failure of plaintiffs'
Sherman Act claim is fatal to their state claims and to their
unjust enrichment claim.  Given that plaintiffs have
successfully pled a Sherman Act violation, these arguments are
inapposite.


CONCLUSION

The Publisher Defendants' March 2, 2012 Motion to Dismiss

is denied.  Apple's March 2, 2012 Motion to Dismiss is also
denied.


     SO ORDERED:

Dated: New York, New York
      May 15, 2012

                       _____
                            DENISE COTE
              United States District Judge