**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
———————————————————————

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | **12 Civ. 2826 (DLC)** |
| **v.** ) | |
| ) | |
| **APPLE INC.,** *et al.***,** ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ——————————————————————— ) | |

———————————————————————

| | |
|---|---|
| **THE STATE OF TEXAS,** *et al.***,** ) | |
| ) | |
| Plaintiffs, ) | |
| ) | **12 Civ. 03394 (DLC)** |
| **v.** ) | |
| ) | |
| **PENGUIN GROUP (USA), INC.,** *et al.***,** ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ——————————————————————— ) | |

**PLAINTIFF STATES' RESPONSE TO APPLE INC.'S MOTION IN LIMINE
TO EXCLUDE THE EXPERT TESTIMONY OF PROFESSORS
BAKER AND ASHENFELTER**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................................ii

I.   PRELIMINARY STATEMENT ......................................................................................... 1

II.  LEGAL STANDARD ....................................................................................................... 1

III. PROFESSOR BAKER'S TESTIMONY IS ADMISSIBLE AND RELEVANT TO THE PLAINTIFF STATES' ALLEGATIONS OF CONSPIRACY ............................................... 3

    A.   Coordinated Conduct ............................................................................................. 3

    B.   Average Market Price ............................................................................................ 6

    C.   Output .................................................................................................................... 9

    D.   Consumer Harm ................................................................................................... 10

IV.  PROFESSOR ASHENFELTER'S TESTIMONY EMPLOYS SOUND METHODOLOGY AND IS THEREFORE RELIABLE AND ADMISSIBLE ............................................... 11

    A.   Assumption of Conspiracy ................................................................................... 11

    B.   "Adjusted" Market Price ...................................................................................... 12

    C.   Output .................................................................................................................. 13

V.   CONCLUSION ............................................................................................................... 17

# TABLE OF AUTHORITIES

## Cases

*Amorgianos v. Nat'l. R.R. Passenger Corp.*, 303 F.3d 256 (2d Cir. 2002)....................................................2

*Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18 (2d Cir. 1996) ...................................................................2

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993) .....................................8

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) ...............................................................1, 3, 8

*Davis v. Carroll*, No. 09 Civ. 1088 (JPO), 2013 U.S. Dist. LEXIS 45884 (S.D.N.Y. March 29, 2013)......2

*Fleischman v. Albany Med. Ctr.,* 728 F. Supp. 2d 130 (N.D.N.Y. 2010).......................................5, 6, 9, 11

*General Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588 (7th Cir. 1984) ...............................9

*Hygh v. Jacobs*, 961 F.2d 359(2d Cir. 1992) .........................................................................................3, 4

*Louis Vuitton Malletier v. Dooney& Bourke, Inc.*, 525 F. Supp. 2d 558 (S.D.N.Y. 2007) .........................2

*Rock v. Arkansas*, 483 U.S. 44 (1987) .......................................................................................................3

*United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991).........................................................................3

*United States v. Brown*, 415 F.3d 1257 (11th Cir. 2005).........................................................................2

*United States v. Duncan*, 42 F.3d 97 (2d Cir. 1994)................................................................................3

*United States v. Lumpkin*, 192 F.3d 280 (2d Cir. 1999)...........................................................................1

*Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206 (2d Cir. 2009) ................2, 8

## Rules

Fed. R. Evid. 702 ...................................................................................................................................1, 2, 9

## I.  PRELIMINARY STATEMENT

Professor Baker's expert testimony regarding the coordinated conduct of the defendant publishers and Apple and the resulting consumer harm is amply grounded in the record, the product of reliable and established economic principles and methods, and reliably applied to the facts of this case.  Professor Ashenfelter's expert testimony regarding price increases and output reductions in the trade ebooks market following the Apple Agency Agreements likewise is focused on undisputed market data and employs methodology based on well-accepted economic theory.  Apple's assertions to the contrary rest on wholesale distortions of testimony or amount, at most, to matters for cross-examination, not exclusion.  There is no genuine question that the opinions of Professors Baker and Ashenfelter fit the facts of the case and will assist the trier of fact to resolve the issues here, so their testimony should be admitted pursuant to Fed. R. Evid. 702.[1]

## II.  LEGAL STANDARD

To be admissible, expert testimony must be both relevant and reliable.  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).  As long as an expert witness' testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue," he or she will be allowed to testify.  *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999) (*citing* Fed. R. Evid. 702).

Under *Daubert*, the trial court is tasked with being a gatekeeper to keep expert opinions that amount to nothing more than "junk science" out of the hands of the trier of fact.

---

[1]Fed. R. Evid. 702 provides:  "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."

*Amorgianos v. Nat'l. R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002); *Davis v. Carroll*, No. 09 Civ. 1088 (JPO), 2013 U.S. Dist. LEXIS 45884, at *53 (S.D.N.Y. March 29, 2013) ("Under Rule 702 and [*Daubert*], district courts are assigned a critical gatekeeping role at the boundary between real science and junk science.").  In construing *Daubert*, the Second Circuit has emphasized its preference for admissibility.[2]  This preference is in accord with the intention behind Fed. R. Evid. 702 that rejection of expert testimony should be the exception, not the rule. Fed. R. Evid. 702 advisory committee's notes to the 2000 amendments. When, as here, the judge serves as the factfinder, the *Daubert* gatekeeping standard is applied even more flexibly.  *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 629 (S.D.N.Y. 2007); *see also United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005) ("There is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself.").

Apple's arguments for excluding the testimony of Professors Baker and Ashenfelter are more properly characterized as arguments about the weight these opinions should be afforded. The Second Circuit has stated that expert testimony should be excluded only if it is "speculative or conjectural or based on assumptions that are 'so unrealistic and contradictory as to suggest bad faith' or to be in essence 'an apples and oranges comparison.'"  *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 214 (2d Cir. 2009) (*quoting Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)).  Other allegations that assumptions are unsubstantiated "go to the weight, not the admissibility, of the testimony."  *Boucher*, 73 F.3d at 21.  The appropriate methods of attacking evidence that is admissible but not persuasive are "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the

---

[2] *Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995).  ("First, . . .*Daubert* reinforces the idea that there should be a presumption of admissibility of evidence.  Second, it emphasizes the need for flexibility in assessing whether evidence is admissible.")

burden of proof" by the trial court to the factfinder.  *Daubert*, 509 U.S. at 596 (*citing Rock v. Arkansas*, 483 U.S. 44, 61 (1987)).

### III.   PROFESSOR BAKER'S TESTIMONY IS ADMISSIBLE AND RELEVANT TO THE PLAINTIFF STATES' ALLEGATIONS OF CONSPIRACY

#### A.   Coordinated Conduct

Of all of the economic experts retained in this case, Professor Baker alone is a lawyer and a law professor in addition to being a well-respected economist.  As such, he is keenly aware of the differences between economic terms such as "coordination" and legal terms such as "collusion," "agreement," and "conspiracy." Professor Baker correctly distinguished his economic opinions on the likelihood of coordination, which the Plaintiff States asked him to provide and are relevant to this case, from opinions about the ultimate legal conclusions, which are reserved for the trier of fact to determine.  *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991).

In evaluating the admissibility of expert testimony, the Second Circuit "requires the exclusion of testimony which states a legal conclusion."  *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) (*citing Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992)).  Such testimony usurps the role of the trial judge, who is the proper authority to instruct the jury about the applicable law and the role of the jury in applying that law to the case before them.  *Bilzerian*, 926 F.2d at 1294.

> When an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's.  When this occurs, the expert acts outside of his limited role of providing the groundwork in the form of an opinion to enable the jury to make its own informed determination.

*Hygh*, 961 F.2d at 363.

Despite being goaded numerous times in his deposition to adopt legal conclusions in his answers, Professor Baker held firm to his mandate that he is only opining about the economic likelihood of coordination, which is the correct standard for an expert economist.  For example, Professor Baker was asked in his deposition if his opinions "go to whether or not there is an agreement that is being alleged to be a violation in this case," to which he answered, "my *economic* opinions are not . . . about any *legal* conclusion, including whether it's an agreement." Baker Dep. 25:18-24 (emphasis added).

Professor Baker avoids the pitfall of making impermissible legal conclusions that plagues the testimony of one of Apple's experts.  Professor Murphy's Direct Testimony is replete with examples of improper legal conclusions.  For example, Professor Murphy claims that neither the contract terms (specifically, the MFNs and the price caps) in the Apple Agency Agreements, nor the manner in which Apple negotiated these terms, demonstrate Apple's "participation in or knowledge of the alleged publisher conspiracy."  Murphy Direct at ¶¶ 15-17 (heading of section); *see also id. at ¶ 9.*  Professor Murphy further opines that Random House's and the smaller publishers' eventual decisions to join the iBookstore platform under the agency model do not suggest that they participated in a conspiracy, *id.* at ¶ 44, and he stated that an Apple executive's assurances to some publishers that other publishers had joined the iBookstore platform, or were considering joining, were "not anticompetitive and do[] not imply a conspiracy."  *Id.* at ¶ 42.  Describing behavior as indicative of participation in a conspiracy or of being anticompetitive goes to the ultimate legal question in the case and, therefore, should be determined by the trier of fact, not the expert.  *Hygh*, 961 F.2d at 363.

Apple further displays its confusion over the correct role of the economic expert by its misleading characterizations of Professor Baker's opinions and deposition testimony on the price

caps contained in the Apple Agency Agreements.  Apple points to a portion of Professor Baker's deposition testimony as conceding that prices can become "focal" for non-collusive reasons that do not violate § 1 of the Sherman Act.  A closer reading of the transcript shows that Professor Baker was clearly answering the question as a law professor, *see* Baker Dep. 233:22-24 ("[Y]ou're asking me a question which I'm going to answer at any rate as a lawyer/law professor"), and he emphasized that there might not be a § 1 violation if prices became focal "for some other reason" than they did here.  *Id.* at 234:19-23.  Apple also claims that since Professor Baker admits that the price caps constrained the defendant publishers' prices, Apple and the publishers must have had independent business justifications for the price caps that transform the setting of these caps into legal behavior.  This fundamentally misstates Professor Baker's opinion that "[e]ven though the publishers may have wanted higher prices than those specified in the cap schedule or might have coordinated to achieve even higher prices had the distribution agreements not included price caps, the caps explain the prices actually set by the publishers insofar as they reflect the publishers' common understanding."  Baker Direct at ¶ 109.  Professor Baker further explains that Apple did not shield consumers from harm simply because the publishers' coordination might have produced even higher prices.  *Id.;* s*ee also Fleischman v. Albany Med. Ctr.,* 728 F. Supp. 2d 130, 155 (N.D.N.Y. 2010) (holding that an expert's opinion that information exchanges softened wage competition for nurses in area hospitals was not contradicted by the fact that overall compensation continued to rise).

Far from using the term "coordinated conduct" in a manner that permits a reading of either lawful or unlawful behavior by the defendants, Professor Baker specifically tethers his analysis to the Plaintiff States' allegations of conspiracy and to coordinated outcomes that are harmful to consumers rather than benign.  For example, in ¶ 64 of Professor Baker's Direct

Testimony, he opines that two outcomes that *are consistent with the States' allegations* – an end to Amazon's discounting by shifting the retail price-setting function to the publishers through agency and higher retail prices than otherwise would have prevailed – "likely resulted from coordinated conduct among those publishers, as facilitated by Apple."  In ¶ 65, Professor Baker illustrates that he understands that his economic conclusions of coordination among the defendant publishers and Apple are relevant, and therefore admissible under the *Daubert* standard, to a trier of fact's ability to find that the coordination's outcomes were the product of an illegal agreement among the defendants.  In situations where the relevant conduct could be consistent with either lawful or unlawful behavior, expert testimony is especially necessary to help a jury understand the impact of the particular behavior in question.  *Fleischman*, 728 F. Supp. 2d at 151.

**B.     Average Market Price**

Professor Baker's opinion that the average price in the relevant market rose as a result of the adoption of the Apple Agency Agreements is well-supported by the facts in the record[3] and the opinions of other experts.  Apple bases its assertion to the contrary on a mischaracterization of the opinions and findings of other experts.  In its Motion to exclude Professor Baker's testimony, Apple implies a causal link between its entry into the ebooks market and Dr. Burtis' finding that mean prices in the relevant market were lower in March 2012 than they were pre-agency.  Apple then compounds this false correlation by stating that Professor Gilbert agrees with Dr. Burtis on this point.

It is true that Professor Gilbert does not dispute Dr. Burtis' findings that average prices for all publishers were lower two years after the Apple Agency Agreements were adopted.

---

[3]  *See, e.g.*, PX-0548 at 16 ("Average price rose as expected with agency pricing."); PX-0549 at 1-3 (April 22, 2010 Amazon email showing that Average Selling Price increased from $7.56 on 4/1/2010 to $8.16 three weeks later).

Gilbert Dep. 371:25-372:6.  However, as Professor Baker notes, the analysis performed by Dr. Burtis does not answer the relevant question here, which is whether the Apple Agency Agreements actually *caused* the price effects that she observed.  Baker Direct at ¶ 120; *see also* Gilbert Direct at ¶¶ 171-78 (setting forth errors in Dr. Burtis' analysis and concluding that the errors caused Dr. Burtis to understate the degree of consumer harm).  In addressing the correct question that Professor Baker posed, Professor Gilbert agrees with him that an increase in the defendant publishers' prices is sufficient to show consumer harm because "there is no reason to expect that other publishers' prices should fall as a consequence of the adoption of the Apple Agency Agreements by the defendant publishers."  Gilbert Direct at ¶ 173.  In addition, Professor Gilbert performed an empirical analysis that "shows that the average price of *all trade e-books rose significantly* after the adoption of the agency agreements."  *Id.* (emphasis added).  Specifically, Professor Gilbert finds that the overall price of trade ebooks increased by approximately 9 percent.  *Id.*

Apple's expert, Dr. Burtis, acknowledges that the average prices in the relevant market increased immediately after the defendant publishers adopted the agency model,[4] and that this market-wide price increase was sustained for at least the six-month period that Professor Ashenfelter analyzed.[5]  In addition, as discussed more fully below, when Professor Ashenfelter attempted to re-create Dr. Burtis' finding that the mean prices of all ebooks fell from the pre-agency to the post-agency period using her dataset, but implementing controls for the publisher composition (a variable for which Dr. Burtis did not control, but which she did acknowledge as a

---

[4]Burtis Report (PX-831) at ¶ 26.
[5]*See* DX-434, which is Dr. Burtis' analysis of average ebook retail prices.  The black line representing "Average Price All Publishers" increases immediately on April 1, 2010, and sustains that higher price level for approximately 8 months.  *See also* Ashenfelter Direct at ¶¶ 7, 10.

driver of lower prices[6]), he found that adjusted prices for all ebooks actually rose from the pre-agency to the post-agency period.  Ashenfelter Direct at ¶¶ 63-64.[7]

Even if Apple were correct that Professor Baker's opinion is directly contradicted by the facts in the record, that would go to the weight, not the admissibility, of his testimony.  *Zerega*, 571 F.3d at 214.  Apple's argument that it should lead to the exclusion of Professor Baker's testimony rests on an erroneous reading of *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993).  In that case, the Court addressed whether the plaintiff's evidence was sufficient to avoid the entry of a directed verdict, 509 U.S. at 230, and determined that the testimony of the plaintiff's expert was not adequate to sustain the jury's verdict.  *Id.* at 243.  In the context of this discussion, the Court observed that "[w]hen indisputable record facts contradict or otherwise render the opinion unreasonable, *it cannot support a jury's verdict.*"  *Id.* at 242 (emphasis added).  Whether an expert's testimony is sufficient to avoid a directed verdict is an entirely different question than whether that expert's testimony is admissible.  *See Daubert*, 509 U.S. at 596.  The Court in *Brooke Group* did not comment on the probative value of expert testimony in the context of a determination under Rule 702 of whether an expert's opinion is helpful to the finder of fact.  It cannot, therefore, serve as legal authority to exclude Professor Baker's testimony.  However, as discussed above, Professor Baker is not alone in his opinion

---

[6]Burtis Direct at ¶ 41 ("Growth in this [independent and self-publishing] segment of the alleged relevant market has contributed to the falling average retail price of ebooks in the period following the adoption of the agency agreements.")

[7] As explained in Professor Ashenfelter's testimony and discussed more fully *infra* in IV(B), "Dr. Burtis' decline in mean prices may reflect a decline in the relative sales of the higher-priced books sold by the big six publishers rather than a general decrease in the prices of particular books."  Ashenfelter Direct at ¶ 63.  Indeed, Dr. Burtis admits that the trend of  independent publishers and self-published authors accounting for a larger share of ebook sales over time pre-dated the introduction of agency, and therefore, is not attributable to agency and cannot be a procompetitive benefit thereof.  Burtis Direct at ¶¶ 40-41.  In addition, DX-434, which Dr. Burtis created, implies that the prices for ebooks from the non-big six publishers were, on average, lower than the prices for ebooks from the big six publishers.  Put together, these two facts may account for Dr. Burtis' opinion that the mean prices of ebooks fell.  Ashenfelter Direct at ¶ 63.

that average prices in the trade ebooks market were higher after the adoption of the Apple Agency Agreements,[8] so his testimony is not without a factual foundation and is admissible.

## C.    Output

Many of the same considerations supporting the relevance and reliability of Professor Baker's opinion about price effects also demonstrate the same for Professor Baker's opinion about the output effects in the relevant market.  First, Professor Baker's opinion about market-wide output effects is based, in part, on Professor Ashenfelter's analysis, which demonstrates that the defendant publishers' output fell after the adoption of the agency model.  Baker Direct at ¶ 117.  That he did not do his own empirical analysis is of no consequence, as, again, he relies in part on the empirical analysis conducted by Professor Ashenfelter.  *See* Fed. R. Evid. 702 advisory committee's notes to the 2000 amendments.[9]  Second, the inference that the reduction in defendants' output was reflected in the wider market is supported by economic theory, which holds that when there is a price increase, output is necessarily lower than it would have been had the price not increased.  *See General Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 594 (7th Cir. 1984) ("If firms raise price, the market's demand for their product will fall, so the amount supplied will fall too—in other words, output will be restricted.").  As noted above, Professor Baker was able to conclude that prices in the relevant market increased.  Because of this, Professor Baker was also able, using established economic principles, to further opine that market-wide output was lower than it would have been had the Apple Agency Agreements not been adopted.

---

[8]  Gilbert Direct at ¶ 173; Ashenfelter Direct at ¶¶ 63-64; Burtis Report (PX-831) at ¶ 26; DX-434.
[9] The Advisory Committee Notes to the 2000 Amendments for Fed. R. Evid. 702 make it clear that expert testimony should be "based on sufficient underlying 'facts or data.'  The term 'data' is intended to encompass the reliable opinions of other experts."  *See also Fleischman*, 728 F. Supp. 2d at 155 (finding economic expert's testimony admissible even though he did not "independently verify any of Ashenfelter's [the other expert] findings.")

### D.    Consumer Harm

Apple argues that  Professor Baker impermissibly relies on Professor Ashenfelter's analysis of the price and output effects of agency as a basis for his opinion that consumers were harmed even after possible efficiency benefits of the iBookstore are taken into account.  In his deposition, Professor Ashenfelter never says that his results could *not* be used to make an inference about consumer harm in the relevant market; he simply says that he did not study that question and therefore has no opinion on the matter.  Ashenfelter Dep. 161:2-19.  Instead, Professor Baker draws an inference about the price and output effects in the relevant market from

Professor Baker acknowledged that characterizing Professor Ashenfelter's analysis as "demonstrating" that consumers were harmed "was not the best choice of words,"  Baker Dep. 278:4-14, but explained that Professor Ashenfelter's analysis of price and output effects among the defendant publishers was evidence that, in conjunction with other evidence he had seen, led him to conclude that consumers were harmed.  *Id.* at 278:15-279:3.  Thus, Apple's argument that Professor Baker's conclusion relies on "a false and unfounded characterization of Professor Ashenfelter's analyses" is simply not true.  Instead, Professor Baker draws an inference about the defendant publishers' prices and output without characterizing the analysis in any way.

After concluding that there were price and output effects in the relevant market, Professor Baker goes on to examine the potential procompetitive justifications proffered by the defendants' experts.  *See* Baker Direct at Part X.  Professor Baker noted that it is important, for purposes of this inquiry, to distinguish between the possible procompetitive effects attributable to the iBookstore from those properly attributable to the iPad because only the former are relevant to establishing the effect of the defendants' coordinated conduct on consumer welfare.  *Id.* at 134.

Professor Baker considered the proffered procompetitive justifications and found no quantifiable justification attributable to the iBookstore. *See id.* at 133 (noting that the proffered justifications provide no basis for overturning his opinion that consumers were harmed).

It is therefore obvious that Professor Baker's conclusion that consumers in the relevant market were harmed is not, as Apple argues, "rank speculation," but is instead the result of a permissible inference about the price and output effects in the relevant market from Professor Ashenfelter's analysis, coupled with his own analysis and rejection of the procompetitive justifications proffered by defendants' experts. Professor Baker's conclusion should, therefore, be admitted into evidence.

## IV. PROFESSOR ASHENFELTER'S TESTIMONY EMPLOYS SOUND METHODOLOGY AND IS THEREFORE RELIABLE AND ADMISSIBLE

### A. Assumption of Conspiracy

Apple argues that because Professor Ashenfelter assumed that a conspiracy existed and reached no independent opinion on the subject, he should be precluded from offering any testimony about the subject. As established above, the existence of a conspiracy is a legal question upon which it would be improper for Professor Ashenfelter to opine. For this reason, Professor Ashenfelter was not asked to formulate an opinion about whether a conspiracy existed, and he did not do so. Thus, there is no testimony to exclude. Further, Professor Ashenfelter's opinion is not rendered unreliable or irrelevant because he does not opine about whether a conspiracy exists. *See Fleischman*, 728 F. Supp. 2d at 149 ("The fact that [the economic expert, Orley Ashenfelter] did not address whether a conspiracy existed or whether a conspiracy caused the [alleged harm] does not render his opinions, as to impact and damages, unreliable.").

**B.**   **"Adjusted" Market Price**

Apple accuses Professor Ashenfelter of using a faulty regression model to determine "adjusted" average market prices and challenges these adjusted prices as meaningless.  Notably, Apple is not challenging Professor Ashenfelter's conclusion that the prices of defendant publishers' ebooks were higher after the adoption of the agency agreements or the analysis that he uses to arrive at that conclusion.  Presumably, this is because there is no way to challenge Professor Ashenfelter's analysis.  Unlike Dr. Burtis, who merely conducts a comparison of price and output pre- and post-agency at far distant times, Ashenfelter Direct at ¶¶ 60, 66, Professor Ashenfelter uses a robust regression model to control for a number of potentially confounding variables and further uses a group of titles published by Random House as a control group to further adjust for factors that affected the ebook market as a whole. *Id.* at ¶ 8.  Instead, Apple challenges Professor Ashenfelter's critique of Dr. Burtis' failure to account for a factor that could explain why her calculation of average prices showed that they fell during the period after the adoption of the agency model.  Because Apple has not challenged Professor Ashenfelter's primary analysis in this matter, Apple has put forward no basis to exclude Professor Ashenfelter's entire testimony.

Furthermore, Apple has put forward no real basis to exclude even the portion of Professor Ashenfelter's testimony it does challenge.  Once again, Professor Ashenfelter undertook the regression analysis at issue here to highlight Dr. Burtis' failure to account for certain factors in her analysis of average market prices.  Specifically, Professor Ashenfelter noted that Dr. Burtis failed to take into account the changing composition of ebook sales.  *Id.* at ¶ 63.  As Dr. Burtis herself noted, the market shares of the defendant publishers began declining before the adoption of the agency model and continued to decline during the agency period.  Burtis Direct at ¶ 41;

Ashenfelter Direct at ¶ 63.  Furthermore, her Graph in DX-434 implies that the prices for ebooks from the big six publishers were higher than those of the smaller publishers that were gaining market share at the time.[10]  It is therefore possible that the decrease in average market prices that Dr. Burtis observes is due to the decrease in the sales of the higher-priced ebooks sold by the big six publishers rather than a decrease in the prices of particular books.  *Id.* at ¶ 63.  Dr. Burtis acknowledged that the growth in independent publishers' and self-published authors' market share contributed to the falling average retail price of ebooks she observed after the adoption of the agency agreements, Burtis Direct at ¶ 41, but she failed to control for this growth in her analysis.

To highlight this error, Professor Ashenfelter used Dr. Burtis' dataset and performed a regression analysis to control for the changing composition of sales.  Ashenfelter Direct at ¶ 64 & n.46.  Using that model, Professor Ashenfelter was able to reverse Dr. Burtis' conclusion and find that publisher-adjusted prices actually rose during the agency period.  *Id.* at ¶ 64.  The analysis conducted by Professor Ashenfelter illustrates that the changing composition of ebook sales could explain the reduction in average market price observed by Dr. Burtis.  *Id.* at ¶ 65.  The regression model is not "faulty" and the numbers that result are not "meaningless," so there is no basis for the related testimony to be excluded.  Rather, the testimony is important to demonstrate the lack of rigor in Dr. Burtis' analysis.

## C.    Output

Apple's arguments related to Professor Ashenfelter's output findings relate to two separate areas.  First, Apple challenges an analysis Professor Ashenfelter undertook to highlight an erroneous assumption underlying Dr. Burtis' analysis.  Second, Apple argues that the results

---

[10]Ashenfelter Direct at ¶ 63 & n.44. *See also* Burtis Direct at ¶ 8 ("The market has seen a substantial increase in the number of inexpensive eBooks published by independent publishers, including self-published authors.")

of Professor Ashenfelter's primary analysis of the effect of the adoption of the agency model on defendant publishers' output is misleading and that the control group he uses to conduct his analysis is flawed.  Each argument will be addressed in turn.

Apple's first criticism addresses Professor Ashenfelter's conclusion that ebook sales were 7 percent below trend after the adoption of the agency model.  Professor Ashenfelter made that statement in the context of criticizing Dr. Burtis' conclusion that the volume of unit sales of all ebooks rose on average following the adoption of the agency model.  Ashenfelter Direct at ¶¶ 66-67.  Professor Ashenfelter noted that Dr. Burtis' conclusion appears to be based on the assumption that, had the agency model not been adopted, the volume of sales would not have changed at all.  *Id.* at ¶ 67.  Because ebook sales were growing at a very fast pace prior to the adoption of the agency model, Professor Ashenfelter posited that this assumption was unlikely to reflect reality.  *Id.*  To illustrate this flawed assumption, Professor Ashenfelter performed a regression analysis that found that the growth rate in ebook sales was 7 percent below the average rate of increase for the period before agency and after agency taken together.  *Id.* at ¶ 68.  Whether this finding is statistically significant or whether the pre-agency growth rate would have continued indefinitely has no bearing on the relevance and reliability of Professor Ashenfelter's testimony on this point, as the testimony is not being offered to describe actual market conditions.  Instead, Professor Ashenfelter conducted the analysis to demonstrate that Dr. Burtis' failure to control for the changes in the market that would have occurred in the absence of the agency model can lead to flawed results.  *Id.* at ¶ 69; s*ee* Baker Direct at ¶ 128 ("[T]he slowdown in sales growth Professor Ashenfelter found [through this analysis] calls into question Dr. Burtis' implicit attribution of sales growth to agency.").  In other words, Professor Ashenfelter's testimony illustrates why Dr. Burtis' analysis is unreliable.  As such, it is clearly relevant.

Apple next addresses Professor Ashenfelter's primary analysis.  Its first criticism relates to Professor Ashenfelter's conclusion that consumers either purchased fewer ebooks from the conspiring publishers or bought a different mix of ebooks as a result of the alleged conspiracy. Apple argues that this testimony should be excluded because Professor Ashenfelter cannot distinguish between the two possibilities and his testimony is therefore misleading.   The failure to distinguish between the two possibilities is not misleading because both possibilities involve consumer harm.  *See* Baker Direct at ¶ 116.  Moreover, while Professor Ashenfelter cannot empirically distinguish between the possibilities, Professor Baker does distinguish between them by calculating a range within which the actual reduction in consumer purchases from the defendant publishers must fall.  Baker Direct at ¶ 117 & n.176.  To do this, Professor Baker took Professor Ashenfelter's finding of a 14.5 percent reduction in the defendant publishers' output relative to Random House's output as an upper bound and then calculated a lower bound from the relative size of Random House and the defendant publishers.  *Id.*  Professor Baker concluded that the actual reduction in defendant publishers' output was between 4.4 percent and 14.5 percent.  *Id.* at ¶ 117.  Because both possibilities are harmful to consumers and Professor Baker has, in any event, distinguished between the two possibilities using Professor Ashenfelter's data, Professor Ashenfelter's testimony is not misleading and should not be excluded.

Finally, Apple criticizes Professor Ashenfelter's use of Random House titles as a control in his regression analysis because Random House received more favorable promotion on Amazon than the defendant publishers.  This argument could relate to promotion through either advertising[11] or favorable pricing.  To the extent that the argument relates to advertising,

---

[11]   It should be noted that Amazon was not focused on promoting ebook titles from publishers that were still on wholesale terms over those that had adopted agency terms.  Naggar Direct at ¶ 39.  Instead, Amazon promoted those ebooks it felt provided the most value to its customers – frontlist ebooks priced at $9.99.  *See id.*  Moreover,

Professor Ashenfelter addressed this concern by conducting a robustness check using only data from Barnes & Noble, which did not provide additional or favorable advertising to Random House.  *See* Ashenfelter Direct at ¶ 55.  This analysis resulted in a larger, and statistically significant, price effect than the price effect found in his primary analysis, which used data from Amazon, Barnes & Noble, and Apple together.  *See id.*  Thus, the notion that Random House may not serve as a suitable control due to its receipt of favorable advertising is not a valid concern.

To the extent that the argument relates to Random House's receipt of favorable pricing at Amazon, Professor Ashenfelter addressed the concern by examining Professor Rubinfeld's claim that Amazon increased its below-cost pricing of Random House titles after the defendant publishers adopted the agency model.  *See id.* at ¶ 70.  Professor Ashenfelter noted that Professor Rubinfeld used total sales figures to arrive at his conclusion, which may reflect not only price changes, but also changes in the quantity sold.  *Id.*  To more accurately measure whether Amazon changed its discounting of Random House titles after agency, Professor Ashenfelter examined whether Amazon increased the number of Random House titles sold below cost.  *Id.* He found that, if anything, the fraction of Random House titles Amazon sold below cost after agency decreased.  *Id.*  As a result, he concluded that Professor Rubinfeld's claim that his analysis was biased because Amazon increased its below-cost pricing of Random House titles was baseless.  *Id.*  Thus, Apple has failed to demonstrate that there are *any* errors in Professor Ashenfelter's analysis, much less errors that would render the analysis unreliable.

---

Amazon did not change its advertising system for the backlist titles, which make up the vast majority of Amazon's ebook sales.  *Id.*

## V.    CONCLUSION

Professor Baker and Professor Ashenfelter have given opinions in this case that are both relevant and reliable.  Apple's arguments to the contrary are, as demonstrated above, without merit.  Apple's motion should therefore be denied.

Dated: May 3, 2013

Gabriel Gervey
Eric Lipman (EL6300)
David Ashton
Assistant Attorneys General
Office of the Attorney General of Texas
P.O. Box 12548
Austin, TX 78711
(512) 463-1262
Gabriel.Gervey@texasattorneygeneral.gov


W. Joseph Nielsen
Gary M. Becker (GB8259)
Assistant Attorneys General
Office of the Attorney General of Connecticut
55 Elm Street
Hartford, CT 06106
(860) 808-5040
Joseph.Nielsen@ct.gov


Sarah Oxenham Allen
Matthew R. Hull
Assistant Attorneys General
Office of the Attorney General of Virginia
900 East Main Street
Richmond, VA 23219
(804) 786-6557
SOAllen@oag.state.va.us


*On Behalf of the Plaintiff States*

18