**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE STATE OF TEXAS *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> PENGUIN GROUP (USA), INC. *et al.*, <br><br> Defendants. | Civil Action No. 12-cv-3394  (DLC) |
| IN RE ELECTRONIC BOOKS ANTITRUST LITIGATION | Civil Action No. 11-md-2293 (DLC) |

**PENGUIN GROUP (USA) INC.'S COMBINED PROPOSED STATEMENT OF
FACTS AND CONCLUSIONS OF LAW**

Penguin Group (USA) Inc. ("Penguin"),[1] by and through its undersigned counsel, Akin

Gump Strauss Hauer & Feld, LLP, submits the following proposed findings of fact and

conclusions of law in conjunction with the trial of this matter to be conducted on June 3, 2013.

**SUMMARY TABLE OF PROPOSED STATEMENT OF FACTS**

1.      The publishing industry is defined by the multitude of different publishers selling

highly differentiated, often unique products, and its support of the creative process of writing by

individual authors.  These market characteristics make price fixing in publishing economically

improbable.  PSOF ¶¶ 1-8.

---

[1] Penguin Group (USA) Inc. is referred to as "Penguin" throughout.  Other Penguin or Pearson entities are excluded from this definition and are specifically identified as necessary for sake of clarity.

2.     Penguin Group (USA) Inc and its associated international parents and affiliates are likewise defined by their unique market positioning and strategy.  Not all publishers are alike.  PSOF ¶¶ 9-15.

3.     By the end of 2008, the possibility of eBooks becoming a viable product was becoming apparent and Penguin began to consider how to take advantage of the eBooks opportunity to sell more books, better meet customer demand, and make a profit.  PSOF ¶¶ 16-27.

4.     The emergence of online selling and eBooks presented business both challenges and opportunities to Penguin.  Most fundamentally, Penguin realized that these trends would impact its established brick & mortar distribution channel, which had been contracting.  PSOF ¶¶ 28-43.

5.     Amazon's practice of loss leading on certain eBooks associated with new release best sellers further complicated these opportunities and challenges.  Because Penguin's overriding strategic goal is to have broad distribution, Amazon's marketing strategy was in some ways at odds with Penguin's goals.  PSOF ¶¶ 44-70.

6.     In 2009, Penguin reacted unilaterally and uniquely by developing incentive-based wholesale terms that would encourage distributors invested in non-price competition to not engage in deep loss-leading.  PSOF ¶¶ 71-74.

7.     Other publishers responded by withholding eBooks (windowing).  Penguin never windowed.  Penguin believed that windowing was against its ultimate business interests.  PSOF ¶¶ 75-78.

8.      Penguin also began to consider and join joint ventures focused on marketing and selling books online.  These ventures included both publishers and one retailer.  This was a further competitive response to the rise of both online sales and eBooks.  PSOF ¶¶ 79-90.

9.      The Apple opportunity was an intriguing, exciting, and unexpected opportunity. Penguin did not seek out Apple or propose the agency model to Apple.  To the contrary, Penguin attempted to negotiate a wholesale agreement with Apple.  PSOF ¶¶ 91-99.

10.     Penguin engaged in arms-length negotiations with Apple and ultimately determined, after significant financial analysis, that the Apple distribution agreement made business sense to Penguin.  Penguin's decision was unilateral and in its unilateral self-interest. PSOF ¶¶ 100-122.

11.     The facts of the negotiations demonstrate that Penguin acted independently. PSOF ¶¶ 113-124.

12.      Penguin further independently determined that the agency selling model made sense for Penguin and the emerging eBooks product and distribution channels.  Penguin's decision was unilateral and in its unilateral self-interest.  PSOF ¶¶ 125-135.

13.     Penguin reasonably believed both that the Apple distribution agreement and the decision to use the agency model promoted its business interests and furthered a productive and competitive marketplace.  PSOF ¶¶ 136-139.

14.     While Penguin considered using a wholesale model and an agency model for different accounts, Penguin ultimately decided to propose and negotiate agency terms with all its distributors.  PSOF ¶¶ 140-147.

15.     There is insufficient proof that a relevant antitrust market could be defined as narrowly as trade eBooks in the United States.  PSOF ¶¶ 148-150.

3

16.     Penguin has no market power in such an alleged market.  PSOF ¶¶ 151-154.

17.     There are more than plausible benefits that have resulted from the Penguin/Apple distribution agreement and Penguin's adoption of the agency model.  PSOF ¶¶ 155-156.

18.     Prices have gone down.  PSOF ¶¶ 157-160.

19.     Output has gone up.  PSOF ¶¶ 160-166.

20.     New entry has occurred.  PSOF ¶¶ 167-182.

21.     Competitive responses, including Amazon's, have benefited consumers.  PSOF ¶¶ 183-192.

22.     Penguin has improved its U.S. and international businesses, and has become more competitive.  PSOF ¶¶ 193.

## PROPOSED FINDINGS OF FACT

### *The Publishing Industry*

1.     The publishing industry in the United States, if it were to be assessed as a market, would be considered relatively de-concentrated.  (Rubinfeld Tr. Aff. ¶ 53.)  Publishing in the United States is comprised of thousands of publishing houses and numerous imprints.  (*Id.* ¶16.)

2.     The selling and distribution of eBooks is a series of classic vertical relationships between authors, literary agents, publishing houses, and distributors, and distribution agreements that govern the sale and distribution of eBooks are vertical in nature.  Authors create content, then, with the assistance of literary agents, they sell that content to publishing houses, often with publishing houses committing significant resources not only to acquiring the titles but to assisting the authors in writing, editing, and marketing their books.  Publishers then distribute and market their books, traditionally through resellers under a wholesale model, and most

predominantly through brick and mortar stores.  The vertical nature of industry relationships is a fundamental characteristic of publishing.  (Rubinfeld Tr. Aff. ¶ 10.)

3.        Variety and choice are critical characteristics of publishing.  Each book is unique unto itself, and may have limited or even no competitive significance for other books.  (*See, e.g.,* Shore Tr. Aff. ¶ 26.)  As one Penguin executive colorfully notes, "books are not cans of beans." (*Id.*)  Marketing is an especially important part of publishing because of the perhaps uniquely differentiated nature of books.

4.        One result of the differentiation of book titles is that different publishing houses focus on different sets of book titles and genres.  Correspondingly, each publisher owns a unique set of titles.  (*See, e.g.,* Shanks Tr. Aff. ¶ 5.)

5.        The uniqueness of publishing is a result of the uniqueness of the people who write.  Publishing would not exist without authors.  Authors are compensated, typically, through advances and royalties.  Author content acquisition costs are the vast majority of a publishing company's profit and loss.  (Shore Tr. Aff. ¶ 13; Shanks Tr. Aff. ¶ 8.)  Penguin, in determining what level of advances it might be willing to pay to acquire a new title, considers among other factors the number of titles it can sell, the formats in which it can sell the work (including both print and eBook), its return rate for printed books, and ultimately its profitability.  Penguin, and presumably other publishers, will not pay to acquire content if they cannot do so at a fair profit. (Shanks Tr. Aff. ¶¶ 7-8.)

6.        In 2009, for example, Penguin paid advances of approximately REDACTED to around REDACTED authors, just for new releases.  (Shanks Tr. Aff. ¶ 60.)

7.        Another component of the publishing industry is the existence of copyright protection.  Copyrights are a constitutionally protected form of property.  Publishers, when they

own copyrighted material, are entitled to use it or withhold it unilaterally because it is their property. (*See, e.g.*, Gigante Tr. Aff. ¶ 36.)

8.      Certain characteristics of the eBook publishing industry, from an economics perspective, make collusion less likely. (*See* Rubinfeld Tr. Aff. ¶ 52 (product differentiation, lack of concentration, vertical integration of competitors); *id.* ¶¶ 65-69 (vertical nature of marketplace, product differentiation).)

### *Penguin & Pearson*

9.      Penguin Group (USA) Inc. is the second largest trade publishing house in the United States. (Shanks Tr. Aff. ¶ 4.)

10.     Trade publishing includes fiction, nonfiction, children's books, cookery, and other categories that could be found in a typical brick and mortar bookstore and are sold "to the trade."

11.     Penguin is particularly well known for its bestsellers, extensive backlist including, notably, Penguin Classics, and its children's books. Penguin operates numerous imprints (category-focused internal publishing houses), each of which focuses on its own niche. (Shanks Tr. Aff. ¶ 5.) Penguin is not part of a media conglomerate like CBS or News Corp. Penguin as a result has a different business and strategic focus than other publishers. (Shanks Tr. Aff. ¶ 4.)

12.     David Shanks is the CEO of Penguin Group (USA), Inc. (Shanks Tr. Aff. ¶ 3.)

13.     The Penguin Group is a London-based international trade publishing division of Pearson plc, which oversees all of the Penguin companies around the world and is effectively the parent company of the Penguin Group (USA), Inc. Penguin Group affiliates are involved in publishing across the English-speaking world. (Makinson Tr. Aff. ¶ 5.)

14.     John Makinson is the CEO of the Penguin Group. (Makinson Tr. Aff. ¶ 4.)

6

15.     Pearson, a London-based publisher, is involved not only in trade publishing but also in educational textbooks and news, including operation of the esteemed *Financial Times*. It is effectively the parent of the Penguin Group.  (Makinson Tr. Aff. ¶ 5.)

### Alternative Book Formats & eBooks

16.     Any specific book title can be sold in multiple formats.  Today, there are three common formats for books:  print books, audio books, and electronic books, which are commonly known as "eBooks."  However, the most traditional format for books is print. Generally, print books are divided into hardcover, trade paper, and mass market.  Each category is generally defined by the size of the physical book and the quality of the physical product.

17.     As explained in an Op Ed by CEO John Makinson, Penguin invented the mass market format.  (PEN Ex. 1; *see also* Makinson Tr. Aff. ¶¶ 9-10.)  The print book formats can be, and are sold in different outlets, or to different sets of consumers, or in different time periods.

18.     Even today, print books remain the overwhelming format in which consumers read.  (Shanks Tr. Aff. ¶ 12 (over 90% in 2010).)

19.     eBooks are the newest format to develop in publishing.  eBooks can be—but do not have to be—duplicative electronic copies of print books.  Audio books are another popular format.

20.     Unlike print books, eBooks can only be read on some sort of device, such as a computer, a phone, a dedicated reader, or now, a multi-purpose tablet.  eBooks can also be "enhanced" to include additional electronic content over the print format, such as video, audio, hyperlinks, and other substance is tied to the functionality of the device on which the eBook is viewed.

21.     eBooks present a convenience for many consumers because, for example, they can be purchased instantaneously online wherever there in an internet connection, they are highly portable (limited only by the size of the device), and are stored electronically.  However, unlike print books, they have no actual look and feel, they cannot be shared between consumers, and in many instances, because of proprietary format or digital rights management (DRM) features, cannot be transferred between eReading devices or eReading platforms.

### The Nascent eBooks Marketplace of 2008

22.     eBooks have been around since the 1980s.  However, prior to 2007, there was no sizable or significant eBooks business, at least insofar as Penguin was concerned.  (Shanks Tr. Aff. ¶ 13.)

23.     Penguin's sales of eBooks prior to 2008 were small.  As of 2008, Penguin's financial team estimated that net sales of eBooks in 2007 were $7.2 million.  Total sales for the previous four years were a mere $2.8 million.  (PEN Ex. 4, p. 13.)

24.     At this time, there was great uncertainty over the eBook opportunity.  As noted by Penguin executives in early 2008, previous industry estimates of the size and scope of potential eBook sales had been grossly wrong.  (PEN Ex. 4, at 3 & 6 ("Anderson Consulting predicted a $2.3b market for ALL eBooks by 2005 ... Didn't Anderson work for Enron also?").)  The same uncertainty existed over eReaders—which would succeed?—and whether direct-to-consumer author offerings might become viable.  (*Id.*at 4-5.)  Even Apple and Steve Jobs made an appearance in Penguin's early predictions about where eBooks were headed.  (*Id.*at 10, 27.)

25.     With Sony's release of the Sony Reader in 2006, Amazon's release of the Kindle in 2007, and the existence of several other dedicated eReading devices, eBooks began to gain consumer acceptance.  Penguin at this period in time started seriously thinking about eBooks as a

true business opportunity, and thinking about "dependency on technology partners[,]" and about how the incentives of Amazon, Sony and others differed from Penguin's. (PEN Ex. 4 at 21-23; Gigante Tr. Aff. ¶ 9.) As the Penguin executives concluded: "[i]n such a rapidly evolving market, the unknown is always the greatest threat – risk and **Opportunity**." (PEN Ex. 4 at 28.)

26.     Part of the reason Penguin applied the same wholesale pricing model to eBooks that it had for print books was because Penguin was not very focused on eBooks when the first product came out. (Gigante Tr. Aff. ¶ 8.) There also was uncertainty over consumer acceptance and adoption. It simply was unknown whether eBooks were going to be another passing fad (like CD books had been). (Gigante Tr. Aff. ¶ 7.) It was also unknown how eBooks should be priced with regard to their physical counterparts, (Shanks Tr. Aff. ¶¶ 17-18), and whether consumers would pay more, less, or something entirely different for eBooks than for related print books. (Shore Tr. Aff. ¶ 15.) As a result of the uncertainty, Penguin did not know how successful eBooks would be as a format, how much to invest in them, or whether eBooks presented a viable business opportunity.

27.     Even by 2009, eBooks represented less than 2% of Penguin's total sales of book titles. (Shore Tr. Aff. ¶ 11.)

### *Amazon & The Kindle*

28.     Amazon is the largest online account of Penguin (McCall Tr. Aff. ¶ 5), and perhaps the largest bookstore in the United States. (*See* Amazon.com.) Amazon sells both print books and eBooks. (*Id.*) But Amazon is much more than a bookstore; it is a retailer of an extensive array of consumer products. (*Id.*)

29.     Amazon, and the existence of online sales, have changed the book industry—in Penguin's opinion, for the better. Online accessibility of print books, and now eBooks, is an

additional channel of distribution for Penguin to sell books and reach consumers. Both provide more accessibility for consumers, and at least an opportunity to both better communicate with consumers and understand consumer preferences and demand.

30.     The original Kindle essentially replicated, as best it could, the look of a print edition of a book, both in terms of its size and its black and white display. (Makinson Tr. Aff.¶ 46.)

31.     The Kindle was innovative; for example, it allowed consumers to wirelessly purchase and download eBooks directly to their device. One limitation was that the Kindle had its own unique proprietary format for eBooks, and an eBook purchased on the Kindle could not be read on other devices, and an eBook purchased from somewhere other than Amazon could not be read on the Kindle. It was, in effect, a closed system. (*See generally* Rubinfeld Tr. Aff. ¶ 12.)

32.     By 2008, Amazon began gaining a significant share of the sales of eBooks, and had replaced Sony as the leading eBook seller. By 2009, Amazon's share of eBook sales was approaching or over 80% of the marketplace. (McCall Aff. ¶ 5; *see also* Rubinfeld Tr. Aff. ¶45 & Rubinfeld Aff. Ex. 10 (calculating eBook "shares" among Amazon, B&N, and Sony).)

33.     Vertically integrated "systems competitors" like Amazon (as well as Apple, Google, and Sony) have different sets of incentives than book publishers. (Rubinfeld Tr. Aff. ¶54.)

34.     Penguin viewed Amazon and its innovations as an opportunity to sell more books. Penguin worked hard to foster and maintain a positive and unique relationship with Amazon by visiting often with Amazon executives, and by participating in exclusive programs with Amazon, including an author contest. (Makinson Tr. Aff. ¶ 12.) Penguin was also very experimental in its relationship with Amazon, releasing early chapters of books and sneak previews. (Shore Tr. Aff.

¶ 21.)  Penguin was also one of the first publishers to produce enriched eBooks, which they did exclusively with Amazon.  (*Id.*)

35.     By 2009, Penguin believed it was the largest eBook publisher on Amazon.com. (PEN Ex. 25, p. PEN 747507.)  Sales at Amazon had in fact increased by over 500% from the previous year.  (*Id.*)

36.     At the same time, Penguin recognized that Amazon's objectives were not always aligned with those of Penguin.  From Penguin's perspective, Amazon was focused on becoming an online sales juggernaut with a bookstore being only part of its product offering.  Moreover, the proprietary and closed nature of its device was contrary to Penguin's device-agnostic philosophy, and its goal of having the broadest distribution of books.  Finally, as with any business partner, Penguin and Amazon would have to negotiate the terms of their relationship, and from Penguin's perspective, the Amazon executives were extremely tough negotiators. These reasons led one Penguin executive to label Amazon a "frenemy."  (Shore Tr. Aff. ¶¶ 18; *see also* Makinson Tr. Aff. ¶¶14-17.)

### The Importance of Brick & Mortar Stores to Penguin

37.     Despite the growth of online sales of print books, and the emergence of eBooks as a viable format, brick & mortar stores remained the leading means for Penguin to sell its books. (Shanks Tr. Aff. ¶ 12.)

38.     In 2009, Amazon was Penguin's third largest customer (with 9% of sales), with the traditional brick & mortar accounts of Barnes & Noble and Border's being Penguin's biggest accounts (combined 30%).  (PEN Ex. 26, p. PEN 517941)  Over the last three decades, the number of traditional brick and mortar bookstores had steadily been shrinking.  (Shanks Tr. Aff. ¶ 10.)

39.     The rise of alternative sales channels, such as mass-market stores (*e.g.,* Wal-Mart and Costco) and online sellers, had been putting competitive pressure on traditional bookstores. The rise of eBooks sold through traditional bookstores as a possible alternative format that may or may not be successful was yet another possible, additional competitive pressure point.  By 2009, executives at Penguin were living through the demise of book giant Walden Books, and concerned about the ongoing viability of the Borders bookstore chain.   Penguin executives began to consider a publishing world with few—or even no—traditional bookstores.  (Shanks Tr. Aff. ¶¶ 26-27.)

40.     Traditional bookstores, however, had played an important if not critical role in the book publishing world.  Traditional bookstores were showcases for books and engaged in marketing techniques such as "hand selling," which had proven to be highly effective for selling both known and unknown authors.  Even today, polls show that 1/3 to 40% of on-line buyers first check out books in traditional bookstores.  (Gigante Tr. Aff. ¶ 10.)  From Penguin's perspective, the traditional bookstore channel was well-understood and quite effective.  (Shanks Tr. Aff. ¶ 14.)

41.     It also was viewed as a critically important tool for Penguin to help consumers find new authors.  At least as far as 2009, it was Penguin's perspective that not a single online retailer had developed a new author.  It was only through showcasing, "hand selling," book tours, in-store recommendations, and the other methods of the established traditional bookstore that Penguin felt it could develop new authors like Kathryn Stockett, who wrote *The Help.*  (Shanks Tr. Aff. ¶¶ 15-16.)

42.     In comparison, the emerging dominant online retailer, Amazon, was viewed by Penguin, as having a very poor recommendation engine, limited viewable "shelf space," and was

promoting only the most popular titles in order to drive traffic to its multipurpose website.  While all of this might have been a good business tactic for Amazon, at some level it was contrary to Penguin's interest in selling and developing Penguin titles.  In an expanding digital landscape where brick and mortar outlets were disappearing and an online space dominated by Amazon, whose approach towards marketing and promoting Penguin books diverged from Penguin's interests, Penguin struggled to conceive of new ways to continue to be a both a relevant and profitable publisher.  (PEN Ex. 25, p. PEN747506-PEN747514.)

43.     Penguin was also worried that online marketing would undercut the efforts and incentives of its brick & mortar partners to market books in-store.  As one example, these accounts complained that customers were using the bookstores to browse and find books and then buying them on the spot electronically with their Kindles.  (Shanks Tr. Aff. ¶ 16; Gigante Tr. Aff. ¶ 11.)

### Loss Leading and the $9.99 Price Point

44.     Amazon also had a policy of selling certain hardcover-related new release eBooks for less than the cost at which it acquired them from publishers.  In short, Penguin knew that it was selling certain new release eBooks to Amazon at a wholesale price of approximately half the suggested list price of the print book version, and that Amazon was selling that eBook title for $9.99 for some period of time, representing a loss of several dollars per unit sold.  (Shanks Tr. Aff. ¶ 21.)

45.     Penguin recognized that Amazon's loss leading strategy might have made sense for Amazon, for example by driving consumers to its website in order to sell other consumer products like lawn chairs, but it was in conflict with Penguin's long-term interests of selling its own titles and maintaining brick and mortar stores.  (Makinson Tr. Aff.¶¶ 17-19.)

46.     It was Penguin's perception that this loss leading by Amazon was part of a strategy to sell more of its Kindle eReading devices.  (Makinson Tr. Aff.¶ 17; McCall Tr. Aff. ¶ 9.)  While Amazon may have been able to make up the losses it was taking on the sale of eBooks through sales of its relatively expensive device, from Penguin's perspective, Amazon's interests in pursuing this sales strategy were not aligned with Penguin's interests as a book publisher. (McCall Tr. Aff. ¶¶ 9-12.)

47.     Penguin, however, did view the impact of the strategy as counter to its short-term and long-term interests.

### *The Problem of Cannibalization*

48.     Penguin was concerned that Amazon's price policy was having a spill-over effect on physical stores.  (Makinson Tr. Aff.¶¶ 21.)  Penguin perceived that one effect of Amazon selling certain eBook titles at a loss, and significantly below the cost of the print versions of the same titles, was that the price point might increase cannibalization between print and eBooks. (Shanks Tr. Aff. ¶¶ 17-18, 23.)

49.     Penguin thought, but did not know, that a sale of an eBook would result in one less sale of a print book.  On the other hand, it was possible that eBook sales were somewhat or completely incremental.  Penguin, without access to actual sales data, struggled to assess whether there was actual print book cannibalization as a result of eBooks, and if so, how much.  (Shanks Tr. Aff. ¶¶25, 30.)  Penguin was also uncertain whether the loss-leading had the effect of increasing sales.  (Shanks Tr. Aff. ¶ 29.)

50.     Cannibalization and the reduction of print book sales, of course, were vitally important issues to brick and mortar stores, especially those that lacked any significant online capability.  And regardless of the fact that cannibalization stood to have an effect on brick and

mortar accounts, cannibalization was a problem for Penguin because it had to struggle to make

decisions about how many print books to make.  If Penguin printed too many, it would result in

very expensive returns.  If Penguin printed too few, consumers would be upset.  Despite the

potential long-term effects of cannibalization, Penguin's lack of knowledge about it and inability

to assess it was a serious problem.  (Shanks Tr. Aff. ¶ 25.)

51.    Penguin did not receive data from Amazon on Amazon's actual sales prices other

than what it could observe on the Amazon website.  What the head of Penguin's online sales

observed was that the prices often changed frequently, that at some point in the life cycle of a

book Amazon would raise the price from $9.99 to up to $15, and that the loss leading was limited

to new release bestsellers and did not appear to be impacting trade or mass market-related eBook

titles.  (McCall Tr. Aff.¶ 6.)

### The Problem of Lack of Differentiation

52.    Another problem perceived by Penguin was that a single price point for all books

did not make a lot of sense.  (Shanks Tr. Aff. ¶ 31 ("It's is sort of like that one size fits all price

for books is the equivalent of charging the same price for a Volkswagen or a Rolls Royce.").)

Even looking at the spectrum of Amazon's pricing (not just its $9.99 price point for certain

titles), Amazon's pricing polices compressed the range of selling prices.  (Rubinfeld Tr. Aff.

¶¶23-24 & Rubinfeld Aff. Ex. 3.)

53.    Although Penguin did not view Amazon's $9.99 price point for certain eBook

titles as too low per se, Penguin did view the price point as problematic from the perspective of

product differentiation because Amazon was using the same price point for a vast range of books

that bore no resemblance to one another; Amazon priced serial romance books at the same $9.99

price as biographies of important historical figures that took a decade for an author to write. (Shanks Tr. Aff. ¶¶ 17, 28, 31; Makinson Tr. Aff.¶ 20.)

54.     From Penguin's perspective, differentiating its product offerings was important in order to better target and reach consumers, to develop new authors, and to satisfy established authors, and price is one very significant method of differentiation.  This is particularly true with eBooks, which have no physical attributes through which differentiation is possible at the point of purchase.  (*See, e.g.,* McCall Tr. Aff. ¶ 47.)

55.     A corollary to the lack of differentiation was the perception by Penguin that selling books below their cost would lead to a devaluation of books in the minds of consumers. (McCall Aff. ¶ 10.)

### The Problem of Barriers to Entry

56.     Penguin also believed Amazon's loss leading on certain eBook titles to be creating barriers to new competitors becoming eBook sellers.  If an existing bookseller wanted to add eBooks to its portfolio, he or she was going to have to make a decision about whether to match Amazon's prices on the bestselling books and take potentially significant losses, or have different and less effective consumer prices.  (Shanks Tr. Aff. ¶¶ 24, 26; Makinson Tr. Aff.¶¶ 18-19.)

57.     Another barrier to entry was the potential lock-in created by the nature of the devices and the fact certain eBook formats were only compatible with certain devices.  (Shanks Tr. Aff. ¶¶ 32-33.)  If Amazon's strategy was to loss-lead on eBooks to get consumer "lock-in" to the device and the system, it was going to make it harder for other retailers to compete.  (Shanks Tr. Aff. ¶ 34.)  Penguin likewise also recognized that there might be barriers to entry for the development of new and different eReading devices.  (*Id.*)

16

58.     Eliminating or reducing consumer lock-in to a specific eReader is economically rational for a publisher, and in that publisher's unilateral economic self-interest. (*See* Rubinfeld Tr. Aff. ¶¶ 12, 80-81.)

59.     It makes economic sense, moreover, for individual publishers such as Penguin to prefer a retail environment that could support a large number of eBook retailers so that consumers would have a wide range of choices as to where to buy eBooks.   (Rubinfeld Tr. Aff. ¶¶13, 32; *see also* Shanks Tr. Aff. ¶ 32.)

### The Problem of Monopsony Power

60.     The Penguin executives also recognized that Amazon's share had grown to what they perceived to be a dominant level in the United States.  If there were effective barriers to entry and Amazon's closed system led to a balkanization of eBooks—*i.e.,* a dominant device, a dominant seller, and very little choice or competition—in addition to not thinking this would be consumer-friendly, Penguin was also worried about the possibility of monosopny power.  That is, if Penguin only had one account to sell through, Penguin would potentially be subjugated to inefficient demands to lower its pricing to a point where it could not support its profitability and its ability to compensate authors, develop new books, market, and do all of the sorts of things Penguin does to compete effectively.  (Makinson Tr. Aff. ¶23; *see also* Rubinfeld Tr. Aff. ¶72.)

61.     Indeed, by 2009, Amazon already was putting pressure on Penguin to lower its wholesale costs by refusing to promote some front-list titles and raising prices to consumers on those eBooks. (McCall Aff. ¶ 11; PEN Ex. 7.)

### The Problem of Uncertainty and Unknown Consumer Demand

62.     Another problem with having one dominant distributor is that it could do things like withhold consumer data, which would otherwise help to operate the business.  This is what

17

Amazon was already doing. (*See, e.g.*, McCall Tr. Aff. ¶ 6.) Penguin's perception was that Amazon was very sophisticated in gathering and using consumer sales data, but the data that Penguin received from Amazon was aggregated to the point that it did not even allow Penguin to know how many units of any particular title were sold at particular price points. Penguin's long-term plans envisioned using and understanding consumer data to better run its business and meet consumer demand. (*See, e.g.,* Makinson Tr. Aff.¶ 48.)

### The Very Public Debate

63.     The perceived problems of online sales, Amazon's dominant share and position, and the $9.99 loss leading price point on certain eBook titles were widely and publicly debated. All of these problems throughout 2009 were reported in press publications like the Wall Street Journal, The New York Times, and Publisher's Lunch (which bills itself as the "essential daily read" of the publishing industry).   Stories were written through the spring and summer with titles like "Paid Is a Lot More Complicated than You Think—So Is the Truth"; "Steal This Book (for $9.99)"; "The eBook Pricing Problem"; and "Publisher Delays E-Book Amid Debate on Pricing." (PEN Exs. 11, 18, 19 & 21.)

64.     Authors, agents, and publishers were quoted for their views and positions. (*See, e.g.,* PEN Ex. 18 (quoting author David Baldacci & Simon & Schuster CEO Carolyn Reidy); PEN ex. 11 ("Publishers should certainly be reading this forum—as well as posting to it, just as they should be analyzing daily price and performance data across the major ebook channels before coming to any conclusions about what does and doesn't work."); PEN Ex. 21 (quoting Sourcebooks CEO).)

65.     Penguin made no secret with Amazon that it had concerns with Amazon's eBook pricing policy on new releases.  Penguin President of Hardcover and Children's Sales, Dick

Heffernan, for example, bluntly told Amazon in February of 2009 that "their $9.99 model for HC [hardcover] was not a good sustainable one."  (PEN Ex. 9.)

### *Accounts Complain*

66.     Throughout the summer of 2009 and into the fall, Penguin executives also heard complaints directly from accounts about the state of the marketplace.

67.     Specifically, Sony, which had an eReading device, complained to Penguin that they were having trouble remaining competitive, and therefore viable, because they felt they needed to match Amazon's loss-leading prices on bestselling titles.  (McCall Tr. Aff. ¶ 9; Shanks Tr. Aff. ¶ 55.)  Sony proposed various different business models, including the agency model— although that was not completely apparent at the time—as being a legitimate response to market conditions and more aligned with Penguin's interests as a publisher.  (Shanks Tr. Aff. ¶ 55.)

68.     Borders also complained to Penguin that they could not compete with Amazon's loss leading on certain eBook titles.  (McCall Tr. Aff. ¶9.)

69.     Barnes & Noble, which opened its eBookstore in July 2009 and began selling a dedicated eReader called the Nook in late 2009, also approached Penguin on several occasions both before and after these events, to propose various solutions to marketplace conditions, including windowing the eBook versions of a title (presumably to boost hardcover sales), and the agency model—although again, Barnes & Noble's proposal of an agency model was not entirely clear to Penguin at the time.  (McCall Tr. Aff ¶8; Shanks Tr. Aff. ¶ 52.)

70.     Given the importance of these accounts and Penguin's goal of broad distribution, Penguin began to consider how it could strategically ensure the broadest reasonable distribution of its products.

### Penguin Responds Unilaterally by Proposing Its Unique Terms

71.     Because of the complaints from its accounts and because of Penguin's own concerns about the $9.99 price point for certain eBook titles, Penguin came up with new, incentive-based wholesale terms that it proposed to all of its accounts for use in 2010.  (McCall Tr. Aff. ¶¶ 13-14; PEN Ex. 22.)  Under these new wholesale terms, accounts would receive a discount based on percentage growth, and an additional discount incentive if they did not engage in deep loss-leading.  (McCall Tr. Aff. ¶14; PEN Ex. 52.)

72.     With regard to these unique Penguin terms, Penguin told accounts that it was willing to offer the retailers better margins that would provide "additional staffing, research, promotions, etc.," to enhance sales.  (PEN Ex. 52.)  Penguin's Vice President of Online Sales and Marketing conceived of the idea and explained that "it signals the right message to consumers, retailers, authors, agents, and publishers and is more likely than postponement to preserve the integrity and commercial viability of our industry."  He added "I'm not even sure it would matter if we were a rogue publisher on this point."  (PEN Ex. 38; *see also* McCall Tr. Aff. ¶ 16.)

73.     Penguin independently began to propose these terms to its accounts in the fall of 2009, including to Amazon and planned to implement them starting in the new year.  (McCall Tr. Aff. ¶ 17; PEN Ex. 199.)

74.     No other publisher engaged in similar incentive-based wholesale terms.

### Other Publishers Respond by Windowing

75.     Beginning in the summer of 2009, other publishers besides Penguin publicly announced a different response to the marketplace conditions.  For example, Sourcebooks, a small, independent publisher, was reported by the press to be withholding the eBook version of certain titles.  (Shanks Tr. Aff. ¶ 39 & PEN Ex. 21.)  Windowing is a traditional tool for a

publisher to control the interaction between different print forms. (Shanks Tr. Aff. ¶ 38.)  For example, it has long been publishing practice to withhold the paperback edition of a book until about one year after publication of the hardcover.

76.     By late Fall and early December, several other publishers including Simon & Schuster, Hachette, and Harper Collins, all publicly announced plans to engage in some form of eBook windowing. (*See, e.g.*, PEN Exs. 24, 28, 44, 48.).

### *Penguin Uniquely Supports Consumer Choice by Not Windowing*

77.     Penguin also internally considered windowing as a competitive response, but its executives categorically rejected the option.  Penguin never adopted a policy of windowing eBooks. (*See, e,g.*, Makinson Tr. Aff.¶ ¶ 36-38.)  Penguin felt that consumers were expecting a simultaneous release of print books and eBooks, so as not to alienate the consumers who preferred to read their favorite authors in that format. (Shanks Tr. Aff. ¶¶ 40-41.)

78.     However, one popular author, Catherine Coulter, had contractually insisted on the ability to window her books and it provided a natural windowing experiment for Penguin.  Based on Penguin's analysis of that experience, Penguin decided that windowing simply did not make economic sense. (Shanks Tr. Aff. ¶¶ 40-42.)

### *Penguin Collaborates in Legitimate Marketing and/or Sales Joint Ventures*

79.     Another competitive response by the Penguin Group was to consider and become a founding partner of two separate, formal joint ventures, both of which were intended to create online marketing and sales operations.  From the perspective of the Penguin management, these ventures were intended to be both an experiment in direct-to-consumer selling, and an insurance policy for the shrinking distribution channel options for bookselling. (Makinson Tr. Aff.¶¶ 33-34.)

80.     In the United States, Carolyn Reidy, the CEO of Simon & Schuster, conceived of an online marketing and sales joint venture, which she actively promoted throughout the spring and summer of 2009.  The concept was to create a website that provided much more sophisticated publisher-developed marketing, and attempt to replicate the bookfinding function of the in-store brick and mortar environment—essentially a "Pandora" for books modeled after the online music finding company.  (PEN Ex. 198, p. PEN-LIT-04440591; Makinson Tr. Aff. ¶¶31-32.)

81.     At some point, Simon & Schuster, Hachette, and Macmillan agreed in principle to be the founding partners.  In November of 2009, Macmillan formally withdrew from its possible participation in the joint venture, and Carolyn Reidy and David Young, CEO of Hachette, then approached Penguin management.  (PEN Exs. 41, 42.)

82.     In a series of meetings and presentations in the first full week of December 2009, Reidy and Young convinced Penguin management, including CEO David Shanks and CEO John Makinson, to replace Macmillan as a founding member of the joint venture.  (*See, e.g.,* Makinson Tr. Aff.¶ 31.)

83.     Penguin was enthusiastic about the joint venture because it was anticipating the day when there might not be physical showcases for books any longer, and because Penguin was anticipating growth of e-marketing parallel to growth of an eBooks market.  (Gigante Tr. Aff. ¶ 16.)

84.     As a result, Penguin management necessarily communicated with the two other publishers, including at the CEO level, to take the necessary steps to form the joint venture, hire a CEO, and get the project moving.  The participants were advised by counsel and were provided antitrust advice.  (Shanks Tr. Aff. ¶ 97 & PEN Ex. 198 (Antitrust "Do's & Dont's")

85.     That venture now operates today as bookish.com, which according to its website, has the mission to "engage more readers with more books."  (PEN Ex. 191)

86.     In the United Kingdom, the Penguin Group U.K. participated as a founding member in a similar, though not identical, joint venture focused on online book sales, marketing, and social media in the U.K. and Europe.  (Makinson Tr. Aff. ¶¶ 24-25.)  In its conception, the project was referred to by its founding members as Project Z or Zed.  The founding members were Penguin U.K., and the U.K. subsidiaries of Random House, and Harper Collins.  At one point early in the summer of 2009, Hachette seriously considered being a founding participant also and committed funds to explore the concept, but subsequently decided not to participate.  (Makinson Tr. Aff.¶ 25 & PEN Ex. 20.)

87.     In November of 2009, a fourth founding partner joined, HMV (the company that owns the Waterstone's bookstore chain in the United Kingdom).  At that time, Penguin CEO John Makinson once again attempted to convince Hachette to join the venture.  (Makinson Tr. Aff.¶ 29.)  From Makinson's perspective, it did not make a lot of sense for there to be two nearly identical joint ventures in the US and UK with different publisher founders.  Given Hachette's previous interest, and Hachette's successful recruitment of Penguin USA into Bookish, Makinson thought it would be natural to re-interest Hachette's UK management.  Despite meeting with and talking to Hachette's UK management in December, he was unsuccessful.  (Makinson Tr. Aff.¶ 29.)

88.     Whatever the purpose or intent of the Hachette executives in considering a joint venture partnership and related communication with Makinson in December 2009, (THH Dep. 32:12-33:14; 100:23-104:15 & PEN EX 17; PEN EX 55), Makinson's purposes was to further the efforts of the joint venture.

89.     The joint venture activity related to the European project necessitated a certain amount of communications and coordination.  The JV participants, including Penguin, were advised by outside antitrust counsel.  (Makinson Tr. Aff. ¶ 30.)

90.     The UK venture is known today as aNobii, the Latin word for bookworm, and it bills itself as "an online reading community built by readers for readers." (PEN Ex. 192.)

### *The Apple Opportunity*

91.     Throughout 2009, there had been rumors reported in the press that Apple intended to release a multi-functional tablet device with similar features to its iPhone, that would function in part as an eReader.  The first time Penguin executives learned that there was an actual basis to these rumors was on December 11, 2009, when Penguin President of Hardcover and Children's Sales, Dick Heffernan, emailed David Shanks saying, "I just got a call from my contact at ITUNES.  He wanted me to set up a meeting with you and me and their top person Eddy Cue and the person below him Keith Moerer . . . to discuss EBooks."  (Shanks Tr. Aff. ¶ 43 & PEN Ex. 190.)

92.     Penguin was very excited about the meeting because Apple has exciting products, a great consumer-friendly reputation, a proven track record of innovation, and, through iTunes, sold a huge amount of digital content (largely music), had something like 100 million customers using iTunes (along with their credit card information to make their purchases virtually instantaneous and seamless).  Penguin believed that the Apple customers would tend to be better off financially and better educated than the average consumer, and that those demographics would probably match nicely with the types of people who are heavy purchasers of Penguin titles.  (Shanks Tr. Aff. ¶¶ 44-45; Makinson Tr. Aff.¶¶ 45-46.)

93.     In an initial meeting on December 15, 2009, David Shanks and other Penguin executives met with Eddy Cue from Apple for the first time, and Cue described a device they were prepared to launch.  It was Cue's meeting and the Penguin executives mostly listened.  Cue expressed dissatisfaction with their current model of selling books as "apps" through Apple's App Store, explaining that the App Store was disorganized, and said that Apple was considering the possibility of opening an online bookstore to sell eBooks.  Among other things, Cue told them that if Apple were to open an iBookstore, it would have to be profitable.  Cue also told the Penguin executives that while they saw that Apple offering eBooks would be a value to their consumers, they did not feel any driving compunction to do so unless they could sell the books competitively with other people in the market.  (Shanks Tr. Aff. ¶ 47.)

94.     Cue also made clear to Penguin that Apple wanted one contract and was not going to have separate terms for separate publishers.  (Shanks Tr. Aff. ¶ 47.)

95.     As CEO David Shanks recalls, Cue also mentioned going forward using an agency model where Penguin would be the principal and seller of record, and Apple would be the agent and receive a 30% commission.  Shanks understood that this was a model that Apple used for its other businesses.  Whether or not Shanks' memory is correct, in no way did Penguin propose or advocate to Apple that Apple insist upon or consider an agency model for bookselling.  (Shanks Tr. Aff. ¶ 47.)

96.     Eddy Cue also told Penguin executives that he was meeting with other publishers to discuss the iBookstore, without identifying which other publishers specifically.  (Shanks Tr. Aff. ¶ 48.)

97.     Already, however, CNN was reporting that that Apple was exploring the possibility of opening a bookstore, and was in discussions with publishers.  (PEN Ex. 50.)  The

press reports represented that Apple was offering publishers "an App Store-type 30/70 split (30% for Apple) with no exclusivity requirement." (*Id.*)

98.    Afterwards, at the initial meeting between Penguin and Apple, there were additional communications of a technical and non-substantive nature.  Otherwise, there were no further communications between Apple and Penguin in December 2009.  (Shanks Tr. Aff. ¶ 17.)

99.    Also during the rest of December, there were no executive-level communications between Penguin and other publishers.

### *Penguin Proposes to Go Forward With Apple Under A Wholesale Model*

100.    Penguin was prepared to go forward with Apple on a wholesale basis.  Penguin's general counsel and Penguin's director of digital sales worked during their respective Christmas vacations while the Penguin office was closed to transform Penguin's boilerplate wholesale agreement into an Apple-specific wholesale agreement.  They forwarded the draft Penguin contract to Eddy Cue on January 4, 2010, when Penguin's offices reopened. (Shanks Tr. Aff. ¶ 49-50 & PEN Ex. 58)

101.    Penguin's draft agreement apparently passed like a ship in the night with Apple's first salvo in the negotiations.

### *Apple's Take-It-Or-Leave-It Material Terms*

102.    Specifically, on January 6, 2010, Penguin CEO David Shanks received an email from Eddy Cue setting forth the basic business terms Apple said that it needed in order to go forward with opening a bookstore.  The fundamental business model was agency terms of sale. As Cue wrote: "Just like the App Store, we are proposing a principal-agent model with you, where you would be the principal and iTunes would sell the product as your agent for your

account." Cue wrote that he thought agency would be "the best approach for ebooks." (PEN Ex. 61.)

103.    The uniform reaction of the Penguin executives was dismay. CEO David Shanks had a one word descriptive comment: "Yuck." He also stated that "[s]trangely, we would be better off with the status quo." (PEN Ex. 61.)

104.    The fundamental problem from the perspective of the Penguin executives was the proposed deal terms made clear on their face that the commission, in combination with the price tiers, would effectively drive down Penguin's received price on a book title to a point that did not appear to be profitable for Penguin. (Shanks Tr. Aff. ¶ 56.)

105.    On the other hand, Penguin executives liked the idea of the agency model on the surface, and for the first time, Penguin, as a business, started to contemplate whether an agency model would be a more effective way of doing business with regard to eBooks. (Shanks Tr. Aff. ¶ 57 & PEN Ex. 60; Makinson Tr. Aff. ¶¶ 47-48.)

106.    While Shanks was unaware of what the agency model was, for Penguin as a company, the model was not unknown and would have been perceived as a normal way to do business, including for eBooks. Indeed, Penguin has used the agency model for some channels for a long time, including for selling eBooks as apps in Apple's App Store, in the gift trade, and in what they call the custom special sales market. (Shore Tr. Aff. ¶ 39.) The Penguin executives understood that Apple's decision to open a bookstore was tied to the launch of the new device. Cue therefore was insistent that if this were to happen, terms would have to be negotiated quickly and that there needed to be a "critical mass" of publishers to be part of the opening. (Shanks Tr. Aff. ¶ 74.) Penguin understood that to operate a successful bookstore, a critical mass of publishers was necessary in order to ensure adequate content and variety. For example,

Penguin had been unsuccessful in its own solo efforts to sell its eBooks online through a Penguin-branded website. (Shanks Tr. Aff. ¶ 48.)   Penguin also understood that Apple, in launching the iBookstore, wanted a substantial amount of major publishers it could publicly name to underscore its commitment to, and generate interest in, this new product offering.

107.    Wanting a critical mass of publishers to participate in opening a bookstore was economically rational for both Apple and Penguin, and in both entities' unilateral economic self-interest. (Rubinfeld Tr. Aff. ¶ 127.)

### Penguin & Apple Hotly Negotiate

108.    On January 11, Penguin received a copy of a draft agency agreement from Apple. The draft agreement contained price tiers for different categories of eBooks pegged to the list price of the print editions. These were effectively price ceilings, and were different from the price points that had been contained in Apple's initial description of its deal terms. (PEN Ex. 70.)

109.    The draft agreement also included a parity provision, which required hardcover new-release books sold under the Apple agreement to meet the lowest price sold by any other Penguin customer. (*Id*. § 5(b).)

110.    Penguin performed various internal financial analyses to determine the financial viability of the agency model for Penguin's business, and continued to negotiate with Apple through mid-January. Penguin's primary task at this point was to financially analyze Apple's proposal and determine if it made business sense for them. Penguin had no commitment to doing a deal with Apple that did not make sense for Penguin. (McCall Tr. Aff. ¶29; Shanks Tr. Aff. ¶¶ 61; 64-65.)

111.    From its financial analyses, Penguin understood that moving to Apple's proposed terms would mean that Penguin earned less revenue on a per-title basis for some important segments of its catalog, like hardcover frontlist eBooks, than Penguin earned under the wholesale model.  (McCall Tr. Aff. ¶¶28-30.)

112.    By the 19th of January, detailed rumors and speculation about publisher negotiations started to be reported in the press.  Among other items, the press reported that publishers were negotiating with Apple and were considering agency terms.  (PEN Exs. 73, 79.)

### Penguin Resisted Price Ceilings

113.    Throughout the negotiations, Penguin resisted the concept of a price ceiling. From Penguin's perspective, Penguin wanted to gain the ability to price its own books in a diverse way in reaction to market forces, and price ceilings seemed contrary to that goal.

114.    Penguin understood, however, that Apple's goal, which in fact was really no different from Amazon's, was to ensure that at least for new-release hardcover related eBooks, would be priced significantly below the print book versions of the same title were likely to end up priced in the marketplace.

115.    Penguin would have been perfectly happy to be the only publisher without pricing tiers included in its contract with Apple.

### Penguin Resisted the Price Parity Provision

116.    Penguin neither sought nor wanted the price parity provision proposed by Apple. (McCall Tr. Aff. ¶ 33.)   Penguin's business practice (given the strictures of the anti-discrimination mandates of the Robinson-Patman Act) is to treat all of its distribution partners equally.  (Gigante Tr. Aff. ¶ 25.)  This was the uniform business approach for the print book business and it was carried over to the developing eBooks business.  (McCall Tr. Aff. ¶ 33.)

117.    Penguin would have been perfectly happy to be the only publisher without a price parity provision in its contract with Apple.

### Amazon's Agency Model, Direct-Publishing Program Announcement

118.    In the midst of Penguin's negotiations with Apple, Amazon issued a press release announcing that it was creating a new direct publishing program targeted towards established authors and literary agents that would provide attractive commissions for the right to sell exclusive content.  (PEN Ex. 86.)

119.    This announcement and program was a competitive response by Amazon to the announced and widely anticipated entry of Apple into the eBooks market.

120.    Penguin executives were upset by the Amazon announcement because it had been given no advance notice by Amazon of their impending move to go into the self publishing business and directly target Penguin authors.  (Shanks Tr. Aff. ¶ ¶ 68-69.)

121.    At this point, the view became cemented in the mind of Penguin CEO David Shanks that "more than ever, Penguin needed a viable alternative to Amazon in the marketplace." (PEN Ex. 93)  The next day, David Shanks emailed Apple's Eddy Cue and said "let's sell a lot of books."  (PEN Ex. 95.)

### The Issues of "Assurances"

122.    There was a conference call of the Penguin Group Board in London the next day (January 22nd) to discuss the Apple proposal.  Both prior to the call and afterwards, Shanks asked Cue to verify that he was gaining the critical mass of publishers necessary for Apple to make the decision to launch the bookstore.  (Shanks Tr. Aff. ¶¶ 74-75.)

123.    Apple had made clear to Penguin that it would not open a bookstore unless it was going to be both competitive and profitable, and carry a "critical mass" of publishers' material.

(Shanks Tr. Aff. ¶ 74.)  And Shanks was concerned that in fact Apple would not succeed, and either the bookstore would not open or would be a failure.  Either could be a potential embarrassment for Penguin.  The Penguin executives were also worried that Amazon would react negatively to Penguin doing business with Apple, and that having a viable alternative outlet, like Apple, populated by multiple publishers, diminished that threat.  From Penguin's perspective, however, it did not care who exactly was in the bookstore, so long as it could be successful;  it also did not care what business model was used by other Apple business partners.   (Shanks Tr. Aff. ¶ 77.)

124.    Notably, there was never a legitimate possibility that Penguin would be the only publisher participating in the launch of Apple's iBookstore.  There is simply no but-for world in which one publisher would have opened a bookstore with Apple. There were only two possible outcomes:  Either multiple publishers – enough to constitute a "critical mass" – would join the iBookstore and accept agency with Apple, or the iBookstore would not open.   In that sense, Penguin would know that its decision to move to agency with Apple's iBookstore was contingent on Apple's securing enough publishers to collectively constitute a critical mass.  (Rubinfeld Tr. Aff. ¶ 14.)

### The Importance of Increased Sales

125.    Penguin's decision to go forward was ultimately predicated upon Penguin's reasoned belief that it would increase the sales of Penguin eBooks.  (*See, e.g.,* Makinson Tr. Aff.¶ 50.)

126.    Tim McCall, Penguin's Vice President of Online Sales and Marketing, who had engaged in modeling the financial impact of the deal terms, believed that they would be able to make up this loss through incremental sales that would come as a result of the additional Apple

distribution, and the additional distribution that would hopefully result once other agents were able to earn a fair revenue for the sale of eBooks.  (McCall Tr. Aff. ¶ 31.)

127.    Likewise, Penguin Group financial personnel engaged in detailed modeling of the proposed Apple deal.  (PEN Exs. 101, 102, 103, 105.)  As Penguin Group CFO Coram Williams wrote: "The simplest answer is everything needs to increase by 12.5% to make us whole."  (Pen Ex. 130.)   "If we can re-coup the 12.5% of lost revenue on eBooks, then we should hold ourselves whole on profit, too."  (PEN Ex. 105.)

128.    Penguin, at the time of agreeing to the deal, had a plausible belief that the distribution agreement would promote its business, increase eBook sales, and increase competition.  (*See, e.g.,* Makinson Tr. Aff.¶¶ 53-56.)

### Penguin's Final Agency Agreement with Apple

129.    On the morning that the Penguin/Apple agreement was to be signed, Apple attempted to impose an additional price tier on Penguin's extensive backlist catalog.  (PEN Exs. 113, 114.)

130.    Penguin executives refused to move forward with the deal, and contemplated backing out completely, until they were able to secure the ability to price their eBook backlist in a way that suited Penguin's unique business interests and comported with the financial modeling that Penguin had performed, which had convinced Penguin that the agency model would be profitable for Penguin in the long run.  (PEN Ex. 114.)

131.    Penguin and Apple became vertical distribution partners.  The final contract that Penguin and Apple negotiated and executed on January 25, 2010 is a legitimate agency arrangement between vertical business concerns.

132.     Penguin CEOs both uniformly deny under oath that the Apple distribution agreement or its terms were the result of a horizontal agreement with other publishers.  (Shanks Tr. Aff. ¶ 2; Makinson Tr. Aff. ¶ 2.)

133.     From an economic perspective, the timing of the move to adopt distribution agreements by Penguin and other publishers and the similarity of contract terms is explainable by each party's unilateral self-interests and the context of the negotiations.   (Rubinfeld Tr. Aff. ¶¶ 15, 126.)

134.     Moreover, the final contract that Penguin and Apple negotiated on January 25, 2010 is not identical to the agency contracts that Apple negotiated with any of the other publishers in the same time period.  Significantly, Penguin's contract with Apple contained a fundamentally different deal term than the other publisher agency contracts, related to Penguin's important backlist.  (*Compare* PEN Ex. 2, page 13 *with* PEN Exs. 106, 111, 112, 120.)

135.     There is no evidence that the limited communication that occurred between Penguin executives and other publishers during January 2010, when the Apple agreement was being negotiated, involved discussing a quid pro quo of any sort.  In fact, such an inference is refuted by the consistent evidence that Penguin was making a reasoned and independent decision about whether to go forward with the deal.  Such limited communications most likely involved discussions related to the joint venture activity or other non-competitively sensitive topics.  Meetings and communications between or among publishers cannot be assumed from an economic perspective to be reflective of price-fixing.  (Rubinfeld Tr. Aff. ¶¶35-36, 97-100; *see also* PEN Ex. 176, Plaintiff States' Interrogatory Answer No. 12, p. 18.)

### *Plausible Pro-Competitive Effects of the Agency Model*

136.    Penguin believed that a move to the agency model would have numerous pro-competitive benefits.  First and foremost, Penguin believed that Apple would be a viable competitor to Amazon, and that Apple would not open its iBookstore unless Penguin moved to the agency model.  Apple was "new" entry.  From an economic perspective, this belief would be rational and self-interested on a publisher's part.  (Rubinfeld Tr. Aff. ¶13.)

137.    Penguin wanted Apple to open its iBookstore for a variety of reasons.  First, Penguin believed that the additional sales channel brought about by Apple's entry would increase Penguin's incremental eBook sales and allow Penguin to sell more books and reach more consumers.  Second, Penguin wanted the opportunity to work with the world's largest and most successful device manufacturer and retailer (Shore  Tr. Aff. ¶ 46), and to work with Apple's new iPad technology to create new types of enhanced eBooks (Makinson Tr. Aff. ¶ 52).  Because Penguin is a global company and has a publisher parent with different lines of business, Penguin also considered the opportunity that its partnership with Apple would have for Pearson's educational textbooks and for the *Financial Times*.  (Makinson Tr. Aff. ¶ 53; Shore Tr. Aff. ¶ 48.)

138.    Penguin believed that the direct-to-consumer relationship it gained through the agency model would provide the opportunity to test consumer eBook pricing and to obtain greater access to consumer data.  (Makinson Tr. Aff. ¶ 51.)  Penguin thought better sales and consumer data would allow it to better understand what consumers were prepared to pay for eBooks.  (Shore Tr. Aff. ¶¶15; 39.)

139.    Perhaps most important, Penguin believed that the agency model and the 70/30 commission split proposed by Apple would provide its agents the possibility of profitable eBook lines of business by guaranteeing an acceptable return on investment for selling eBooks.

(McCall Tr. Aff. ¶ 33.)  Penguin's eBook accounts had been asking Penguin for alternatives to the wholesale model.  (Gigante Tr. Aff. ¶ 14; Shanks Tr. Aff. ¶ 54.)   Penguin knew its brick and mortar retailers were struggling to compete in the changing digital landscape.  And Penguin believed that the agency model would allow both existing eBook sellers and new entrants to make a profit on the sale of Penguin eBooks, rather than have to sell important bestsellers at a loss in order to compete with Amazon.  (McCall Tr. Aff. ¶ 28.)  Penguin believed this would lead not only to better competition at the retailer level, but perhaps foster a new wave of innovation in eReading devices and firms that would be able to devote their resources to hardware development rather than loss leading.  (McCall Tr. Aff. ¶¶ 37-45.)

### Penguin's Decision to Transition Other Accounts to Agency

140.    After agreeing to enter an agency-based sales relationship with Apple, Penguin explored the possibility of using a mix of agency and wholesale models for eBooks.  (Gigante Tr. Aff. ¶ 33.)  However, as the seller of record under the agency model, Penguin was subject to a host of new legal requirements, including having to deal with sales tax reporting in different sales tax structures throughout the United States.  (Gigante Tr. Aff. ¶ 34.)  Additionally, Penguin had to retool its financial and pricing systems to the 70/30 agency pricing model.  (*Id.*)  With all of the new issues to deal with, Penguin decided it would be unmanageable to maintain two models for eBook sales, and decided to roll out agency for all accounts.  (*Id.*; Makinson Aff. ¶ 57.)  It also made business sense to Penguin to move all accounts to agency because of Penguin's inclination to treat all accounts the same based on the company's history with the Robinson-Patman Act.  (Gigante Tr. Aff. ¶ 34.)

141.    In February 2010, Penguin notified all of its eBook customers, including Amazon, Barnes & Noble, Ingram Digital, Overdrive, Kobo, Sony, Baker & Taylor, Symtio, ScrollMotion,

Follett, eBrary and eBooks.com, that Penguin was changing its selling terms to the agency model. (McCall Tr. Aff. ¶ 50.) Several of Penguin's accounts, including Barnes & Noble and Kobo, were anxious to move to the agency model themselves. (Gigante Tr. Aff. ¶ 34.) After the move to agency, Penguin was able to bring in its major wholesalers and redefine their roles to be fulfillment providers that interface with all of the small agents representing Penguin. (*Id.*)

142.    Penguin's existing eBook wholesale agreement with Amazon was not set to expire until November 2010. (Makinson Tr. Aff. ¶ 59.) Amazon had the option to remain on wholesale terms for its existing Penguin catalog until November. (*Id.*) Initially, Amazon refused to come to the table to negotiate an agency contract with Penguin. (McCall Tr. Aff. ¶ 52.)

143.    By late February or March, Penguin and Amazon were involved in agency negotiations, but were very far apart on terms. (Gigante Tr. Aff. ¶ 36; McCall Tr. Aff. ¶¶ 53-54.) For a period of time, Penguin stopped selling to Amazon its new release eBooks. (Gigante Tr. Aff. ¶ 36.) The practice of withholding products in the context of contract negotiations is not out of the ordinary in a business that involves copyrights, as it is within a property owner's right to exclude others from using its property. (Gigante Tr. Aff. ¶ 36.)

144.    The sticking point for Amazon in Penguin's negotiation with them, at least from Penguin's perspective, was not the agency aspect of the agreement but rather Amazon's insistence upon obtaining MFN language that Penguin viewed as onerous. (Makinson Tr. Aff. ¶ 60; McCall Tr. Aff. ¶ 55; Gigante Tr. Aff. ¶37.) Essentially, Amazon wanted an MFN for new business models that its competitors might devise. (*Id.*)

145.    Penguin and Amazon were able to reach an agency agreement by late May 2010. (PEN Ex. 3, p. 18.)

146.    While there was no uniform opinion about what effect, if any, the parity provision or MFN in Penguin's agency agreement with Apple had on Penguin's decision to transition all of its eBook accounts to the agency model, it is clear that Penguin was not forced to do so by the terms of the Apple contract.

147.    Penguin's Vice President of Online Sales and Marketing believed that transitioning all accounts to agency was Penguin's objective, notwithstanding the MFN, in order to ensure that all agents earned an acceptable return on investment for selling eBooks.  (McCall Tr. Aff. ¶ 33.)  Penguin explored using a mix of agency and wholesale models and concluded that having two systems would be unmanageable from an infrastructure perspective.  (Gigante Tr. Aff. ¶ 34.)  Penguin's general counsel even suggested that Penguin propose to Amazon a new *wholesale* model where Amazon would get wholesale terms subject to a brief period of windowing, but the idea was rejected by the Penguin CEOs because they perceived that any form of windowing would be bad for consumers.  (Gigante Tr. Aff. ¶ 33.)

### *The Unproven Relevant Market*

148.    There is no empirical basis to demonstrate that eBooks or trade eBooks constitute a relevant market.  (See Rubinfeld Tr. Aff. ¶¶ 118-19.)

149.    There is no factual basis to understand whether a relevant market would exclude print books, devices, or even other entertainment choices.  (*See generally* Rubinfeld Tr. Aff. ¶¶ 57-64.)  Consumers substitute between some eBooks and some print books.  Consumers do not substitute between some eBooks and other eBooks.  Some books, in whatever format, have no substitutes.  (*See, e.g.,* Makinson Tr. Aff. ¶ 11 & n. 2.)  There is evidence that print book prices can affect eBook prices.  Penguin, for example, considers all formats, including eBooks and print books in making pricing decisions.  (Shanks Tr. Aff. ¶ 9.)

150.    There is no meaningful factual context within which to assess the alleged impact of the alleged conduct by Penguin.

### No Proof, Empirical or Otherwise, of Market Power

151.    There is no empirical basis to demonstrate that Penguin has market power in the alleged relevant market.  (*See* Rubinfeld Tr. Aff. ¶ 117.)  Penguin has a "share" of the alleged relevant market that cannot possibly be measured to a level at which market power could be assumed.

152.    There is no empirical basis to demonstrate that Penguin in combination with one or more other Publisher Defendants has market power in the alleged relevant market.  The five Defendant publishers had combined shares of less than 50% as measured by revenue, and slightly more than 40% as measured by volume of purchased eBooks. (Rubinfeld Tr. Aff. ¶¶ 120.)

153.    Class Plaintiffs' experts cannot exclude free eBooks from the alleged relevant market.  Free eBooks affect the prices of sold eBooks.  (Rubinfeld Tr. Aff. ¶¶ 47-48 & Rubinfeld Aff. Exs. 11 & 12.)  Plaintiff States' experts make no attempt to examine how free eBooks might impact market power.  Including free eBooks in the "relevant market" would reduce Penguin and the other publisher Defendants' share substantially.

154.    There is no evidence that there are substantial barriers to entry into publishing post-agency in either a print format or eBooks format.  New entry demonstrates otherwise.

### The Overwhelmingly Pro-Competitive Effects

155.    The market and economic evidence demonstrates that Apple's entry as a bookseller and the shift of business models by Penguin (and the other publishers) has increased

competition throughout both the eBook and publishing ecosystems.  (*See generally* Trial Affidavits of Drs. Burtis & Rubinfeld.)  Consumers have benefited.

156.    Consumer prices for eBooks have gone down in the post-agency period.  Dr. Michelle Burtis calculates using the extensive data produced in this matter that the weighted-average retail price for an eBook was $7.97 between February 2008 and March 2010 compared with $7.34 between April 2010 until March 2012.  (Burtis Tr. Aff. ¶ 21 & Burtis Aff. Ex. 4; *see also id*. ¶¶ 21 (different time periods) & 12-19 (scope of data considered).)  Penguin executives, who are market participants, similarly observe that eBook consumer prices are in decline.  (*See, e.g.,* McCall Tr. Aff. ¶ 62.)

157.    Plaintiff States' experts do not dispute that average retail prices fell.  (Burtis Tr. Aff. ¶ 22.)

158.    Even focusing just on the Defendant Publishers' sales alone and the best selling and new release titles (which alone are subject to the price tiers and price parity provision), those titles represent 10% or less of eBook sales in the alleged relevant market and less than one-third of all the Publisher Defendants' eBook sales.  (Burtis Tr. Aff. ¶ 29 & Burtis Aff. Ex. 7).  And of those titles, the data shows that fewer than half increased in price following the adoption of the agency model. (Burtis Tr. Aff. ¶ 30 & Burtis Aff. Ex. 8)

159.    Over 75% of titles sold through the bookstores were priced at or below $9.99 during the post-agency time period for which data was available.  (Burtis Tr. Aff. ¶ 44.)

160.    Penguin's effective wholesale price also dropped as a result of the shift to the agency model.  (Burtis Tr. Aff. ¶ 26 & Burtis Aff. Ex. 5.)  Penguin executives explain that they agreed to do so—lower their prices—in order to grow the market and expand sales.  (McCall Tr. Aff. ¶ 26; Shanks Tr. Aff. ¶ 56.)

161.    Output has also increased.  Comparing the same two time periods, Dr. Burtis calculates that sales of purchased eBooks increased by over 447%—from 18 million to approximately 100 million books.  If free eBooks are included, the number of units grows from 31 million to 222 million.  Growth was reflected in both Defendant and non-defendant publisher sales.  (Burtis Tr. Aff. ¶ 31 & Burtis Aff. Ex. 9.)  This result is consistent with the Penguin executives' views on how the Apple distribution agreement and the agency model would increase sales.

162.    The number of free eBooks has also sky rocketed.  If free eBooks are included, the number of units grows from 31 million to 222 million.  Growth was reflected in both Defendant and non-defendant publisher sales.  (Burtis Tr. Aff. ¶ 31 & Burtis Aff. Ex. 9; *see also* (Rubinfeld Aff. Ex. 11.)  Apple alone has allowed consumers to download 122 million eBooks,including over 80 million free eBooks—a consumer benefit that would not otherwise have existed without an Apple bookstore.  (Burtis Tr. Aff. ¶ 32 & Burtis Aff. Ex. 10; *see also* Rubinfeld Aff. Ex. 12 (measuring Amazon, Apple, B&N, and Sony free eBook ratios).)

163.    Consumer choice with regard to the selection of eBooks has also measurably increased.  For example, the growth in Amazon's available catalog has accelerated post-agency.  (Burtis Tr. Aff. ¶ 32 & Burtis Aff. Ex. 11.)  Adding deeper selection and variety is a competitive response.

164.    Given that different agents/resellers focus on different sets of consumers and market in differentiated ways, consumer choice has also increased beyond just the fact that there is now a broader selection of titles available.  (McCall Tr. Aff. ¶ 40.)  Such choice and diversity is causally linked to the adoption of the agency model.

165.     Different agents and resellers also engage in different forms of marketing and promotion.  For example, each of Penguin's eBook agents has very different top seller lists, which speak to the "hand selling" that is done by each particular eBook agent.  (McCall Tr. Aff. ¶ 41.)

166.     The fall in eBook prices and the growth of units sold or given away can be traced to new entry.  New entry has occurred at every level of distribution.  (*See, e.g.,* Burtis Tr. Aff. ¶ 42.)

167.     New entry has occurred at the agent/retailer level.  (McCall Tr. Aff. ¶ 37.)

168.     Apple entered as an agent by opening the iBookstore, and this entry was the direct and necessary effect of Penguin and the other publishers' distribution agreements with Apple. Apple sales represent around 15% of all eBooks measured by dollars.  (McCall Tr. Aff. ¶ 49.) The specific deal terms of the distribution agreement, such as the price ceilings and the price parity provision (MFN), were necessary to facilitate Apple's entry and therefore had meaningful pro-competitive benefits.  (See Rubinfeld Tr. Aff. ¶74.)

169.     Other significant retailers have either entered or recommitted to eBooks sales. Barnes & Noble has gained considerable positioning and is now at 22%. (McCall Tr. Aff. ¶ 49.) And other sellers such as Google, Sony, and Kobo remain with toehold market shares.  (*Id.*)

170.     Amazon has lost significant share and now represents approximately 58% of eBook sales.  (McCall Tr. Aff. ¶ 49.)  Amazon both competes as a seller (of the titles of publishers who operate on the wholesale model) and as an agent (for the sale of eBooks of agency model publishers).

171.     Consumers benefit by having more choices they prefer.  Given that Amazon's share has decreased as other resellers/agents' shares have increased, that demonstrates that the

marketplace is better aligned with those consumers' demands. Some significant share of consumers prefers eBook distribution choices other than Amazon. (Rubinfeld Tr. Aff. ¶ 145.)

172.   Hundreds of independent brick & mortar bookstores have also entered the eBook market or substantially expanded their eBook programs, given that such business models now have a chance of being profitable. (*See, e.g.,* Protti Tr. Aff. ¶ 5; Bernard Tr. Aff. ¶¶ 6-9; Robinson Tr. Aff. ¶¶ 6-9; Fiocco Tr. Aff. ¶¶ 10-11; & Stroh Tr. Aff. ¶¶ 6-7; *see also* McCall Tr. Aff. ¶¶ 38-39.) Around 200 seller/agents were supported by Google working in conjunction with the American Booksellers Association; now Kobo has taken over that relationship with the ABA and increased it to over 460 independent stores. (McCall Tr. Aff. ¶ 38.) Ingram, Baker & Taylor, and Overdrive—traditional wholesalers—are now also providing turn-key online services to independent bookstores. (McCall Tr. Aff. ¶ 39.)

173.   Independent bookstores provide unique hands-on and personal consumer services that cannot be replicated by online sellers like Apple, Amazon, or Google. (*See e.g.,* Protti Tr. Aff. ¶¶ 2-5; Bernard Tr. Aff. ¶¶ 3-7; Robinson Tr. Aff. ¶¶ 2-4, 8-9; Fiocco Tr. Aff. ¶¶ 4-7, 11; Stroh Tr. Aff. ¶¶ 2-7.) These stores uniquely expand book buyers' interest in new eBook titles and lesser-known authors because these stores use a variety of marketing tools precisely aimed to readers in their communities. (*See, e.g.,* Protti Tr. Aff. ¶¶ 2-5; Bernard Tr. Aff. ¶¶ 3-6; Robinson Tr. Aff. ¶¶ 2-4; Fiocco Tr. Aff. ¶¶ 4-6, 8; Stroh Tr. Aff. ¶¶ 2-6.)

174.   In addition, these independent bookstores expand consumers' understanding of and familiarity with eReader technology and eBook purchasing, particularly customers who may be reluctant to adopt new technology without hands-on assistance. (*See e.g.,* Protti Tr. Aff. ¶ 5; Bernard Tr. Aff. ¶ 7; Robinson Tr. Aff. ¶ 8; Fiocco Tr. Aff. ¶ 11; Stroh Tr. Aff. ¶ 7.)

175.    The new agent entry is explainable by the fact that the agency model provides a set commission and likely profit margin for sellers.  Sellers have a financial incentive to enter or invest, and the market data demonstrates that is what has happened.  (Rubinfeld Tr. Aff. ¶ 13; Makinson Tr. Aff. ¶ 63.)

176.    New agent and reseller entry is also economically explainable by the fact that the agency model reduced barriers to entry.  (Rubinfeld Tr. Aff. ¶ 32.)

177.    Penguin and other agency model publishers have also entered into the sale of eBooks to consumers.  Penguin is the direct seller of record to consumers.  (Rubinfeld Tr. Aff. ¶90 ("Consistent with the predictions of economic theory, post-agency price competition has moved upstream to the publisher level.").)

178.    As a direct seller, Penguin now has more robust pricing data, which it is using to improve its business and better understand consumer demand.  (McCall Tr. Aff. ¶ 46.)  Since 2010, Penguin has used the data it gets to  engage in pricing analysis, including controlled pricing experiments to learn about consumer demand and understand the effectiveness of discounting.  (McCall Tr. Aff. ¶ 64.)  Penguin has gotten better, through experience, at pricing eBooks to meet consumer demand.  (McCall Tr. Aff. ¶ 68.)  Penguin is now a more effective competitor.  (McCall Tr. Aff. ¶ 69.)

179.    Penguin is also able to ensure that its eBooks have better and more usable metadata.  (McCall Tr. Aff. ¶ 47.)  Penguin, as a direct seller, is also now experimenting with social media and using it to advertise in ways Penguin simply could not do as a wholesaler. (McCall Tr. Aff. ¶ 48.)

180.    The number of publishers providing, marketing, and selling (through any model) eBooks has also increased. (Burtis Tr. Aff. ¶ 42 & Burtis Aff. Ex. 13.)

181.    Consumers benefited from the tremendous growth in independent and self-publishing segments of the alleged relevant market.  (Burtis Tr. Aff. ¶ ¶ 40-41 & Burtis. Aff. Ex. 12.)

182.    This new publisher entry is explainable in part by the fact that there are both more outlets overall at which eBooks can be sold as well as there being a reduction in lock-in for devices.  (Rubinfeld Tr. Aff. ¶ 56.)

183.    Amazon's competitive response to the shift in business models also has to be assessed.  Because the actual effect of the agency model on Amazon is to give pricing control to agency publishers, Amazon is no longer able to implement a business strategy of loss leading on those publishers' titles.  However, Amazon, as a system competitor, is using loss leading in other parts of its business, or otherwise shifting the funds it used to loss lead Penguin's new release best seller related eBooks, to other parts of its system operations.

184.    Amazon has increased the discounts it makes on non-agency publisher titles. (Rubinfeld Tr. Aff. ¶¶ 89 & Rubinfeld Aff. Ex. 17; *see also* Rubinfeld Tr. Aff. ¶135.)   Plaintiff States have made no effort to assess the positive impact of the reduction of the prices of those titles.  Amazon reducing the prices on non-Penguin titles is consistent with the overall reduction of eBook prices as being pro-competitive.  Those price reductions, from an economic perspective, would impact on prices of Amazon's competitors too.  (Rubinfeld Tr. Aff. ¶ 89.)

185.    Amazon also shifted some of its loss leading from eBooks to print books.  (*See e.g.,* PEN Ex. 150.)  Below-cost discounting of print books is a replacement for below-cost discounting of eBooks.

186.    ██████████████ REDACTED ██████████████

████████████████████████████████████████████

REDACTED (Rubinfeld Tr.

Aff. ¶¶ 20 & Rubinfeld Aff. Ex. 2.)

187.    Amazon's apparent strategy is economically rational, and demonstrates that consumers who may have paid more for certain new release titles may (and did) make up in part or in whole by purchasing less expensive other publishers' titles or less expensive devices.

188.    The economic evidence demonstrates that Amazon's competitive response has triggered similar competitive responses by other agents and wholesalers.

189.    Amazon, for example, has entered into self-publishing.  This was a competitive response to Apple's entry.  (Burtis Tr. Aff. ¶ 43.)  Pearson plc has entered into self-publishing by purchasing Author Solutions, Inc.  (PEN Ex. 160.)  This was a competitive response to Amazon and the greater competition in the sale of eBooks.

190.    Amazon has also been forced to increase its competitive focus at the device level and in how its devices display eBooks.  The capability of devices like Apple's iPad, for example its ability to display color, has forced other device manufacturers to innovate and develop similar capabilities.  (McCall Tr. Aff. ¶ 42.)  Given Apple's unique brand positioning, opening its iBookstore and featuring Penguin's enhanced eBook, *Winnie the Pooh*, as a free offering with the iPad, created a competitive advantage for the iBookstore that Amazon apparently believed it had to match.  Without a device that could display color, that was impossible.  (Makinson Tr. Aff. ¶¶ 64-65.)

191.    Penguin also believes that agents have pursued device strategies and invested in device innovation because they now can earn a sufficient return on investment from their content sales to do so.  The result is both new devices, new types of devices, and cheaper devices. (McCall Tr. Aff. ¶¶ 43-45.)

192.    A causative element for the decrease in prices and the increase in output is the increase in competition at both the publisher level as well as the retailer/agent level.

193.    Penguin's adoption of the agency model for eBooks has improved Penguin's ability to sell books—in all formats.  Penguin has better information regarding consumer demand and is investing in systems and personnel to compete more effectively.  (*See, e.g.,* Makinson Tr. Aff. ¶ 48; McCall Tr. Aff.  ¶ 64.)

### *There Is No Empirical Proof That Any Penguin Agreement Substantially and Adversely Effects Competition in the Alleged Relevant Market*

194.    There is no empirical proof of a substantial adverse effect on competition in the alleged relevant market.

195.    The nature of competition in the publishing industry takes place as part of a "vertical distribution chain," whether one examines print books or eBooks.   From an economic perspective, in order to assess possible competitive effects, one must analyze the characteristics of the marketplace, including the products, the distribution change, and the reading formats or devices.  (Rubinfeld Tr. ¶¶ 10, 49-56.)  No systematic effort to do so was done by Plaintiff States' experts.

196.    Plaintiff States' empirical evidence of anticompetitive effects is fatally flawed. (Burtis Tr. Aff. ¶¶ 6; Rubinfeld Tr. Aff. ¶¶ 101-113, 133-138.)  Plaintiff States' experts have not attempted to measure alleged anticompetitive effects in the alleged relevant market, examine price changes of a limited number of sellers and agents, do so in an unreliably short time period, and do not consider off-setting actions or reactions.  (Burtis Tr. Aff. ¶¶ 22-24, 34-38.)  Measuring only the prices or output of the Publisher Defendants is inherently unreliable.

197.    Evidence of price increases of certain eBook titles is consistent with the economic explanation that Penguin (and other publishers) was changing business models.  (Rubinfeld Tr.

¶¶ 11.)  Some increased prices do not provide a factual basis for proving market impact. (Rubinfeld Tr. Aff. ¶ 115.)

198.    When Random House changed its distribution model to agency, its prices increased (in varying ways) in the same fashions as Penguin's did when Penguin changed business models.  (DX 434.)

199.    Plaintiff States' experts have failed to make any assessment of anticompetitive effects in the alleged relevant market.

200.    Economic analysis and evidence regarding the price tiers contradict any State Plaintiffs' theory—if one is indeed asserted—that the tiers represent price fixing agreements. (Burtis Tr. Aff. ¶¶ 51-56.)

201.    From an economic perspective, price ceilings presumptively restrain prices. (Burtis Tr. Aff. ¶ 52 & Burtis Aff. Ex. 16;  Rubinfeld Tr. Aff. ¶¶ 75-77.)  Consistent with Apple witnesses' testimony that the price ceilings were intended to keep eBook prices below those of the same hardcover titles, the economic evidence shows that around 74% of such eBook titles actually were sold at prices under the wholesale cost.  (Burtis Tr. Aff. ¶ 53.)  Given that the wholesale cost represents an economically rational price floor for resellers, Apple likely achieved its goal.

202.    Prices of eBooks related to hardcover new releases were not uniformly set at the maximum price ceilings over the time period for which data was available.  Different publishers had different strategies for pricing below the maximums.  (Burtis Tr. Aff. ¶¶ 55 & Burtis Aff. Ex. 18.)  Penguin, for example, began experimenting with discounts below the price ceilings in order to study and meet consumer demand.  (McCall Tr. Aff. ¶¶ 64-68.)  The pricing data is not

indicative of a price fixing agreement centered upon the maximum price bands. (Rubinfeld Tr. Aff. ¶¶ 79 & Rubinfeld Aff. Exs. 14a & 14b; *see also id.* ¶¶ 127-128.)

203.   An estimated increase in the price of certain eBooks titles is insufficient to demonstrate substantial consumer harm.

204.   All the concrete and/or empirically measureable benefits must be assessed against the "but-for world"—*i.e.*, what would have happened absent the alleged behavior.

205.   Amazon's loss leading likely was unsustainable. (Rubinfeld Tr. Aff. ¶ 13; *see also* Burtis Tr. Aff. ¶¶ 45-50.)

## CONCLUSIONS OF LAW

206.   Section 1 of the Sherman Act prohibits unreasonable restraints of trade. 15 U.S.C. § 1. State Plaintiffs have proven neither an agreement nor an unreasonable restraint of trade.

207.   Plaintiffs have failed to meet their burden to present evidence that "tends to exclude the possibility" that Penguin acted independently. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). Plaintiff States have not proven by a preponderance of the evidence that Penguin had a conscious commitment with other publishers to the common scheme of raising eBook prices. Penguin made an independent decision to enter into the Apple distribution agreement. There is no horizontal agreement between Penguin and the other publishers.

208.   Penguin's distribution agreement with Apple is vertical, reasonable, lawful, and its terms are not subject to scrutiny under Section 1 as a principal and agent lack disunity of purpose sufficient to form an agreement as defined by the Sherman Act. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769 (1984).

209. Alternatively, Penguin's conduct must be assessed under the rule of reason as Penguin could "reasonably have been believed to promote enterprise and productivity." *In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1110–11 (7th Cir. 2012).

210. Under the rule of reason, Plaintiff States' claims fail because they have not demonstrated by a preponderance of the evidence that Penguin's conduct "had an actual adverse effect on competition as a whole in the relevant market." *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 543 (2d Cir. 1993). Plaintiff States have failed to prove a relevant market, market power, or actual anticompetitive effects.

211. Alternatively, Plaintiff States' claims fail because they have not demonstrated by a preponderance of the evidence that that any legitimate competitive effects could have been achieved through less restrictive alternatives.

Alternatively, Plaintiff States' claims fail because they have not demonstrated by a preponderance of the evidence that the anticompetitive effects of Penguin's conduct substantially outweigh the pro-competitive effects. *E&L Consulting Ltd. v. Doman Indus. Ltd.*, 473 F.3d 23, 29 (2d Cir. 2006).


Dated: May 9, 2013                                    Respectfully Submitted,


Daniel Ferrel McInnis
David A. Donohoe
Allison Sheedy
Carolyn Perez
Mollie McGowan Lemberg
Gregory Granitto
Akin Gump Strauss Hauer & Feld, LLP
1333 New Hampshire Ave., NW

49

Washington, DC 20036
Tel.:  202-887-4000
Fax:  202-887-4288
dmcinnis@akingump.com

*Counsel for Defendant Penguin Group (USA), Inc.*