UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE ELECTRONIC BOOKS ANTITRUST LITIGATION | No. 11-md-02293 (DLC)<br>ECF Case |
| This Document Relates to:<br><br>ALL ACTIONS | <u>CLASS ACTION</u> |

**MEMORANDUM IN SUPPORT OF CLASS COUNSEL'S MOTION FOR AWARD OF
ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES,
<u>AND PARTICIPATION AWARDS FOR NAMED PLAINTIFFS</u>**

**TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................................1

II.  THE WORK UNDERTAKEN BY CLASS COUNSEL......................................3

    A.   Prosecution of the Case..............................................................................3

        1.   Pre-Filing Preparation and Pre-Consolidation Proceedings ........................3

        2.   Pleadings and Motions to Dismiss...............................................4

        3.   Document and Written Discovery ...............................................6

        4.   Depositions ...............................................................................8

        5.   Expert Discovery and Trial Preparation .....................................9

        6.   Mediation and Settlement .........................................................10

III. ARGUMENT ....................................................................................................12

    A.   Plaintiffs' Request for Attorneys' Fees Is Reasonable Given the Risk Involved and the Success of this Action ...............................................12

        1.   Most courts, including the Second Circuit, award attorneys' fees based on a percentage-of-the-benefit conferred on the class. ....................12

        2.   Class Counsel seeks a reasonable percentage of the benefit conferred on the Class..............................................................13

        3.   The requested fees are consistent with the *Goldberger* factors. ...............15

            a.   The time and labor expended by counsel support the requested fee ................................................................16

            b.   The litigation's magnitude and complexity support the requested fee ...............................................................16

            c.   The risks entailed in the litigation support the requested fee........16

                (1)   No governmental actions had been filed or appeared likely to be filed when Plaintiffs filed their action ............17

                (2)   Class Counsel's resources committed to the case..............17

                (3)   Risks arising from substantive issues ................................18

            d.   The quality of representation supports the requested fee..............19

(1)     Quality of Class Counsel ....................................................19

(2)     Quality of Defendants' Counsel.........................................20

e.     The fee request is consistent with the size and scope of the settlement .......................................................................................21

f.     Public-policy considerations support the requested fee.................21

4.     The requested fee is presumptively reasonable in light of counsel's lodestar............................................................................................22

B.     Class Counsel's Expenses Are Reasonable ...........................................23

C.     The Named Representatives' Active Involvement in This Case Deserves Recognition Through the Proposed Participation Awards...................................24

IV.     CONCLUSION..........................................................................................25

010260-11  637986 V1

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alpine Pharm., Inc. v. Chas. Pfizer & Co., Inc.*,
    481 F.2d 1045 (2d Cir. 1973).................................................................................12

*Am. Express Co. v. Italian Colors Rest.*
    __ U.S. __, 133 S. Ct. 2304 (2013).....................................................................6, 18

*Beckman v. KeyBank, N.A.*,
    2013 U.S. Dist. LEXIS 60894 (S.D.N.Y. Apr. 29, 2013).....................................22

*Blomkest Fertilizer v. Potash Corp. of Saskatchewan*,
    203 F.3d 1028 (8th Cir. 2000) ..............................................................................17

*Boeing Co. v. Van Gemert*,
    444 U.S. 472 (1980)................................................................................................12

*Brennan v. N.Y. Law Sch.*,
    2012 U.S. Dist. LEXIS 135095 (S.D.N.Y. Aug. 15, 2012)...................................23

*Cassese v. Williams*,
    2012 U.S. App. LEXIS 23834 (2d Cir. Nov. 20, 2012)...........................................3

*City of Detroit v. Grinnell Corp.*,
    495 F.2d 448 (2d Cir. 1974)..............................................................................17, 18

*Dewey v. Volkswagen of Am.*,
    728 F. Supp. 2d 546 ...............................................................................................15

*Dornberger v. Metro. Life Ins. Co.*,
    203 F.R.D. 118 (S.D.N.Y. 2001) ...........................................................................24

*Goldberger v. Integrated Res., Inc.*,
    209 F.3d 43 (2d Cir. 2000)............................................................................. *passim*

*Hawaii v. Standard Oil Co. of Cal.*,
    405 U.S. 251 (1972)................................................................................................12

*Hess v. Sprint Commc'ns Co. L.P.*,
    2012 WL 5921149 (N.D. W. Va. Nov. 26, 2012)..................................................14

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
    2009 WL 3077396 (E.D.N.Y Sept. 25, 2009) .......................................................21

*In re Am. Bank Note Holographics, Inc.*,
    127 F. Supp. 2d 418 (S.D.N.Y. 2001).....................................................................18

*In re Baby Food Antitrust Litig.*,
166 F.3d 112 (3d Cir. 1999)...................................................................................17

*In re Buspirone Antitrust Litig.*,
2003 U.S. Dist. LEXIS 26538 (S.D.N.Y. Apr. 17, 2003).......................................24

*In re Carbon Dioxide Indus. Antitrust Litig.*,
229 F.3d 1321 (11th Cir. 2000) ..............................................................................18

*In re Citric Acid Litig.*,
191 F.3d 1090 (9th Cir. 1999) ................................................................................17

*In re Countrywide Fin. Corp. Customer Data Security Breach Litig*,
2010 WL 3341200 (W.D. Ky. Aug. 23, 2010) .......................................................21

*In re Currency Conversion Fee Antitrust Litig.*,
2012 U.S. Dist. LEXIS 123875 (S.D.N.Y. Aug. 22, 2012).....................................24

*In re Enron Corp. Secs., Derivative & ERISA Litig.*,
586 F. Supp. 2d 732 (S.D. Tex. 2008) ...................................................................22

*In re Freddie Mac Secs. Litig.*,
No. 03-CV-4261 (JES), slip. op. (S.D.N.Y. Oct. 27, 2006) ...................................21

*In re Initial Pub. Offering Sec. Litig.*,
671 F. Supp. 2d 467 (S.D.N.Y. 2009).....................................................................21

*In re Lloyd's Am. Trust Fund Litig.*,
2002 WL 31663577 (S.D.N.Y. Nov. 26, 2002).......................................................13

*In re Merrill Lynch & Co., Inc. Research Reports Secs. Litig.*,
246 F.R.D. 156 (S.D.N.Y. 2007) .....................................................................13, 20

*In re The Mills Corp. Secs. Litig.*,
265 F.R.D. 246 (E.D. Va. 2009) .............................................................................21

*In re NASDAQ Market-Makers Antitrust Litig.*,
187 F.R.D. 465 (S.D.N.Y. 1998) ...............................................................13, 20, 22

*In re Towers Fin. Corp. Noteholders Litig.*,
1996 U.S. Dist. LEXIS 2311 (S.D.N.Y. Jan. 17, 1996) .........................................23

*In re Twinlab Corp. Secs. Litig.*
187 F. Supp. 2d 80 (E.D.N.Y. 2002) ......................................................................13

*In re Visa Check/Mastermoney Antitrust Litig.*,
297 F. Supp. 2d 503 (E.D.N.Y. 2003) ....................................................................16

- iv -

*In re Vitamin C Antitrust Litig.*,
　2012 U.S. Dist. LEXIS 152275 (E.D.N.Y. Oct. 22, 2012)....................................................23

*In re Wash. Public Power Supply Sys. Secs. Litig.*,
　19 F.3d 1291 (9th Cir. 1994) .................................................................................................12

*In re WorldCom, Inc. Secs. Litig.*,
　388 F. Supp. 2d 319 (S.D.N.Y. 2005).....................................................................................22

*In re WorldCom, Inc. Secs. Litig.*,
　2004 U.S. Dist. LEXIS 22992 (S.D.N.Y. Nov. 12, 2004)......................................................22

*J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc.*,
　485 F.3d 880 (6th Cir. 2007) .................................................................................................17

*Johnston v. Comerica Mortg. Corp.*,
　83 F.3d 241 (8th Cir. 1996) ...................................................................................................14

*Loudermilk Servs., Inc. v. Marathon Petroleum Co. LLC*,
　623 F. Supp. 2d 713 (S.D. W. Va. 2009) ...............................................................................21

*McAnaney v. Astoria Fin. Corp.*,
　2011 U.S. Dist. LEXIS 114768 (E.D.N.Y. Feb. 11, 2011).....................................................24

*McDaniel v. Cnty. of Schenectady*,
　595 F.3d 411 (2d. Cir. 2010)..................................................................................................22

*Mercury Interactive Corp. Sec. Litig.*,
　618 F.3d 988 (9th Cir. 2010) ...................................................................................................3

*Mills v. Elec. Auto-Lite Co.*,
　396 U.S. 375 (1970)................................................................................................................12

*Muhammad v. Nat'l City Mortg. Inc.*,
　2008 WL 5377783 (S.D. W. Va. Dec. 19, 2008).....................................................................21

*Park v. The Thomson Corp.*,
　2008 U.S. Dist. LEXIS 84551 (S.D.N.Y. Oct. 22, 2008) .......................................................24

*Perma Life Mufflers, Inc. v. Int'l Parts Corp.*,
　392 U.S. 134 (1968)................................................................................................................12

*Pillsbury Co. v. Conboy*,
　459 U.S. 248 (1983)................................................................................................................12

*Ramirez v. Lovin' Oven Catering Suffolk, Inc.*,
　2012 U.S. Dist. LEXIS 25060 (S.D.N.Y. Feb. 24, 2012).......................................................22

*Reiter v. Sonotone Corp.*,
    442 U.S. 330 (1979).............................................................................12

*Roberts v. Texaco, Inc.*,
    979 F. Supp. 185 (S.D.N.Y. 1997)......................................................24

*Shaw v. Toshiba Am. Info. Sys., Inc.*,
    91 F. Supp. 2d 942 (E.D. Tex. 2000) ..................................................13

*Superior Offshore Int'l, Inc. v. Bristow Grp, Inc.*,
    490 Fed. Appx. 492 (3d Cir. 2012) ......................................................17

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005)......................................................13, 17, 22

*Williamsburg Fair Hous. Comm. v. N.Y. City Hous. Auth.*,
    2005 U.S. Dist. LEXIS 5200 (S.D.N.Y. Apr. 4, 2005)........................23

*Williamson Oil Co., Inc. v. Philip Morris USA*,
    346 F.3d 1287 (11th Cir. 2003) ...........................................................17

### OTHER AUTHORITIES

Manual for Complex Litigation (Fourth), § 14.121 (2004) ..........................13

David B. Wilkins, *Rethinking the Public-Private Distinction in Legal Ethics: The Case of
    'Substitute' Attorneys General*, 2010 Mich. St. L. Rev. 423, 469-70 (2010)........................20

## I.    INTRODUCTION

Class Counsel submits this request for an award of attorneys' fees, expenses and participation awards for twenty named plaintiffs. Class Counsel has worked in close coordination with the Department of Justice ("DOJ") and thirty-three State Attorneys General readying the case for the liability and damages trials for the past two years. The harmonious blending of effort and organization between Federal, State, and private attorneys in this litigation was integral in achieving these strong settlements. The government and private plaintiffs worked together to allocate responsibilities, augmenting these groups' individual resources to prosecute this matter, while limiting unnecessary duplication of efforts. These settlements were thus not only a product of highly skilled litigation efforts but also the respective plaintiffs' dedication and effort in managing many complexities of organizational issues between these parties.

An important example of a unique issue faced by these plaintiffs – and successfully managed by these plaintiffs – was the approach to negotiating the consumer-compensation settlement terms. Class Counsel and the litigating States worked together to present a united front to Penguin and Macmillan to maximize the results for consumers and ensure the proposed class and the consumers in the litigating States were treated similarly when it came to total consumer compensation in these coordinated negotiations.[1] Accordingly, the Class and the States first negotiated total consumer relief that would apply nationwide. Only then did the Class and the States enter into separate negotiations with Penguin and Macmillan for fees, costs and (in the States' case) civil penalties.  Accordingly, through this process the five settling defendants have

---

[1]    Class Counsel negotiated separately with HarperCollins, Hachette and Simon & Schuster on behalf of the state of Minnesota. These three defendants settled with the State Attorneys General in June 2012.

agreed to pay Class Counsel $11,206,000 in attorneys' fees and expenses – separate from the consumer compensation fund.[2]

The results to date speak for themselves. An expert retained by the State Attorneys General estimates that the Class will recover between 75 and 98 percent of single damages, depending on their state of residence.[3] And the current settlements before the Court will return over $97 million to consumers nationwide. Class Counsel, the DOJ, and the litigating State Attorneys General achieved this result only through a coordinated effort. The amount and pace of discovery in this case required dedicating significant resources – with more than 13 million pages of documents produced, over 50 depositions taken, and dozens of written discovery requests (much of it occurring in less than a year).

Class Counsel requests $11,206,000 in fees and expenses, which was negotiated separately from, and in addition to, the $97 million to be paid to consumers. This request equals approximately 10 percent of the benefit conferred on consumers. Even if the Court were to only calculate the percentage of the population that will be procedurally certified as a "class" (approximately 40 percent), Class Counsel's fee request would amount to only 21 percent of the benefit conferred on class members.

---

[2]    Settlement Agreement by and Among Holtzbrinck Publishers, LLC, d/b/a Macmillan and Plaintiff States and Settlement Class ("Macmillan Settlement Ag.") at 9, June 21, 2013, ECF No. 360-1 (providing for attorneys' fees and expenses for Class Counsel up to $2,475,000); Settlement Agreement by and Among Penguin Group (USA), Inc. and Plaintiff States and Settlement Class ("Penguin Settlement Ag.") at 9, June 21, 2013, ECF No. 360-2 (providing for attorneys' fees and expenses for Class Counsel up to $8 million); HarperCollins, *et al.* Settlement Agreement (between Class Plaintiffs and HarperCollins, Hachette and Simon & Schuster) ("HarperCollins, *et al.* Settlement Ag.") at 9, June 21, 2013, ECF No. 362-1(providing for attorneys' fees and expenses for Class Counsel up to $731,000). Unless otherwise indicated, all ECF citations are to the *In re Electronic Books Antitrust Litig.*, No. 11-md-02293 (DLC) (S.D.N.Y.).

[3]    July 10, 2013 Letter from Rebecca Fisher, Senior Assistant Attorney General to Judge Cote ("R. Fisher Letter to the Court"), July 23, 2013, ECF No. 368.

Finally, Class Counsel submits this request fourteen days before the deadline for objections and exclusions in this case because, although the Second Circuit does not require this timing, at least one other Circuit has recently adopted this practice.[4] Class Counsel will make these papers immediately available on the website dedicated to communications with settlement class members, which is identified in all class notices. Therefore this motion will ensure class members receive a full opportunity to review Counsel's request for fees, expenses and participation awards to the named plaintiffs before the final approval hearing.

## II.    THE WORK UNDERTAKEN BY CLASS COUNSEL

### A.    Prosecution of the Case

#### 1.    Pre-Filing Preparation and Pre-Consolidation Proceedings

Hagens Berman Sobol Shapiro LLP's ("Hagens Berman") investigation commenced in or about April 2010, after market prices for titles of the majority of the publisher defendants' E-books shot up – nearly simultaneously – by 30 to 50 percent. This highly suspicious pricing behavior caused Hagens Berman to begin analyzing the market and developing the facts eventually pled in the class action. After months of research and consultation with economists specializing in this field, on August 9, 2011, Hagens Berman initiated this antitrust litigation by filing *Petru, et al. v. Apple Inc., et al.*, No. 11-cv-03892-EMC, in the Northern District of California. At the time Hagens Berman filed the *Petru* action, even though the Connecticut and Texas Attorney Generals publicly acknowledged investigating the eBook industry in 2010,[5] no

---

[4]    *See Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988 (9th Cir. 2010). *But see Cassese v. Williams*, No. 11-4333, 2012 U.S. App. LEXIS 23834 (2d Cir. Nov. 20, 2012) (rejecting a similar objection to that raised in *Mercury Interactive*).

[5]    *Attorney General Investigates Potentially Anticompetitive E-Book Deals With Amazon and Apple*, State of Connecticut Office of the Attorney General (August 2, 2010), http://www.ct.gov/ag/cwp/view.asp?A=2341&Q=463894; Jeffrey A. Trachtenberg and Yukari Iwatani Kane, *Texas Questions E-Book Publishers*, The Wall Street Journal (June 2, 2010), http://online.wsj.com/article/SB10001424052748703961204575281173811063424.html.

ongoing governmental litigation was publicly known. In fact, the DOJ did not officially

acknowledge its investigation of the publishers until December 2011 – more than four months

after Hagens Berman filed the *Petru* Action.[6]

Alerted to the possible conspiracy by Hagens Berman's complaint, Cohen Milstein

Sellers & Toll PLLC ("Cohen Milstein") began investigating the allegations immediately, aided

by Cohen Milstein Partner Kit Pierson's familiarity with and contacts in the publishing industry

dating back to his involvement in a successful antitrust suit brought by the American Booksellers

Association against the same defendants. Drawing on their independent research, Cohen Milstein

filed *Greene v. Macmillan*, No. 11-cv-6019, on August 26, 2011, in the Southern District of New

York.[7]

A request to consolidate proceedings was filed before the Judicial Panel on Multi-District

Litigation, which sent the related actions to this Court on December 9, 2011.[8] Hagens Berman

and Cohen Milstein both applied to be appointed as interim lead counsel, a request granted by

this Court on December 21, 2011.[9]

## 2.    Pleadings and Motions to Dismiss

The class filed its consolidated complaint on January 20, 2012.[10] The consolidated

pleadings did not rely on the details of government investigations – in fact, the DOJ and the State

---

[6]    Paul Eng, *Department of Justice Joins E-book Pricing Probe*, The Consumerist (Dec. 8, 2011), http://consumerist.com/2011/12/08/department-of-justice-joins-e-book-pricing-probe/. *See also* Declaration of Steve W. Berman in Support of Class Counsel's Motion for Award of Attorneys' Fees, Reimbursement of Expenses, and Participation Awards for Named Plaintiffs ("Berman Decl."), ¶ 2, filed concurrently herewith.

[7]    Berman Decl., ¶ 3.

[8]    Transfer Order, Dec. 9, 2011, ECF No. 1.

[9]    Case Management Order, Dec. 21, 2011, ECF No. 23; Berman Decl., ¶ 4.

[10]    Consolidated Amended Class Action Complaint, Jan. 20, 2012, ECF No. 47.

Attorneys General did not file their complaints until April 2012.[11] The class complaint contained a detailed analysis of defendants' public statements about eBook pricing, a detailed description of defendants' coordinated actions to stabilize pricing, a list of the relevant participants in the pricing conspiracy, and extensive economic allegations of the pricing in the market, demonstrating the conspiracy's anticompetitive effects. The consolidated complaint alleged violations of the Sherman Act and various state laws.[12]

In March 2012, defendants moved to dismiss the entire complaint. The five publisher defendants argued that plaintiffs had made no direct allegations of an explicit agreement and that the allegations of parallel conduct alone could not give rise to a plausible inference of a conspiracy.[13] Apple filed its own motion arguing that plaintiffs did not and could not plausibly allege that Apple participated in any conspiracy among publishers, given Apple's status as a new entrant in the eBook market.[14] Plaintiffs opposed both of these motions. The Court denied the motions to dismiss on May 15, 2012, in a detailed 56-page opinion.[15]

At the same time all defendants were moving to dismiss the complaint, one publisher defendant – Penguin – moved to compel arbitration of the civil plaintiffs' claims and stay proceedings in this Court. Penguin argued that class members agreed in their purchase agreements with Amazon or Barnes & Noble to arbitrate any disputes related to their purchases of E-books – even where the claims alleged wrongdoing only by third parties to the arbitration

---

[11]   *United States v. Apple Inc. et al*., No. 12-cv-02826 (S.D.N.Y.), filed April 11, 2012; *The State of Texas, et al. v. Penguin Group (USA) Inc., et al.*, No. 12-cv-0324 (W.D. Tex.), filed April 11, 2012.

[12]   Berman Decl., ¶ 5.

[13]   Memorandum of Law in Support of Publisher Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint, Mar. 2, 2012, ECF No. 89.

[14]   Apple Inc.'s Memorandum of Law in Support of Motion to Dismiss the Consolidated Amended Class Action Complaint, Mar. 2, 2012, ECF No. 74.

[15]   Opinion & Order, May 15, 2012, ECF No. 156; Berman Decl., ¶ 6.

agreements, rather than Amazon or Barnes & Noble themselves.[16] Plaintiffs opposed this motion, proffering voluminous testamentary evidence including: (i) a declaration from an expert economist estimating that it would approach or exceed one million dollars to retain an economist to testify in this case; (ii) declarations from twelve attorneys stating that unless the option of class action litigation or arbitration of plaintiffs' claims existed, the claimants' statutory rights against Penguin would not likely be vindicated; (iii) declarations from the twenty named plaintiffs in the action stating they would not hire an attorney to arbitrate their individual claims and that bringing their claims on an individual basis would not be practical.[17] This Court denied Penguin's motion to stay proceedings and compel arbitration on June 27, 2012.[18] Penguin filed an appeal to the Second Circuit, which was held in abeyance pending the U.S. Supreme Court's decision in *American Express Co. v. Italian Colors Restaurant*.[19] Penguin withdrew its appeal upon the parties' settlement in this action.[20]

### 3.   Document and Written Discovery

Although the DOJ and the State Attorneys General had not filed litigation at the time the civil plaintiffs began this case, the filing of the governmental actions and the mutual desire for an expedited discovery schedule in this case underscored the importance of cooperation. Class Counsel, the State Attorneys General, and the DOJ worked in an integrated and cooperative fashion on all discovery. The negotiation of discovery limits, ESI protocols, custodians, and

---

[16]   Memorandum of Law in Support of the Motion to Stay Proceedings and Compel Arbitration by Defendant Penguin Group (USA), Inc., Mar. 2, 2012, ECF No. 87.

[17]   *See* Declaration of Kit A. Pierson in Support of Plaintiffs' Opposition to Defendant Penguin Group (USA), Inc.'s Motion to Stay Proceedings and Compel Arbitration, Mar. 30, 2012, ECF No. 112.

[18]   Opinion & Order, June 27, 2012, ECF No. 190.

[19]   *Am. Express Co. v. Italian Colors Rest.* __ U.S. __, 133 S. Ct. 2304 (2013).

[20]   Stipulation, *In re Electronic Books Antitrust Litig.*, Case No. 12-2999 (2d. Cir.), May 22, 2013, ECF No. 97; Berman Decl., ¶¶ 7-9.

search terms required extensive discovery conferences with all parties. Defendants eventually produced over 13 million pages of documents.[21] The process of culling and reviewing over 13 million pages of documentary evidence necessarily entailed educating, managing and coordinating attorneys across all plaintiffs. Class Counsel coordinated at all times with the DOJ and State Attorneys General to prevent duplication of effort. Class Counsel's team of attorneys were integrally involved in the review of these documents and prepared memoranda, digests and summaries to identify critical documents, analyze the emerging conspiratorial record, and share their findings with the governmental plaintiffs. These documents eventually became deposition exhibits, trial exhibits, and exhibits to various motions filed with the Court.[22]

Substantial written discovery also occurred in this case. Class Plaintiffs served a total of 22 interrogatories on defendants, 6 requests for admission, and 102 requests for production of documents. Defendants likewise served extensive written discovery on Class Plaintiffs – 33 interrogatories and 31 requests for production of documents. Again, the Class, States, and DOJ coordinated written discovery in order to serve non-duplicative discovery covering all issues that plaintiffs believed was necessary.[23]

In addition to acquiring millions of documents from defendants, Class Plaintiffs fought for and obtained large amounts of transactional data from both defendants and third parties. Recognizing the import of transactional data to any class certification motion, damages, and anticompetitive-effects analysis, Class Plaintiffs took the lead in negotiating the production of transactional data. Fourteen third parties (major distributors and retailers of books) produced

---

[21]   Precisely, defendants collectively produced 13,123,309 pages of documents. Berman Decl., ¶ 10.

[22]   Berman Decl., ¶¶ 10-11.

[23]   *Id.*, ¶ 12.

transactional data relevant to the claims in this case.[24] The six defendants themselves also produced hundreds of thousands of transaction-by-transaction data to plaintiffs. At the trial in *United States v. Apple*, *Inc.*, Apple's counsel characterized the data as "the largest and most comprehensive database of transactional eBook sales," and Dr. Gilbert, an expert testifying on behalf of the United States, agreed that he was not aware of a larger database.[25] Class Counsel's efforts also helped secure robust documentary evidence from third parties in addition to the transactional data – over 3.3 million pages of documents – describing pricing strategy and policies of these various third parties as well as market information potentially relevant to the alleged conspiracy.[26]

### 4.    Depositions

Class Counsel also played a significant role in nearly all of the depositions. In all, 47 party depositions and 9 third-party depositions took place. As this Court instructed at the outset, merits and class discovery proceeded in tandem, and Class Counsel was well aware that no fact witness would be re-deposed absent an extremely strong showing.[27] Moreover, because of the possibility that the government plaintiffs could reach settlements at any time with any or all of the defendants (as they ultimately did with all of the publisher defendants), Class Counsel had to be fully prepared to litigate this matter and proceed to trial with or without the government entities' involvement.  While Class Counsel worked with government counsel in an extremely efficient manner – indeed, this is a paradigmatic example of effective cooperation between

---

[24]    The third parties included: Amazon Inc., Baker & Taylor, Barnes & Noble, Books-A-Million, CableVision, Google, Ingram, Kobo, Microsoft, OverDrive, Random House, ReaderLink, Sony Corp., Sony Electronics Inc., and Wal-Mart. Berman Decl., ¶ 13.

[25]    June 12, 2013 Trial Tr. at 1571, *United States v. Apple, Inc.*, No. 12-cv-02826 (S.D.N.Y.).

[26]    Berman Decl., ¶¶ 13-15.

[27]    Oct. 26, 2012 Hearing Tr. at 64.

government and private counsel – Class Counsel was aware that it had to be able to move forward with the litigation expeditiously and capably at all times if the DOJ, or the States, reached settlements.[28]

Class Counsel attended all but eight of these depositions and questioned the witnesses at nearly half of the depositions.[29] Beyond coordinating with the DOJ and State Attorneys General, however, Class Counsel also took the lead on several critical depositions. For example, recognizing the burden to prove antitrust impact and damages that the class would face (over the state and federal governments), Class Counsel took charge of deposing Penguin and Macmillan's expert economist Dr. Daniel Rubinfeld. Class Counsel also led the questions for critical depositions such as David Shanks, Penguin's Chief Executive Officer (both in his personal capacity and as a Rule 30(b)(6) witness testifying about Penguin's pricing policies); John Makinson, Chairman and Chief Executive Officer of Penguin's parent company, Pearson PLC; Tim McCall, Penguin's Vice President of Online Sales; and Alex Gigante, Penguin's General Counsel. As with the other areas of discovery, Class Counsel assisted in preparing for depositions, shared work product with the other plaintiffs' groups and ensured as much as possible the efficient conduct of the depositions.[30]

### 5. Expert Discovery and Trial Preparation

Although on October 26, 2012, the Court "de-linked" class certification from the other issues in the case, this schedule change occurred only three weeks before plaintiffs were scheduled to file their class certification motion. By the time the Court extended the class certification deadline, Class Counsel had already dedicated hundreds of hours developing the

---

[28]   Berman Decl., ¶ 16.

[29]   Class Counsel separately examined the witnesses at 22 of the 47 party depositions and 3 of the 9 third-party depositions. Berman Decl., ¶ 17.

[30]   Berman Decl., ¶¶ 17-19.

facts and obtaining the data for its expert and consultants to prepare a robust analysis of the eBook industry, pricing and the impact of defendants' conspiracy. And as Class Counsel recently explained to the Court in the context of Apple's request to "do-over" discovery, Counsel spent nearly a year pursuing discovery needed for liability, class certification and damages all at the same time.[31] The schedule Apple requested required focus, efficiency and coordination – all of which Class Counsel used with great success.[32]

### 6.    Mediation and Settlement

The entrance of the State Attorneys General early in this case was announced with the simultaneous filing of a complaint against the HarperCollins, Hachette, and Simon & Schuster publisher defendants along with a settlement agreement and request for preliminary approval on August 29, 2012.[33] The settling States filed their complaint and settlements on April 2012 – nine months after the original class *Petru* complaint. Although Class Counsel will receive no fees for consumer benefits conferred from these settlements, it is reasonable to believe the class case provided some impetus for these three defendants to reach early settlement with the States. This early settlement did not include the state of Minnesota, and Class Counsel continues to represent that state's consumers.[34]

After these early settlements, thirty-three State Attorneys General filed suit against the remaining defendants (Penguin, Macmillan, and Apple) and litigated alongside the DOJ and the class.  These three plaintiffs' groups cooperatively litigated alongside each other, and eventually the State Attorneys General and the Class Plaintiffs jointly entered into settlement negotiations

---

[31]    Letter from Steve W. Berman to Judge Cote, Sept. 4, 2013, ECF No. 392.

[32]    Berman Decl., ¶ 20.

[33]    *See The State of Texas, et al. v. Hachette Book Group, Inc., et al.*, No. 12-civ-6625 (DLC) (S.D.N.Y.).

[34]    Berman Decl., ¶ 21.

with some of the defendants. This litigation presented a rare paradigm, where the States and the Class agreed to coordinate settlement negotiations with the defendants and cooperated extensively in an effort to accept only a total consumer-compensation amount that both the State Attorneys General and the class would support. The parties negotiated these settlements with the Penguin and Macmillan defendants to have at least 100 percent of the estimated single damages attributable to those defendants' sales – totaling $95 million – returned to class members. They negotiated attorneys' fees and expenses, participation awards to the class representatives, and payments to the States separately and in addition to this consumer compensation.[35]

The State Attorneys General and Class Plaintiffs negotiated these settlements over a period of months. Macmillan, the State Attorneys General, and Class Plaintiffs executed a joint settlement agreement on April 25, 2013.[36] The Penguin settlement followed a similar process where the Class Plaintiffs and the State Attorneys General met in Texas to negotiate with the Penguin defendants on May 16, 2013.  Penguin, the State Attorneys General and Class Plaintiffs executed a joint settlement agreement on May 20, 2013.[37] Finally, Class Plaintiffs participated in a mediation before Judge Kimba Woods on April 16, 2013, where they alone settled with the HarperCollins, Hachette and Simon & Schuster defendants, on behalf of the Minnesota class. This trio of defendants and Class Plaintiffs executed a settlement agreement on June 20, 2013.[38]

---

[35]   *Id.*, ¶ 22.

[36]   Macmillan Settlement Ag. at 1, ECF No. 360-1.

[37]   Penguin Settlement Ag. at 1, ECF No. 360-2.

[38]   HarperCollins, *et al.* Settlement Ag. at 1, ECF No. 362-1; Berman Decl., ¶¶ 24-25.

### III.   ARGUMENT

**A.   Plaintiffs' Request for Attorneys' Fees Is Reasonable Given the Risk Involved and the Success of this Action**

**1.   Most courts, including the Second Circuit, award attorneys' fees based on a percentage-of-the-benefit conferred on the class**

The Supreme Court "has recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole."[39] This doctrine's purpose is that "those who benefit from the creation of the fund should share the wealth with the lawyers whose skill and effort helped create it."[40] The Supreme Court recognizes the importance of private antitrust litigation as a necessary and desirable tool to assure the antitrust laws' effective enforcement.[41] Substantial fee awards in successful cases, such as this one, encourage meritorious class actions, and thereby promote private enforcement of, and compliance with, the antitrust laws. As noted by the Second Circuit in *Alpine Pharmacy*, "[i]n the absence of adequate attorneys' fee awards, many antitrust actions would not be commenced."[42]

The Second Circuit has also held that courts may use both the percentage or the lodestar methods to compute fees in common-fund cases.[43] But "[t]he trend in this Circuit is toward the

---

[39]   *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). *See also Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 393 (1970). All internal citations and quotations herein are omitted and all emphasis added, unless otherwise indicated.

[40]   *In re Wash. Public Power Supply Sys. Secs. Litig.*, 19 F.3d 1291, 1300 (9th Cir. 1994).

[41]   *See, e.g., Pillsbury Co. v. Conboy*, 459 U.S. 248, 262-63 (1983); *Reiter v. Sonotone Corp.*, 442 U.S. 330, 331 (1979); *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 266 (1972); *Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 139 (1968), *overruled in part, Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984).

[42]   *Alpine Pharm., Inc. v. Chas. Pfizer & Co., Inc.*, 481 F.2d 1045, 1050 (2d Cir. 1973).

[43]   *See Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 50 (2d Cir. 2000).

- 12 -

percentage method."[44] This is because the "percentage method directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation, which clearly benefits both litigants and the judicial system."[45] It also permits the judge to focus on the quality of the lawyers' efforts rather than on how many hours they billed.[46] The hourly-rate approach frequently bears "little or no relationship to the value of the services performed in anything but the most routine work. A flash of brilliance by a trial lawyer may be worth far more to his client than hours or days of plodding effort."[47] The Court of Appeals recommends, however, considering the hours submitted by counsel as a "cross-check" on the requested percentage's reasonableness.[48]

### 2.    Class Counsel seeks a reasonable percentage of the benefit conferred on the Class

The *Manual for Complex Litigation* provides that "[g]enerally, the factor given the greatest emphasis [in awarding a percentage of a fund] is the size of the fund created, because a common fund is itself the measure of success . . . [and] represents the benchmark from which a reasonable fee will be awarded."[49] To be clear – this is not a common fund here. Attorneys' fees and costs were negotiated and are to be awarded separate from any compensation to consumers. But the amount involved and the results obtained are exceptional in this case. Based on the

---

[44]   *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc*., 396 F.3d 96, 121 (2d Cir. 2005). *See also In re Merrill Lynch & Co., Inc. Research Reports Secs. Litig*., 246 F.R.D. 156, 171 (S.D.N.Y. 2007).

[45]   *In re Lloyd's Am. Trust Fund Litig*., No. 96 Civ. 1262, 2002 WL 31663577, at *25 (S.D.N.Y. Nov. 26, 2002); *see also In re Twinlab Corp. Secs. Litig.* 187 F. Supp. 2d 80, 85 (E.D.N.Y. 2002) ("[c]ourts favor the percentage of the fund method because lodestar created an unanticipated disincentive to early settlements, tempted lawyers to run up their hours, and compell[ed] district courts to engage in a gimlet-eyed review of line-item fee audits").

[46]   *In re NASDAQ Market-Makers Antitrust Litig*., 187 F.R.D. 465, 485 (S.D.N.Y. 1998).

[47]   *Shaw v. Toshiba Am. Info. Sys., Inc*., 91 F. Supp. 2d 942, 964 (E.D. Tex. 2000).

[48]   *Goldberger*, 209 F.3d at 50.

[49]   Manual for Complex Litigation (Fourth), § 14.121 (2004). (Alteration added and in original.)

- 13 -

States' expert's submission for settlement valuation, non-Minnesota class members will receive

75 percent of their single damages through the settlements with the five publishers and

Minnesota class members will receive 98 percent of their single damages:[50]

| Defendant | Non-MN Damages | Settlement Amt Paid for Non-MN | % of Non-MN Damages Pd | MN-Only Damages | Settlement Amt Paid for MN-Only | % of MN-Only Damages Pd | Total Damages | Total Paid | % of Total Damages Paid |
|---|---|---|---|---|---|---|---|---|---|
| Hachette | $62,280,000 | $31,711,425 | 51% | $1,060,000 | $974,740 | 92% | $63,340,000 | $32,686,165 | 52% |
| HarperCollins | $30,590,000 | $19,575,390 | 64% | $550,000 | $593,320 | 108% | $31,140,000 | $20,168,710 | 65% |
| Simon & Schuster | $42,920,000 | $17,752,610 | 41% | $840,000 | $550,940 | 66% | $43,760,000 | $18,303,551 | 42% |
| Macmillan | $18,159,000 | $19,616,000 | 108% | $356,000 | $384,000 | 108% | $18,515,000 | $20,000,000 | 108% |
| Penguin | $60,963,000 | $73,594,000 | 121% | $1,165,000 | $1,406,000 | 121% | $62,128,000 | $75,000,000 | 121% |
| **TOTALS** | **$214,912,000** | **$162,249,426** | **75%** | **$3,971,000** | **$3,909,000** | **98%** | **$218,883,000** | **$166,158,476** | **76%** |

And, as the Court noted at the preliminary approval hearing, Minnesota residents –

represented by Class Counsel – will receive significantly more than other class members on a

percentage basis: "the one state of the union that chose not to participate with the other states in

the first round of settlements has actually been advantaged. Its consumers, through their

representation by the class, have been advantaged vis-a-vis the consumers in the other states."[51]

And even though the consumers will be receiving over $97 million as a result of these

settlements, the class will still be able to recover up to 100 percent of treble damages as Apple –

the remaining defendant – faces joint and several liability.

The attorneys' fees requested by plaintiffs represent approximately 10 percent of the

benefit conferred on consumers.[52] Even if the calculation was limited only to the procedural

---

[50]    R. Fisher Letter to the Court, ECF No. 368. The final damages estimate by the Class's expert is not complete at the time of this filing.  The final damages estimate, however, may exceed Dr. Wickelgren's estimate for evaluating the reasonableness of settlement.

[51]    July 9, 2013 Hearing Tr. at 27.

[52]    The proper calculation of the percentage is to consider the benefit conferred on consumers ($97,119,000) from the settlements in which Class Counsel participated, plus the additional attorneys' fees and expenses ($11,206,000). *See Johnston v. Comerica Mortg. Corp.,* 83 F.3d 241, 246 (8th Cir. 1996) (construing attorney fees as "an aspect of the class' recovery"). *Hess v. Sprint Commc'ns Co. L.P.,* No. 11-cv-00035, 2012 WL 5921149, at *3 (N.D. W. Va. Nov. 26, 2012) ("Under the percentage-of-the-

certified class (approximately 40 percent), Class Counsel's fee request would amount to only 21 percent of the benefit conferred on class members. These percentages do not attempt to account for any impetus the class may have caused for HarperCollins, Hachette, and Simon &Schuster to settle with the States prior to the States filing suit (but at a time when the class case was already pending). Because of the unique nature of the negotiations with the Penguin and Macmillan defendants (coordinated between the State Attorneys General and the class), and to ensure that class members' interests were the sole consideration in negotiations over the consumer funds, the parties agreed they would negotiate costs, attorneys' fees, and payments to the States separately from consumer compensation.[53] The Court has discretion whether to award the requested fees and costs. Under the settlement agreement, any amount this Court does not approve will revert to defendants.[54] The outstanding total recovery to consumers, however, makes clear that Class Counsel's requested percentage is fair and reasonable.

### 3.   The requested fees are consistent with the *Goldberger* factors

No matter which method is chosen, the fees awarded must be "reasonable" and "based on scrutiny of the unique circumstances of each case."[55] A reviewing court should consider the following six factors set forth in *Goldberger* in evaluating what constitutes a reasonable fee: (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation;

---

fund method, it is appropriate to base the percentage on the gross cash benefits available for class members to claim, plus the additional benefits conferred on the class by [defendant's] separate payment of attorney's fees and expenses, and the expenses of administration."); *Dewey v. Volkswagen of Am.*, 728 F. Supp. 2d 546, 591 (D.N.J. 2010), *rev'd on other grounds*, 681 f.3d 170 (3d Cir. 2012).

[53]   Berman Decl., ¶ 26.

[54]   Macmillan Settlement Ag. at 9-10, ECF No. 360-1; Penguin Settlement Ag. at 10, ECF No. 360-2.

[55]   *Goldberger*, 209 F. 3d at 47, 53.

- 15 -

(3) the risk of the litigation; (4) the quality of the representation measured by result; (5) the requested fee in relation to the settlement; and (6) public-policy considerations.[56]

### a.    The time and labor expended by counsel support the requested fee

The time and effort expended by Class Counsel are detailed above (*see supra* at 3-11) and in the declarations submitted by Class Counsel. The lodestar figure of $6,444,358.25, reflecting Hagens Berman's work through September 30, 2013 and Cohen Milstein's work through August 31, 2013, is a necessary result of the scope of that effort. Both firms have undertaken an audit of this time spent to ensure that all time billed to this case was reasonably necessary to effectuate the strategy and work in this case.

### b.    The litigation's magnitude and complexity support the requested fee

The magnitude of this litigation is evident, particularly in the result. The "complexity of federal antitrust law is well known."[57] But here, an additional burden was present. Plaintiffs were required to show not only that the five publishers entered into a horizontal conspiracy, but that Apple, a vertical partner, also joined this conspiracy. The volume of the pleadings filed in this case, the number of depositions, the breadth of document productions, and the complexity of the transactional database all confirm that this was, and is, extraordinarily complex litigation.[58]

### c.    The risks entailed in the litigation support the requested fee

The risks Class Counsel undertook in this case are consistent with the litigation's scope and complexity, and justify a substantial award.

---

[56]    *Id.* at 50.

[57]    *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 510 (E.D.N.Y. 2003), *aff'd*, *Wal-Mart Stores*, 396 F.3d at 96.

[58]    Berman Decl., ¶¶ 10-19.

**(1)      No governmental actions had been filed or appeared likely to be filed when Plaintiffs filed their action**

"[L]itigation risk must be measured as of when the case is filed."[59] As of August 9, 2011, when the civil plaintiffs filed their original complaint, neither the DOJ nor the State Attorneys General had filed their actions, although the State Attorneys General had announced an investigation a year earlier.[60] Plaintiffs' decision to commit the resources to prosecute a case of this magnitude against this backdrop was fraught with risk. The Second Circuit and district courts in this Circuit recognize the lack of previous government action as a key factor in assessing risk in this context.[61] The Class Plaintiffs were fully prepared and committed to litigating this case without governmental assistance at either the state or federal level. And given that no government action had been filed as of August 2011 – more than a year after defendants' switch to agency pricing – Class Plaintiffs did not believe a governmental action was imminent or, for that matter, likely.

**(2)      Class Counsel's resources committed to the case**

Class Counsel collectively committed approximately 14,534 hours of their time and $750,465.44 in expenses without any assurance of compensation. The historical record is full of antitrust class actions in which a court granted summary judgment for defendants, or where defendants prevailed at trial or on appeal.[62]

---

[59]     *Goldberger*, 209 F.3d at 55.

[60]     *See* note 5, *supra*.

[61]     *See, e.g.*, *Wal-Mart*, 396 F.3d at 122; *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 471 (2d Cir. 1974), *abrogated on other grounds by Goldberger*, 209 F.3d 43.

[62]     *See, e.g.*, *Superior Offshore Int'l, Inc. v. Bristow Grp, Inc.*, 490 Fed. Appx. 492 (3d Cir. 2012) (affirming summary judgment for defendants); *J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc.*, 485 F.3d 880 (6th Cir. 2007) (same); *Williamson Oil Co., Inc. v. Philip Morris USA*, 346 F.3d 1287 (11th Cir. 2003) (same); *Blomkest Fertilizer v. Potash Corp. of Saskatchewan*, 203 F.3d 1028 (8th Cir. 2000) (same); *In re Citric Acid Litig.*, 191 F.3d 1090 (9th Cir. 1999) (same); *In re Baby Food Antitrust Litig.*, 166 F.3d 112

- 17 -

The Second Circuit has long recognized that the risk associated with a case undertaken on a contingent basis is an important factor in determining an appropriate fee award:

> No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success. Nor, particularly in complicated cases producing large recoveries, is it just to make a fee depend solely on the reasonable amount of time expended.[63]

Here, the amount of resources committed to this case certainly supports the requested fee award.

### (3)     Risks arising from substantive issues

The standard risks inherent to antitrust class actions magnified the risks unique to this case. Class Plaintiffs litigated motions to dismiss and Penguin's motion to compel arbitration. The Supreme Court's decision in *American Express Co. v. Italian Colors Restaurant*[64] and Penguin's pending appeal before the Second Circuit were certainly risk factors contemplated by the class. Moreover, as was clear during the course of vigorous discovery, the publisher defendants intended to press creative defenses. While plaintiffs viewed this as a traditional price-fixing case, a view borne out by this Court's opinion in the liability phase, defendants consistently sought to portray their conduct as *sui generis* and subject to novel, uncharted analyses. Although plaintiffs were (and are) confident in the outcome of the proceedings, there was risk that defendants could have prevailed on at least some of their arguments.

---

(3d Cir. 1999) (same). *See also In re Carbon Dioxide Indus. Antitrust Litig.*, 229 F.3d 1321 (11th Cir. 2000) (jury verdict against opt-out plaintiffs).

[63]   *Grinnell*, 495 F.2d at 470; *In re Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 433 (S.D.N.Y. 2001).

[64]   133 S. Ct. at 2304.

        **d.**     **The quality of representation supports the requested fee**

        **(1)**     **Quality of Class Counsel**

Both Hagens Berman and Cohen Milstein – have long-standing records of representing plaintiffs in complex cases with an enviable success rate. Hagens Berman is a fifty-five lawyer firm, with offices in New York, Seattle, Washington D.C., Boston, San Francisco, Los Angeles, Phoenix, and Colorado. Since its founding in 1993, Hagens Berman has represented plaintiffs in a broad spectrum of complex, multi-party antitrust cases. Courts throughout the United States have recognized the firm for its ability and experience in handling major complex litigation.[65] The firm has litigated some of the most complex antitrust cases in recent decades, including action as co-lead counsel in *In re Visa Check/Mastercard Antitrust Litig.*, No. 96-cv-05238 (E.D.N.Y.), which settled for over $3 billion in cash and over $20 billion in injunctive relief, making it one of the largest antitrust settlements in history.[66]

Cohen Milstein has been one of the nation's leading plaintiff's class action firms for more than forty years, and is particularly known for its expertise in complex antitrust litigation. Cohen Milstein has been recognized by both courts and leading commentators as one of the top plaintiffs' firms in the nation.[67] The firm has obtained substantial recoveries through settlement or trial in dozens of antitrust cases, including, most recently, winning a $400 million (pre-trebling) jury verdict against Dow Chemical Co. in *In re Urethane Antitrust Litig.*, No. 04-md-

---

[65]    Berman Decl., Ex. 1 (résumé).

[66]    *See also* Application to Appoint Hagens Berman Interim Lead Counsel at 13-14, Dec. 19, 2011, ECF No. 19 (listing Hagens Berman's recent antitrust experience).

[67]    Kit A. Pierson's Declaration in Support of Class Counsel's Motion for Award of Attorneys' Fees, Reimbursement of Expenses, and Participation Awards for Named Plaintiffs ("Pierson Decl."), Ex. 1 (firm résumé); *see also* Application of Cohen Milstein Sellers & Toll PLLC Seeking Appointment to Represent Consolidated Putative Class at 7-11, Dec. 19, 2011, ECF No. 11 (providing additional examples of Cohen Milstein's cases and acclimations, as well as the biographies of its litigation team in this case).

1616 (D. Kan.), on top of $139 million in settlements with other defendants. Additionally, Cohen Milstein has the country's leading practice representing State Attorneys General in affirmative litigation to redress injuries to the states and their citizens, experience that facilitated Class Counsel's working relationship with the State Attorneys  General in this case.[68]

### (2)      Quality of Defendants' Counsel

The quality and zealousness of defense counsel similarly weighs in favor of the requested fee award.[69] Defendants are collectively represented by some of the nation's foremost antitrust practitioners, many (if not all) of whom represented their clients in complex antitrust litigation before this case. And defendants were highly motivated to draw on their vast resources in defending this action. The breadth of issues raised in this case – whether each defendant participated in the conspiracy, whether the Class was subject to an arbitration agreement, how the conspiracy affected the eBook market, whether any of the many arguments made by Apple and other defendants had merit – alone demonstrates the formidable resources facing plaintiffs.

These resources allowed defendants to litigate this matter for however long they believed it was in their interest to do so. Apple, for example, is one of the wealthiest companies in the world and has (and continues to) deployed dozens of attorneys in this matter. Each of the publisher defendants was a subsidiary of a major multinational corporation, including some of

---

[68]      *See* David B. Wilkins, *Rethinking the Public-Private Distinction in Legal Ethics: The Case of 'Substitute' Attorneys General*, 2010 Mich. St. L. Rev. 423, 469-70 (2010) ("The fact that firms such as Cohen Milstein are developing government-representation practices that are largely staffed by former government lawyers . . . should be taken as a hopeful sign.").

[69]      *See In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 246 F.R.D. 156, 174 (S.D.N.Y. 2007) ("'The quality of opposing counsel is also important in evaluating the quality of Class Counsels' work.'"); *In re NASDAQ*, 187 F.R.D. at 489 (awarding counsel 14 percent of $1 billion settlement where defendants' counsel included "the nation's biggest and best defense firms operating on a seemingly unlimited budget over a period of four years").

the largest media conglomerates in the world. It is safe to assume defendants have paid far more in fees to their counsel to defend the claims than Class Counsel seeks in fees.

### e.   The fee request is consistent with the size and scope of the settlement

Contingency fees in cases where class members receive such a large benefit often fall between 20 to 33 percent.[70] Class Counsel's request here equates to about 10 percent of the total recovery to consumers nationwide and is consistent with the settlement's size and the scope. It is also notable that the request is nearly equal to the $10 million in payments sought by the Plaintiff States under the Macmillan and Penguin settlements.[71] In total, the fees, costs and penalties requested by the Plaintiff States and Class Counsel amount to just 18 percent of the plaintiffs' recovery, well below the low end of typical awards.

### f.   Public policy considerations support the requested fee

Only a small number of firms have the expertise, resources, and inclination to lead the prosecution of cases such as this one, as the overwhelming majority of firms with the expertise and resources lack the inclination due to their defense orientation. And the number of those plaintiffs' firms who have proven their willingness and ability to carry such a case through trial

---

[70]   *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467 (S.D.N.Y. 2009) (awarding 33.3 percent); *In re Air Cargo Shipping Servs. Antitrust Litig.*, MDL No. 1775, 2009 WL 3077396 (E.D.N.Y Sept. 25, 2009) (awarding approximately 25 percent); *In re Freddie Mac Sec. Litig.,* No. 03-CV-4261 (JES), slip. op. at 1 (S.D.N.Y. Oct. 27, 2006) (awarding 20 percent). *See also In re Countrywide Fin. Corp. Customer Data Security Breach Litig*, No. 08-MD-01998, 2010 WL 3341200, at *9 (W.D. Ky. Aug. 23, 2010) ("[T]he ordinary range for attorney's fees [has been] between 20-30%."); *In re The Mills Corp. Secs. Litig*., 265 F.R.D. 246, 264 (E.D. Va. 2009) (collecting cases within Fourth Circuit and in other courts with fees of 18-33.3%); *Loudermilk Servs., Inc. v. Marathon Petroleum Co. LLC*, 623 F. Supp. 2d 713, 723-24 (S.D. W. Va. 2009) (summarizing studies finding median awards of between 20 and 30%); *Muhammad v. Nat'l City Mortg. Inc*., No. 07-cv-0423, 2008 WL 5377783, at *9 (S.D. W. Va. Dec. 19, 2008) (collecting cases within Fourth Circuit with fees of 25-35%).

[71]   Penguin Settlement Ag. at 9, ECF No. 360-2 (allowing for $7 million to be paid to the Plaintiff States for the costs of investigation and litigation); Macmillan Settlement Ag. at 9, ECF No. 360-1 (allowing for $3 million to be paid to the Plaintiff States for the costs of investigation and litigation).

is even smaller yet.[72] As this Court has recognized in other cases, undertaking representation on a fully contingent basis is a risk and effort that deserves to be awarded appropriately.[73]

### 4.    The requested fee is presumptively reasonable in light of counsel's lodestar

Class Counsel's current total lodestar in this case is $6,444,358.25. The requested award of $10,455,534.56 represents a 1.62 multiplier. In part, this multiplier reflects Class Counsel's efficiency in coordinating their efforts both between firms and with the various governmental participants. "The level of risk associated with litigation . . . is perhaps the foremost factor to be considered in assessing the propriety of a multiplier."[74] The risk undertaken by Class Counsel in this case was at the highest level by virtue of their large investments of time and money as well as the case's unique and formidable issues. Class Counsel's request – which seeks a multiple of approximately 1.62 times the lodestar – falls within any range that might govern it.[75]

Class Counsel's hourly rates are also reasonable. The proposed rate of compensation for paralegals falls within $240 to $255; associates fall within a range of $350 to $480; and partners fall within a range of $515 to $900.[76] These rates are consistent with other awards in this

---

[72]    *See In re WorldCom, Inc. Secs. Litig.*, 388 F. Supp. 2d 319, 359 (S.D.N.Y. 2005) ("*In re WorldCom I*") ("[i]n order to attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so, it is necessary to provide appropriate financial incentives").

[73]    *In re WorldCom, Inc. Secs. Litig.*, No. 02 Civ. 3288, 2004 U.S. Dist. LEXIS 22992, at *73 (S.D.N.Y. Nov. 12, 2004).

[74]    *McDaniel v. Cnty. of Schenectady*, 595 F.3d  411, 424 (2d. Cir. 2010).

[75]    *Wal-Mart Stores*, 396 F.3d at 96 (finding 3.5 multiplier reasonable); *Beckman v. KeyBank, N.A.*, No. 12 Civ. 7836, 2013 U.S. Dist. LEXIS 60894, at *38 (S.D.N.Y. Apr. 29, 2013) (allowing 6.3 multiplier); *Ramirez v. Lovin' Oven Catering Suffolk, Inc.*, No. 11 Civ. 0520, 2012 U.S. Dist. LEXIS 25060, at *4 (S.D.N.Y. Feb. 24, 2012) (granting attorneys' fees equal to 6.8 times lodestar); *In re Enron Corp. Secs., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732, 803 (S.D. Tex. 2008) ("a multiplier of 5.2 is warranted, given the unmatched size of the [$7.2 billion] recovery, the obstacles and risks faced by [counsel] from the beginning, and the skill and commitment exhibited by counsel"); *In re NASDAQ*, 187 F.R.D. at 489 ("multipliers of between 3 and 4.5 have become common").

[76]    Berman Decl., ¶ 31; Pierson Decl., ¶ 7.

District.[77] Courts "should generally use the hourly rates employed in the district in which the reviewing court sits in calculating the presumptively reasonable fee."[78]

**B.      Class Counsel's Expenses Are Reasonable**

Class Counsel requests reimbursement for $750,465.44 in expenses.[79] Over half of this ($407,581.10) represents compensation to the class's experts. Class Counsel maintained substantial incentives to control out-of-pocket expenses in this case due to the high risk they would not be reimbursed and the near certainty that many years would pass before Class Counsel could recoup the expenses.

Courts in the Second Circuit normally grant expense requests in common fund cases as a matter of course – even where, as here, the action continues against other defendants.[80] All of the expenses for which Class Counsel requests reimbursement here are of the type normally incurred in a complex action (expert-witness costs, deposition reporters and transcripts, copying, travel, research, court filings) and are appropriate for reimbursement here.[81]

---

[77]      One source commonly used by Courts in this Circuit is the National Law Journal Survey to determine the fairness of fee rates. *See, e.g., Williamsburg Fair Hous. Comm. v. N.Y. City Hous. Auth*., No. 76 Civ. 2125, 2005 U.S. Dist. LEXIS 5200, at *35 (S.D.N.Y. Apr. 4, 2005) (observing that "a recent billing survey made by the National Law Journal shows that senior partners in New York City charge as much as $ 750 per hour and junior partners charge as much as $ 490 per hour"). The most recent National Law Journal survey for 2012 shows that partners at New York firms charge between $330 to $1200 and associates range between $215 to $760. Berman Ex. B (2012 National Law Journal survey).

[78]      *Brennan v. N.Y. Law Sch*., No. 10 Civ. 0338, 2012 U.S. Dist. LEXIS 135095, at *13 (S.D.N.Y. Aug. 15, 2012).

[79]      Berman Decl., ¶¶ 33-34; Pierson Decl., ¶ 10.

[80]      *In re Vitamin C Antitrust Litig*., No. 06-MD-1738, 2012 U.S. Dist. LEXIS 152275, at *33 (E.D.N.Y. Oct. 22, 2012). *See also In re Towers Fin. Corp. Noteholders Litig.,* No. 93 Civ. 0810, 1996 U.S. Dist. LEXIS 2311, at *6 (S.D.N.Y. Jan. 17, 1996) ("[r]egardless of what happens in the balance of the litigation, counsel's efforts have benefitted the class, and there is no reason that part of counsel's expenses should not be reimbursed now").

[81]      *Vitamin C Antitrust Litig*., 2012 U.S. Dist. LEXIS 152275, at *34-*35.

- 23 -

C.    **The Named Representatives' Active Involvement in This Case Deserves Recognition Through the Proposed Participation Awards**

Plaintiffs request that the Court approve participation awards for twenty class representatives. In the Second Circuit, "Courts have, with some frequency, held that a successful Class action plaintiff, may . . . apply for and, in the discretion of the Court, receive an additional award."[82] Such an award is meant to compensate the named plaintiffs for the risk incurred and the "additional effort expended by the individual for the benefit of the lawsuit."[83] The participation awards requested here are modest compared with awards in other cases.[84]

Defendants Penguin and Macmillan have each agreed to pay up to $1,000, for a total of $2,000 to recognize the class representatives' service to the class.[85] Plaintiffs request individualized awards between $396 and $2,000 tailored to each class representative's efforts on behalf of the class. Each class representative seeking an award submits a declaration with this motion detailing the time spent assisting in litigating this case.[86] The representatives in this case have been active and engaged throughout the litigation. Before filing the complaint, class representatives aided counsel in gathering evidence to file the pleadings. During the litigation, the representatives submitted declarations, responded to written discovery, produced records and

---

[82]    *Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 200 (S.D.N.Y. 1997).

[83]    *Dornberger v. Metro. Life Ins. Co.*, 203 F.R.D. 118, 124 (S.D.N.Y. 2001).

[84]    *See, e.g.*, *In re Currency Conversion Fee Antitrust Litig.*, No. 04 Civ. 5723, 2012 U.S. Dist. LEXIS 123875, at *8 (S.D.N.Y. Aug. 22, 2012) (approving participation awards of $5000 and $2500 respectively for the two class representatives); *McAnaney v. Astoria Fin. Corp.*, No. 04-CV-1101, 2011 U.S. Dist. LEXIS 114768, at *33 (E.D.N.Y. Feb. 11, 2011) (approving participation awards of $7500 for the two class representatives); *Park v. The Thomson Corp.*, No. 05 Civ. 2931, 2008 U.S. Dist. LEXIS 84551 (S.D.N.Y. Oct. 22, 2008) (approving a $5000 participation award); *In re Buspirone Antitrust Litig.*, MDL No. 1413, 2003 U.S. Dist. LEXIS 26538 (S.D.N.Y. Apr. 17, 2003) (approving $25,000 participation award).

[85]    Penguin Settlement Ag., IV.D at 10, ECF No. 360-2; MacMillan Settlement Ag., IV.D at 10, ECF No. 360-1.

[86]    Berman Decl., Exs. 2-22.

maintained regular communication with Class Counsel. The class representatives also participated in the settlement negotiations in this action.

Furthermore, the class representatives zealously upheld their fiduciary duty to the absent class members, and there is no indication the participation awards requested are the product of bad faith or collusion. Indeed, relief for the class was agreed upon before determining the participation awards for named plaintiffs, preventing any conflict of interest with the class.[87] The awards requested are appropriate in light of the time and effort expended and the risk undertaken to vindicate the rights of absent class members.

## IV.    CONCLUSION

When Class Counsel filed this case, it was willing to undertake the entire burden of this risky litigation alone. Once joined with the DOJ and the State Attorneys General from thirty-three states, Class Counsel has worked efficiently to litigate this conspiracy against six sophisticated defendants. The class and the State Attorneys General now seek final approval of settlements that offer over $97 million in consumer compensation nationwide. With these settlements, Class Counsel requests attorneys' fees in the amount of $10,455,534.56, reimbursement of expenses in the amount of $750,465.44 and incentive awards for the class representative in amounts ranging from $396 and $2,000. These amounts are fair and reasonable, given the excellent recovery in this case.

DATED: October 7, 2013                     HAGENS BERMAN SOBOL SHAPIRO LLP


                                           By ____/s/ Steve W. Berman_____
                                                STEVE W. BERMAN

---

[87]    Berman Decl., ¶ 26.

George W. Sampson (GS-8973)
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
george@hbsslaw.com

Jeff D. Friedman (173886) (*Pro Hac Vice*)
Shana Scarlett (217895) (*Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
jefff@hbsslaw.com
shanas@hbsslaw.com

Kit A. Pierson (*Pro Hac Vice*)
Jeffrey Dubner (JD4545)
COHEN, MILSTEIN, SELLERS & TOLL, PLLC
1100 New York Avenue, N.W.
South Tower, Suite 500
Washington, D.C. 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
KPierson@cohenmilstein.com
jdubner@cohenmilstein.com

Douglas Richards (JR6038)
COHEN, MILSTEIN, SELLERS & TOLL, PLLC
88 Pine Street, 14th Floor
New York, NY 10005
Telephone: (212) 838-7797
Facsimile: (212) 838-774
DRichards@cohenmilstein.com

*Co-Lead Counsel for the Class*

## CERTIFICATE OF SERVICE

I hereby certify that on October 7, 2013, I electronically filed the foregoing document using the CM/ECF system which will send notification of such filing to the e-mail addresses registered in the CM/ECF system, as denoted on the Electronic Mail Notice List, and I hereby certify that I have caused to be mailed a paper copy of the foregoing document via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice List generated by the CM/ECF system.

/s/ Steve W. Berman
STEVE W. BERMAN

- 27 -

010260-11  637986 V1