**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: ELECTRONIC BOOKS ANTITRUST LITIGATION | Civil Action No.: 1:11-md-02293 (DLC) |

**NOTICE OF INTENTION TO APPEAR IN OPPOSITION TO THE SETTLEMENT**
**AND STATEMENT IN SUPPORT OF DISMISSAL WITH PREJUDICE**
**OF THIS ACTION**

**BY ELIGIBLE CONSUMER BOB KOHN**

# TABLE OF CONTENTS

I.   NOTICE ................................................................................................................. 1

II.  ELIGIBILTY ........................................................................................................ 1

III. STATEMENT ........................................................................................................ 2

   A.  Introduction ................................................................................... 2

   B.  Standard of Review ......................................................................... 8

   C.  The Settlement can be Neither Fair nor Reasonable ........................................ 10

IV. CONCLUSION ..................................................................................................... 26

EXHIBIT A

# TABLE OF AUTHORITIES

## CASES

*Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227 (1983) ........................................................12, 15

*Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1 (1979) ......................................4

*Broadcast Music, Inc. v. Moor-Law, Inc.*, 527 F.Supp. 758 (D. Del. 1981) ...........................................21

*Brook Group v. Brown and Williamson Tobacco Corp.*, 509 U.S. 209 (1993) ..............................15, 16, 18

*Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717 (1988) ......................................3, 6

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974) ..................................................................2

*D'Amato v Deutsch Bank*, 236 F. 3d 78 (2nd Cir. 2001) ...........................................................................8

*FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447 (1986) .................................................................. passim

*Leegin Creative Leather Products, Inc. v. PSKS, Inc*, 551 U.S. 877 (2007) ........................................3, 4

*NCAA v. Board of Regents*, 468 U.S. 85 (1984) .........................................................................................5

*Northeastern Telephone Co. v. American Tel. & Tel. Co.*, 651 F.2d 76 (2d. Cir. 1981) ..........................16

*Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968) ...8

*Safeway Stores, Inc. v. Oklahoma Retail Grocers Ass'n, Inc.*, 360 U.S. 334 (1959)................................14

*Starr v. Sony BMG Music Entm't*, 592 F.3d 314 (2010) .............................................................................4

*Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001) ..................................................................................20

*United States v. Bleznak*, 153 F.3d 16 (2d Cir. 1998) ..............................................................................13

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966) ..........................................................8, 9, 18, 25

*United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940) ................................................................7

*Weinberger v. Kendrick*, 698 F.2d 61 (2d Cir. 1982) ..........................................................................8, 10

*Young v. Katz*, 447 F.2d 431 (5th Cir. 1971) ..............................................................................................9

## OTHER AUTHORITIES

Antitrust Guidelines for the Licensing of Intellectual Property (DOJ/FTC 1995).....................................5

Horizontal Merger Guidelines (DOJ/FTC 2010) .......................................................................................20

## RULES

Federal Rule of Civil Procedure 23(e) ........................................................................................................8

## TREATISES & ARTICLES

Christopher R. Leshe, *Achieving Efficiency Through Collusion: A Market Failure Defense to Horizontal Price Fixing*, 81 California Law Rev. 243 ........................................................................................5

Doreen Carvajal, *Small Publishers Feel Power of Amazon's Buy Button*, NEW YORK TIMES (June 16, 2008) ..........20

Gary L. Reback, *Free Market: Why Only Government Can Keep the Marketplace Competitive* (Portfolio, 2009).......3

John Cirace, *CBS v. ASCAP: An Economic Analysis of a Political Problem*, 47 Fordham L. Rev. 277, 293-94 (1978-79) ......................................................................................................................21

Philip E. Areeda & Donald F. Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act*, 88 Harv. L. Rev. 697 (1975) ........................................................................................16, 21

R.G. Lipesy & Kevin Lancaster, *The General Theory of Second Best*, 24 Rev. Econ. Stud. 11 (1956-57) .................5

Richard S. Wirtz, *Rethinking Price-Fixing*, 20 Indiana L. Rev. 531 (1987)..................................................5

Satariano & Kucera, "Amazon Seen Gaining Advantage With Apple's Defeat," *Bloomberg* (July 11, 2013)..............24

Streitfeld, "E-Book Ruling Gives Amazon an Advantage," *New York Times* (July 10, 2013) .......................................24

## COURT DOCUMENTS

*Amicus Curiae* Brief of Bob Kohn (Proposed), 12-cv-2826, ECF#97, 97-1 ....................................................2, 20, 21

*Amicus Curiae* Brief of Bob Kohn on Penguin Settlement  12-cv-2826, ECF#214-2.................................................2

*Amicus Curiae* Brief of Bob Kohn, 12-cv-2826, ECF#110.................................................................................2

Complaint 12-cv-2826, ECF#1......................................................................................................................12

Final Judgment, 9/6/13, 12-cv-2826, ECF#374.............................................................................................8

Government Response to Penguin Settlement, 12-cv-2826, ECF#201 .............................................................17

Government's Response to Comments 12-cv-2826, ECF#81 ............................................................................5

Opinion & Order 5/12/12, 11-md-2293, ECF#156........................................................................................4

Opinion & Order 7/10/13, 12-cv-2826 ECF#326 ..............................................................................2, 4, 10, 14

Opinion & Order, 5/15/12, 11:md-02293, ECF#156......................................................................................26

Order Preliminarily Approving Macmillan & Penguin Settlements (11-md-2293, ECF #373, 373-1 .........................1

## PUBLIC COMMENTS

Comments of Author's Guild, 12-cv-2826, ATC-0214....................................................................................20

Kohn Comments on Tunney Act Settlement with Hachette/HarperCollins/Simon & Schuster (May 30, 2012) ..........2

Kohn Comments on Tunney Act Settlement with Macmillan 12-cv-2826, ECF#261-1 ...........................................2

Kohn Comments on Tunney Act Settlement with Penguin 12-cv-2826 ECF#201-1 .................................................2

## OTHER DOCUMENTS

*Kindle Direct Publishing Agreement, Pricing Page* (as of July 28, 2012) .................................................12

# I.    NOTICE

Pursuant to the District Court's order in this action dated August 6, 2013 (Order Preliminarily Approving Macmillan & Penguin Settlements (11-md-2293, ECF #373, 373-1), Bob Kohn hereby provides—to the Clerk of this District Court, with a copy to the Claims Administrator by mail at E-Books AG Settlements Objections, P.O. Box 2825, Faribault, MN 55021-8630— notice of his intention to appear in this action in opposition to the Settlement, including entry of proposed final judgment, with all defendants who are signatory to the Settlement, including but not limited to Macmillan, Inc., Macmillan Publishers, Inc., Verlagsgruppe Georg Von Holtzbrink GmbH and Holtzbrink Publishers, LLC d/b/a/ Macmillan (individually and collectively, "Macmillan Defendants") and with Defendants The Penguin Group, A Division Of Pearson Plc and Penguin Group (USA), Inc. (collectively, "Penguin" Defendants) and for the dismissal with prejudice of this action in its entirety as to all defendants ("Defendants"). Kohn hereby requests an opportunity to be heard at the hearing set for this matter at 3:00pm on December 6, 2013.[1]

# II.    ELIGIBILTY

Kohn is an eligible Consumer, having received on August 31, 2012 a notice of the Settlement from Amazon.com, a copy of which is attached as Exhibit A hereto, indicating that he is a member of the class set forth in the Order (11-md-2293, ECF#373, 373-1). Kohn has not previously filed a request for exclusion from the Settlement. He files this timely notice of intention to appear and statement in favor of dismissal of this action pursuant to ¶20 of such Order.

---

[1] Kohn also requests an opportunity to develop on the record any additional facts that may be necessary or appropriate to show that Amazon was engaging in below marginal cost pricing prior to April, 2010, that such pricing harmed consumer welfare, and that Defendants' conduct which lead to Amazon's adoption of agency pricing in April, 2010 had a counter-veiling, pro-competitive economic consequence which benefited the Consumers and the public generally—all of which facts go the propriety of the Settlement.

# III.    STATEMENT

## A.    Introduction

This Court made a fundamental error of law when it ruled that an examination into Amazon's e-book pricing practices prior to April, 2010 was not relevant to the Court's inquiry in this case and its related actions. See, for example, Opinion & Order 7/10/13, 12-cv-2826 ECF#326 at 157 (declaring that this litigation was not "the occasion" to decide whether Amazon's below marginal cost pricing practices "may be a defense to the claims litigated"). By excluding consideration of Amazon's below marginal cost pricing, this Court deliberately precluded the essential inquiry it must necessarily make—to comply with U.S. Supreme Court mandate and the law of this Circuit—in reaching its decision on the Settlement at hand. Without such an inquiry, this Court does not have sufficient facts concerning the claims or possible defenses in order to intelligently approve the Settlement.

"The rule in [the Second] Circuit provides that an approval of a class action settlement offer by a lower court must be overturned if that court acted 'without [knowledge of] sufficient facts concerning the claim' *or* 'if it failed to allow objectors to develop on the record facts going to the propriety of the settlement." *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 (2d Cir. 1974). As explained below (and repeatedly in comment letters and *amicus curiae* briefs filed in the related Tunney Act proceedings by this Objector[2]), the question whether Defendants' alleged conduct was "unlawful" has always hinged upon the economic consequence of Defendants'

---

[2] Kohn Comments on Tunney Act Settlement with Hachette/HarperCollins/Simon & Schuster (May 30, 2012) (http://www.justice.gov/atr/cases/apple/comments/atc-0143.pdf); *Amicus Curiae* Brief of Bob Kohn (Proposed), 12-cv-2826, ECF#97, 97-1; *Amicus Curiae* Brief of Bob Kohn, 12-cv-2826, ECF#110; Kohn Comments on Tunney Act Settlement with Penguin 12-cv-2826 ECF#201-1; *Amicus Curiae* Brief of Bob Kohn on Penguin Settlement  12-cv-2826, ECF#214-2; Kohn Comments on Tunney Act Settlement with Macmillan 12-cv-2826, ECF#261-1.

conduct and whether such conduct, which ended Amazon's below marginal cost pricing of e-books, enhanced consumer welfare.

The Supreme Court, in a pivotal decision, established the appropriate lens through which antitrust inquiry must made: in determining whether conduct amounts to a restraint of trade in contravention of the Sherman Act, the courts must look "not to a particular list of agreements, but to a particular *economic consequence* which may be produced by quite different sorts of agreements in varying times and circumstances." *Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 731 (1988) (emphasis added).

The high court did not limit its holding to a particular species of antitrust violation. It applies to *horizontal* restraints as well as it does vertical restraints. In *Leegin Creative Leather Products, Inc. v. PSKS, Inc,* 551 U.S. 877 (2007), the high court ruled that a manufacturer's attempt to stop price discounting at the retail level was no longer a *per se* violation of antitrust laws. Writing for the majority, Justice Kennedy made it clear that consumer welfare could be enhanced by restraints of trade that lead to higher prices. *Leegin* at 5 (The rule of reason "distinguishes between restraints with anticompetitive effect that are harmful to the consumer and restraints that are in the consumer's best interest)." In other words, the inquiry does not stop with a finding of higher prices; it goes on to determine whether those higher prices harm consumer welfare.

As Justice Scalia observed during the hearing in *Leegin*:

> "Is the sole object of the Sherman Act to produce low prices?...I thought it was consumer welfare....So the mere fact that it would increase prices doesn't prove anything."[3]

---

[3] See, Comments of Bob Kohn (May 30, 2012) 12-cv-2826, ATC-0143 at 10; Gary L. Reback, *Free Market: Why Only Government Can Keep the Marketplace Competitive* (Portfolio, 2009).

Higher prices do not prove anything, even in an inquiry involving horizontal price fixing. *Leegin* does not support this Court's view—expressed in its Order of 5/12/12[4], Order of 9/6/12[5] and Order of 7/10/13[6]—that facts alleging a "straight-forward, horizontal pricing fixing conspiracy" would always constitute a *per se* violation or would "*necessarily* be a violation under the rule of reason." Justice Kennedy, writing for the majority in *Leegin*, only stated that "Restraints that are *per se* unlawful ***include*** horizontal agreements among competitors to fix prices." *Leegin* at 6 (emphasis added). Justice Kennedy was careful to add that resort to the *per se* rule is confined to restraints "that would ***always*** tend to restrict competition and decrease output." Id (emphasis added). The Second Circuit is in accord. *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 329 n4 (2010) ("Price-fixing agreements between competitors are generally *per se* unlawful" [emphasis added: *generally, but not always*]).

In his discussion of horizontal price restraints, Justice Kennedy went on to cite several cases involving horizontal restraints that could be sustained under the rule of reason—including a case of "literal" price fixing (e.g., *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1 (1979). *Leegin* at 6. In *Broadcast Music*, music publishers conspired to fix minimum prices for licenses for the performance of music on network television. In ruling in favor of the publishers, the Supreme Court declared that the question of antitrust liability in horizontal price fixing cases is "not simply a question of whether two or more potential competitors have literally 'fixed' a 'price…'"). Id at 9. In so ruling, the Supreme Court held for the first time that *not all horizontal price fixing will constitute a* per se *violation*.[7]

---

[4] Opinion & Order 5/12/12, 11-md-2293, ECF#156 at 27, 35, 53, 54.
[5] Opinion & Order 9/6/12, 12-cv-2826, ECF#113 at 18, 27.
[6] Opinion & Order 7/10/13, 12-cv-2826, ECF#326 at 107 and 153.
[7] The courts of the 2nd Circuit ultimately ruled in that case that the music publisher's literal price fixing conspiracy did not constitute a violation of the Sherman Act *at all*.

"The Court of Appeals' literal approach does not along establish that this particular practice is one of those types that is 'plainly anticompetitive' and very likely without 'redeeming virtue.' Literalness is overly simplistic and often overbroad." Id.

This principle was reaffirmed and extended by the Supreme Court when it ruled that collusive conduct will be sustained under the rule of reason where there is a "countervailing procompetitive virtue—such as for example, the creation of efficiencies in the operation of a market or the provision of goods and services." *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 459 (1986) (citing *Broadcast Music*). See also, Antitrust IP Guidelines[8] at §3.4 (The Government "will assess whether the restraint in question can be expected to contribute to an efficiency-enhancing integration of economic activity," citing *Broadcast Music*, 441 U.S. at 16-24).[9]

In the Government's Response to Comments (12-cv-2826, ECF#81), the Government cited *Indiana Fed'n of Dentists*, 476 U.S. at 465, for the proposition that a competitor may not "take the law into its own hands." The citation was inapt, because the conduct at issue in that case was not aimed at addressing a market failure in the antitrust context. The unlawful practice at issue in *Indiana Fed'n of Dentists* was a violation of an Indiana statute prohibiting the unauthorized practice of dentistry. The Supreme Court held (476 U.S. at 465) that responding to the unauthorized

---

[8] The antitrust policy of the United States with respect to copyrighted works, including e-books, is set forth in Antitrust Guidelines for the Licensing of Intellectual Property (DOJ/FTC 1995) ("Antitrust IP Guidelines").

[9] The Supreme Court reiterated this principal in *NCAA v. Board of Regents*, 468 U.S. 85 (1984), when seven Justices declared a horizontal agreement on the price of college football television rights unlawful under the rule of reason, expressly declining to condemn it under the *per se* rule. See also, *Indiana Fed'n of Dentists*, 476 U.S. 458-59 ("We have been slow to…extend *per se* analysis to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious," citing as examples *Broadcast Music* and *NCAA*). See generally, Richard S. Wirtz, *Rethinking Price-Fixing*, 20 Indiana L. Rev. 531, 627 (1987) ("After *Broadcast Music* and *NCAA*, the question is not whether exceptions to the general prohibition against agreements among competitors will be recognized, but rather when. Potentially pro-competitive collaboration among competitors is to be encouraged, within limits, even if it involves agreement on prices"); R.G. Lipesy & Kevin Lancaster, *The General Theory of Second Best*, 24 Rev. Econ. Stud. 11 (1956-57) ("The distorting effect of overconsumption could be made worse if, in cases of horizontal price fixing, antitrust laws are used to decrease prices"); Christopher R. Leshe, *Achieving Efficiency Through Collusion: A Market Failure Defense to Horizontal Price Fixing*, 81 California Law Rev. 243, 270.[9]

practice of medicine is a not a sufficient justification for collusion, but in the same opinion (476 U.S. at 459) the high court reiterated its holding in *Broadcast Music* that "literal" collusive price-fixing conduct would be sustained under the rule of reason where such conduct has a "countervailing pro-competitive virtue" such as, for example, where such conduct will create "efficiencies in the operation of a market." This is precisely what Defendants' conduct was aimed at when they sought to eliminate Amazon's market-inefficient below marginal cost selling of e-books.

Likewise, when this Court raised the familiar mantra about "two wrongs" not making a right (Opinion & Order 9/6/12, 12-cv-2026 ECF#113 at 40), it betrayed a fundamental misunderstanding of this clear Supreme Court mandate to consider the economic consequence of the alleged collusive conduct—in this case, the counter-veiling procompetitive consequences of Defendants' conduct in response to Amazon's economically inefficient below marginal cost pricing of e-books.

It is thus abundantly clear, under Supreme Court authority (as well as the Government's own Antitrust Guidelines), that the inquiry in a horizontal price fixing case goes beyond simply a finding of higher prices. The Court must also examine the *economic consequence* of the price increase. *Business Electronics* at 731. Specifically, whether the restraint is otherwise "pro-competitive" or contributes to the "creation of efficiencies in the operation of a market or the provision of goods and services." *Indiana Fed'n of Dentists,* 476 U.S. at 459 (citing *Broadcast Music*).

It is undisputed that the entire thrust of Defendants' conduct in this case was to address the inefficiencies and misallocation of resources created by Amazon's below marginal cost pricing of e-books prior to April, 2010. Yet, instead of making the essential inquiry into whether Amazon's

pricing harmed consumer welfare and whether higher e-book prices after April, 2010 restored efficiency to the market, this Court rejected all attempts by the parties and the public to engage the Court in such an inquiry. Instead, this Court, citing only a 1940 Supreme Court case[10] for support, ruled that, "even if Amazon <u>was</u> engaged in predatory pricing, this is no excuse for unlawful price fixing." Opinion & Order 9/6/12, 12-cv-2026 ECF#113 at 40 (emphasis in the original). See also, Opinion & Order 7/10/13, 12-cv-2826 ECF#326 at 157 (Citing no authority, the Court repeated its refusal to inquire into the market efficiencies of the increase in e-book prices in April, 2010 and the counter-veiling, beneficial effect of Defendants' conduct on consumer welfare).

This statement will attempt to describe the essential inquiry this Court repeatedly refused to make. It will explain why the Court's explanation for the rise in e-book prices could not, as a matter of law, be correct and why it was wrong for the Court to simply assume that the higher e-books prices after April, 2012 harmed consumers. On the contrary, such higher prices, as a matter of law, could only have benefited consumers. In other words, if Amazon <u>was</u> engaged in predatory pricing, Defendants' conduct could not have contravened the Sherman Act."

This Statement, therefore, will explain why the proposed entry of judgment in this action, the action itself—and, indeed, all the related actions in this matter, including the decisions of this Court approving the judgments under the Tunney Act—have had, and shall have, a detrimental impact upon competition in the trade e-book market and upon the public generally, and in particular, the Consumers such proposed Settlement intends to benefit. It will show, as this Objector has repeatedly pointed out as *amicus curiae* (and attempted intervener) in the related Tunney Act proceedings, how the proposed injunctive relief in the Settlement, by restricting Defendant Publishers' use of the agency agreements to thwart Amazon's below marginal cost

---

[10] *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940).

discounting of e-books, will only compound the economic harm to members of the class and the public generally.[11] A Settlement that, as a matter of law, harms the Consumer members of the class far more than any slight monetary distribution they may expect to receive under its terms, and which harms the public generally, cannot be fair, reasonable, or adequate. Entry of the proposed Settlement should be denied, and this action should be dismissed as to all defendants.

### B.     Standard of Review

Under Federal Rule of Civil Procedure 23(e), a class action cannot be settled without a finding by the District Court that the settlement is fair, reasonable, and adequate. *D'Amato v Deutsch Bank*, 236 F. 3d 78, 85 (2nd Cir. 2001). The District Court "must carefully scrutinize the settlement to ensure its adequacy, fairness and reasonableness." Id. Courts analyze a settlement's fairness, reasonableness and adequacy with reference to both the procedural process leading up to the settlement and settlement's substantive terms. Id. The Court may not engage in a mere "rubber stamp approval" of the settlement. Id. (citing, *Grinnell Corp.*, 495 F.2d at 462. Rather, the court must engage in an "independent evaluation." [12] Id.

In *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982), Judge Friendly wrote, "The primary concern is with the substantive terms of the settlement: 'Basic to this…is the need to compare the terms of the compromise with the likely rewards of litigation'." (citing and quoting *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25 (1968)). To make this evaluation, the courts have followed several factors,

---

[11] This Court's permanent injunction against Apple (Final Judgment, 9/6/13, 12-cv-2826, ECF#374) would exacerbate the harm to consumers and members of this class by effectively extending the existing restrictions on Defendant Publishers' agency agreements (and Amazon's below marginal cost discounting) for an additional three years.

[12] Given that the thrust of this Objection is that the Court made a fundamental error in applying antitrust doctrine in this matter, this Court is urged to consider whether it can engage in a truly "independent evaluation" of this Settlement.

enumerated initially in *Grinnell Corp.*, 495 F.2d at 463: (1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through trial, (7) the ability of defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

But none of these factors could be "intelligently" evaluated by the Court without "sufficient facts concerning the claim." *Grinnell* at 462. When considering a settlement, a District Court "must give comprehensive consideration to *all relevant factors*." Id. (emphasis added). The Court is not only "called upon to consider and weigh the nature of the claim," but also "*the possible defenses*." Id. At 462 (citing, *Young v. Katz*, 447 F.2d 431, 433 (5th Cir. 1971) (emphasis added).

This Court presided over this litigation through a full trial on the merits of the claims. Yet, in doing so, it precluded all attempts of the Defendants' to develop on the record facts regarding not only a "possible defense," but the quintessential defense to the price fixing claims—perhaps the only legal defense the Defendants' had: that the higher prices resulting from Defendants' conduct had a pro-competitive, counter-veiling beneficial effect upon consumer welfare by virtue of the efficiencies such conduct created in the operation of the e-book market. These facts concerning "the possible defenses" go straight "to the propriety of the settlement." Id. Without them, the Court cannot intelligently rule on its propriety.

C.  **The Settlement can be Neither Fair nor Reasonable**

1.  **This Court Does Not Have Before It Sufficient Facts Intelligently To Approve the Settlement**

This Court was wrong to repeatedly declare that this litigation was not "the occasion" to decide whether Amazon's below marginal cost pricing practices "may be a defense to the claims litigated at this trial." See, for example, Opinion & Order 7/10/13, 12-cv-2826 ECF#326 at 157. By the same token, this Court was wrong to declare that "even if Amazon <u>was</u> engaged in predatory pricing, this is no excuse for unlawful price fixing" (Opinion & Order 9/6/12, 12-cv-2026 ECF#113 at 40 (emphasis in the original). The question whether Defendants' alleged conduct was "unlawful" has always hinged upon the *economic consequence* of Amazon's pricing practices and the effect on consumer welfare arising from Defendants' action to reverse Amazon's below marginal cost pricing. The Supreme Court has made it clear that even "literal" price fixing may not be unlawful under the rule of reason if such conduct had a counter-veiling, procompetitive economic consequence. *Indiana Fed'n of Dentists,* 476 U.S. at 459 (citing *Broadcast Music*).

By refusing even consider how Amazon's below marginal cost pricing practices "may be a defense to the claims litigated," the Court "does not have before it sufficient facts intelligently to approve the settlement." See, *Grinnell* at 463.

On the contrary, if the Court has erred in precluding consideration of the Amazon's below marginal cost pricing as a possible defense to Defendants' conduct, then the Settlement must be rejected. If the rise in e-book prices in April, 2010 benefited rather than harmed the Consumers and the public generally, as Objector herein contents, then the likely rewards of this litigation fall to zero. The only conceivable benefit of the Settlement that might remain is the avoidance of the costs of litigation. While that may be a "weighty justification" for settlement (*Weinberger* at 73), it does not outweigh, in this case, the heavy irreparable damage that the Settlement would have on

10

the trade e-book market, the Consumer members of the class, other buyers of e-books, and the authors, publishers, and resellers of those e-books. Yet, even prospective litigation costs drop to zero if the Complaint in this action is dismissed with prejudice for failure to state a cause of action or, in the alternative, dismissed upon summary judgment, as it should be.

### 2. Amazon's Pricing Practices Prior to April, 2010 is Relevant to Determining Whether the Settlement is Fair and Reasonable

The essential inquiry necessary to resolve this case in accordance with modern antitrust doctrine is: If the Defendants' conduct resulted in an increase in e-book prices in April, 2010, what was the economic consequence of such increase? The mere fact that Defendants' conduct resulted in higher prices *doesn't prove anything*. If the higher prices had "countervailing procompetitive virtue—such as for example, the creation of efficiencies in the operation of a market or the provision of goods and services," then Defendants' conduct could not have violated of the Sherman Act. *Indiana Fed'n of Dentists*, 476 U.S. 447, 459.

For a pro-competitive virtue, this Court need not go further than its own finding of fact: that it was undisputed that Amazon had a "90% monopoly" of the e-book market prior to April, 2010 and that such monopoly "decreased to 60 percent in the two years following the introduction of agency pricing." Opinion & Order, 12-cv-0286, ECF 113 at 34-35.

For efficiencies in the operation of a market, this Court need not go further than the allegations in the Complaint and the undisputed allegations by the Government in the related action in this case, which demonstrate that the increase in e-book prices after April, 2012, when agency pricing was adopted, constituted a correction of the market failure that Amazon created with respect to the e-books it systematically, and undisputedly, sold below its marginal cost.

Justice Breyer, writing then as Circuit Judge for the First Circuit, stated that the "antitrust courts look to the relation of price to 'avoidable' or 'incremental' costs as a way of segregating

price cuts that are 'suspect' from those that are not". *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 232 (1983) (citing, *Northeastern* and *Areeda & Turner*). Justice Breyer defined "avoidable" or "incremental" costs as "the costs that the firm would save by not producing the additional product it can sell at that price." Id.  The only exceptions, according to Justice Breyer, are where the price cutter can (1) "show that this low price is 'promotional', e.g., a "free sample," or (2) "show that it expects costs to fall when sales increase." *Barry Wright* at 232.

The salient facts in this case are undisputed. Prior to April, 2010, Amazon was selling e-books made available by the Defendant Publishers and by most, if not all, independent book publishers, including every best-seller, at below its marginal cost, consistently, "[f]rom the time of its Kindle launch" until Amazon's acceptance of the agency model. See, CIS §II.A, 12-cv-2826, ECF#5. Even the Government directly alleged facts in its Complaint (12-cv-2826, ECF#1) and Competitive Impact Statement that Amazon was selling e-books at below their marginal cost, something which the Government has *never* denied. Amazon's marginal cost, under the retail model, was at least equal to the fixed wholesale price (e.g., $13.00, which is 50% of a typical list price of $26.00) it pays to the publishers for each *incremental* e-book it sells.[13] Id. CIS §II.A, ECF#5 . These books were re-sold by Amazon for "$9.99-or-less." Id.; Complaint, ECF#1 at ¶30. Thus, for example, at a marginal cost per e-book of $13.00, Amazon was selling such e-books at $3.01 (more than 23%) below its marginal cost.

There was never an allegation that showed Amazon's below-marginal cost selling of e-books was, as Circuit Judge Breyer stated, (1) "'promotional', *e.g.*, a 'free sample'" or (2) that Amazon expected "costs to fall when sales increase." *Wright* at 232. "Without special

---

[13] Amazon has additional unavoidable, marginal costs, such as the cost of wirelessly delivering each incremental e-book to a *Kindle* e-reader, which is estimated to cost nearly 15 cents per e-book delivery. See, *Kindle Direct Publishing Agreement, Pricing Page* (as of July 28, 2012).

circumstances there is little to be said in economic or competitive terms for such a price cut." *Barry Wright,* 724 F.2d 227, 231.

Neither the pleadings, nor evidence produced in the Apple trial, suggest there were any special circumstances that justified Amazon's below marginal cost pricing for every e-book published by defendants, hundreds of independent publishers, and all best-sellers since the day it launched the Kindle until the day it adopted the agency model. Such conduct, which goes to heart of determining the *economic consequence* of Defendants' alleged conduct, was not addressed by this Court, because the Court ruled, incorrectly, that this litigation was not "the occasion" to address it (even after repeated requests by the public and amicus curiae for the Court to consider it).

In the Complaint in the related action, the Government made an extraordinary claim: that, as result of the Government's investigation into Amazon's pricing practices, Amazon's e-book business prior to April, 2010 was "consistently profitable." 12-cd-2826, Complaint, ECF#1 at ¶30. Any materials or documents concerning such investigation would clearly constitute "either 'smoking guns' or the exculpatory opposite" (*Bleznak*, 153 F.3d 16, 20) on Amazon's pricing practices and whether the likely *decrease* in e-book prices caused by the Settlement will benefit or harm the public.[14] Yet, this Court repeatedly refused to require the Government to disclose such documents. It is respectfully submitted that without such documents, and other facts concerning the economic consequence of the lower e-book prices likely to result from the terms of this Settlement, this Court cannot intelligently approve the Settlement under Rule 23(e).

In its recent Order & Opinion, the Court characterized (for the first time) Amazon's pricing

---

[14] If the Government possesses materials or documents that would shed light on this key issue—containing a "smoking gun" or its "exculpatory opposite"—it was bound by the Tunney Act to share it with the public and the District Court. *United States v. Bleznak*, 153 F.3d 16 (2d Cir. 1998).

as a "loss leader." Opinion & Order 7/10/13, 12-cv-2826, ECF#326 at 17, 33, and 43. Yet, there is no "loss leader" exception to below marginal cost pricing. Justice Breyer used the term, "promotional" and the example he give was "free samples." Amazon's pricing was not *promotional*, which implies either a free sample to get someone to switch brands or a sales initiative aimed at differentiating consumers who are sensitive to prices from those who are not. (The most common examples of such promotional tactics are discount "coupons," "trading stamps," and periodic "sales," which tend to be taken advantage of by consumers who are price sensitive. A retailer can maximize profits by identifying consumers who are less sensitive to price—such as those who do not bother waiting for sales or cutting coupons—and charging them higher prices than those consumers who take advantage of promotional offers). On the contrary, Amazon was engaging in an across the board *strategy* of consistent, below marginal cost discounting of every e-book published by Publisher Defendants and others from the introduction of the Kindle in November 19, 2007 to April 1, 2010, over 2½ years. These were not "promotions," but rather Amazon's "everyday low prices" offered to all e-book buyers. Even in its CIS, the Government did not call Amazon's conduct "promotional"; rather, it described it as one of Amazon's most successful "strategies." CIS §I.2, 12-cv-2826, ECF#5.

It is perhaps notable that some states maintain laws against "loss leader" pricing. As Justice Frankfurter stated, "The selling of selected goods in order to lure customers into the store is deemed not only a destructive means of competition; it also plays on the gullibility of customers by leading them to expect what generally is not true, namely that a store which offers such an amazing bargain is full of other such bargains. Clearly there is a reasonable basis for a conclusion that selective price cuts tend to perpetuate such abuse." *Safeway Stores, Inc. v. Oklahoma Retail Grocers Ass'n, Inc.*, 360 U.S. 334, 340 (1959).

14

In Amazon's case, it was clearly using below marginal cost pricing as a *strategy* to attract and "lock in" consumers to its e-book store and e-book reader systems. See, Comments of Bob Kohn, 12-cv-2826, ATC-143 (May 30, 2012). This strategy was not akin to giving away "free samples" or accepting discount coupons to engage in price discrimination. If Amazon was engaging in below marginal cost pricing of "selective" loss leaders, their "playing on the gullibility of consumers" would have been bad enough. But Amazon's discounting was anything but "selective." They sold every single e-book released by every name brand publisher and every bestselling author at a price that was significantly below their marginal cost. And they did this every day—day in and day out, for the three years, four months and eleven days—from the day they introduced the Kindle to the day they adopted the agency contracts. And the below marginal cost prices were offered to all prospective buyers of e-books during this period, all the time. This could not have been "promotional" in the sense that Justice Breyer envisioned in *Barry Wright*.

Nor could Amazon, as a matter of mathematics, ever have expected its marginal cost for e-books to "fall when sales increase." Amazon's marginal cost for selling each *incremental* e-book having a list price of $26.00 will always remain $13.00. In other words, by selling such a book for $9.99, Amazon lost $3.01 per book. And it will lose $3.01 per book whether Amazon sells one copy or one million copies of such book. It was not mathematically possible for Amazon to expect to make these losses up on volume. "At a minimum, one would wonder why this firm would cut prices on 'incremental production' below its 'avoidable' costs unless it later expected to raise its prices and recoup its losses." *Barry Wright,* 724 F.2d 227, 232.

In *Brook Group,* Justice O'Conner stated that low prices benefit consumers *only* so long as they are "above predatory levels" and "do not threaten competition." *Brook Group v. Brown and Williamson Tobacco Corp.*, 509 U.S. 209, 223 (1993) (opinion by Justice O'Conner quoting,

15

Justice Brennan in *Atlantic Richfield* at 340). It is now hornbook law that consumer welfare is best promoted, not by low prices, but by marginal cost pricing. *Northeastern Telephone Co. v. American Tel. & Tel. Co.*, 651 F.2d 76, 86-89 (2d. Cir. 1981), cert. denied, 455 U.S. 943 (1982). Areeda & Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act*, 88 Harv.Law.Rev.697 (1975).

In *Brook Group*, the Supreme Court set forth two elements for an action for predatory pricing. The first is to establish that prices were set at "below an appropriate measure of its rival's costs." Interpreting its prior holdings, the Court stated, "below-cost prices should suffice." Id at 223. This was consistent with the standard previously adopted by the Second Circuit. *Northeastern Telephone Co. v. American Tel. & Tel. Co.*, 651 F.2d 76, 86-89 (2d. Cir. 1981), cert. denied, 455 U.S. 943 (1982) ("The relationship between a firm's prices and its marginal costs provides the best single determinate of predatory pricing"). Marginal cost is traditionally defined as "the increment to total cost that results from producing an additional increment of output." *Northeastern* at 87 (quoting Areeda & Turner).

This prerequisite is clearly satisfied by the factual allegations set forth in the Complaint. By selling e-books for "$9.99-or-less" that it purchased at higher amounts Amazon was selling such e-books at below their marginal cost. The Plaintiffs' in these actions *never denied* this, because the "evidence" of Amazon's selling below marginal cost was not only obvious and abundant, it was factually supported in the Complaint and in the Government's Competitive Impact Statements in the related actions.

Yet, when this Court was faced with the issue of Amazon's below marginal cost pricing, it stated,

> [W]hile comments complain that Amazon's $9.99 price for newly-re-leased and bestselling e-books was 'predatory,' none of them attempts to show that Amazon's e-book prices as a whole were below marginal cost. [12-cv-2826, Dkt#113 at 39].

Of course, none of public commentators attempted to "show" it, because none of them had to. It was *undisputed*. As the Government observed, Amazon's below-cost pricing was the "overarching theme" of the public comments. 12-cv-2826, ECF#81 at 2. Facts supporting it were directly alleged in the Government's own Complaint and CIS. Indeed, the express terms of each of the Tunney Act settlements—which allow each Publisher Defendant to prevent Amazon from selling the publisher's "entire catalogue at a sustained loss"—is an express admission by the Government that Amazon was selling below marginal cost. See, for example, Competitive Impact Statement as to Penguin (12-cv-2826, ECF#163) at 8; Penguin Settlement (12-cv-2826, ECF#162-1) at Section VI.B. If there were any doubt, the Government recently conceded that Amazon was selling e-books at below marginal cost. Specifically, in its Response to Public Comments on the Penguin Settlement in the Tunney Act proceeding, the Government asserted that the degree to which Amazon may discount under the settlement is limited to the "the level of [the e-retailer's] aggregate commission." Government Response to Penguin Settlement, 12-cv-2826, ECF#201 at 12. Thus, according to the Government, the settlement permits Amazon to resume selling e-books at below marginal cost, albeit at prices "closer to their marginal cost" than before. Id. at 12-13.

In its criticism of the public's failure to come forth with sufficient facts regarding Amazon's below marginal cost pricing, this Court once seemed careful to use the phrase "as a whole," somehow suggesting that it has to be shown that Amazon's below-cost pricing of e-books had to concern all of the e-books they offered or that they were "as a whole" sold below marginal cost. Opinion & Order, 9/6/12, 12-cv-2826, Dkt#113 at 39. Nowhere, either in Circuit Judge Breyer's opinion in *Barry Wright* or in the Second Circuit's opinion in *Northeastern*, does it say

that accused has to be selling its products "as a whole" below marginal cost in order to segregate "price cuts that are 'suspect' from those that are not." *Barry Wright Corp.* at 232 (citing *Northeastern* and *Areeda & Turner*).

The second prerequisite, under *Brook Group*, for predatory pricing is a demonstration that the predator has a "dangerous probability [] of recouping its investment in below-cost pricing." *Brook Group*, 509 U.S. 209, 224. In order to recoup their losses, the predator "must obtain enough market power to set higher than competitive prices." Id. at 225. **This prerequisite was satisfied by the District Court's *factual finding* that Amazon achieved a "90 percent monopoly" of the e-book market.** Dkt#113 34-35. The existence of the requisite market power ordinarily may be inferred from the predominant share of the market. See, *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966) (in which 87% of the market constituted "monopoly power").

Moreover, in the Second Circuit, once the first prerequisite is demonstrated, the second is *presumed*. *Northeastern* at 88. Without the presence of facts to overcome the presumption, conduct that resulted in raising illegally-low (consumer welfare-harming) prices back up to the consumer welfare-optimizing level of marginal cost could not have, **as a matter of law**, harmed consumers.

Be that as it may, it need not be proven that that Amazon would *actually* be liable in an action for predatory pricing under the Sherman Act in order to show that the rise in e-book prices that occurred after the switch to the agency model could not have harmed to consumers. As a matter of law, it is clear: **the increase in e-book prices after April, 2012, when agency pricing was adopted, constituted a correction of the market failure that Amazon created with respect to the huge number of e-books it systematically, and undisputedly, sold below its marginal cost**. The correction of such market failure was essential to the consideration of the lawfulness of Defendants' conduct. It wasn't only a "possible" defense; it was possibly their best defense.

18

Perhaps the only fact that everyone seems to agree on is that e-book prices rose in April, 2010. But that "doesn't prove anything." As this Court recognized, the intent of the agency contracts used by defendants was to shift price competition, until then occurring at the retail level, and move it back up to the publisher level. This Court specifically ruled, as a finding of fact, that those agency contracts were "not intrinsically unlawful." Opinion & Order, 09/6/12, 12-cv-2828, ECF#113 at 17. In other words, the *intentional elimination of price competition* at the retail level was *not unlawful*. (If it were, then Random House would be subject to the same fate as the Publisher Defendants when it moved to agency pricing a year later).

When the Defendants' agency contracts took effect in April, 2010, e-book prices rose back up to Amazon's marginal cost. That is the only thing they could have done. (Even if the defendant publishers had not colluded as the Complaint has alleged, the adoption of agency pricing would still have resulted in higher e-book prices in April, 2010, because the agency model forced Amazon to cease selling e-books at below their marginal cost. Evidence of this was submitted to the Court at the Apple trial when the plaintiff showed a chart indicating the rise in e-book prices sold by Random House when they later entered into agency contracts with e-retailers). Thus, any increase in e-book prices back up to the level of Amazon's marginal cost was simply a movement back up to the equilibrium or efficient market price. That increase, regardless of the conduct that lead to it, could not have harmed consumers.

Under the principles set forth in *Northeastern*, Amazon's below marginal cost pricing was causing an enormous misallocation of resources that was harming consumer welfare. *Northeastern* at 87-88; Areeda & Turner at 711 ("Under certain conditions [selling below marginal cost], low prices have anticompetitive effects"). Defendants' conduct not only resulted in the correction such

misallocation, but reduced Amazon's undisputed 90% market share to 60%, benefiting not only the Consumers, but other consumers of e-books, and the public generally.

Another important pro-competitive *economic consequence* of Defendants' conduct that this Court repeatedly failed to acknowledge was the reduction in Amazon's *monopsony* power from 90% to 60% following its adoption of the agency contracts. It has been said that a monopsony is the "mirror image" of monopoly. *Todd v. Exxon Corp.*, 275 F.3d191, 202 (2d Cir. 2001) (opinion by Circuit Judge Sotomayor). Under the textbook economic definition, the monopsonist, in depressing the price of the goods purchased, transfers wealth to itself from the supplier of the goods. According to the Government's own Merger Guidelines, the monopsonist will *not* pass along the lower price input to its downstream consumers. Horizontal Merger Guidelines of 2010 at §12.[15]

The Government's Complaint alleges ample facts to demonstrate that Defendant Publishers faced in Amazon a single buyer generating 90% of their e-book revenues who both wielded and exercised demonstrable monopsony power. Complaint, 12-cv-2826, ECFt#1 at ¶80.[16] When Amazon's 90% monopoly of the e-book market dropped to 60%, Amazon's monopsony power dropped correspondingly. The Court failed to take cognizance of the fact that that this pro-competitive drop in Amazon's monopoly and monopsony power was directly attributed to Defendants' conduct. As discussed elsewhere[17], the use of monopsony power to reduce the price paid to publishers and authors for e-book distribution rights is antithetical to the exercise of the

---

[15] U.S. Dept. of Justice and Federal Trade Commission, *Horizontal Merger Guidelines* (August, 19, 2010) http://www.justice.gov/atr/public/guidelines/hmg-2010.pdf
[16] Amazon effectively put the sixth largest U.S. book publisher out of business when in an instant it removed all "buy" buttons from its printed book and e-book stores for Macmillan's books. Amazon's exercise of this power against Macmillan was not the first. Doreen Carvajal, "Small Publishers Feel Power of Amazon's Buy Button," *New York Times* (June 16, 2008). See, Comments of Author's Guild, 12-cv-2826, ATC-0214 at 3, 5-6. http://www.justice.gov/atr/cases/apple/comments/atc-0214.pdf.
[17] See, *Amicus Curiae* Brief of Bob Kohn (Proposed), 12-cv-2826, ECF#97, 97-1.

rights of copyright owners, whose pricing is already significantly constrained by the free-rider/piracy problem.[18] Since consumers of e-books benefit from the incentive the Copyright Act provides to authors for the creation of works of authorship, Amazon's monopsony, buy reducing the price paid for such works (such as when Amazon licenses e-book rights directly from self-published authors), harms consumer welfare. Defendants' conduct benefited the public generally by reducing Amazon's monopsony powers and restoring a competitive market among buyers of e-book distribution rights.

Finally, by seemingly borrowing the Plaintiffs' mistaken primacy of "low prices" (rather than "efficient" or marginal cost prices), the Court was lead to dismiss the legitimate concerns expressed by "bricks & mortar" retailers. Retailers of printed books were not seeking protection from "the working of the market" or the "vicissitudes" of competition. 12-cv-2826, ECF#113 at 23-24. The digital disintermediation of printed book retailers may well be inevitable, but Amazon's below marginal cost pricing does not constitute a "working of the market" or "competition on the merits." As Areeda & Turner (at 712) explain, selling below marginal cost leads to an improper allocation of resources and "greatly increases the probability that rivalry will be extinguished or prevented for reasons unrelated to the efficiency of the monopolist." See, *Northeastern,* 651 F.2d at 87-88.

Amazon's below marginal cost selling, which *artificially increased* the disparity in price between printed hardcover books and their e-book versions, accelerated an otherwise natural digital disintermediation of physical bookstores. The immediate beneficiary of this *accelerated*

---

[18] *Broadcast Music, Inc. v. Moor-Law, Inc.,* 527 F.Supp. 758, 763 (D. Del. 1981). See also, John Cirace, *CBS v. ASCAP: An Economic Analysis of a Political Problem,* 47 Fordham L. Rev. 277, 293-94 (1978-79) (the collusive conduct by music publishers in *Broadcast Music* was justified, not by reduced transaction costs, but by the need to balance the monopsony power of the three TV network buyers of musical performances), discussed in *Amicus Curiae* Brief of Bob Kohn (Proposed) (12-cv-2826, ECF#97-1) at 12-14.

digital disintermediation was the predator itself, Amazon. This is precisely the kind of misallocation of resources that predatory pricing causes and why the Second Circuit makes it *presumptively* illegal. It invokes the very essence of the Second Circuit's declaration that the purpose of antitrust law is "not to protect businesses from the working of the market," but "to protect the public from the *failure of the market*." *United States v. Int'l Bus. Machines*, 163 F.3d 737, 741-42 (2d Cir. 1998) (emphasis added). Defendants' conduct benefited the consumers and the public generally when it ended the market failure caused by Amazon's below marginal cost pricing.

As the Supreme Court has made clear, the courts must look not to a particular list of agreements, but to "a particular economic consequence" in determine whether defendant's conduct amounts to a restraint of trade that contravenes the Sherman Act. *Business Electronics,* 485 U.S. 717, 731. The high court has repeatedly recognized that conduct may be permissible under the rule of reason if there is a "counterveiling, procompetitive virtue." *Indiana Fed'n of Dentists*, 476 U.S. 447, 459. Focused solely on Defendants' conduct, not once has this Court acknowledged the pro-competitive and efficiency-enhancing *economic consequences* of such conduct. But, under antitrust law, the economic consequence is precisely what is at issue. It was not only a possible defense, it was an essential part of Plaintiff's case. If the purpose of Sherman Act is to protect consumer welfare, then without legally cognizable claim of consumer harm, you have no reasonable cause of action for a violation of antitrust laws. Moreover, since the terms of the Settlements injunction provisions effectively prevents Defendant Publishers from using their agency agreements to thwart Amazon's below marginal cost pricing, members of the class will be harmed by the Settlement.

Because the Settlement is detrimental to both the Consumers it purports to benefit and the public generally, it is unfair and unreasonable. Entry of the proposed Settlement should be denied, and this action should be dismissed as to all defendants.

### 3. Consideration of the Grinnell Factors in Determining the Fairness and Reasonableness of the Settlement's Substantive Terms

The pivotal issue in determining whether the substantive terms of the Settlement is fair and reasonable is whether this Court abused its discretion in rejecting Amazon's below marginal cost pricing practices prior to April, 2010 as a defense to the claims brought against the Defendants. See, *D'Amato* at 85. Errors of law or fact may constitute such abuse. *Brennan v. N.Y.C. Board of Ed.*, 260 F.3d 1234 (2001). If the Court erred in rejecting such facts in defense of the claims, then it cannot have "sufficient facts intelligently to approve the settlement." *Grinnell* at 462. Accordingly, the Court cannot intelligently approve the substantive terms of the settlement as fair, reasonable and adequate.

The factors set forth in Grinnell with respect to considering the fairness and reasonableness of the substantive terms of the Settlement, must be reviewed in the light of this Court's *error of law* in cutting off inquiry into Defendants' "possible defenses."

### a. Complexity, Expense, and Likely Duration of the Litigation

If, upon appeal, it is adjudged that the Court erred in failing to consider Amazon's pricing policies and the consequence of Defendants' conduct on those policies, the complexity, expense and likely duration of the litigation would therefore be of little consequence. The Court would require little more than the pleadings to rule, as a matter of law, that Defendants' conduct could not have constituted a restraint of trade under the rule of reason.

23

### b. Reaction of the Class to the Settlement

Had this Court engaged in an inquiry into the beneficial economic consequences of Defendants' conduct, as it should have, the Class may have reacted far more negatively to the Settlement, if even a Settlement would have been reached at all. This Court has already found, as an undisputed fact, that Amazon had a "90% monopoly" of the e-book market prior to April, 2010 and that such monopoly "decreased to 60 percent in the two years following the introduction of agency pricing." Opinion & Order, 12-cv-0286, ECF 113 at 34-35—a trend that was clearly beneficial to consumers. However, the Court's subsequent orders in this case, including the entry of the previous judgments, appears to have reversed that trend. Streitfeld, "E-Book Ruling Gives Amazon an Advantage," *New York Times* (July 10, 2013); Satariano & Kucera, "Amazon Seen Gaining Advantage With Apple's Defeat," *Bloomberg* (July 11, 2013). Moreover, to the extent the proposed judgment contains provisions which restrict the Publisher Defendants in their ability to freely implement agency pricing—and therefore prevent Amazon from discounting e-book prices to below their marginal cost—consumers will be harmed substantially. This Objector has discussed the detrimental effects of such restrictions at length elsewhere. See comment letters and *amicus curiae* briefs cited at footnote 2, *supra*. Had the Court ruled that Defendants' conduct was justified, and had Defendants' settled anyway, it is not inconceivable that a far greater number of class members would have opposed the Settlement.

### c. Stage of Proceedings and Amount of Discovery Completed

Consideration of this Grinnell factor also supports the *disapproval* of the settlement. Defendants' were precluded by the Court from mounting what this Objector believes was their best legal defense—one which also demonstrates how their conduct benefited consumers, but what the Court erroneously ruled was no defense at all. Under Grinnell, approval of a class action

settlement must be overturned if the district court acted "without knowledge of sufficient facts concerning the claim" or "possible defenses" to the claim. *Grinnell* at 462. The district court "must give comprehensive consideration to *all* relevant factors." Id. By dismissing the economic consequence of Amazon's below marginal cost pricing as irrelevant, the Court made it impossible for itself to make an intelligent approval of the Settlement under Rule 23(e).

> **d.   Risks of Class Prevailing (Establishing Liability and Damages, and of Maintaining the Class through trial).**

If the Court erred in precluding evidence of Defendants' best defense to the claims, then the likelihood that the class would prevail in a trial would fall to zero. Consumer welfare is enhanced by the elimination of Amazon's below marginal cost discounting and by the reduction in Amazon's monopoly and monopsony market power. It is also enhanced by the proper remuneration of copyright holders, which would suffer from the wasteful transfer payment from the Defendant Publishers (i.e., the buyers of e-book rights from authors) to Consumers and their attorneys for no legally justifiable reason. This will have the effect of reducing the supply of e-books and would harm Consumers of e-books more than any wasteful transfer payment would benefit them.

> **e.   Ability of Defendants to Withstand a Greater Judgment**

Defendant Penguin was the second largest U.S. e-book publisher before it was acquired earlier this year by the largest e-book publisher, Random House, a subsidiary of Bertelsmann. Bertelsmann has annual revenues exceeding $15 billion and annual profits exceeding $1.5 billion. Defendant Macmillan is a subsidiary of Defendant Georg von Holtzbrinck GmBH, which has operations in 80 countries and annual revenues exceeding $3 billion and annual profits exceeding $300 million. Each Defendant can certainly withstand a judgment greater than the Settlement amounts.

### f.   Range of Reasonableness of the Settlement Fund

If this Objector is correct about the Court's error of law, the Settlement Fund is far outside the range of reasonableness, as Consumers would be better off with no Settlement at all and the case dismissed.

## IV.    CONCLUSION

This Settlement, as a matter of law, harms the Consumer members of the class far more than any monetary distribution they may expect to receive under its terms, and it harms the public generally. It therefore cannot be fair, reasonable, or adequate. Entry of the proposed Settlement should be denied, and this action should be dismissed as to all defendants.

It is clear now that this Court, very early in this case, jumped to substantive conclusions before it ever stopped to consider the *economic consequence* of either Amazon's pre-April, 2010 pricing practices or Defendants' conduct in relation to such practices. In its ruling on Defendant's motion to dismiss, with only bear allegations before it, the Court prematurely characterized Defendants' alleged conduct as "per se unlawful" and "necessarily unlawful under the rule of reason" (Opinion & Order, 5/15/12, 11:md-02293, ECF#156 at 54). Upon entering a Tunney Act judgment with three of the Publisher Defendants, the Court characterized the action as a "straightforward price-fixing case" (Opinion & Order, 9/06/12, 12-cv-02826, ECF#113 at 18). This case was nothing of the kind.

Indeed, this Court betrayed its error in no uncertain terms when it stated, in the opening words of its Opinion & Order of July 10, 2013 (12-cv-2826, ECF#326),

> "This Opinion explains how and why the prices for many electronic books, or "e-books," rose significantly in the United States in April, 2010."

As the Supreme Court has instructed, the mere fact that prices rose *doesn't prove anything*. What this Court should have explained, but never did, was not just why e-book prices rose in April,

26

2010, but how such price increases harmed consumers. Without a showing, or even an allegation, that Defendants' conduct caused a negative economic consequence to consumer welfare, no cause of action for violation of the Sherman Act could lie.

During the trial against Defendant Apple, the Court seemed singularly focused on Defendants' conduct and intentionally avoiding any inquiry into the economic consequences of their conduct. Those consequences, from the outset, were overwhelmingly pro-competitive and beneficial to consumers of e-books and the public generally. To ignore the economic consequence of Defendants' conduct is to risk turning the Sherman Act into an instrument of harm to consumer welfare.

It is respectfully submitted that the likelihood of plaintiff's *ultimate* success on the merits of this action is, at best, slim. Any residual societal benefit from the reduction of litigation costs are greatly overwhelmed by the costs the Settlement imposes on Consumers and the public at large. Unless this Court engages in an inquiry into the economic consequence of Defendants' conduct in relation to Amazon's below marginal cost selling of e-books—perhaps through an evidentiary hearing on the matter—this Court cannot intelligently approve the Settlement.

DATED: October 18, 2013                    Respectfully submitted,

_____
BOB KOHN
140 E. 28th St.
New York, NY 10016
Tel. +1.408.602.5646
Fax. +1.212.596.7172
eMail: bob@bobkohn.com

EXHIBIT A

**Bob Kohn**

| | |
|---|---|
| **From:** | Amazon.com <store_news@amazon.com> |
| **Sent:** | Saturday, August 31, 2013 12:14 PM |
| **To:** | bob@bobkohn.com |
| **Subject:** | Kindle Book Credit - Important New Information Re:  Attorneys General and Class Action Settlements |

**amazon**.com

Dear Kindle Customer,

Last fall we notified you that you are entitled to a credit for some of your past Kindle book purchases as a result of legal settlements between several major book publishers and the Attorneys General of most U.S. states and territories. We wanted to let you know that two more publishers have since settled with some State Attorneys General and Class Plaintiffs and these new settlements may increase the amount of the credit you will receive. A formal notification from the Court about these settlements is included below.

You do not need to do anything to receive this credit. If the Court approves the settlements in December 2013 and there is no appeal, a credit will appear automatically in your Amazon.com account that can be used to purchase Kindle books or print books. We will contact you when the credit is applied to your account. While we will not know the amount of your credit until the Court approves the settlements, it is estimated that it will range from $0.73 to $3.06 for every eligible Kindle book that you purchased. To be eligible, you must have a U.S. billing address and must have purchased a Kindle book published by Hachette, HarperCollins, Simon & Schuster, Penguin or Macmillan between April 1, 2010 and May 21, 2012. These publishers will provide the funds for the settlements. If you have already requested a check instead of a credit in response to the notice you received last fall, that request will cover these additional settlements and you do not need to do anything else. If you would like to request a check, you may do so by following the instructions included in the formal notice of the settlements, set forth below. You can learn more about the settlements at www.amazon.com/help/agencyebooksettlements.

In addition to the account credit, the settlements impose limitations on the publishers' ability to control eBook prices. We think these settlements are a big win for readers.

Thank you for being a Kindle customer.

The Amazon Kindle Team

========================================================

*Settlement ID Number: AMkZXSYp76qc4owMUr*

**Benefits from E-books Settlement Fund**
*Para unanotificación en Español, llamar o visitarnuestro website.*
Records indicate that you are eligible for a payment from Settlements reached by State Attorneys General and Class Plaintiffs with E-book publishers Holtzbrinck Publishers, LLC, (known as Macmillan) ("Macmillan") and Penguin Group (USA) Inc.("Penguin"). The Settlements resolve Plaintiffs' claims against Macmillan and Penguin in antitrust lawsuits about the price of electronic books ("E-books").

Amazon has not been sued in these cases. It is providing this notice as a service to its customers.

## What the Settlements Provide

The Macmillan and Penguin Settlements, together with settlements previously approved by the Court, create a $162.25 million fund for payments to consumers who purchased qualifying E-books from April 1, 2010 through May 21, 2012. If the Court approves the Macmillan and Penguin Settlements, eligible consumers like you will receive automatic credits to your E-reader accounts. The credit can be used on any purchases of E-books or print books. The amount of your payment has been determined based on the qualifying E-book purchases identified by Amazon in your E-reader account.

## How to Receive your Benefit

Because you are pre-qualified, you do not need to do anything to receive your credit. It will be applied to your account by Amazon automatically, and you will receive another email letting you know when it's available. Please note, while this notice is for the Macmillan and Penguin Settlements, your payment from all settling publishers will be combined and issued as one credit for your Amazon E-reader account. (If you bought E-books from more than one retailer, you may receive notices with different instructions about whether you will receive a credit or need to file a Claim Form for that retailer. You will have a separate claim for each retailer and you should follow the specific instructions from each one.)

You also have the option to receive a check instead of your credit. You can request a check by calling 1-866-621-4153, or going to the Settlement website listed below, and clicking on the Check Request Option link on or before **October 21, 2013**. Be sure to reference the Settlement ID number found at the top of this email. The Settlement website is: **www.EBookAGSettlements.com**.

## Your Other Rights

You can choose to exclude yourself from the Macmillan and/or Penguin Settlements and keep your right to sue on your own. If you exclude yourself, you can't receive any benefits from that Settlement. If you don't exclude yourself, you can submit objections about the Macmillan and/or Penguin Settlements.

Your written Exclusion Form or objections must be postmarked by **October 21, 2013**. Please visit the Settlement website for detailed information on how to submit a valid Exclusion Form or objection.

The antitrust lawsuit against Apple, Inc. continues. Your rights in the separate suit are not affected by any action you take in regards to these Settlements.

The Court will hold a hearing on **December 6, 2013, at 3:00 p.m.** to consider whether to approve the Settlements. You or your own lawyer may ask to appear and speak at the hearing.

**For more detailed information:**
**Call 1-866-621-4153 or visit www.EBookAGSettlements.com**

=====================================================

(c) 2013 Amazon.com, Inc. or its affiliates. All rights reserved.
Amazon.com, 410 Terry Avenue N., Seattle, WA 98109-5210.

Reference: 32294330

Please note that this message was sent to the following e-mail address: bob@bobkohn.com