UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

IN RE ELECTRONIC BOOKS ANTITRUST
LITIGATION

This Document Relates to:

ALL ACTIONS

No. 11-md-02293 (DLC)
     ECF Case

<u>CLASS ACTION</u>

FIRST AMENDED CONSOLIDATED
CLASS ACTION COMPLAINT

Demand for Jury Trial

## TABLE OF CONTENTS

**Page(s)**

I.   INTRODUCTION ....................................................................................1

II.  PARTIES .............................................................................................7

III. JURISDICTION AND VENUE ................................................................9

IV.  PLAINTIFFS' FACTUAL ALLEGATIONS..................................................10

    A.   All Major Publishing Houses, Including the Agency 5, Have
        Historically Sold Books to Retailers Under the "Wholesale Model."..................10

    B.   Amazon Adopts a Pro-Consumer Discount Pricing Model, and
        becomes the eBook Market Leader........................................................11

    C.   The Agency 5 Believed that the Popularity and Cost-Competiveness
        of eBooks Threatened the Profitability of Physical Books and
        Wanted to Increase and Stabilize Prices, Slow Consumer Adoption
        of the eBook Format, and Protect Price Levels for the Physical Book
        Format. ..............................................................................................13

    D.   Defendants Coordinated their Activities to Increase eBook Prices
        and Stabilize the Industry.....................................................................19

    E.   Apple and the Agency 5 Combine to Use the Release of the iPad to
        Force All Retailers to Depart from Their Historical Business Model,
        Implement Substantially Higher Prices and Minimize Price
        Competition.......................................................................................25

    F.   The Agreement Successfully Raised the Prices for eBooks. .................47

    G.   Federal, State, and International antitrust authorities are investigating
        the Agency 5 and Apple.......................................................................48

    H.   Defendants Exercised Market Power Over eBooks by Raising and
        Stabilizing Prices by More than Thirty Percent.......................................49

    I.   Plaintiffs and the Putative Class Suffered Antitrust Injury...................61

V.   NATIONWIDE FEDERAL DIRECT PURCHASER CLASS .........................62

    A.   Plaintiffs are Direct Purchasers.............................................................62

VI.  CAUSE OF ACTION FOR VIOLATION OF THE SHERMAN ACT (15
    U.S.C. § 1) .........................................................................................73

JURY TRIAL DEMANDED..........................................................................73

PRAYER FOR RELIEF ...............................................................................74

Plaintiffs, by and through their attorneys, based on their individual experiences, the investigation of counsel, and information and belief allege as follows:

## I.     INTRODUCTION

1.      In November 2007, Amazon revolutionized the book publishing industry by releasing the Kindle, a handheld digital reader for electronic books or "eBooks." Using proprietary "electronic ink" technology, the Kindle replicated the appearance of ink on paper and introduced numerous efficiency-enhancing characteristics, including portability and other advantages of a digital format. A major economic advantage to eBook technology is its potential to massively reduce distribution costs historically associated with brick-and-mortar publishing. But certain publishers concluded that if market forces were allowed to prevail too quickly, these efficiency-enhancing characteristics would rapidly lead to lower consumer prices, improved consumer welfare, and threaten the current business model and available surplus (profit margins). So, faced with disruptive eBook technology that threatened their inefficient and antiquated business model, several major book publishers, working together and with Apple Inc. ("Apple"), decided free market competition should not be allowed to work – together they coordinated their activities to fight back in an effort to restrain trade and retard innovation. The largest book publishers and Apple were successful.

2.      The original Kindle sold out in less than six hours. To gain market share and capitalize on the tremendous efficiencies associated with eBooks, Amazon set eBook pricing levels significantly below prices for physical books ("paper books" or "hardcover books"). Amazon set the prices of many of the popular new eBook titles at or below $9.99 almost immediately after release. Consumers started to identify Amazon's eBook sales with "$9.99 pricing." Amazon instituted this pro-consumer, discounted pricing even though it was not uncommon for publishers to charge Amazon a wholesale price at or above $9.99.

3.      Even though publishers were reaping the benefits of Amazon's successful efforts to vastly expand the consumer base and increase volume of units sold via Amazon's investment in eBook sales, publishers also feared Amazon's $9.99 pricing strategy. Amazon's discount

pricing threatened to disrupt the publishers' long-established brick-and-mortar model faster than the publishers were willing to accept. Being hidebound and lacking innovation for decades, the publishers were particularly concerned that Amazon's pro-consumer pricing of eBooks would negatively impact the sale of higher priced physical copies of books. And, longer term, publishers anticipated Amazon would eventually use its market power to reduce the publishers' share of the available surplus (profit margins) from each eBook sale – as well as physical book sales.

4.      Given Amazon's ever-growing installed user base, publishers knew that no single publisher could slow down Amazon and unilaterally force an increase in eBook retail prices. If one publisher acted alone to try and raise prices for its titles, that publisher would risk immediately losing a substantial (and growing) volume of sales. Not wanting to risk a significant loss of sales in the fastest growing market (eBook sales), the publishers named as defendants ("Publisher Defendants" or "Agency 5") solved this problem through coordinating between themselves (and Apple) to force Amazon to abandon its pro-consumer pricing. The Publisher Defendants worked together to force the eBook sales model to be entirely restructured. The purpose and effect of this restructuring was to halt the discounting of eBook prices and uniformly raise prices on all first release fiction and nonfiction published by these Publisher Defendants. Under the Publisher Defendants' new pricing model, known as the "Agency model," the Publisher Defendants have restrained trade by coordinating their pricing to directly set retail prices higher than had existed in the previously competitive market.

5.      In 2009, David Young, chairman and CEO of Hachette Book Group USA, told The New Yorker, "The big concern – and it's a massive concern – is the $9.99 pricing point. If it's allowed to take hold in the consumer's mind that a book is worth ten bucks, to my mind it's game over for this business."[1]

---

[1]      Lorien Crow, *Apple E-Book Price-Fixing Battle Intensifies*, Mobiledia.com (Dec. 21, 2011), http://www.mobiledia.com/news/121646.html.

6.     Believing they faced this "game over" scenario due to the pro-consumer $9.99 pricing point set by Amazon, the Publisher Defendants set about to orchestrate a way to stop this price point from "taking hold."

7.     Because Amazon was unwilling to raise eBook prices to appease the Publisher Defendants, the Publisher Defendants initially devised a scheme to "window" eBooks. Within a twelve-day period in December 2009, four of the Defendant Publishers almost simultaneously informed Amazon that they would break from their established business practices and no longer allow Amazon to sell an eBook format of a book title at the same time the new physical book title was released. Instead, the Publisher Defendants would withhold the eBook title until a later date – the eBook release "window." It is not plausible to infer that each of these Publisher Defendants independently decided to "window" a significant volume of eBooks at the exact same time.

8.     Enter the appearance of Apple and the iPad. Apple was fast approaching its announced launch of the iPad in January 2010. Apple had strong incentives to help the Publisher Defendants restrain trade and increase the price of eBooks. If Amazon continued to solidify its dominant position in the sale of eBooks, strong network effects would make it difficult to dislodge Amazon. Moreover, Amazon's pro-consumer pricing meant that to enter the eBooks market, Apple would likely be forced to sell at least some eBooks near or below its wholesale costs for an extended period of time. Apple did not want to enter the eBooks market subject to this margin pressure caused by Amazon's pricing. But at the same time, Apple believed that it had to enter the eBook market because the Kindle was (and is) a competitive threat to Apple's business model. Apple is competing to be – and has become – a dominant manufacturer of mobile devices, such as Apple's iPod, iPhone and iPad devices. These devices are designed to distribute, store and access digital media through Apple's iOS platform, including Apple's App Store and iTunes Store. The iPad launch provided the Publisher Defendants the opportunity to hatch a plan to raise consumer prices for eBooks. But they needed each other for their plan to succeed.

9.     Just one week before Defendant Apple announced the iPad launch on January 27, 2010, news reports leaked that the largest book publishers in the United States – the Agency 5 – were in simultaneous discussions with Apple to radically change the way prices were set for eBooks in the publishing industry – a fundamental change in control over pricing that had existed for more than a hundred years.  Five of the largest publishers in the United States would no longer allow retailers (or "e-tailers") to set consumer prices for eBooks based on supply and demand dynamics or offer discounts based on competitive market forces.

10.     Instead, the Agency 5 publishers engaged in coordinated activities and entered agreements – first with Defendant Apple – to become the seller of record and set and control all consumer retail prices for the eBook titles they published.

11.     Working simultaneously with each of the Agency 5 to enter into "'agency" agreements, Defendant Apple was at the core of these coordinated activities, acting as a hub for Defendants' conspiracy.

12.     Reports based on information from parties with knowledge of confidential negotiations in New York during the week of January 17, 2010, between Apple and the Publisher Defendants described:

> Certain very important themes are identifiable, however.  The key for most publishers is not so much the long-expected expansion of Apple in a way that puts ebooks at the center of the proposition but rather the opportunity to change the basic selling terms of ebooks with at least one major trading partner in a way that lets publishers take back control of pricing and reassert their vision of the value of an electronic version of a book.[2]

13.     The Publisher Defendants understood that no single publisher had sufficient market power to achieve such a radical change in pricing authority and increase industry prices.  Acting alone would subject a publisher to risking a significant loss in business by raising prices

---

[2]     *Big Six Negotiate with Apple, Ready New Business Model for eBooks*, Publishersmarketplace.com (July 22, 2010), http://www.publishersmarketplace.com/login.php/lunch/archives/006139.php (subscription required); *see also* Maya Reynolds, *Texas AG Probes Publishing Agency Model*, Maya Reynolds: One Writer's View of the World (June 02, 2010), http://mayareynoldswriter.blogspot.com/2010/06/publishers-marketplace-had-interesting.html.

for its titles alone by thirty to fifty percent above the industry standard $9.99 price point. Such a pricing outlier would surely be punished by the market. And unilateral actions would not achieve the desired outcome – industry price stability.

14.     Fearing this, the Publisher Defendants coordinated their efforts and almost simultaneously abandoned established business practices to ensure they achieved critical mass sufficient to wrestle control of pricing from retailers, and in particular Amazon who possessed nearly *ninety percent* of the rapidly increasing eBook sales volume.

15.     The Publisher Defendants' planned coordination was described based on information provided by parties with knowledge of the Defendant Publisher's confidential negotiations with Apple:

> Part of the hope in some quarters is that there will be safety in numbers. If enough publishers offer enough titles on the new agency model only, and enough retailers (including the glamorous new Apple proposition) join them in that offer, i [sic] the reasoning goes, then the marketplace will shift. And if Amazon or any other retailer wants to maintain their role, they will need to accept the new terms to ensure access to product. As one person put it, with the Apple launch imminent and the ebook market growing quickly but still not so big or mature that it can't be changed, 'the big six are in a brief moment of great power.'[3]

16.     The Publisher Defendants successfully leveraged their "brief moment of great power." The following week, on January 27, 2010, Apple announced the launch of the iPad, which would include an application to read eBooks – called "iBooks." At the same time, Apple announced it had entered into eBook distribution agreements with each of the Agency 5 publishers. Each agreement was based on the newly minted agency model that transformed the Agency 5 into direct sellers of record; they now control eBook prices and transfer of the eBook license to the consumer. Each of the publishers also simultaneously took steps that ensured the same business and price terms would be imposed on Amazon and each made clear that if Amazon declined to agree to those terms, they were each going to refuse to sell eBooks to Amazon until many months after they were made available to its competitor, Apple.

---

[3]     *Big Six Negotiate with Apple, Ready New Business Model for eBooks, supra,* n.1.

17.     On the same day Apple announced the iPad launch, Apple CEO Steve Jobs told Walt Mossberg of the Wall Street Journal that Amazon's $9.99 pricing for eBooks was about to end:

> Mossberg:   Why should [a consumer] buy a book for $14.99 on your device when she can buy one for $9.99 from Amazon or Barnes & Noble?
>
> Jobs:   That won't be the case.
>
> Mossberg:   You won't be $14.99 or they won't be $9.99?
>
> Jobs:   ***The prices will be the same. . . . Publishers are actually withholding their books from Amazon because they're not happy.*** (Emphasis added.)

18.     The next day, Mr. Jobs privately explained how he knew prices in the entire eBook industry would go up and stabilize at higher price points, as he predicted to the Wall Street Journal, when he confided to his biographer:

> Amazon screwed it up.  It paid the wholesale price for some books, but started selling them below cost at $9.99.  The publishers hated that – they thought it would trash their ability to sell hard-cover books at $28.  So before Apple even got on the scene, some booksellers were starting to withhold books from Amazon.  So we told the publishers, "We'll go to the agency model, where you set the price, and we get our 30%, and yes, the customer pays a little more, but that's what you want anyway."  But we also asked for a guarantee that if anybody else is selling the books cheaper than we are, then we can sell them at the lower price too.  So they went to Amazon and said, "You're going to sign an agency contract or we're not going to give you the books."
>
> *            *            *
>
> Given the situation that existed, what was best for us was to do this aikido move and end up with the agency model. ***And we pulled it off.***[4]

19.     Indeed, the Agency 5 and Defendant Apple "pulled it off" and, as Jobs predicted, consumers paid more as a result.  When the iPad officially went on sale the first week of April 2010, the Agency 5 increased consumer prices for eBooks approximately thirty to fifty percent,

---

[4]     Walter Isaacson, Steve Jobs, 1428-29 (2011).

stabilized eBook pricing, and completely changed the competitive pricing landscape that had existed for decades in the industry – all in less than three months' time.

20.     As a direct result of this anticompetitive conduct as intended by the conspiracy, the price of eBooks has soared. The price of the Agency 5's bestselling eBooks increased nearly forty percent on average. The price of an eBook in many cases now approaches – or even exceeds – the price of the same book in paper even though there are almost no incremental costs to produce each additional eBook unit. The price of the Publisher Defendants' eBooks sold on the iBookstore, facing no pricing competition from Amazon or other e-distributors for the exact same eBook titles, has remained at supra-competitive levels.

21.     Any doubt about whether Defendants did, in fact, conspire to violate the antitrust laws and thereby drive up the price of trade eBooks was extinguished by the opinion of the District Court for the Southern District of New York on July 10, 2013 in *United States v. Apple*, No. 12-cv-2826, and *The State of Texas v. Penguin Group (USA) Inc.*, No. 12-cv-3394. The District Court found that Apple "knowingly and intentionally participated in and facilitated a horizontal conspiracy [among the Publisher Defendants] to eliminate retail price competition and to raise the retail price of e-books" and that this conspiracy led to an "across-the-board price increase in e-books sold by the Publisher Defendants." Slip Op. at 122, 129. These findings conclusively establish that Defendants violated the Sherman Act and that consumers of trade eBooks, including the proposed Class, were injured by the higher prices that Defendants desired and imposed.

22.     Plaintiffs bring claims under federal and state antitrust laws to enjoin the illegal conduct and to obtain damages.

## II.     PARTIES

23.     Plaintiff Anthony Petru is a resident of Oakland, California. Plaintiff Petru purchased at least one eBook at a price directly from a Publisher Defendant for use on his Amazon Kindle.

24.     Plaintiff Thomas Friedman is a resident of Boca Raton, Florida.  Plaintiff Friedman purchased eBooks directly from Publisher Defendants for use on his Amazon Kindle and was injured as a result of Defendants' conduct.

25.     Plaintiff Shane S. Davis is a resident of Beaverton, Oregon.  Plaintiff Davis purchased eBooks directly from Publisher Defendants for use on his Amazon Kindle, Barnes and Noble Nook, Sony Reader and/or iPad and was injured as a result of Defendants' conduct.[5]

26.     Plaintiffs paid higher prices for their eBooks as a direct and foreseeable result of the unlawful conduct set forth below.

27.     Defendant Apple Inc. ("Apple") is a California corporation having its principal place of business at 1 Infinite Loop, Cupertino, CA 95014.  Apple is a leading manufacturer of mobile devices designed to distribute, store and display digital media.  Examples of such devices include the Apple iPad device, a tablet computer which supports several eReader applications, including the Kindle App and Apple's proprietary app, iBookstore.

28.     Defendant Hachette Book Group, Inc. ("HBG") is a leading U.S. trade publisher.  Its imprints include Little, Brown & Co. and Grand Central Publishing.  HBG and Defendant Hachette Digital, Inc. ("Hachette Digital") are wholly owned subsidiaries of Defendant Hachette Livre USA, Inc. ("Hachette Livre USA").  All three share their principal places of business at 237 Park Ave., New York, NY 10017.  Defendant Hachette Livre SA ("Hachette Livre SA") is a French company with its principal place of business at 43 Quai de Grenelle, 75015 Paris, France.  (Collectively, these four defendants are referred to as "Hachette.")  Hachette's ultimate corporate parent is Lagardere SCA, a French company.

29.     Defendant HarperCollins Publishers L.L.C.  ("HarperCollins") is a leading U.S. trade publisher with its principal place of business at 10 East 53rd St., New York, NY 10022.  Its imprints include Ecco, Harper, Harper Perennial and William Morrow.

---

[5] Plaintiffs Marcus Mathis, Christian Gilstrap, Cynthia J. Tyler, Jeremy Sheppeck, Aloysius J. Brown, III, Anne M. Rinaldy, Laura J. Warner, Barbara Heath, Kathleen Linda Pitlock, and Sue Ellen Gordon hereby voluntarily dismiss their claims without prejudice.

010260-11 640104 V1

30.     Defendant Holtzbrinck Publishers, LLC d/b/a Macmillan and Macmillan

Publishers, Inc. (collectively "Macmillan") are part of a group of leading publishing companies

whose ultimate corporate parent is Georg von Holtzbrinck GmbH & Co. KG, a German

company.  Both have their principal place of business at 175 Fifth Ave., New York, NY 10010.

Macmillan's U.S. publishers include Farrar Straus and Giroux, Henry Holt & Company, Picador,

and St. Martin's Press.

31.     Defendant Penguin Group (USA) Inc. ("Penguin") is the U.S. affiliate of Penguin

Group, one of the largest English-language trade book publishers in the world.  Penguin's

principal place of business is at 375 Hudson St., New York, NY 10014.  Its imprints include

Viking, Riverhead Books, Dutton and Penguin Books.

32.     Defendant Simon & Schuster, Inc. is a leading U.S. trade publisher with its

principal place of business at 1230 Avenue of the Americas, New York, NY 10019.  Its imprints

include Simon & Schuster, Scribner, Atria and Gallery Books.  Defendant Simon & Schuster

Digital Sales, Inc. (collectively with Simon & Schuster, Inc., "Simon & Schuster") is a wholly-

owned subsidiary of Simon & Schuster, Inc. and has its principal place of business at the same

address.

### III.     JURISDICTION AND VENUE

33.     This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C.

§§ 4 and 15; and 28 U.S.C. §§ 1331 and 1337, in that this action arises under the federal antitrust

laws.  The Court has supplemental subject matter jurisdiction of the pendant state law claims

under 28 U.S.C. § 1367.  The Court also has diversity jurisdiction over this action pursuant to 28

U.S.C. § 1332(d) because the amount in controversy for the Class exceeds $5,000,000, and there

are members of the class who are citizens of a different state than the Defendants.

34.     Venue is proper in this District under 28 U.S.C. § 1391(b) and (c) and Sections 4

and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22, because Defendants reside, transact business

or are found within this District, and a substantial part of the events giving rise to the claims

arose in this District.

35.     This Court has personal jurisdiction over Defendant Hachette Livre SA because it purposefully availed itself of the benefits of this forum and committed wrongful acts in whole or in part within this District, which have had direct effects in this District.  Hachette Livre SA has purposefully directed its illegal activities to artificially raise eBook prices towards residents of the United States and New York.  Activities in furtherance of these activities include, but are not limited to, meetings between its Chairman and CEO, Arnaud Nourry, and book industry executives in the United States.  The claims in this case arise out of these forum-related activities; and the exercise of jurisdiction in this case would comport with fair play and substantial justice.

## IV.   PLAINTIFFS' FACTUAL ALLEGATIONS

### A.   All Major Publishing Houses, Including the Agency 5, Have Historically Sold Books to Retailers Under the "Wholesale Model."

36.     Hardcover books, specifically the sale of front list titles, have historically formed the core sales for the Agency 5 (who in turn sells about seventy-five to eighty-five percent of the fiction market).  In 2009, the Agency 5, along with Random House, were responsible for publishing more than ninety percent of all hardcover New York Times bestsellers.

37.     For physical books, publishers typically have the highest margin per unit of sale from printed hardcovers which are sold to the trade (wholesalers, booksellers, etc.) at discounts of thirty to sixty percent off the list price depending on the account.  The list price for new hardcover books can frequently exceed $26.

38.     For decades, all major publishing houses have used the same basic distribution model, known as the "wholesale model" (sometimes called the "retail model").  Under this model, book publishers sold their titles to retailers based on a discount off a book's list price.  For example, if a new hardback title's list price was $26, the retailer (*e.g.*, Barnes & Noble) would pay the publisher fifty percent off list price – $13.  The retailer would then set the retail price at whatever market price it decided would maximize its sales strategy – either above, at, or

010260-11 640104 V1

below the wholesale price.  Whether the retailer discounted the retail price of the book below the hypothetical $13 or charged a retail premium, the publisher would still receive $13.

39.     When online vendors began to sell books, publishers contracted with them based on the wholesale model, just as they had for decades with brick-and-mortar retailers.

**B.     Amazon Adopts a Pro-Consumer Discount Pricing Model, and Becomes the eBook Market Leader.**

40.     In November 2007, Amazon revolutionized the book publishing industry by releasing the Kindle, a handheld digital reader for eBooks.  eBooks are usually read on dedicated hardware devices known as eReaders.  Personal computers, tablets and some mobile phones can also be used to read eBooks.  eBooks are sold directly through eReaders, as well as through the web.

41.     When the Amazon Kindle was released, each of the Defendants determined that it was in their independent interest to sell eBooks through Amazon using the wholesale model that had long been the dominant and accepted model for the sale of books.  With rare exceptions, each of the Publisher Defendant also established and adhered to a business practice of releasing all or almost all available eBooks on a simultaneous basis with release of the physical book copy of those books.

42.     Although Sony had launched its Sony Reader, the first commercial successful eReader in 2006, Amazon's Kindle quickly became the market leader.  Using proprietary "electronic ink" technology, the Kindle replicated the appearance of ink on paper and introduced numerous efficiency-enhancing characteristics, including portability and other advantages of a digital format.  Amazon offered a much broader selection of books than Sony and successfully competed by offering eBooks at a standard pro-consumer price of $9.99 or lower for new eBook titles soon after release.

43.     The original Kindle sold out in less than six hours.  To gain market share, take advantage of its first-mover advantage, and capitalize on the tremendous efficiencies associated with eBooks, Amazon set eBook pricing levels significantly below prices for physical books

("paper books" or "hardcover books").  Amazon set the prices of many of the popular eBook titles at $9.99 or below.  Almost all of Amazon's eBook prices were at or below $9.99 soon after release.

44.     Amazon instituted its discounted pricing model even though in many instances the wholesale price it paid equaled or even exceeded $9.99 for newly released books.  Amazon was willing to establish this price level, in part, to grow market share as well as capitalize on other lower price points where Amazon had positive margins.  Amazon also knew that with sufficient buying power and efficiencies it could eventually reduce the surplus publishers were paid for eBooks, thereby increasing Amazon's margins.

45.     Amazon was able to offer eBooks at a lower price than paper books due to a major economic advantage of eBook technology:  its potential to massively reduce distribution, storage and return costs historically associated with brick-and-mortar publishing and sales.  For example, paper books have historically been sold to retailers with a right to return unsold books to the publisher and receive reimbursement for virtually the entire purchase price.  Many retailers return twenty-five percent or more of the books that have been shipped to them by publishers and the paper books are then destroyed by the publishers or sold as remainders (or otherwise at heavily discounted prices).  The eBook technology eliminates the printing, binding, shipping, storing and return expenses involved, as well as the waste incurred when large volumes of books are sent back to the publishers unsold.

46.     Amazon's disruptive technology forced traditional booksellers to respond by introducing competing technology and pricing.  In 2009, Barnes & Noble released its own eReader – the Nook – and tried to match Amazon's pro-consumer pricing.  Following Barnes & Noble's announcement, Sony similarly announced that it would adopt the $9.99 pricing for its Sony Reader.  Nevertheless, Amazon's eBook prices were almost always lower than that of its competitors such as Sony and Barnes & Noble.  A study by the Inkmesh eBook search engine reported that Amazon had the lowest prices nearly seventy-five percent of the time.

47.     Although Amazon's $9.99 pricing policy was near or even sometimes below the price Amazon paid to book publishers for certain mass market eBook content, its aggressive eBook pricing practices succeeded in fueling Kindle sales and increasing Amazon's share of the eReader market. According to Credit Suisse, as of February 2010, Amazon's Kindle eBooks occupied ninety percent of the market for eBooks.[6]

48.     At least in part as a result of Amazon's pro-consumer practices, consumers rapidly started adopting new book reading habits, making eBooks hugely popular. The Association of American Publishers reports that eBooks are the fastest-growing segment of the book publishing industry. In July 2010, Amazon reported sales of eBooks for its Kindle in the second quarter of 2010 outnumbered sales of hardcover books for the first time. In February 2011, the New York Times added an eBook bestseller list.

**C.     The Agency 5 Believed that the Popularity and Cost-Competitiveness of eBooks Threatened the Profitability of Physical Books and Wanted to Increase and Stabilize Prices, Slow Consumer Adoption of the eBook Format, and Protect Price Levels for the Physical Book Format.**

49.     Hardcover books, specifically the sale of front-list titles, have historically formed the core sales for the Agency 5 (who in turn sell about seventy-five to eighty-five percent of the fiction market). In 2009, the Agency 5, along with Random House, were responsible for publishing more than ninety percent of all hardcover New York Times bestsellers.

50.     For physical books, publishers typically have the highest margin per unit of sale from printed hardcovers which are sold to the trade (wholesalers, booksellers, etc.) at discounts of thirty to sixty percent off the list price depending on the account. The list price for new hardcover books can frequently exceed $26.

51.     Even though Amazon's discount pricing was driving rapid adoption of the eBook format and huge year-over-year growth in eBook sales, easily outpacing stagnant physical book sales growth, the Publisher Defendants disapproved of Amazon's discount model. Amazon's pro-consumer discount pricing threatened to disrupt the publishers' long-established brick-and-

---

[6]   Paul Verna, *Google Writes New Chapter in E-Book Saga*, The eMarketer Blog (May 6, 2010), http://www.emarketer.com/blog/index.php/google-writes-chapter-ebook-saga/.

mortar model faster than the publishers were willing to accept. Publishers were particularly concerned that Amazon's pro-consumer pricing of eBooks threatened to disrupt the publishers' business model by shifting book purchases away from higher priced physical copies of books, which had traditionally been the publishers' most profitable product.

52.     Longer term, publishers anticipated Amazon and other e-tailers would eventually use their market power to reduce the publishers' share of the available surplus (profit margins) from each eBook sale. Amazon had demonstrated a commitment to passing surplus (savings) onto the consumer in the form of lower prices.

53.     The $9.99 standard eBook price Amazon set threatened the economic models of many large publishers. With low and decreasing retail prices for eBooks, publishers feared the rapidly increasing movement by consumers away from physical book purchases – on which publishers had built their businesses for centuries. They also anticipated that, as the popularity of eBooks grew, Amazon and other retailers would pressure publishers to reduce their list prices and/or increase the discount off the list price (thereby reducing wholesale prices). This in turn would eventually reduce the publishers' profits.

54.     The Publisher Defendants also feared Amazon's discount pricing would lead in the long term to condition consumers to expect (and only be willing to pay) lower price points for all books.[7] Thus, by increasing eBook prices and slowing down the rate of eBook adoption, new entrants into the digital market would be less inclined to demand a $9.99 price point made popular by Amazon. An article in Psychology Today refers to this as anchoring:

> At issue is the phenomenon of "anchoring," discovered by Amos
> Tversky and Daniel Kahneman. When people don't know what a
> fundamentally new product should cost, they are strongly
> influenced by the first price they encounter.

---

[7]     *See, e.g.*, Jack Shafer, *Does the Book Industry Want to Get Napstered?*, Slate (July 15, 2009), http://www.slate.com/of/2222941/; Brad Stone & Motoko Rich, *Apple Courts Publishers, While Kindle Adds Apps*, N.Y. Times (Jan. 20, 2010), http://www.nytimes.com/2010/01/21/technology/21reader.html?pagewanted=all (explaining that the attraction of the agency model to publishers is driven by their "fear that Amazon has accustomed buyers to unreasonably low prices" and their conviction that "if Kindle were to maintain its dominant position [in eBook sales], it could force publishers to lower their wholesale prices").

55.     Publisher Defendants wanted consumer prices for eBooks to go up to break through the $9.99 price-point ceiling for eBooks before the price took psychological "hold" and it was too late.  And Apple, a new entrant into the eBook market – with no market share – wanted to increase its margins on eBook sales by driving prices above the $9.99 price point set by Amazon.

56.     The Defendants therefore decided to drive up and standardize consumer prices for eBooks, even though by doing so it would likely reduce eBook revenues and slow eBook growth.  By doing so, the Agency 5 believed they would protect their physical book margins and not allow eBook prices to take hold at "too low" a price point.

57.     During the time the Agency 5 were coordinating their switch from the wholesale model to the Agency model, they acknowledged they were doing so because they did not like Amazon's pro-consumer pricing.

58.     For example, on February 2, 2010, Rupert Murdoch, News Corp. CEO, and corporate parent of HarperCollins, indicated publishers were unhappy with Amazon's low prices and that the agreement with Apple to go to the Agency model would help to achieve "higher prices."

59.     Speaking to analysts during a News Corp. earnings call, Murdoch stated:

> Yeah we don't like the Amazon model of selling everything at
> $9.99 they don't pay us that.  They pay us the whole wholesale
> price of $14 or whatever we charge but we [sic] I think it really
> devalues books and it hurts all the retailers of the hard cover
> books. . . .  Amazon, sorry, Apple in its agreement with us, which
> is [sic] not been disclosed in detail, does allow for a variety of
> slight of [sic] higher prices.  There will be prices very much less
> than the printed copy of books.  But still it will not be fixed in a
> way that Amazon has been doing it.  And it appears that Amazon is
> now ready to sit down with us again and re-negotiate pricing.

60.     Other Publisher Defendants expressed their disdain toward Amazon's low prices and that the industry needs to take steps to restrain competition – even if the Agency model would likely reduce the Publisher Defendants' eBook revenues.

010260-11  640104 V1

61.    Two days after Rupert Murdoch's comment, John Sargent, CEO of Macmillan, in effect admitted this on February 4, 2010, when he posted a blog saying:

> Over the last few years we have been deeply concerned about the pricing of electronic books.  That pricing, combined with the traditional business model we were using, was creating a market that we believe was fundamentally unbalanced.  In the last three weeks, from a standing start, we have moved to a new business model. *We will make less money on the sale of e books, but we will have a stable and rational market.*[8] (Emphasis added.)

62.    Defendants were willing to sacrifice eBook revenue because they were relying on an understanding with their co-conspirators to restrain future price competition and stabilize industry prices at higher levels.

63.    As demonstrated below based on industry data, after switching to the Agency model, for at least a large percentage of eBook sales, the Agency 5's average revenue-per-unit of eBooks sold decreased by thirty-one percent compared to their longstanding wholesale model.

---

[8]    Dennis Johnson, *Full Text of John Sargent's Second Letter to Macmillan Authors*, Melville House (Feb. 5, 2010), http://mhpbooks.com/12432/full-text-of-john-sargents-second-letter-to-macmillan-authors/.



**Average eBook Unit Revenue of Agency 5 Publishers before and after Switch to Agency Model**

64.     One reason the Publisher Defendants would receive less revenue from eBook sales under the Agency model is because under the wholesale model an e-tailer, such as Amazon, typically paid the same – or nearly the same – wholesale price to a publisher regardless of the title's format – electronic or physical.

65.     And because book publishers' costs are lower for eBooks than physical books due to lower or nearly nonexistent incremental expense for printing, distribution, warehousing, and returns, the publishers' margins per unit are often greater for eBooks than physical books under the wholesale pricing model.  So even if a Publisher Defendant had a lower list price for the eBook format, typically the publisher's margin for an eBook unit sold was still greater than for the same title in physical format.

66.     These economics changed under the Agency model.  For example, under the wholesale model, a publisher may receive $13 from an e-tailer based on a list price of $26. Amazon would then sell the title in eBook format to the consumer for $9.99.  But under the

010260-11 640104 V1

Agency model, a publisher may set the eBook price the consumer pays at $14.99. The publisher would then pay a thirty percent commission to the e-tailer ($4.50). So instead of receiving $13 under the wholesale model, the publisher now receives less revenue, about $10.50, under the Agency model.

67. Basic economics also predict that the Publisher Defendants' coordinated efforts to increase prices also restrained eBook unit growth. Industry evidence indicates the eBook growth rate in 2010 for the Publisher Defendants slowed after adopting the Agency model compared to the growth rate of eBook sales for publishers still selling titles under the wholesale ("reseller") model:



68. Thus, even though under the wholesale model the economic dynamic on a per-unit basis was nearly revenue neutral between eBook and physical book formats – and likely margin positive for eBooks – and increasing eBook prices would restrain growth, the Publisher Defendants wanted to attack what they viewed as a systemic industry issue presented by technological innovation: $9.99 for new book content – regardless of format – was just too low of a price point in the Publisher Defendants' opinion. They feared this price point would become the established ceiling and would ultimately lead to price pressure on list prices for physical books, particularly including the high margin hardcover books.

010260-11  640104 V1

69.     As such, despite the Publisher Defendants recognizing the switch to the Agency model for eBooks would increase consumer prices, and likely reduce future growth rates and lower eBook revenue (and margins) per unit in the near term, they were willing to pay – more accurately, have consumers pay – this price to stabilize the market.

70.     According to Macmillan's CEO:

> The agency model would allow Amazon to make more money selling our books, not less. We would make less money in our dealings with Amazon under the new model. Our disagreement is not about short term profitability but rather about the long-term viability and stability of the digital book market.[9]

71.     Currently, the Publisher Defendants still allow an e-tailer like Amazon to set the physical book price for consumer purchases on Amazon.com, and Amazon remains the seller of record. Retailers under this model compete for consumer sales of the same titles with hundreds of other retailers and e-tailers based on price and services. In contrast, under the Agency model, only the Agency 5 now set the price for their eBook titles and are the sellers of record.

72.     As such, under the Agency model, only one firm – the publisher – controls the eBook price for any given title published by one of the Publisher Defendants. Just as the Publisher Defendants planned, consumers no longer receive the benefit of competition between retailers for the sale of eBooks in this "stabilized" market.

**D.     Defendants Coordinated Their Activities to Increase eBook Prices and Stabilize the Industry.**

73.     The Publisher Defendants believed that if market forces were allowed to prevail too quickly, the efficiency-enhancing characteristics of eBooks would rapidly lead to even lower consumer prices, improved consumer welfare, and threaten their current business model and available surplus (profit margins). So, faced with disruptive eBook technology that threatened their inefficient and antiquated business model, the Publisher Defendants decided free-market

---

[9]     *To: All Macmillan authors/illustrators and the literary agent community*, PublishersLunch (John Sargent letter), http://www.publishersmarketplace.com/lunch/macmillan_30jan10.html (last visited Jan. 18, 2012).

competition should not be allowed to work. Instead, they coordinated their activities to fight back in an effort to restrain trade and retard innovation. The largest book publishers and Apple were successful.

74.    Given Amazon's market power and ever-growing installed user base, the Agency 5 knew that no single publisher could slow down Amazon and unilaterally force an increase in eBook retail prices. If one publisher acted alone to try and raise prices for its titles, that publisher would risk immediately losing a substantial (and fast-growing) volume of sales. Moreover, if only one publisher switched to the Agency model, this would not achieve the "rational and stable" market the Defendants desired.

75.    Not wanting to risk a significant loss of sales in the fastest growing market (eBook sales), the Agency 5 solved this problem through coordinated activities, between themselves and eventually an agreement with Apple, to force the industry pricing leader – Amazon – to abandon its pro-consumer pricing.

76.    Defendants conspired to restructure entirely the eBook sales model. Their object was to limit price competition between eBooks and physical book formats for the same titles, restrain price discounting for eBooks, and stabilize industry prices for all titles.

77.    The individual participants in the coordinated activities and agreements to restrain competition include, but are not limited to:

| Defendant Company | Name of Individual (and title if known) |
|---|---|
| Simon & Schuster | Carolyn Reidy (President and CEO) |
| Simon & Schuster | Michael Selleck (EVP, Sales and Marketing) |
| Simon & Schuster | Elisa Rivlin (SVP, and General Counsel) |
| Simon & Schuster | Ellie Hirshorn (Chief Digital Officer) |
| Simon & Schuster | Doug Stambaugh (VP, Digital Strategy and Business Development) |
| Hachette | Arnaud Nourry (Chairman and CEO Hachette Livre SA) |
| Hachette | David Young (Chairman and CEO Hachette Book Group USA) |

| Defendant Company | Name of Individual (and title if known) |
|---|---|
| Hachette | Maja Thomas<br>(SVP, Hachette Digital) |
| Hachette | Carol Ross<br>(EVP, Business Affairs & General Counsel<br>Hatchette Book Group USA) |
| Penguin | John Makinson<br>(Chairman and CEO, Penguin Group) |
| Penguin | Tim McCall<br>(VP, Online Sales and Marketing, Digital Sales<br>Penguin Group USA) |
| Penguin | Genevieve Shore<br>(Digital Strategy Director, Pearson Plc) |
| Penguin | David Shanks<br>(CEO Penguin Group USA) |
| Penguin | Alex Gigante<br>(SVP, Legal Affairs, Penguin Group (USA) |
| HarperCollins | Rupert Murdoch<br>(Chairman and CEO, NewCorp.) |
| HarperCollins | Brian Murray<br>(President and CEO, HarperCollins Worldwide) |
| HarperCollins | Anna Maria Allessi<br>(VP, Publisher, HarperMedia at HarperCollins<br>Publishers) |
| HarperCollins | Leslie Hulse<br>(VP Digital Business Development,<br>HarperCollins Publishers) |
| HarperCollins | Charlie Redmayne<br>(EVP, Chief Digital Officer, HarperCollins<br>Publishers)* – former |
| HarperCollins | Kyran Cassidy<br>(VP/Associate General Counsel, HarpersCollins<br>Publishers) |
| Macmillan | John Sargent<br>(CEO, Macmillan Publishers USA) |
| Macmillan | Brian Napack<br>(President, Macmillan US)* – former |
| Macmillan | Paul Slevin<br>(Internal counsel, Macmillan) |
| Macmillan | Amy Wolosoff<br>(Associate General Counsel, Macmillan<br>Publishers) |
| Macmillan | Fritz Foy<br>(SVP, Strategic Technology, Macmillan US) |
| Apple | Steve Jobs<br>(CEO and Chairman, Apple)* -former |

010260-11  640104 V1

| Defendant Company | Name of Individual (and title if known) |
|---|---|
| Apple | Eddy Cue<br>(SVP, Internet Software and Services) |

78.     The Agency 5's first stage of coordinating their activities to raise and stabilize
industry eBook prices took shape in the fall of 2009.  The Publisher Defendants' initial means to
restrain competition from Amazon's eBook discount pricing model was to refuse to deal with
Amazon in the sale of eBook versions of many titles until many months after release of the
physical version.  The decision to withhold eBook versions from Amazon was euphemistically
described as "windowing."

79.     Since the release of the Kindle in 2007, each of the publisher's ordinary practice
had been to sell Amazon the eBook version of a title at the same time the physical copy was
released.  While a small number of eBook titles were withheld by Defendants Hachette and
Simon & Schuster in the Summer and Fall of 2009 when the same physical title initially went on
sale, these and other publishers stated that this would be limited to a very select number of titles,
based on a book-by-book analysis.  For example, in September 2009, the leader of Hachette's US
Division, David Young, privately assured Amazon that it had no plans to delay any titles other
than "True Compass."

80.     This business practice changed dramatically in December 2009.  On December 3,
2009, Arnaud Nourry, Chairman and CEO of Hachette Livre SA, met for breakfast with an
Amazon executive.  Prior to this meeting Mr. Nourry had discussed with other industry
representatives a price point for Amazon's eBooks that would be agreeable to the Agency 5.  Mr.
Nourry asked whether Amazon was firm in its decision to price eBooks at $9.99, stating it was a
"big problem for the industry."  Mr. Nourry stated that it would solve the "problem" if Amazon
would raise eBook prices by a dollar or two.  Mr. Nourry stated that based on conversations with
other retailers, they would be satisfied if eBook prices went up to $11.99 or $12.99.  Stated
plainly, Mr. Nourry communicated that if Amazon would agree to a price of $11.99 or $12.99,
this would be agreeable to its competitors and would solve the "industry" problem.  Amazon

indicated it was not intending to change its price structure in the short term. Mr. Nourry's comments clearly indicate that the publishers were discussing price and were content to agree to a stable base price as opposed to prices being set by competition.

81.     Industry sources at this time also reported that Leonard Riggio, Chairman of Barnes & Noble, met with publishers the previous week and complained about the potential for Amazon's low pricing of eBooks to hurt Barnes & Noble's hardcover sales. Thus, almost immediately after these discussions between Amazon's competitor Barnes & Noble and major publishers, the Chairman and CEO of one of the major publishers proposed a new and significantly higher price point to Amazon while making clear that this price point for eBooks would satisfy Amazon's competitors and solve a "big problem for the industry."

82.     The very day after Amazon rejected this invitation to agree on a higher price point, on December 4, 2009, Mr. Nourry e-mailed Amazon's CEO and stated that Hachette USA had a board meeting that morning and Amazon would soon be hearing its decisions. Later that day, Hachette made clear that it was going to implement a significant change in the business practice it had been following since the release of the Kindle and would now refuse to sell eBook versions of a very large percentage of its hardcover titles until many months after release of the hardcover version.

83.     Four days after Amazon rejected Mr. Nourry's proposal of a higher price point to solve the "industry problem," on December 7, 2009, Michael Selleck, of Simon & Schuster, informed Amazon that Simon & Schuster was also going to depart from its established business practice. Beginning almost immediately, Simon & Schuster would instead delay releasing eBooks for at least twenty-five new hardcover releases between January and April 2010.

84.     The next day, on December 8, 2009, the Wall Street Journal reported that Simon & Schuster and Hachette would be windowing eBook titles. David Young, Chairman and CEO of HBG, was quoted as saying:

> We're doing this to preserve our industry. . . . I can't sit back and
> watch years of building authors sold off at bargain-basement
> prices. It's about the future of the business.[10]

85.     A week after Amazon rejected Hachette's proposed higher price point, on
December 10, 2009, HarperCollins indicated that it too was dramatically changing its business
practice regarding the release of eBooks.  HarperCollins now stated that it would withhold
eBook releases by up to six months for five to ten new hardcover titles per month.[11]

86.     Only days later, on December 16, 2009, Macmillan stated that it too would depart
from its established business practice.  Macmillan indicated that it was also going to withhold
eBook versions of newly released titles for several months after the hardcover release.[12]

87.     Thus, within approximately thirteen days of Hachette's CEO proposing a higher
price level that would be satisfactory to address "the industry problem" – and being told
privately that Amazon was adhering to its pro-consumer pricing – four of the Agency 5 informed
Amazon that they would depart from historical business practices with regard to the timing of
eBooks being released simultaneously with the physical format (a historical practice they had
informed Amazon only months earlier that they were adhering to).  Suddenly, and practically
simultaneously after one of the major publishers confronted Amazon and was informed it would
adhere to its low pricing, each of these Publisher Defendants responded by enacting new and
similar policies to restrain a large volume of newly released eBook titles to protect the prices of
their physical book sales.

88.     No publisher could have refused to provide eBook versions of many of its major
titles without knowing that other major publishers would take the same action.  First,

---

[10]   Jeffrey A. Trachtenberg, *Two Major Publishers To Hold Back E-Books*, Wall St. J. (Dec. 9, 2009), http:// online.wsj.com/article/SB10001424052748704825504574584372263227740.html.

[11]   Jeffrey A. Trachtenberg, *HarperCollins Joins Ranks Of Those Delaying E-Books*, Wall St. J. (Dec. 10, 2009), http:// online.wsj.com/article/SB10001424052748704825504574586291583582158.html.

[12]   Jeffrey A. Trachtenberg, *Macmillan to Sell Enhanced E-Books*, Wall St. J. (Dec. 16, 2009) (subscription required), http:// online. wsj.com/article/SB10001424052748704398304574598152759224302.html.

independent action against Amazon – the leading retailer of paper editions and the e-tailer accounting for ninety percent of eBook sales – would risk antagonizing a company that was the largest book distributor in the United States. Second, withholding eBook versions of major titles for many months while other major publishers adhered to their historical practices and made eBook versions immediately available to consumers would place a publisher at a major competitive disadvantage in the fastest-growing segment of the market. This was a radical departure in business practice that only made business sense if it was undertaken in concert by major publishers, knowing that major competitors would implement the same strategy. That is exactly what happened, within a matter of days, after Amazon told Hachette's CEO that it would not agree to the substantial proposed price hike to address the "industry problem."

**E.    Apple and the Agency 5 Combine to Use the Release of the iPad to Force All Retailers to Depart from Their Historical Business Model, Implement Substantially Higher Prices and Minimize Price Competition.**

89.    Although refusing to supply eBook versions of many of their titles for months could delay Amazon's ability to implement pro-consumer pricing, it could not achieve the Publisher Defendants' main goal:  stabilizing the price of eBooks at a higher price point.

90.    The Agency 5 would not have to wait long for an opportunity to attack Amazon's prices directly. Apple's launch of the iPad the following month gave the Agency 5 the means to force a substantial price increase, a cover story for making simultaneous, radical changes to their traditional model, and a powerful partner eager to chip away at Amazon's position.

91.    Apple, the most powerful digital content distribution company other than Amazon had strong incentives to help the Publisher Defendants restrain trade and increase the price of eBooks. If Amazon continued to solidify its position for eBook sales, strong network effects would make it difficult to dislodge Amazon. That is, the value of a Kindle to an individual purchaser rises as the total number of purchasers increase. This occurs because growth in the installed base attracts additional and superior content, drives down prices and increases the value of Kindle ownership for consumers. A virtuous cycle develops and feeds itself, creating a high barrier to new entrants.

92.     Because of these network effects, Apple knew that if Amazon were allowed to continue to solidify its position in the eBook market, these network effects would make it nearly impossible for Apple to dislodge Amazon in the near term.

93.     Moreover, Amazon's pro-consumer pricing meant that to enter the eBooks market, Apple would likely be forced to sell at least some eBooks near or below its wholesale costs for an extended period of time. Apple did not want to enter the eBooks market subject to this margin pressure caused by Amazon's pricing. But at the same time, Apple believed that it had to enter the eBook market because the Kindle was (and is) a competitive threat to Apple's business model. Apple is competing to be – and has become – a dominant manufacturer of mobile devices, such as Apple's iPod, iPhone and iPad devices. These devices are designed to distribute, store and access digital media through Apple's proprietary iOS platform, including Apple's App Store and iTunes Store.

94.     Apple knew that if Amazon could establish the Kindle as the dominant eReader by subsidizing the purchase of eBooks, Amazon could then use the Kindle platform (and its large installed user base) to distribute other digital media. Notably, Apple had successfully used a virtually identical strategy to gain a virtual monopoly on the distribution of digital music files through its iPod device and its associated iTunes Store. Apple then used this huge installed base to capture a large share of a second market, the nascent application market for mobile devices.

95.     In fact, just as Apple likely anticipated, Amazon very recently launched the Kindle Fire Tablet on September 28, 2011, a competitive tablet product to the iPad.

96.     Thus, Apple believed it was necessary to enter the eBooks market because it viewed Amazon and its Kindle platform as a long-term threat to its dominant position in the sale and marketing of mobile devices designed to distribute, store and access digital media, and Apple's iOS content distribution platform.

97.     Recognizing Apple's interest in protecting and expanding its dominant position in the sale and marketing of mobile devices designed to distribute, store and access digital media, Amazon had already taken steps to compete with Apple. After numerous commentators

observed that Apple's popular App Store offered seventy percent of royalties to software
application publishers, Amazon began a program that offered seventy percent royalties to Kindle
publishers who agreed to certain conditions. In order to be eligible, authors were required to list
their books for between $2.99 and $9.99 on the Kindle, and the price had to be at least twenty
percent below the lowest list price for the print edition.

98.     Apple and the Publisher Defendants thus shared a common anticompetitive
interest in forcing Amazon (and the rest of the market) to raise the prices for eBooks. In
addition, Apple and the Publisher Defendants wanted to tie Amazon's hands so it could not
vigorously compete on eBook price with Apple (or anyone else in the industry).

99.     This strategy could only be pursued by Apple, however, if most of the major
publishers would agree to increase prices in the same manner and force Amazon to do so.
Absent this coordinated action, Apple would risk selling eBooks at a significantly higher price
than its major competitor at the very time it was trying to become a major new entrant in the
eBook market – it had zero market share.

100.    Thus, sharing this common threat to their profits and Apple's platform strategy –
and a common interest in ensuring an industry-wide response that would force Amazon to accept
higher eBook prices – the Agency 5 and Apple coordinated their activities during January 2010
and agreed on a plan that would raise eBook prices.

101.    The launch of the iPad gave Apple and the Agency 5 the opportunity to achieve
this shared goal by developing a new model of eBook distribution that would tie Amazon's
hands and prevent it from continuing to sell eBooks at the pro-consumer price point on which it
had settled. Apple was a critical partner and conduit for the success of this conspiracy. Through
Apple's agreements with each of the Agency 5, the conspirators were able to assure themselves
of each other's participation in the conspiracy, privately communicate acceptable positions in a
seemingly innocuous way, and pull off a coup de grace that no single publisher could have
accomplished.

102.    Apple announced the launch of the iPad on January 27, 2010.  During the launch announcement, Steve Jobs, Apple's CEO, indicated that Apple had agreements in place with five of the six largest publishing houses – Hachette, HarperCollins, Macmillan, Penguin, and Simon & Schuster – to provide eBook content for the new device.[13]  The iPad would include "iBook" and "iBookstore" applications (competing directly with the Amazon Kindle).  The iBook functioned as an eBook reader and the iBookstore would display eBook content sold by the Agency 5.  The Agency 5 allowed Apple to use their trademarks in connection with the launch.

103.    Coinciding with the announced iPad launch, it was reported that each of the Agency 5 was abandoning the established wholesale model for eBooks and switching to a new "Agency model."  Under this model, publishers set eBook prices and are the sellers of record. Apple (and, subsequently, all other online vendors of eBooks) functions solely as an agent responsible for obtaining offers from consumers and distributing eBooks through its download portals.  Under its contract with each Publisher Defendant (the "Agency Agreements"), Apple receives a thirty percent commission from each eBook sold through Apple's iBookstore, with the remaining seventy percent going to publishers (who in turn then compensate the authors pursuant to whatever arrangement exists between the publisher and author).[14]

104.    In contrast to the Agency model, under the wholesale distribution model that traditionally has governed their relationships with brick-and-mortar bookstores and other online sellers like Amazon, publishers essentially "sold" their products to retailers for a fixed (wholesale) price – typically half the list price of the print edition – and surrendered control over the final price ultimately charged to consumers.[15]  In order to spur demand for eBooks (as well as

---

[13]   Motoko Rich, *Books on iPad Offer Publishers a Pricing Edge*, N.Y. Times (Jan. 27 2010), http://www.nytimes.com/2010/01/28/business/media/28media.html.

[14]   *Id.*; Motoko Rich & Brad Stone, *Publisher Wins Fight With Amazon Over E-Books*, N.Y. Times, Feb. 1, 2010, at B1.

[15]   Donald Marron, *How Should We Price E-Books*, Christian Science Monitor (Aug. 5, 2010), http://www.csmonitor.com/Business/Donald-Marron/2010/0805/How-should-we-price-e-books; Paul Biba, *Why Smashwords moved to "agency pricing" – explained by Mark Coker*, Teleread.com (Dec. 2, 2010), http://www. teleread.com/paul-biba/why-smashwords-moved-to-agency-pricing-explained-by-markcoker/ (reviewing traditional wholesale model for pricing and distributing books and chronology of shift to agency arrangements).

for its own eReader, the Kindle), Amazon set $9.99 as the standard price for most new releases, even though at times Amazon purchased the content near or above $9.99.[16]

105.    The Agency 5 (who were five of the six major trade book publishers of fiction and nonfiction works) simultaneously entered into these agreements with Apple to switch from a wholesale pricing model to Agency model for eBook sales.  This was an unprecedented industry shift in pricing (and sales model) in the book industry in the United States.

106.    Each Agency Agreement specifies that the publisher will set prices for their eBooks that were offered through the iBookstore based on a formula tied to the list price of physical books.  This eBook formula would cause prices for eBooks to increase.

107.    This common formula agreed to by the Publisher Defendants and Apple was intended to increase, standardize and stabilize most first-release general fiction and nonfiction titles.  This scheme would have the effect of increasing and stabilizing eBook prices to a range of $12.99 to $14.99 for many newly released general fiction and nonfiction titles.[17]

108.    Apple and the Publisher Defendants also agreed that the Publisher Defendants would not set prices of eBooks offered through other distribution channels (e.g., Amazon's Kindle store) below the prices the Publisher Defendants sold through the iBookstore (the "MFN Clause").[18]  They also agreed that the Publisher Defendants would sell through other vendors under the Agency model exclusively, abandoning the wholesale model altogether for online vendors of any meaningful size.

---

[16]    Rich & Stone, *supra* n.13; Erica Naone, *iPad Rattles the e-Bookshelves*, Tech. Rev. (Feb. 2, 2010), http://www.technologyreview.com/computing/24443 ("Under its existing model, Amazon buys books from publishers for a set fee in bulk [and] reportedly often pays publishers more than $9.99 for some books, selling them at a discount in order to drive adoption of the Kindle.").

[17]    Rich, *supra* n. 12; *see also* Jeffrey A. Trachtenberg & Geoffrey A. Fowler, *E-Book Pricing Put Into Turmoil*, Wall St. J. (Feb. 1, 2010), http://finance.yahoo.com/news/pf_article_108723.html.

[18]    Rich, *supra* n.12.  The agreement also reportedly contains language allowing Apple to obligate publishers to discount eBook prices on bestsellers below the $12.99 to $14.99 range in order to compete with brick-and-mortar bookstores and competing online sites.  *Id.*

109.    The MFN Clause guaranteed Apple that the Publisher Defendants would not allow their eBook titles to compete on a lower price elsewhere, such as through other eBook distributors, including Amazon, starting on April 3, 2010 – the iPad official release date.  Due to the MFN Clauses, all of the Publisher Defendants had committed themselves to preventing Amazon – or any other retailer – from competing with Apple by selling new eBook titles at more pro-consumer price points.

110.    The effect of the MFN Clause, combined with the pricing formula tied to physical book prices, was to increase prices and reduce competition for the eBooks of the Publisher Defendants, specifically for the price of most newly released adult fiction and nonfiction eBooks; this resulted in increasing and stabilizing eBook prices and eliminated competitive pricing. Apple coordinated these agreements with the Agency 5.  On information and belief, in the course of entering into agreements with Apple, Apple and the Agency 5 communicated the terms of the agreements and pricing information with each other, including signaling to each other that they would agree to the MFN Clause and price formula that would increase and standardize pricing to a range between $12.99 to $14.99.

111.    Thus, the Agency 5 all agreed with Apple they would not allow Amazon to price compete with Apple -- or any other retailer – by selling the Agency 5's new eBook titles at Amazon's $9.99 price point, after April 3, 2010.  Thus, the Publisher Defendants agreed to set the deadline for the switch to the Agency model on April 1, 2010.

112.    Press reports indicate that each of the Publisher Defendants were negotiating with Apple simultaneously in the two weeks before the iPad's release and adopted the Agency model within days of each other.  This move to the Agency model was a seismic and unprecedented shift in the sales model of the publishing industry in the United States.  Upon information and belief, each Publisher Defendant agreed to substantially identical Agency Agreements – agreements that, it bears repeating, worked a radical change in the business model of each company – despite the short time frame and the supposed confidentiality of each negotiation. Upon information and belief, all of the key terms – Apple's thirty percent commission; the MFN

Clause; the April 1, 2010 cut-off for all non-Agency sales – were virtually identical, even though they were ostensibly negotiated by different parties with different market positions and bargaining power.

113.   The fact that Apple brokered the simultaneous switch to the Agency model, and the Publisher Defendants agreed to standardize higher eBook prices, is amply demonstrated by a interview immediately after announcing the iPad launch in which Apple CEO Steve Jobs told Walt Mossberg of the Wall Street Journal that Amazon's $9.99 pricing for eBooks was about to end:

| Mossberg: | Why should [a consumer] buy a book for $14.99 on your device when she can buy one for $9.99 from Amazon or Barnes & Noble? |
| Jobs: | That won't be the case. |
| Mossberg: | You won't be $14.99 or they won't be $9.99? |
| Jobs: | ***The prices will be the same. . . . Publishers are actually withholding their books from Amazon because they're not happy.*** (Emphasis added.) |

114.   Absent Apple's knowledge of and participation in the unlawful conspiracy, Steve Jobs would not have been able to predict future eBook pricing with such startling accuracy.

115.   It was also the Publisher Defendants' intent to reduce pricing competition for the same titles sold in different formats (physical versus electronic). By moving to the Agency model, the Publisher Defendants could increase eBook prices at or above the prices for the same title in physical format and attempt to forestall physical book price erosion.

116.   Remarkably, even though the Publisher Defendants' switch to the Agency model was an unprecedented and radical change in the book industry, and Amazon possessed approximately ninety percent of the eBook sales market, none of the Agency 5 publishers told Amazon of the pending move to the Agency model until one week before Apple's announcement on January 27, 2010. By the time any Publisher Defendant told Amazon, they had already committed themselves to refusing to do business with Amazon on any other terms.

117.    Amazon was each publishing house's largest distributor. Its entry into the physical book market, by all accounts, had been a shot in the arm for an industry whose profitability had once been sinking. According to The New Yorker, Amazon had "a profound effect on publishers' business, creating a place where customers could reliably find books that were no longer being promoted in stores." These backlist titles "sell reliably over time" and "are vital to publishing houses."

118.    When the Agency 5 confronted Amazon, Amazon sold approximately ninety percent of all eBooks purchased in the United States. Pursuant to the conspiracy, each of the Agency 5 simultaneously issued an ultimatum to its most powerful distributor, demanding that it cede control of retail prices, a concession that Amazon had already indicated it would not do. Unilaterally, such a move could be disastrous: if Amazon were to pull a publisher's eBook catalog – or, even worse, its eBook catalog *and* its physical books – it would devastate a publisher's sales.

119.    For any individual publisher, throwing its lot in with Apple who had zero eBook or physical book sales – and withholding books from or otherwise threatening the leading distributor, Amazon – was dangerous for other reasons. Unlike Kindle eBooks, Apple's iBooks sold through its iBookstore could only be read on its own devices. A Kindle eBook could be read on a Kindle, as well as other devices such as a computer and even an iPhone, an iPad or an iPhone. Thus, a publisher would have its books on the iPad whether or not it joined forces with Apple, eliminating the need to concede to unwanted terms with Apple or antagonize Amazon. The iPad would not help a publisher tap into a new customer market; as industry analyst James McQuivey told the Wall Street Journal, "If you're an iPad buyer, chances are about 90% that you're also a book buyer on Amazon."

120.    The iPad was also less ideal for reading than the Kindle, according to many commentators. The iPad was heavier, making it awkward to read for long periods of time, unlike the Kindle and other eReaders; and its screen reflected too much light to be read in the sun

easily, unlike the Kindle and other eReaders.  As MSNBC bluntly reported, "The Kindle is a better e-reader."

121.   Each Publisher Defendant, had it acted independently, thus had numerous reasons not to commit itself to Apple at the risk of losing distribution through Amazon.  It would potentially be foregoing its largest and most effective distributor of eBooks; jeopardizing a revolutionary and highly lucrative means of delivering its backlist to customers; accepting a lower profit margin on each eBook; and abandoning an established customer base using the industry-leading eReader.

122.   In short, to take on Amazon alone would have been a reckless, almost suicidal move.  But to take on Amazon with the assurance that five of the six largest publishing houses in the nation, the producers of seventy-five to eighty-five percent of the U.S. fiction market, would stand together, was an unbeatable gambit.

123.   It was also, as the Agency 5 well knew, illegal.  According to The New Yorker, "none of the publishers seemed to think that they could act alone, and if they presented a unified demand to Amazon they risks being charged with price-fixing and collusion."[19]  The scheme described above allowed them to achieve the latter – going to Amazon within days of each other with both common demands and common threats if Amazon would not accede.

124.   Once the Publisher Defendants and Apple agreed to the radical switch to the Agency model, the Publisher Defendants approached Amazon to require it to switch to a similar structure.  Although none of the Agency 5 had even mentioned this radical change in their business model, within the publishing industry it was well known that Amazon was the true target of the negotiations between the Publisher Defendants and Apple.  Thus, Michael Cader, founder of the Publishers Lunch newsletter, e-mailed Amazon on January 18, 2010 – before any Publisher Defendant had broached the subject with Amazon – to ask: "have you gotten wind yet of the Apple-and-beyond ebook selling model that *publishers* are working on – and have you

---

[19]   Ken Auletta, *Publish or Perish: Can the iPad Topple the Kindle, and Save the Book Business?*, The New Yorker (April 26, 2010), http://www.newyorker.com/reporting/2010/04/26/100426fa_fact_auletta.

decided what you're going to do when *publishers* roll it out?" (Emphasis added). As Cader observed, the new "ebook selling model" was something that *publishers*, collectively, were working on – and, just as he correctly warned, the *publishers* were about to roll it out.

125.    The first time any of the Agency 5 disclosed their plan to Amazon to move to the Agency model was on January 20, 2010 – a mere seven days before Apple's announcement.

126.    In fact, on the exact same day – January 20, 2010 – *four* defendants "independently" proposed the agency model to Amazon. Defendants Hachette, HarperCollins, Simon and Schuster, and Macmillan each met on that day in New York with Amazon representatives and each disclosed for the first time to Amazon their plan to move to the Agency model. This created a face-off between the Agency 5 and Amazon. These meetings, all occurring on the same day, were not independent events but had been collectively planned by the Agency 5.

127.    Macmillan reportedly proposed that Amazon agree to sell Kindle editions of Macmillan's books as an agent, on the same 70/30 terms contained in the Publisher Defendants' agreement with Apple.[20] Alternatively, Macmillan offered to permit Amazon to keep purchasing eBooks under the existing wholesale model, but warned that it would begin delaying release of those eBook editions (reducing output) until seven months after publication of the hardcover edition.[21] The latter offer would have crippled Amazon's competitive position against Apple.

128.    Macmillan was able to threaten Amazon with this ultimatum even though Amazon at the time possessed ninety percent of the market share for eBook sales, because, on information and belief, Macmillan knew each of the other Publisher Defendants had reached similar agreements with Apple. Like Macmillan, the other Publisher Defendants and Apple had agreed to a pricing formulae and MFN Clauses, assuring themselves that Amazon would be

---

[20]   Brad Stone & Motoko Rich, *Amazon Removes Macmillan Books*, N. Y. Times, Jan. 30, 2010, at B4. *See also To: All Macmillan authors/illustrators and the literary agent community*, (John Sargent letter), *supra* n.7.

[21]   *See To: All Macmillan authors/illustrators and the literary agent community*, (John Sargent letter), *supra* n.8.(quoting Sargent as saying "I told [Amazon] that they could stay with their old terms of sale, but that this would involve extensive and deep windowing of titles").

closed out of the market for the Publisher Defendants' eBook titles unless Amazon agreed to allow the Publisher Defendants to raise prices.

129.    Amazon made an initial effort to fight by pulling all Macmillan titles off both the Kindle site and Amazon.com.[22]

130.    Amazon briefly ceased sales of Macmillan titles; however, by the end of the weekend, the books were back for sale and Amazon had bowed to Macmillan's demands.[23]   In a strongly worded message on its website, Amazon stated:

> We have expressed our strong disagreement and the seriousness of our disagreement by temporarily ceasing the sale of all Macmillan titles. We want you to know that ultimately, however, we will have to capitulate and accept Macmillan's terms because Macmillan has a monopoly over their own titles, and we will want to offer them to you even at prices we believe are needlessly high for e-books.

Very soon after, Amazon entered into Agency agreements with each of the four other major publishers that had signed on with Apple.[24]

131.    These individuals met on the following occasions to implement the eBooks price fix:

---

[22]   Stone & Rich, *supra* n.19. Amazon did, however, permit the continued sale of Macmillan books by third parties on Amazon.com. *See To: All Macmillan authors/illustrators and the literary agent community*, (John Sargent letter), *supra* n.7.

[23]   *See Whose move? Amazon and Macmillan vie for position*, L.A. Times, http://latimesblogs.latimes.com/jacketcopy/2010/02/amazon-macmillan-conflict.html (quoting Amazon letter to Kindle customers indicating that despite "[its] strong disagreement" Amazon was giving in to Macmillan's terms because "Macmillan has a monopoly over their own titles, and we will want to offer them to you even at prices we believe are needlessly high for e-books"); Trachtenberg & Fowler, *supra* n.16. Shortly thereafter, Sony reportedly also switched over to the agency model.  John Timmer, *E-book prices to rise as Amazon, Sony adopt agency model* (Apr. 2010), http://arstechnica.com/gadgets/news/2010/04/e-book-prices-to-rise-as-amazon-sony-adopt-agency-model.ars.  Google has apparently also given in to publishers' demands and is offering them agency agreements to participate in its recently launched Google e-books store.  Murad Ahmed, *E-books: Publishers Poised for Victory in Latest Battle*, The Times (London), Feb. 15, 2010; *Google to take on Amazon, Apple, Barnes & Noble with new e-book store*, L.A. Times, http://latimesblogs.latimes.com/technology/2010/12/google-amazon-apple-barnes-noble-with-new-e-book-store-kindle.html (last visited Jan. 18, 2012).

[24]   At that point Random House was the only one of the six major U.S. publishers to stick with the wholesale distribution model.  *See* Jeffrey A. Trachtenberg, *Random House Balks at Apple's Book Pricing*, Wall St. J., Apr. 5, 2010, at B4; Marron, *supra* n.14.

| Nature of Mtg. | Date | Time | Location | Persons Present |
|---|---|---|---|---|
| In person | 1/20/2010 | Unknown | New York City | Brian Murray (Harper Collins) Ana Maria Alessi (Harper Collins) Leslie Hulse (Harper Collins) Russell Grandinetti (Amazon) David Naggar (Amazon) |
| In person | 1/20/2010 | Unknown | New York City | Michael Sellect (Simon Schuster) Laura Porco (Amazon) |
| In person | 1/20/2010 | Midday (lunch) | New York City | John Sargent (Macmillan) Russell Grandinetti (Amazon) |
| Phone | 1/21/2010 | Unknown | N/A | John Sargent (Macmillan) Russell Grandinetti (Amazon) |
| Phone | 1/22/2010 | Unknown | N/A | Carolyn Reidy (Simon & Schuster) Russell Grandinetti (Amazon) |
| Phone | 1/22/2010 | Unknown | N/A | John Sargent (Macmillan) Russell Grandinetti (Amazon) |
| Phone | 1/26/2010 | Unknown | N/A | Michael Sellect (Simon & Schuster) David Naggar (Amazon) |
| In person | 1/28/2010 | Unknown | Seattle | John Sargent (Macmillan) Brian Napack (Macmillan) Paul Slevin (Macmillan) Steve Kessel (Amazon) Russell Grandinetti (Amazon) David Naggar (Amazon) Laura Porco (Amazon) |
| Phone | 1/29/2010-2/5/2010 | Various | N/A | Numerous telephone conferences between Amazon personnel (including Russell Grandinetti, David Naggar, Laura Porco, John Lange and Tim Leslie) and Macmillan personnel (including John Sargent, Brian Napack, Paul Sleven, Amy Wolosoff, and Fritz Foy) |

132.    During this critical time period, a book industry trade meeting occurred.  The American Booksellers Association held the ABA's Fifth Annual Winter Institute, from February 3 through February 5, 2010, in the Doubletree San Jose, San Jose, California.  Many key industry participants attended, including personnel from the Agency 5.

133.    One program discussion that occurred on February 3, 2010 was entitled:  "The State of General Trade Publishing:  Three Noted Publishers Discuss How Digitization is Impacting Their Business & the Industry."

134.    During this trade meeting, the issue of the Agency model was discussed.  And two high-level executives from Hachette and Macmillan were seen meeting in a hotel bar.

135.    While Amazon was publicly resisting Macmillan's demands to move to the Agency model, each of the Agency 5 were also privately imposing the same April 1, 2010 deadline (the iPad sales launch) for Amazon to accept their ultimatum.  If Amazon did not agree to switch to the Agency model by April 1, the Agency 5 would withhold from Amazon newly released titles in the eBook format.  That would deprive Amazon of seventy-five to eighty-five percent of fiction titles, and many leading nonfiction titles, just as its most potent competitor was releasing a new device that was expected to prompt a surge in eBook purchasing.

136.    In fact, Amazon was unable to conclude negotiations with Hachette to move to the Agency model by Hachette's April 1, 2010, deadline.  As a result, on April 1, 2010, Amazon posted the following message on its website:

> [Hachette] has disallowed the sale of ebooks except on agency terms effective as of 12:01 am this morning.  We came to terms late last night but we cannot be operationally ready to sell their ebooks on agency terms until two days from now – April 3 – when we will also cut over for the other publishers that are switching to agency.  If we can get a two day extension from Hachette to continue selling their ebooks under the prior terms, we can have the Hachette ebooks promptly back for sale today.  If not, then they will be back on April 3.[25]

137.    Penguin also refused to offer Amazon new titles in the eBook format.  On April 1, 2010, Penguin sent a letter to its agents and authors that read, in part:

> In recent weeks we have been in discussion with our retail partners who sell eBooks, including Amazon, to discuss our new terms of sale for eBooks in the U.S.  At the moment, we have reached an agreement with many of them, but unfortunately not Amazon – of course, we hope to in the future. . . .  Your newly released eBook is currently not available on Amazon, but all of your eBooks released prior to April 1st are still for sale on their site. . . .  Our

---

[25]    *Announcement: Publisher Update*, Amazon. com, http://www.amazon.com/forum/kindle/TxIX30302M2NFH?_encoding=UTF8&cdForum=Fx1D 7SY3BVSESG&displayType=tagsDetail (last visited Jan. 19, 2012).

conversations with Amazon are ongoing and we do hope to
continue our long-term relationship with them.[26]

138.    HarperCollins and Simon & Schuster struck a similar position with Amazon
during this time period – adopt the Agency model by April 1, 2010 or eBook titles would be
withheld from Amazon.

139.    The Publisher Defendants were well aware of the negotiations going on between
Amazon and their co-conspirators.  Indeed, HarperCollins' CEO, Brian Murray, admitted as
much to Amazon, saying in an e-mail that "I know you have many discussions going on right
now."

140.    After Amazon capitulated and accepted the Defendants' price-fixing scheme, an
Apple insider acknowledged to The New Yorker that Apple had expected and intended the
publishers to take on Amazon.

141.    Amazon itself recognized the concerted nature of the scheme and threats
instigated by the Agency 5 with Apple.  Contemporaneous with these actions, Amazon was
concerned with the parallel steps taken by the major U.S. book publishers and believed the
publishers' private communications with Amazon about their uniform desire for Amazon to raise
its prices, their public statements to that effect, and the seemingly coordinated tactics that they
employed to force eBook prices higher threatened to dampen the robust competition that existed
among different book retailers and eBook platforms, and also suggested a high level of
horizontal coordination.  Amazon concluded that Apple and the Publisher Defendants
collectively had agreed to force Amazon and other competing retailers to increase eBook prices
to the same level as Apple's.  Amazon also felt that the similarity of the major publishers'
conduct and the timing of their tactics in response to Amazon's eBook pricing raised significant
concerns about whether these actions resulted from an improperly high level of horizontal

---

[26]    Dennis Johnson, *Amazon bans some Penguin, and all Hachette ebooks*, Melville House
(Apr. 2, 2010), http://mhpbooks.com/13973/amazon-bans-some-penguin-and-all-hachette-
ebooks/.

cooperation and communication among publishers and between publishers and retailers who compete with Amazon, rather than lawful competition.

142. Amazon was not the only target of these concerted actions. Making good on their uniform threat to Amazon, at or near midnight on March 31, 2010, each of the Agency 5 completely cut off another eBook retailer – BooksOnBoard – because it had not yet agreed to switch to the Agency model.

143. To effectuate the price-fix, representatives of the Agency 5 met with Amazon in April 2010 on at least the following occasions:

| Nature of Mtg | Date | Time | Location | Persons Present |
|---|---|---|---|---|
| In person | 4/14/2010 | Unknown | New York City | David Young (Hachette) Steven Kessel (Amazon) |
| In person | 4/14/2010 | Unknown | New York City | Steven Kessel (Amazon) HarperCollins representative |
| In person | 4/15/2010 | Unknown | New York City | Steven Kessel (Amazon) Penguin representative |
| In person | 4/15/2010 | Unknown | New York City | Steven Kessel (Amazon) Random House representative |
| In person | 4/15/2010 | Unknown | New York City | Steven Kessel (Amazon) Simon & Schuster representative |
| In person | 4/15/2010 | Unknown | New York City | Steven Kessel (Amazon) Hachette representative |
| In person | 4/15/2010 | Unknown | New York City | John Sargent (Macmillan) Steven Kessel (Amazon) |
| In person | 4/19/2010 | Unknown | London | Charlie Redmayne (HarperCollins) David Naggar (Amazon) |
| In person | 4/22/2010 | Morning (breakfast) | London | Genevieve Short (Penguin) David Naggar (Amazon) |
| Phone | 4/22/2010 | Unknown | N/A | David Naggar (Amazon) Tim McCall (Penguin) |
| In person | 4/28/2010 | Unknown | Unknown | Ayala Thomas (Amazon) Laura Porco (Amazon) Hyperion representative |

144. Eventually Amazon, in order to compete and offer eBooks from the Agency 5, agreed to the Agency model. It did so despite its concern that the publishers "coordinated

010260-11 640104 V1

tactics" "force e-books prices higher" in a way that threatens to "dampen the robust competition that currently exists among different book retailers and e-book platforms."

145.   As a result of the coordinated and unlawful conduct of the Defendants, Sony and Barnes & Noble also adopted the Agency model for eBook pricing, further stabilizing the industry.

146.   Consumers were clearly angered by the switch to the Agency model and the anticipated rise in eBook prices that it would engender.  In March 2010, after the switch was announced but before it was effectuated, eBook sales increased 184%.  Some Kindle users posting in various online communities attributed the sudden spike in eBook sales to a last-ditch effort by readers to stock up on eBooks before the switch to the Agency model.  One such user stated: "Myself and another Kindle owner definitely bought more books before Agency model, perhaps 8 each."

147.   Defendants' conduct has had, and continues to have, real economic consequences to potential class members.  Here are just few examples of the harm Defendants are inflicting on consumers, which they have described:

- The Kindle is very important to me because I am visually impaired and use the Kindle because of its adjustable font sizes. . . . The price increase for e-books has affected me greatly, making some books unattainable for me.  Buying the print version, or checking it out from the public library, are simply not options for me (in almost all cases).

- Higher prices [have] hinder[ed] the start of a program at my middle school library.

- Our family is on fixed incomes (self, wife, mother) . . . . We have had to drastically change our reading habits since the Agency Model was implemented.  Mother has Parkinson's and cannot read paper copy any longer.  The Kindle has been a Godsend to her, but the Agency model/collusion has made obtaining reading material difficult.

- I am a disabled senior and got my Nook with the hope that I could purchase e-books at a lower cost than paper books.  I quickly discovered that some e-books are more expensive than hardcovers.  I refuse to spend more than $10 for an e-book.

- I have noticed the prices of e-books has risen, especially for new releases. Sometimes they are only a few dollars cheaper in e-book format or at the same price. Since it is not printed and not using paper/or other environment and sent electronically this does not make sense. On kindle new books use to be 9.99 now it is not the case new books can be more than $20 in some cases. That means an increase of more than 100% increase.

- The Agency Model has severely limited my purchasing new releases from many of my favorite authors not to mention new authors I would have tried but now I won't. What amazes me the most? When publishers release the soft cover version of books - many months after the hard cover is released - they DO NOT lower the price of the e-book accordingly (or at all!)

  I have to admit that in certain instances I have (grudgingly) paid the higher price.

- I am an avid reader with corneal dystrophy. I bought both a Sony Reader and an Amazon Kindle so that I could make large print books out of most of my reading material. Prices have gone so high since the agency model came out that it's no longer affordable to buy current bestsellers.

- I have purchased approximately 4 dozen ebooks from Amazon.com. Many of these books were purchased after the introduction of the agency model. After investigating the possibility of switching to another ereader platform for lower ebook prices, I realized that ebooks from all sources (Amazon, B&N, Kobo, iBooks) were priced identically and higher than the previous $9.99 or less initially offered by Amazon in the early days of their Kindle ereader. The lack of competition in the ebook market has certainly cost me more money than I would have spent in a truly free market setup.

- After the battle waged by Apple and the Big 5 publishing houses against Amazon and the ebook-buying public, the 'agency model' caused the prices of ebooks I subsequently purchased to go up exponentially after April 1st, 2010. Prior to that time, I was buying ebooks for my Kindle at a much lower price.

  This was a much-discussed situation and many of us were watching prices quite closely. The prices jumped noticeably on the day that the agency model took effect. Many of the books by my favorite authors went from 9.99 to 12.99 to 14.99, thereby becoming too expensive for me, as I live on a low income.

- I am an avid e-book reader and I noticed the price of ebooks rise after the deal Apple made with the publishers. I'm sure

I have paid more for my ebooks than I would have if Amazon had been allowed to continue their competitive pricing. I worked for Barnes & Noble at the time of the deal, and was actively promoting Barnes & Noble's new Nook ereader to customers. Many customers stated that Amazon's ebooks were cheaper, and I would answer that by saying that the publishers would soon be forcing equal pricing across all online ebook retailers (because of the deal with Apple).

- I've bought a number of ebooks at price points higher than the 9.99 price amazon attempted to set based on prices set by the publisher. Currently I limit the number of ebooks I buy because I feel that current best sellers are well overpriced based on what I know about the publishing business.

- I have held off buying new ebooks due to the high prices

- I have been reading ebooks for a very long time, & they became even more important to me due to visual impairment, because I could enlarge the font so easily. I purchased a B&N nook when it came out, because the ebooks were so much cheaper than their physical counterparts & the large print books that were available. Unfortunately, after Apple's iBookstore hit the scene and the Big 6 implemented their Agency Model agreement with them & then shoved it onto other eretailers, my pocketbook - already feeling the financial squeeze from high gas prices - began to suffer. I watched ebooks skyrocket to unreasonable prices, meeting & many times even exceeding their physical counterparts in price, sometimes even doubling from the pre-Agency Model pricing. Unlike many consumers, I have no choice but to pay this price: in most physical books, the font is simply too small for me to read easily.

- Because of the prohibitive pricing on e-books, largely dictated by the companies listed in your suit, I have been unable to adopt e-book technology. While I have not suffered a monetary loss the inability to come forward to a technology which is in some cases the ONLY method of reading a recent release is deeply felt.

- I loved Amazon's pricing model but since books have become more expensive I have been forced to buy dramatically less of them. I understand the publishers want to set their own prices, but the collusion between major publishers is illegal. I have an iPhone and an iPad, and not a Kindle but this is blatant monopolistic behavior by Steve Jobs, Apple and the publishers. Disgusting.

- This case has greatly affected me. I am a large consumer of ebooks. I have owned or used some form of e-reader device for the past few years. I originally owned a Kindle, and now

I use the Kindle app on the iPad. I have purchased many books for the Kindle after the price hike went into effect. I did not have the ability to purchase ebooks that were not affected by the price hike, since the price hike forced all ebook stores to raise their prices. Had the ebook prices stayed at $9.99, I would have saved a lot of money on ebooks.

- I have purchased several hundred ebooks over the last two plus years. I own Kindles and purchased books through Amazon. I find it outrageous that with the dawn of the iPad, virtually all of the major book releases are priced at or about the price of the hardback edition. The price of the eBook edition remains at this inflated price even after the mass paperback edition is published. I believe that in a true free market environment, eBooks should and would be less in price than the lowest priced commercially available printed edition (as Amazon originally implemented its market strategy).

- I just want to see justice done in this situation because I experienced this as it happened. I was an early Kindle adopter and got used to paying $10 a book. Then I heard rumors that Apple was going to enter the market and change the pricing structure and lo and behold it happened. Now I'm rarely buying an eBook for $10 and more often than not, paying around $15.

  I love Apple products and am writing this on an iPad, but Apple like most corporations needs some parenting in the form of litigation and/or regulation.

148.    Collusion was a necessary ingredient of the Publisher Defendants' anticompetitive plan to gain direct control over eBook pricing. If they had not all conspired to force retailers like Amazon to adopt the Agency model under the same terms and at the same time, consumers would have simply reacted to rising eBook prices by choosing to purchase their eBooks from publishers or retailers who did not participate in the Agency model.

149.    Indeed, this is exactly what happened in the case of Random House, the only big-six publisher who did not conspire with Apple to adopt the Agency model in early 2010. Random House continued to use the wholesale model, allowing Amazon and other eBook distributors to price eBooks below the Agency 5. In 2010, Random House saw a 250% increase in eBook sales in the United States and an 800% increase in the United Kingdom.

150.    As a result of Random House being willing to allow price competition, Apple –
per its agreements with the Agency 5 – refused to allow Random House to sell its books through
Apple's iBookstore.  Absent the anticompetitive restraints agreed to by Apple and the Publisher
Defendants, Apple would not have an economic incentive to force Random House to utilize the
Agency model.  Instead, Apple would seek the widest possible selection of eBooks whether or
not sold directly or through the Agency model.  In banning Random House books from its
iBookstore, Apple acted pursuant to the conspiracy outlined above and with the purpose and
intent of forcing Random House to join the cartel it had helped to create and raise prices.
Random House switched to the Agency model effective March 1, 2011.

151.    The Publisher Defendants and Apple could not have switched to the Agency
model without a coordinated effort because the same-title eBooks are substitutes for each other.
For example, if a consumer saw that a title listed through Apple's iBookstore was $14.99, and
was also available at $9.99 if purchased through Amazon's Kindle App, the consumer could
simply just load the least-expensive version of the eBook title onto their eReader device.
Moreover, if one publisher's eBook title was priced at $14.99, versus a comparative title
available through Amazon at $9.99, there is a risk that the consumer would forego the more
expensive title and choose to purchase the less expensive, differently titled eBook.  Thus, no
single major publisher would risk such loss of sales and insist on the Agency model by itself.
Thus, as a matter of economics, the Agency model works only if there is an agreement by a
significant number of publishers to the new pricing model.

152.    The Agency 5 were willing to sacrifice revenue in the short-run in order to
**undermine Amazon's market position and ability to maintain a low price points for**
**consumers.**  But no individual publisher would dare incur short-run losses unless it knew its
rivals were also willing to go along with the plan. Only by acting collectively could the Agency 5
block Amazon's threat to drive down wholesale prices in the future.

153.    Moreover, the shift to the Agency model occurred simultaneously and almost
overnight – under any definition this shift constitutes a radical, structural change to a business

010260-11 640104 V1

model that has been in existence for decades. The Agency 5 did not have experience in retail pricing and all agreed with Apple to take over this function at the same time, in a matter of weeks, without the experience or extant infrastructure.

154.   The shift to the Agency model required significant changes in the industry, including technical changes in the distribution chain. These changes likely required significant information exchanges between Defendants in order to quickly move to the new Agency model.

155.   For example, the publishing industry had developed a standard for disseminating pricing and sales information, referred to as Online Information eXchange – or ONIX. ONIX is designed to support computer-to-computer communication between parties involved in creating, distributing, licensing, or otherwise making available intellectual property in published form, whether physical or digital.

156.   This ONIX standard is overseen by the Book Industry Study Group, Inc. ("BISG") in the United States. BISG is the U.S. book industry's leading trade association for policy, standards and research. BISG's members include Defendants, Hachette, HarperCollins, Macmillan, Pearson Technology (affiliated with Penguin), and Simon & Schuster.

157.   ONIX is also overseen by EDItEUR, an international body which maintains product information standards.

158.   Working together, the Association of American Publishers and the UK Publishers Association made rapid changes to the ONIX technical system in order to adapt the system to the new Agency model by April 1, 2010.

159.   On March 31, 2010, BISG announced a "rapid" change to the ONIX standard to allow for a new standard means of communicating the sales terms for the Agency model for eBooks. BISG described the changes that needed to be made due to the new Agency model:

> The agency model is a newly defined commercial model for
> e-book sales which is distinctly different from the more traditional
> retail model. In the agency model, the publisher sells to the
> consumer via an "agent" – who may be an online retailer or
> another similar intermediary – who fulfills the sale on the
> publisher's behalf and receives a commission from the publisher
> for doing so. Although the traditional model, in which the
> publisher sells the book to retailers at wholesale, has long been

accommodated for in ONIX for Books, appropriate new code values had to be developed rapidly to meet requirements of the new agency model. These new code values are now included in the just-published ONIX Code Lists Issue 11.[27]

160.     On information and belief, Defendants used their membership in BISG as a means to communicate and coordinate their switch to the Agency model, and share sensitive competitive information.

161.     The anticompetitive nature of this conspiracy, and the Publisher Defendants' motivation to control eBook pricing, is also revealed by the fact that certain eBooks are now priced the same as – or even higher than – the price for the same-titled physical book. Yet, the printing and distribution costs of hardcover books are greater. Thus, absent anticompetitive motivation and conduct, the difference in prices between hardcover books and eBooks would be greater. However, this is often not the case as publishers are motivated to raise eBook prices to levels close to or above the price of physical books. The Amazon model was a direct threat to accelerating the decay of hardcover and paperback book sales (and margins).

162.     Jobs and Apple would not have agreed to go to the Agency model unless they knew the Publisher Defendants would not sell their eBooks through other distribution channels at lower prices. Absent such an agreement, Apple could not have competed at the higher prices for eBooks if it did not coordinate with the Publisher Defendants to ensure Apple was not the only eReader platform agreeing to the Agency model and higher, standardized prices.

163.     Apple conspired with the Publisher Defendants to switch to the Agency model and artificially inflate the price range of eBooks in order to cut into Amazon's substantial share of the markets for eBooks and to prevent Amazon from emerging as a serious competitor to its mobile platforms for the distribution, storage and access of digital media.

164.     Apple's strategy for gaining market share at the expense of Amazon was successful. According to a 2010 survey conducted by ChangeWave, between August and

---

[27]  *"Agency Model" Now Accommodated in Book Industry Standard for Public Information*, BISG, http://www.bisg.org/news-5-546-press-releaseagency-model-now-accommodated-in-book-industry-standard-for-product-information.php (last visited Jan. 19, 2012).

December 2010, the iPad's share of the U.S. eReader market rose 16 percentage points and the Kindle's share fell fifteen percentage points.

165.    The trend of Apple's increasing market share and Amazon's declining share is predicted to continue. Of the respondents in the ChangeWave survey planning on buying an eReader in the next ninety days, forty-two percent said they'd like an iPad, while only thirty-three percent said they would opt for a Kindle. In addition, a Credit Suisse analyst announced in February 2010 that, as a result of the switch to the Agency pricing model, he expected Amazon's share of the eBooks market to fall from ninety percent to thirty-five percent over the next five years.

**F.    The Agreement Successfully Raised the Prices for eBooks.**

166.    The Publisher Defendants have used the pricing formula contained in the Agency Agreements to coordinate pricing for eBooks across retailers and to restrain competition in the market. For example, the prices of the following current or former bestselling eBooks are identical at Amazon, Sony, Apple and Barnes & Noble: Don't Blink (Hachette, $14.99); The Kite Runner (Penguin, $12.99); Heart of the Matter (St. Martin's Press/Macmillan, $9.99); and Best Friends Forever (Simon & Schuster, $11.99).

167.    As a result of the unlawful anticompetitive actions alleged above, the price of eBooks has soared. eBooks now often cost more than their print counterparts. For example, at Amazon.com the price of The Kite Runner (Penguin) costs $12.99 in Kindle version and $8.82 as a paperback. Other examples of this price discrepancy among current and former bestselling titles on Amazon.com include: Don't Blink (Hachette, $14.99 digital and $14.74 hardcover); Best Friends Forever (Simon & Schuster, $11.99 digital and $10.79 paperback); Heart of the Matter (St. Martin's Press/Macmillan, $9.99 digital and $8.03 paperback); and The Art of Racing in the Rain (HarperCollins, $9.99 digital and $7.99 paperback).

168.    In addition, because the price of eBooks is no longer set by the retailer, promotional discounts and customer reward programs have effectively ended as to eBook sales.

010260-11 640104 VI

Case 1:11-md-02293-DLC  Document 432  Filed 10/23/13  Page 50 of 77

169.    As a direct result of this anticompetitive conduct as intended by the conspiracy, the price of eBooks has soared. The price of new bestselling eBooks increased by forty percent on average, even though there had been no increase in costs that would justify these higher prices. The price of an eBook in many cases now approaches – or even exceeds – the price of the same book in hardcopy even though there are almost no incremental costs to produce each additional eBook unit. The price of the Publisher Defendants' eBooks sold on the iBookstore, facing no pricing competition from Amazon or other e-distributors for the exact same eBook titles, has remained at supra-competitive levels.

## G.    Federal, State, and International Antitrust Authorities Are Investigating the Agency 5 and Apple.

170.    The simultaneous switch by the Agency 5 publishers to the Agency model, timed with the release of the Apple iPad, has prompted antitrust scrutiny by several sovereigns.

171.    According to industry newsletter Publishers Lunch, the Texas Attorney General has launched an inquiry that "appears to focus on pricing practices for eBooks and Apple's entrance into the [e-book] market in particular."

172.    Connecticut's Attorney General has also launched an inquiry. After a preliminary review, former Attorney General Richard Blumenthal commented, "These agreements among publishers, Amazon and Apple appear to have already resulted in uniform prices for many of the most popular eBooks – potentially depriving consumers of competitive prices."[28]

173.    Blumenthal also said, "Amazon and Apple combined will likely command the greatest share of the retail e-book market, allowing their most-favored-nation clauses to effectively set the floor prices for the most popular e-books. Such agreements – especially when offered to two of the largest e-book retail competitors in the United States – threaten to encourage coordinated pricing and discourage discounting."[29]

---

[28]    *Attorney General Investigates Potentially Anticompetitive E-Book Deals With Amazon and Apple,* Office of the Attorney General State of Connecticut, http://www.ct.gov/ag/cwp/view.asp?Q=463892&A=3869 (last visited Jan. 19, 2012).

[29]    *Id.*

010260-11 640104 V1

174.    In March 2011, European Union antitrust regulators, working closely with Britain's Office of Fair Trading, made unannounced raids on eBook publishers in several countries.  According to the Associated Press, the European Commission had "reason to believe that the companies concerned may have violated EU antitrust rules that prohibit cartels and other restrictive business practices."[30]

175.    On December 6, 2011, The European Commission announced opening a formal investigation into the Agency 5 and Apple.  The announcement states:  "The Commission has concerns the publishers may have colluded to raise the price of e-books and that Apple may have facilitated this."[31]

176.    And on December 7, 2011, Sharis Pozen, acting Assistant Attorney General in charge of the Department of Justice's antitrust division, testified before Congress that the Department of Justice is investigating anticompetitive behavior in the pricing of eBooks.

177.    On information and belief, these antitrust inquiries are ongoing.

**H.    Defendants Exercised Market Power Over eBooks by Raising and Stabilizing Prices by More than Thirty Percent.**

178.    An eBook is an e-text that forms the digital media equivalent of a conventional print book, sometimes restricted with a digital rights management (DRM) system.  eBooks represent a distinct antitrust market.  The geographic market is the entire United States.  No reasonable substitute exists for eBooks.  Consumers who purchase eBooks value their flexibility and portability.  Consumers of eBooks can carry thousands of publications with them on a single device and have the ability to immediately purchase books rather than having to go to a brick-and-mortar bookstore.  In addition to saving time by not having to go to a bookstore, eBook readers need not pay shipping costs associated with online purchases of physical books.

---

[30]   Steve O'Hear, *European Commission Raids eBook Publishers on Suspicion of Cartel*, TechCruch Europe (Mar. 2, 2011), http://eu.techcrunch.com/2011/03/02/european-commission-raids-ebook-publishers-on-suspicion-of-cartel/.

[31]   Tom Espiner, *Apple Investigated by EU Over E-Book Pricing*, ZD Net UK Edition (Dec. 6, 2011), http://www.zdnet.co.uk/news/compliance/2011/12/06/apple-investigated-by-eu-over-e-book-pricing-40094589/.

Moreover, eBooks have a highly unique distribution methodology and unique pricing. The industry also views eBooks as a separate economic segment of the more general book market.

179.   A hypothetical monopolist that controlled the supply of eBooks would have the ability to raise the price of eBooks substantially for a significant period of time without consumers substituting another product.

180.   Defendants exerted market power over eBook sales, as directly demonstrated by the anticompetitive effects of their conduct. Here, Defendants exercised market power as evidenced by their ability to raise prices above the competitive level – by increasing prices by thirty percent or more percent above similar books published previously under the wholesale model as demonstrated below based on industry data:



**Average Prices of Bestselling eBooks Published by "Agency 5"**
**Wholesale vs. Agency**



Average Prices of Bestselling eBooks

010260-11  640104 V1



**Average Prices of All eBook Titles**
**Wholesale vs. Agency**

010260-11 640104 V1



Average eBook Prices in Periods since Publication

010260-11  640104 V1



181.    By coordinating and entering into the above agreements, Apple and the Publisher Defendants have raised, stabilized and standardized eBook prices.  Absent this anticompetitive conduct, eBook prices would be lower and there would be price competition.

182.    The Publisher Defendants have not required an Agency model for internet sales of physical books.  One can see the effect of the conspiracy was to increase and standardize pricing for eBooks, compared to the diverse competitive pricing for internet sales of the physical book for the same title under the wholesale model.

(a)     The following is a screen capture from Amazon.com displaying standardized higher prices for eBooks sold by the Publisher Defendants:

# New York Times® Bestsellers
**Fiction, Nonfiction, and Advice & How-To**

## New York Times® Bestsellers: Fiction







Smokin' Seventeen: A
Stephanie Plum...
> Janet Evanovich
List Price: $28.00
Kindle Price: $12.99

Against All Enemies
Tom Clancy, Peter Telep
Kindle Price: $12.99

Maine
> J. Courtney Sullivan
List Price: $25.95
Kindle Price: $12.99

The Girl Who Kicked
the Hornet's Nest
Stieg Larsson, Reg
Keeland
List Price: $27.95
Kindle Price: $12.99

Betrayal of Trust: A J.
P. Beaumont...
> J. A. Jance
List Price: $25.99
Kindle Price: $12.99







Silver Girl: A Novel
> Elin Hilderbrand
List Price: $26.99
Kindle Price: $12.99

Escape
> Barbara Delinsky
List Price: $25.95
Kindle Price: $12.99

The Devil Colony: A
Sigma Force Novel
> James Rollins
List Price: $27.99
Kindle Price: $12.99

The Paris Wife: A
Novel
> Paula McLain
List Price: $25.00
Kindle Price: $12.99

Folly Beach: A
Lowcountry Tale
Dorothea Benton Frank
List Price: $25.99
Kindle Price: $12.99

> See all New York Times® fiction bestsellers

## New York Times® Bestsellers: Nonfiction







The Greater Journey
> David G. McCullough
List Price: $37.50
Kindle Price: $19.99

Bossypants
> Tina Fey
List Price: $26.00
Kindle Price: $12.99

SEAL Team Six:
Memoirs of an Elite...
> Howard E. Wasdin,
Stephen A. Templin,
Stephen Templin
List Price: $26.99
Kindle Price: $12.99

The Miracle of
Freedom: 7 Tipping...
> Chris Stewart, Ted
Stewart
List Price: $28.99
Kindle Price: $9.99

Reckless
Endangerment: How
Outsized...
Gretchen Morgenson,
Joshua Rosner
List Price: $30.00
Kindle Price: $12.99

(b)     The following chart further details the standardization of supra-

competitive pricing effectuated by the conspiracy:

- 55 -

**Current Amazon Prices for New York Times Bestsellers (Hardcovers, Fiction and Nonfiction)**
**Bestseller List Week of August 7, 2011**

| Genre | Title | Author | Publisher | NYT Rank | Current Amazon Price |
|---|---|---|---|---|---|
| Nonfiction | BOSSYPANTS | Tina Fey | Hachette | 4 | $12.99 |
| Fiction | NOW YOU SEE HER | James Patterson and Michael Ledwidge | Hachette | 5 | $12.99 |
| Nonfiction | LIES THAT CHELSEA HANDLER TOLD ME | Chelsea Handler | Hachette | 8 | $11.00 |
| Fiction | THE BOURNE DOMINION | Eric Van Lustbader | Hachette | 9 | $12.99 |
| Fiction | ONE SUMMER | David Baldacci | Hachette | 11 | $12.99 |
| Fiction | BURNT MOUNTAIN | Anne Rivers Siddons | Hachette | 12 | $12.99 |
| Nonfiction | THOSE GUYS HAVE ALL THE FUN | James Andrew Miller and Tom Shales | Hachette | 15 | $14.99 |
| Nonfiction | AREA 51 | Annie Jacobsen | Hachette | 18 | $14.99 |
| Fiction | SILVER GIRL | Elin Hilderbrand | Hachette | 22 | $12.99 |
| Fiction | 10TH ANNIVERSARY | James Patterson and Maxine Paetro | Hachette | 31 | $14.99 |
| Nonfiction | CHELSEA CHELSEA BANG BANG | Chelsea Handler | Hachette | 34 | $12.99 |
| | | | **Average Hachette Price** | | **$13.26** |
| Fiction | PORTRAIT OF A SPY | Daniel Silva | HarperCollins | 2 | $12.99 |
| Fiction | STATE OF WONDER | Ann Patchett | HarperCollins | 8 | $12.99 |
| Nonfiction | THROUGH MY EYES | Tim Tebow | HarperCollins | 10 | $12.99 |
| Nonfiction | LOST IN SHANGRI-LA | Mitchell Zuckoff | HarperCollins | 11 | $12.99 |
| Nonfiction | DOES THE NOISE IN MY HEAD BOTHER YOU? | Steven Tyler | HarperCollins | 13 | $12.99 |
| Fiction | BEFORE I GO TO SLEEP | S. J. Watson | HarperCollins | 16 | $12.99 |
| Fiction | THE DEVIL COLONY | James Rollins | HarperCollins | 23 | $12.00 |
| Nonfiction | MY DAD SAYS* | Justin Halpem | HarperCollins | 24 | $9.99 |
| Fiction | FOLLY BEACH | Dorothea Benton Frank | HarperCollins | 32 | $12.99 |
| | | | **Average HarperCollins Price** | | **$12.66** |
| Nonfiction | SEAL TEAM SIX | Howard E Wasdin and Stephen Templin | Macmillan | 7 | $12.99 |
| Nonfiction | RECKLESS ENDANGERMENT | Gretchen Morgenson and Joshua Rosner | Macmillan | 9 | $12.99 |
| Nonfiction | STORIES I ONLY TELL MY FRIENDS | Rob Lowe | Macmillan | 16 | $12.99 |
| Fiction | QUINN | Iris Johansen | Macmillan | 18 | $12.99 |
| Fiction | IRON HOUSE | John Hart | Macmillan | 19 | $12.99 |
| Fiction | SUMMER RENTAL | Mary Kay Andrews | Macmillan | 28 | $12.99 |
| Nonfiction | THE BELEIVING BRAIN | Michael Shermer | Macmillan | 33 | $14.99 |
| | | | **Average Macmillan Price** | | **$13.28** |
| Fiction | SPLIT SECOND | Catherine Coulter | Penguin | 4 | $12.99 |
| Fiction | AGAINST ALL ENEMIES | Tom Clancy | Penguin | 10 | $12.99 |
| Fiction | DEAD RECKONING | Charlaine Harris | Penguin | 21 | $14.99 |
| Nonfiction | CAR GUYS VS. BEAN COUNTERS | Bob Lutz | Penguin | 25 | $12.99 |
| Nonfiction | THE PSYCHOPATH TEST | Jon Ronson | Penguin | 26 | $12.99 |
| Nonfiction | ON CHINA | Henry Kissinger | Penguin | 27 | $19.99 |
| Nonfiction | THE SECRET KNOWLEDGE | David Mamet | Penguin | 29 | $14.99 |
| Nonfiction | THE HELP* | Kathryn Stockett | Penguin | 29 | $9.99 |
| Nonfiction | MOONWALKING WITH EINSTEIN | Joshua Foer | Penguin | 31 | $12.99 |
| Nonfiction | IF YOU ASK ME | Betty White | Penguin | 32 | $12.99 |
| Fiction | CALEB'S CROSSING | Geraldine Brooks | Penguin | 34 | $12.99 |
| | | | **Average Penguin Price** | | **$13.72** |
| Fiction | A DANCE WITH DRAGONS | George R. R. Martin | Random House | 1 | $14.99 |
| Nonfiction | UNBROKEN | Laura Hillenbrand | Random House | 2 | $12.99 |
| Nonfiction | IN THE GARDEN OF BEASTS | Erik Larson | Random House | 3 | $12.99 |
| Fiction | HAPPY BIRTHDAY | Danielle Steel | Random House | 3 | $12.99 |
| Fiction | SMOKIN SEVENTEEN | Janet Evanovich | Random House | 6 | $12.99 |
| Nonfiction | INCOGNITO | David Eagleman | Random House | 12 | $12.99 |
| Fiction | THE GIRL WHO KICKED THE HORNETS NEST | Stieg Larsson | Random House | 13 | $12.99 |
| Nonfiction | DEMONIC | Ann Coulter | Random House | 14 | $12.99 |
| Fiction | MAINE | J. Courtney Sullivan | Random House | 14 | $12.99 |
| Fiction | THE PARIS WIFE | Paula McLain | Random House | 16 | $12.99 |
| Fiction | STAR WARS-CHOICES OF ONE | Timothy Zahn | Random House | 17 | $13.99 |
| Nonfiction | THE SOCIAL ANIMAL | David Brooks | Random House | 17 | $12.99 |
| Nonfiction | THE TRIPLE AGENT | Joby Warrick | Random House | 19 | $13.99 |
| Fiction | THE SILENT GIRL | Tess Gerritsen | Random House | 20 | $12.99 |
| Nonfiction | ABSOLUTE MONARCHS | John Julius Norwich | Random House | 22 | $12.99 |
| Nonfiction | SUPERGODS | Grant Morrison | Random House | 22 | $13.99 |
| Nonfiction | SEX ON THE MOON | Ben Mezrich | Random House | 23 | $12.99 |
| Fiction | SISTERHOOD EVERLASTING | Ann Brashares | Random House | 24 | $12.99 |
| Fiction | THE LAST WEREWOLF | Glen Duncan | Random House | 25 | $12.99 |
| Fiction | CONQUISTADORA | Esmeralda Santiago | Random House | 27 | $12.99 |
| Fiction | DREAMS OF JOY | Lisa See | Random House | 30 | $14.99 |
| Fiction | THE LAND OF PAINTED CAVES | Jean M. Auel | Random House | 33 | $14.99 |
| | | | **Average Random House Price** | | **$13.31** |
| Nonfiction | A STOLEN LIFE | Jaycee Dugard | Simon & Schuster | 1 | $11.99 |
| Nonfiction | THE GREATER JOURNEY | David McCullough | Simon & Schuster | 5 | $19.99 |
| Nonfiction | OF THEE I ZING | Laura Ingraham | Simon & Schuster | 6 | $11.99 |
| Nonfiction | THEN CAME YOU | Jennifer Weiner | Simon & Schuster | 7 | $12.99 |
| Fiction | WORLD OF WARCRAFT: THRALL | Christie Golden | Simon & Schuster | 26 | $12.99 |
| Nonfiction | A LOVE THAT MULTIPLIES | Michelle and Jim Bob Duggar | Simon & Schuster | 28 | $9.99 |
| Nonfiction | NOTHING DAUNTED | Dorothy Wickenden | Simon & Schuster | 35 | $12.99 |
| | | | **Average Simon & Schuster Price** | | **$13.20** |
| Nonfiction | THE SEVEN DEADLY SINS | Corey Taylor | Non-Big Six | 21 | $9.99 |
| Nonfiction | THE MIRACLE OF FREEDOM | Chris Stewart and Ted Stewart | Non-Big Six | 30 | $9.99 |
| Fiction | TURN OF MIND | Alice LaPlante | Non-Big Six | 35 | $9.99 |
| | | | **Average Non-Big Six Price** | | **$9.99** |

*The titles *The Help* and *My Dad Says* are long-term bestsellers. *The Help* first made the list in March 2009. *My Dad Says* in May 2010.

(c)   The following are screen captures from the internet displaying examples of various price levels for the same-titled physical books contained in ¶ 203(a):

| BOOK | PRICE RANGES |
|---|---|
|  | 67 total offers.  Range: $172.70.  New hardcover edition. <br><br> Low: <br> **$14.95**  New <br> + $3.99 shipping <br><br> Seller: janet wolfe <br> Seller Rating: ☆☆☆☆☆ **94% positive** over the past 12 months. (174 total ratings) <br> In Stock. Ships from PA, United States. Domestic shipping rates and return policy. <br><br> Median: <br> **$99.99**  New <br> + $3.99 shipping <br><br> Seller: Dexter's Book Cellar <br> Seller Rating: ☆☆☆☆☆ **33% positive** over the past 12 months. (3 total ratings) <br> In Stock. Ships from CT, United States. Expedited shipping available. International & domestic shipping rates and return policy. <br> First Printing. Signed boldly by the author directly to the title page. The book is fine in a fine dust jacket, which is no... <br> » Read more <br><br> High: <br> **$187.65**  New <br> + $3.99 shipping <br><br> Seller: Origin <br> Seller Rating: ☆☆☆☆☆ **99% positive** over the past 12 months. (250 total ratings) <br> In Stock. Ships from NH, United States. International & domestic shipping rates and return policy. <br> NEW! The Greater Journey: Americans in Paris. Pages: 558. Good service! |

| BOOK | PRICE RANGES |
|---|---|
|  | Total offers: 97.  Range: $26.94.  New hardcover edition.<br><br>**Low:**<br>**$12.95**   New<br>+ $3.99 shipping<br><br>Seller: **THE BOOK SHACK**<br><br>Seller Rating: ★★★★★ <u>98% positive</u> over the past 12 months. (7,262 total ratings)<br><br>In Stock. Ships from PA, United States. <u>Domestic shipping rates</u> and <u>return policy</u>.<br><br>ITEM IS BRAND NEW. SHIPPING TIME CAN RANGE FROM 5 TO 14 DAYS. I STRIVE FOR 100% CUSTOMER SATISFACTION. IF YOU HAVE A PROBLEM ... » <u>Read more</u><br><br>**Median:**<br>**$26.31**   New<br>+ $3.99 shipping<br><br>Seller: **squirreledawaybooks**<br><br>Seller Rating: ★★★★★ <u>98% positive</u> over the past 12 months. (2,121 total ratings)<br><br>In Stock. Ships from MI, United States. Expedited shipping available. <u>International & domestic shipping rates</u> and <u>return policy</u>.<br><br>Email us for a photo! -- Binding: Hard Cover -- Book Condition: NEW -- Dust Jacket: NOT ISSUED -- Series: Southern Vampire My... » <u>Read more</u><br><br>**High:**<br>**$39.89**   New<br>+ $3.99 shipping<br><br>Seller: **most_lovely_books**<br><br>Seller Rating: ★★★★☆ <u>91% positive</u> over the past 12 months. (43 total ratings)<br><br>In Stock. Ships from WA, United States. Expedited shipping available.. <u>Domestic shipping rates</u> and <u>return policy</u>.<br><br>Brand New! In stock! |

010260-11 640104 V1

| BOOK | PRICE RANGES |
|------|--------------|
| | Total Offers: 44.  Range:  $18.04.  New hardcover edition. |

Total Offers: 44.  Range:  $18.04.  New hardcover edition.

**Low:**
**$7.95**
+ $3.99 shipping

New

Seller: **cseereader**

Seller Rating: ★★★★★ 97% positive over the past 12 months. (53,971 total ratings)

In Stock. Ships from GA, United States. Expedited shipping available. Domestic shipping rates and return policy.

BRAND NEW FULL SIZE RETAIL EDITION - NOT A BOOK CLUB EDITION - BOOKSTORE QUALITY - EXCELLENT BUY!!!

**Median:**
**$16.58**
+ $3.99 shipping

New

Seller: **indoobestsellers**

Seller Rating: ★★★★☆ 87% positive over the past 12 months. (118,999 total ratings)

In Stock. Ships from NJ, United States. Domestic shipping rates and return policy.

BRAND NEW

**High:**
**$25.99**
+ $3.99 shipping

New

Seller: **powells_books**

Seller Rating: ★★★★★ 97% positive over the past 12 months. (341,468 total ratings)

In Stock. Ships from OR, United States. Expedited shipping available. International & domestic shipping rates and return policy.

Legendary independent bookstore online since 1994. Reliable customer service and no-hassle return policy.

010260-11  640104 V1

| BOOK | PRICE RANGES |
|------|--------------|
|  | Total offers: 58.  Range: $39.74.  New hardcover edition.<br><br>Low:<br>**$10.25** New<br>+ $3.99 shipping<br>Seller: **Anne Tracey**<br>Seller Rating: ★★★★★ **98% positive** over the past 12 months. (61 total ratings)<br>In Stock.<br>Domestic shipping rates and return policy.<br>BRAND NEW AND IN PERFECT CONDITION<br><br>Median:<br>**$27.99** New<br>+ $3.98 shipping<br>Seller: **powells_books**<br>Seller Rating: ★★★★★ **97% positive** over the past 12 months. (341,464 total ratings)<br>In Stock. Ships from OR, United States. Expedited shipping available. International & domestic shipping rates and return policy.<br>Legendary independent bookstore online since 1994. Reliable customer service and no-hassle return policy.<br><br>High:<br>**$49.99** New<br>+ $3.99 shipping<br>Seller: **Kwik Ship**<br>Seller Rating: ★★★★★ **99% positive** over the past 12 months. (473 total ratings)<br>In Stock. Ships from CA, United States. Domestic shipping rates and return policy.<br>Amazon Inventory in that this item ships direct from Amazon Warehouse with a 100% money back guarantee from Kwik Ship for any... » Read more |
|  | 71 total offers.  Range: $19.97.  New hardcover edition.<br><br>Low:<br>**$12.35** New<br>+ $3.99 shipping<br>Seller: **cseereader**<br>Seller Rating: ★★★★★ **97% positive** over the past 12 months. (53,969 total ratings)<br>In Stock. Ships from GA, United States. Expedited shipping available. Domestic shipping rates and return policy.<br>BRAND NEW FULL SIZE RETAIL EDITION - NOT A BOOK CLUB EDITION - BOOKSTORE QUALITY - EXCELLENT BUY!!!<br><br>Median: |

| BOOK | PRICE RANGES |
|------|--------------|
| **$22.04** New <br> + $3.98 shipping | Seller: **AbeBooks Marketplace 2** <br><br> Seller Rating: ★★★★☆ **94% positive** over the past 12 months. (1,055 total ratings) <br><br> In Stock. Expedited shipping available. Domestic <u>shipping rates</u> and <u>return policy</u>. <br><br> This book is sold by Book Lovers USA, shipping from Woodstock, GA - Seller on AbeBooks Marketplace. Binding: HARDCOVER // The... » <u>Read more</u> |
| High: <br> **$32.22** New <br> + $3.98 shipping <br> ) | Seller: **charlestonsoon** <br><br> Seller Rating: ★★★★☆ **94% positive** over the past 12 months. (9,005 total ratings) <br><br> In Stock. Ships from SC, United States. Domestic <u>shipping rates</u> and <u>return policy</u>. |

## I.   Defendants' Conduct Lacked Pro-Competitive Justifications

183.   As the District Court found in *United States v. Apple* and *The State of Texas v. Penguin Group (USA) Inc.*, Defendants' conspiracy harmed competition and consumers in the relevant market by producing less price competition and higher prices.

184.   In its unsuccessful attempt to justify its conduct during the governmental cases, Apple vigorously argued that the conspirators' actions had pro-competitive effects in the trade eBook market. It argued that prices in the overall market decreased; that additional publishers, self-publishers, and retailers entered the market; that supposedly predatory conduct by Amazon was halted; that eBooks would have been windowed but for the conspiracy; and that the conspiracy brought other innovations into eBook publishing and retailing. The District Court definitively rejected each of these arguments, concluding that "the Agreements did not promote competition, but destroyed it." Slip Op. at 121. As the Court explained, "[t]he pro-competitive effects to which Apple has pointed, including its launch of the iBookstore, the technical novelties of the iPad, and the evolution of digital publishing more generally, are phenomena that are independent of the Agreements and therefore do not demonstrate any pro-competitive effects flowing from the Agreements." *Id.*.

**J.    Plaintiffs and the Putative Class Suffered Antitrust Injury.**

185.    But for Defendants' conspiracy to restrict and increase the price range of eBooks through the switch to the Agency model of eBook pricing, the price of eBooks would be substantially lower than their current price.  Moreover, consumers would have enjoyed additional features such as promotional discounts and rewards programs traditionally offered by retailers.

186.    As a direct result of Defendants' anticompetitive actions, competition in the market for eBooks has been restrained.

187.    *United States v. Apple* and *The State of Texas v. Penguin Group (USA) Inc.* conclusively established that Publisher Defendants used the Agency Agreements to "raise the prices for their e-books," including "both New Releases and NYT Bestsellers, as well as backlist titles."  Slip Op. at 121-22.

188.    Even consumers who did not purchase one of the many titles whose prices rose as a result of the conspiracy were injured by Defendants' antitrust violations.  As the District Court explained, "[c]onsumers suffered in a variety of ways from this scheme to eliminate retail price competition and to raise e-book prices. Some consumers had to pay more for e-books; others bought a cheaper e-book rather than the one they preferred to purchase; and it can be assumed that still others deferred a purchase altogether rather than pay the higher price." Slip Op. at 98.

189.    Defendants' conspiracy thus caused antitrust injury to Plaintiffs and the proposed Class of eBook purchasers.

## V.    FEDERAL DIRECT PURCHASER CLASS

**A.    Plaintiffs Are Direct Purchasers.**

190.    Prior to the adoption of the Agency model, Apple, Amazon, Barnes & Noble and Sony acted as resellers of eBooks through their eReaders, and they set retail prices in response to unrestrained market forces. John Sargent, the CEO of Macmillan, explained this "retail model" of selling eBooks on his corporate blog as follows:  "publishers sell to retailers, who then sell to readers at a price that the retailer determines."

010260-11 640104 VI

191.     In contrast, under the Agency model, each Publisher Defendant sets the retail prices of eBooks charged to consumers and sells the book directly to consumers. The online merchants who facilitate sales have no authority to change the price in any way. The Publisher Defendant pays the agent (*e.g.*, Amazon, Apple, Barnes & Noble, Sony, etc.) a fixed commission of thirty percent of the retail price. John Sargent, the CEO of Macmillan explained this Agency model as follows: *"publishers set the price*, and retailers take a commission on the sale to readers." (Emphasis added.)

192.     Although the agreements developed by the Publisher Defendants and Apple in January 2010 (and later imposed on other online merchants willing to carry a Publisher Defendant's eBooks) vary in some respects due to differences in the negotiations producing each agreement, all include the same essential terms.

193.     Under each agreement, the Publisher Defendant's counterparty (*e.g.*, Apple, Amazon or another online merchant) is explicitly identified as an "Agent." Each agreement provides that the Agent is undertaking to perform marketing, sale and distribution services as an agent on behalf of the Publisher Defendant.

194.     An Agent cannot set or modify retail pricing in any way. Agents are generally forbidden from discounting eBooks, including them in deals such as "buy one, get one" offers, lowering the price of an eBook through any membership or loyalty program, or offering, advertising, or displaying any price other than the one set by the relevant Publisher Defendant.

195.     Each agreement provides for a specific commission to be paid to the Agent for any sale of the Publisher Defendant's eBook. For major online merchants such as Apple or Amazon, each agreement provides the exact same commission: thirty percent.

196.     Each agreement delineates specific, limited responsibilities that Agents perform. Agents market, solicit and obtain orders for eBooks from end-user customers, thereby securing offers for the Publisher Defendants' eBooks. They provide storage services that allow customers who purchase individual eBooks from Publisher Defendants to obtain the purchased book via

electronic download.  And they process orders and payment, and engage in similar activities that are merely incidental to the sale.

197.    Under the agreements, consumers purchase eBooks from the Publisher Defendants.  The Publisher Defendants do not sell the eBook to the Agent, nor is a physical product transferred from publisher to retailer or from retailer to consumer.  Instead, the Publisher Defendants sell access to a digital copy (*e.g.*, in the form of a non-exclusive license) to a given eBook directly to consumers, facilitated by an Agent's delivery system.  Agents never receive title to the books that consumers buy.  Rather, Publisher Defendants retain all right, title and interest to all digital files and copies of the eBooks until it is purchased by the customer.

198.    Generally, the Publisher Defendants own all accounts receivable from the fulfillment of all orders of eBooks by consumers and bear all credit risk from sales to consumers. Agents may only permit returns in limited circumstances.

199.    Agents are authorized to show limited excerpts of eBooks to customers at no charge. The limitations are explicitly defined in the Agency Agreements, and an Agent generally cannot deviate from these specified limits without obtaining the Publisher Defendants' approval of other security measures.

200.    Each agreement prohibits Agents from abridging, expanding, or otherwise modifying the content of an eBook in any way without the relevant Publisher Defendant's consent.

201.    In addition to the terms of the agreements, other sources in the publishing industry, including various Defendants themselves, make clear that the Publisher Defendants sell directly to consumers under the Agency model, with their former retailers reduced to mere agents.

202.    For example, Michael Selleck, Executive Vice President of Simon & Schuster for Sales and Marketing, wrote in a letter to customers on February 19, 2010, that Simon & Schuster had "determined to sell its electronic books *direct to customers* in the United States" and that it

would be "entering into arrangements with third parties to act as [its] agent with respect to these sales." (Emphasis added.)

203. BISG, the Publisher Defendants' trade association, summarized the Agency model similarly in a message explaining its updates to ONIX: "Under an agency model, the publisher does not sell to the retailer. Instead, *the publisher sells to the end-customer at a price set by the publisher*, treating the retailer as a sales agent to whom a commission is paid on each sale."[32] (Emphasis added.)

204. Apple's user agreement for its iBookstore expressly acknowledges that consumers directly purchased from publishers under the "Agency model," which it has forced on all other distributors of eBooks. Specifically, Apple's user agreement states as follows:

> Apple is acting as agent for the Publisher in providing each such iBookstore Product to you; Apple is not a party to the transaction between you and the Publisher with respect to that iBookstore Product; and the Publisher of each iBookstore Product reserves the right to enforce the terms of use relating to that iBookstore Product. The Publisher of each iBookstore Product is solely responsible for that iBookstore Product, the content therein, any warranties to the extent that such warranties have not been disclaimed, and any claims that you or any other party may have relating to that iBookstore Product or your use of that iBookstore Product.[33]

205. Amazon likewise makes clear in its terms and conditions that the publishers are the entities who are selling use of the content to consumers:

> For the purposes of this Agreement:
>
> "Content Provider" means the party offering Digital Content in the Kindle Store, which may be us or a third party; however, for Digital Content designated as active content in the Kindle Store, "Content Provider" means the publisher of the Digital Content.
>
> * * *
>
> **Use of Digital Content.** Upon your download of Digital Content and payment of any applicable fees (including applicable taxes),

---

[32] *New Specs & Standards: EDItEUR, Agency Terms in ONIX*, NISO Newsline, http://www.niso.org/publications/newsline/2010/newslineapr2010.html (last visited Jan. 19, 2012).

[33] Additional iBookstore Terms and Conditions; Purchase of iBookstore Products, http://www.apple.com/legal/itunes/us/terms.html#GIFTS (last visited Jan. 18, 2012).

the Content Provider grants you a non-exclusive right to view, use, and display such Digital Content an unlimited number of times, solely on the Kindle or a Reading Application or as otherwise permitted as part of the Service, solely on the number of Kindles or Other Devices specified in the Kindle Store, and solely for your personal, non-commercial use. Unless otherwise specified, Digital Content is licensed, not sold, to you by the Content Provider. The Content Provider may include additional terms for use within its Digital Content. Those terms will also apply, but this Agreement will govern in the event of a conflict. Some Digital Content, such as Periodicals, may not be available to you through Reading Applications.[34]

206.   When a consumer purchases an eBook subject to an Agency Agreement through Amazon, Amazon explicitly states that the price is set by the publisher and that the book is sold by the publisher. The following screen captures demonstrate this and compares pricing between eBooks and physical books:



Click to LOOK INSIDE!

kindle edition

share your own customer images

**The Greater Journey** [Kindle Edition]
David McCullough (Author)
★★★★★ ☑ (97 customer reviews) | 👍 Like (86)

Print List Price: $37.50
Kindle Price: **$19.99** includes free wireless delivery via *Amazon Whispernet*
You Save: $17.51 (47%)
**Sold by:** Simon and Schuster Digital Sales Inc
*This price was set by the publisher*

• Text-to-Speech: Not enabled ☑
• Don't have a Kindle? Get your Kindle here.

| Formats | Amazon Price | New from | Used from |
|---|---|---|---|
| Kindle Edition | -- | $19.99 | -- |
| ⊞ Hardcover, Deckle Edge | $20.65 | $14.95 | $19.84 |
| ⊞ Audio, CD, Audiobook, Unabridged | $31.49 | $28.69 | $27.00 |
| ⊞ Audible Audio Edition, Unabridged | $29.95 | or Free with Audible 30-day free trial | |

≫ Show 3 more formats

---

[34]   Kindle License Agreement and Terms of Use, http://www.amazon.com/gp/help/customer/display.html?ref=hp_rel_topic?ie=UTF8&nodeId=20 0506200 (last visited Aug. 8, 2012).



Click to LOOK INSIDE!

kindle edition



See 1 customer image
Share your own customer Images

# Dead Reckoning: A Sookie Stackhouse Novel [Kindle Edition]

Charlaine Harris ☑ (Author)

★★★☆☆ ☑ (687 customer reviews) | 👍 Like (486)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Kindle Price: **$14.99** includes free wireless delivery via **Amazon Whispernet**

**Sold by:** Penguin Publishing
*This price was set by the publisher*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

- Text-to-Speech: Enabled ☑
- Don't have a Kindle? Get your Kindle here.

| Formats | Amazon Price | New from | Used from |
|---|---|---|---|
| Kindle Edition | --- | $14.99 | --- |
| ⊞ Hardcover | $16.65 | $12.95 | $12.94 |
| Paperback | $7.99 | $7.99 | --- |
| ⊞ Audio, CD, Audiobook, Unabridged | $23.09 | $16.35 | $19.75 |
| Audible Audio Edition, Unabridged | $23.95 | or Free with Audible 30-day free trial | |

≫ Show 3 more formats



Click to **LOOK INSIDE!**

**kindle edition**

Share your own customer images

# Betrayal of Trust: A J. P. Beaumont Novel
## [Kindle Edition]
J. A. Jance ☑ (Author)

☆☆☆☆☆ ☑ (15 customer reviews) | 👍 Like (39)

Print List Price: $25.99

Kindle Price: **$12.99** includes free wireless delivery via *Amazon Whispernet*

You Save: $13.00 (50%)

**Sold by:** HarperCollins Publishers
*This price was set by the publisher*

- Text-to-Speech: Enabled ☑
- Don't have a Kindle? Get your Kindle here.

| Formats | Amazon Price | New from | Used from |
|---|---|---|---|
| Kindle Edition | -- | $12.99 | -- |
| Hardcover | $16.92 | $7.95 | $7.50 |
| Paperback, Large Print | $16.37 | $15.20 | $15.43 |
| Audio, CD, Audiobook, Unabridged | $26.39 | $24.00 | $17.55 |
| Audible Audio Edition, Unabridged | $23.95 | or Free with Audible 30-day free trial | |



See all 2 customer images
Share your own customer images

# Now You See Her [Kindle Edition]
James Patterson ☑ (Author), Michael Ledwidge (Author)

☆☆☆☆☆ ☑ (120 customer reviews) | 👍 Like (406)

Print List Price: $27.99

Kindle Price: **$12.99** includes free wireless delivery via *Amazon Whispernet*

You Save: $15.00 (54%)

**Sold by:** Hachette Book Group
*This price was set by the publisher*

- Text-to-Speech: Not enabled ☑
- Don't have a Kindle? Get your Kindle here.

| Formats | Amazon Price | New from | Used from |
|---|---|---|---|
| Kindle Edition | -- | $12.99 | -- |
| ⊞ Hardcover | $15.30 | $9.00 | $7.99 |
| ⊞ Paperback | $10.19 | $10.19 | -- |
| ⊞ Audio, CD, Audiobook | $13.59 | $13.59 | -- |
| Audible Audio Edition, Unabridged | $21.95 | or Free with Audible 30-day free trial | |

⌄ Show 4 more formats

010260-11  640104 V1



Click to LOOK INSIDE!

HOWARD E. WASDIN
& STEPHEN TEMPLIN

kindle edition

Share your own customer Images

**SEAL Team Six: Memoirs of an Elite Navy SEAL Sniper** [Kindle Edition]
Stephen Templin ☑ (Author), Howard E. Wasdin ☑ (Author)
★★★★☆ ☑ (142 customer reviews) | 👍 Like (100)

Print List Price: ~~$26.99~~

Kindle Price: **$12.99** includes free wireless delivery via *Amazon Whispernet*

You Save: $14.00 (52%)

**Sold by:** Macmillan
*This price was set by the publisher*

- Text-to-Speech: Enabled ☑
- Don't have a Kindle? Get your Kindle here.

| Formats | | Amazon Price | New from | Used from |
|---|---|---|---|---|
| Kindle Edition | | -- | $12.99 | -- |
| ⊞ Hardcover | | $15.19 | $12.35 | $13.45 |
| ⊞ MP3 CD, Audiobook, Unabridged | | $19.77 | $18.57 | $18.00 |
| Audible Audio Edition, Unabridged | | $16.95 | or Free with Audible 30-day free trial | |
| ⌄ Show 5 more formats | | | | |

207.   After a consumer purchases an eBook subject to an Agency Agreement from Amazon, the confirmation of sale again states that the publisher is the entity selling the eBook to the purchaser:

**Order Summary:**

Details:

| | |
|---|---|
| Order #: | D01-2220747-7578556 |
| Subtotal of items: | $11.99 |
| | ------ |
| Total before tax: | $11.99 |
| Tax Collected: | $0.00 |
| | ------ |
| **Total for this Order: $11.99** | |

The following item is auto-delivered to your Kindle or other device. You can view more information about this order by clicking on the title on the Manage Your Kindle page at Amazon.com.

**The Next 100 Years: A Forecast for the 21st Century** [Kindle Edition] $11.99
Sold By: Random House Digital, Inc.

208.    Under the Agency model, the Publisher Defendants sell eBooks directly to consumers at prices and terms set by the Publisher Defendants.  Agents perform no functions on behalf of the Publisher Defendants other than securing offers from buyers, and exercise no discretion concerning the price and terms under which the eBooks are sold.  For purposes of the Sherman Act, online merchants such as Apple or Amazon are therefore exactly what the agreements denominate them and exactly what they represent themselves as to consumers: *agents.  See Fuchs Sugars & Syrups, Inc. v. Amstar Corp.*, 602 F.2d 1025, 1031 n.5 (2d Cir. 1979); *see also In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 505-06 (S.D.N.Y. 1996); *Diskin v. Daily Racing Form*, No. 92 Civ. 6374, 1994 U.S. Dist. LEXIS 9129, at *14-*15 (S.D.N.Y. July 7, 1994).

209.    Because Plaintiffs and the members of the class they represent purchased from the Publisher Defendants through mere agents, they are direct purchasers and may maintain an action for damages under the Sherman Act against the Publisher Defendants. *See NASDAQ Market-Makers*, 169 F.R.D. at 505-06; *Diskin*, 1994 U.S. Dist. LEXIS 9129, at *14-*15.

210.    Additionally, because "the price" that Plaintiffs and other consumers "have paid directly is the one that was unlawfully fixed," *In re ATM Fee Antitrust Litig.*, No. C 04-02676,

- 70 -

2010 U.S. Dist. LEXIS 97009, at *24 (N.D. Cal. Sept. 16, 2010), Plaintiffs and eBook
consumers are direct purchasers of eBooks.

211.    Because the simultaneous adoption of the Agency model represents a "conspiracy
among horizontal competitors at the retail level to fix retail prices," the Supreme Court's decision
in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) "does not prevent this garden variety price-
fixing claim." *State of Ariz. v. Shamrock Foods Co.*, 729 F.2d 1208, 1211 (9th Cir. 1984); *see
also, e.g., Schwimmer v. Sony Corp. of Am.*, 637 F.2d 41, 48-49 & n.18 (2d Cir. 1980); *Temple v.
Circuit City Stores, Inc.*, No. 06 CV 5303, 2007 U.S. Dist. LEXIS 70747 (E.D.N.Y. Sept. 25,
2007).

212.    Plaintiffs sue on behalf of a class of persons pursuant to Federal Rule of Civil
Procedure 23 under federal law.  All persons in the Non-Litigating Jurisdictions who purchased
eBooks between April 1, 2010 and May 21, 2012, published by Hachette Book Group, Inc.
("Hachette"), HarperCollins Publishers L.L.C. ("HarperCollins"), Holtzbrinck Publishers, LLC
d/b/a Macmillan ("Macmillan"), Penguin Group (USA) Inc. ("Penguin"), or Simon & Schuster,
Inc. ("Simon & Schuster") directly from that publisher (including any of its imprints) after the
adoption of the agency model by that publisher.  The "Non-Litigating Jurisdictions" are
American Samoa, California, Florida, Georgia, Guam, Hawaii, Kentucky, Maine, Minnesota,
Mississippi, Montana, Nevada, New Hampshire, New Jersey, North Carolina, Northern Mariana
Islands, Oklahoma, Oregon, Rhode Island, South Carolina, U.S. Virgin Islands, Washington, and
Wyoming.  Excluded from the Class are Defendants, their employees, co-conspirators, officers,
directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries of
affiliated companies, as well as the Honorable Denise L. Cote and persons described in 28
U.S.C. § 455(b)(4)-(5).

213.    The persons in the Class are so numerous that individual joinder of all members is
impracticable under the circumstances of this case.  Although the precise number of such persons
is unknown, the exact size of the Class is easily ascertainable, as each Class member can be

- 71 -

identified by using Defendants' records and/or the records of its distributors or retailers. Plaintiffs are informed and believe that there are many thousands of Class members.

214.    There are common questions of law and fact specific to the Class that predominate over any questions affecting individual members, including:

(a)    Whether, and to what extent, the findings and conclusions in *United States v. Apple* and *The State of Texas v. Penguin Group (USA) Inc.* estop Apple from contesting its liability and offering arguments and justifications contrary to facts found in those cases.

(b)    Whether Defendants unlawfully contracted, combined and conspired to unreasonably restrain trade in violation of section 1 of the Sherman Act by agreeing to switch to the Agency model of eBook pricing and by agreeing to restrict the price range of eBooks;

(c)    Whether consumers and Class members have suffered antitrust injury by Defendants' conduct;

(d)    Whether evidence common to the class may be used to show antitrust injury and estimate damages; and

(d)    The amount of any damages.

215.    Plaintiffs' claims are typical of the Class' claims, as they arise out of the same course of conduct and the same legal theories as the rest of the Class, and Plaintiffs challenge the practices and course of conduct engaged in by Defendants with respect to the Class as a whole.

216.    Plaintiffs will fairly and adequately protect the interests of the Class.  Plaintiffs have retained Class Counsel who are able and experienced class action litigators.

217.    Resolution of this action on a class-wide basis is superior to other available methods and is a fair and efficient adjudication of the controversy because in the context of this litigation, no individual Class member can justify the commitment of the large financial resources to vigorously prosecute a lawsuit against Defendants.  Separate actions by individual Class members would also create a risk of inconsistent or varying judgments, which could establish incompatible standards of conduct for Defendants and substantially impede or impair the ability of Class members to pursue their claims.  A class action also makes sense because

Defendants have acted and refused to take steps that are, upon information and belief, generally applicable to thousands of individuals, thereby making injunctive relief appropriate with respect to the Class as a whole.

## VI.   CAUSE OF ACTION FOR VIOLATION OF THE SHERMAN ACT
## (15 U.S.C. § 1)

218.   Each of the foregoing allegations is incorporated in this claim for relief.

219.   Plaintiffs do not believe it is necessary to prove a relevant market.  To the extent one is required the relevant product market is trade eBooks, defined as general interest fiction and non-fiction ebooks.

220.   To the extent required, the relevant geographic market is the entire United States.

221.   Defendants by and through their officers, directors, employees, agents and other representatives have entered into an unlawful agreement, combination and conspiracy in restraint of trade.  Specifically, Defendants have unlawfully agreed to artificially inflate the retail price range of eBooks by switching to an Agency model in which eBook prices are determined using a common formula across individual books and publishers.  These unlawful agreements have unreasonably restrained price competition among retailers for eBook sales.

222.   Plaintiffs and the Class members have been injured and will continue to be injured in their businesses and property by paying more for eBooks than they would have paid or would pay in the future in the absence of Defendants' unlawful acts.

223.   Plaintiffs and Class members are direct purchasers because the Publisher Defendants set the retail price for eBooks, and Amazon, Apple and other eBook distributors are acting only as agents.

### JURY TRIAL DEMANDED

224.   Plaintiffs hereby demand a trial by jury of all the claims asserted in this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

A.      Certification of the action as a Class Action pursuant to the Federal Rule of Civil Procedure 23, and appointment of Plaintiffs as Class Representatives and their counsel of record as Class Counsel;

B.      A declaration that Defendants' conduct constituted a conspiracy and that Defendants are liable for the conduct or damage inflicted by any other co-conspirator;

C.      An award of treble damages to Class members for the purchase of eBooks;

D.      Pre-judgment and post-judgment interest on such monetary relief;

E.      The costs of bringing this suit, including reasonable attorneys' fees; and

F.      All other relief to which Plaintiffs and members of the Class may be entitled at law or in equity.

DATED:  October 11, 2013               HAGENS BERMAN SOBOL SHAPIRO LLP

                                       By _____
                                              Steve W. Berman


                                       George W. Sampson (GS-8973)
                                       1918 Eighth Avenue, Suite 3300
                                       Seattle, WA  98101
                                       Telephone:  (206) 623-7292
                                       Facsimile:  (206) 623-0594
                                       steve@hbsslaw.com
                                       george@hbsslaw.com

                                       Jeff D. Friedman (*Pro Hac Vice*)
                                       Shana Scarlett (*Pro Hac Vice*)
                                       HAGENS BERMAN SOBOL SHAPIRO LLP
                                       715 Hearst Avenue, Suite 202
                                       Berkeley, CA  94710
                                       Telephone:  (510) 725-3000
                                       Facsimile:  (510) 725-3001
                                       jefff@hbsslaw.com
                                       shanas@hbsslaw.com

010260-11  640104 V1

Kit A. Pierson
COHEN, MILSTEIN, SELLERS & TOLL, PLLC
1100 New York Avenue, N.W.
South Tower, Suite 500
Washington, D.C.  20005
Telephone:  (202) 408-4600
Facsimile:  (202) 408-4699
KPierson@cohenmilstein.com

Douglas Richards
COHEN, MILSTEIIN, SELLERS & TOLL, PLLC
88 Pine Street
14th Floor
New York, NY  10005
Telephone:  (212) 838-7797
Facsimile:  (212) 838-774
DRichards@cohenmilstein.com

*Co-Lead Counsel for Plaintiffs*