# EXHIBIT A

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK


THE STATE OF TEXAS, et
al.,

    Plaintiffs,

     vs.              Case No. 12-CV-03394 (DLC)

PENGUIN GROUP (USA), INC.,
et al.,

    Defendants.
_____

This Document Relates to:  Case No. 11-MD-02293 (DLC)

IN RE ELECTRONIC BOOKS
ANTITRUST LITIGATION.
~~~~~~~~~~~~~~~~~~~~~~~~~
VIDEOTAPED DEPOSITION  OF

ROGER G. NOLL, Ph.D.

November 1, 2013

Palo Alto, California

8:34 a.m.


By Reported:
WENDY E. ARLEN, CSR #4355, RMR, CRR
Job No:  32239

18

| | | |
|---|---|---|
| 08:49:23 | 1 | Q. And then if you could flip to page 5 of |
| 08:49:26 | 2 | Exhibit 1, the second paragraph under the heading |
| 08:49:29 | 3 | Summary and Conclusions. |
| 08:49:31 | 4 | A. Yes. |
| 08:49:32 | 5 | Q. In that paragraph you talk about the -- the |
| 08:49:36 | 6 | tasks that you identified after reading the judge's |
| 08:49:40 | 7 | opinion. Do you see that? |
| 08:49:41 | 8 | A. Yes. |
| 08:49:41 | 9 | Q. And does that set forth tasks you pursued |
| 08:49:47 | 10 | in -- in preparing your report? |
| 08:49:48 | 11 | A. Yes. |
| 08:49:49 | 12 | Q. Okay. Were there any other tasks that you |
| 08:49:51 | 13 | undertook that you can remember? |
| 08:49:53 | 14 | A. I believe that all -- all the contents of my |
| 08:49:56 | 15 | reports are summarized there, yes. |
| 08:49:58 | 16 | Q. Okay. Professor, are you familiar with the |
| 08:50:01 | 17 | term but-for world? |
| 08:50:03 | 18 | A. Yes. |
| 08:50:03 | 19 | Q. And you've used that term before? |
| 08:50:06 | 20 | A. Yes, to the minimum possible extent. |
| 08:50:09 | 21 | Q. I note a certain reticence to use it in this |
| 08:50:15 | 22 | document. Is there a reason for that? |
| 08:50:16 | 23 | A. I just don't like the term. |
| 08:50:18 | 24 | Q. It's an ugly term. |
| 08:50:21 | 25 | A. It's an ugly term. I think it's less clear |

19

| | | |
|---|---|---|
| 08:50:24 | 1 | than using the term competitive benchmark. |
| 08:50:27 | 2 | Q. I note in your report you speak of defining |
| 08:50:30 | 3 | anticompetitive harm as the departure of market |
| 08:50:33 | 4 | outcomes from the outcomes that would have occurred |
| 08:50:36 | 5 | in the absence of anticompetitive conduct? |
| 08:50:38 | 6 | A. That's right. |
| 08:50:38 | 7 | Q. Is that roughly what would be equated |
| 08:50:42 | 8 | normally with the but-for world concept? |
| 08:50:45 | 9 | A. Yes. |
| 08:50:46 | 10 | Q. And if we speak of the but-for world today or |
| 08:50:49 | 11 | at least if I ask you questions about the but-for |
| 08:50:51 | 12 | world, you'll understand that that's what I'm |
| 08:50:53 | 13 | referring to? |
| 08:50:54 | 14 | A. I understand what you mean. |
| 08:50:57 | 15 | Q. Let me ask you to turn to page 8 of your |
| 08:51:00 | 16 | report, and at the bottom of that page, actually the |
| 08:51:10 | 17 | last sentence which is a carry-over to the next page, |
| 08:51:14 | 18 | you say the starting place for your analysis is that |
| 08:51:17 | 19 | the existence of anticompetitive conduct through |
| 08:51:21 | 20 | price fixing has been established. |
| 08:51:23 | 21 | A. Yes. |
| 08:51:23 | 22 | Q. Do you see that? |
| 08:51:24 | 23 | A. Yes. |
| 08:51:25 | 24 | Q. And now, you indicated you reviewed the |
| 08:51:27 | 25 | judge's decision in the case from July, correct? |

20

| | | |
|---|---|---|
| 08:51:29 | 1 | A. Correct. |
| 08:51:30 | 2 | Q. And you read that carefully, I assume? |
| 08:51:33 | 3 | A. Yes, several times. |
| 08:51:34 | 4 | Q. Several times. Is that the basis for your |
| 08:51:39 | 5 | understanding that the existence of anticompetitive |
| 08:51:42 | 6 | conduct through price fixing has been established in |
| 08:51:44 | 7 | this case? |
| 08:51:45 | 8 | A. Yes, as I explained elsewhere, I'm relying on |
| 08:51:48 | 9 | that completely for the foundation for the analysis |
| 08:51:52 | 10 | that I'm doing. |
| 08:51:53 | 11 | Q. As you understand it, are all of the material |
| 08:51:57 | 12 | elements of the but-for world in this case |
| 08:52:00 | 13 | established in the Court's opinion? |
| 08:52:02 | 14 | MR. FRIEDMAN: Objection, form. |
| 08:52:03 | 15 | THE WITNESS: I believe so, but, I mean, I'm |
| 08:52:09 | 16 | open to reason. But I believe, yes, they're... |
| 08:52:14 | 17 | MR. SWANSON: What, in your view, are those |
| 08:52:16 | 18 | material elements of the but-for world? |
| 08:52:18 | 19 | MR. FRIEDMAN: Objection, form. |
| 08:52:20 | 20 | THE WITNESS: I don't fully understand what |
| 08:52:21 | 21 | you mean. What do you mean by material elements? |
| 08:52:24 | 22 | What are you after? |
| 08:52:25 | 23 | Q. MR. SWANSON: Well, I guess my question |
| 08:52:28 | 24 | was -- first question was is it your understanding |
| 08:52:31 | 25 | that the judge's opinion establishes the material |

21

| | | |
|---|---|---|
| 08:52:34 | 1 | elements. You said yes. So my question is what -- |
| 08:52:41 | 2 | what are the material elements that you think are |
| 08:52:45 | 3 | established. |
| 08:52:46 | 4 | MR. FRIEDMAN: Objection, form. |
| 08:52:47 | 5 | THE WITNESS: I believe that what the opinion |
| 08:52:49 | 6 | establishes is, A, a price fixing conspiracy existed |
| 08:52:55 | 7 | and was implemented; B, it had an anticompetitive |
| 08:53:00 | 8 | impact on prices; and, C, there were no |
| 08:53:05 | 9 | pro-competitive benefits that were accomplished by |
| 08:53:08 | 10 | the price fixing conspiracy. |
| 08:53:11 | 11 | Q. MR. SWANSON: And are those premises or |
| 08:53:18 | 12 | conclusions sufficient to dictate what the but-for |
| 08:53:21 | 13 | world would look like in this case? |
| 08:53:23 | 14 | MR. FRIEDMAN: Objection, form. |
| 08:53:26 | 15 | THE WITNESS: I believe -- there were -- |
| 08:53:31 | 16 | there was -- testimony was offered on alternative |
| 08:53:36 | 17 | visions of what the competitive marketplace would |
| 08:53:40 | 18 | look like, and in my view, the -- the judge accepted |
| 08:53:47 | 19 | the vision of the competitive world that was |
| 08:53:55 | 20 | advocated by the Department of Justice and the |
| 08:53:57 | 21 | states. |
| 08:53:57 | 22 | Q. MR. SWANSON: Now, in addition to reviewing |
| 08:53:59 | 23 | the judge's decision, you also reviewed the class and |
| 08:54:03 | 24 | plaintiff stage complaints; is that correct? |
| 08:54:05 | 25 | A. Yes. |

6  (Pages 18 to 21)

42

| | | |
|---|---|---|
| 09:21:33 | 1 | have to be someone who wants to use it as an e-reader |
| 09:21:38 | 2 | to buy one. In fact, you know, my grandchildren have |
| 09:21:44 | 3 | iPads and they don't use them as e-readers. |
| 09:21:46 | 4 | So I don't -- there is reasons to believe |
| 09:21:50 | 5 | that if the complementarity exists it's de minimis |
| 09:21:58 | 6 | between an iPad and e-books. |
| 09:22:00 | 7 | Q. Does the price of an e-reader device affect |
| 09:22:10 | 8 | the demand for e-books? |
| 09:22:12 | 9 | MR. FRIEDMAN: Objection, form. |
| 09:22:13 | 10 | THE WITNESS: I'm sorry. Ask it again. I |
| 09:22:15 | 11 | got waylaid here. |
| 09:22:17 | 12 | Q. MR. SWANSON: No problem. I'm glad to repeat |
| 09:22:21 | 13 | a question. |
| 09:22:22 | 14 | A. It just went out of my mind. |
| 09:22:24 | 15 | Q. Not a problem. Does the price of an |
| 09:22:30 | 16 | e-reading device affect the demand for e-books? |
| 09:22:35 | 17 | MR. FRIEDMAN: Objection, form. |
| 09:22:37 | 18 | THE WITNESS: If it is used significantly in |
| 09:22:40 | 19 | reading e-books, then an increase in the price of |
| 09:22:45 | 20 | that device might affect the demand for e-books, but |
| 09:22:49 | 21 | it would depend on what was happening to the prices |
| 09:22:53 | 22 | of substitutes for that device. |
| 09:22:55 | 23 | If somebody wanted to read e-books on a |
| 09:22:58 | 24 | tablet computer, then a change in the relative price |
| 09:23:02 | 25 | of one e-reader versus another would just cause them |

43

| | | |
|---|---|---|
| 09:23:06 | 1 | to switch which one they bought. So it might not |
| 09:23:11 | 2 | have a measurable effect, but it could in principle |
| 09:23:13 | 3 | have such an effect. If in general prices of |
| 09:23:17 | 4 | e-readers went up, then they would have a depressing |
| 09:23:21 | 5 | effect on the demand for e-books. |
| 09:23:23 | 6 | Q. MR. SWANSON: And if in general the price of |
| 09:23:26 | 7 | e-readers declined, would that have a stimulating |
| 09:23:29 | 8 | effect on the demand for e-books? |
| 09:23:33 | 9 | MR. FRIEDMAN: Objection, form. |
| 09:23:34 | 10 | THE WITNESS: Again with all the caveats I |
| 09:23:36 | 11 | just said, yes. |
| 09:23:37 | 12 | Q. MR. SWANSON: In setting e-reading device |
| 09:23:39 | 13 | prices, how would you expect retailers to take e-book |
| 09:23:43 | 14 | prices into account? |
| 09:23:44 | 15 | MR. FRIEDMAN: Objection, form. |
| 09:23:45 | 16 | THE WITNESS: What kind of retailer? |
| 09:23:46 | 17 | Q. MR. SWANSON: A retailer that is selling an |
| 09:23:49 | 18 | e-reading device. |
| 09:23:51 | 19 | A. They would -- retailers that are -- that are |
| 09:24:00 | 20 | integrated to the degree they have any market power |
| 09:24:06 | 21 | would obviously take -- price them jointly, but if |
| 09:24:12 | 22 | the market is competitive, then they wouldn't have |
| 09:24:16 | 23 | any ability jointly to have any discretion. They |
| 09:24:20 | 24 | would be setting -- the price would be the market |
| 09:24:23 | 25 | price determined through the competitive interactions |

44

| | | |
|---|---|---|
| 09:24:26 | 1 | of the firms. |
| 09:24:27 | 2 | Q. Let's take Amazon as a specific concrete |
| 09:24:31 | 3 | example. How would you, during the class period, |
| 09:24:35 | 4 | expect Amazon to take account of the price of e-books |
| 09:24:40 | 5 | when it is setting the price of a Kindle device? |
| 09:24:43 | 6 | MR. FRIEDMAN: Objection, form. |
| 09:24:44 | 7 | THE WITNESS: First of all, I have done no |
| 09:24:47 | 8 | independent analysis of that. All right? So I can't |
| 09:24:54 | 9 | give you an answer based on work I've done in this |
| 09:24:57 | 10 | case. I just don't have an opinion about how they |
| 09:25:04 | 11 | actually take into account, if at all, Kindle's |
| 09:25:10 | 12 | prices when setting e-books prices. |
| 09:25:13 | 13 | Q. MR. SWANSON: You agree, though, don't you, |
| 09:25:17 | 14 | that the price of e-books and the price of e-reading |
| 09:25:20 | 15 | devices are related as an economic matter? |
| 09:25:22 | 16 | MR. FRIEDMAN: Objection, form. |
| 09:25:22 | 17 | THE WITNESS: I agree they could be related, |
| 09:25:25 | 18 | yes. That's the point of the discussion in -- in |
| 09:25:28 | 19 | this report. In principle, yes, they are related. |
| 09:25:35 | 20 | But to say that they're related in a market sense is |
| 09:25:38 | 21 | not the same thing as to say that any given firm has |
| 09:25:46 | 22 | any firm specific discretion in how those prices are |
| 09:25:49 | 23 | set. |
| 09:25:49 | 24 | Q. MR. SWANSON: Have you analyzed how long |
| 09:25:54 | 25 | consumers on average use the same e-reading device? |

45

| | | |
|---|---|---|
| 09:26:01 | 1 | In other words, until they replace it or stop using |
| 09:26:03 | 2 | it? |
| 09:26:04 | 3 | A. Not in the context of this case. I don't |
| 09:26:08 | 4 | recall having -- but I have seen such information, |
| 09:26:10 | 5 | but none of that information plays any role in my |
| 09:26:13 | 6 | damages model. |
| 09:26:16 | 7 | Q. So if consumers on average use e-reading |
| 09:26:19 | 8 | devices for two years, three years, that assumption |
| 09:26:25 | 9 | would not play any role in your analysis in this |
| 09:26:29 | 10 | case? |
| 09:26:29 | 11 | MR. FRIEDMAN: Objection, form. |
| 09:26:30 | 12 | THE WITNESS: No, it has no role in what I |
| 09:26:32 | 13 | did for this case. |
| 09:26:34 | 14 | Q. MR. SWANSON: Do you, based on the general |
| 09:26:39 | 15 | information that you have, have an understanding as |
| 09:26:41 | 16 | to what the range is for average use of an e-reading |
| 09:26:45 | 17 | device? |
| 09:26:45 | 18 | MR. FRIEDMAN: Objection, form. |
| 09:26:46 | 19 | THE WITNESS: Yes, which is it's actually my |
| 09:26:50 | 20 | understanding is that in the -- in terms of the |
| 09:26:54 | 21 | devices that are used for e-readers, the more |
| 09:26:57 | 22 | specialized device, the shorter the half-life. |
| 09:27:01 | 23 | And so, you know, at one extreme personal |
| 09:27:04 | 24 | computers have a long half-life, like three years. |
| 09:27:09 | 25 | For specialized devices like the original Kindle and |

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123 (212)705-8585

**50**

09:32:34 1 price of e-books would be?

09:32:35 2 A. Every single publisher sets a price for their

09:32:41 3 book, but that price is based upon competitive

09:32:43 4 interactions in the marketplace. So they set it

09:32:47 5 independently, but competitive market theory says

09:32:50 6 that their amount of discretion is de minimis.

09:32:54 7 So the fallacy of composition would be on the

09:32:59 8 one hand, yes, they think of themselves as setting

09:33:02 9 their price independently, but on the other hand,

09:33:05 10 it's the interaction among all of them that causes

09:33:07 11 the market price to be what it is.

09:33:09 12 Q. I'm focusing on retail price of trade

09:33:13 13 e-books. Before agency, was there a single publisher

09:33:17 14 setting the retail price of an e-book?

09:33:19 15 A. I don't know whether any -- there was a

09:33:21 16 single publisher. That wasn't the common practice,

09:33:24 17 but I do not know if there was anybody who was using

09:33:27 18 a different model. It's not -- again, it's not

09:33:30 19 relevant to what I did.

09:33:31 20 Q. After agency -- the definition of agency, is

09:33:40 21 it not, is that the publisher is setting the retail

09:33:43 22 price, correct, in this context?

09:33:45 23 A. That's part of it, yes.

09:33:47 24 Q. And after --

09:33:52 25 A. There are things that are not agency models

**51**

09:33:54 1 for which that statement would be true. So that's

09:33:55 2 why your statement is incorrect. But, yes, part of

09:33:58 3 what the agency model is about is the publisher

09:34:03 4 setting a retail price. It's a retail price

09:34:06 5 maintenance agreement.

09:34:07 6 Q. Well, agency is a model that vests the

09:34:11 7 decisionmaking authority in the publisher as opposed

09:34:14 8 to the retailer, correct?

09:34:16 9 A. Well, yes, that's one characteristic of it,

09:34:19 10 and then there are other things that aren't agency

09:34:21 11 models where that also is true. So...

09:34:26 12 Q. Isn't it true that every publisher who

09:34:28 13 adopted agency became a retail competitor of Amazon

09:34:33 14 to that extent?

09:34:34 15 MR. FRIEDMAN: Objection, form.

09:34:36 16 THE WITNESS: I don't think that's the

09:34:37 17 appropriate way to characterize it, no.

09:34:39 18 Q. MR. SWANSON: So a publisher, an independent

09:34:44 19 publisher who entered into an agency agreement with

09:34:46 20 Apple and gained the power to set its own prices for

09:34:50 21 its e-books wasn't competing with all the books the

09:34:54 22 Amazon was setting prices for on wholesale?

09:34:56 23 MR. FRIEDMAN: Objection, form.

09:34:57 24 THE WITNESS: The competition occurs among

09:34:59 25 the retailers, and there's other aspects of what they

**52**

09:35:02 1 offer for sale than just the price. The agency model

09:35:06 2 consists of a -- a retail price maintenance rule or

09:35:12 3 retail price fixing rule on behalf of wholesalers,

09:35:15 4 but the wholesalers are -- the sellers of the e-books

09:35:18 5 are competing with each other. It's not, in my mind,

09:35:22 6 accurate to say that Macmillan is competing with

09:35:27 7 Apple and Amazon. Macmillan is competing with

09:35:31 8 Hachette and Apple is competing with Amazon.

09:35:35 9 Q. Well, is Disney -- who is Disney and

09:35:38 10 Harlequin, who are they competing with?

09:35:43 11 A. Anybody who -- anybody can be in both

09:35:45 12 markets, but that is to say you can be someone who is

09:35:49 13 both a retailer and a publisher. So you can -- your

09:35:54 14 retail activity can be competing with other

09:35:58 15 retailers, but your publishing activity is competing

09:36:06 16 with other publishers.

09:36:07 17 Q. As an economist, your view is that a

09:36:09 18 publisher who has the power to set its retail price

09:36:13 19 is not competing with all the other entities who are

09:36:15 20 setting retail prices in the same relevant market?

09:36:16 21 MR. FRIEDMAN: Objection, form.

09:36:18 22 THE WITNESS: A publisher is competing with

09:36:21 23 other publishers. And it may make a mistake in terms

09:36:25 24 of its retail pricing rule, but its retail outlets,

09:36:30 25 that a separate market. Retail and wholesale are not

**53**

09:36:31 1 the same relevant market, and it's not correct to say

09:36:34 2 that the publisher who is engaged in retail price

09:36:38 3 maintenance is in the retail market. It's not.

09:36:40 4 Q. MR. SWANSON: Is it your understanding that

09:36:42 5 Apple entered the trade e-books market through the

09:36:46 6 agency model?

09:36:48 7 MR. FRIEDMAN: Objection, form.

09:36:49 8 THE WITNESS: I don't know what you mean by

09:36:51 9 that, and I don't know why it's relevant to a damages

09:36:55 10 model. I have certainly made no assumptions about

09:37:01 11 anything related to why Apple entered the e-books

09:37:05 12 market other than what's in the opinion.

09:37:09 13 Q. MR. SWANSON: In your view, for purposes of

09:37:12 14 your modeling, have you made an assumption about

09:37:14 15 whether Apple would have distributed e-books in the

09:37:17 16 but-for world?

09:37:17 17 A. Not beyond what's stated in the opinion, no.

09:37:23 18 Q. And did the Court make a finding on that

09:37:26 19 point in the opinion?

09:37:26 20 A. What the Court said is it's irrelevant, that

09:37:31 21 it's not -- that is not -- there is no

09:37:35 22 pro-competitive benefit of that form arising from the

09:37:39 23 implementation of the agency model. So at that point

09:37:41 24 I dismiss it as something I need to take into

09:37:44 25 account.

14 (Pages 50 to 53)

58

```
09:42:27   1   discussed it in the Court's decision, are you taking
09:42:31   2   that as a predicate fact for your modeling?
09:42:36   3   A.    No, it's -- the -- what I'm taking as a
09:42:40   4   predicate fact is are there pro-competitive
09:42:44   5   justifications for the collusive agreement, and the
09:42:48   6   Court found there were none.  So, therefore, I didn't
09:42:50   7   have to get into an analysis of the potential
09:42:53   8   pro-competitive justifications.
09:42:54   9   Q.    Would Amazon have implemented a 70 percent
09:42:57  10   royalty option under the Kindle direct publishing
09:43:01  11   platform for self-publishers in the but-for world?
09:43:05  12       MR. FRIEDMAN:  Objection, form.
09:43:07  13       THE WITNESS:  I have no idea what they would
09:43:09  14   have adopted in the but-for world in terms of the
09:43:10  15   specific contract form with independent publishers.
09:43:13  16   The issue is not -- that I'm addressing is what the
09:43:18  17   price would be of those books, not what the impact
09:43:21  18   for the publisher would be.
09:43:23  19   Q.    MR. SWANSON:  Did you investigate how
09:43:24  20   retailers determine their pricing under the wholesale
09:43:27  21   model?
09:43:27  22   A.    Yes, I reference the discovery material from
09:43:38  23   Amazon and I think Barnes & Noble within the report
09:43:41  24   about how they did pricing, and that fed into how I
09:43:46  25   constructed the econometric model of pricing.  I
```

59

```
09:43:51   1   wanted to make it consistent with Amazon's model.
09:43:54   2   Q.    And are you aware that Amazon invested
09:43:58   3   substantial time and money in developing a system for
09:44:00   4   setting the retail price of e-books?
09:44:02   5       MR. FRIEDMAN:  Objection, form.
09:44:03   6       THE WITNESS:  I -- obviously it takes time
09:44:09   7   and money to develop a pricing algorithm, yes.  That
09:44:15   8   fact played no role in anything I did.
09:44:17   9   Q.    MR. SWANSON:  You do refer at multiple points
09:44:22  10   in your report to Amazon's pricing formula or pricing
09:44:26  11   algorithm, don't you?
09:44:28  12   A.    Yes.
09:44:29  13   Q.    And what do you mean by that?
09:44:31  14   A.    What I mean by that is a way of classifying
09:44:37  15   books by how long they've been out, what kind of book
09:44:42  16   they are, what their retail price is and mapping that
09:44:46  17   into an e-book price on Amazon.
09:44:49  18   Q.    Does your model attempt to reflect then
09:44:56  19   Amazon's pricing algorithm?
09:45:00  20   A.    It wouldn't be Amazon's pricing algorithm,
09:45:05  21   no.  It would -- it's a model that takes into account
09:45:09  22   the factors that Amazon took into account.  So it's
09:45:13  23   not intended to be anybody's pricing algorithm,
09:45:16  24   because price in a market is the result of
09:45:19  25   competitive interactions among firms, and one of the
```

60

```
09:45:22   1   elements in Amazon's model is what's the price at
09:45:27   2   Barnes & Noble, like just as at Barnes & Noble one of
09:45:31   3   the elements is what's the price at Amazon.
09:45:33   4       So it isn't -- the model is a reduced form
09:45:38   5   pricing model that has both supply and demand
09:45:42   6   characteristics in it.  It isn't intended to be -- it
09:45:44   7   is intended to be a marketing, delivery and price
09:45:48   8   estimated through a reduced form model.  It's not
09:45:51   9   intending to be anybody's pricing algorithm.
09:45:53  10   Q.    Have you ever had access to the algorithms
09:45:58  11   used by Amazon for e-book pricing?
09:46:00  12   A.    I don't have -- I have not seen the actual
09:46:03  13   algorithms, no.
09:46:04  14   Q.    Are you aware whether Amazon produced any
09:46:09  15   document showing its precise methodology for
09:46:11  16   determining e-book prices?
09:46:12  17   A.    I don't remember whether they did or didn't.
09:46:14  18   I mean, it would be irrelevant anyway since they base
09:46:16  19   it on Barnes & Noble prices.  So that tells me that
09:46:20  20   whatever their algorithm spits out, if the price
09:46:23  21   that's spit out is higher than Barnes & Noble, they
09:46:26  22   will set the price equal to Barnes & Noble.
09:46:29  23       So for my purposes recreating their pricing
09:46:33  24   formula wouldn't be accurate.  It would tend to
09:46:36  25   produce an imprecise and incorrect estimate of
```

61

```
09:46:40   1   pricing because it wouldn't be just the book
09:46:45   2   characteristics that were taken into account.  It
09:46:48   3   would be market conditions as well.
09:46:49   4   Q.    Are you aware that Amazon considers its
09:46:54   5   methodologies for determining e-book prices to be
09:46:57   6   among its most closely guarded trade secrets?
09:47:01   7       MR. FRIEDMAN:  Objection, form.
09:47:03   8       THE WITNESS:  I'm not surprised that that
09:47:05   9   would be true, but I don't recall having known that
09:47:07  10   and it doesn't play any role in my analysis.
09:47:09  11   Q.    MR. SWANSON:  Are you aware that access to
09:47:11  12   such information is restricted even within Amazon?
09:47:14  13       MR. FRIEDMAN:  Same objection.
09:47:16  14       THE WITNESS:  Again, I'm not surprised that's
09:47:18  15   true.  I don't recall ever having read those words,
09:47:20  16   but if you would have asked me do I think they keep
09:47:23  17   this stuff confidential, I would have said yes,
09:47:27  18   because almost everybody keeps their pricing
09:47:29  19   algorithm confidential, including Apple.
09:47:31  20   Q.    MR. SWANSON:  Do you claim to understand how
09:47:34  21   Amazon's pricing formula operated during the period
09:47:37  22   from 2008 through 2012?
09:47:41  23   A.    Only insofar as revealed in the report, which
09:47:43  24   is to identify variables that they claimed to take
09:47:46  25   into account and then to see if they in fact do
```

16 (Pages 58 to 61)

62

| | | |
|---|---|---|
| 09:47:49 | 1 | affect prices in the model. |
| 09:47:51 | 2 | Q.    Are you aware that Google attempted to |
| 09:47:54 | 3 | backward engineer Amazon's pricing formula and |
| 09:48:00 | 4 | failed? |
| 09:48:00 | 5 | MR. FRIEDMAN:  Objection, form. |
| 09:48:01 | 6 | THE WITNESS:  No.  I don't know that that's |
| 09:48:04 | 7 | true, but, again, it doesn't matter. |
| 09:48:07 | 8 | Q.    MR. SWANSON:  Is Amazon's pricing formula |
| 09:48:10 | 9 | static or dynamic? |
| 09:48:12 | 10 | MR. FRIEDMAN:  Objection, form. |
| 09:48:13 | 11 | THE WITNESS:  What do you mean by static |
| 09:48:15 | 12 | versus dynamic? |
| 09:48:17 | 13 | Q.    MR. SWANSON:  Well, does it change |
| 09:48:19 | 14 | frequently?  Let's start with that. |
| 09:48:20 | 15 | MR. FRIEDMAN:  Form. |
| 09:48:21 | 16 | THE WITNESS:  I don't know what the actual |
| 09:48:24 | 17 | algorithm is.  All I know is the factors that they |
| 09:48:30 | 18 | take into account.  So I wouldn't be able to answer |
| 09:48:36 | 19 | any question at all about their proprietary company |
| 09:48:39 | 20 | information.  All I know is what variables they say |
| 09:48:42 | 21 | are important. |
| 09:48:42 | 22 | Q.    MR. SWANSON:  Well, where -- |
| 09:48:45 | 23 | A.    And I suspect those do change through time, |
| 09:48:48 | 24 | but it doesn't matter to me.  All that matters is |
| 09:48:51 | 25 | that I have the variables that are -- that are |

63

| | | |
|---|---|---|
| 09:48:53 | 1 | important in my -- I test in the equation the extent |
| 09:48:58 | 2 | to which the factors that I see in these discovery |
| 09:49:02 | 3 | documents to see if they affect prices, but that |
| 09:49:05 | 4 | doesn't mean that they reproduce the pricing |
| 09:49:07 | 5 | algorithm.  I'm not trying to reproduce the pricing |
| 09:49:10 | 6 | algorithm. |
| 09:49:10 | 7 | Q.    What are the variables used in Amazon's |
| 09:49:14 | 8 | pricing algorithm? |
| 09:49:14 | 9 | A.    Well, one of the ones that I focus on |
| 09:49:17 | 10 | especially is the 90-day new release window, which is |
| 09:49:22 | 11 | somewhat different than the industry definition.  And |
| 09:49:27 | 12 | so that's one.  But they also take into account genre |
| 09:49:33 | 13 | and, as I said before, retail price, what the status |
| 09:49:37 | 14 | of hardback -- hard copy releases are, things like |
| 09:49:40 | 15 | that. |
| 09:49:40 | 16 | Q.    Focusing on the 90-day new release, Amazon's |
| 09:49:46 | 17 | pricing algorithm didn't always treat new releases in |
| 09:49:51 | 18 | a particular way for the first 90 days only, did it? |
| 09:49:57 | 19 | MR. FRIEDMAN:  Objection, form. |
| 09:49:58 | 20 | THE WITNESS:  Again, I don't know what's |
| 09:50:00 | 21 | inside their actual algorithm.  All I know is what |
| 09:50:04 | 22 | the documents say about what kinds of variable they |
| 09:50:07 | 23 | consider.  And so I have this 90-day variable in |
| 09:50:10 | 24 | there as a way to try to capture as much as I can |
| 09:50:15 | 25 | what's happening in terms of retail pricing, but I'm |

64

| | | |
|---|---|---|
| 09:50:18 | 1 | applying that to all retailers, not just Amazon |
| 09:50:22 | 2 | because the nature of the competitive process would |
| 09:50:25 | 3 | be if one of them prices on that basis, the others |
| 09:50:28 | 4 | will, too, if for no other reason that everybody |
| 09:50:33 | 5 | looks at everybody else's price to set their own |
| 09:50:36 | 6 | price. |
| 09:50:37 | 7 | Q.    MR. SWANSON:  How does Amazon's pricing |
| 09:50:39 | 8 | algorithm or formula incorporate the price of hard |
| 09:50:42 | 9 | copy books? |
| 09:50:43 | 10 | MR. FRIEDMAN:  Objection, form. |
| 09:50:44 | 11 | THE WITNESS:  I don't know.  I don't know |
| 09:50:45 | 12 | anything about their algorithm.  All I know is that |
| 09:50:53 | 13 | there's documents that say that might be important. |
| 09:50:55 | 14 | So I let the econometrics speak for itself as to |
| 09:50:58 | 15 | what's important. |
| 09:50:59 | 16 | Q.    MR. SWANSON:  Do you know how Amazon's |
| 09:51:03 | 17 | pricing formula treats the genre as a factor that |
| 09:51:06 | 18 | influences pricing? |
| 09:51:06 | 19 | MR. FRIEDMAN:  Objection, form. |
| 09:51:08 | 20 | THE WITNESS:  I do not know anything about |
| 09:51:10 | 21 | the actual pricing algorithm they use.  I'm not |
| 09:51:14 | 22 | attempting to recreate the pricing algorithm of |
| 09:51:16 | 23 | Amazon. |
| 09:51:17 | 24 | Q.    MR. SWANSON:  Does the Amazon pricing formula |
| 09:51:21 | 25 | or algorithm charge the same price for the same title |

65

| | | |
|---|---|---|
| 09:51:25 | 1 | at the same time to all buyers? |
| 09:51:26 | 2 | MR. FRIEDMAN:  Objection, form. |
| 09:51:28 | 3 | THE WITNESS:  There -- there is a common |
| 09:51:34 | 4 | price, but sometimes there's -- Amazon offers deals |
| 09:51:39 | 5 | to people, but I do not know the degree to which that |
| 09:51:42 | 6 | applies to e-books.  I know it applies to hard copy |
| 09:51:45 | 7 | books.  I do not know the degree to which they have |
| 09:51:48 | 8 | special deals with respect to e-book prices.  I've |
| 09:51:53 | 9 | seen no evidence of that in the data. |
| 09:51:59 | 10 | Q.    MR. SWANSON:  Isn't it a fact that Amazon |
| 09:52:01 | 11 | engages in price discrimination and charges different |
| 09:52:04 | 12 | consumers at the same time different prices for the |
| 09:52:07 | 13 | same e-books? |
| 09:52:08 | 14 | MR. FRIEDMAN:  Objection, form. |
| 09:52:10 | 15 | THE WITNESS:  You have to explain -- describe |
| 09:52:15 | 16 | to me exactly what you mean by engaging in price |
| 09:52:17 | 17 | discrimination here.  What are you referring to that |
| 09:52:22 | 18 | you are calling price discrimination?  Because price |
| 09:52:26 | 19 | discrimination has an economic meaning that is pretty |
| 09:52:32 | 20 | complicated.  So I want to know what you mean by |
| 09:52:34 | 21 | that. |
| 09:52:35 | 22 | Q.    MR. SWANSON:  Well, we can strike that from |
| 09:52:36 | 23 | the sentence.  Isn't it true that Amazon with |
| 09:52:39 | 24 | regularity during the class period charged different |
| 09:52:42 | 25 | consumers different prices at the same time for the |

17  (Pages 62 to 65)

66

| | | |
|---|---|---|
| 09:52:45 | 1 | same title? |
| 09:52:46 | 2 | MR. FRIEDMAN: Objection, form. |
| 09:52:48 | 3 | THE WITNESS: I am not aware of that being |
| 09:52:52 | 4 | true for e-books. I'm not aware of data that suggest |
| 09:52:58 | 5 | it's true, other than what I've discussed before, |
| 09:53:00 | 6 | which is the presence of some short-term discounts |
| 09:53:03 | 7 | for specific things. |
| 09:53:04 | 8 | Q.    MR. SWANSON: Let's take backlist pricing. |
| 09:53:07 | 9 | You've got data that show all the prices that Amazon |
| 09:53:10 | 10 | charged, correct? |
| 09:53:11 | 11 | A.    Yes. |
| 09:53:11 | 12 | Q.    And you can look at any given day and find |
| 09:53:14 | 13 | out if Amazon charged all the consumers who bought a |
| 09:53:17 | 14 | particular title the exact same price, correct? |
| 09:53:20 | 15 | A.    In principle, you could do a histogram of |
| 09:53:23 | 16 | that, yes. In practice, the number of data points is |
| 09:53:25 | 17 | so large, in the time frame I had I couldn't do that. |
| 09:53:28 | 18 | Q.    Have you looked at any of those questions as |
| 09:53:30 | 19 | to whether or not Amazon charges the same price to |
| 09:53:33 | 20 | the same consumers for the same title? |
| 09:53:35 | 21 | A.    I don't know the answer to the question, do |
| 09:53:38 | 22 | they engage in price differences in the same day for |
| 09:53:41 | 23 | different consumers. I do not know the answer to |
| 09:53:44 | 24 | that. |
| 09:53:44 | 25 | Q.    That's an easy question to answer given the |

67

| | | |
|---|---|---|
| 09:53:47 | 1 | data you have? |
| 09:53:48 | 2 | A.    No, it's a very hard question to answer |
| 09:53:50 | 3 | because the data is so large. Yes, in principle one |
| 09:53:54 | 4 | could do it, but because of the size of the data set, |
| 09:53:57 | 5 | it's difficult. |
| 09:53:57 | 6 | Q.    Was that an important question for purposes |
| 09:53:59 | 7 | of your opinions here? |
| 09:54:01 | 8 | A.    No, because if what they give is certain |
| 09:54:04 | 9 | people in certain circumstances get percentage |
| 09:54:07 | 10 | discounts, it's still -- it's still a percentage |
| 09:54:11 | 11 | discount off of an elevated list price. So there |
| 09:54:14 | 12 | would still be elevation of price. |
| 09:54:16 | 13 | Q.    What leads you to speak in terms of |
| 09:54:20 | 14 | percentage discounts in that response? |
| 09:54:22 | 15 | A.    Because that's what I'm aware of |
| 09:54:24 | 16 | independently, the kinds of things that Amazon does. |
| 09:54:28 | 17 | But, again, I've seen nothing in the record that |
| 09:54:34 | 18 | systematic gives me an insight into the extent to |
| 09:54:40 | 19 | which there is anything other than just that |
| 09:54:43 | 20 | occasional percentage discount offers to specific |
| 09:54:45 | 21 | customers. |
| 09:54:46 | 22 | Q.    So you, for example, don't know if the Amazon |
| 09:54:50 | 23 | pricing algorithm adds two or three cents to a |
| 09:54:54 | 24 | particular consumer's price compared to another |
| 09:54:57 | 25 | consumer's price as opposed to a percentage? |

68

| | | |
|---|---|---|
| 09:55:00 | 1 | MR. FRIEDMAN: Objection, form. |
| 09:55:01 | 2 | THE WITNESS: I have no clue what's inside |
| 09:55:03 | 3 | the Amazon pricing algorithm because it's not -- it's |
| 09:55:07 | 4 | proprietary. |
| 09:55:09 | 5 | Can we take a break soon? |
| 09:55:10 | 6 | MR. SWANSON: Oh, yeah. We can take it at |
| 09:55:13 | 7 | any time. |
| 09:55:15 | 8 | VIDEOGRAPHER: This now marks the ending of |
| 09:55:18 | 9 | tape labeled as number one of Roger Noll. We are now |
| 09:55:22 | 10 | going off the record. The time is 9:54. |
| 10:02:47 | 11 | (Deposition recess taken.) |
| 10:09:55 | 12 | VIDEOGRAPHER: This now marks the beginning |
| 10:10:09 | 13 | of tape labeled number two in the videotaped |
| 10:10:13 | 14 | deposition of Roger Noll. We are now going back on |
| 10:10:16 | 15 | the record, the time is 10:09. |
| 10:10:18 | 16 | Q.    MR. SWANSON: Professor, do you understand |
| 10:10:20 | 17 | that Amazon priced its e-books based in part on the |
| 10:10:36 | 18 | title's digital list price? |
| 10:10:36 | 19 | A.    Digital list price. By that you mean the |
| 10:10:43 | 20 | list price of an e-book by the publisher? |
| 10:10:52 | 21 | Q.    Correct. |
| 10:10:54 | 22 | A.    Well, I think there is a relation -- the |
| 10:11:08 | 23 | physical copy price and the list price are related to |
| 10:11:11 | 24 | each other. So the answer would have to be yes. And |
| 10:11:15 | 25 | if there is no physical copy price, then it would be |

69

| | | |
|---|---|---|
| 10:11:18 | 1 | the e-book list price, yes. |
| 10:11:21 | 2 | So -- but that's, again -- I haven't done |
| 10:11:27 | 3 | a -- I don't know what they actually do inside their |
| 10:11:29 | 4 | algorithm, so I can't answer to what they actually |
| 10:11:32 | 5 | do. |
| 10:11:33 | 6 | Q.    Did you have access to digital list price |
| 10:11:37 | 7 | data? |
| 10:11:37 | 8 | A.    I don't remember whether we had digital list |
| 10:11:42 | 9 | price data or not. It's too long ago. |
| 10:11:45 | 10 | Q.    Did you include digital list prices in your |
| 10:11:51 | 11 | model? |
| 10:11:51 | 12 | A.    I don't believe we did. |
| 10:11:52 | 13 | Q.    Do you have an understanding as to whether |
| 10:11:55 | 14 | digital list prices generally changed when a title |
| 10:11:59 | 15 | shifted from a hard cover to a trade paperback |
| 10:12:02 | 16 | version? |
| 10:12:03 | 17 | A.    Yes, we do have that shift in the model, yes. |
| 10:12:07 | 18 | So that would be -- to the extent the price did |
| 10:12:11 | 19 | depend on the existence of a paperback edition, yes, |
| 10:12:14 | 20 | we have that in the model. |
| 10:12:15 | 21 | Q.    And do you understand that digital list |
| 10:12:20 | 22 | prices generally changed when a title shifted from a |
| 10:12:23 | 23 | trade paperback to a mass market version? |
| 10:12:26 | 24 | MR. FRIEDMAN: Object to form. |
| 10:12:28 | 25 | THE WITNESS: I believe that -- I believe |

18 (Pages 66 to 69)

74

| | | |
|---|---|---|
| 10:17:06 | 1 | A.    The collusive version of the agency model |
| 10:17:10 | 2 | became effective for some publishers on April 1st. |
| 10:17:16 | 3 | Q.    And the agency agreements between the |
| 10:17:20 | 4 | defendant publishers and Apple were signed in |
| 10:17:23 | 5 | January 2010, correct? |
| 10:17:23 | 6 | MR. FRIEDMAN:  Objection, form. |
| 10:17:24 | 7 | THE WITNESS:  I haven't memorized the dates. |
| 10:17:26 | 8 | They're in the record, and I will let the record |
| 10:17:29 | 9 | speak for itself.  It plays no role in my analysis. |
| 10:17:32 | 10 | Q.    MR. SWANSON:  Was the 9.99 price point for |
| 10:17:37 | 11 | new releases under the wholesale model generally |
| 10:17:42 | 12 | above or below incremental cost? |
| 10:17:45 | 13 | MR. FRIEDMAN:  Objection, form. |
| 10:17:47 | 14 | THE WITNESS:  Sometimes above, sometimes |
| 10:17:49 | 15 | below. |
| 10:17:51 | 16 | Q.    MR. SWANSON:  Under what circumstances do |
| 10:17:54 | 17 | economists expect rational, profit-maximizing |
| 10:17:57 | 18 | retailers to set prices below incremental cost? |
| 10:18:02 | 19 | A.    Promotional. |
| 10:18:03 | 20 | Q.    Any other circumstances that you can think |
| 10:18:06 | 21 | of? |
| 10:18:07 | 22 | A.    Why don't you ask me a question?  I mean, |
| 10:18:15 | 23 | pricing has to do with costs and pricing has to do |
| 10:18:19 | 24 | with advertising, and so I would expect both of those |
| 10:18:24 | 25 | things to affect how pricing was set. |

75

| | | |
|---|---|---|
| 10:18:30 | 1 | Q.    Right.  And understand that for promotional |
| 10:18:33 | 2 | reasons a rational, profit-maximizing retailer could |
| 10:18:39 | 3 | set price below incremental cost.  Are there any |
| 10:18:43 | 4 | other reasons or circumstances you can think of as an |
| 10:18:45 | 5 | economist why such a retailer would do that? |
| 10:18:47 | 6 | A.    The defendants in this case claimed that |
| 10:18:49 | 7 | Amazon was engaged in predatory pricing, but that was |
| 10:18:52 | 8 | rejected by the Court. |
| 10:18:54 | 9 | Q.    Any other circumstances you can think of |
| 10:18:57 | 10 | other than promotional reasons or predatory pricing? |
| 10:19:00 | 11 | A.    Not that I -- I'm aware of.  Maybe I'm just |
| 10:19:06 | 12 | forgetting something that you can tell me about.  I |
| 10:19:09 | 13 | don't know that it would play any role in my report, |
| 10:19:11 | 14 | but if you want to ask me a question about something |
| 10:19:13 | 15 | else, I can, A, say whether I've thought about it |
| 10:19:17 | 16 | and, B, say whether it would play any role in |
| 10:19:20 | 17 | estimating damages. |
| 10:19:21 | 18 | Q.    Are you assuming that Amazon would continue |
| 10:19:23 | 19 | to price some e-books below incremental cost in the |
| 10:19:27 | 20 | but-for world to the same extent that it had in the |
| 10:19:30 | 21 | actual world? |
| 10:19:30 | 22 | A.    I see no reason to believe that there would |
| 10:19:36 | 23 | be a change in Amazon's pricing policy on April 1st |
| 10:19:40 | 24 | other than the implementation of the agency model. |
| 10:19:44 | 25 | Q.    Overall, would Amazon make money on e-books |

76

| | | |
|---|---|---|
| 10:19:50 | 1 | in the but-for world? |
| 10:19:51 | 2 | MR. FRIEDMAN:  Objection, form. |
| 10:19:53 | 3 | THE WITNESS:  I would expect that people who |
| 10:19:58 | 4 | are engaged in e-book retailing would make money on |
| 10:20:01 | 5 | the fact they were e-book retailing or get out of the |
| 10:20:05 | 6 | business, yes. |
| 10:20:05 | 7 | Q.    MR. SWANSON:  And is it your expectation that |
| 10:20:10 | 8 | in the but-for world Amazon's profitability would be |
| 10:20:15 | 9 | positive with respect to the sale of trade e-books? |
| 10:20:20 | 10 | MR. FRIEDMAN:  Objection, form. |
| 10:20:22 | 11 | THE WITNESS:  I would expect them to be |
| 10:20:27 | 12 | profitable selling e-books in general.  With respect |
| 10:20:30 | 13 | to any specific product, no, I wouldn't expect |
| 10:20:33 | 14 | anything about whether that product was profitable or |
| 10:20:35 | 15 | not. |
| 10:20:36 | 16 | Q.    MR. SWANSON:  Any specific title? |
| 10:20:37 | 17 | A.    Or even specific category.  Yes, overall |
| 10:20:40 | 18 | profitability.  No with respect to any specific |
| 10:20:44 | 19 | thing. |
| 10:20:44 | 20 | Q.    Have you analyzed whether Amazon was losing |
| 10:20:51 | 21 | money on e-books before April 1st, 2010? |
| 10:20:54 | 22 | MR. FRIEDMAN:  Objection, form. |
| 10:20:55 | 23 | THE WITNESS:  I have undertaken no |
| 10:20:56 | 24 | independent analysis of the financial condition of |
| 10:20:58 | 25 | Amazon's e-book business. |

77

| | | |
|---|---|---|
| 10:21:00 | 1 | Q.    MR. SWANSON:  Did you analyze whether Amazon |
| 10:21:05 | 2 | was making money on Kindle devices before the |
| 10:21:08 | 3 | conspiracy period? |
| 10:21:08 | 4 | A.    I have undertaken no independent analysis of |
| 10:21:11 | 5 | the profitability of their device business for the |
| 10:21:16 | 6 | purposes of writing my report. |
| 10:21:18 | 7 | Q.    Would you take issue with the |
| 10:21:22 | 8 | characterization that Amazon before the agency |
| 10:21:25 | 9 | agreements was at best breaking even on e-books? |
| 10:21:27 | 10 | MR. FRIEDMAN:  Objection, form. |
| 10:21:28 | 11 | THE WITNESS:  I have again taken no -- done |
| 10:21:32 | 12 | no independent analysis of whether they were or were |
| 10:21:34 | 13 | not making money on Kindles before and after the |
| 10:21:37 | 14 | agency agreement. |
| 10:21:38 | 15 | Q.    MR. SWANSON:  Or e-books? |
| 10:21:39 | 16 | A.    Or e-books. |
| 10:21:41 | 17 | Q.    Would you expect Amazon's pricing strategy |
| 10:21:48 | 18 | with respect to e-books sold on the wholesale model |
| 10:21:52 | 19 | to be different in the but-for world than in the |
| 10:21:54 | 20 | actual world? |
| 10:21:56 | 21 | MR. FRIEDMAN:  Objection, form. |
| 10:21:58 | 22 | THE WITNESS:  I have no clue what that |
| 10:22:00 | 23 | question means.  What do you mean by actual world? |
| 10:22:06 | 24 | The but-for world is supposed to be a guess about |
| 10:22:08 | 25 | what the actual world would look like in the absence |

20  (Pages 74 to 77)

82

| | |
|---|---|
| 10:27:34 | 1 | good with assumptions. |
| 10:27:35 | 2 | So if you assumed that Barnes & Noble could |
| 10:27:38 | 3 | not continue to match Amazon's prices in the but-for |
| 10:27:41 | 4 | world, how would that affect your modeling? |
| 10:27:44 | 5 | MR. FRIEDMAN:  Objection, form. |
| 10:27:45 | 6 | THE WITNESS:  If I assume that and I also |
| 10:27:47 | 7 | assume that the market is competitive, then I would |
| 10:27:50 | 8 | be predicting that Barnes & Noble would exit the |
| 10:27:53 | 9 | industry and the only firm left would be Amazon and |
| 10:27:56 | 10 | it would be true of everybody else.  So Amazon would |
| 10:27:59 | 11 | start to be a complete monopolist because the -- it's |
| 10:28:07 | 12 | the competitive process that determines the price, |
| 10:28:09 | 13 | and Barnes & Noble would be unsuccessful if it |
| 10:28:13 | 14 | systematically priced above Amazon. |
| 10:28:14 | 15 | Q.    MR. SWANSON:  Have you made any evaluation as |
| 10:28:16 | 16 | to whether or not Barnes & Noble's e-book business |
| 10:28:20 | 17 | would be profitable in the but-for world? |
| 10:28:23 | 18 | MR. FRIEDMAN:  Objection. |
| 10:28:23 | 19 | THE WITNESS:  I have undertaken no |
| 10:28:25 | 20 | independent analysis of Barnes & Noble's |
| 10:28:27 | 21 | profitability, and it's irrelevant to anything I did |
| 10:28:29 | 22 | in my report. |
| 10:28:30 | 23 | Q.    MR. SWANSON:  So if under the prices that |
| 10:28:33 | 24 | would prevail in the but-for world Barnes & Noble |
| 10:28:36 | 25 | would be losing substantial amounts of money, in your |

83

| | |
|---|---|
| 10:28:39 | 1 | view, that's irrelevant to the assessment of damages? |
| 10:28:41 | 2 | A.    Yes. |
| 10:28:42 | 3 | Q.    In your view, did the agency model eliminate |
| 10:28:51 | 4 | all retail price competition in the trade e-books |
| 10:28:55 | 5 | market? |
| 10:28:55 | 6 | MR. FRIEDMAN:  Objection, form. |
| 10:28:58 | 7 | THE WITNESS:  It didn't eliminate competition |
| 10:29:01 | 8 | among publishers that were not part of the |
| 10:29:04 | 9 | conspiracy.  It probably reduced its intensity and |
| 10:29:08 | 10 | caused prices to be somewhat higher.  So I haven't |
| 10:29:12 | 11 | modeled that.  So I underestimate damages. |
| 10:29:15 | 12 | Q.    MR. SWANSON:  Would the publisher defendants |
| 10:29:17 | 13 | have competed with each other on the wholesale price |
| 10:29:20 | 14 | of release e-books in the but-for world? |
| 10:29:22 | 15 | MR. FRIEDMAN:  Objection, form. |
| 10:29:23 | 16 | THE WITNESS:  Again, I haven't done an |
| 10:29:29 | 17 | independent analysis of the intensity of competition, |
| 10:29:33 | 18 | but I presume that in the absence of collusion they |
| 10:29:37 | 19 | have competed as they had before the collusion |
| 10:29:39 | 20 | started, yes. |
| 10:29:40 | 21 | Q.    MR. SWANSON:  So would you expect lower |
| 10:29:42 | 22 | wholesale prices in the but-for world? |
| 10:29:44 | 23 | A.    Actually, the nature of the competition was |
| 10:29:48 | 24 | different in this case because they made a sacrifice |
| 10:29:51 | 25 | in wholesale prices of e-books in order to induce -- |

84

| | |
|---|---|
| 10:29:55 | 1 | and as part of the deal to generate a minimum retail |
| 10:29:59 | 2 | price margin because their objective were, as stated |
| 10:30:04 | 3 | in my report derived from the opinion, was to protect |
| 10:30:07 | 4 | sales of hard copies. |
| 10:30:09 | 5 | So their profit calculation is based in part |
| 10:30:12 | 6 | on the price of e-books and in part on the sales and |
| 10:30:15 | 7 | prices of hard copies.  What they wanted to do was |
| 10:30:18 | 8 | protect -- arrest the decline in the sale of hard |
| 10:30:21 | 9 | copies. |
| 10:30:23 | 10 | Q.    MR. SWANSON:  And so you understood that in |
| 10:30:27 | 11 | the actual world as part of the unlawful conduct the |
| 10:30:32 | 12 | publisher defendants took wholesale prices to a lower |
| 10:30:35 | 13 | level? |
| 10:30:35 | 14 | MR. FRIEDMAN:  Objection, form. |
| 10:30:36 | 15 | THE WITNESS:  No, that's not what I said.  I |
| 10:30:38 | 16 | said that in some cases they actually cut the price |
| 10:30:41 | 17 | as part of the collusive agreement.  So the pricing |
| 10:30:44 | 18 | model I'm assuming is the one that -- a continuation |
| 10:30:48 | 19 | of the one that was in place prior to the institution |
| 10:30:51 | 20 | of the collusive agreement. |
| 10:30:52 | 21 | Q.    MR. SWANSON:  I think one of us may have |
| 10:30:55 | 22 | misunderstood the other.  I said took wholesale |
| 10:30:59 | 23 | prices to a lower level.  That is, I think, what |
| 10:31:01 | 24 | you're saying. |
| 10:31:02 | 25 | A.    You said under competition in the but-for |

85

| | |
|---|---|
| 10:31:04 | 1 | world.  The answer to that, if the prices were |
| 10:31:07 | 2 | lowered because of the collusive agreement for some |
| 10:31:09 | 3 | books, obviously they wouldn't be lower still in the |
| 10:31:13 | 4 | absence.  Maybe some e-book prices at the wholesale |
| 10:31:17 | 5 | level would have been higher in the absence of a |
| 10:31:19 | 6 | collusive agreement.  But our interest here is not |
| 10:31:21 | 7 | what the wholesale price was.  Our interest here is |
| 10:31:25 | 8 | what the retail price was. |
| 10:31:27 | 9 | Q.    In the real world, what you call the |
| 10:31:29 | 10 | collusive world, did wholesale prices drop for |
| 10:31:32 | 11 | nondefendant publishers as well? |
| 10:31:34 | 12 | MR. FRIEDMAN:  Objection, form. |
| 10:31:36 | 13 | THE WITNESS:  The model takes into account a |
| 10:31:41 | 14 | general declining trend in e-book prices by having a |
| 10:31:45 | 15 | time variable in there, yes. |
| 10:31:46 | 16 | Q.    MR. SWANSON:  And would the market wholesale |
| 10:31:50 | 17 | price have been that low absent the collusion? |
| 10:31:53 | 18 | MR. FRIEDMAN:  Objection, form. |
| 10:31:54 | 19 | THE WITNESS:  What wholesale market price? |
| 10:31:58 | 20 | Again, it's a very vague and general question, and I |
| 10:32:01 | 21 | want to know what exactly you're talking about. |
| 10:32:03 | 22 | Q.    MR. SWANSON:  So there is no market wholesale |
| 10:32:06 | 23 | price, in your view, for trade e-books? |
| 10:32:08 | 24 | MR. FRIEDMAN:  Objection, form. |
| 10:32:09 | 25 | THE WITNESS:  There's market wholesale prices |

22  (Pages 82 to 85)

86

```
10:32:11   1   at the level of a book, and there is something about
10:32:14   2   average prices, but I -- your question was vague
10:32:16   3   about what you meant.  All right?  And so you're
10:32:19   4   going to have to clarify it for me before I can
10:32:24   5   answer the question.
10:32:24   6   Q.   MR. SWANSON:  Well, let's speak in terms of
10:32:27   7   average wholesale prices.  Are you aware of what the
10:32:31   8   average wholesale price was in the trade e-books
10:32:34   9   market?
10:32:34  10   A.   There are calculations done by Dr. Burtis
10:32:37  11   about that, but they don't take into account
10:32:39  12   compositional effects.  So you can have a change in
10:32:43  13   average price because on average prices are changing
10:32:45  14   or you can have a change because the composition of
10:32:47  15   sales is changing among higher priced versus lower
10:32:53  16   priced categories.
10:32:55  17       So, again, what you mean by average depends
10:32:58  18   on which of those you're interested in.  Are you
10:33:00  19   talking about a price index, or are you talking about
10:33:02  20   an average price that takes into account shifts in
10:33:05  21   composition.
10:33:06  22   MR. FRIEDMAN:  I don't want to interrupt.  I
10:33:09  23   just want to make sure, were you talking wholesale
10:33:11  24   price or retail price in your answer?
10:33:14  25   THE WITNESS:  Either one.  Both would be
```

87

```
10:33:17   1   true, but I understand he asked me about wholesale.
10:33:20   2   Q.   MR. SWANSON:  In the but-for world, would
10:33:24   3   Amazon and other retailers continue to rely on
10:33:26   4   wholesale contracts with publishers?
10:33:28   5   MR. FRIEDMAN:  Objection, form.
10:33:31   6   THE WITNESS:  That was irrelevant to me.  I
10:33:33   7   haven't done any independent analysis about what
10:33:35   8   contract forms or business relationships would emerge
10:33:39   9   between Amazon and individual publishers in the
10:33:42  10   absence of the collusive agreement.
10:33:43  11   Q.   MR. SWANSON:  So you're not planning on
10:33:45  12   testifying that Random House would not have switched
10:33:48  13   to agency in early 2011 in the but-for world?
10:33:51  14   A.   What I'm testifying about is what the price
10:33:55  15   effect was, not whether it was an agency model.  It's
10:33:58  16   whether the price was subject to collusion, and what
10:34:03  17   form the retail price collusion took is irrelevant.
10:34:07  18   What's relevant is the existence of collusion.
10:34:09  19   Q.   In the but-for world, would Amazon have a
10:34:12  20   higher or lower share of the relevant market than it
10:34:16  21   did in reality?
10:34:18  22   MR. FRIEDMAN:  Objection, form.
10:34:21  23   THE WITNESS:  It's almost impossible to state
10:34:32  24   because what Random House's share is going to be --
10:34:36  25   Q.   MR. SWANSON:  Amazon.
```

88

```
10:34:37   1   A.   You said Random House.
10:34:39   2   Q.   I apologize.
10:34:40   3   MR. FRIEDMAN:  I think you said Amazon, but
10:34:42   4   restate it.
10:34:45   5   THE WITNESS:  I'm having trouble parsing it
10:34:46   6   out.
10:34:46   7   MR. SWANSON:  No problem.  And I'm entirely
10:34:48   8   capable of misstating it.  So I'm sure Mr. Friedman
10:34:51   9   will keep me honest.
10:34:53  10   THE WITNESS:  Don't trust him for that.
10:34:54  11   MR. SWANSON:  All right.  We'll stipulate.
10:34:59  12   MR. FRIEDMAN:  Objection to both of you.
10:35:03  13   Q.   MR. SWANSON:  All right.  Let me try it
10:35:06  14   again.  In the but-for world, would Amazon have a
10:35:08  15   higher or lower share of the relevant market than it
10:35:11  16   had in the real world?
10:35:15  17   MR. FRIEDMAN:  Objection, form.
10:35:16  18   THE WITNESS:  I haven't addressed that
10:35:18  19   question.  I've done no analysis of it.  It has no
10:35:21  20   relevance to my report.
10:35:22  21   Q.   MR. SWANSON:  You don't have an expectation
10:35:24  22   based on the things that you have analyzed?
10:35:27  23   A.   No, I actually do not have an expectation.
10:35:30  24   It's an empirical question, not a theoretical
10:35:33  25   question.  So I don't -- I can't really address it.
```

89

```
10:35:36   1   Q.   In your disaggregation calculation or
10:35:48   2   calculations, you considered the retailers' overall
10:35:54   3   market share of publisher defendant titles sold under
10:35:58   4   the agency model.  Is that a fair statement?
10:36:00   5   A.   Yes, it is the case I considered the identity
10:36:04   6   of the retailer, yes, which would reflect their
10:36:06   7   market share.
10:36:08   8   Q.   And you have some assumptions about what that
10:36:14   9   market share would be in the but-for world or at
10:36:17  10   least you modeled?
10:36:19  11   A.   Well, the model is not about market share.
10:36:24  12   It's not trying to predict market share.  The model
10:36:27  13   is about the role of the identity of the retailer in
10:36:30  14   setting -- in pricing.  So I allowed that to have an
10:36:35  15   effect.
10:36:35  16   Q.   Did the publisher defendants' market share of
10:36:40  17   titles sold under the agency model increase, decrease
10:36:45  18   or stay the same after the agency agreements were
10:36:49  19   implemented?
10:36:50  20   A.   I haven't analyzed that question.  It would
10:36:52  21   depend on things other than the implementation of the
10:36:55  22   agency model, such as the hit rate of the publishers
10:36:58  23   with regard to best sellers.  So it's -- you know, I
10:37:02  24   have not attempted to estimate the market shares of
10:37:05  25   publishers either in or out of the collusive
```

23  (Pages 86 to 89)

## 90

```
10:37:08    1   agreement.
10:37:09    2   Q.    Well, isn't it true that the share of sales
10:37:14    3   attributable to the publisher defendants' titles
10:37:19    4   dropped?
10:37:19    5   A.    I believe so, but it doesn't play any role in
10:37:21    6   my analysis. I mean, that's the point is, you know,
10:37:25    7   there's a fact out there about what's happening to
10:37:27    8   market shares. But one would sort of expect, all
10:37:30    9   else being equal, if somebody charges a higher price
10:37:34   10   than their competitors they'd sell less. But there
10:37:38   11   are so many other things going on that that -- in and
10:37:41   12   of itself, that partial equilibrium statement is
10:37:44   13   inadequate to make a forecast as to what's going to
10:37:47   14   happen to the market shares.
10:37:49   15   Q.    In the but-for world, would the publisher
10:37:51   16   defendants' market share have followed the same trend
10:37:53   17   as it did in the real world?
10:37:55   18       MR. FRIEDMAN: Objection, form.
10:37:56   19       THE WITNESS: May or may not. I don't know.
10:37:58   20   I haven't done any analysis of that and you can't --
10:38:01   21   there is no theoretical prediction that is robust.
10:38:04   22   It's an empirical question, and I haven't analyzed
10:38:07   23   it.
10:38:08   24   Q.    MR. SWANSON: In the but-for world, would the
10:38:14   25   publishers defendants' market shares be proportioned
```

## 91

```
10:38:17    1   the same vis-a-vis one another as in the actual post
10:38:20    2   agency world?
10:38:21    3       MR. FRIEDMAN: Objection, form.
10:38:21    4       THE WITNESS: Again, I have not analyzed that
10:38:24    5   question, and it's irrelevant to what I did as long
10:38:25    6   as the market is competitive.
10:38:27    7   Q.    MR. SWANSON: And you make no assumption in
10:38:29    8   the structure of your model to that effect?
10:38:31    9   A.    There is no assumptions about what the market
10:38:34   10   shares of any publisher are going to be at all. It's
10:38:37   11   not part of the model, and it shouldn't be. It has
10:38:41   12   no relevance to what I did.
10:38:43   13   Q.    Market shares have no relevance to
10:38:49   14   calculating damages in an antitrust case?
10:38:51   15       MR. FRIEDMAN: Objection, form.
10:38:52   16       THE WITNESS: The only relevance of market
10:38:53   17   shares is whether the collective market shares of the
10:38:56   18   defendants are sufficient to be able collusively to
10:38:59   19   elevate price, and that's what the model does is
10:39:01   20   elevate -- is calculate as an empirical matter how
10:39:05   21   much they were able to elevate their own price as a
10:39:07   22   consequence of collusion. But besides that, it
10:39:10   23   doesn't depend on what the composition of the market
10:39:14   24   shares of the individual firms was inside the
10:39:17   25   collusive agreement.
```

## 92

```
10:39:18    1   Q.    MR. SWANSON: Do you believe that an
10:39:19    2   effective collusive agreement must not be undercut by
10:39:23    3   competitors who are not part of the agreement?
10:39:25    4       MR. FRIEDMAN: Objection, form.
10:39:26    5       THE WITNESS: Well, the effectiveness of a
10:39:28    6   collusive agreement depends upon the extent of which
10:39:30    7   those outside can undo it, can make it unprofitable,
10:39:34    8   yes.
10:39:34    9   Q.    MR. SWANSON: Is it true that for a collusive
10:39:36   10   agreement to work the parties to the agreement must
10:39:39   11   possess sufficient market power to be able to affect
10:39:43   12   total supply and, hence, prices?
10:39:45   13   A.    That's exactly what I said earlier. That's
10:39:49   14   an empirical question again. They must be able to
10:39:53   15   exercise more market power by acting collusively, and
10:39:57   16   if the presumption is that in the absence of
10:40:01   17   collusion the industry is competitive, then the
10:40:06   18   elevation of price due to collusion is the elevation
10:40:09   19   from a competitive benchmark to a market in which
10:40:16   20   collectively the colluding entities can exercise
10:40:19   21   market power despite the fact that the collusion does
10:40:23   22   not include all sellers.
10:40:25   23   Q.    Is a 50 percent market share sufficient to
10:40:30   24   give parties to a collusive agreement the market
10:40:36   25   power to affect market price?
```

## 93

```
10:40:38    1       MR. FRIEDMAN: Objection, form.
10:40:39    2       THE WITNESS: It depends on the nature of the
10:40:41    3   industry that -- if you back out what the merger
10:40:49    4   guidelines say about mergers, then that says you
10:40:53    5   never would want to allow somebody to get to
10:40:57    6   50 percent through merger. If you look at
10:41:00    7   homogeneous product cases, they frequently find that
10:41:04    8   market shares in the 50 to 60 percent range are
10:41:07    9   insufficient to create power. So it depends on the
10:41:10   10   fact of the case. That's why it's an empirical
10:41:13   11   question whether a collusive agreement can work, not
10:41:13   12   a theoretical question.
10:41:15   13   Q.    How about a 25 percent market share? Is that
10:41:17   14   ever sufficient?
10:41:18   15   A.    It could be in a sufficiently product
10:41:21   16   differentiated industry, yes. The issue then becomes
10:41:25   17   who are the closest competitors to any given person.
10:41:29   18   You think about hotdog stands at a beach. Two or
10:41:33   19   three guys located next to each other, even though
10:41:38   20   they're a small fraction of the market, might be able
10:41:40   21   to effectuate a profit-enhancing collusive agreement.
10:41:45   22   Q.    Do you have an understanding as to whether or
10:41:47   23   not Random House was a part of the conspiracy?
10:41:51   24   A.    My understanding is that they were not, but
10:41:54   25   it's based solely on the opinion and I have no
```

24 (Pages 90 to 93)

**94**

```
10:41:56   1   independent view of that.  I've never analyzed it.
10:41:59   2   Q.    What happened to the market share for sales
10:42:03   3   of Random House titles after the publisher defendants
10:42:07   4   entered into their agency agreements?
10:42:08   5        MR. FRIEDMAN:  Objection, form.
10:42:09   6        THE WITNESS:  I haven't done that
10:42:11   7   calculation.  It is not part of my report.  Nothing
10:42:15   8   in my report hinges on what happened to Random
10:42:18   9   House's market share.
10:42:19  10   Q.    MR. SWANSON:  Is that true of Random House's
10:42:21  11   market share after it entered into an agency
10:42:24  12   agreement itself?
10:42:24  13   A.    Yes, I have such information in data,
10:42:28  14   but it played no role in my report and nothing in my
10:42:31  15   report hinges on that, on those facts.
10:42:34  16   Q.    Are you assuming that the publisher
10:42:39  17   defendants' market power would be the same in the
10:42:41  18   but-for world as in the -- in the real world?
10:42:45  19        MR. FRIEDMAN:  Objection, form.
10:42:47  20        THE WITNESS:  I -- again, are you talking
10:42:53  21   about collectively if they collude or individually?
10:42:56  22   Q.    MR. SWANSON:  Let's talk about individually
10:42:57  23   first.
10:42:58  24   A.    I'm assuming that the individual market power
10:43:02  25   of the publishers is unaffected, that, first of all,
```

**95**

```
10:43:09   1   that they were competitive, so it's an imperfectly
10:43:14   2   competitive or monopolistically competitive market.
10:43:18   3        Obviously they don't sell homogenous
10:43:24   4   products and it's not perfectly competitive.  Indeed,
10:43:27   5   a publishing firm couldn't be perfectly competitive
10:43:32   6   because of the nature of cost function.  But I'm
10:43:35   7   assuming there is a blanket competition in among the
10:43:38   8   publishers.
10:43:40   9   Q.    In the but-for world, would Amazon price
10:43:47  10   Kindle devices at cost, above cost or below cost on
10:43:53  11   average?
10:43:53  12        MR. FRIEDMAN:  Objection, form.
10:43:54  13        THE WITNESS:  That's not answerable on a
10:43:56  14   theoretical basis.  It's an empirical issue, and I
10:44:01  15   haven't done an independent analysis to determine
10:44:03  16   what the optimal pricing of Kindles would be.
10:44:07  17   Q.    MR. SWANSON:  Now, I'm going to make sure I
10:44:12  18   understand something that was touched upon in our
10:44:14  19   earlier discussion.  Do you make any assumption about
10:44:19  20   whether or not the iBookstore would exist in the
10:44:23  21   but-for world as part of your work?
10:44:24  22   A.    There is actually -- the only implicit
10:44:28  23   assumption in there is that the sales of the
10:44:31  24   iBookstore would have happened somewhere, but whether
10:44:35  25   they would happen there is not part of the model.
```

**96**

```
10:44:38   1   Q.    And do you have any opinion, understanding,
10:44:43   2   insight as to whether or not Apple, if it had
10:44:49   3   operated an iBookstore in the but-for world, would
10:44:54   4   have been profitable at the prices that would prevail
10:44:56   5   under your model?
10:44:57   6        MR. FRIEDMAN:  Objection, form.
10:44:58   7        THE WITNESS:  I have undertaken no
10:44:59   8   independent analysis of the profitability of the
10:45:01   9   iBookstore under either the collusive arrangement or
10:45:05  10   the competitive benchmark.  I'm simply accepting the
10:45:12  11   opinion of the Court that that issue is irrelevant
10:45:14  12   and that no case has made that that's a
10:45:18  13   pro-competitive justification for the collusion.
10:45:20  14   Q.    MR. SWANSON:  So you're assuming that the
10:45:23  15   Court determined that Apple would be a retailer in
10:45:27  16   the but-for world?
10:45:27  17   A.    No, I said that the Court determined that
10:45:30  18   that argument was not a pro-competitive -- produced
10:45:37  19   no pro-competitive benefit, that the argument was not
10:45:41  20   established and so it was rejected by the Court.
10:45:44  21   Q.    You're aware from your data, are you not,
10:45:51  22   that Apple sold more than 33 million e-books during
10:45:54  23   the class period?
10:45:55  24   A.    I was not aware of the precise number, no.
10:45:58  25   And thank you for telling me because I would never
```

**97**

```
10:46:01   1   have been able to remember.
10:46:02   2   Q.    Well, you would have been able to find that
10:46:04   3   number out.
10:46:04   4   A.    I would find it out, but I -- you can ask me
10:46:08   5   questions about how many e-books every single
10:46:10   6   retailer sold, and I'm going to come up with exactly
10:46:13   7   the same lack of precision in my knowledge.  Not
10:46:17   8   something I've committed to memory.
10:46:20   9   Q.    I understand.  What were you telling me a
10:46:28  10   moment ago was that your model assumes that those
10:46:31  11   approximately 33 million e-books would be sold in the
10:46:34  12   but-for world by someone.
10:46:36  13   A.    That's correct.  I have -- the model is about
10:46:39  14   how much damages -- you can identify damages
10:46:43  15   associated with each retailer because the data do
10:46:46  16   come from each retailer.  But if the -- the argument
10:46:51  17   that the iBookstore wouldn't exist, in my view, has
10:46:55  18   already been rejected as an argument saying it's a
10:46:59  19   pro-competitive benefit.  So I don't have to worry
10:47:01  20   about it.  But implicit in the model is the notion
10:47:05  21   that those would have been sold anyway.
10:47:06  22   Q.    If it was determined that some of these 33
10:47:12  23   million e-book purchases would not have been made but
10:47:15  24   for the iBookstore, would that affect your model?
10:47:18  25        MR. FRIEDMAN:  Objection, form.
```

25 (Pages 94 to 97)

## 106

| | |
|---|---|
| 11:11:48 | 1 |
| 11:11:51 | 2 |
| 11:11:55 | 3 |
| 11:11:58 | 4 |
| 11:12:03 | 5 |
| 11:12:05 | 6 |
| 11:12:08 | 7 |
| 11:12:09 | 8 |
| 11:12:15 | 9 |
| 11:12:17 | 10 |

1   say market.  I have not examined entry of new
2   publishers in any period.  There is nothing in my
3   report hinges on that.  I haven't addressed the
4   economics of entry into the publishing business.
5   Q.   Is it your opinion that the same titles would
6   be released by independent publishers in the but-for
7   world as in the real world?
8   A.   The assumption in the model is that the
9   titles that were offered would have been offered in
10   any case.
11   Q.   And is that true for titles offered by
12   self-publishers as well?
13   A.   It doesn't matter what they are.  They're
14   part -- they were released and they were released in
15   a noncollusive environment.  So the use of those
16   prices is as part of the prices that are used to
17   formulate the competitive benchmark.
18   So the mechanics of how they enter into the
19   damages model doesn't hinge on whether they would
20   have entered anyway because if the world had been
21   competitive, then there would be no anticompetitive
22   effect on the prices of the colluding publishers.  So
23   they're just data points in this model about a
24   competitive benchmark.
25   Q.   You agree that the average prices for

## 107

1   publishers who were not part of the conspiracy fell
2   after April 1st, 2010?
3   MR. FRIEDMAN:  Objection, form.
4   THE WITNESS:  What do you mean by average?
5   It's true that the -- the average price without
6   taking into effect composition effects fell.  But I
7   have seen nobody who actually constructed a price
8   index, and I didn't.
9   So the question would be yes, that's true, if
10   you're talking about the unweighted average prices.
11   If you're talking about a price index, I don't know
12   whether it's true or not.
13   Q.   MR. SWANSON:  Are you assuming that all
14   e-book prices would be the same in the but-for
15   world as in the real word for publishers outside the
16   big six?
17   MR. FRIEDMAN:  Objection, form.
18   THE WITNESS:  The presumption is that the
19   competitive benchmark is in fact the prices that were
20   charged by those entities, among others.  If those
21   prices during the collusive period were elevated due
22   to the lack of less intense competition from the
23   members of the conspiracy, then that is -- then those
24   prices would have in fact been lower.  So I have
25   underestimated damages by the assumption that they

## 108

1   were competitive.
2   Q.   MR. SWANSON:  In the but-for world, do you
3   assume that Amazon would have introduced the Kindle
4   app for the iPad?
5   MR. FRIEDMAN:  Objection, form.
6   THE WITNESS:  I make no assumptions about
7   what anybody would have done with respect to the
8   introduction of any hardware or any software.  I'm
9   just simply measuring the price effect in the world
10   that actually happened.
11   Q.   MR. SWANSON:  Do you agree -- do you agree
12   that the iPad is a revolutionary device that has
13   encouraged innovation and competition?
14   MR. FRIEDMAN:  Objection, form.
15   THE WITNESS:  I have no independent analysis
16   of the merits or demerits of an iPad that went into
17   the construction of my expert report.
18   Q.   MR. SWANSON:  Well, did the Court make any
19   findings on that point?
20   A.   Yes, the Court did, but I say I have no
21   independent opinion.  Everything -- I'm just taking
22   the Court's opinion as given for all of these issues.
23   Q.   And on that issue as well?
24   A.   On every issue.
25   Q.   Were the Kindle and the iPad competing

## 109

1   products?
2   MR. FRIEDMAN:  Objection, form.
3   THE WITNESS:  Again, I have not undertaken an
4   analysis of the extent of competition in the market
5   for tablet computers, but obviously I believe they
6   were competing products, yes.
7   Q.   MR. SWANSON:  Do you think that the
8   introduction of the iPad had an effect on the quality
9   or features of other e-readers that were released
10   after the iPad?
11   MR. FRIEDMAN:  Objection, form.
12   THE WITNESS:  Again, I've done no independent
13   analysis of the market for tablet computers, but
14   obviously technological innovation is one of the
15   features of consumer electronics products, including
16   tablet computers.  So each firm's technological
17   innovations lead to a response by other firms.
18   Q.   MR. SWANSON:  And did the introduction of the
19   iPad lead other firms making competing products to
20   change their prices for their devices?
21   MR. FRIEDMAN:  Objection, form.
22   THE WITNESS:  I have undertaken no
23   independent analysis of how the introduction of the
24   iPad affected the prices for other makers of
25   e-readers or tablet computers, and it's irrelevant to

28  (Pages 106 to 109)

## 146

```
12:06:39   1   Q.    Is an unweighted version of the specification
12:06:46   2   one that would lead to unreliable results, in your
12:06:51   3   view?
12:06:51   4   A.    The -- yes.  Well, let's put it -- put it
12:06:54   5   somewhat differently.  Nothing is perfect.  All
12:06:57   6   right?  There's no perfect way to deal with the
12:07:00   7   problem that we're dealing with.
12:07:01   8         It would lead to -- if you examine what the
12:07:05   9   errors are, what the prediction errors are inside the
12:07:09  10   model, the prediction error -- if you do unweighted
12:07:13  11   regression, the prediction errors will be smaller for
12:07:16  12   the guys for which sales are very low, and they'll be
12:07:19  13   larger for the titles for which sales are large.
12:07:23  14         And so in terms of the effect on total
12:07:26  15   revenues and total estimates of damages, when you're
12:07:29  16   trading off precision for things that sell one versus
12:07:33  17   precisions that sell a hundred thousand, it's more
12:07:35  18   important to get the hundred thousand guy right, and
12:07:38  19   that's the reason for doing weighted regressions.
12:07:40  20   Q.    Are you familiar with the term statistical
12:07:42  21   significance?
12:07:44  22   A.    Yes.
12:07:45  23   Q.    And -- it's just a foundation question.
12:07:51  24   A.    No, I never heard of it before.
12:07:53  25   Q.    At least I didn't build it up word by word.
```

## 147

```
12:08:00   1         And you mentioned prediction errors a moment
12:08:05   2   ago.  What is the relationship between that concept
12:08:08   3   and the concept of statistical significance?
12:08:11   4   A.    Well, the statistical significance is a
12:08:14   5   summary statistic about the average magnitude of the
12:08:17   6   prediction errors.
12:08:18   7   Q.    And are results that are statistically
12:08:24   8   significant more meaningful to you than results that
12:08:27   9   are not?
12:08:28  10   A.    It depends on what you mean.  I mean, if
12:08:34  11   you're using the appropriate concept of statistical
12:08:38  12   significance, yes.  But -- they are meaningful.  But
12:08:44  13   the standard statistical significance test is not --
12:08:51  14   that's used in an academic paper isn't really
12:08:56  15   mapped -- doesn't really map accurately into
12:08:59  16   litigation concepts because the -- issue there is
12:09:05  17   not necessarily is something statistically
12:09:08  18   significant different from zero, but does it add
12:09:11  19   explanatory power compared to other variables in the
12:09:16  20   equation by having this thing in there, which is a
12:09:18  21   sort of different test.
12:09:19  22         But in general we are concerned about
12:09:21  23   statistical significance, yes.
12:09:23  24   Q.    In offering opinions up about impact, you are
12:09:36  25   offering an opinion that the effect of the challenged
```

## 148

```
12:09:38   1   conduct is different from zero, correct?
12:09:41   2   A.    Yes, whether it's -- whether it is different
12:09:45   3   from zero.  The legal problem is that's a more likely
12:09:50   4   than not question, not a statistical significance
12:09:53   5   question.  That's why there is a -- there's a
12:09:56   6   problem here of using that terminology.
12:09:58   7   Q.    And you understand that you are here not as a
12:10:01   8   juror facing the legal test of more likely than not,
12:10:07   9   but an expert who is supposed to lend expertise in
12:10:11  10   guidance of jurors, correct?
12:10:13  11   A.    Thank you for telling me what my role is,
12:10:15  12   because I never would have guessed that I wasn't a
12:10:18  13   juror.
12:10:18  14   Q.    We might let on you the jury if you promise
12:10:22  15   to be fair.
12:10:24  16         How are we doing on time?
12:10:27  17         VIDEOGRAPHER:  We have about another five
12:10:29  18   minutes.
12:10:29  19         MR. SWANSON:  Let's do it.
12:10:30  20   Q.    If -- if you get very different results
12:10:38  21   whether you weight or not, doesn't it tell you
12:10:42  22   there's a specification problem with your model?
12:10:44  23         MR. FRIEDMAN:  Objection, form.
12:10:45  24         THE WITNESS:  No.  That really isn't what
12:10:50  25   it's about.  There's always -- if you're -- if you're
```

## 149

```
12:10:54   1   not explaining all of the data, there's a
12:10:56   2   specification error unless the world is truly random.
12:11:00   3   All right?  So, of course, there's a specification
12:11:02   4   error.  There's always a specification error in every
12:11:07   5   model, but that's not why results -- that's not
12:11:11   6   only -- that doesn't lead to the conclusion that
12:11:14   7   quantity weighting would get a big or a little
12:11:16   8   difference, right?
12:11:17   9         The quantity weighting is what I told you
12:11:19  10   about.  It's about in a data set which has a very
12:11:22  11   large number of observations that don't matter very
12:11:25  12   much in terms of what the object of the game is which
12:11:28  13   is to estimate damages.  Quantity weighting says
12:11:31  14   we're going to make certain that the resolution of
12:11:34  15   the precision of estimates is -- goes in the favor of
12:11:38  16   the ones that matter as opposed to ones that don't
12:11:40  17   matter.  That's all that it's about.
12:11:43  18         Of course, if you had perfectly specified the
12:11:46  19   model and had an R squared of 1.0, then it wouldn't
12:11:50  20   matter what the quantity weight was; but it does
12:11:54  21   matter as long as the model is imperfect.  It's
12:11:57  22   extremely likely to matter if the model is not
12:12:00  23   perfect.
12:12:01  24   Q.    MR. SWANSON:  Speaking of R squared, earlier
12:12:06  25   we had talked about adjusted R squared and within R
```

38 (Pages 146 to 149)

150

| | | |
|---|---|---|
| 12:12:10 | 1 | squared. |
| 12:12:11 | 2 | A.   Right. |
| 12:12:11 | 3 | Q.   Can you tell me what the difference is |
| 12:12:15 | 4 | between the two of those, adjusted R squared and |
| 12:12:18 | 5 | within R squared? |
| 12:12:19 | 6 | A.   I don't -- in this model I don't know.  I |
| 12:12:22 | 7 | don't remember. |

<div style="border:2px solid green">

| | | |
|---|---|---|
| 12:12:22 | 8 | Q.   Was there a reason why you chose to report |
| 12:12:25 | 9 | adjusted R squared as opposed to within R squared? |
| 12:12:29 | 10 | A.   I -- no, not specific to this case, no.  I |
| 12:12:36 | 11 | just -- I just tend to report adjusted R squared |
| 12:12:39 | 12 | because, you know -- but I didn't think carefully |
| 12:12:42 | 13 | about which one to report. |

</div>

| | | |
|---|---|---|
| 12:12:44 | 14 | Q.   You would have no objection to disclosing |
| 12:12:49 | 15 | to the Court or to the jury what your within R |
| 12:12:52 | 16 | squared -- |
| 12:12:52 | 17 | MR. FRIEDMAN:  No. |
| 12:12:55 | 18 | Q.   -- result is. |
| 12:12:56 | 19 | MR. FRIEDMAN:  No.  I'm going to instruct him |
| 12:12:57 | 20 | not to answer that that question.  It's not a proper |
| 12:13:01 | 21 | question.  Instruct you not to answer. |
| 12:13:03 | 22 | MR. SWANSON:  It's in his results.  Are you |
| 12:13:04 | 23 | serious?  On what basis? |
| 12:13:06 | 24 | MR. FRIEDMAN:  Well, an objection as to |
| 12:13:09 | 25 | disclosing what's in his result? |

151

| | | |
|---|---|---|
| 12:13:12 | 1 | MR. SWANSON:  Yes. |
| 12:13:12 | 2 | MR. FRIEDMAN:  We don't have an objection to |
| 12:13:13 | 3 | that.  That's his result that you have? |
| 12:13:16 | 4 | MR. SWANSON:  Yeah, it's not a secret. |
| 12:13:18 | 5 | MR. FRIEDMAN:  All right.  Then I have no |
| 12:13:19 | 6 | understanding of why you asked that question, but go |
| 12:13:21 | 7 | ahead. |
| 12:13:22 | 8 | Q.   MR. SWANSON:  You're the -- the result that |
| 12:13:25 | 9 | you've disclosed in your report written in your |
| 12:13:27 | 10 | narrative report is an adjusted R squared of |
| 12:13:31 | 11 | 90 percent, correct? |
| 12:13:32 | 12 | A.   Right. |
| 12:13:32 | 13 | Q.   Isn't it a fact that the within R squared is |
| 12:13:36 | 14 | 12 percent? |
| 12:13:36 | 15 | A.   I don't remember what it is.  I mean, those |
| 12:13:44 | 16 | numbers are for different purposes.  All right?  And |
| 12:13:47 | 17 | I don't remember what the within is.  It's not one |
| 12:13:49 | 18 | that I would have used. |
| 12:13:53 | 19 | MR. SWANSON:  Why don't we take our break |
| 12:13:55 | 20 | now. |
| 12:13:56 | 21 | VIDEOGRAPHER:  This now the marks the end of |
| 12:13:58 | 22 | tape labeled number two, the videotaped deposition of |
| 12:14:01 | 23 | Roger Noll.  We're now going off the record.  The |
| 12:14:04 | 24 | time is 12:13. |
| 12:14:05 | 25 | (Deposition recess taken.) |

152

| | | |
|---|---|---|
| 12:59:57 | 1 | VIDEOGRAPHER:  This now marks the beginning |
| 13:00:11 | 2 | of tape labeled number three of the videotaped |
| 13:00:15 | 3 | deposition of Roger Noll.  We're now going back on |
| 13:00:17 | 4 | the record.  The time is 12:59. |
| 13:00:19 | 5 | Q.   MR. SWANSON:  All right.  Professor Noll, the |
| 13:00:22 | 6 | term market concentration is one that economists use, |
| 13:00:25 | 7 | correct? |
| 13:00:26 | 8 | A.   Yes, although I think these days lawyers use |
| 13:00:33 | 9 | it more than economists. |
| 13:00:34 | 10 | Q.   Entirely possible.  What is the relationship |
| 13:00:37 | 11 | between market concentration and market share? |
| 13:00:39 | 12 | MR. FRIEDMAN:  Objection, form. |
| 13:00:41 | 13 | THE WITNESS:  The degree of concentration in |
| 13:00:48 | 14 | the market is the sum of the market shares of the |
| 13:00:54 | 15 | firms in the market. |
| 13:00:55 | 16 | Q.   MR. SWANSON:  Are you familiar with the |
| 13:00:56 | 17 | strata -- I'm sorry.  Strike that. |
| 13:01:01 | 18 | Are you familiar with the Stata command XT |
| 13:01:05 | 19 | reg also, I gather, known as XT regress? |
| 13:01:10 | 20 | A.   Well, it's just a regression.  What -- |
| 13:01:15 | 21 | Q.   Do you know what it does? |
| 13:01:17 | 22 | A.   You run a regression.  I mean, I... |
| 13:01:20 | 23 | Q.   And are you familiar with the Stata command A |
| 13:01:24 | 24 | reg or A regress? |
| 13:01:28 | 25 | A.   I'm not -- I am not going to define precisely |

153

| | | |
|---|---|---|
| 13:01:31 | 1 | what that command means because I don't remember. |
| 13:01:33 | 2 | Q.   If I asked you what the difference between XT |
| 13:01:35 | 3 | reg and A reg is -- |
| 13:01:37 | 4 | A.   I don't remember. |
| 13:01:38 | 5 | Q.   You are aware that you use both in your |
| 13:01:40 | 6 | backup work. |
| 13:01:42 | 7 | A.   The program was not written by me when it was |
| 13:01:45 | 8 | written for Stata, and I did not write the program. |
| 13:01:50 | 9 | And so I'm not the one who has to be writing down the |
| 13:01:56 | 10 | commands to the computer using Stata. |
| 13:01:59 | 11 | Q.   You had someone else confirm that that was |
| 13:02:01 | 12 | done accurately? |
| 13:02:02 | 13 | A.   Yes. |
| 13:02:03 | 14 | Q.   We've spoken before about within R squared. |
| 13:02:08 | 15 | A.   Right. |
| 13:02:09 | 16 | Q.   Can you tell me what that is as a statistical |
| 13:02:12 | 17 | measure in general terms? |
| 13:02:16 | 18 | A.   It's -- the difference between the R squared |
| 13:02:21 | 19 | and adjusted R squared for the regression and the |
| 13:02:24 | 20 | within thing is as follows.  The R squared, an |
| 13:02:28 | 21 | adjusted R squared for the regression talks about the |
| 13:02:32 | 22 | ability to explain the variations in the variable you |
| 13:02:34 | 23 | actually used, but that variable is then used to |
| 13:02:37 | 24 | produce -- predict individual transactions prices. |
| 13:02:41 | 25 | So that creates a second source of variation, which |

39  (Pages 150 to 153)

154

| | |
|---|---|
| 13:02:44 | 1 is the variation of the -- of the individual |
| 13:02:46 | 2 transactions for prices around the predicted price. |
| 13:02:50 | 3 And the within is measuring the latter, not the |
| 13:02:53 | 4 former. |
| 13:02:53 | 5 Q.   Is the within measuring the extent to which |
| 13:02:55 | 6 you're accounting for the variation in individual |
| 13:02:58 | 7 title prices over time? |
| 13:03:00 | 8 A.   Well, it's about the extent to which |
| 13:03:03 | 9 predicting an average in a category predicts the |
| 13:03:08 | 10 individual observations in a category. |
| 13:03:13 | 11 Q.   Let me ask you to turn to page 19 of your |
| 13:03:16 | 12 report, Exhibit 1.  And let me find it.  Oh, I'm |
| 13:03:23 | 13 starting from the first sentence of the bottom |
| 13:03:38 | 14 paragraph where you say:  "To make analysis of these |
| 13:03:41 | 15 data more tractable, the weekly data were aggregated |
| 13:03:46 | 16 into four-week periods for use in econometric |
| 13:03:49 | 17 estimation." |
| 13:03:54 | 18 See that?  What was intractable about using |
| 13:03:55 | 19 nonaggregated data? |
| 13:03:57 | 20 A.   The amount of computer power and time |
| 13:03:57 | 21 required to run a regression.  That the more |
| 13:04:00 | 22 observations you have to run the regression on, the |
| 13:04:04 | 23 more computer power it takes.  And you would have to |
| 13:04:07 | 24 have -- well, there's two aspects to the problem. |
| 13:04:10 | 25 The first is the regression -- the underlying |
| 13:04:19 | |

155

| | |
|---|---|
| 13:04:22 | 1 data, you have to pay attention at the level of |
| 13:04:26 | 2 individual observations to errors to a much greater |
| 13:04:29 | 3 extent.  If a very tiny fraction of the observations |
| 13:04:33 | 4 are wrong, you want to clean the data of those before |
| 13:04:36 | 5 you would do any individual level regression, even if |
| 13:04:40 | 6 they're a small fraction, because outliers can have a |
| 13:04:43 | 7 huge effect on a regression model. |
| 13:04:46 | 8 You are much less concerned about a small |
| 13:04:48 | 9 number of outliers if you are using averages.  So you |
| 13:04:52 | 10 don't have to devote the same amount of time to |
| 13:04:54 | 11 cleaning the data, which can take literally months |
| 13:04:57 | 12 for a large data set. |
| 13:04:59 | 13 And then the second -- the second issue has |
| 13:05:01 | 14 to do with the amount of computer power it takes to |
| 13:05:05 | 15 estimate the regression coefficients when you have |
| 13:05:07 | 16 billions of observations as contrasted to thousands |
| 13:05:11 | 17 or hundreds of thousands or something like that.  To |
| 13:05:13 | 18 do a regression on a huge data set can take linking |
| 13:05:18 | 19 together multiple computers and then running it for |
| 13:05:18 | 20 two days to get a single regression result. |
| 13:05:21 | 21 Q.   And did you give consideration to using other |
| 13:05:25 | 22 periods of time for your aggregation or averaging of |
| 13:05:29 | 23 the price data? |
| 13:05:33 | 24 A.   Well , consideration, yes.  But the |
| 13:05:34 | 25 four-month stuff was already done.  So in the time |
| 13:05:39 | |

156

| | |
|---|---|
| 13:05:42 | 1 horizon I  had -- |
| 13:05:44 | 2 MR. HUBBARD:  Four-week. |
| 13:05:45 | 3 THE WITNESS:  Excuse me.  Four-week.  Yes, it |
| 13:05:47 | 4 wasn't four months.  The aggregation to four weeks |
| 13:05:49 | 5 had already been done.  So that meant that I didn't |
| 13:05:52 | 6 have to construct some other aggregation mechanism |
| 13:05:54 | 7 within the time frame I had. |
| 13:05:56 | 8 Q.   MR. SWANSON:  Did you examine individual |
| 13:06:01 | 9 transaction prices at any point? |
| 13:06:04 | 10 A.   Well, the damage calculation is the actual |
| 13:06:10 | 11 price minus the predicted price.  So in that sense, |
| 13:06:16 | 12 yes. |
| 13:06:17 | 13 Q.   The -- the actual price -- |
| 13:06:20 | 14 A.   I guess I don't understand the question. |
| 13:06:23 | 15 Maybe I missed the question.  What are you -- what |
| 13:06:24 | 16 are you asking me? |
| 13:06:25 | 17 Q.   I was asking is there any statistical work |
| 13:06:28 | 18 you've done on -- on -- |
| 13:06:31 | 19 A.   Oh, okay. |
| 13:06:31 | 20 Q.   -- individual -- individualized transaction |
| 13:06:34 | 21 data. |
| 13:06:35 | 22 A.   No, I have not analyzed the individual |
| 13:06:37 | 23 transactions data.  Actually, that's not quite true. |
| 13:06:47 | 24 Remember, the -- method for allocating the |
| 13:06:51 | 25 damages among states is based upon assigning |

157

| | |
|---|---|
| 13:06:53 | 1 individual transactions to a state.  So, yes, we've |
| 13:06:58 | 2 done that, but we haven't run regressions on |
| 13:07:01 | 3 individual transactions data. |
| 13:07:02 | 4 Q.   Are the only important characteristics for |
| 13:07:08 | 5 pricing an e-book title for any given publisher the |
| 13:07:13 | 6 ones for which you've introduced variables into your |
| 13:07:18 | 7 model? |
| 13:07:19 | 8 A.   In principle, I could imagine there could be |
| 13:07:22 | 9 other characteristics.  In practice, I don't what I |
| 13:07:30 | 10 would use that I haven't used. |
| 13:07:33 | 11 Q.   Would you agree that the transaction data |
| 13:07:35 | 12 upon which your model relies includes more genres |
| 13:07:39 | 13 than the categories you use? |
| 13:07:41 | 14 A.   Yes, remember, we aggregated some into |
| 13:07:45 | 15 puddles.  There's the other genre puddle and there's |
| 13:07:48 | 16 the we don't know what it is puddle. |
| 13:07:50 | 17 Q.   The Amazon data contained genres such as |
| 13:07:54 | 18 romance, mystery and thriller, science fiction and |
| 13:07:58 | 19 fantasy, literature and fiction and sports, correct? |
| 13:08:03 | 20 A.   That's correct. |
| 13:08:03 | 21 Q.   Did you use those genres as separate |
| 13:08:07 | 22 categories in your model? |
| 13:08:08 | 23 A.   No. |
| 13:08:09 | 24 Q.   Have you aggregated -- well, I think you've |
| 13:08:17 | 25 said you've aggregated some different genres into a |

40  (Pages 154 to 157)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123  (212)705-8585

## 158

| | | |
|---|---|---|
| 13:08:22 | 1 | single category or several different categories.  Is |
| 13:08:23 | 2 | that -- is that a proper interpretation? |
| 13:08:24 | 3 | A.    I'm not sure I understand the question. |
| 13:08:26 | 4 | Q.    Okay. |
| 13:08:26 | 5 | A.    If it's not -- if the answer isn't apparent |
| 13:08:29 | 6 | from the list of the variables, then I don't |
| 13:08:31 | 7 | understand the question. |
| 13:08:32 | 8 | Q.    Well, for example, do you aggregate romance, |
| 13:08:36 | 9 | mystery and science fiction into a broad science |
| 13:08:40 | 10 | fiction category? |
| 13:08:41 | 11 | A.    It would be aggregated into the other |
| 13:08:44 | 12 | category, yes. |
| 13:08:44 | 13 | Q.    That would be other and not fiction? |
| 13:08:47 | 14 | A.    Well, if it's something that can appear on |
| 13:08:50 | 15 | the fiction best seller list, it is that category. |
| 13:08:54 | 16 | If it's not something that can appear in the fiction |
| 13:08:57 | 17 | best seller category, it would be in the other. |
| 13:08:59 | 18 | Q.    So that was the basis on which you did that |
| 13:09:02 | 19 | aggregation? |
| 13:09:03 | 20 | A.    Well, the, -- yeah, notice that all the |
| 13:09:07 | 21 | categories we have other than children's are |
| 13:09:09 | 22 | associated with the New York Times best seller list. |
| 13:09:13 | 23 | Q.    Is it your testimony that the price of two |
| 13:09:19 | 24 | e-books in the same category and produced by the same |
| 13:09:23 | 25 | publisher were impacted in the same manner by the |

## 159

| | | |
|---|---|---|
| 13:09:26 | 1 | change from a wholesale business model to an agency |
| 13:09:29 | 2 | business model? |
| 13:09:30 | 3 | MR. FRIEDMAN:  Objection, form. |
| 13:09:31 | 4 | THE WITNESS:  Well, they would have to be. |
| 13:09:33 | 5 | Two titles have the same impact if the values of all |
| 13:09:37 | 6 | the independent variables were identically the same |
| 13:09:39 | 7 | for both of them. |
| 13:09:40 | 8 | Q.    MR. SWANSON:  So if they were in the same |
| 13:09:45 | 9 | category and they were published by the same |
| 13:09:50 | 10 | publisher, what other variables -- |
| 13:09:52 | 11 | A.    Sold by the same retailer, status with regard |
| 13:09:55 | 12 | to the New York Times best seller list, observation |
| 13:09:58 | 13 | at the same point in time.  All those phenomena would |
| 13:10:03 | 14 | have to be the same.  Every single variable that's in |
| 13:10:06 | 15 | the regression would have to take the same value for |
| 13:10:09 | 16 | the two titles. |
| 13:10:10 | 17 | Q.    And to the extent that all those variables |
| 13:10:12 | 18 | did take the same value, then two books would have |
| 13:10:15 | 19 | the same impact, according to your model from the -- |
| 13:10:20 | 20 | from the conduct at issue in the case? |
| 13:10:22 | 21 | A.    Yes, the R squared of .9 is not 1.0 because |
| 13:10:27 | 22 | there's going to be something out there that isn't in |
| 13:10:31 | 23 | the regression that might have explained that. |
| 13:10:33 | 24 | That's the unexplained variance.  I don't know what |
| 13:10:35 | 25 | it is, but that would be something. |

## 160

| | | |
|---|---|---|
| 13:10:39 | 1 | Q.    Do you agree that the standard approach to |
| 13:10:44 | 2 | proving that collusion raised prices is to construct |
| 13:10:48 | 3 | an econometric model of product pricing and taking |
| 13:10:54 | 4 | into account all of the other factors that affect |
| 13:10:57 | 5 | price including costs, market concentration and |
| 13:10:59 | 6 | market demand, prices were higher due to collusion? |
| 13:11:02 | 7 | MR. FRIEDMAN:  Objection, form. |
| 13:11:03 | 8 | THE WITNESS:  Those are the things taken into |
| 13:11:06 | 9 | account, yes. |
| 13:11:06 | 10 | Q.    MR. SWANSON:  Does your regression model take |
| 13:11:09 | 11 | account of costs? |
| 13:11:10 | 12 | A.    Well, the cost that we're interested in is |
| 13:11:14 | 13 | the cost to the retailer, right?  Because we're |
| 13:11:17 | 14 | interested in retail prices.  And these, as you know, |
| 13:11:23 | 15 | the categories depend on hard cover prices which are |
| 13:11:26 | 16 | related to the cost to the retailer. |
| 13:11:31 | 17 | So they're indirectly taken into account, but |
| 13:11:34 | 18 | what they -- what they actually paid for them is not |
| 13:11:38 | 19 | actually a variable in the model. |
| 13:11:40 | 20 | Q.    Does your regression model take account of |
| 13:11:43 | 21 | market concentration? |
| 13:11:44 | 22 | A.    It does not take into account market |
| 13:11:48 | 23 | concentration except insofar as that's taken into |
| 13:11:50 | 24 | account for the indicator variables for the specific |
| 13:11:54 | 25 | firms because the market concentration would -- the |

## 161

| | | |
|---|---|---|
| 13:11:57 | 1 | coefficient for Amazon.com, to the extent it differed |
| 13:12:01 | 2 | from the coefficient for somebody else, would take |
| 13:12:04 | 3 | account of all the attributes of Amazon, including |
| 13:12:07 | 4 | market concentration differences. |
| 13:12:09 | 5 | Q.    Do economists believe that changes in the |
| 13:12:12 | 6 | wholesale prices are relevant to the level of retail |
| 13:12:12 | 7 | prices for the same product? |
| 13:12:15 | 8 | A.    Of course. |
| 13:12:16 | 9 | Q.    Are you aware that the defendant publishers |
| 13:12:21 | 10 | had changed wholesale e-book pricing in the preagency |
| 13:12:25 | 11 | period? |
| 13:12:25 | 12 | MR. FRIEDMAN:  Objection, form. |
| 13:12:28 | 13 | THE WITNESS:  I'm not sure to what you're |
| 13:12:30 | 14 | referring.  I mean, prices change, yes, but I don't |
| 13:12:34 | 15 | know what you're referring to in the question. |
| 13:12:36 | 16 | Q.    MR. SWANSON:  Are you aware of generally how |
| 13:12:42 | 17 | the defendant publishers priced e-books at wholesale |
| 13:12:46 | 18 | under the wholesale model? |
| 13:12:47 | 19 | MR. FRIEDMAN:  Objection, form. |
| 13:12:48 | 20 | THE WITNESS:  I recall having seen that |
| 13:12:50 | 21 | information, but it played no role in how I modeled |
| 13:12:53 | 22 | the damages. |
| 13:12:55 | 23 | Q.    MR. SWANSON:  In the but-for world, would |
| 13:12:59 | 24 | wholesale prices for e-books be different than in the |
| 13:13:01 | 25 | actual world? |

162

```
13:13:02   1        MR. FRIEDMAN:  Objection, form.
13:13:03   2        THE WITNESS:  You asked me that this morning,
13:13:05   3   and one of the features of the agency model was that
13:13:08   4   some prices were reduced at the wholesale level.
13:13:12   5   Q.    MR. SWANSON:  And you would not expect to see
13:13:15   6   that in the but-for world?
13:13:16   7   A.    That's correct.
13:13:17   8   Q.    Focusing on a single transaction for a single
13:13:33   9   title at a given point in time, how do you identify
13:13:38  10   the overcharge associated with that single
13:13:42  11   transaction for that single title?
13:13:43  12   A.    That's the difference between the price that
13:13:47  13   was charged for that title in that period versus the
13:13:52  14   competitive benchmark price.
13:13:54  15   Q.    And the actual price that's charged is in
13:14:03  16   your data?
13:14:04  17   A.    Well, the transactions records are actual
13:14:09  18   prices.  The data constructs the averages for each
13:14:14  19   four-week period for each title.
13:14:16  20   Q.    Is it fair to say that in your regression
13:14:27  21   model you compute 12 overcharge coefficients for each
13:14:33  22   publisher corresponding with the 12 categories we
13:14:37  23   covered earlier today?
13:14:38  24   A.    There are more than those variables in the
13:14:42  25   model.  I guess I don't understand the question.  All
```

163

```
13:14:45   1   the variables affect the estimated price for every
13:14:48   2   publisher.  So I guess I don't understand the
13:14:50   3   question.
13:14:50   4   Q.    Well, you compute overcharge coefficients
13:14:54   5   that for each publisher that are associated with each
13:14:57   6   of those 12 categories that we --
13:15:01   7   A.    Yes.
13:15:01   8   Q.    -- spoke of earlier, correct?
13:15:03   9   A.    Yes, but other variables are still affecting
13:15:07  10   the price.  It's not that those other variables
13:15:09  11   disappear in some sense.
13:15:11  12   Q.    Did you compute a set of overcharge
13:15:14  13   coefficients for Random House?
13:15:17  14   A.    Well, somebody's excluded from the data.  So
13:15:24  15   I don't remember precisely which one is.  But in any
13:15:28  16   case, one could do that calculation with it, yes.
13:15:31  17   You could estimate the departure of the competitive
13:15:36  18   price from the competitive benchmark price for Random
13:15:41  19   House in the data.  Yes, you could do that.
13:15:44  20   Q.    But that's not something you've done?
13:15:46  21   A.    No.
13:15:46  22   Q.    Did you evaluate whether all of your
13:15:50  23   overcharge coefficients were statistically
13:15:54  24   significant?
13:15:54  25   A.    I don't think that's the relevant question at
```

164

```
13:16:00   1   the level of individual coefficients.  I mean, first
13:16:04   2   of all, it's not clear what's the appropriate test
13:16:09   3   for statistical significance.  All right?  And,
13:16:12   4   secondly, the goal is to explain as much of the data
13:16:15   5   as possible without including the effect of the
13:16:19   6   collusive agreement.
13:16:19   7        So it's more like how you would do the first
13:16:24   8   stage of a two-stage least squares model.  You want
13:16:28   9   to do the best job you can of forecasting the
13:16:31  10   dependent variable with the data you have, and there
13:16:34  11   you don't evaluate things on the basis of their
13:16:40  12   statistical significance of a coefficient.  You
13:16:43  13   evaluate instead the quality of the regression on the
13:16:47  14   basis of the difference by adding the collusion
13:16:52  15   indicator.
13:16:54  16   Q.    Well, it's fact, isn't it, that a number of
13:16:59  17   your overcharge coefficients are not statistically
13:17:03  18   significant?
13:17:03  19   A.    I haven't -- I didn't look at that because
13:17:05  20   that's not the point of a forecasting model.  The
13:17:09  21   point of a forecasting model is do the best job of
13:17:13  22   explaining the noncollusive prices and then add to
13:17:17  23   that the effect of collusion.  And there's all kinds
13:17:19  24   of reasons why you might get specific variables being
13:17:22  25   statistically insignificant but you still would want
```

165

```
13:17:26   1   them in the equation because of possible interaction
13:17:28   2   with the effect you're measuring.
13:17:29   3        So the question is premised on an incorrect
13:17:32   4   conceptualization of what the forecasting model is
13:17:36   5   supposed to do and how you construct it.
13:17:38   6   Q.    Well, if one of your coefficients is not
13:17:44   7   statistically significant, can you reject the
13:17:48   8   hypothesis as an academic economist that purchasers
13:17:49   9   of e-books in that category were not injured?
13:17:54  10   A.    No, because -- not unless the coefficient is
13:17:54  11   not statistically significant.  If it -- the only way
13:18:01  12   you could do that is if the effect of the collusion
13:18:04  13   period itself were statistically insignificant.  And
13:18:06  14   since that interacts with a whole bunch of things,
13:18:06  15   you can't do it on the basis of each individual
13:18:08  16   coefficient.
13:18:09  17        That's the whole point of a forecasting
13:18:11  18   model.  You evaluate on the basis of the equation,
13:18:14  19   not on the basis of a coefficient.
13:18:16  20   Q.    So you would have concerns about statistical
13:18:20  21   significance only if all of the coefficients were not
13:18:24  22   statistically significant?
13:18:25  23   A.    No, you could have that for multiple
13:18:30  24   collinearity among the data.  The question is the
13:18:33  25   equation explaining variance in the object of
```

42 (Pages 162 to 165)

166

| | |
|---|---|
| 13:18:36 | 1 interest, which is the dependent variable. |
| 13:18:38 | 2      So am I explaining the variations in prices |
| 13:18:43 | 3 at the competitive benchmark versus not is what the |
| 13:18:46 | 4 question is.  So you're interested in the -- in the |
| 13:18:50 | 5 value of the indicator for the collusive period added |
| 13:18:55 | 6 to the equation. |
| 13:18:56 | 7      Now, if the equation weren't explaining |
| 13:18:59 | 8 anything, then there would be no estimated damages |
| 13:19:04 | 9 because everything would be pulling zero weight in |
| 13:19:09 | 10 explaining differences.  So you'd get a zero effect. |
| 13:19:12 | 11      The object of the game is explain the data as |
| 13:19:16 | 12 well as you can without the collusion variable, then |
| 13:19:20 | 13 add the collusion variable and see if that adds to |
| 13:19:22 | 14 the significance of the question. |
| 13:19:26 | 15 Q.    So is it your testimony that statistically |
| 13:19:30 | 16 there is no way to assess whether or not a particular |
| 13:19:35 | 17 coefficient of the sort that you've reported in |
| 13:19:38 | 18 Exhibit 1 for a particular publisher for a particular |
| 13:19:41 | 19 category is econometrically reliable? |
| 13:19:49 | 20 A.    You could -- if there were a hypothesis you |
| 13:19:57 | 21 wanted to test for which that was the question, then |
| 13:19:59 | 22 you could use -- then you could answer it using |
| 13:20:02 | 23 standard diagnostic statistics, but that's not the |
| 13:20:05 | 24 question being addressed in the model.  So it has |
| 13:20:09 | 25 nothing to do with whether you're able to predict the |

167

| | |
|---|---|
| 13:20:12 | 1 effect of the collusive agreement. |
| 13:20:13 | 2      Whether you're able to produce the effect of |
| 13:20:17 | 3 the collusive agreement depends on the ability to |
| 13:20:19 | 4 explain the overall price variation, not the power of |
| 13:20:23 | 5 any specific coefficient. |
| 13:20:24 | 6 Q.    Well, doesn't the specific coefficient |
| 13:20:27 | 7 determine what a particular member of the class gets |
| 13:20:29 | 8 by way of damage recovery? |
| 13:20:31 | 9 A.    Only insofar as it's interacted with the |
| 13:20:39 | 10 collusion variable.  The issue is what's the price |
| 13:20:43 | 11 they would have been charged, which is the cumulative |
| 13:20:45 | 12 effect of everything, and then what's the price they |
| 13:20:48 | 13 actually were charged.  All right? |
| 13:20:50 | 14      That's -- that's what the model is attempting |
| 13:20:53 | 15 to do, and the collusion variable is stuck in there |
| 13:20:57 | 16 as an explainer of differences in prices within the |
| 13:21:01 | 17 model, and then you're taking it away and taking it |
| 13:21:04 | 18 out to predict the but-for price. |
| 13:21:07 | 19      And so what matters is the -- not a |
| 13:21:11 | 20 particular coefficient, but the interactions of the |
| 13:21:15 | 21 coefficients together, including the collusion |
| 13:21:19 | 22 coefficient, to produce a prediction of price. |
| 13:21:21 | 23 Q.    Your model tells us, as you interpret it, |
| 13:21:28 | 24 does it not, that if I'm a member of the class and |
| 13:21:31 | 25 the only e-book I purchased during the class period |

168

| | |
|---|---|
| 13:21:35 | 1 was a New York Times best seller title of hard cover |
| 13:21:41 | 2 advice published by Macmillan that I wasn't injured, |
| 13:21:45 | 3 correct? |
| 13:21:45 | 4      MR. FRIEDMAN: Objection, form. |
| 13:21:46 | 5      THE WITNESS:  I haven't got that memorized. |
| 13:21:48 | 6 There are specific categories of books for which |
| 13:21:51 | 7 there is no anticompetitive effect, yes, but I |
| 13:21:55 | 8 don't -- I don't have them memorized.  They're listed |
| 13:21:57 | 9 in the report, and that's not reasonable for me to |
| 13:22:01 | 10 memorize them. |
| 13:22:02 | 11 Q.    MR. SWANSON:  Well, there's one in your |
| 13:22:04 | 12 report.  I'm not making any secrets out of this. |
| 13:22:07 | 13 Your report, Exhibit 1, if you want to turn to it. |
| 13:22:10 | 14 A.    Yeah.  Well, there's actually discussion in |
| 13:22:13 | 15 the main body of this phenomenon.  So it's not true |
| 13:22:17 | 16 that I only mentioned one. |
| 13:22:23 | 17      Okay.  Where are you? |
| 13:22:25 | 18 Q.    I was focusing on the negative -- |
| 13:22:28 | 19      MR. FRIEDMAN: Exhibit 1? |
| 13:22:28 | 20 Q.    MR. SWANSON:  -- percentage in Exhibit 1 to |
| 13:22:32 | 21 Exhibit 1, negative 38.4 percent. |
| 13:22:40 | 22 A.    Yeah, so? |
| 13:22:41 | 23 Q.    What does that mean? |
| 13:22:42 | 24 A.    It means that there is a collectivity of |
| 13:22:46 | 25 coefficients that affect a transactions price, and |

169

| | |
|---|---|
| 13:22:49 | 1 the Macmillan identifier is negative relative to the |
| 13:22:51 | 2 baseline.  All right? |
| 13:22:53 | 3      So that means on average Macmillan prices |
| 13:22:55 | 4 were lower, adjusting for everything else, than the |
| 13:22:59 | 5 other publishers.  That's what it means. |
| 13:23:01 | 6      It doesn't mean that there were no damages |
| 13:23:04 | 7 associated with Macmillan.  It just says that with |
| 13:23:06 | 8 that particular variable Macmillan is cheaper.  Then |
| 13:23:10 | 9 when you combine it with all the other variables, you |
| 13:23:13 | 10 can get categories in which Macmillan was cheaper |
| 13:23:15 | 11 within holding constant all the other variables, and |
| 13:23:19 | 12 that's what the main body of the report mentions, is |
| 13:23:23 | 13 all the ones where you take into account |
| 13:23:28 | 14 everything a particular category of Macmillan book is |
| 13:23:30 | 15 cheaper than the predicted competitive benchmark |
| 13:23:34 | 16 price. |
| 13:23:35 | 17 Q.    If I am a member of the class and I bought a |
| 13:23:39 | 18 book in this category from Macmillan where you have |
| 13:23:44 | 19 your negative 38.4 percent entry, in your opinion, |
| 13:23:49 | 20 was I injured and do I have a right to collect |
| 13:23:51 | 21 damages? |
| 13:23:51 | 22 A.    You can't answer that question by looking at |
| 13:23:53 | 23 one coefficient.  That's what the explanation in the |
| 13:23:56 | 24 main body of the report is.  You have to look at the |
| 13:23:58 | 25 cumulative effect of all the coefficients for that |

43 (Pages 166 to 169)

174

| | | |
|---|---|---|
| 13:28:59 | 1 | times, using Exhibit 1 and Exhibit 2, we can |
| 13:29:02 | 2 | calculate my damages -- |
| 13:29:03 | 3 | MR. FRIEDMAN:  Objection, form. |
| 13:29:04 | 4 | Q.    MR. SWANSON:  -- if I tell you what price I |
| 13:29:06 | 5 | paid for it? |
| 13:29:07 | 6 | MR. FRIEDMAN:  Objection, form. |
| 13:29:08 | 7 | THE WITNESS:  Among other things.  I mean, I |
| 13:29:11 | 8 | actually have the transaction record.  So all I |
| 13:29:15 | 9 | actually need to know is your name or your customer |
| 13:29:18 | 10 | identification number for all the retailers, and then |
| 13:29:23 | 11 | I can go to the database, pluck out every transaction |
| 13:29:29 | 12 | you made and calculate the predicted price and the |
| 13:29:32 | 13 | actual price for every single e-book you bought and |
| 13:29:36 | 14 | it's done. |
| 13:29:37 | 15 | Q.    MR. SWANSON:  If we give Exhibit 1 to |
| 13:29:42 | 16 | Exhibit 1 and Exhibit 2 to Exhibit 1 to a neutral |
| 13:29:48 | 17 | administrator and class members submit their purchase |
| 13:29:51 | 18 | records, will the damage numbers be calculable by |
| 13:29:57 | 19 | that independent neutral administrator? |
| 13:29:58 | 20 | A.    Yes. |
| 13:29:59 | 21 | Q.    Just from these pages? |
| 13:30:01 | 22 | A.    From the whole regression equation.  This is |
| 13:30:04 | 23 | a -- from all the coefficients on all the |
| 13:30:07 | 24 | regressions, yes.  It's just simply plugging in the |
| 13:30:10 | 25 | values.  You have the regression equation, which is |

175

| | | |
|---|---|---|
| 13:30:13 | 1 | just a log linear equation, and it says, you know, |
| 13:30:17 | 2 | here are all the independent variables.  Take those |
| 13:30:22 | 3 | values, put them into the equation and predict a |
| 13:30:26 | 4 | price, and that's the but-for price; and the same |
| 13:30:30 | 5 | calculation is used for every single transaction. |
| 13:30:33 | 6 | So you could actually produce -- go back to |
| 13:30:36 | 7 | the transaction records of all the retailers and |
| 13:30:38 | 8 | produce a document that was 10,000 pages long which |
| 13:30:42 | 9 | is the damages for every single transaction by every |
| 13:30:45 | 10 | single e-retailer during the damages period. |
| 13:30:48 | 11 | Q.    And have you produced that? |
| 13:30:50 | 12 | A.    No, I haven't done the calculation, but I've |
| 13:30:53 | 13 | explained how to do it. |
| 13:30:54 | 14 | Q.    Are you planning on doing that at some point |
| 13:30:56 | 15 | before trial? |
| 13:30:57 | 16 | MR. FRIEDMAN:  Sorry.  Doing what? |
| 13:30:59 | 17 | MR. SWANSON:  Just what he just described. |
| 13:31:01 | 18 | Getting the transaction records, running it through |
| 13:31:03 | 19 | his equation, getting the specific damages for each |
| 13:31:06 | 20 | member of the class. |
| 13:31:06 | 21 | MR. FRIEDMAN:  And giving it to an |
| 13:31:08 | 22 | administrator for him to do what he says could easily |
| 13:31:11 | 23 | be done? |
| 13:31:11 | 24 | MR. SWANSON:  No, giving it to us so we can |
| 13:31:13 | 25 | see it before trial. |

176

| | | |
|---|---|---|
| 13:31:14 | 1 | MR. FRIEDMAN:  See the list of consumers? |
| 13:31:16 | 2 | MR. SWANSON:  See the individual damages that |
| 13:31:19 | 3 | apparently can be produced at a snap of a finger with |
| 13:31:23 | 4 | transactions data. |
| 13:31:24 | 5 | MR. FRIEDMAN:  Okay.  Well, he can answer, |
| 13:31:26 | 6 | but, Dan, I think that you're asking him for a |
| 13:31:30 | 7 | requirement that is going to come after Judge Cote's |
| 13:31:34 | 8 | order after the jury trial.  So I don't think that's |
| 13:31:37 | 9 | something that's legally required, but go ahead and |
| 13:31:40 | 10 | ask your question. |
| 13:31:41 | 11 | THE WITNESS:  The answer is I was not |
| 13:31:44 | 12 | intending to predict -- to do a damages calculation |
| 13:31:48 | 13 | on a transaction-by-transaction basis for every |
| 13:31:50 | 14 | record in the transaction record.  What I instead was |
| 13:31:53 | 15 | attempting to do was explain how it would be done |
| 13:31:56 | 16 | and, number two, to use it to characterize what |
| 13:32:00 | 17 | fraction of transactions actually had damages, |
| 13:32:02 | 18 | because I do know the answer to that.  All right? |
| 13:32:05 | 19 | But I was not intending to produce individual damages |
| 13:32:09 | 20 | estimates from the equation for every single |
| 13:32:12 | 21 | transaction in the transaction record. |
| 13:32:15 | 22 | Now, if somebody asks me to do that, I could |
| 13:32:18 | 23 | do it.  Or I, rather, I could employ all of the |
| 13:32:22 | 24 | economists at Ashenfelter & Ashmore for a week doing |
| 13:32:27 | 25 | it, and I could produce the 10,000-page-long |

177

| | | |
|---|---|---|
| 13:32:30 | 1 | document.  Indeed, your experts could do the same |
| 13:32:33 | 2 | thing. |
| 13:32:34 | 3 | The hard part is not once you've got the |
| 13:32:37 | 4 | regression calculating what the predicted price is. |
| 13:32:39 | 5 | That's not the hard part.  That's easy.  It's just a |
| 13:32:42 | 6 | repetitive arithmetic calculation that computers are |
| 13:32:47 | 7 | really good at. |
| 13:32:48 | 8 | Q.    MR. SWANSON:  And you've identified no way |
| 13:32:50 | 9 | for individual damages consistent with your model to |
| 13:32:54 | 10 | be calculated without the use of your regression |
| 13:32:57 | 11 | equation run on a computer. |
| 13:33:00 | 12 | A.    Well, there's another way to do it.  I mean, |
| 13:33:04 | 13 | you could produce the predicted price for every |
| 13:33:06 | 14 | single title in every single month.  And there |
| 13:33:12 | 15 | 1.3 million of them.  They were on average probably |
| 13:33:15 | 16 | sold for six months to a year.  So we could produce a |
| 13:33:18 | 17 | list of, say, 10 million titles by month and have the |
| 13:33:27 | 18 | but-for price of every single one of those listed, |
| 13:33:30 | 19 | and then anybody could look up that title in that |
| 13:33:33 | 20 | month and figure out what the competitive benchmark |
| 13:33:37 | 21 | price was and subtract that from whatever they paid. |
| 13:33:40 | 22 | It would be something this thick, but, yes, |
| 13:33:43 | 23 | we could do that. |
| 13:33:44 | 24 | Q.    And that's not something you've done. |
| 13:33:46 | 25 | A.    I haven't done it, but we've actually done |

45  (Pages 174 to 177)

178

| | |
|---|---|
| 13:33:49 | 1 | some examples, yes, but we -- I haven't done -- I |
| 13:33:53 | 2 | haven't done it for every single title every single |
| 13:33:56 | 3 | month. |
| 13:33:56 | 4 | Q.    Exhibit 1 to Exhibit 1 is then an |
| 13:34:00 | 5 | illustrative or a hypothetical set of coefficients? |
| 13:34:05 | 6 | This does not -- |
| 13:34:06 | 7 | A.    No.  No, these are the real thing.  There's |
| 13:34:09 | 8 | nothing hypothetical about them.  This is the result |
| 13:34:11 | 9 | of the regression model, and it's just some of the |
| 13:34:15 | 10 | coefficients.  That's all.  You know what the |
| 13:34:17 | 11 | coefficients are because they're in the backup. |
| 13:34:19 | 12 | Q.    So you could actually -- I mean, do you need |
| 13:34:22 | 13 | to run it through the model?  I mean, don't you -- |
| 13:34:25 | 14 | you don't have the ability to reduce this all to a |
| 13:34:28 | 15 | formula that can be put on a piece of paper? |
| 13:34:31 | 16 | A.    No, it is a formula.  The formula is the |
| 13:34:34 | 17 | regression.  You know this because you've had enough |
| 13:34:36 | 18 | economics to know it.  We have a regression equation |
| 13:34:39 | 19 | and we have estimated the coefficients.  It's just an |
| 13:34:42 | 20 | equation. |
| 13:34:42 | 21 | It's like, you know, X equals A plus CY.  So |
| 13:34:46 | 22 | all you do is you know what A is, you know what C is, |
| 13:34:52 | 23 | and you know what Y is and you can calculate X.  And |
| 13:34:53 | 24 | you put the formula in the computer and you plug in |
| 13:34:56 | 25 | for any given transaction what the values of the |

179

| | |
|---|---|
| 13:34:59 | 1 | independent variables are and produce the predicted |
| 13:35:03 | 2 | price. |
| 13:35:03 | 3 | Q.    Can you use that methodology to determine |
| 13:35:05 | 4 | which members of the class were not injured? |
| 13:35:07 | 5 | A.    That's precisely what we did in the report is |
| 13:35:10 | 6 | identify that fraction for which the predicted price |
| 13:35:12 | 7 | was -- was greater than the actual price. |
| 13:35:16 | 8 | Q.    Well, you haven't looked at individual |
| 13:35:18 | 9 | transactions, have you? |
| 13:35:19 | 10 | A.    No, we looked at the averages, yes. |
| 13:35:21 | 11 | Q.    Right.  So you don't know how many members of |
| 13:35:25 | 12 | the class actually, based on their particular |
| 13:35:27 | 13 | purchasing patterns, the time at which they |
| 13:35:30 | 14 | purchased, the titles that they purchased were |
| 13:35:31 | 15 | actually not injured. |
| 13:35:34 | 16 | A.    Well, the -- we haven't calculated -- again, |
| 13:35:39 | 17 | we have not done the calculation at the level of |
| 13:35:42 | 18 | individual titles in individual months for every |
| 13:35:44 | 19 | single transaction, no.  We've only done it for the |
| 13:35:48 | 20 | averages over the four-week period. |
| 13:35:51 | 21 | Q.    Do the coefficients in Exhibit 1 apply to -- |
| 13:36:04 | 22 | strike that. |
| 13:36:04 | 23 | The four coefficients that you calculate as |
| 13:36:15 | 24 | reported in panel B on Exhibit 1, have those |
| 13:36:23 | 25 | calculated on a publisher-by-publisher basis? |

180

| | |
|---|---|
| 13:36:31 | 1 | MR. FRIEDMAN:  Just for the record, |
| 13:36:33 | 2 | Mr. Swanson is referring to Exhibit 1 to Exhibit 1. |
| 13:36:43 | 3 | THE WITNESS:  What happened to panel B? |
| 13:36:51 | 4 | Q.    MR. SWANSON:  It's down here. |
| 13:36:52 | 5 | A.    Oh, okay. |
| 13:36:53 | 6 | Q.    It took me a while myself. |
| 13:36:55 | 7 | A.    Now, what's the question again? |
| 13:37:05 | 8 | Q.    Are these incremental overcharge variables |
| 13:37:10 | 9 | calculated on a publisher-by-publisher basis? |
| 13:37:15 | 10 | A.    No, these are not on a publisher-by-publisher |
| 13:37:20 | 11 | basis.  The -- these are something that would be true |
| 13:37:27 | 12 | for a particular book title, but they would take -- |
| 13:37:35 | 13 | they are not inter -- those are not interacted with |
| 13:37:38 | 14 | the publisher variables. |
| 13:37:39 | 15 | Q.    So these are averages across publishers? |
| 13:37:42 | 16 | A.    Well, yes and no.  I mean, to some degree the |
| 13:37:45 | 17 | publisher variables are also in the equation.  So |
| 13:37:48 | 18 | some of the variation attributable to these things is |
| 13:37:51 | 19 | going to be there.  These are departures due to this |
| 13:37:55 | 20 | characteristic that are true for all the publishers. |
| 13:37:59 | 21 | Q.    So you view these each as applying to |
| 13:38:03 | 22 | multiple publishers? |
| 13:38:04 | 23 | A.    Yes. |
| 13:38:05 | 24 | Q.    And why didn't you allow these to vary across |
| 13:38:09 | 25 | publishers? |

181

| | |
|---|---|
| 13:38:09 | 1 | A.    We were getting into the world of serious |
| 13:38:14 | 2 | multicollinearity causing the equation to invert the |
| 13:38:21 | 3 | matrix of observations with sufficient |
| 13:38:25 | 4 | multicollinearity. |
| 13:38:27 | 5 | Q.    Do these incremental overcharge variables |
| 13:38:30 | 6 | also apply to Random House titles? |
| 13:38:34 | 7 | A.    They apply to anything. |
| 13:38:34 | 8 | Q.    Does that mean that the price increases |
| 13:38:37 | 9 | associated with Random House's switch to agency are |
| 13:38:40 | 10 | included in these incremental overcharge variables? |
| 13:38:42 | 11 | A.    Well, these variables take values during all |
| 13:38:46 | 12 | periods depending on the characteristics of the book, |
| 13:38:49 | 13 | yes. |
| 13:38:51 | 14 | Q.    What percentage overcharge is consistent with |
| 13:39:00 | 15 | a $9.99 but-for price and $12.99 actual price? |
| 13:39:07 | 16 | MR. FRIEDMAN:  Objection, form. |
| 13:39:09 | 17 | THE WITNESS:  If the question is you |
| 13:39:15 | 18 | predicted that the price would be $9.99 and it's $3. |
| 13:39:23 | 19 | Q.    MR. SWANSON:  And that's a little over |
| 13:39:25 | 20 | 30 percent? |
| 13:39:25 | 21 | A.    Yes. |
| 13:39:26 | 22 | Q.    And if you predicted that the but-for price |
| 13:39:30 | 23 | was 9.99 and the transaction price in the real world |
| 13:39:34 | 24 | was 14.99, what -- what is the overcharge percentage |
| 13:39:40 | 25 | associated with that scenario? |

46 (Pages 178 to 181)

182

| | | |
|---|---|---|
| 13:39:41 | 1 | A.   50 percent. |
| 13:39:42 | 2 | Q.   **A little bit over 50?** |
| 13:39:44 | 3 | A.   Yeah. |
| 13:39:45 | 4 | Q.   **Do any of your formulaic predictions predict** |
| 13:39:52 | 5 | **precisely 9.99 but-for pricing?** |
| 13:39:57 | 6 | A.   I don't recall what the precise predictions |
| 13:40:02 | 7 | for anything are.  Don't remember.  I, you know, I |
| 13:40:09 | 8 | don't recall what those numbers are. |
| 13:40:10 | 9 | Q.   **Is it your view that the scenario of a 9.99** |
| 13:40:16 | 10 | **but-for price and a 12.99 actual price is a very** |
| 13:40:20 | 11 | **common one as the plaintiffs' damage expert?** |
| 13:40:26 | 12 | MR. FRIEDMAN:  Objection, form. |
| 13:40:27 | 13 | THE WITNESS:  What do you mean by common? |
| 13:40:30 | 14 | Q.   **MR. SWANSON:  Do you think that was the most** |
| 13:40:32 | 15 | **common instance of overcharge?** |
| 13:40:34 | 16 | MR. FRIEDMAN:  Objection, form. |
| 13:40:36 | 17 | THE WITNESS:  I don't know whether it was the |
| 13:40:37 | 18 | most common.  I mean, to begin with, the prices |
| 13:40:40 | 19 | you're quoting are for new releases.  They're less |
| 13:40:43 | 20 | than half of the transactions.  And then there are |
| 13:40:45 | 21 | differences in the prices of new releases.  So I |
| 13:40:48 | 22 | don't know how to characterize most or more common. |
| 13:40:54 | 23 | Those are too vague for me. |
| 13:40:56 | 24 | Q.   **MR. SWANSON:  Are these overcharge scenarios** |
| 13:40:58 | 25 | **that are common at all, in your view?** |

183

| | | |
|---|---|---|
| 13:40:59 | 1 | MR. FRIEDMAN:  Objection, form. |
| 13:41:00 | 2 | THE WITNESS:  You have to be more precise |
| 13:41:04 | 3 | about what common means.  I mean, there are some that |
| 13:41:06 | 4 | happen more often than others, but I don't know what |
| 13:41:09 | 5 | you mean by common. |
| 13:41:09 | 6 | Q.   **MR. SWANSON:  Well, what percentage of** |
| 13:41:11 | 7 | **but-for pricing as predicted by your damage model are** |
| 13:41:18 | 8 | **$9.99?** |
| 13:41:19 | 9 | A.   I don't know what percentage of them are.  I |
| 13:41:23 | 10 | don't regard it as an important question, but I don't |
| 13:41:25 | 11 | know what they are. |
| 13:41:25 | 12 | Q.   **Is it less than ten percent?** |
| 13:41:27 | 13 | A.   Is there something about I don't know you |
| 13:41:29 | 14 | don't understand? |
| 13:41:30 | 15 | Q.   **Is there something about I'm a lawyer that** |
| 13:41:33 | 16 | **you don't understand?** |
| 13:41:34 | 17 | A.   I'm not going to give a Clintonesque |
| 13:41:40 | 18 | definition of I don't know.  I'm just going to say I |
| 13:41:42 | 19 | don't know. |
| 13:41:42 | 20 | Q.   **Well, I don't know, in my sad experience as a** |
| 13:41:50 | 21 | **lawyer, sometimes gets qualified when the numbers get** |
| 13:41:54 | 22 | **bandied about.** |
| 13:41:55 | 23 | **So you don't know if it's zero percent.** |
| 13:41:58 | 24 | A.   Oh, it would be extremely unlikely to be |
| 13:42:01 | 25 | zero percent, but I don't know what it is. |

184

| | | |
|---|---|---|
| 13:42:04 | 1 | Nothing -- nothing -- the probably of anything being |
| 13:42:07 | 2 | a particular number is not zero, but I don't know |
| 13:42:09 | 3 | what it is.  I haven't looked at the distribution of |
| 13:42:11 | 4 | predicted prices, so I can't tell you the frequency |
| 13:42:13 | 5 | of various prices. |
| 13:42:15 | 6 | Q.   **Well, you just told me something that** |
| 13:42:17 | 7 | **somewhat belied the fact that you didn't know** |
| 13:42:20 | 8 | **anything.  Now --** |
| 13:42:21 | 9 | MR. FRIEDMAN:  Objection, form. |
| 13:42:22 | 10 | Q.   **MR. SWANSON:  How likely is it that the** |
| 13:42:24 | 11 | **number of prices that your model predicts in the** |
| 13:42:29 | 12 | **but-for world are in less than five percent of the** |
| 13:42:35 | 13 | **instances 9.99?** |
| 13:42:38 | 14 | MR. FRIEDMAN:  Objection, form. |
| 13:42:39 | 15 | THE WITNESS:  I haven't -- I haven't |
| 13:42:42 | 16 | calculated that number.  I don't -- I don't know. |
| 13:42:44 | 17 | Q.   **MR. SWANSON:  If your model predicted only** |
| 13:42:47 | 18 | **one percent of the prices in the but-for world were** |
| 13:42:51 | 19 | **9.99, would that cause you to reexamine the** |
| 13:42:53 | 20 | **reliability of your model?** |
| 13:42:54 | 21 | A.   No. |
| 13:42:55 | 22 | MR. FRIEDMAN:  Objection, form. |
| 13:42:56 | 23 | THE WITNESS:  Not necessarily.  I'd have to |
| 13:42:58 | 24 | know a lot more. |
| 13:42:58 | 25 | Q.   **MR. SWANSON:  Zero percent?  What if it were** |

185

| | | |
|---|---|---|
| 13:43:01 | 1 | **zero percent?** |
| 13:43:01 | 2 | A.   No, that's not -- that's not a valid measure |
| 13:43:04 | 3 | of reliability.  All right?  The issue is not that. |
| 13:43:07 | 4 | The issue is the extent to which it's doing a good |
| 13:43:12 | 5 | job predicting the overcharge. |
| 13:43:15 | 6 | It could be, you know, small differences in |
| 13:43:18 | 7 | the predicted but-for price.  Like, suppose we got |
| 13:43:22 | 8 | every single one of them that should have been 9.99 |
| 13:43:26 | 9 | as 9.98.  That's not important.  All right?  If every |
| 13:43:30 | 10 | single one that was supposed to be 9.99 was $2.36, |
| 13:43:35 | 11 | then that would be important, or if it was $27.14, |
| 13:43:39 | 12 | that would be important.  But just knowing what |
| 13:43:41 | 13 | fraction of them was exactly 9.99 is not relevant to |
| 13:43:45 | 14 | any known or suspected question that I would have |
| 13:43:48 | 15 | about the quality of the model. |
| 13:43:50 | 16 | Q.   **So absolutely unimportant to you what** |
| 13:43:52 | 17 | **percentage are 9.99.** |
| 13:43:53 | 18 | MR. FRIEDMAN:  Objection, form. |
| 13:43:54 | 19 | THE WITNESS:  I don't know why I would care |
| 13:43:56 | 20 | to know the percentage of them that predicted 9.99, |
| 13:44:00 | 21 | yes.  I can't think of a good reason to do that.  You |
| 13:44:04 | 22 | could do it, but I don't know what the point would |
| 13:44:07 | 23 | be. |
| 13:44:07 | 24 | Q.   **MR. SWANSON:  Would your answers be different** |
| 13:44:08 | 25 | **if I asked you the same questions but specified a** |

47 (Pages 182 to 185)

186

| | | |
|---|---|---|
| 13:44:10 | 1 | range of from, say, 9.75 to 10.25? |
| 13:44:15 | 2 | A.    That comes closer to being something that |
| 13:44:19 | 3 | matters, yes. I mean, but you're leaving out the |
| 13:44:22 | 4 | other shoe, which is what actually was the category |
| 13:44:26 | 5 | of the book that's not being 9.99. Is it one that |
| 13:44:30 | 6 | you really should have predicted in the, say, the |
| 13:44:35 | 7 | Amazon data prior to the institution of the agency |
| 13:44:39 | 8 | problem model. |
| 13:44:40 | 9 |     If you haven't done a good job of identifying |
| 13:44:43 | 10 | the books they would have set the price at 9.99, then |
| 13:44:48 | 11 | that's important; but if that's true, then I don't |
| 13:44:50 | 12 | know how you get an R square of .90. |
| 13:44:55 | 13 |     So, you know, it's -- the question has to be |
| 13:44:58 | 14 | answered in the context of a regression that's |
| 13:45:01 | 15 | explaining 90 percent of the variance, and the |
| 13:45:04 | 16 | average prices for the books that were 9.99 is going |
| 13:45:08 | 17 | to be 9.99. So if you're not explaining that, I |
| 13:45:12 | 18 | don't know how you get an R square of .90 if they |
| 13:45:15 | 19 | constitute more than a trivial fraction of the sales. |
| 13:45:19 | 20 | Q.    What happens when you get a within R squared |
| 13:45:26 | 21 | of .12? What does that tell you? |
| 13:45:28 | 22 | A.    What that's telling me is that within a |
| 13:45:30 | 23 | month-long period, there's lots of variation in price |
| 13:45:34 | 24 | around the average price; and, of course, you're not |
| 13:45:37 | 25 | explaining it because you're not dealing -- you don't |

187

| | | |
|---|---|---|
| 13:45:40 | 1 | have a transactions model. |
| 13:45:41 | 2 |     If you did estimate a transactions model with |
| 13:45:46 | 3 | even the same variables, your ability to explain |
| 13:45:49 | 4 | individual transactions would be better than that, |
| 13:45:52 | 5 | because you're just not -- you're not giving the |
| 13:45:55 | 6 | model the chance to even try to explain those because |
| 13:45:58 | 7 | that's not the input to the model. |
| 13:46:00 | 8 | Q.    Well, do people purchase at average prices or |
| 13:46:06 | 9 | do they purchase at actual individual prices -- |
| 13:46:09 | 10 | MR. FRIEDMAN: Objection, form. |
| 13:46:10 | 11 | Q.    MR. SWANSON: -- at a given point in time? |
| 13:46:12 | 12 | A.    Well, some do, some don't. The -- the range |
| 13:46:16 | 13 | of prices being charged obviously is not something |
| 13:46:21 | 14 | where every single price is right at the average. |
| 13:46:24 | 15 | Most of them are not at the average or else you |
| 13:46:27 | 16 | wouldn't have the variation that you do within -- |
| 13:46:31 | 17 | within the four-month period. |
| 13:46:33 | 18 | MR. FRIEDMAN: Four-week. |
| 13:46:34 | 19 | THE WITNESS: Four-week period. Excuse me. |
| 13:46:36 | 20 | Q.    MR. SWANSON: Are there e-book prices that |
| 13:46:56 | 21 | predictably change within a four-week period that |
| 13:46:59 | 22 | your model is not taking account of? |
| 13:47:01 | 23 | A.    Well, to the extent that indicator variable |
| 13:47:04 | 24 | changes its stripe in the middle of the period, then, |
| 13:47:08 | 25 | you know, there's a -- it's not completely |

188

| | | |
|---|---|---|
| 13:47:10 | 1 | representative. Like the 90-day expiration date, all |
| 13:47:14 | 2 | right, can happen after two weeks of the four weeks. |
| 13:47:17 | 3 | So what you're reducing is the power of that variable |
| 13:47:20 | 4 | to explain variation in price. |
| 13:47:23 | 5 | Q.    Suppose a consumer comes forward and presents |
| 13:47:32 | 6 | evidence that in the middle of the book -- in the |
| 13:47:36 | 7 | middle of the month they bought a book that was -- |
| 13:47:48 | 8 | had just come off its 90-day period, new release that |
| 13:47:50 | 9 | had just come off its 90-day period. Typically |
| 13:47:55 | 10 | coming off the 90-day period for Amazon would result |
| 13:47:58 | 11 | in a higher e-book price, would it not? |
| 13:48:01 | 12 | A.    Typically, yes. |
| 13:48:02 | 13 | Q.    And the approach of your model will use data |
| 13:48:07 | 14 | based on averaging all of the transactions in that |
| 13:48:09 | 15 | month, correct? |
| 13:48:10 | 16 | A.    That's correct. |
| 13:48:11 | 17 | Q.    So as you just pointed out, it could be that |
| 13:48:16 | 18 | two weeks in the price might have gone up under the |
| 13:48:20 | 19 | Amazon pricing model, but your model will treat the |
| 13:48:25 | 20 | average price of that book throughout the month which |
| 13:48:28 | 21 | will give weight to the lower price before the price |
| 13:48:34 | 22 | hike kicks in. |
| 13:48:36 | 23 | A.    It will give weight to both, but the average |
| 13:48:39 | 24 | will be in between. So those who bought before the |
| 13:48:43 | 25 | change occurred, their damages will be |

189

| | | |
|---|---|---|
| 13:48:46 | 1 | underestimated; and for ones that bought after, their |
| 13:48:49 | 2 | damages will be overestimated. But on average, |
| 13:48:51 | 3 | they'll cancel out. |
| 13:48:53 | 4 | Q.    And some consumers who will not have been |
| 13:48:59 | 5 | injured directly under your methodology as a result |
| 13:49:01 | 6 | of that be in line to collect damages, correct? |
| 13:49:04 | 7 | MR. FRIEDMAN: Objection, form. |
| 13:49:05 | 8 | THE WITNESS: Well, that -- that's only true |
| 13:49:08 | 9 | if the predicted price in the next four-week period |
| 13:49:11 | 10 | would have been at or above the price they actually |
| 13:49:16 | 11 | paid. Because, you know, in the next period, nothing |
| 13:49:20 | 12 | else will have changed except now we have the full |
| 13:49:22 | 13 | effect of the post 90-day thing. So you're going to |
| 13:49:25 | 14 | have a different predicted price there. And they are |
| 13:49:29 | 15 | going to have zero damages as opposed to what they |
| 13:49:33 | 16 | get only if in that period you would have predicted |
| 13:49:36 | 17 | no anticompetitive harm for that category, and yet in |
| 13:49:42 | 18 | reality what the model is about is saying that there |
| 13:49:45 | 19 | will be anticompetitive harm for everybody. It just |
| 13:49:48 | 20 | will differ depending whether you're before 90 days |
| 13:49:51 | 21 | or after 90 days. |
| 13:49:53 | 22 | Q.    Are you planning on taking that into account |
| 13:49:55 | 23 | or can you take that into account? |
| 13:49:57 | 24 | A.    The way to take it into account, which would |
| 13:50:02 | 25 | require more work, a lot more time, would be to |

48  (Pages 186 to 189)

190

| | | |
|---|---|---|
| 13:50:05 | 1 | reduce the -- the time period for which the average |
| 13:50:09 | 2 | was taken down to a week or something like that, down |
| 13:50:13 | 3 | to something closer to the frequency of the changes |
| 13:50:16 | 4 | in the variables. |
| 13:50:17 | 5 | Q.    And that is something that you could do. |
| 13:50:28 | 6 | A.    It's something you can do with enough time, |
| 13:50:30 | 7 | sure.  You have to reconstitute the aggregation of |
| 13:50:35 | 8 | the data.  Rather than just rely on stuff that was |
| 13:50:37 | 9 | done in the liability phase, you'd have to actually |
| 13:50:41 | 10 | go back and reconstitute the aggregation from the |
| 13:50:44 | 11 | transactions record to average periods and do that. |
| 13:50:47 | 12 | MR. FRIEDMAN:  Would you like to have us |
| 13:50:48 | 13 | incur that cost in the distribution phase?  Just give |
| 13:50:52 | 14 | me a heads-up. |
| 13:50:56 | 15 | MR. SWANSON:  I don't know what phase you get |
| 13:50:58 | 16 | to unless you meet the requirement of moving |
| 13:51:01 | 17 | something up.  But we can debate that offline. |
| 13:51:08 | 18 | Q.    Sitting here right now, obviously you don't |
| 13:51:14 | 19 | have your computer, nor would Mr. Friedman allow me |
| 13:51:19 | 20 | to make you run some calculations here live, but if I |
| 13:51:23 | 21 | gave you some hypothetical information about a |
| 13:51:25 | 22 | particular consumer purchasing on a particular day, |
| 13:51:29 | 23 | all of the information that corresponds to the |
| 13:51:33 | 24 | variables that you've used, would you be able to |
| 13:51:35 | 25 | figure out how your methodology calculates the |

191

| | | |
|---|---|---|
| 13:51:39 | 1 | overcharge for that consumer as you sit here without |
| 13:51:42 | 2 | using your computer? |
| 13:51:43 | 3 | A.    I have no idea until you ask the question |
| 13:51:46 | 4 | because the question was sufficiently vague that I'm |
| 13:51:48 | 5 | not sure what's coming.  So I'd hate to answer yes |
| 13:51:52 | 6 | and then not be able to answer the question or no and |
| 13:51:56 | 7 | then be able to answer it.  So maybe you should try |
| 13:51:58 | 8 | and I can tell you whether that's sufficient |
| 13:52:00 | 9 | information for me to be able to answer it. |
| 13:52:02 | 10 | Q.    Well, I mean, if I bought Ted Kennedy's book |
| 13:52:07 | 11 | True Compass on April 1st, 2010, and I bought it from |
| 13:52:10 | 12 | Apple, could you tell me what my -- how much I was |
| 13:52:15 | 13 | overcharged? |
| 13:52:15 | 14 | A.    Yes. |
| 13:52:16 | 15 | Q.    How much? |
| 13:52:17 | 16 | A.    By plugging in the values associated with |
| 13:52:21 | 17 | that title into the regression equation, producing a |
| 13:52:25 | 18 | but-for price and then subtracting that from the |
| 13:52:28 | 19 | price you actually paid. |
| 13:52:29 | 20 | Q.    If I told you what price hypothetically I |
| 13:52:33 | 21 | paid for that book, can you sitting here point me to |
| 13:52:35 | 22 | numbers in your report that would allow us to figure |
| 13:52:38 | 23 | that out?  Or do you need a computer to do that? |
| 13:52:41 | 24 | A.    Depends.  There's nothing in the report that |
| 13:52:46 | 25 | would enable you to calculate it, but if I produce |

192

| | | |
|---|---|---|
| 13:52:49 | 1 | for you the 10,000-page computer dump of the but-for |
| 13:52:55 | 2 | price of every title in every month, then you could |
| 13:52:59 | 3 | just look at that and do it yourself. |
| 13:53:01 | 4 | Q.    Well, you've answered my question.  I |
| 13:53:03 | 5 | appreciate that. |
| 13:53:05 | 6 | A.    Shall we take a break? |
| 13:53:06 | 7 | MR. SWANSON:  Yeah. |
| 13:53:07 | 8 | VIDEOGRAPHER:  We are now going off the |
| 13:53:09 | 9 | record, the time is 1:52. |
| 14:06:07 | 10 | (Deposition recess taken.) |
| 14:16:07 | 11 | VIDEOGRAPHER:  We're now going back on the |
| 14:16:19 | 12 | record.  The time is 2:15. |
| 14:16:22 | 13 | Q.    MR. SWANSON:  Professor Noll, you state in |
| 14:16:25 | 14 | your report that: |
| 14:16:27 | 15 | "Anticompetitive conduct by the |
| 14:16:28 | 16 | defendants caused prices to be higher for |
| 14:16:30 | 17 | e-books that account for 99.5% of e-book |
| 14:16:38 | 18 | sales by the publisher defendants." |
| 14:16:40 | 19 | Do you recall that? |
| 14:16:40 | 20 | A.    Yes. |
| 14:16:40 | 21 | Q.    How did you compute the 99.5 percent figure? |
| 14:16:44 | 22 | A.    It's a fraction that are accounted for by the |
| 14:16:49 | 23 | actual price being above the predicted price. |
| 14:16:51 | 24 | Q.    And did you make that computation at the |
| 14:16:54 | 25 | level of individual transactions? |

193

| | | |
|---|---|---|
| 14:16:56 | 1 | A.    At the level of the four-week periods. |
| 14:17:00 | 2 | Q.    And did you make that computation at the |
| 14:17:04 | 3 | level of the individual title? |
| 14:17:15 | 4 | A.    It would be the -- let's see.  What did we |
| 14:17:15 | 5 | do. |
| 14:17:16 | 6 | I've just forgotten sitting here whether it |
| 14:17:27 | 7 | was at the title or category level.  I think it |
| 14:17:30 | 8 | was -- I just don't remember for sure. |
| 14:17:32 | 9 | Q.    Let me assert that it was at the category |
| 14:17:35 | 10 | level. |
| 14:17:35 | 11 | A.    I think it was, but I'm just having a main |
| 14:17:39 | 12 | memory block.  I don't remember for sure. |
| 14:17:40 | 13 | Q.    And if you calculated it at the category |
| 14:17:44 | 14 | level, in effect, what you did was compute the |
| 14:17:47 | 15 | average price effect within a category, and then to |
| 14:17:51 | 16 | the extent there was a price effect, you added up the |
| 14:17:55 | 17 | percentage of each of those categories to come up |
| 14:17:59 | 18 | with a 99.5 percent figure? |
| 14:18:01 | 19 | A.    I think that the 99.5 percent figure is based |
| 14:18:10 | 20 | on the volume of sales, as I remember, as opposed to |
| 14:18:13 | 21 | a count of categories.  You said a count of |
| 14:18:15 | 22 | categories, and I don't think it was. |
| 14:18:16 | 23 | Q.    I agree it's not a count of categories. |
| 14:18:19 | 24 | A.    Right. |
| 14:18:20 | 25 | Q.    I was not being very precise.  I think we're |

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123  (212)705-8585

194

| | | |
|---|---|---|
| 14:18:23 | 1 | on the same page, but we should be on the same page |
| 14:18:25 | 2 | on the record. |
| 14:18:26 | 3 | You determined whether or not a category was |
| 14:18:29 | 4 | affected. If it was, according to your model, then |
| 14:18:31 | 5 | you added its share of sales -- |
| 14:18:34 | 6 | A.   Right. |
| 14:18:35 | 7 | Q.   -- to all the other categories that your |
| 14:18:37 | 8 | model indicated was affected, that came up to a |
| 14:18:41 | 9 | 99.5 percent share of sales, right? |
| 14:18:45 | 10 | A.   Correct. The calculated damages in my model |
| 14:18:48 | 11 | are positive for 99.5 percent of the volume of |
| 14:18:53 | 12 | transactions, yes. |
| 14:18:55 | 13 | Q.   Now, that could be consistent with calculated |
| 14:19:04 | 14 | impact on 40 percent of titles, could it not? |
| 14:19:11 | 15 | MR. FRIEDMAN:  Objection, form. |
| 14:19:13 | 16 | THE WITNESS:  I don't -- I think that's |
| 14:19:18 | 17 | extremely implausible, no. I mean, the -- there are |
| 14:19:24 | 18 | circumstances in which it could be a significant |
| 14:19:26 | 19 | fraction of the titles in the category, but those |
| 14:19:28 | 20 | would be where the predicted price is very close to |
| 14:19:31 | 21 | the average price. If there's a big difference, |
| 14:19:33 | 22 | there wouldn't -- it wouldn't be -- it wouldn't be |
| 14:19:37 | 23 | any significant fraction where the predicted price |
| 14:19:40 | 24 | was above the actual price. |
| 14:19:41 | 25 | Q.   MR. SWANSON:  So you do have an opinion as to |

195

| | | |
|---|---|---|
| 14:19:43 | 1 | what percentage of titles were impacted? |
| 14:19:45 | 2 | MR. FRIEDMAN:  Objection, form. |
| 14:19:46 | 3 | THE WITNESS:  No, I don't know what |
| 14:19:47 | 4 | percentage were, but I'm saying the hypothesis you |
| 14:19:52 | 5 | put forth would not be -- that wouldn't be a good |
| 14:19:55 | 6 | estimate. |
| 14:19:56 | 7 | Q.   MR. SWANSON:  You don't think it's as low as |
| 14:19:59 | 8 | 40 percent? |
| 14:19:59 | 9 | A.   Well, 40 percent, as I understand it, was the |
| 14:20:04 | 10 | number that you thought the damages would be negative |
| 14:20:07 | 11 | when in fact they were calculated as positive, and I |
| 14:20:10 | 12 | don't think it would be that high. All right? |
| 14:20:13 | 13 | Wasn't 40 percent that I had incorrectly |
| 14:20:16 | 14 | identified as having positive damages? |
| 14:20:18 | 15 | Q.   We may be talking past each other here. |
| 14:20:21 | 16 | A.   Okay. |
| 14:20:22 | 17 | Q.   I'm sure it's my fault. My question for you |
| 14:20:25 | 18 | is you have a 99.5 percent of affected sales figure |
| 14:20:30 | 19 | that you've been reporting -- |
| 14:20:32 | 20 | A.   Yes. |
| 14:20:32 | 21 | Q.   -- in your report. And my question was is it |
| 14:20:35 | 22 | consistent with that number that you've reported that |
| 14:20:41 | 23 | at the same time perhaps only as low as 40 percent of |
| 14:20:44 | 24 | the publisher defendant titles were positively |
| 14:20:49 | 25 | impacted? |

196

| | | |
|---|---|---|
| 14:20:49 | 1 | A.   No, I think that is an implausibly low |
| 14:20:55 | 2 | number, yes. The only categories in which you would |
| 14:20:58 | 3 | find that would be true would be ones where the |
| 14:21:01 | 4 | predicted price is very close to but still below the |
| 14:21:04 | 5 | average price. |
| 14:21:05 | 6 | Q.   What do you think is the more reasonable |
| 14:21:08 | 7 | estimate of the number of impacted titles? |
| 14:21:11 | 8 | A.   I don't know what it would be. There could |
| 14:21:13 | 9 | be a category for which that number is true, but I |
| 14:21:17 | 10 | think it's extremely unlikely it's true for all |
| 14:21:20 | 11 | categories or even most categories. |
| 14:21:22 | 12 | Q.   And is it possible that the 99.5 figure is |
| 14:21:25 | 13 | consistent with an impact in only 50 percent of |
| 14:21:29 | 14 | individual transactions? |
| 14:21:31 | 15 | A.   I do not think that's true. I think that's |
| 14:21:34 | 16 | unlikely to be the case, but we can calculate and |
| 14:21:37 | 17 | figure it out. I mean, that's a task that can easily |
| 14:21:41 | 18 | be done with a regression equation. |
| 14:21:42 | 19 | Q.   Do you have the information that would allow |
| 14:21:45 | 20 | you to do that? |
| 14:21:46 | 21 | A.   Of course. |
| 14:21:46 | 22 | Q.   You would be able to determine the individual |
| 14:21:52 | 23 | transactional histories of members of the class? |
| 14:21:55 | 24 | A.   We have the transaction records of everybody |
| 14:21:57 | 25 | in the class, and all we would do is take a sample of |

197

| | | |
|---|---|---|
| 14:22:02 | 1 | transactions records and predict the prices of |
| 14:22:05 | 2 | everything on that list, compare it with the actual |
| 14:22:08 | 3 | price in the transactions records and see how many of |
| 14:22:10 | 4 | them are positive. |
| 14:22:11 | 5 | Q.   But you didn't do that. |
| 14:22:13 | 6 | A.   I haven't done that, no. I've given |
| 14:22:16 | 7 | illustrations of how you do the calculation, but I |
| 14:22:20 | 8 | haven't attempted to calculate for all transactions |
| 14:22:25 | 9 | for a sample of class members. |
| 14:22:27 | 10 | Q.   Could you turn to page 12 of your expert |
| 14:22:31 | 11 | report? And I wanted to ask you about something in |
| 14:22:38 | 12 | the first paragraph. Actually, toward the end of the |
| 14:22:42 | 13 | first paragraph you're talking about a wealth |
| 14:22:46 | 14 | transfer and at the end you say: |
| 14:22:47 | 15 | "The wealth transfer is the sum over all |
| 14:22:51 | 16 | e-book titles and all days for which the |
| 14:22:53 | 17 | collusive agency model was in place, but the |
| 14:22:55 | 18 | quantity sold multiplied by the elevation in |
| 14:22:57 | 19 | price on that day is the collusive agency |
| 14:22:59 | 20 | model." |
| 14:23:01 | 21 | What are you referring to there? |
| 14:23:02 | 22 | A.   I'm trying to figure out why it isn't clear. |
| 14:23:13 | 23 | For any given e-book title, we have a number of |
| 14:23:15 | 24 | transactions and we just sum the difference between |
| 14:23:19 | 25 | the actual price and the but-for price for every |

50 (Pages 194 to 197)

## 206

```
14:34:23   1    other extraneous information and calculate the
14:34:27   2    equilibrium markup before and after the
14:34:28   3    anticompetitive conduct.
14:34:29   4         That doesn't require the use of econometrics
14:34:32   5    except insofar as you need it to produce numbers that
14:34:36   6    are the parameters of the model.
14:34:38   7         In this case, I don't know how I would do
14:34:42   8    that without information about the but-for price.  I
14:34:44   9    mean, I don't get yet how I would do that without
14:34:48  10    information about the but-for price.
14:34:51  11         But that modeling exercise of creating a
14:34:54  12    theoretical model of imperfect competition has been
14:34:59  13    used on occasion.  I've seen it used maybe twice, but
14:35:03  14    as you can well imagine, an economist who does that
14:35:05  15    is in deep trouble because he's got to defend a
14:35:09  16    particular model of imperfect competition, and we can
14:35:13  17    think of about a hundred alternatives to any model
14:35:20  18    you want to come up with.  So all you're  going --
14:35:21  19    both sides are just going to be paying a lot of money
14:35:25  20    to economists if you take that approach.
14:35:27  21    Q.    We can't have that.  It's been done.
14:35:30  22         Is it -- do you have any empirical view on
14:35:39  23    whether two different customers normally pay the same
14:35:43  24    price for the same e-book at the same retailer on the
14:35:47  25    same day, focusing on the class period?
```

## 207

```
14:35:50   1         MR. FRIEDMAN:  Objection, form, asked and
14:35:51   2    answered.
14:35:51   3         THE WITNESS:  I haven't studied that problem,
14:35:53   4    and I have no opinion about it based on anything I've
14:35:56   5    done in this case.
14:35:57   6    Q.    MR. SWANSON:  Do some consumers use coupons
14:36:02   7    or have discounts or rebates on their e-book
14:36:05   8    purchases?
14:36:06   9         MR. FRIEDMAN:  Objection, form, asked and
14:36:07  10    answered.
14:36:07  11         THE WITNESS:  That sounds like a statement,
14:36:09  12    not a question.
14:36:10  13    Q.    MR. SWANSON:  No, it's a question.  It's a
14:36:15  14    question I hope you know the answer to.
14:36:17  15    A.    Do some people -- I know that Amazon does in
14:36:20  16    fact have coupons.  The extent to which they use them
14:36:23  17    for e-books I don't know and I haven't studied and
14:36:26  18    it's not part of my opinion in this case.
14:36:29  19    Q.    Do you have the data that allow you to adjust
14:36:34  20    the Amazon prices for any coupons or discounts or
14:36:38  21    rebates that were provided on any of the --
14:36:42  22    A.    If it's -- if it's in the transactions
14:36:45  23    prices, it's there in part of the average.  Yes.  I
14:36:49  24    mean, the average is the actual average of the actual
14:36:52  25    transaction prices.  So it's in there.
```

## 208

```
14:36:55   1         But I haven't attempted -- I don't know of
14:36:59   2    any independent source of information about coupons.
14:37:02   3    Q.    Professor, if an individual consumer received
14:37:07   4    benefits that he or she would not have received in
14:37:11   5    the but-for world, how do you treat those benefits in
14:37:14   6    your damage calculation?
14:37:15   7         MR. FRIEDMAN:  Objection, form.
14:37:16   8         THE WITNESS:  Since I don't know what you
14:37:17   9    mean by benefits, I can't answer the question.  I
14:37:20  10    don't know what you're even talking about.
14:37:21  11    Q.    MR. SWANSON:  Well, if -- speaking generally
14:37:26  12    of damage calculation, if a challenged conduct gives
14:37:29  13    rise to both harm and benefits, when you quantify
14:37:33  14    damages as a damage expert, do you take account in
14:37:38  15    any way of the benefits?
14:37:40  16         MR. FRIEDMAN:  Objection, form.
14:37:41  17         THE WITNESS:  It depends on the circumstances
14:37:44  18    where the benefits accrued, but in general in this
14:37:47  19    case I relied upon the opinion of the Court that
14:37:50  20    there were no pro-competitive benefits.  So, of
14:37:53  21    course, I'm not taking into account things that the
14:37:56  22    Court has said don't exist.
14:37:57  23    Q.    MR. SWANSON:  If your interpretation or
14:38:01  24    counsel's interpretation of the significance of
14:38:04  25    whatever court findings that you're pointing to is
```

## 209

```
14:38:07   1    incorrect and the issue is presented to a jury for
14:38:10   2    decision and the jury finds there were
14:38:12   3    pro-competitive benefits, how do you handle those as
14:38:15   4    a damage expert?
14:38:16   5         MR. FRIEDMAN:  Objection, form.
14:38:18   6         THE WITNESS:  Well, if this were a case in
14:38:21   7    which pro-competitive benefits were found to exist,
14:38:24   8    then you would have to attempt to include them in the
14:38:26   9    model of damages to the extent they occurred to the
14:38:29  10    same people who were damaged by the conspiracy.
14:38:31  11    Q.    MR. SWANSON:  And would you calculate net
14:38:36  12    damages, in other words, net of pro-competitive
14:38:40  13    benefits?
14:38:40  14         MR. FRIEDMAN:  Objection, form.
14:38:42  15         THE WITNESS:  As an economist, I don't think
14:38:43  16    I'm entitled to an opinion about a legal conclusion
14:38:46  17    about which benefits should be counted as offsetting
14:38:49  18    versus not.  I would do whatever I was told in terms
14:38:52  19    of the legal opinion because it's not up to me.  I
14:38:56  20    mean, it's not up to me to make that judgment about
14:39:02  21    the -- what the pro-competitive benefits are and
14:39:05  22    which ones are offset against damages.
14:39:11  23         MR. SWANSON:  I'm going to move to on
14:39:15  24    Exhibit 5, which is three pages.
14:39:33  25    ///
```

53 (Pages 206 to 209)

214

14:45:22  1  have entered into settlement agreements with

14:45:25  2  plaintiffs that provide for monetary payments to

14:45:30  3  certain consumers who purchased their e-books between

14:45:35  4  April 1st, 2010, and May 21st, 2012?

14:45:37  5      MR. FRIEDMAN:  Objection, form.

14:45:39  6      THE WITNESS:  I'm aware of the existence of

14:45:41  7  the settlement agreement.  I do not know the details

14:45:44  8  of the settlement agreement.

14:45:46  9  Q.    MR. SWANSON:  Let's go back actually to the

14:45:48  10  hypothetical -- third hypothetical we were just

14:45:52  11  talking about, the consumer who buys two books and

14:45:55  12  only two books.

14:45:59  13      If that consumer has received a settlement

14:46:05  14  payment in this litigation of $3, do you calculate

14:46:12  15  any damages for purposes of the upcoming damage

14:46:16  16  trial?

14:46:16  17      MR. FRIEDMAN:  Objection, form.

14:46:17  18      THE WITNESS:  Since I don't know anything

14:46:19  19  about how much anybody's received in settlement

14:46:23  20  payments, any consumer's received, I can't possibly

14:46:26  21  account for that in the model.  I don't know how much

14:46:28  22  anybody's received in settlements because I don't

14:46:31  23  know the details.

14:46:32  24  Q.    MR. SWANSON:  I ask you to turn to page 4 of

14:46:42  25  your report.  Now, you indicated in the paragraph

215

14:46:57  1  under Assignment in the second sentence here, I

14:47:03  2  think, that:  "Attorneys for class plaintiffs also

14:47:06  3  have asked me to determine whether anticompetitive

14:47:09  4  harm arising from the conspiracy can be demonstrated

14:47:12  5  for all class members."

14:47:14  6      Do you see that?

14:47:14  7  A.    Yes.

14:47:16  8  Q.    Does that really mean all, as in a hundred

14:47:21  9  percent?

14:47:22  10  A.    It means for the group of class members you

14:47:26  11  can demonstrate the injury that accrued to each one,

14:47:31  12  each of them, yes.  So you can -- you can talk about

14:47:34  13  the class itself being affected on a classwide basis

14:47:41  14  by anticompetitive harm.

14:47:42  15  Q.    And for a class to be affected classwide by

14:47:47  16  anticompetitive harm, what percentage of members of

14:47:49  17  that class must be individually injured?

14:47:52  18      MR. FRIEDMAN:  Objection, form, calls for

14:47:54  19  legal conclusion.

14:47:55  20      THE WITNESS:  I have no opinion on that.

14:47:57  21  It's not -- not my task to characterize that issue.

14:48:03  22  My task is to -- what's the mechanism for determining

14:48:06  23  whether class members were injured on a classwide

14:48:11  24  basis.

14:48:11  25  Q.    MR. SWANSON:  Is it your testimony that all

216

14:48:13  1  class members were harmed by paying higher prices for

14:48:17  2  e-books than they would have paid absent the agency

14:48:20  3  agreements?

14:48:20  4  A.    The existence of higher prices for all

14:48:25  5  e-books harm all class members, yes, but it doesn't

14:48:30  6  mean they actually -- it could -- the mechanism by

14:48:34  7  which that's true isn't necessarily just the

14:48:36  8  purchases.  It's also the dead-weight loss and also

14:48:42  9  the other effects that arose from this.

14:48:44  10  Q.    So there are class members -- withdraw that.

14:48:48  11      You entertain the possibility that there are

14:48:51  12  class members who made no overcharges but who

14:48:55  13  experienced dead-weight loss?

14:48:56  14  A.    Well, I don't anticipate there are such

14:49:00  15  people, but I'm saying if somebody was excluded from

14:49:03  16  the market because all the books they bought went up

14:49:06  17  in price by 20 or 30 percent, then indeed they would

14:49:10  18  have suffered loss, although they wouldn't

14:49:13  19  necessarily have made any transactions.

14:49:15  20      I'm not talking about do I know who those

14:49:18  21  customers are.  I don't.  But I'm saying damage is

14:49:22  22  not restricted to overcharges on e-books.  Or I

14:49:25  23  shouldn't say -- damage is restricted to that.

14:49:28  24  Anticompetitive injury is not restricted to damages.

14:49:33  25  Q.    Your model does not show that the price of

217

14:49:39  1  each e-book that a proposed class member purchased

14:49:41  2  from a publisher defendant was elevated by the

14:49:44  3  conspiracy.

14:49:45  4  A.    No.

14:49:46  5  Q.    Now, you find that there were reductions in

14:49:51  6  prices for a half percent of e-books.  That's what

14:49:55  7  you say, right?

14:49:57  8  A.    Half, yeah.  Half of a percent of the

14:49:59  9  transactions are accounted for by categories in which

14:50:02  10  the predicted price is above the actual price.

14:50:05  11  Q.    And there were no damages associated with

14:50:08  12  those categories of purchases?

14:50:11  13      MR. FRIEDMAN:  Objection, form.

14:50:12  14      THE WITNESS:  Well, I calculated what the

14:50:14  15  negative amount was, and whether you want to call

14:50:17  16  that negative damages or nothing is up to you.

14:50:20  17  Q.    MR. SWANSON:  You don't subtract those price

14:50:22  18  reductions from your damage calculations, correct?

14:50:24  19  A.    No, but they're there.  If you want to do the

14:50:32  20  subtraction, it's easy.

14:50:33  21  Q.    What, if anything, do you know about consumer

14:50:35  22  e-book purchasing patterns?

14:50:38  23      MR. FRIEDMAN:  Object to form.

14:50:39  24      THE WITNESS:  I haven't studied consumer

14:50:41  25  e-book purchasing patterns, so I have no opinion

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123  (212)705-8585

218

| | | |
|---|---|---|
| 14:50:42 | 1 | about that. |
| 14:50:42 | 2 | Q.    MR. SWANSON:  Do you know whether an |
| 14:50:45 | 3 | individual class member engaged in one e-book |
| 14:50:46 | 4 | transaction or 20? |
| 14:50:46 | 5 | A.    Well, I can tell it from the transaction |
| 14:50:49 | 6 | records, yes, but I have not examined the |
| 14:50:51 | 7 | distribution of e-books purchases across customers, |
| 14:50:54 | 8 | no.  I've done no analysis of that. |
| 14:50:56 | 9 | Q.    And how from the transaction record can you |
| 14:50:58 | 10 | tell if a class member purchased 20 as opposed to one |
| 14:51:02 | 11 | e-book? |
| 14:51:02 | 12 | A.    You can follow that customer's transaction |
| 14:51:04 | 13 | records through time for a given period.  You can't |
| 14:51:04 | 14 | sum them across retailers because you don't know how |
| 14:51:14 | 15 | to match -- if somebody is buying from multiple |
| 14:51:17 | 16 | e-retailers, I don't know of a way to match across |
| 14:51:21 | 17 | them, but certainly it would be possible for Amazon |
| 14:51:23 | 18 | to give you a printout of all the e-books that a |
| 14:51:28 | 19 | given customer bought from Amazon, similarly Apple |
| 14:51:31 | 20 | and similarly Barnes & Noble. |
| 14:51:34 | 21 | Q.    But do you have that now? |
| 14:51:35 | 22 | A.    Well, I don't have it now in that form, but I |
| 14:51:43 | 23 | could easy produce it, I believe, from the |
| 14:51:47 | 24 | transactions data.  Maybe I couldn't.  Maybe I'd have |
| 14:51:54 | 25 | to ask Amazon for it.  I'm not absolutely certain, |

219

| | | |
|---|---|---|
| 14:51:57 | 1 | but I thought we could probably do it from the |
| 14:52:00 | 2 | transactions records. |
| 14:52:01 | 3 | Q.    So your -- your understanding is that there |
| 14:52:05 | 4 | are customer identifiers in the data that have been |
| 14:52:07 | 5 | produced in this case? |
| 14:52:08 | 6 | A.    I'm not certain that's true.  I |
| 14:52:12 | 7 | thought -- I think there might be, but I'm not |
| 14:52:12 | 8 | absolutely certain and I don't want to trust my |
| 14:52:15 | 9 | memory.  So maybe, maybe not. |
| 14:52:17 | 10 | Q.    If there are no customer identifiers, then it |
| 14:52:25 | 11 | would be the case that you wouldn't be able to tell |
| 14:52:27 | 12 | if an e-book consumer bought one or a hundred |
| 14:52:33 | 13 | e-books? |
| 14:52:34 | 14 | MR. FRIEDMAN:  Just for clarification, that |
| 14:52:36 | 15 | there is no customer identifiers that have been |
| 14:52:38 | 16 | produced in the litigation, is that your question? |
| 14:52:40 | 17 | MR. SWANSON:  Right. |
| 14:52:41 | 18 | MR. FRIEDMAN:  As opposed to that exist in |
| 14:52:43 | 19 | the world? |
| 14:52:43 | 20 | MR. SWANSON:  Yeah, absolutely. |
| 14:52:45 | 21 | Q.    Do you understand the distinction? |
| 14:52:46 | 22 | A.    I understand the distinction.  I know the |
| 14:52:50 | 23 | customer identifiers exist in the real world.  It's |
| 14:52:52 | 24 | conceivable that the only way you could get at this |
| 14:52:56 | 25 | would be to give the regression equation to Amazon |

220

| | | |
|---|---|---|
| 14:52:59 | 1 | and have them calculate for each customer or for a |
| 14:53:03 | 2 | given customer have them print out all e-books that |
| 14:53:07 | 3 | that customer has bought.  That would be the way to |
| 14:53:09 | 4 | get that information. |
| 14:53:10 | 5 | Q.    Do you have any understanding as to the |
| 14:53:12 | 6 | percentage of consumers who purchased only one e-book |
| 14:53:16 | 7 | during the damage period? |
| 14:53:18 | 8 | A.    I do not know how many.  Obviously if I can't |
| 14:53:22 | 9 | identify whether two different transactions are two |
| 14:53:27 | 10 | different customers or the same customer, then I |
| 14:53:29 | 11 | obviously can't tell how many people bought exactly |
| 14:53:33 | 12 | one. |
| 14:53:33 | 13 | Q.    So you don't know if it's more or less than |
| 14:53:36 | 14 | 50 percent? |
| 14:53:36 | 15 | A.    I do not know how many people bought |
| 14:53:40 | 16 | precisely one e-book in their history. |
| 14:53:44 | 17 | Q.    Would it surprise you to learn that it could |
| 14:53:47 | 18 | be 30 or 40 percent? |
| 14:53:48 | 19 | A.    I have no expectations about what the number |
| 14:53:53 | 20 | is.  So in a certain sense, every number you might |
| 14:53:57 | 21 | throw at me would be a surprise because I don't know |
| 14:53:59 | 22 | what it is. |
| 14:54:00 | 23 | Q.    Well, 101 percent would be a big surprise, I |
| 14:54:05 | 24 | think. |
| 14:54:05 | 25 | A.    Not coming from you.  Yes, I would expect it |

221

| | | |
|---|---|---|
| 14:54:11 | 1 | to be between zero and a hundred. |
| 14:54:14 | 2 | Q.    You've clearly been talking to Dale Jorgensen |
| 14:54:20 | 3 | about my abilities. |
| 14:54:23 | 4 | Do you have any individual transactional |
| 14:54:33 | 5 | e-book purchase data from the named -- either |
| 14:54:37 | 6 | currently or former named class representatives? |
| 14:54:40 | 7 | A.    I personally do not have in my possession. |
| 14:54:44 | 8 | MR. FRIEDMAN:  All right.  Go ahead.  That's |
| 14:54:46 | 9 | fine. |
| 14:54:46 | 10 | THE WITNESS:  I personally at this moment do |
| 14:54:49 | 11 | not have in my possession any transactions records |
| 14:54:52 | 12 | for any named plaintiff. |
| 14:54:53 | 13 | Q.    MR. SWANSON:  Were -- are you saying that |
| 14:54:56 | 14 | none were made available to you? |
| 14:54:57 | 15 | MR. FRIEDMAN:  I'm not going to allow him to |
| 14:54:59 | 16 | answer that.  Next question. |
| 14:55:01 | 17 | MR. SWANSON:  Why? |
| 14:55:02 | 18 | MR. FRIEDMAN:  I think that violates -- I |
| 14:55:04 | 19 | think it violates what information was communicated |
| 14:55:10 | 20 | to Dr. Noll from counsel. |
| 14:55:12 | 21 | MR. SWANSON:  I think you're suggesting I'm |
| 14:55:16 | 22 | asking a question I'm not asking. |
| 14:55:19 | 23 | MR. FRIEDMAN:  Then I don't understand your |
| 14:55:20 | 24 | question.  You could ask him if he relied on it. |
| 14:55:25 | 25 | He's already said he didn't have them available or he |

226

| | | |
|---|---|---|
| 15:18:10 | 1 | A.   I was aware that reports on that issue had |
| 15:18:15 | 2 | been submitted, but I wouldn't have been able to give |
| 15:18:18 | 3 | you his name had you asked me for it. |
| 15:18:20 | 4 | Q.   Are you familiar with Professor Wickelgren's |
| 15:18:26 | 5 | work as an economist? |
| 15:18:27 | 6 | A.   No. |
| 15:18:27 | 7 | Q.   Have you heard of him before in the academic |
| 15:18:30 | 8 | context? |
| 15:18:31 | 9 | A.   No. |
| 15:18:32 | 10 | Q.   I take it you have no insight as to whether |
| 15:18:36 | 11 | he's an expert on anything? |
| 15:18:44 | 12 | A.   I'm sure he's a fine fellow and kind to his |
| 15:18:49 | 13 | mother.  Okay?  I don't know him.  So I can't really |
| 15:18:55 | 14 | say anything one way or the other about them. |
| 15:18:58 | 15 | Q.   That means you haven't read any of his |
| 15:19:01 | 16 | billion academic papers. |
| 15:19:04 | 17 | A.   Regardless.  Not even his guffaws.  I'm not |
| 15:19:08 | 18 | familiar with the name.  That doesn't mean that if I |
| 15:19:11 | 19 | looked at his CV I wouldn't recognize something.  It |
| 15:19:13 | 20 | just means that I don't know.  What is there about I |
| 15:19:17 | 21 | don't know -- |
| 15:19:18 | 22 | Q.   You can only do that once.  It loses its |
| 15:19:31 | 23 | force. |
| 15:19:32 | 24 | **So you have no knowledge as to whether or not** |
| 15:19:44 | 25 | **Professor Wickelgren has developed a reliable basis** |

227

| | | |
|---|---|---|
| 15:19:47 | 1 | **for estimating damages in this case.** |
| 15:19:51 | 2 | A.   No. |
| 15:19:51 | 3 | Q.   And you're not the least bit curious about |
| 15:19:55 | 4 | what he's done? |
| 15:19:56 | 5 | MR. FRIEDMAN:  Objection, form. |
| 15:19:57 | 6 | THE WITNESS:  Yeah, I don't know -- no, I'm |
| 15:20:08 | 7 | not curious, no.  Curious is the wrong word. |
| 15:20:16 | 8 | MR. FRIEDMAN:  I think you've answered the |
| 15:20:18 | 9 | question. |
| 15:20:19 | 10 | THE WITNESS:  I don't have any great desire |
| 15:20:25 | 11 | to study his work, no. |
| 15:20:26 | 12 | Q.   MR. SWANSON:  And if -- if I represent to you |
| 15:20:28 | 13 | that there is a 40 percent difference in the |
| 15:20:33 | 14 | calculated damages, that doesn't stimulate you to |
| 15:20:37 | 15 | look further into his work? |
| 15:20:39 | 16 | MR. FRIEDMAN:  Objection, form. |
| 15:20:41 | 17 | THE WITNESS:  I mean, if someone asked me to |
| 15:20:49 | 18 | undertake a study of his report to figure out why he |
| 15:20:53 | 19 | got the number he did, I would do that.  But I have |
| 15:20:57 | 20 | not been asked to do it and I don't have any great |
| 15:21:00 | 21 | desire to do it.  But if somebody asked me to do it, |
| 15:21:04 | 22 | I'd do it. |
| 15:21:06 | 23 | Q.   MR. SWANSON:  If you were told that another |
| 15:21:08 | 24 | economist had studied the same issues that you had |
| 15:21:11 | 25 | and had come up with a wildly different estimate of |

228

| | | |
|---|---|---|
| 15:21:14 | 1 | **damages, would that lead you to be more concerned** |
| 15:21:19 | 2 | **about your own methodology at all?** |
| 15:21:23 | 3 | MR. FRIEDMAN:  I'm going to object and I also |
| 15:21:24 | 4 | don't think, Dan, in fairness, that that's an |
| 15:21:26 | 5 | accurate representation and a fair one, given the |
| 15:21:30 | 6 | fact that the doctor has not looked at it and I don't |
| 15:21:35 | 7 | think it's accurate. |
| 15:21:36 | 8 | So if you're representing that Dr. Wickelgren |
| 15:21:39 | 9 | was doing the exact same thing for the exact same |
| 15:21:43 | 10 | purposes, which was the implication of question, I |
| 15:21:47 | 11 | think that's misleading.  And I don't think you |
| 15:21:49 | 12 | intended to, but I just don't think that's a fair |
| 15:21:53 | 13 | presentation to Roger.  Excuse me.  To Dr. Noll. |
| 15:21:56 | 14 | THE WITNESS:  I forgot the question. |
| 15:21:57 | 15 | Q.   MR. SWANSON:  Well, my question is as an |
| 15:21:59 | 16 | economist, if you learned that another economist had |
| 15:22:04 | 17 | looked at the same issue that you had and had come up |
| 15:22:09 | 18 | with a conclusion that was 40 percent off of the |
| 15:22:14 | 19 | number that represented your own conclusion, would |
| 15:22:17 | 20 | that give you any pause, leading you to reconsider |
| 15:22:20 | 21 | your own methodology? |
| 15:22:22 | 22 | MR. FRIEDMAN:  Objection, form. |
| 15:22:24 | 23 | THE WITNESS:  Only if they had done exactly |
| 15:22:25 | 24 | the same thing in exactly the same context.  I mean, |
| 15:22:29 | 25 | how could they possibly have done the same thing a |

229

| | | |
|---|---|---|
| 15:22:32 | 1 | year before the opinion was offered?  All right?  I |
| 15:22:37 | 2 | mean, I'm relying upon the outcome of the liability |
| 15:22:40 | 3 | phase.  He's not. |
| 15:22:44 | 4 | So he's in a -- he's in a state of much |
| 15:22:47 | 5 | different information than I am.  So it would be |
| 15:22:49 | 6 | irrelevant what he did at that state of information. |
| 15:22:51 | 7 | Q.   MR. SWANSON:  As an academic economist, when |
| 15:22:57 | 8 | you work in a particular area and form opinions or |
| 15:23:01 | 9 | theories, do you normally canvass the work of other |
| 15:23:05 | 10 | economists in the area first? |
| 15:23:07 | 11 | MR. FRIEDMAN:  Objection, form. |
| 15:23:08 | 12 | THE WITNESS:  In peer reviewed journals, yes. |
| 15:23:10 | 13 | In expert reports in antitrust cases, no.  I don't |
| 15:23:14 | 14 | read people's antitrust declarations to inform my |
| 15:23:17 | 15 | research that I'm going to try to publish in an |
| 15:23:20 | 16 | economics journal. |
| 15:23:21 | 17 | Q.   MR. SWANSON:  If Dr. Wickelgren was an |
| 15:23:30 | 18 | economist whose work you were familiar with, would |
| 15:23:33 | 19 | that make you more likely to review the work on |
| 15:23:36 | 20 | damages he's done in this case? |
| 15:23:37 | 21 | MR. FRIEDMAN:  Objection, form. |
| 15:23:39 | 22 | THE WITNESS:  My lack of interest in what he |
| 15:23:42 | 23 | has to do is not with respect to his name.  It's with |
| 15:23:45 | 24 | respect to the timing and circumstances, that what |
| 15:23:50 | 25 | happened there before the record was developed in the |

58  (Pages 226 to 229)

230

| | |
|---|---|
| 15:23:53 | 1   liability phase of this case has no natural |
| 15:23:58 | 2   relationship to what I did. |
| 15:23:59 | 3   Q.   MR. SWANSON:  Can you take a look at |
| 15:24:00 | 4   Exhibit 7, what would be the second page.  Do you |
| 15:24:05 | 5   note the date of Professor Wickelgren's declaration? |
| 15:24:12 | 6   A.   Well, the first one I noticed was August of |
| 15:24:14 | 7   2012. I don't know when this one is. |
| 15:24:20 | 8   Q.   Just the second page.  This would be -- |
| 15:24:23 | 9   A.   Okay.  So this one in June.  This is prior to |
| 15:24:26 | 10   the issuance of the opinion. |
| 15:24:27 | 11   Q.   So your -- your view is that Dr. Wickelgren's |
| 15:24:32 | 12   work is necessarily irrelevant because it didn't rely |
| 15:24:38 | 13   on the Court's opinion? |
| 15:24:40 | 14   MR. FRIEDMAN:  Objection, form. |
| 15:24:41 | 15   THE WITNESS:  No, I didn't say it was |
| 15:24:43 | 16   irrelevant.  I don't know for sure that it's |
| 15:24:45 | 17   irrelevant.  You asked me if I had a burning desire |
| 15:24:49 | 18   to read his reports, and I don't.  If there's |
| 15:24:54 | 19   something in them that is directly comparable to what |
| 15:24:57 | 20   I did, then obviously I should read it, but I'm not |
| 15:25:02 | 21   aware of that being true.  I don't know that it's |
| 15:25:05 | 22   true, and so I can't answer questions about it; and |
| 15:25:13 | 23   I'm not going to bill some client for reading |
| 15:25:16 | 24   something that's irrelevant if it isn't and so -- and |
| 15:25:21 | 25   I would certainly not read it outside the context |

231

| | |
|---|---|
| 15:25:23 | 1   of litigation. |
| 15:25:24 | 2   So I just don't see a point here.  But if it |
| 15:25:28 | 3   is -- if it is a valid damages model, I'm sure I'm |
| 15:25:31 | 4   going to see it in your expert reports and then I'll |
| 15:25:35 | 5   have an opportunity to reply to it.  The best expert |
| 15:25:40 | 6   reports for me to deal with are going to be the ones |
| 15:25:44 | 7   that you produce, not the ones that were produced for |
| 15:25:46 | 8   settlement in something else months ago. |
| 15:25:50 | 9   Q.   MR. SWANSON:  Let me -- you can put those to |
| 15:25:57 | 10   one side.  I ask you, you have a category of damage |
| 15:26:09 | 11   quantification that includes consumers with foreign |
| 15:26:12 | 12   addresses who are not members of the military. |
| 15:26:15 | 13   A.   Yes. |
| 15:26:16 | 14   Q.   And can you tell me what percentage of your |
| 15:26:23 | 15   overall damage calculation that those -- or that |
| 15:26:28 | 16   group represents? |
| 15:26:29 | 17   A.   It's in the report and I haven't memorized |
| 15:26:32 | 18   the number.  My recollection is a few percent, but I |
| 15:26:35 | 19   don't remember the exact number. |
| 15:26:35 | 20   Q.   It's in your report.  Could you just find it |
| 15:26:39 | 21   for us?  That would be Deposition Exhibit 1. |
| 15:26:50 | 22   A.   I don't remember where it is. |
| 15:26:52 | 23   MR. HUBBARD:  The very last. |
| 15:26:53 | 24   THE WITNESS:  Of the exhibits? |
| 15:26:56 | 25   MR. HUBBARD:  Yes. |

232

| | |
|---|---|
| 15:26:57 | 1   THE WITNESS:  I think it's also in the main |
| 15:26:59 | 2   body. |
| 15:27:01 | 3   Q.   MR. SWANSON:  Yeah, I think it's in both |
| 15:27:03 | 4   places, but if you can find it at the end, that's |
| 15:27:06 | 5   great. |
| 15:27:06 | 6   A.   Subtotal for unidentified foreign is |
| 15:27:09 | 7   6.3 percent. |
| 15:27:11 | 8   Q.   And what -- what dollar amount does that |
| 15:27:13 | 9   correspond with? |
| 15:27:14 | 10   A.   19.5 million. |
| 15:27:19 | 11   Q.   And you're looking at the second page of |
| 15:27:25 | 12   Exhibit 3 to your report which is Deposition |
| 15:27:29 | 13   Exhibit 1, correct? |
| 15:27:32 | 14   A.   Correct. |
| 15:27:33 | 15   Q.   And that 19.5 million is the figure on this |
| 15:27:43 | 16   Exhibit 3 to your report that is associated with |
| 15:27:48 | 17   subtotal for unidentified, right? |
| 15:27:50 | 18   A.   Yes. |
| 15:27:51 | 19   Q.   But those are identified as being not U.S. |
| 15:27:59 | 20   purchasers? |
| 15:28:00 | 21   A.   Yes. |
| 15:28:01 | 22   Q.   And excluded territories?  What does that |
| 15:28:08 | 23   refer to? |
| 15:28:08 | 24   A.   That refers to -- and they're listed in the |
| 15:28:16 | 25   report -- I can't remember them by name, three |

233

| | |
|---|---|
| 15:28:19 | 1   territories that are not listed in the state |
| 15:28:21 | 2   complaint and not members of the class. |
| 15:28:23 | 3   Q.   And then the subtotal for the plaintiff |
| 15:28:26 | 4   states, that's a number of about 170.6 million; is |
| 15:28:32 | 5   that correct? |
| 15:28:32 | 6   A.   Yes. |
| 15:28:32 | 7   Q.   And that corresponds to what? |
| 15:28:34 | 8   A.   That corresponds to the 55.4 percent of sales |
| 15:28:44 | 9   that are accounted for by those states, the damages |
| 15:28:48 | 10   associated with those sales. |
| 15:28:50 | 11   Q.   And the subtotal for class states, that's |
| 15:28:56 | 12   116.7 million? |
| 15:28:57 | 13   A.   Yeah, that's the same -- this is the other |
| 15:29:00 | 14   states that are not represented in the state |
| 15:29:02 | 15   complaint.  Class members live in those states. |
| 15:29:08 | 16   Q.   And in each instance, either the subtotal for |
| 15:29:11 | 17   plaintiff states or the subtotal for class states, |
| 15:29:15 | 18   that is your best opinion as to what the total damage |
| 15:29:18 | 19   was to consumers in those respective categories? |
| 15:29:23 | 20   A.   Yes, that's my estimate of damages in those |
| 15:29:25 | 21   categories of states. |
| 15:29:26 | 22   Q.   Do you have any margin of error that attaches |
| 15:29:29 | 23   to your estimates of either of those numbers? |
| 15:29:32 | 24   A.   No, I do not. |
| 15:29:38 | 25   Q.   When in your report you were addressing the |

59 (Pages 230 to 233)

## 234

```
15:29:56   1   subject of dead-weight loss, you made reference to
15:30:01   2   Dr. Ashenfelter's finding that the average increase
15:30:04   3   in prices for the publisher defendants relative to
15:30:07   4   Random House titles was 16.8 percent and the relative
15:30:11   5   decline in unit sales was 14.5 percent.
15:30:14   6       Do you recall that?
15:30:14   7   A.   Yes.
15:30:15   8   Q.   And for purposes of that discussion, you
15:30:19   9   assumed that Random House provides a competitive
15:30:23  10   benchmark for prices of sales in e-books that were
15:30:27  11   sold by the publisher defendants during the agency
15:30:30  12   period?
15:30:30  13   A.   Yes.
15:30:30  14   Q.   Is that anything more than an assumption for
15:30:35  15   purposes of discussing dead-weight loss or --
15:30:38  16   A.   No, that discussion is premised on sort of
15:30:40  17   average values.  It wouldn't apply to any particular
15:30:46  18   publisher, any particular title or any particular
15:30:50  19   thing.  It's just an average across all of them.
15:30:53  20   Q.   You state in your report, and I think this is
15:31:02  21   at page 12, that:
15:31:03  22       "...the Court found that 'it is
15:31:05  23       abundantly clear, and not surprising, that
15:31:07  24       each of the Publisher Defendants lost sales
15:31:10  25       of e-books due to the price increases.'"
```

## 235

```
15:31:12   1   A.   Where are you?
15:31:13   2   Q.   I am at page 12.
15:31:28   3       MR. FRIEDMAN:  Last sentence, page 12.
15:31:30   4       MR. SWANSON:  Hmm?
15:31:31   5       MR. FRIEDMAN:  Last sentence, page 12.
15:31:33   6       MR. SWANSON:  Thank you.
15:31:33   7       MR. FRIEDMAN:  You're welcome.
15:31:34   8       THE WITNESS:  You're reading a quote from the
15:31:36   9   opinion.
15:31:36  10   Q.   MR. SWANSON:  Yes, where you're --
15:31:39  11   A.   I'm quoting the opinion here and you read the
15:31:41  12   quote.  I didn't recognize those as the way I would
15:31:43  13   write something.  So that's why I asked for the
15:31:46  14   citation because it sounded to me like I was quoting
15:31:49  15   somebody else.
15:31:49  16   Q.   Yeah, I appreciate that.  Now, is it your
15:31:52  17   understanding that the Court quantified the amount of
15:31:55  18   sales of e-books that were lost by the publisher
15:31:58  19   defendants?
15:31:58  20   A.   No, the reason I didn't proceed to this
15:32:01  21   exercise is to use the data that the Court cited to
15:32:04  22   produce an illustrative calculation.
15:32:07  23   Q.   And are you able to identify a particular
15:32:11  24   quantity of lost sales for purposes of your analysis?
15:32:16  25   A.   I don't understand the question.  The
```

## 236

```
15:32:19   1   calculation is an overall estimate of the decline in
15:32:23   2   sales arising from the price increase based on the
15:32:25   3   data in the opinion.  It's nothing more and nothing
15:32:29   4   less.  So I don't know what beyond that you think it
15:32:31   5   might be that I was attempting here.
15:32:34   6   Q.   Let me ask you to turn back to Exhibit 4.
15:32:50   7   A.   Back to the computer program.
15:32:52   8   Q.   Right.  Can you confirm that this is the
15:32:58   9   Stata code that runs your model?
15:33:00  10   A.   Well, it's been represented to me as such.
15:33:03  11   I'm not the one who actually ran the model, so --
15:33:08  12   but, yes, I've been told that it is.
15:33:10  13   Q.   Can you program in this software language?
15:33:12  14   A.   I could.  I don't know that I could do it
15:33:14  15   today because I now rely upon my research assistants
15:33:17  16   to do it.
15:33:17  17   Q.   When was the last time you coded in this
15:33:20  18   software language?
15:33:21  19   A.   A while.  A long time ago.  Several years.
15:33:24  20   Q.   Let me ask you to turn to line 77.  Do you
15:33:42  21   see the merge command in there?
15:33:43  22   A.   Yeah.
15:33:44  23   Q.   Your program is merging the data here,
15:33:47  24   correct?
15:33:47  25   A.   That's right.  Creating a larger data set
```

## 237

```
15:33:50   1   from smaller data sets.
15:33:51   2   Q.   Can you identify what kind of data was merged
15:33:54   3   here?
15:33:54   4   A.   No, I don't remember what all these mnemonics
15:34:00   5   refer to.  There was a time when I knew, but I don't
15:34:06   6   remember what the mnemonics mean now.
15:34:09   7   Q.   Let me ask you to turn to line 181.  Can you
15:34:29   8   tell me what that does?
15:34:34   9   A.   Well, this is simply stating all the
15:34:36  10   variables that are to be included in a regression;
15:34:39  11   and if, again, you're going to ask me how the
15:34:49  12   mnemonics correspond to the actual variables, I don't
15:34:53  13   remember.
15:34:53  14   Q.   So you can't -- is it true you just don't --
15:34:56  15   you don't know or you don't remember?  I mean, in
15:34:58  16   other words, did you -- were you involved in --
15:35:01  17   A.   In naming the variables, no.  I was involved
15:35:04  18   in telling them what variables to include, and some
15:35:06  19   of them are obvious.  Like under 90 days is a fairly
15:35:10  20   obvious mnemonic, but others are not obvious.  Again,
15:35:15  21   I'm not going to remember from memory what they all
15:35:19  22   are.
15:35:19  23       What my role was to describe in words the
15:35:23  24   variables to go in the regression and then to be
15:35:25  25   certain that what they that the regression output
```

60 (Pages 234 to 237)

**238**

| | | |
|---|---|---|
| 15:35:28 | 1 | contained.  It wasn't to write the code and to name |
| 15:35:30 | 2 | the variables in the code. |
| 15:35:31 | 3 | Q.    Can you tell me what calculation is being |
| 15:35:36 | 4 | performed in line 1 and 2? |
| 15:35:37 | 5 | A.    I think -- I'm not sure, but I think what |
| 15:36:22 | 6 | they're doing here is calculating the difference in |
| 15:36:26 | 7 | the predicted collusive price and the but-for |
| 15:36:32 | 8 | collusive price. |
| 15:36:34 | 9 | Q.    How uncertain are you? |
| 15:36:36 | 10 | A.    I don't know what -- I said I'm doing the |
| 15:36:39 | 11 | best I can, but obviously I cannot remember what this |
| 15:36:42 | 12 | particular line of code does.  I don't remember -- I |
| 15:36:47 | 13 | don't even think I may have ever known what |
| 15:36:50 | 14 | particular line of code made which particular |
| 15:36:53 | 15 | calculation.  So I've never examined this code on a |
| 15:36:56 | 16 | line-by-line basis to try to figure out what every |
| 15:36:59 | 17 | single line does. |
| 15:37:00 | 18 | Q.    This -- this is the implementation of your |
| 15:37:05 | 19 | regression model, correct? |
| 15:37:07 | 20 | A.    Yes. |
| 15:37:08 | 21 | Q.    And this is what a jury would have to endorse |
| 15:37:11 | 22 | in order to calculate on your view individual damages |
| 15:37:15 | 23 | for the members of the class and the consumers in the |
| 15:37:18 | 24 | plaintiff states? |
| 15:37:19 | 25 | MR. FRIEDMAN:  Objection, form. |

**239**

| | | |
|---|---|---|
| 15:37:21 | 1 | THE WITNESS:  This code implements the |
| 15:37:24 | 2 | regression model that I instructed the people working |
| 15:37:28 | 3 | for me at Ashenfelter & Ashmore to undertake. |
| 15:37:35 | 4 | Remembering the specific names -- what all the |
| 15:37:38 | 5 | specific names refer to, I'm not going to be able to |
| 15:37:40 | 6 | do that and I'm not going to attempt to.  It's not |
| 15:37:45 | 7 | that -- in my task. |
| 15:37:47 | 8 | Q.    MR. SWANSON:  So if I go through line 209 or |
| 15:37:50 | 9 | any of the other hundred and 20 possible variables |
| 15:38:00 | 10 | that are reflected in here -- |
| 15:38:05 | 11 | A.    A lot of them are obvious.  You're picking |
| 15:38:07 | 12 | things that are especially inobvious.  All right? |
| 15:38:11 | 13 | And so -- of course.  You know, you hand me something |
| 15:38:15 | 14 | with a long list of variables in it, I'm not going to |
| 15:38:19 | 15 | remember everything in it by memory.  I'd be foolish |
| 15:38:21 | 16 | to even try. |
| 15:38:22 | 17 | Q.    What is 209? |
| 15:38:24 | 18 | A.    I haven't looked at it yet.  I have no idea |
| 15:38:46 | 19 | what it is. |
| 15:38:47 | 20 | Q.    Going back to line 192, you testified that |
| 15:38:53 | 21 | you calculated actual minus predicted price, right? |
| 15:38:57 | 22 | A.    Yeah, that -- the actual minus predicted is |
| 15:39:03 | 23 | what's in the report because I told you earlier there |
| 15:39:06 | 24 | is this alternative way that this was an estimate of |
| 15:39:10 | 25 | it.  There was also an estimate of it made, but it |

**240**

| | | |
|---|---|---|
| 15:39:13 | 1 | wasn't the correct way to do it.  So it's not |
| 15:39:16 | 2 | reported. |
| 15:39:16 | 3 | Q.    Well, isn't line 192 but-for minus predicted? |
| 15:39:22 | 4 | A.    Yeah, but the but-for is a prediction.  I |
| 15:39:27 | 5 | mean the but-for price is the price that would |
| 15:39:30 | 6 | pertain in the absence of collusion, and so it has to |
| 15:39:35 | 7 | be estimated. |
| 15:39:35 | 8 | Q.    Yes.  And I said is this not calculating the |
| 15:39:39 | 9 | but-for price minus the predicted actual price. |
| 15:39:43 | 10 | A.    Predicted is the crucial word.  It's not the |
| 15:39:47 | 11 | actual price.  It's the predicted price.  I mean, I'm |
| 15:39:51 | 12 | not certain that that mnemonic refers to this because |
| 15:39:56 | 13 | I don't know what mnemonic was assigned to, A, the |
| 15:40:00 | 14 | actual price or, B, the predicted actual price after |
| 15:40:04 | 15 | collusion.  So I don't know what terminology was used |
| 15:40:07 | 16 | in communicating with the computer to convey the |
| 15:40:13 | 17 | notion of calculating the damages. |
| 15:40:13 | 18 | So I just don't remember what -- and I -- I |
| 15:40:19 | 19 | did see such a list a long time ago, but I certainly |
| 15:40:23 | 20 | didn't attempt to memorize it. |
| 15:40:24 | 21 | Q.    Is it possible that the coding implemented |
| 15:40:27 | 22 | your methodology in a different way than you |
| 15:40:29 | 23 | intended? |
| 15:40:30 | 24 | A.    It's perfectly conceivable, but -- I can |
| 15:40:36 | 25 | certainly ask them and find out if they screwed up |

**241**

| | | |
|---|---|---|
| 15:40:39 | 1 | and didn't do what I told them to do.  That's |
| 15:40:42 | 2 | certainly a possibility. |
| 15:40:43 | 3 | Q.    And who would be the person to ask that? |
| 15:40:47 | 4 | Would that be Mr. Ashmore? |
| 15:40:49 | 5 | A.    Well, would be three or four people, but he'd |
| 15:40:52 | 6 | be the one I asked first, yes. |
| 15:40:54 | 7 | Q.    And he was the one you relied upon to |
| 15:40:56 | 8 | faithfully implement your methodology? |
| 15:40:58 | 9 | A.    Well, they're all being relied on.  I mean, |
| 15:41:01 | 10 | that's not fair.  Everybody's relied on, including |
| 15:41:06 | 11 | Orley Ashenfelter.  He was involved with this as |
| 15:41:10 | 12 | well. |
| 15:41:10 | 13 | Q.    Do you hold any opinions to which you intend |
| 15:41:19 | 14 | to testify at trial that were not set forth in your |
| 15:41:22 | 15 | declaration or discussed in this deposition? |
| 15:41:23 | 16 | A.    I don't think so.  You might try me, but I |
| 15:41:26 | 17 | think I've expressed all my opinions. |
| 15:41:29 | 18 | Q.    It has been your intent to disclose them all |
| 15:41:31 | 19 | in your report and answer my questions obviously |
| 15:41:35 | 20 | today. |
| 15:41:36 | 21 | A.    Yes, I have attempted to answer -- to |
| 15:41:39 | 22 | disclose everything that I have done, all the |
| 15:41:41 | 23 | opinions that I have. |
| 15:41:43 | 24 | Q.    Do you have any plans to revise your |
| 15:41:46 | 25 | declaration as you sit here today? |

61 (Pages 238 to 241)