# EXHIBIT A

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: ELECTRONIC BOOKS ANTITRUST LITIGATION | No. 11-md-02293 (DLC) ECF Case |
| THE STATE OF TEXAS, et al., Plaintiffs v. PENGUIN GROUP (USA), INC., et al., Defendants | No. 12-cv-03394 (DLC) ECF CASE |

**CORRECTED DECLARATION OF JONATHAN ORSZAG**

**November 25, 2013**

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

CONTENTS

I. Qualifications ........................................................................................................................ 3

II. Assignment and Summary of Conclusions ........................................................................... 4

III. Background ........................................................................................................................... 5

    A. Amazon and Sony in the pre-conduct period .......................................................... 8

    B. Introduction of Barnes & Noble's Nook and Apple's iPad ....................................... 10

IV. Overview of Professor Noll's Damages Model .................................................................... 12

V. Professor Noll's Econometric Model Overstates the Increase in e-Book Prices During the Damages Period .................................................................................................................................. 14

    A. Professor Noll's econometric model uses an inappropriate control group ............... 15

    B. Professor Noll's econometric results are sensitive to the choice of pre-agency time period .... 18

    C. Professor Noll's econometric model generates lower estimated agency price effects when using a sample more similar to Professor Ashenfelter's sample .................................. 20

VI. Professor Noll incorrectly characterizes the but-for world and ignores the change in Amazon's and other retailers' economic incentives .......................................................................... 22

    A. Amazon's *pre-conduct* business strategy: ████████████████████████ 24

    B. Amazon's *post-conduct* business strategy in the actual world: ████████████ ██████████ .......................................................................................................... 26

    C. But-for world: a change in business strategy at Amazon and other retailers would have also occurred absent the alleged conspiracy .......................................................... 29

    D. As complementary products, e-book and e-reader prices are related: Allegedly collusive price increase in e-books had the effect of reducing device prices .............................. 35

    E. A quantification of the relationship between e-book and device prices shows that Professor Noll's model substantially overstates damages suffered by consumers ....................... 37

VII. Professor Noll ignores other offsetting effects from the move to agency ........................... 42

    A. The growth in self-publishing would not have occurred to the same extent in the absence of Apple's agency agreements with publishers ......................................................... 42

    B. The agency period was accompanied by an expansion in free e-book offerings ........ 47

    C. Professor Noll incorrectly includes in his damages model all e-book sales from Apple's iBookstore ................................................................................................................. 51

    D. Without a change in its business model, Barnes & Noble's existing e-book business would have been unsustainable ...................................................................................................... 53

**CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER**

VIII.  Conclusion and Summary of Damages Calculations ............................................................... 56

Appendix A:  Curriculum Vitae - Jonathan M. Orszag

Corrected Appendix B:  Materials Relied Upon

Appendix C:  Additional Figures and Tables

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

## I.    Qualifications

1. My name is Jonathan Orszag. I am a Senior Managing Director and member of the Executive Committee of Compass Lexecon, LLC, an economic consulting firm. My services have been retained by a variety of public-sector entities and private-sector firms ranging from small businesses to Fortune 500 companies. These engagements have involved a wide array of matters, from entertainment and telecommunications issues to issues affecting the sports and retail industries. I have provided testimony to the U.S. Congress, U.S. courts, the European Court of First Instance, the Federal Communications Commission ("FCC"), and other domestic and foreign regulatory bodies on a range of issues, including competition policy, industry structure, and fiscal policy.

2. Previously, I served as the Assistant to the U.S. Secretary of Commerce and Director of the Office of Policy and Strategic Planning and as an Economic Policy Advisor on President Clinton's National Economic Council. For my work at the White House, I was presented the Corporation for Enterprise Development's 1999 leadership award for "forging innovative public policies to expand economic opportunity in America."

3. I am a Fellow at the University of Southern California's Center for Communication Law & Policy and a Senior Fellow at the Center for American Progress. I received an M.Sc. in economic and social history from Oxford University, which I attended as a Marshall Scholar. I graduated *summa cum laude* in economics from Princeton University, was elected to Phi Beta Kappa, and was named to the *USA Today* All-USA College Academic Team.

4. While I served in the federal government, I worked on a number of policy issues involving the technology sector, including how the federal government could promote access to the Internet and issues related to the export of high-speed computers.

5. Since leaving government, I have been active in applied analysis of issues affecting the technology sector. For example, I recently published a paper about the consumer benefits associated with increased access to broadband. I have also worked on numerous mergers involving hardware, software, and Internet companies and I have worked on litigation matters involving the same sectors, including testifying before the European Court of First Instance about Microsoft's anticompetitive conduct in the seminal *Microsoft v. European Commission* case. In addition, among other technology firms, I have consulted for IBM, Microsoft, Yahoo!, Google, Oracle, Hewlett-Packard, AT&T, RealNetworks, nVidia, Equinix, RealNetworks, and Micron.

6. Finally, I have testified or consulted on the damages phase of a number of disputes in a range of industries, such as software, computer servers, airlines, sports, pay television, medical devices, and credit cards.

7. My full *curriculum vitae*, including prior testimony, is included as Appendix A. The hourly rate charged by Compass Lexecon for my work on this matter is $895. I have a financial interest in the overall profitability of the firm, but I have no financial interest in the outcome of this case.

3

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

## II.    Assignment and Summary of Conclusions

8.    I have been asked by counsel for Apple Inc. ("Apple") to estimate damages incurred by the Plaintiffs due to Apple's alleged anticompetitive conduct, as determined by this Court in its *Opinion and Order*.[1] I have also been asked to review the report submitted on behalf of Plaintiffs in this matter by Professor Roger Noll and to assess and respond to his arguments as they pertain to damages allegedly incurred by Plaintiffs in this matter.[2]

9.    I assume for the purposes of my analysis that "Apple conspired to raise the retail price of e-books."[3] The time period selected by Plaintiffs for assessing damages is April 1, 2010 to May 21, 2012.[4]

10.    I reach the following conclusions with respect to damages incurred as a result of Apple's alleged anticompetitive actions:

- *The actual harms suffered by consumers as a result of Apple's allegedly anticompetitive conduct are modest*: I use an econometric model similar to Professor Orley Ashenfelter's and make several improvements to it (some of which Professor Noll proposes in his report).[5] These improvements have only a small effect on its conclusions about overall average price effects. I then account properly for the incentives market participants would have had in the absence of the allegedly anticompetitive conduct. Based on this analysis, I conclude that damages to consumers resulting from Apple's allegedly anticompetitive conduct were not more than $30 million. Moreover, I present illustrative calculations of the impacts of the other offsetting benefits to consumers that indicate that my estimate of damages is likely to be conservative (i.e., overstate any harm to consumers).

- *Professor Noll's econometric model relies on inappropriate assumptions, which cause him to overstate substantially the effect of agency contracts on e-book prices*: Professor Noll compares the pricing of e-books sold by the Publisher Defendants[6] with a so-called control group of e-

---

[1]    On July 10, 2013, the Court found that Apple conspired to restrain trade in violation of Section 1 of the Sherman Act and relevant state statutes. (See Opinion & Order, *United States v. Apple Inc., et al.*, No. 12-cv-02826-DLC; *State of Texas, et al., v. Penguin Group (USA) Inc., et al.*, No. 12-cv-03394-DLC (S.D.N.Y. July 10, 2013) (hereinafter, *Opinion and Order*), at 159.) I understand that Apple is appealing this ruling.

[2]    See Corrected Declaration of Roger G. Noll, October 18, 2013 (hereinafter, *Noll Report*).

[3]    *Opinion and Order*, at 5.

[4]    Professor Kalt explains in his Declaration why Professor Noll's methodology cannot be used to calculate damages on a group-wide basis. For a discussion of issues related to class certification and damages, see Declaration of Joseph P. Kalt, PhD, November 15, 2103 (hereinafter, *Kalt Declaration*).

[5]    See Report of Orley Ashenfelter, February 8, 2013 (hereinafter, *Ashenfelter Report I*), Section V; Rebuttal Report of Orley Ashenfelter, March 1, 2013 (hereinafter, *Ashenfelter Report II*), Section V; Direct Testimony of Orley C. Ashenfelter, Ph.D., April 25, 2013 (hereinafter, *Ashenfelter Testimony*), Section V.

[6]    The Publisher Defendants are Hachette Book Group, Inc. ("Hachette"), HarperCollins Publishers LLC ("HarperCollins"), Holtzbrinck Publishers LLC d/b/a Macmillan ("Macmillan"), Penguin Group (USA), Inc. ("Penguin"), and Simon & Schuster, Inc. ("Simon & Schuster" or "S&S").

4

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

books sold by other publishers. However, the e-books sold by the other publishers in Professor Noll's control group, while in the same relevant market and substitutes to a certain extent, are subject to different economic forces than those sold by the Publisher Defendants. Moreover, Professor Noll includes data from non-representative time periods in his control group. Both of these issues cause Professor Noll to overstate substantially the impact of agency contracts on the prices of e-books sold by the Publisher Defendants. Correcting these issues, by using a model more similar to the one used by Professor Ashenfelter in the first phase of this litigation, leads to the conclusion that the agency price effect is substantially lower than claimed by Professor Noll.

- *Professor Noll's damages analysis is incomplete and inconsistent with his own testimony, which suggests that damages were substantially lower than he estimates*: While acknowledging that e-books and e-readers are complementary products whose prices are inextricably linked, Professor Noll ignores completely the implications of this fact when assessing damages. Instead, he focuses only on the impact on e-book prices in isolation. Properly accounting for the impact of the agency contracts on the pricing incentives of e-books and e-readers sold via Amazon.com ("Amazon") and other retailers leads to the conclusion that Professor Noll substantially overstates the harm to consumers from Apple's actions.

- *Professor Noll's damages analysis ignores other offsetting benefits to consumers*: The evidence shows that the move to agency contracts created a number of other changes in the industry that benefited consumers, including the introduction of Apple's iBookstore with the launch of the iPad, which helped lead to an increase in self-publishing and the availability of free e-books, and the sustainability of Barnes & Noble as a viable competitor. While some of these outcomes would likely have occurred to a certain extent but-for the agency contracts, the evidence is clear that these benefits would not have accrued to consumers to the same degree in the absence of the agency contracts. Professor Noll ignores these factors, which further undermine his damages analysis. Illustrative examples provided in this report show that the exclusion of these offsetting benefits for consumers means that Professor Noll may have overstated damages by millions, if not tens of millions, of dollars.

11. In the following sections, I describe in more detail the facts and analyses that lead to these conclusions. A list of the materials I have relied on in forming my opinions is included as Corrected Appendix B. My opinions and estimates may be revised in light of any new evidence that may emerge. I, therefore, reserve the right to incorporate such evidence into my analysis.

## III.   Background

12. The publishing industry has experienced dramatic change in recent years as consumers have shifted toward reading more content in a digital format. Publishers now release titles in a variety of formats, including hardcover, trade paperback, mass-market paperback, audio (e.g., Books on Tape),

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

book applications (or "apps"), and e-books.[7] Consumers purchase physical books through a retailer, either a traditional brick-and-mortar store (e.g., Barnes & Noble, Walmart, or smaller independent bookstores) or an online retailer (e.g., Amazon or Barnes & Noble's online site BN.com). A consumer can also purchase an e-book online through an e-bookstore, such as Amazon's Kindle Store, Barnes & Noble's Nook Book Store, or Apple's iBookstore.[8]

13.    Plaintiffs have defined the relevant market in this case as trade e-books (i.e., general interest fiction and non-fiction e-books) sold in the United States.[9] I make the same assumption for purposes of this report. Print and digital trade books make up approximately 55 percent of U.S. book publishers' revenues.[10] In the United States, Hachette, HarperCollins, Macmillan, Penguin, and Simon & Schuster, and Random House, Inc. ("Random House") represent the largest trade book publishers.[11] According to the Association of American Publishers ("AAP"), in 2012, trade book sales were approximately $15 billion, of which approximately 20 percent ($3 billion) were e-books.[12] As a result of the growth in e-book sales from 2008 to 2012, total sales of trade books increased by 14 percent, despite decreasing print book sales.[13]

14.    An e-book can be purchased online and downloaded to a variety of electronic devices, including dedicated e-readers, general-use tablet computers, personal computers, or other types of mobile devices, such as smartphones.[14] The type of device used may limit the retailer from which the e-book can be purchased.[15] For example, Apple allows an iPad user to download third-party apps (e.g.,

---

[7]    Many books are released simultaneously in hardcover print and e-book formats with a trade and/or mass-market paperback edition released a year or so later.

[8]    E-books have been around since the 1970s, but did not become a commercially viable format until the release of the Sony Reader in 2006 and Amazon's Kindle in 2007. (MAC0038365-402, at 381; SEL-R-1357315-19, at 16; PEN379983-86; and PEN-LIT-00159549-68.)

[9]    Opinion and Order, at 121, n. 60.

[10]    Other categories of books include academic textbooks, reference materials, and other texts. See Jim Milliot, "Trade Sales Rose 6.9% in 2012," PublishersWeekly.com, May 15, 2013.

[11]    Collectively, I will refer to the Publisher Defendants and Random House as the "Big 6" publishers. Random House is the largest of the Big 6, followed, in descending order of size, by Penguin, Simon & Schuster, HarperCollins, Hachette, and Macmillan. During 2010, the Publisher Defendants represented approximately 47 percent of the total e-book revenues. Random House merged with Penguin in July 2013. (See Publishers Weekly, "Random House, Penguin Merger Completed," July 1, 2013.)

[12]    Jim Milliot, "Trade Sales Rose 6.9% in 2012," PublishersWeekly.com, May 15, 2013.

[13]    During this period, sales of print books fell 8.4 percent, from approximately $13 billion to just over $12 billion. (Jim Milliot, "BEA 2013: The E-book Boom Years," PublishersWeekly.com, May 29, 2013.)

[14]    In this report, I generally refer to e-reader devices to include dedicated e-readers (such as the Kindle or the Nook) and general use tablets (such as the iPad or the Kindle Fire).

[15]    Some independent e-book retailers do not have a hardware or software platform of their own, but partner with another firm to provide e-reader support. For instance, independent book retailers (such as Powells) partnered with Kobo. When customers go to the retailers' web site or Kobo's own bookstore and

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

the Kindle App for the iPad) such that, in addition to being able to read e-books purchased from Apple's iBookstore, the user can also read e-books purchased from Amazon, Barnes & Noble, and several other retailers. On the other hand, dedicated e-readers such as the Kindle typically do not allow a user to download third-party apps. Consequently, a consumer with a dedicated e-reader cannot access e-books from another retailer (e.g., an e-book purchased from Apple's iBookstore or Barnes & Noble's Nook Book Store cannot be accessed through Amazon's Kindle e-reader).[16]

15. Through the Kindle platform, Amazon is the largest e-book retailer. The next largest e-book retailers are Barnes & Noble, which introduced its Nook platform in November 2009, and Apple, which introduced its iBookstore in April 2010.[17] Other smaller players in the e-book/e-reader market include Sony (although Sony has recently exited the U.S. market), Kobo, Books-A-Million ("BAM"), and Google (see Figure III-1).[18]

---

purchase an e-book, the title is downloaded to their Kobo reading device or Kobo reading app on another device. In addition, some brick-and-mortar retailers sell the Kobo reading devices at their stores. (See Kobo Café, "Kobo and Independent Bookstores Join Forces to Expand eReading Across the U.S., Kobo.com," August 29, 2012, *available at* http://cafe.kobo.com/press/releases/kobo-and-independent-bookstores-join-forces-to-expand-ereading-across-the-u-s. See also Indiebound, "Independent Bookstores Selling Kobo eReaders and eBooks," *available at* http://www.indiebound.org/ebooks; and Powell's Books, "Kobo," *available at* http://www.powells.com/kobo.)

[16] Some retailers also provide their e-books in universal formats (e.g., PDF) or a variety of formats readable on an array of devices, such as Scribd. (See Scribd, "About us", available at http://www.scribd.com/about.)

[17] During 2009, Amazon reached a 90 percent share of e-book revenues. ███████████████████████ ███████████████████████

[18] For the growth in total paid e-books, see Appendix C, Figure C-1. In September 2013, Sony confirmed that it would not be selling its latest e-reader device, the PRS-T3, in the United States. (Michael Kozlowski, "Sony Abandons the eReader Market in the United States," *GoodEreader.com*, September 26, 2013.)

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

**Figure III-1: E-Books Sold by Retailer (Paid e-books sold over 4-week periods, June 2008 – March 2012)**



## A.    Amazon and Sony in the pre-conduct period

16.    Sony launched the first e-reader device in the United States – the Sony Reader (a.k.a, PRS-500) – in September 2006.[19] Simultaneously, Sony launched its content store, with approximately 10,000 titles.[20] Demand for e-readers increased dramatically with Amazon's release of the Kindle in November 2007, which quickly became the market leader.[21] Amazon's Kindle bookstore featured more than 90,000 titles, including more than 90 percent of the books on *The New York Times*

---

[19]    See Barb Dybwad, "Sony Reader details and pics," *Engadget.com*, January 6, 2006. Sony had previously released the Libre e-reader in Japan in 2004. (See SEL00093124-44, at 26.) Sony also followed the PRS-500 a year later with the PRS-505, in October 2007. (See http://gdgt.com/sony/reader/prs-505/specs/.)

[20]    Barb Dybwad, "Sony Reader details and pics," *Engadget.com*, January 6, 2006.

[21]    "Introducing Amazon Kindle," *Amazon.com press release*, November 19, 2007, *available at* http://phx.corporate-ir.net/phoenix.zhtml?c=176060&p=irol-newsArticle&ID=1079388.

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

bestsellers list.[22] Amazon also initiated a business strategy of marketing certain new releases and bestsellers at $9.99.[23] (Subsequently, Amazon narrowed the window during which it priced these titles at $9.99 to ███████[24]

17. Amazon and Sony released new e-reader models in 2009.[25] Amazon also released the Kindle App for Apple's iPhone and iPod Touch.[26] While Sony reduced the prices of its *New York Times* bestsellers from $11.99 to $9.99 to match Amazon's prices, expanded its library to 120,000 titles, and allowed users to access more than one million free public-domain titles from Google, sales of Sony's Reader devices lagged far behind those of Amazon. [27, 28]

18. Prior to April 2010, Amazon and Sony acquired e-books from publishers through a wholesale pricing model. Under the wholesale model, the publisher set a suggested retail price (or list price) and then sold the e-books to retailers at a wholesale price, typically a percentage of the list price. The retailers then determined the retail price at which to offer the e-book to consumers.[29]

---

[22]   For more detail regarding the growth in e-book titles at Amazon's Kindle Store, see Trial Exhibit DX-463, *USA v. Apple Inc., et al.*, No. 12-CV-02826-DLC.

[23]   "Introducing Amazon Kindle," *Amazon.com press release*, November 19, 2007, *available at* http://phx.corporate-ir.net/phoenix.zhtml?c=176060&p=irol-newsArticle&ID=1079388.

[24]   See n. 119.

[25]   Amazon released the Kindle 2 and the Kindle DX (a larger screened version of the Kindle) in February 2009 and May 2009, respectively. In August 2009, Sony announced two new devices: the Reader Touch at $299 and the Reader Pocket at $199. (See "Introducing Amazon Kindle 2," *Amazon.com press release*, February 9, 2009 *available at* http://phx.corporate-ir.net/phoenix.zhtml?c=176060&p=irol-newsArticle&ID=1254544&highlight=; "Introducing Kindle DX – Amazon's Large Screen Addition to the Kindle Family of Wireless Reading Devices," *Amazon.com press release*, May 6, 2009, *available at* http://phx.corporate-ir.net/phoenix.zhtml?c=176060&p=irol-newsArticle_pf&ID=1285140&highlight=; and Motoko Rich and Brad Stone, "Sony to Cut E-Book Prices and Offer New Readers," *The New York Times*, August 4, 2009, SEL00060359-63, at 61-62.)

[26]   "Kindle for iPhone and iPod touch Now Available for Free From Apple's App Store," *Amazon.com press release*, March 4, 2009, *available at* http://phx.corporate-ir.net/phoenix.zhtml?c=176060&p=irol-newsArticle&ID=1262380&highlight=.

Sony did not release a reader app for Apple products until late 2012. (Dianna Dilworth, "Sony Releases iOS App For Reading," *Mediabistro.com*, November 6, 2012.)

[27]   See Motoko Rich and Brad Stone, "Sony to Cut E-Book Prices and Offer New Readers," *The New York Times*, August 4, 2009, SEL00060359-63, at 61-62; and SEL00063904-91, at 25. See also Andrea Nusca, "Sony, Google announce 1 million free books," *ZDNet*, July 29, 2009. Sony also expanded its library by signing deals with self-publishing content providers. (SEL00063904-91, at 25; SEL00033107-08; SEL00059764-68, at 64.)

[28]   See, e.g., Motoko Rich and Brad Stone, "Sony to Cut E-Book Prices and Offer New Readers," *The New York Times*, August 4, 2009, SEL00060359-63, at 61.

[29]   Publishers also used a wholesale model to sell print books.

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

## B.    Introduction of Barnes & Noble's Nook and Apple's iPad

19.    Barnes & Noble acquired e-book retailer Fictionwise in March 2009 and subsequently launched its own e-bookstore in July 2009, featuring a library of 700,000 titles (and an additional 500,000 free public domain titles).[30] Barnes & Noble priced new releases and bestsellers at $9.99.[31] In November 2009, Barnes & Noble introduced the Nook e-reader, which it sold at the same price ($259) as Amazon's Kindle.[32] Barnes & Noble's share of the e-book market grew rapidly during the first half of 2010, reaching approximately a █ percent market share, which it maintained in 2011 and 2012 (see Figure III-2).

20.    In December 2009, Apple executives had a first round of meetings with the Big 6 publishers.[33] During these meetings, Apple made it clear it would only enter the e-books market if it could earn profits on e-book sales and effectively compete with Amazon on selection and price.[34] Prior to the iPad launch, the five Publisher Defendants signed agency agreements with Apple.[35] Under the agency model, a publisher sets the retail price and the retailer sells the e-book as its agent. In its contracts with the Publisher Defendants, Apple earned a 30 percent commission on e-book sales, the same commission it earned on app sales in its App Store.[36]

---

[30]    Barnes & Noble released an upgraded Fictionwise reader app for most platforms (iPhone, iPod Touch, Blackberry, Windows, and Mac). See "Barnes & Noble Acquires Fictionwise," *Barnes & Noble press release*, March 5, 2009, *available at* http://www.barnesandnobleinc.com/press_releases/2009_march_5_fictionwise.html; "Barnes & Noble Launches World's Largest eBookstore; Introduces 'Every Device' Strategy; Upgrades eReader Application," *Barnes & Noble press release*, July 20, 2009, *available at* http://www.barnesandnobleinc.com/press_releases/2009_july_20_ebookstore.html.

[31]    "Barnes & Noble Launches World's Largest eBookstore; Introduces 'Every Device' Strategy; Upgrades eReader Application," *Barnes & Noble press release*, July 20, 2009, *available at* http://www.barnesandnobleinc.com/press_releases/2009_july_20_ebookstore.html.

[32]    "Barnes & Noble Introduces nook, its Wireless eBook Reader with E Ink Display & First Color Touch Screen for Navigation," *Barnes & Noble press release*, October 20, 2009, *available at* http://www.barnesandnobleinc.com/press_releases/2009_oct_20_nook.html.

[33]    Declaration of Eddy Cue (Apple), April 26, 2013 (hereinafter, *Cue Declaration (Apple)*), ¶38 and Deposition of Eddy Cue (Apple), January 25, 2011 (hereinafter, *Cue Deposition (Apple)*), 47:17-24 and Exhibit 1. Prior to the iPad's development, Apple CEO Steve Jobs did not believe Apple had a device that would make a great e-reader, and thus Apple had not entered the market. E-reading was possible on Apple products via stand-alone apps (which Apple considered flawed) and various e-reading apps, including Amazon's Kindle App and Barnes & Noble's e-reading App. (*Cue Declaration (Apple)*, ¶¶23-24.)

[34]    *Cue Declaration (Apple)*, ¶¶13, 28, 40-41, 50 and *Cue Deposition (Apple)*, 40:10-43:17, 48:17-49:13.

[35]    See APLEBOOK-00013101-23; APLEBOOK-00013040-65; APLEBOOK-00013025-39; APLEBOOK-00013082-100; and APLEBOOK-00013066-81. Random House eventually signed an agreement with Apple in January 2011. (See RH-USDOJ-00025408-30.)

[36]    The final agreements also included a Most Favored Nation ("MFN") clause, term length of one year, a clause forbidding windowing, and price caps for new releases and bestsellers. (See n. 35.)

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

21. Apple announced the iPad on January 27, 2010 and began to ship it on April 3, 2010.[37] The iBookstore was announced on the same day as the iPad. When it opened on April 3, 2010, Apple's iBookstore offered 60,000 titles, including approximately ■ percent of the current bestsellers.[38] Upon opening the iBookstore, Apple's share of paid e-book unit sales fluctuated between ■■■ ■ percent (see Figure III-2).

**Figure III-2: Shares of Paid e-Book Units by Retailer (January 2009 – March 2012)**



22. In January 2010, each Publisher Defendant also began to negotiate agency contracts with Amazon.[39] Amazon agreed to agency contracts with Hachette, HarperCollins, Macmillan, and Simon & Schuster

---

[37] "Apple Launches iPad," *Apple press release*, January 27, 2010, *available at* http://www.apple.com/pr/library/2010/01/27Apple-Launches-iPad.html; and "iPad Arrives This Saturday," *Apple press release*, March 29, 2010, *available at* http://www.apple.com/pr/library/2010/03/29iPad-Arrives-This-Saturday.html.

[38] See, e.g., APPLETX00018016.

[39] AMZN-MDL-0161098-103, at 100-101.

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

by the end of March 2010 and with Penguin by the end of May 2010.[40] Each Publisher Defendant also negotiated agency contracts with other retailers, including Barnes & Noble and Sony.[41]

## IV.    Overview of Professor Noll's Damages Model

23.    Professor Noll presents an econometric model that purports to show that prices of e-books sold by the Publisher Defendants would have been approximately 19.9 percent lower, on average, in the absence of the agency agreements than they were after the agency agreements went into effect.[42] Professor Noll then computes damages as the product of the quantity of e-book sales by the Publisher Defendants and the difference between the actual retail prices paid for those e-books and the but-for prices predicted by his econometric model, summed over all post-agency sales by Publisher Defendants during the damages period. On the basis of these calculations, Professor Noll concludes that the allegedly anticompetitive conduct resulted in approximately $308 million dollars in damages during the damages period.[43]

24.    The econometric model presented by Professor Noll is similar in many respects to the model presented by Professor Ashenfelter in the first phase of this litigation.[44] Both Professor Noll and Professor Ashenfelter rely on a "difference-in-differences" methodology that assesses the impact of the agency agreements by comparing the change (from pre- to post-agency) in the average price of e-books sold by Publisher Defendants to the change in the average price of e-books sold by a control group of non-Publisher Defendants, while also controlling for other observable characteristics of e-books.[45]

25.    However, Professor Ashenfelter concluded average price effects in the range of 15-17 percent "seem[] like[] a reasonable number."[46] Such a range is below the average price effect estimated by

---

[40]    See AMZN-TXCID-0000436-63; AMZN-TXCID-0000468-85; AMZN-TXCID-0000486-97; and AMZN-TXCID-0000543-60. Penguin did not sign its agency contract with Amazon until May 25, 2010 (the contract went into effect on June 2, 2010). (See AMZN-TXCID-0000345-65 at 62.) During the period between the iBookstore opening (April 3, 2010) and signing its agency agreement with Amazon, Penguin withheld all new release e-book titles from Amazon. (See AMZN-TXCID-0009984.)

[41]    See BN00104150-66; BN00104167-89; BN00046926-41; BN00104191-229; BN00104230-52; SEL-R-0013029-41; HC-TXAG-0906440-58; SEL-R-0001126-44; and SEL-R-1697218-37.

[42]    *Noll Report*, Exhibit 2.

[43]    *Id.*

[44]    See *Ashenfelter Report I*, Section V; *Ashenfelter Report II*, Section V.

[45]    *Noll Report* at 19-22. See also *Ashenfelter Report I*, ¶22. For a discussion of difference-in-differences models, see William H. Greene (2012), *Econometric Analysis*, 7th Ed., Prentice Hall: Boston, MA (hereinafter, *Greene (2012)*), Section 6.2.5.

[46]    Trial Transcript, *United States v. Apple Inc., et al.*, No. 12-cv-02826-DLC; *State of Texas, et al., v. Penguin Group (USA) Inc., et al.*, No. 12-cv-03394-DLC (S.D.N.Y) (hereinafter, *Trial Transcript*), Orley Ashenfelter, June 12, 2013, at 1496:21.

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

Professor Noll. There are a number of important differences in the implementation of the analyses that explain the different results.[47]

26.   These differences include (but are not limited to):

- Professor Noll includes data from all publishers (thereby using data from Random House *and* other non-Publisher Defendants in his control group), while Professor Ashenfelter included data only from the Publisher Defendants and Random House;

- Professor Noll includes data from the week of June 8, 2008 through the week of April 8, 2012, while Professor Ashenfelter used data only from 24 weeks before and after April 1, 2010;

- Professor Noll includes data from all retailers, while Professor Ashenfelter used data only from Amazon, Apple, and Barnes & Noble;[48]

- Professor Noll weights his regression results using sales quantities after April 1, 2010, while Professor Ashenfelter estimated unweighted regressions; and

- Professor Noll estimates average price differences between the prices of Publisher Defendants' e-books and those in the control group for multiple different categories of e-books (depending on the publisher and genre), while Professor Ashenfelter estimated a single average agency coefficient.

Some of these differences derive from the fact that Professor Noll is addressing damages issues while Professor Ashenfelter was not. Nonetheless, it is instructive to consider the impact of the different modeling choices. While several of the modeling decisions made by Professor Noll appear to be unobjectionable, others are inappropriate and cause him to overstate the impact of the agency agreements on the prices of the Publisher Defendants. I discuss the empirical implications of these modeling choices further in Section V.

---

Professor Ashenfelter reported the price effect as a percentage of but-for prices, whereas Professor Noll reports the price effect as a percentage of actual prices. To the extent that but-for prices are lower than actual prices, on average, the former approach yields a higher percentage (although the implied dollar amount is the same). Professor Ashenfelter's point estimate of 16.8 percent of but-for prices is equivalent to 14.4 percent of actual prices (i.e., Professor Ashenfelter claimed that but-for prices would have been 14.4 percent lower than actual prices, on average).

[47]   I also note that Professor Noll's estimated damages are approximately 40 percent higher than those estimated by Professor Abraham Wickelgren, an expert retained by the settling states to evaluate the settlement reached with the Publisher Defendants. (See Letter from Rebecca Fisher, Senior Assistant Attorney General, Texas, to The Honorable Denise L. Cote, *State of Texas, et al., v. Penguin Group (USA) Inc., et al.,* No. 12-cv-03394-DLC (S.D.N.Y. July 10, 2013). See also Declaration of Abraham L Wickelgren, Ph.D. Regarding Damages to Eligible Consumers and the Proposed Plan of Allocation, August 27, 2012 (hereinafter, *Wickelgren Declaration*).)

[48]   Professor Ashenfelter also estimated additional models that included data from Sony. (See *Ashenfelter Testimony*, ¶56.)

13

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

27.  Before discussing in further detail the specifics of Professor Noll's econometric model, it is worth noting that Professor Noll makes a number of assumptions in his damages analysis – most of which are implicit, since he does not lay out with any specificity his key assumptions. In particular, Professor Noll implicitly assumes at least the following:

- The prices of e-books sold by non-Publisher Defendants were unaffected by the alleged conspiracy;[49]

- But-for the shift to agency contracts, the relative prices of e-books sold by Publisher Defendants compared to non-Publisher Defendants would have been the same in the post-agency period as in the pre-agency period, despite important changes in the industry (including entry by Barnes & Noble and Apple);

- The prices of complementary products such as e-reader devices did not change as a result of the allegedly anticompetitive behavior;

- All e-book sales by Apple would have occurred in the but-for world, regardless of whether Apple would have introduced its iBookstore in the absence of agency agreements;

- All e-book sales by Barnes & Noble and other retailers would have occurred in the but-for world, regardless of whether these retailers would have been profitable in a but-for world with lower e-book prices; and

- The observed growth in self-publishing and the availability of free e-books after the move to agency and Apple's entry with the iBookstore would have also occurred, to the same extent, in the but-for world.

In Section V, I discuss issues with Professor Noll's econometric model. In Sections VI and VII, I discuss the implications of the economic factors that he omits entirely from his model.

## V.    Professor Noll's Econometric Model Overstates the Increase in e-Book Prices During the Damages Period

28.  Professor Noll's econometric model is flawed in at least two respects that cause him to overstate the magnitude by which the prices of e-books from Publisher Defendants increased relative to those in the control group. First, Professor Noll uses an inappropriate set of publishers in his control group. Second, Professor Noll uses data from time periods that are non-representative and can contaminate his results. I discuss each in turn.

---

[49]    Professor Noll indicates that an exception is Random House, since it is possible that Random House's move to agency contracts in early 2011 may have been influenced by the alleged conspiracy. As a result, he removes Random House from his control group once it moves to agency contracts. See n. 66 for further discussion.

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

## A.    Professor Noll's econometric model uses an inappropriate control group

29.    In describing his difference-in-differences econometric model, Professor Ashenfelter stated: "To capture the changes in price and quantities sold that would have occurred anyway, I *assume* that changes in demand for e-books were also reflected in the prices and quantities sold of e-books from Random House."[50] Professor Ashenfelter then explicitly considered whether the alleged conspiracy might have affected Random House, thereby potentially biasing his results.[51]

30.    Professor Noll's econometric analysis also relies on the assumption that changes in demand for e-books were also reflected in the prices of e-books in his control group. Professor Noll performed no analysis to verify this assumption.[52] It is therefore notable that Professor Noll's "other" category of publishers, which forms the bulk of his control group, consists of tens of thousands of unique publishers.[53] The "other" category consists primarily of e-books published by specialty publishers and self-published titles. Table V-1 shows the top-20 publishers in Professor Noll's data ranked by quantity of e-book sales and highlights important differences between the Big 6 publishers and other publishers.[54] First, the "other" publishers are substantially smaller than the Big 6. The largest non-Big 6 – Harlequin, a "leading publishers of books for women"[55] – ███████████████████ ███████████████████████████████████[56] Second, whereas the Big 6

---

[50]    *Ashenfelter Report I*, ¶22 (*emphasis added*).

[51]    *Ashenfelter Report I*, ¶23. See Expert Rebuttal Report of Professor Daniel L. Rubinfeld, March 1, 2013, Section II.B., for a critique of Ashenfelter's use of Random House as a control group.

[52]    Deposition of Roger G. Noll, November 1, 2013 (hereinafter, *Noll Deposition*), 140:23-141:13: "Q: Would your regression results be biased if e-book prices in your control group responded differently to changes in market circumstances coincident with the move to agency? A: I am not sure what you're asking there. Something happened simultaneously with the introduction of agency? That sounds like the same argument that was given and rejected in the liability phase, that there were other independent factors that would have caused the price to go up and they explained why the price went up, and that was rejected by the Court. *So I've just assumed that all of that – all of that kind of argument isn't true for the sake of doing my damages report.*" (*emphasis added*)

[53]    Specifically, after accounting for various adjustments made by Professor Noll, I find that within Professor Noll's "other" category there exist 106,446 unique values for his publisher variable. Figure C-2 in Appendix C shows the growth in the share of e-books sold by "other" publishers.

[54]    Collectively, the publishers in Table V-1 account for approximately 81 percent of e-book revenue in Professor Noll's sample.

[55]    See Harlequin, "About Harlequin," available at http://www.harlequin.com/articlepage.html?articleId=36&chapter=0.

[56]    Titles published by the Big 6 also sell more units, on average, than do "other" titles. For example, in Professor Noll's regression sample, the mean number of paid units sold for a Big 6 title was 1,966 while the median was 111. In contrast, the mean number of units sold for a non-Big 6 book was 196 and the median was 6. So, on average, Big 6 titles sell ten times as many units as do non-Big 6 titles.

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

publish a broad range of different types of e-books, the non-Big 6 publishers tend to specialize in particular genres.[57]

**Table V-1: Top 20 Publishers in Professor Noll's Sample**



31. Figure V-1 further illustrates the differences between the Publisher Defendants, Random House, and "other" publishers. The average price of e-books published by the Big 6 in the pre-agency period was nearly $2 higher than the average price of the e-books sold by "other" publishers.[58]

---

[57] ███████████████████████████████████ I have implemented Professor Noll's analysis using all of the non-Publisher Defendant general interest publishers in the top 20 (including Random House, Kensington, Perseus, Headline, Norton, and Hyperion) as the control group and find that the results are not substantively different from those that I report in Section V.C.

[58] See also Appendix C, Figure C-3, and Trial Exhibit DX-719, *USA v. Apple Inc., et al.*, No. 12-CV-02826-DLC. The analysis in Figure V-1 excludes free e-books. Professor Noll also excludes free e-books from his econometric analysis. I discuss free e-books further in Section VII.B.

**CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER**

**Figure V-1: Average e-Book Price, by Publisher**



Source: Professor Noll's Transaction Data.

32. The differences in prices and quantities between e-books published by the Big 6 and e-books published by "other" publishers reflect different supply and demand conditions. Although all of these books are in the same market for trade e-books, there is no reason to expect, as Professor Noll implicitly assumes, that books in the "other" category would respond in the same way to changes in competitive conditions facing e-books. As Professor Noll acknowledged, there exists product differentiation in the market for trade e-books and the degree of substitutability varies among books within that market.[59]

33. Indeed, the data in Figure V-1 suggests that it would be incorrect to assume that e-books in the "other" category responded in the same way to the competitive forces affecting the industry. While there is no obvious downward trend in price of the "other" category in the pre-agency period, the average price of the "other" category declines from around $7 in the pre-agency period to

---

[59]    *Noll Deposition,* 35:22-36:5.

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

approximately $5 by the end of the sample period.[60] Certainly, there are some publishers and/or titles in the "other" category that could be appropriate to include in the control group, but Professor Noll makes no attempt to determine which publishers or titles are appropriate controls and which ones are not. He simply assumes, without any analysis, that any title published by a non-Big 6 publisher is appropriately included, which is a deeply flawed assumption.

34.    As I describe further in Section VII.A, one reason for the decline in average price in the "other" category was the rise of self-publishing. The entry of Apple induced Amazon to change its royalty model for self-published titles. Amazon began offering much more generous royalties to self-publishing authors in June 2010, shortly after the move to agency.[61] As a result of the entry of Apple's self-publishing platform along with more generous royalties, the supply of self-published e-books increased dramatically. Economic theory indicates that the increase in supply of self-published titles should decrease the price of self-published titles. Moreover, because self-published titles are likely to be closer substitutes for each other than for books published by the Big 6 publishers, the increase in supply of self-published e-books can be expected to have a differential impact on the prices of self-published titles in Professor Noll's control group relative to e-books published by the Publisher Defendants. Such a conclusion suggests that Professor Noll's "other" category does not provide an appropriate control group.[62]

## B.    Professor Noll's econometric results are sensitive to the choice of pre-agency time period

35.    As discussed in Section IV, in contrast to Professor Ashenfelter, Professor Noll uses data as far back as June 2008, when the e-book industry was in its incipiency and sales volumes were very small relative to the damages period. For example, Figure V-2 shows the dramatic increase in e-book

---

[60]    Professor Noll may be tempted to argue that the title fixed effects in his regression account for the reduction in the average price of the "other" category. It is therefore informative to note that, while the weighted average residual for the "other" category is positive prior to April 1, 2010, it is negative in the period after April 1, 2010. Such a result indicates that prices for "other" e-books are higher than can be explained by Professor Noll's model in the pre-agency period and lower than can be explained in the post-agency period. As I show in the next section, this pattern causes him to overstate the effect of the alleged conspiracy on e-book prices.

At his deposition, Professor Noll argued that if the alleged conspiracy caused prices for non-colluding publishers to increase, then his model underestimates damages. The converse also holds. To the extent that the alleged conspiracy or other concurrent industry events caused prices for non-colluding publishers to decline, his model overestimates damages. (See *Noll Deposition,* 78:20-79:18.)

[61]    On January 20, 2010, Amazon announced that it would implement a new 70-percent royalty option for e-books with a list price between $2.99 and $9.99 by which a self-publishing author would get 70 percent of the list price. (AMZN-MDL-0153986-89.)

[62]    Another perspective on this same point is that Professor Noll fails to control for factors affecting the "other" category that are potentially changing during the relevant period and, as a result, his model suffers from so-called omitted variable bias.

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

revenue from the beginning of Professor Noll's sample to the end of his sample. Total e-book revenue from July-December 2008 was approximately $27 million, while total e-book revenue from July-December 2011 was approximately $1.1 billion, an increase of approximately 4000 percent.[63]

**Figure V-2: Total e-Book Revenue (2008-2012, by Quarter)**

Source: Professor Noll's Transaction Data.
Note: Quarters assigned based on 15th day of 4-week time period.

36.    To further examine this issue, I calculate the "residuals" generated by Professor Noll's econometric model and plotted them over time in Figure V-3. The residuals are the portion of the price that is unexplained by Professor Noll's econometric model (i.e., the difference between what the model predicts for each observation and what the actual data show). As with all regressions, the residuals in Professor Noll's regression are equal to zero, on average, with some greater than zero and others less than zero.[64] However, the data suggest that the pattern in the second-half of 2008 and early 2009 is substantially different from the rest of the sample, calling into question the validity of using this portion of the sample as part of the pre-agency control period. In the following section, I investigate the sensitivity of Professor Noll's results to the inclusion of this time period.

---

[63]    For the purposes of this calculation, I define June-December 2008 to cover the 28-week period from June 22, 2008 to January 3, 2009. I define June-December 2011 to cover the 28-week period from June 26, 2011 to January 7, 2012. Figure C-1 in Appendix C shows the increase in the total quantity of paid e-books.

[64]    See *Greene (2012)*, Section 2.3.3.

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

**Figure V-3: Average e-Book Residual, by Publisher**



Source: Professor Noll's Transaction Data.

### C.    Professor Noll's econometric model generates lower estimated agency price effects when using a sample more similar to Professor Ashenfelter's sample

37.  To investigate the sensitivity of Professor Noll's model to the choice of control group and pre-agency time period, I start with Professor Noll's computer code and then make modifications to his code in order to isolate the key factors driving his results.[65]

38.  First, I limit Professor Noll's analysis to the Big 6 publishers following the approach used by Professor Ashenfelter.[66] Making this change alone reduces the average effect of the conspiracy on e-book

---

[65] Aside from the modifications discussed in this section, I maintain Professor Noll's other modeling decisions.

[66] Because Random House moved to agency contracts with retailers in early 2011, in the regressions in which Random House is the only control group, the agency effect is identified off of sales prior to Random House's move to agency.

20

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

prices from 19.9 percent to 14.9 percent (excluding the other factors described in the following Sections).[67, 68]

39.   Next, I follow Professor Ashenfelter's approach of limiting the pre-period to 24 weeks prior to April 1, 2010 and limiting the post-period to 24 weeks after April 1, 2010. Limiting the post-period may be particularly important because Professor Noll's model cannot explain the reduction in the average Random House e-book prices in the months prior to its move to agency. Random House informed Amazon of its intention to move to agency several months before the agency contracts were finalized, during which time Amazon retained pricing control over Random House titles. The reduction in average price that is evident in Figure V-1 and the negative Random House residuals in that period that are evident in Figure V-3 indicate that Professor Noll's model cannot explain this pricing pattern. Once I implement this change, the average agency effect in this specification is 15.5 percent (again, excluding other factors described below).

40.   Finally, I note that Figure V-1 indicates that the average prices of the Big 6 publishers declined during the first quarter of 2010, just prior to the introduction of the agency contracts and the iPad's entry. Given that the iPad's imminent arrival and Apple's negotiations with publishers were both known at least by the end of January 2010, prices in this quarter may be non-representative. For example, Apple's negotiations with publishers and subsequent entry led to a competitive response by Amazon and that response would be absent in the but-for world where Apple does not enter in the absence of agency contracts. To test the sensitivity of Professor Noll's results to this possibility, I limit his analysis to one year prior to April 1, 2010 and 24 weeks after April 1, 2010, but exclude the first quarter of 2010. This specification generates an estimated average agency effect of 14.2 percent (ignoring factors described in Section VI and VII).

41.   The results presented in this section indicate that Professor Noll's analysis overstates the likely average effect of the agency contracts on e-book prices due to his use of an inappropriate control

---

Professor Noll does not claim damages based on Random House's move to agency contracts nor has there been any claim that Random House's move to agency was conspiratorial. Consequently, excluding Random House from the control group following its move to agency, as does Professor Noll, overstates damages. However, for the purposes of comparability, I adopt Professor Noll's approach and exclude Random House prices from the control group following its implementation of agency contracts.

[67]   Throughout this section, I will refer to the average percentage price effect generated by Professor Noll's econometric model as the "agency effect."

[68]   Professor Noll's total damages estimate excludes the price reductions that he estimates on 0.5 percent of e-books. (*Noll Report*, at 26.) This exclusion is inappropriate as an economic matter as these reductions benefit consumers and should be included in the total damages estimate. Moreover, as Professor Kalt discusses, Professor Noll's econometric approach averages over various price changes, including price reductions, within the groups defined in Professor Noll's Exhibit 1. (See *Kalt Declaration*, Section V.D.) There is no logical basis to include negative price changes within groups but to exclude negative price changes across groups. Including these estimated price reductions reduces Professor Noll's overall effect to 19.8 percent. In all estimated effects reported in this section, I net out the impact of estimated price reductions.

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

group and his reliance on non-representative time periods in his control group. Straightforward modifications to Professor Noll's calculation result in a likely average agency effect in the range of 15 percent (excluding other factors that cannot possibly be included in the econometric analysis), in line with Professor Ashenfelter's results and the range Professor Ashenfelter determined was "reasonable" at trial.[69]

## VI.    Professor Noll incorrectly characterizes the but-for world and ignores the change in Amazon's and other retailers' economic incentives

42.    Economic theory, the record evidence in this case, and Professor Noll's own testimony show that e-books and e-readers are complementary products. Complementary products are typically consumed together. Consumer demands are interconnected such that when the price of one product increases – holding everything else constant – demand for the other decreases. Classic examples of complementary products are left and right shoes, printers and ink cartridges, DVD players and DVDs, and boots and laces.[70] Prices for complementary products are inextricably linked: Consumers care about what they pay for both—not just what they pay for one component.

43.    In this case, there is no dispute that e-books and e-reader devices are complementary products: Professor Noll agreed with that simple proposition.[71] But the proposition has important implications for determining damages since it means that the pricing incentives of e-books and e-readers are tightly interconnected. By focusing his damages analysis solely on the prices of e-books published by the Publisher Defendants relative to prices in a control group, Professor Noll ignores the interconnection between prices of e-books and prices of e-readers that he identifies in his own testimony.[72] This omission renders his damage calculation incomplete and leads to the unrealistic and incorrect conclusion that retailers would have earned low or even negative margins on e-books *and* e-reader devices.

44.    Economic analysis indicates that, in a but-for world without agency agreements, two effects would have operated in the same direction:

- E-book prices would have been higher than Professor Noll claims (because the entry of the iPad changed Amazon's and other retailers' incentives to earn profits on e-book content rather than on devices); and/or

---

[69]    *Trial Transcript,* Orley Ashenfelter, June 12, 2013, at 1496:21. As discussed in the *Kalt Report*, the average effect does not imply common impact throughout the class. In fact the averages mask a wide range of price movements – including negative movements. (See *Kalt Declaration*, Section V.C.)

[70]    See, e.g., *Noll Deposition*, 40:3-14.

[71]    *Noll Deposition*, 40:20-41:11.

[72]    See *Noll Report*, at 13-15; and *Noll Deposition*, 38:19-39:4, 43:12-44:1, 44:13-23.

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

- Device prices would have been higher than Professor Noll assumes (because e-book sales would have been less profitable than in the actual world and therefore retailers would have had less incentive to sell devices below cost).

45.   The extent of the reduction in device prices that took place after the introduction of the iPad both required and was the result of an increase in e-book prices. The entry of Apple not only increased competition in the e-book/e-reader market, but also fundamentally changed Amazon's and other retailers' economic incentives. Following Apple's iPad entry, retailers had an incentive to reduce device prices (to compete with Apple's new product) and instead try to earn profits on the device's complementary product: content sales. And the mechanism to make money on content sales, of course, would be by higher e-book prices, even in the absence of the alleged collusion.

46.   At the same time, the higher e-book margins due to agency contracts created an incentive to reduce device prices (which, ignoring the impact of higher e-book prices, also benefitted consumers) and helped to expand e-book libraries on multiple electronic platforms (also to the benefit of consumers). It is incorrect to assume the dramatic reduction in device prices observed in the actual world would have occurred in the same magnitude in the but-for world if Amazon and other retailers could not recover at least some of the losses through earning higher margins on the sale of e-books. Such an assumption is contrary to economic logic and unsupported by the evidence in this case and Professor Noll's own testimony.

47.   Another perspective on this same point is that the increase in e-book margins under agency contracts had a number of effects:

- it incentivized Amazon to lower its prices for devices and invest more in its Kindle business (in order to attract more customers to the Kindle platform, while earning positive margins on content);

- it allowed Barnes & Noble and other retailers to stay in business and invest in new devices; and

- it enabled Apple's introduction of the iBookstore with the launch of the iPad.

48.   Professor Noll completely ignores these effects in his analysis, which means he dramatically overstates damages. When asked in deposition whether he had analyzed these aspects of the but-for world, Professor Noll simply responded that he did not, because the Court had rejected any possibility of procompetitive effects from the conspiracy.[73] From an economic perspective, conduct

---

[73]   See *Noll Deposition*, 20:23-21:21, 208:11-22. See also *Noll Deposition*, 53:13-25, 57:17-58:8, and 77:1-14. Professor Noll appears to point to the Court's statement regarding the absence of procompetitive effects from the introduction of the iPad, the iBookstore, and other market changes. (See *Noll Report*, at 13-14, citing *Opinion and Order*, at 121.) In its analysis of procompetitive effects, the Court did not discuss any effects on e-reader prices and the interconnection with e-book prices. (*Opinion and Order*, at 121-122, 155-158.) Moreover, the Court also stated, for example, that Apple was not willing to introduce the iBookstore if it could not make money on it, and that Amazon's introduction of the 70-percent royalty option for self-publishing authors was in response to publishers moving to agency agreements with Apple. (See *Opinion and Order*, at 31, 68-69.)

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

can be found to be anticompetitive to the extent that the procompetitive effects do not outweigh its anticompetitive effects. Nonetheless, to compute accurately damages suffered by Plaintiffs, it is necessary to consider whether the harm to consumers could have been partially offset by procompetitive effects. Professor Noll failed to do so. I present abundant evidence in this Section and Section VII that benefits to consumers from Apple's conduct at least partially offset the increase in content prices. Although it is difficult to quantify some of these effects, ignoring them entirely – as Professor Noll did – presents a misleading and inaccurate picture of the net economic impact of the challenged conduct.

49.   Second, Professor Noll ignores that e-books and e-readers are consumed in combination and their prices are interconnected. Such is true both from the consumers' perspective and the retailers' perspective.[74] It thus makes no economic sense to analyze the impact of Apple's conduct on e-book prices in isolation. Prices on one side of the market inevitably affect incentives and prices on the other side of the inextricably linked market. Professor Noll's incorrect assumption leads him to an incomplete damages calculation that ignores the impact of the alleged conspiracy on e-reader prices.

### A.    Amazon's *pre-conduct* business strategy: ██████████



50.

---

[74]   From the consumers' perspective, Professor Noll admits that a change in the price of one component affects the demand of the other component (*Noll Report*, at 13-15), which in turn would affect the price of the second component. From the retailers' perspective, the economic literature is also clear that a company setting the price on one component (e.g., an e-reader) would respond to an exogenous change in the price of the complementary component (e.g., e-books). For example, when the profit margin for e-books is high, retailers have the incentive to lower prices for e-readers in order to increase e-book sales.

[75]   ████████████████████████████████████████ (AMZN-TXCID-0019428-42, at 32.) In what follows, I include Amazon's profits from the sale of accessories in the calculation of device profits and profit margins.

[76]

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER



51. ████████ the government's claim that "[f]rom the time of its launch, Amazon's e-book distribution business has been consistently profitable, even when substantially discounting some newly released and bestselling titles."[80]

52. ████████

> I participated in the decision to establish Amazon's price for the Kindle version of most current *New York Times* best sellers and some other new releases at $9.99. In many cases early on, $9.99 was a breakeven price... In any event, having some titles as loss leaders is quite common in both book-selling and retailing generally.[81]

53. ████████

---

[77] ████████ (See *Kindle 2011 OP1*, at 24.) Unless noted, I use the terms profit, profit margins, and gains/losses to refer to the short-term measure of profitability from accounting statements, which is based on revenues minus a measure of variable costs. These measures (gross profits or contribution profits), however, typically exclude other operating expenses and fixed costs, which are relevant in assessing whether a company has the incentive to make additional investments in the business. In addition, these measures of profitability do not include certain capital costs and other costs and revenues in the same way they would be included in a calculation of economic profits. ████████

[78] See Deposition of Russell Grandinetti (Amazon), January 28, 2013 (hereinafter, *Grandinetti Deposition (Amazon)*), 53:6-10.

[79] *Grandinetti Deposition (Amazon)*, 51:19-20.

[80] Complaint, *United States v. Apple Inc. et al.*, No. 12-cv-02826-DLC (S.D.N.Y. April 11, 2012), ¶30.

[81] Direct Testimony of Russell C. Grandinetti (Amazon) (hereinafter, *Grandinetti Testimony (Amazon)*) , ¶25.

[82] Kindle 2009 OP1 Review, October 6, 2008, AMZN-D-00000024-35 (hereinafter, *Kindle 2009 OP1*), at 29.

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER



### B.    Amazon's *post-conduct* business strategy in the actual world:

54. Amazon's business fundamentally changed in 2010 as a result of increased competition from the new and innovative iPad and the new agency contracts with publishers. Amazon responded by cutting its device prices substantially,
But after the move to agency contracts with the Publisher Defendants, Amazon's retail prices on certain e-books increased



55.

---

83    *Kindle 2009 OP1*, at 30 (*emphasis added*).

84    Third-party analysts also understood that Amazon set low prices for e-books in order to sell more Kindle devices. See, e.g., Motoko Rich and Brad Stone, "Publisher Wins Fight With Amazon Over E-Books," *The New York Times*, January 31, 2010.

85    Not all of the growth in Amazon's margins on e-books can be attributed to higher prices on certain e-book titles. Amazon also benefited from lower per-unit payments to agency publishers. (See, e.g., *Noll Deposition*, 161:23-162:7.)

86    Note that Amazon has not produced actual figures for the entire year. The only produced document projects 2010 figures as of October 2010. See *Kindle 2011 OP1*, at 24.

87    See *Kindle 2011 OP1*, at 24.

88    See Declaration of John Lange in Support of Motion to Quash or Modify Subpoena Duces Tecum, *In Re Amazon.com*, No. 12-mc-00351-P1 (S.D.N.Y. October 5, 2012) (hereinafter, *Lange Declaration (Amazon)*). As discussed below, third-party "teardown" analyses show that Amazon continued to sell e-readers at or below cost after 2010. See n. 158.

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER



**Figure VI-1: Amazon Contribution Profits on Kindle (2009-2010)**



56. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ In June 2010, Amazon reduced the price of its Kindle device by 27 percent, from $259 to $189. In August 2010, it introduced a new Kindle at an even lower price.[90] Later, in September 2011, Amazon further reduced the price of the Kindle by 42 percent, to $109.[91] Competition from Apple and Amazon also

---

[89]  Data on contribution margins for print books are only available for 2007 to 2009. See AMZN-TXCID-0000799-832, at 800; and AMZN-TXCID-0000771-98, at 87.

[90]  In July 2010, Amazon announced the third-generation Kindle. (See Nicholas Kolakowski, "Amazon Kindle Features Hint at Future Direction," *eWeek*, July 29, 2010.)

[91]  Amazon had not implemented price reductions of this magnitude before the introduction of the iPad. Amazon had reduced the Kindle price by 10 percent in May 2008, by 17 percent in July 2009, and by 13 percent in October 2009. (See backup file "Device Prices.xlsx.")

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

induced Barnes & Noble and Sony to reduce their device prices. In June 2010, Barnes & Noble reduced the price of the Nook device by 23 percent (from $259 to $199) and introduced a new device at a lower price.[92] Soon after, Sony reduced prices of its e-readers by 12-15 percent.[93]

57.   The increase in competition to sell e-reader devices led to a reduction in device prices that outpaced the decline in manufacturing costs for electronic devices.[94] Consumers benefited not only because retailers passed on to consumers the reduced manufacturing costs of the devices, but also because retailers reduced their profit margins on the devices. The price cuts on devices were seen by industry analysts as a "fundamental change" in Amazon's and Barnes & Noble's business strategy. For example, one analyst wrote:

> Barnes & Noble on Monday slashed nearly $60 off the $199 prices of Nook eBook reader. Hours later, Amazon dropped the retail price on the Kindle eBook reader to $189, down from $259. Not coincidentally, Apple launched its iBook application, making the free reader software available on the iPad, iPhone and iPod... With zero profits on their hardware, both these companies now hope to make their money in this market through the sale of ebooks. This is the same 'razor/razor blade' business model successfully employed in the video game console business, where the hardware is sold at a loss and profits are made on sales of content.[95]

58.   Apple's iPad entry changed the economic incentives of rival retailers and prompted a competitive response by Amazon. ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌ This conclusion is confirmed by contemporaneous industry analysts. For example, according to a report by Goldman Sachs, "For AMZN, we believe Kindle sales matter less than e-book sales and e-book market share.[96] A *Wall*

---

[92]   Brad Stone, "In Price War, E-Readers Go Below $200," *The New York Times*, June 21, 2010.

[93]   Nicholas Kolakowski, "Sony Follows Amazon, Slashes E-Reader Prices," *eWeek*, July 6, 2010.

[94]   "Prices of e-readers have fallen faster and further than anyone expected." (Jeffry Bartash, "Price war, iPad rapidly reshaping young e-book market; Analysis: Amazon, Barnes & Noble might lose profits, but gain market power," *Market Watch*, July 1, 2010.) See also William Kidd, "iPad Spurs eBook Reader Price War," *iSuppli*, June 23, 2010; and Brad Stone, "In Price War, E-Readers Go Below $200," *The New York Times*, June 21, 2010.

[95]   William Kidd, "iPad Spurs eBook Reader Price War," *iSuppli*, June 23, 2010. See also Brad Stone, "In Price War, E-Readers Go Below $200," *The New York Times*, June 21, 2010. I should note that in June 2010 Barnes & Noble reduced the price of the Nook e-reader by $60 off the $259 price, which resulted in a price of $199. The iSuppli article quoted here incorrectly reports the price reduction from a starting price of $199.

[96]   Goldman Sachs, "Americas: Retail – E-reader price cuts signify iPad pressure (bad) and scale (good)," June 21, 2010, PEN-LIT-00188802-06, at 02.

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

*Street Journal* article concluded, "A price war for low-end e-readers could force Barnes & Noble and Amazon to rely more heavily on their profit from selling e-books... 'Booksellers are actually making money off of e-books now'."[97] Other industry analysts reached similar conclusions:

> The cuts are so deep, market-research firm iSuppli calculates, that the cost of making the e-readers is virtually equal to their price. The result: Amazon and B&N can't make money on the sale of devices, so profits will have to come from the sale of digitized books and other content.[98]

> Given that Amazon sells its Kindle Fire tablet for $199, one could easily presume that the company is not making much money out of its otherwise well-selling device. After all, once the guys at iSuppli gave it the teardown treatment, it became evident that the actual cost of its components exceeds its retail price by a few bucks. However, you might be surprised by the amount of revenue the Kindle Fire is likely to bring straight into Amazon's pockets.[99]

## C.     But-for world: a change in business strategy at Amazon and other retailers would have also occurred absent the alleged conspiracy

59.   A change in business strategy at Amazon and other retailers would necessarily have occurred absent the alleged conspiracy. Such a conclusion is clear from the fact that even in the but-for world Apple still would have introduced the iPad, which would necessarily have changed retailers' incentives. In particular, the entry of a new competing device created a greater incentive for retailers to make money on content rather than devices. Professor Noll acknowledges this relationship between the prices of content and devices but ignores this fundamental fact in his analysis of e-book prices.[100] As a result, he incorrectly assumes that in the but-for world e-book retailers would have reduced device prices without any increase in content prices (relative to the pre-conduct period). By ignoring the interconnected nature of prices of content and devices, Professor Noll's proposed model systematically and substantially overstates the damages suffered by consumers.

60.   ████████████████████████████████████████████████████████████████

---

[97]   Geoffrey A. Fowler, "Price Cuts Electrify E-Reader Market," *The Wall Street Journal*, June 22, 2010.

[98]   Jeffry Bartash, "Price war, iPad rapidly reshaping young e-book market; Analysis: Amazon, Barnes & Noble might lose profits, but gain market power," *Market Watch*, July 1, 2010.

[99]   PhoneArena, "Amazon will rake in $136 additional revenue from each Kindle Fire sold, claims study," January 19, 2012 (*emphasis omitted*).

[100]   Moreover, Professor Noll did not consider the documents produced in this case related to device prices and retailers' profit margins on content and devices. See *Noll Deposition*, 76:20-77:6, 82:15-22. See also *Noll Report*, Appendix B.

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

[101] First, by selling e-books at (or below) cost that could then be read using the iPad, Amazon risked making the iPad more attractive to consumers, thereby cannibalizing sales of Kindle devices while not generating positive margins on content. Professor Noll recognized this logic in his report, but failed to consider its implications for Amazon's pricing incentives.[102] Second, and relatedly, for those consumers who would buy an iPad anyway, the only way Amazon could make money on them would be through setting prices such that it earned positive margins on e-book sales.

61.

62. Testimony from Amazon's Vice President for Kindle, Mr. Grandinetti, summarizes the new business environment:[106]

> We have a healthy business selling Kindle books to people who don't own a hardware device that we built, and we like that.

63. Economics textbooks analyze the relationship between prices for content and devices in the context of complementary goods and bundled sales.[107] When consumers purchase complementary goods from the same seller (for example, when IBM computer customers purchased IBM punch cards), the seller can collect profits from the basic device (the computer), the complementary content (the punch cards), or both. Depending on the business environment (i.e., consumer demand,

---

[101]    Plaintiffs' experts agree that Amazon would have released the Kindle App for iPad, which allowed customers to read Kindle e-books on the iPad regardless of whether they owned a Kindle device. See Direct Testimony of Jonathan B. Baker, Ph.D., April 25, 2013 (hereinafter, *Baker Testimony*), ¶136; and Direct Testimony of Richard J. Gilbert, Ph.D., April 25, 2013 (hereinafter, *Gilbert Testimony*), ¶27, 255-258.

[102]    *Noll Report* at 14 ("The decision by a consumer to buy an electronic device that can be used as an e-reader is based on the expected net benefit of the device. Higher prices for e-books are like a tax on e-reading that reduces the value of an e-reader as well as the net value of e-books.")

[103]    Kindle eBook Monthly Business Review, October 2010, AMZN-DOJ-000302-67, at 04.

[104]    See *Kindle 2011 OP1*, at 26.

[105]

[106]    *Grandinetti Testimony*, ¶18.

[107]    See, e.g., Jean Tirole, 1988, *The Theory of Industrial Organization*, The MIT Press, pp. 143-148.

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

competition, and production costs), a company may find it profitable to sell the device or the complementary good at or below cost. When consumers are homogeneous in their demands, a profit-maximizing monopolist would tend to sell the content at cost and collect profits through the sale of the device.[108] █████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

64.   ███████████████████████████████████████████████████████████████
      ██████████████████████████████████[109] Once Apple entered the device market, consumers could buy an iPad and read Amazon's low-priced e-books with the Kindle App. As a result, Amazon's incentives changed and it had a greater incentive to earn positive margins on content purchases from these customers.

65.   There are many examples from other industries in which, in the presence of competition, companies attract customers by offering a device at or below cost and then make money on complementary goods. The standard razors-and-blades model is one such example.[110] Similarly, wireless companies heavily subsidize the price of the handset device and recover that loss through annual or multi-year service contracts.[111] Google follows a similar model with its Android system software. It provides the software for Android tablets for free and makes money on applications and media sold through its Google Play marketplace.[112] Videogame platforms subsidize game consoles and make money on the games sold.[113]

66.   Examples from other industries also show how the price structure can change under different market conditions and the presence of new competitors. A clear example of the transition between sources of revenue is the broadcast TV industry.[114] Broadcast TV networks had traditionally

---

[108]   See Jean Tirole, 1988, *The Theory of Industrial Organization*, The MIT Press, p. 145.

[109]   See, e.g., Randal C. Picker, 2011, "The Razors-and-Blades Myth(s)," *The University of Chicago Law Review*, 78, 225-255, at 228.

[110]   See, e.g., Randal C. Picker, 2011, "The Razors-and-Blades Myth(s)," *The University of Chicago Law Review*, 78, 225-255, at 225: "Large chunks of modern technological life-from VCRs and DVD players to video game systems like the Xbox and now e-book readers-seem to operate subject to the same dynamics of razors-and-blades."

[111]   "Amazon makes its money not on Kindle hardware, but on the paid content and other products it plans to sell the consumer through the Kindle. This is a similar business model to wireless companies such as AT&T or Verizon. They sell you a phone that costs them $400 to $600 or more to make for a price of only $200. However, they expect to more than make up for that loss with a two-year service contract." (Andrew Rassweiler, "Amazon Kindle Fire Costs $201.70 to Manufacture," *iSuppli*, November 18, 2011.)

[112]   BBC News, "Kindle Fire HD and Paperwhite sales Make Amazon no profit," October 11, 2012.

[113]   Robin S. Lee, 2013, "Vertical Integration and Exclusivity in Platform and Two-Sided Markets," *The American Economic Review, forthcoming*, p. 7.

[114]   See Michael L. Katz, Jonathan Orszag, and Theresa Sullivan, "An Economic Analysis of Consumer Harm from the Current Retransmission Consent Regime," *Study Commissioned by the National Cable &*

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

depended on advertising revenues from having a large audience on broadcast affiliates and cable systems. After broadcasters suffered a decline in advertising revenue, they pushed for higher retransmission fees (i.e., per-subscriber fees to retransmit the broadcaster's signal) from cable operators. In order to continue producing the same quality of programming, broadcasters had to replace advertising revenue with retransmission fees. (Like a balloon, if pushed on one end, it will need to expand on the other end.)

67. Absent the agency agreements, such a change in business strategy would have been necessitated by the increased competition among devices. Amazon's CEO Jeff Bezos would later summarize Amazon's new business strategy, "[w]e want to make money when people use our devices, not when they buy our devices."[115] Amazon's CEO further explained why it made economic sense to sell low-priced devices, "What we find is that when people buy a Kindle they read four times as much as they did before they bought the Kindle. But they don't stop buying paper books. Kindle owners read four times as much, but they continue to buy both types of books."[116] Third-party analysts also highlighted Amazon's new incentive to make money on content rather than on devices.[117]

68. The evidence also shows that Amazon's model was under pressure in the pre-agency contract period. ███████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████[119]

69. ██████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████████

---

*Telecommunications Association, DIRECTV, and DISH Network*, November 12, 2009; Aaron Bartell and Dana Frix, "Time Warner Cable and CBS: Anatomy of a Retransmission Dispute," *TMT Perspectives*, August 5, 2013; Mike Farrell, "Study: Retrans Fees Boost B'cast Revenue," *Multichannel News*, January 5, 2009; and PRWeb, "SNL Kagan Projects Growth in TV Station Ad Revenue in 2010," August 19, 2009.

[115] Therese Poletti, "How Amazon really declared war on Apple; Commentary: Bezos says he's aligned with the customer," *Market Watch*, September 11, 2012.

[116] BBC News, "Kindle Fire HD and Paperwhite sales make Amazon no profit," October 11, 2012.

[117] See, e.g., Goldman Sachs, "Americas: Retail – E-reader price cuts signify iPad pressure (bad) and scale (good)," June 21, 2010, PEN-LIT-00188802-06, at 2: "For AMZN, we believe Kindle sales matter less than e-book sales and e-book market share. Amazon possesses 15% share of US physical book sales and we believe it can retain about 30% share of US e-book sales even if dedicated e-readers disappear because some Apple users, and many non-Apple users, may buy e-books from Amazon." See also n. 95 and 98.

[118] AMZN-TXCID-0002410-13, at 12-13. See also AMZN-TXCID-0005308-22, at 16. ██████████████
████████████████████████████████████████████ See *Kindle 2009 OP1*, at 25.

[119] See MCMLN-LIT-00106678-81, at 79; RH-USDOJ-00040780-81, at 80; AMZN-TXCID-0005308-22, at 16; and PEN-LIT-00172856. See also *Grandinetti Deposition (Amazon)*, 254:6-13.

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

███████████████████████████████████████████
███████████████████████

70.    There was also pressure from publishers to change the relationship with Amazon.[121] Publishers were particularly troubled by Amazon's $9.99 price for new releases and bestsellers. They feared that Amazon's discount pricing strategy would have negative short-term and long-term effects for the publishing industry.[122] Although publishers had not been successful before the move to agency in changing Amazon's discounting strategy for new releases and bestsellers, the evidence shows that some publishers were considering several strategies to discourage Amazon from selling e-books below their acquisition cost, including "windowing" certain titles and raising the wholesale price paid by Amazon.[123] In late 2008 and early 2009, some publishers began to increase digital list prices ("DLPs") for their e-books to match the list prices for print books.[124] Since Amazon and other retailers typically pay the publisher roughly half the DLP, the increase in the DLP results in a higher wholesale price for Amazon. Even Random House, which had not moved to agency with the Publisher Defendants, eventually found that Amazon's model was not sustainable vis-à-vis other retailers and signed agency agreements with Amazon, Apple, and Barnes & Noble during the first quarter of 2011.[125]

71.    Amazon documents also show that the proliferation of competitive products could require a change in business strategy.[126]

72.    Third-party analysts also understood that the proliferation of competitive products and the pressure from publishers could require Amazon to change its business strategy. Lazard Capital Markets wrote that, "we believe that Amazon ultimately needs to transition from hardware as a profit center to

---

[120]    AMZN-TXCID-0018298-302, at 299.

[121]    See, e.g., *Trial Transcript*, John Sargent (Macmillan), June 10, 2013, at 1138:4-12.

[122]    See, e.g., Brad Stone, 2013, *The Everything Store: Jeff Bezos and the Age of Amazon*, Little, Brown and Company, p. 279.

[123]    See, e.g., Declaration of John Sargent (Macmillan), April 26, 2013, ¶¶16-17. Windowing refers to the practice of delaying the release, or "withholding," the e-book versions of new releases.

[124]    See, e.g., Direct Testimony of Laura Porco (Amazon), ¶9; Direct Testimony of David Naggar (Amazon), April 23, 2013 (hereinafter, *Naggar Testimony (Amazon)*), ¶14; Deposition of Dennis Eulau (Simon & Schuster), Vol. 1, January 11, 2011, 105:11-21; Deposition of Brian Murray (HarperCollins), Vol. 1, August 25, 2010, 144:22-147:21. See also Jeffrey A. Trachtenberg and Geoffrey A. Fowler, "Publisher Delays E-Book Amid Debate on Pricing," *The Wall Street Journal*, July 13, 2009. Simon & Schuster's publishing arm began setting its own prices on nearly 5,000 e-books sold by Scribd, a website that allows people to post and read documents online.

[125]    Declaration of Madeline McIntosh (Random House), April 25, 2013, ¶¶23-29.

[126]    See Kindle 2010 OP1 report, October 30, 2009, AMZN-TXCID-0019428-42, at 36.

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

content as a source of profits."[127] Another investment bank concluded that, "[i]n our projections, we assume that the weighted average retail price per eBook increases at a 5.3% compound annual rate from 2009-2014, as it appears to us that book publishers are becoming increasingly uncomfortable with Amazon's low retail price on Kindle books (e.g., fear of devaluing book content)."[128]

73.    ████████████████████████████████████ was highlighted by Amazon's CEO in an interview:

> People don't want gadgets, they want services.[129]

74.    Amazon's executives have also testified that the pricing strategy on e-books was "no different" than Amazon's pricing strategy on print books.[130] ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

---

[127]    Lazard Capital Markets, "Rise of the e-reader and Apple's tablet – impact on Amazon and Semiconductors," January 25, 2010, at AMZN-MDL-0153831-55, at 40. In order to make profits on content, the report mentions that one or more of the following changes must occur: (i) increase the average selling price for e-books, (ii) lower wholesale prices from publishers; and (iii) increase the mix of self-published titles.

[128]    Credit Suisse "Amazon.com Inc. Everything you need to know about the Kindle; 2Q2009 Preview," July 20, 2009, SS-MDL-000032558-99, at 78.

[129]    Bloomberg Businessweek, "As the Kindle Turns Five, Amazon Girds for a New Fight," November 26, 2012 (emphasis added). "On Nov. 15, Amazon also began shipping its newest Kindle tablets, including the Wi-Fi version of the Kindle Fire HD 8.9-inch, which sports an iPad-like screen. At $299 for the 16 GB model, it's cheaper than comparable tablets from Apple and Google and funnels customers into the universe of Amazon digital content, likely converting them into more voracious online shoppers as well." (Id.)

[130]    "Amazon's pricing strategy was highly sustainable and, quite frankly, no different than the Amazon print book pricing model..." Naggar Testimony (Amazon), ¶11; ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

[131]    See AMZN-TXCID-0000799-832, at 800; and AMZN-TXCID-0000771-98, at 87. ████████████████

████████████████████████████ See, e.g., AMZN-TXCID-0000799-832, at 826.

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER



133, 134

75. The evidence presented in this section makes clear that a change in business strategy at Amazon would have occurred as a result of the introduction of the iPad, regardless of whether Apple had agency agreements and whether or not it introduced the iBookstore. As discussed below, in the absence of agency agreements, Apple would have likely launched the iPad without introducing the iBookstore. Since the introduction of the iBookstore created a competing platform for Amazon and other e-book retailers, it is possible that in the actual world consumers benefited from additional competition on device prices that may not have occurred in a but-for world without the iBookstore. However, the introduction of the iPad as a reading device, by itself, required a change in business strategy for Amazon because it was no longer optimal to sell e-books at (or below) cost when a large share of customers could read them on competing devices.

### D.  As complementary products, e-book and e-reader prices are related: Allegedly collusive price increase in e-books had the effect of reducing device prices

76. The evidence in the previous section shows that, but-for the alleged conspiracy, e-book prices would have been higher than Professor Noll claims. However, to the extent that Amazon and other e-book retailers would not have changed their content pricing strategies and increased e-book prices immediately after the introduction of the iPad, they would not have had an economic incentive to reduce device prices as much as they did in the actual world. In the actual world, the higher margins on e-books under the agency agreements gave retailers an additional incentive to lower devices prices in order to attract even more customers to their platforms.[135]

77. The economic literature is consistent with the market dynamics I describe here. A company setting the price of a device, such as an e-reader, would respond to an exogenous increase in the price of complementary content, such as e-books, by reducing the price of the device. In pricing digital

---

[132]  *Id.* See also AMZN-TXCID-0009369-92, at 69:

[133]  *Naggar Testimony (Amazon),* ¶11: "[the print book pricing model,] which has always included some loss leaders, was and is sustainable ▮▮▮▮▮▮▮▮"

[134]  One commentator related Amazon's e-book strategy to its strategy in the diapers line of business, in which Amazon "competed to lower diaper prices; then it acquired the smaller business; then it raised prices." See Ken Auletta, "Paper Trail: Did Publishers and Apple Collude Against Amazon?" *The New Yorker,* June 25, 2012, p. 6: "The pressure from stockholders to increase profits will only grow, and, like conventional publishers, Amazon may want to make more money on its best-selling books."

[135]  In other words, if e-book prices in the but-for world would have been higher than Professor Noll claims, but lower than they were in the actual world, Amazon and other retailers would not have had as strong an economic incentive to reduce device prices as they had in the actual world.

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

devices, companies take content prices (and competition) into consideration. When the profit margin on content increases, companies have an incentive to lower prices for digital devices in order to facilitate content sales.[136]

78.    The antitrust literature also analyzes this relationship between prices of complementary goods in the context of price-fixing cartels. When a price-fixing agreement increases the price of one good, multiproduct retailers have a strong incentive to lower the price of the complementary good for consumers willing to buy both goods from the same retailer.[137] Competition on the complementary good will make the cartel less effective and reduce harm to consumers relative to the scenario in which retailers fix the price of a good that has no complements.

79.    The evidence in this case shows that the higher margins on e-books post-agency facilitated the large price cuts on e-reader devices.



80.    A recently published book about Jeff Bezos and Amazon, based on hundreds of interviews with Amazon's executives and employees (and discussions with Bezos himself), reaches the same conclusion: the move to the agency model helped Amazon sustain the price reductions in Kindle devices.[140]

81.    

---

[136]    See, e.g., Aimin Yu, Yong Hu, and Ming Fan, 2011, "Pricing strategies for tied digital contents and devices," *Decisions Support Systems*, 51, 405-412.

[137]    Plaintiffs' expert Jonathan Baker describes the incentive of firms in a price-fixing conspiracy to sell the complementary good at below cost in order to drive demand of good for which the price has increased. See Jonathan B. Baker, 1989, "The Antitrust Analysis of Hospital Mergers and the Transformation of the Hospital Industry," *Law and Contemporary Problems*, 51:2, 93:164, at 135-136, and n. 201.

[138]    See, e.g., *Noll Deposition*, 161:23-162:7.

[139]    *Kindle 2011 OP1*, at 27 (*emphasis added*).

[140]    Brad Stone, 2013, *The Everything Store: Jeff Bezos and the Age of Amazon*, Little, Brown and Company, pp. 13 and 283.

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

Professor Noll neither considered the financial data produced by Amazon nor did he factor it into his analysis.[141] Consequently, he failed to consider all the relevant factors affecting consumers.

82.    In summary, Professor Noll's damages analysis fails to capture a basic factor: He ignores that the device price reductions of the magnitude discussed in this Section could only have taken place if e-book retailers were earning positive margins on content. Professor Noll readily admits that (i) e-books and e-readers are complements; (ii) e-book and e-reader prices are related; and (iii) consumers care about what they pay for both—not just what they pay for one component.[142] It is therefore striking that when analyzing the effects of the alleged conspiracy on consumers, he restricts his attention to e-book prices and ignores any offsetting changes in device prices. Professor Noll argues that the conspiracy reduced consumer welfare because it increased e-book prices and reduced e-book sales. He further provides an estimate of the "dead-weight loss" in consumer welfare based solely on the change in e-book prices and quantities.[143] This estimate is an incomplete and unreliable measure of consumer injury because it ignores device prices (and quantities). In particular, if consumers paid less in total for the combination of device and e-books, their welfare is likely to increase. From a theoretical perspective, one may even observe that consumers purchase more e-books at higher prices (because they save more money on the device).

### E.    A quantification of the relationship between e-book and device prices shows that Professor Noll's model substantially overstates damages suffered by consumers

83.    In this section, I quantify the benefit to consumers that Professor Noll ignores. The main challenge in quantifying this effect is separating the price reduction in devices that occurred as the result of increased competition (which would have reduced Amazon's overall profitability in the but-for world) from the changes in prices due to both Amazon's changed business strategy in response to Apple's introduction of the iPad *and* the drop in device prices resulting from the elevation in e-book prices due to the adoption of the allegedly collusive agency agreements. Professor Noll fails to undertake this necessary analysis in his damage estimate. He simply assumes that all of the change in e-book prices that occurred was the result of the alleged collusion (ignoring changes in Amazon's business strategy and device prices). Professor Noll's failure to consider these factors renders his damage analysis incomplete and incorrect.

---

[141]    See *Noll Deposition*, 76:20-77:6.

[142]    *Noll Deposition*, 40:20-41:11; 44:13-23; and 40:3-14.

[143]    *Noll Report*, at 12-13. Professor Noll does not include the dead-weight loss in his estimate of damages. (*Noll Deposition*, 99:9-20.) Professor Wickelgren stated that he did not estimate the dead-weight loss component because such an estimate would be almost certainly very small and difficult to calculate with any degree of certainty. (See *Wickelgren Declaration*, ¶13.)

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

84.

85. To see the implications of this, note that Professor Noll estimates that the harm to consumers from e-books sold by Publisher Defendants at Amazon was approximately $40 million in 2010 (as discussed in Section V, this estimate itself is overstated).

At the average e-book price, Professor Noll's estimated overcharge implies a consumer harm of approximately $2 per e-book.

---

[144]    Amazon has not produced data on profit margins for later periods. See *Lange Declaration (Amazon)*.

[145]

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

Table VI-1: Amazon's Contribution Profit on Content and Devices (2009-2010)



86.  The data in Table VI-1 is sufficient to provide a reasonable estimate of the portion of the reduction in device prices that was related to the increase in e-book prices.

87.  Note that Amazon's Vice President for Kindle, Mr. Grandinetti, testified that Amazon's goal was not to use sales of e-books to "subsidize" the Kindle device. Instead, Amazon's goal had been "to have both parts of the business sustainable in their own right."[146] Professor Noll and other Plaintiffs' experts argue that Amazon would not have changed its business strategy in the but-for world in April 2010 forward.[147] If Professor Noll is correct that Amazon's strategy in the but-for world would have continued to emphasize low e-books prices—not to "subsidize" the device, then it is reasonable to assume that Amazon would have reduced device prices in the presence of competition from the iPad, but it would not have sold the devices at a loss (i.e., devices would have been sustainable "in their own right"). Moreover, Professor Noll claims that Amazon would have been profitable in the but-for world,[148] yet his damages model assumes that Amazon would have lost money on devices and overall.

88.  

---

[146]    *Grandinetti Testimony (Amazon)*, ¶26.

[147]    *Noll Deposition*, 75:22-23: "I see no reason to believe that there would be a change in Amazon's pricing policy on April 1st." See also *Baker Testimony*, ¶114, and n. 43; and *Gilbert Testimony*, ¶64, and n. 25.

[148]    *Noll Deposition*, 75:25-76:15.

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER



89.

90. Before netting out these consumer benefits, one must consider that Amazon captures profits from e-book sales over the useful life of the device, not just during a particular year. Documents from ▮▮▮▮▮▮▮▮▮▮ Amazon suggest that the average useful life of a reading device is approximately three years.[149] Professor Noll understands that customers use a Kindle or Nook device, on average, for only about 18 months.[150] While it would be reasonable to assume a useful life of two or three years, I make a conservative assumption to account for uncertainties related to the limited financial information available and other factors not included in this calculation. I assume that the useful life of the Kindle is four years (a shorter useful life reduces my estimate of damages).[151]

91.

---

[149] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Amazon was also reported to have considered a three-year lifecycle for the Kindle. (See AMZN-MDL-0088298.)

[150] *Noll Deposition*, 44:24-46:1. Professor Noll also stated that, from his experience in another case, consumers use a computer, on average, for about three years.

[151] I reserve the right to revise my opinions and estimates in light of any new evidence that may emerge.

[152] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER**

 [153] Finally, Professor Noll's model is based on the assumption that in 2010 the agency model only raised prices for the five Publisher Defendants relative to a competitive benchmark.[154] The Publisher Defendants represent approximately ██ percent of Amazon's e-book revenue during this period. ███████████████████

**Table VI-2: Offsetting Consumer Benefits from Device Prices**



92. ██████████████████████████ [155, 156] Other factors suggest that the calculation in Table VI-2 is conservative.[157] Because the

---

████ (See AMZN-TXCID-0007031-46, at 40, 46; AMZN-DOJ-002453-95 at 94; BN00530423-24; BN00530426; and BN00512546-62 at 48.)

[153] To be conservative, I do not discount future e-book revenues. If one discounts future e-book revenues using Amazon's weighted average cost of capital ("WACC") (11.4 percent as of June 2010, based on Bloomberg data), the offsetting effect from devices increases by approximately two percentage points.

[154] See *Noll Report*, at 6.

[155] I also conducted a series of sensitivity checks to measure how changes in the main parameters of this model affect my calculation. I included in the sensitivity analyses further losses in profits from competition, a shorter useful life for the Kindle, a discount rate for future revenues, positive growth in e-book revenue, and additional revenues from physical books or unrelated content. In all cases, the resulting offset ranged between nine percent and 17 percent of Publisher Defendants' e-book prices. These calculations are provided in the backup to my report. I should note that it would not be surprising, as a matter of economic theory, if the consumer benefit from lower device prices fully offsets the allegedly collusive price increases for e-books. See Jonathan B. Baker, 1989, "The Antitrust Analysis of Hospital Mergers and the Transformation of the Hospital Industry," *Law and Contemporary Problems*, 51:2, 93:164, at 135-136, and n. 201. However, I am assuming, based on the Court's *Opinion and Order*, that this would not be the case.

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

financial data necessary for this calculation are only available ██████████ and limited to 2010, I apply this percentage offset to all retailers during the entire damages period. Third-party analyses show that Amazon and Barnes & Noble continued to sell devices at or below manufacturing cost after 2010.[158]

## VII.    Professor Noll ignores other offsetting effects from the move to agency

93.    In his cursory examination of the e-book industry, Professor Noll ignores other effects that mitigated the impact of higher content prices for many consumers. In particular, Professor Noll admits that he did not conduct any analysis related to the availability of self-published titles, free e-books, and the increased supply of e-books from Apple's iBookstore and Barnes & Noble.[159] This section documents how Apple's entry facilitated the expansion of self-published titles and increased e-book offerings, including free e-books and paid e-books that may not have been purchased in the absence of Apple's iBookstore.

### A.    The growth in self-publishing would not have occurred to the same extent in the absence of Apple's agency agreements with publishers

94.    The move to agency was followed by a substantial increase in self-published titles and sales. Professor Noll did not conduct any analysis of self-published titles or the extent to which the growth

---

[156]    The actual increase in e-book prices relative to Professor Noll's but-for prices would be larger than ██ percent. This is because the ██ percent figure from Table VI-2 is calculated as a percentage of actual prices. To be consistent with Professor Noll's convention, I report these figures as percentages of actual prices. See also n. 46.

[157]

[158]    See Jason Perlow, "The Coming eReader Apocalypse," *ZDNet*, December 21, 2012: "Clearly, both of these devices have reached a zero-margin or below manufacturing cost go to market price for both of these companies. Obviously, both companies [Amazon and Barnes & Noble] still have been able to justify selling them at that price point, by taking losses on the hardware and making money on the content;" and Andrew Rassweiler, "Amazon Kindle Fire Costs $201.70 to Manufacture," *iSuppli*, November 18, 2011: "The Kindle Fire, at a retail price point of $199, is sold at a loss by Amazon, just as the basic Kindle is also sold at a loss at the current $79 retail price point." See also Seth Fiegerman, "Exclusive: Amazon's $79 Kindle Costs $84 to Make," *The Street Network*, November 9, 2011; and PhoneArena, "Amazon will rake in $136 additional revenue from each Kindle Fire sold, claims study," January 19, 2012.

[159]    *Noll Deposition*, 106:5-24, 134:1-19, 136:1-5, 95:17-25.

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

in self-publishing was driven by increased competition to attract self-published authors such as Amazon's royalty-raising reaction to the publishers' move to agency and Apple's entry with an e-book platform open to self-publishers.[160] In a but-for world without agency agreements and no iBookstore, consumers would have had a more limited supply of self-published e-books (which tend to be priced at relatively lower levels).

95. Amazon introduced its self-publishing platform in 2007. Amazon initially offered self-publishing authors a 35 percent royalty on all e-books.[161] On January 20, 2010, Amazon announced a new royalty option under its Kindle Direct Publishing program by which self-publishing authors could receive a 70 percent royalty if they priced their e-books from $2.99 to $9.99.[162] Books priced below $2.99 or above $9.99 earned the standard royalty rate of 35 percent.[163] Amazon implemented this royalty structure on June 30, 2010.[164]

96. By May 2010, Apple announced its self-publishing program, which offered a 70 percent royalty to authors, regardless of the price the author charged.[165] Since the iBookstore terms were similar for publishers and self-publishers, Apple provided a convenient new outlet for self-publishers. In particular, Apple provided a more convenient outlet than Amazon for self-publishing authors who wished to offer their e-books for free.[166] Although Barnes & Noble's launched its self-publishing platform in October 2010, it offered slightly lower royalties for authors and did not become a

---

[160]    *Noll Deposition*, 57:11-58:18, 134:1-19, 135:14-22.

[161]    Deborah Solomon, "Questions for Jeffrey P. Bezos, Book Learning," *The New York Times*, December 6, 2009.

[162]    Jacqui Cheng, "Amazon hikes Kindle royalties to 70%, with a catch," *ArsTechnica*, January 20, 2010.

[163]    David Carnoy, "Amazon ups author royalty Kindle, matching Apple," *CNET*, January 20, 2010.

[164]    See AMZN-DOJ-002496-536, at 504.

[165]    Geoffrey A. Fowler and Jeffrey A. Trachtenberg, "'Vanity' Press Goes Digital," *The Wall Street Journal*, June 3, 2010.

[166]    The minimum price for self-published e-books on Amazon is $0.99. (See Kindle Direct Publishing Terms and Conditions, List Price Requirements, available at https://kdp.amazon.com/self-publishing/help?topicId=A301WJ6XCJ8KW0.) A self-publishing author can only offer an e-book for free (and for only 5 days) if she becomes a member of Kindle Direct Publishing Select ("KDP Select"), which requires the e-book to be exclusively available at Amazon for a minimum of 90 days. In some cases, Amazon would match the price at zero if the e-book is not part of KDP Select but is available for free on another retailer. (See, e.g., Eric Griffith, "How To Self-Publish Your Novel on the Amazon Kindle," *PCMag*, October 1, 2012.) ███████████████████████████████████████████ (See backup files "Free e-books (April 2010).xlsx" and "Free e-books (April 2011).xlsx".)

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

significant competitor to Amazon's self-publishing platform.[167] Competition for self-published e-books was centered around Amazon's and Apple's platforms.

97.    Figure VII-1 shows the growth in self-published e-books as a percentage of the total e-books sold by each retailer.[168]

98.    In claiming that the change in Amazon's royalties for self-publishing are not relevant for his model,[169] Professor Noll ignores the Court's finding that Amazon's decision to increase the royalty for self-publishers was in response to information Amazon had received that most of the publishers were likely to enter agency agreements with Apple.[170] Just two days after receiving confirmation that publishers were likely to enter agency agreements with Apple, Amazon announced the new 70-percent royalty option for self-published e-books. Third-party accounts also interpreted Amazon's intensified focus on its self-publishing platform as a reaction to the publishers' moving to the agency model.[171]

---

[167]    Barnes & Noble offered a 65 percent royalty on e-books priced from $2.99 to $9.99, while e-books under $2.99 and over $9.99 received a 40 percent royalty. (See Jim Milliot, "B&N's Publt Newest Self-Publishing Entrant," *Publishers Weekly*, October 11, 2010.)

[168]    Professor Noll's data do not distinguish self-published e-books from other non-Big 6 publishers. To identify self-published e-books, I first identified those e-books for which the author is the same as the publisher. (This first step follows Dr. Burtis' methodology; see Rebuttal Expert Report of Dr. Michelle Burtis, March 1, 2013, ¶18.) I then reviewed the publisher and imprint data fields and added e-books that appeared under known self-publishing platforms (e.g., Smashwords, Lulu.com). I excluded any e-books associated with the Big 6 publishers and reviewed the largest of these records to remove obvious errors. A review of the largest entities identified via this methodology suggests that it reasonably captures most of the self-published titles. Complete documentation is provided in my backup materials.

[169]    *Noll Deposition*, 58:13-18: "I have no idea what they would have adopted in the but-for world in terms of the specific contract form with independent publishers. The issue is not -- that I'm addressing is what the price would be of those books, not what the impact for the publisher would be."

[170]    *Opinion and Order*, at 68-69.

[171]    Brad Stone, 2013, *The Everything Store: Jeff Bezos and the Age of Amazon*, Little, Brown and Company, p. 283.

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

**Figure VII-1: Shares of Self-Published E-Books at Each Retailer (June 2008 – March 2012)**



99. Furthermore, under this new royalty option for self-published authors, Amazon adopted essentially the same royalty model that Apple used in its App Store (and would eventually offer in its iBookstore).[172]

[174] Without the presence of Apple's

---

172    See, e.g., David Carnoy, "Amazon ups author royalty Kindle, matching Apple," *CNET*, January 20, 2010: "That's a big jump from its current 35 percent royalty rate and not coincidentally, the same number Apple doles out to developers who sell their apps in Apple's App Store."

173    Kindle eBook Monthly Business Review, April 2010, AMZN-TXCID-0003759-98, at 66-67: See also Kindle eBook Monthly Business Review, May 2010, AMZN-DOJ-002453-95, at 62.

174    Kindle eBook Monthly Business Review, April 2011, AMZN-MDL-0003711-58, at 25.

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

iBookstore, Amazon would have been the default platform for self-publishing content.[175] There would have been no need for Amazon ███████████████████████████ to increase author royalties, at least not to the same extent that it did at the time of Apple's entry. Third-party analysts also viewed Amazon's new royalty option as a response to the threat of Apple's entry to the e-book business.[176]

100. Although the move to agency resulted in lower unit payments for Publisher Defendants, the change in royalties at Amazon and Barnes & Noble, as well as the introduction of the iBookstore, dramatically increased compensation for self-publishing authors. Not surprisingly, this increased the supply of self-published titles (see Figure VII-1).[177] The increased royalties made self-publishing more attractive for authors relative to the traditional model from publishing houses. This is because authors typically receive from publishers between 7 percent and 15 percent of the list price of physical books and around 25 percent of the net price that publishers receive for digital books.[178] For example, for an e-book priced at $9.99, an author would receive $3.50 under Amazon's old model, $6.99 under Amazon's (and Apple's) new model, and approximately $2.50 from traditional publishers.

101. It is undeniable that the introduction of Apple's iBookstore with the launch of the iPad contributed to expand the supply of self-published titles, and that Amazon's dramatic increase in royalties for self-published authors was, in large part, a reaction to the move to agency contracts.

---

[175] ████████████████████████████████████████ In addition, as discussed below, without agency agreements, Barnes & Noble likely would have exited or downsized its e-book business.

[176] See, e.g., Jacqui Cheng, "Amazon hikes Kindle Royalties to 70%, with a catch," ArsTechnica, January 20, 2010: "The decision to offer such an appealing royalty system comes just a week before the expected launch of an Apple tablet, which some believe may aim directly at the Kindle with its own e-book distribution system;" and Matthew Shaer, "New Amazon royalty terms could be tied to release of Apple Tablet," The Christian Science Monitor, January 20, 2010: "Amazon announced today that it would raise royalty rates for authors and publishers using the Kindle Digital Text Platform, a self-publishing service. The move appears to coincide with the launch of the Apple Tablet, which many expect to become a major player in the e-book game... By reaching out to 'little guy' authors, Amazon is likely trying to lessen the damage of a full-frontal assault by Apple." See also Sarah Weinman, "Publishers Try to Protect E-Book Prices from Apple, Amazon," InvestorCenter, January 20, 2010.

[177] See, e.g., Kindle eBook Monthly Business Review, June 2010, AMZN-DOJ-002496-536, at 504: ███

██████████████████████████████

Kindle eBook Monthly Business Review, October 2010, AMZN-DOJ-000302-67, at 15: "
██████████████████████████████
████

[178] See Motoko Rich, "Amazon Increases Royalty Rate for Books on Its Kindle E-Reader," The New York Times, January 20, 2010; and Matthew Shaer, "New Amazon royalty terms could be tied to release of Apple Tablet," The Christian Science Monitor, January 20, 2010.

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

102.  To illustrate the impact of the increase in self-publishing, I note that self-published titles accounted for 1.5 percent of paid unit sales of e-books in the year prior to April 1, 2010. In the post-agency period, self-published titles accounted for approximately 6.6 percent of unit sales. The entire growth in self-publishing may not be attributed to Apple's introduction of the iBookstore, which the evidence shows would not likely have been launched in the absence of the agency agreements (see Section VII.C). Moreover, the iPad would have been introduced regardless of the presence of agency agreements and the iPad was a compelling new device to display e-book content, including self-published content.

103.  Nonetheless, Amazon's introduction of a more generous royalty for self-published titles (matching Apple's 70-30 agency split) and the option of self-publishing through the iBookstore certainly increased the number of self-published titles. To illustrate the consumer welfare benefits from the increase in self-publishing, I consider the impact on consumers if between 25 and 50 percent of the increment in the share of self-publishing is due to Apple's entry with the agency model. (I do not rule out an alternative percentage but for my illustrative purposes this range suffices.) I then adopt the elasticity of -1.01 calculated by Professor Ashenfelter to characterize the demand curve for e-books.[179] Using these assumptions, a welfare calculation suggests that the benefit to consumers from the increased supply of self-published e-books was approximately $15 million to $30 million.[180, 181] As noted, I provide this range only for illustrative purposes. However, it is worth noting that ignoring the consumer benefits from an increase in self-published titles between the but-for and actual worlds overstates damages – and may overstate damages by a significant amount.

## B.  The agency period was accompanied by an expansion in free e-book offerings

104.  As explained in Section VI.D, the increased profitability of e-books under the agency agreements (from higher retail prices and lower wholesale prices to publishers on certain e-books) gave retailers the incentive to lower device prices. The same logic suggests that retailers would have the incentive to invest in their platforms by expanding the selection of free e-book titles. ███████████████

---

[179]  See *Ashenfelter Testimony*, ¶10.

[180]  To estimate the welfare gain, I assume a linear demand with an elasticity of minus one at the actual price (which is similar to the elasticity estimated by Professor Ashenfelter). The increased welfare to consumers is $(1/\text{elasticity}) \times P \times \Delta Q$, where P is the average price of self-published e-books and $\Delta Q$ is the increase in self-published e-books estimated by the econometric model. This calculation is consistent with either a shift out in the demand curve generated by the greater selection of self-published titles, or by a shift out in the supply curve for self-published titles, which leads to a decrease in the price.

[181]  As noted above, Professor Noll's estimate of the loss in consumer welfare is incomplete because it ignores the impact of the agency model on devices. (See *Noll Report*, at 12-13.) My estimates of consumer welfare in this Section are in addition to the consumer benefits from changes in Amazon's business strategy and device prices estimated in Section VI.E.

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

█████████████████████████████ The logic is straightforward: Free e-books, much like low-priced devices, attract more customers to the Kindle platform and increase Amazon's profits on future sales of paid e-books.

105. The evidence in this case shows that Apple entered the market with a very large share of promoted e-books at a price of zero. Immediately after Apple's entry, Amazon and other retailers emphasized their own free e-book offerings. The increase in promotions of free e-books was in large part driven by the competitive threat from Apple's iBookstore, which the evidence shows would not likely have been launched in the but-for world (see Section VII.C).

106. Figure VII-2 shows that, when Apple entered the market, more than █ percent of the e-books customers downloaded from the iBookstore were available for free. Although Apple had a relatively small share of the e-book industry ██████████████████████████, it dramatically expanded the supply of free e-books. During the first year after Apple's entry, customers downloaded from the iBookstore ██████████████████████████ ██████████████████████████[183] In addition, under an agreement with Penguin, Apple purchased the e-book version of "Winnie the Pooh" and gave it away for free when iPad users clicked on the iBookstore icon.[184] (Apple's shares of free e-books in Figure VII-2 do not include downloads of "Winnie the Pooh".) Publishers could also offer e-books for free on the iBookstore.[185]

107. ██████████████████████████████████████████████████████████ █████████████████[186] In particular, it was more difficult for self-published authors to offer their e-books for free on the Kindle Store. In some cases, Amazon matched the price at zero if an e-book was offered for free at another retailer.[187] ████████████████████████████ ██████████████████████████

---

[182]    *Kindle 2011 OP1*, at 27.

[183]    ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████

[184]    See *Trial Transcript*, Eddy Cue (Apple), June 17, 2013, at 1919:16-21; and *Trial Transcript*, David Shanks (Penguin), June 4, 2013, at 422:7-20.

[185]    *Cue Declaration (Apple)*, ¶60.

[186]    The transaction data produced by Amazon and Apple for free titles do not always include the e-book identification number and publisher. (And Barnes & Noble did not produce data on free titles.) I examined the data available for April 2010 and April 2011 and analyzed whether the top titles available for free on Apple's iBookstore were also available (under the same or similar title) on the Kindle Store.

[187]    Eric Griffith, "How To Self-Publish Your Novel on the Amazon Kindle," *PCMag*, October 1, 2012.

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

**Figure VII-2: Shares of Free e-Books as Percentage of Total e-Books Sales**



108.  [189] Although the share of free e-books had been increasing over time, between March and April 2010, Amazon experienced a ▮

---

[188]    Kindle eBook Monthly Business Review, April 2011, AMZN-MDL-0003711-58, at 15:

[189]    See AMZN-DOJ-001023-32, at 27:

(See RH-MDL-00052068-70, at 69.)

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

percent growth in free e-book downloads.[190] ████████████████████
████████████████████████████████████████████[191]

109. Other retailers also expanded their offers of free e-books. In July 2010, Barnes & Noble rolled out a new promotion offering a weekly list of approximately 10 classic e-books at no cost.[192] Borders Group, in partnership with Kobo, also announced a promotion of five free top-selling books valued at over $40 to anyone who downloaded Borders' app.[193] Google launched its e-bookstore in December 2010. Six months after its launch, Google had more than three million free e-books available on its e-bookstore.[194]

110. Professor Noll does not factor into his analysis of damages that some free e-books would not have been available or would not have been offered for free in a but-for world without agency agreements and without Apple's iBookstore.[195] To illustrate the potential impact of the increase in free e-books, note that the share of unit sales accounted for by free e-books increased from approximately 30 percent in the year prior to April 1, 2010, to approximately 53 percent in the post-agency period. If I assume that between 25 and 50 percent of the share increase is attributable to Apple's entry with the iBookstore and that consumers are willing to pay $0.50 for each of these free e-books, then I find that consumer welfare increased, all else equal, by $20 million to $41 million as a result of the increased supply of free e-books.[196] (The consumer benefit here equals the difference between a consumer's willingness to pay ($0.50) and the actual price ($0).) However, this calculation is for illustrative purposes only.

---

[190]   See Kindle eBook Monthly Business Review, April 2011, AMZN-MDL-0003711-58, at 15. ████████
████████████████████████████████████ (See AMZN-MDL-0154848-49, at 48.)

[191]   Kindle eBook Monthly Business Review, May 2010, AMZN-DOJ-002453-95, at 53, 55: ████████
████████████████████████████████



[192]   Entertainment Close-Up, "Barnes & Noble Offers Weekly Series of Free Classic eBooks," July 22, 2010. Except for Amazon and Apple, other retailers did not provide comprehensive data on free e-books downloads.

[193]   As discussed above, some independent e-book retailers do not have a hardware or software platform of their own, but partner with another firm to provide reader support. Borders' promotion followed the launch of the Borders-branded e-Book store and the release of Borders' app for iPad and other devices, all powered by Kobo. (See Internet Business News, "Borders offers free books to customers downloading Borders application," July 9, 2010.)

[194]   Laurie Sullivan, "Google eBooks: A Digital Publishing ARM," *MediaPost.com*, May 25, 2011.

[195]   In fact, Professor Noll did not conduct any analysis related to the availability of free e-books. See *Noll Deposition*, 136:1-137:7.

[196]   ████████████████████████████████████████
████████████████████████████████████████ I
conservatively assume an average willingness to pay of $0.50.

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

### C.    Professor Noll incorrectly includes in his damages model all e-book sales from Apple's iBookstore

111. Plaintiffs' and Defendant's experts in this case have assumed that, in the absence of agency agreements, Apple would have likely launched the iPad without introducing the iBookstore.[197] Although Apple would have allowed other retailers' e-book apps on the iPad, it would not have entered the e-book distribution business as a retailer.

112. The conclusion of the experts in this case is based on the unambiguous statements of Apple's executives that Apple would not have entered the e-book industry absent the agency agreements. Apple was only willing to enter the e-book industry if it could make a small profit. It was not possible to do that and match Amazon's pricing, given the wholesale prices publishers charged before agency and the fact that Amazon was setting the retail price of bestselling titles below cost.[198, 199] While the Kindle Store was essential to the success of the Kindle, the iBookstore was not critical to the success of the iPad because the iPad was a multiuse device. In addition, the iBookstore did not play the same role as the Kindle Store. The iBookstore was not used to the same extent as the Kindle Store to attract buyers to other products, such as those sold at Amazon.com.

113. Professor Noll's damages model assumes that all of Apple's sales of e-books would have occurred in the but-for world.[200] But such an assumption assumes that (a) either Apple would have introduced the iBookstore with the launch of the iPad or (b) if Apple did not introduce the iBookstore, that

---

[197]  See, e.g., *Baker Testimony*, at n. 165: "More specifically, in the 'but-for' world against which I evaluate harm to consumers, publishers would have wholesale model distribution contracts with retail outlets, ... Apple would have launched the iPad without introducing the iBookstore." See also Deposition of Jonathan B. Baker, April 3, 2013, 225:22-226:17, 265:5-13; Rebuttal Report of Jonathan B. Baker, March 1, 2013, ¶43; *Gilbert Testimony*, ¶54; and Deposition of Richard J. Gilbert, April 10, 2013, 389:11-390:5.

See, e.g., Declaration of Professor Kevin M. Murphy, April 26, 2013, ¶¶16, 49, 54; Rebuttal Expert Report of Dr. Michelle Burtis, March 1, 2013, ¶25; Deposition of Benjamin Klein, March 26, 2013, 86:14-87:12, 146:16-25; and Expert Report of Professor Daniel L. Rubinfeld, ¶¶25, 150.

[198]  See *Cue Declaration (Apple)*, ¶¶13, 28, 41, 50-51; and Deposition of Keith Moerer, December 13, 2012, 40:1-22. See also *Cue Deposition (Apple)*, 40:10-43:17.

[199]  According to Apple's executives, with a 30-percent commission Apple generally makes a single-digit profit. (See *Cue Declaration (Apple)*, ¶13.) Based on Apple's 30 percent commission under the agency agreements, I estimate that Apple collected approximately ▮▮▮▮▮▮ in commissions during the damages period. (See Appendix C, Figure C-4.) I also note that, contrary to Professor Noll's statement that Apple had a "guaranteed 30 percent margin" over the retail price, there are other costs associated with the sale of e-books, including the costs of developing and running the iBookstore. (See *Noll Report*, at 10-11.) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (See *Kindle 2011 OP1*, at 24.)

[200]  *Noll Deposition*, 95:17-25. Professor Noll also stated in deposition that he made no assumptions on whether Apple would have introduced the iBookstore, other than what was stated in the *Opinion and Order*. See *Noll Deposition*, 53:13-17.

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

every sale made through the iBookstore in the actual world would have been made through an alternative retail channel in the but-for world.

114. Professor Noll admits that if this is not the case, some sales would be lost.[201] Professor Noll and I agree that not all Apple sales would be lost in the but-for world. Indeed, some Apple customers would have purchased the same e-books that they purchased through the iBookstore through either another device (e.g., the Kindle or a Nook) or an e-books app on the iPad. But there are certainly many customers who did not have another e-reader device (e.g., the Kindle or a Nook) and would not have downloaded the Kindle or Nook apps for the iPad.[202]

115. For such individuals, in the but-for world, they would not have purchased e-books at all without the iBookstore. Professor Noll has neither conducted an analysis of this factor nor has he even provided a methodology to assess the extent to which these customers would have purchased any e-books in the absence of the iBookstore. He admits that his damages estimates assumes an overcharge on 100 percent of Apple's e-book sales, which would overstate damages in the likely scenario that some of those sales would not have occurred in the but-for world.

116. Although it is difficult to estimate the exact share of e-book sales that would have occurred through other retailers in the absence of iBookstore, the following illustration shows that Professor Noll's methodology likely overstates damages associated with Apple's e-book sales.[203] Figure VII-3 shows that approximately ▇ percent of Apple's customers purchased ▇ e-books or less. These customers represent approximately ▇ percent of iBookstore revenue. Survey data also show that between 60 and 67 percent of iPad owners do not have a Kindle device.[204] If I assume that ▇ percent of Apple's e-book sales (60 percent of ▇▇▇▇ may not have occurred in the but-for world,[205] Professor Noll's model would overstate damages by approximately $4 million (based on Apple's share of e-book sales). If one assumed that only those customers who purchased two e-books or less (and did not own a Kindle) would not have made any purchases in the but-for world,

---

[201]   *Noll Deposition*, 97:22-98:21.

[202]   There are a number of possible explanations for this phenomenon: For example, Apple promoted its iBookstore. For someone not particularly familiar with e-book retailers and not particularly tech savvy, they may have downloaded the product associated with the manufacturer of the device (i.e., the iBookstore), but not known about the Kindle or Nook apps.

[203]   This calculation and the calculation in Section VII.D are conservative because they do not take into account the gain in consumer welfare from the availability of additional e-books in the actual world. They only provide a measure of the damages erroneously included in Professor Noll's model for sales that would not have occurred in the but-for world.

[204]   See Book Industry Study Group, "Consumer Attitudes Toward E-Book Reading," Vol. 3, Report 2, April 2012, MCMLN-LIT-00321918-57, at 30-31.

[205]   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

the result would be $3 million. If one included customers who purchased less than 10 e-books, the result would be $8 million.[206]

**Figure VII-3: Number of e-Book Purchases on Apple's iBookstore (April 2010 - April 2012)**



### D.    Without a change in its business model, Barnes & Noble's existing e-book business would have been unsustainable

117. Professor Noll also assumes, incorrectly, that all of Barnes & Noble's e-book sales would have occurred in the but-for world.[207] The evidence in the record is clear that Barnes & Noble would not have been profitable and likely would have reduced its operations at the but-for prices proposed by Professor Noll. Indeed, the evidence shows that the increase in e-book prices under the agency agreements allowed Barnes & Noble to stay in business and continue to invest in new devices and other services.

---

[206]    Under the corrected version of Professor Noll's econometric model (see Section V.C.), the range would be approximately between $2 million and $6 million.

[207]    *Noll Deposition*, 98:22-99:8.

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER



118. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[208] When Barnes & Noble launched its e-book store (in July 2009, prior to the Nook's release) it attempted to price e-book titles at a premium. But it soon realized that it had to more closely match Amazon's prices to be competitive.[209] Barnes & Noble lowered prices on some e-books, but the result of this price-matching strategy was that it began to suffer "severe losses."[210] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[212]

119. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

208  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Deposition of William Lynch (Barnes & Noble), June 23, 2011 (hereinafter *Lynch Deposition (Barnes & Noble)*), 168:9-11.) See also Declaration of Theresa Horner (Barnes & Noble), April 26, 2013 (hereinafter, *Horner Declaration (Barnes & Noble)*), ¶15: "we predicted that if we stayed on the same course we would continue to lose money at an unsustainable rate;" and Declaration of John Sargent (Macmillan), April 26, 2013, ¶12: "A Barnes & Noble executive told us that he felt that they had to match Amazon's $9.99 pricing on certain new releases and bestsellers, but they could not afford to continue losing money over an extended period of time. We thought that Barnes & Noble would eventually be forced to exit the e-books market if aggressive below-cost pricing continued."

209  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ See also *Horner Declaration (Barnes & Noble)*, ¶¶13-14.

210  See *Horner Declaration (Barnes & Noble)*, ¶15. Barnes & Noble's shift to a price matching strategy in November 2009 ▮▮▮ its overall margin on e-books from about ▮ percent to ▮ percent. BN00044959-62, at 59; and BN00044796-800. Gross margins on e-books continued to ▮▮▮ and reached a ▮ point in January 2010, with an overall ▮▮▮ margin of ▮ percent. (See BN00093250-81 at 70; and BN00120696-744 at 720.) Overall, before the agency agreements Barnes & Noble had an average gross margin on e-book content of ▮ percent (before considering fixed costs). (See BN00120840 and BN00120841 (fiscal year 2010 refers to the period May 2009 to April 2010).)

211  *Lynch Deposition (Barnes & Noble)*, 88:12-89:15. In the last year before the agency agreements, Barnes & Noble had ▮▮▮ gross margins on devices, of ▮ percent for online sales and ▮ percent for sales at retail stores. (See BN00118217-30 at 22-23 (online stores; calculated as device margin divided by device sales); and BN00111903-38 at 09 (retail stores).

212  See BN00118217-30 at 23. See also BN00120840, BN00120841. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

213  Barnes & Noble has not produced data on gross margins for the entire year. Data produced by Barnes & Noble show gross margins for e-books for May through November 2010. See BN00117468.

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER



[215]

120. Without agency agreements, Barnes & Noble likely would have exited the e-book business ███ ███████████████████████████████████████ [216] According to Barnes & Noble executives, absent the agency agreements, Barnes & Noble would have been unlikely to make the investments it made on its electronic bookstore and Nook devices and would not be operating anywhere near the scale it operated after the agency agreements. [217]

121. Professor Noll neither considered nor analyzed the financial data produced by Barnes & Noble. [218] He admits that retailers had to be profitable in order to stay in business. [219] Yet the implications of his model are clear, since he assumes that but-for the allegedly anticompetitive conduct, e-book prices would have been, on average, 19.9 percent lower. In such a case, Barnes & Noble would have continued to be unprofitable – ███████████████████████████████████████ ███ [220]

122. In fact, the main reason cited by Random House to move to agency was to maintain its relationship with Barnes & Noble, which was losing money on Random House titles under the wholesale model. [221] By relying on Random House (before agency) and other publishers' prices as the

---

[214]   BN00663317.

[215]   ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████ A teardown analysis from March 2010, before the price cut on the device, already showed that the Nook devices were not profitable for Barnes & Noble. (See Amy Teng and Ben Lee, "Teardown Report: Barnes & Noble's Nook E-Book Reader," *Gartner*, March 12, 2010, BN00120819-36, at 19.)

[216]   ██████████████████████████████████

[217]   ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ *Trial Transcript*, Theresa Horner, June 18, 2013, 2204:18-2205:2.

[218]   *Noll Deposition*, 82:15-22.

[219]   *Noll Deposition*, 75:25-76:6.

[220]   "Selling nook hardware is not a profitable business for Barnes & Noble. Instead, it is a strategic move to generate sales at its e-book store." (Amy Teng and Ben Lee, "Teardown Report: Barnes & Noble's Nook E-Book Reader," *Gartner*, March 12, 2010, BN00120819-36, at 19.)

[221]   Declaration of Madeline McIntosh (Random House), April 25, 2013, ¶¶23-27: "That decision was primarily driven by our relationships with bricks-and-mortar resellers, such as Barnes & Noble, Books-a-Million,

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

competitive benchmark, Professor Noll implicitly assumes that Barnes & Noble would have lost money on Publisher Defendants' titles as it did with Random House titles and, overall, would have operated at a huge loss. The reduced market presence from Barnes & Noble and other retailers,[222] together with the absence of a competing iBookstore from Apple, would have changed the structure of the e-book market, a factor also ignored by Professor Noll.

123. Thus, Professor Noll's methodology clearly overstates damages associated with Barnes & Noble's sales since he assumes that every sale would have occurred in the but-for world. To illustrate the magnitude of the potential overstatement, I conduct a similar analysis to the one I use for the iBookstore and estimate that Professor Noll's damages overstatement may be between approximately $6 million and $18 million.[223] As in the case of Apple's customers, some Barnes & Noble customers purchased few e-books (but presumably customers who purchased the Nook device are likely to be more avid readers than iPad customers). Many of these customers did not have a Kindle device and, unlike iPad users, could not download a Kindle App to their Nook devices. If Barnes & Noble had exited the market or reduced its operations – as would have been the case in Professor Noll's but-for world, some of Barnes & Noble customers may not have purchased e-books at all.[224]

## VIII.  Conclusion and Summary of Damages Calculations

124. Professor Noll claims that e-book prices from the Publisher Defendants would have been, on average, 19.9 percent lower but-for the allegedly anti-competitive conduct. Based on e-book sales during the same period, he estimates that purchasers of e-books from the Publisher Defendants suffered damages of $307.8 million.[225] However, Professor Noll's damage estimate includes almost $20 million for consumers whose location is "unidentified," and thus, one cannot confirm that they are U.S. residents. Significantly, neither Class Plaintiffs nor Plaintiff States purport to bring claims on behalf of non-residents of the United States or its territories.[226] Excluding such consumers lowers Professor Noll's damage estimate to $288.3 million.[227]

---

Indigo, and independent bookstores." Internal documents from Barnes & Noble confirm that the retailer had negative margins on Random House titles during 2010. See, e.g., ▮▮▮▮▮▮▮▮ BN00109051.

[222]  Not being able to compete with Amazon and Barnes & Noble's prices, Sony recently exited the e-reader book business in the U.S. (Michael Kozlowski, "Sony Abandons the eReader Market in the United States," *GoodE-Reader.com*, September 26, 2013.)

[223]  Under the corrected version of Professor Noll's econometric model (see Section V.C.), the range would be approximately between $5 million and $14 million.

[224]  My analysis does not account for the further detriment to consumers that would result from the loss of retailer competition if Barnes & Noble or other retailers exited the market.

[225]  *Noll Report*, Exhibit 2.

[226]  See First Amended Class Action Consolidated Complaint, *In Re Electronic Books Antitrust Litigation*, No. 11-md-02293-DLC (S.D.N.Y. October 23, 2013); and Second Amended Complaint for Injunctive Relief, Civil

**CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER**

125. In his damages model, Professor Noll uses an inappropriate control group as competitive benchmark, relies on data from non-representative time periods that contaminate his results, and inappropriately ignores negative price effects (see Section V). A corrected version of Professor Noll's econometric model indicates that the average agency effect was in the range of 15 percent.

126. In addition, Professor Noll's analysis focuses on e-book prices in isolation and ignores the interconnection between prices of e-books and prices of e-reader devices that he identifies in his own testimony. As a result, the damages estimated by Professor Noll imply an unrealistic but-for world in which e-book retailers, such as Amazon and Barnes & Noble, would sell e-books and e-readers at or below cost and would lose money, even before considering other costs associated with the investment and operation of their electronic bookstores.

127. There is no dispute in this case that e-books and e-readers are complementary products whose prices are tightly interconnected. The reduction in device prices that took place after the introduction of the iPad both required and was the result of an increase in e-book prices (see Section VI). I use available data from Amazon to calibrate this relationship between e-book and e-reader prices and conclude that ██████████████████████████████████████████ ██████████ I also conclude that in the absence of the conspiracy, either e-book prices from the Publisher Defendants would have increased at least by 12.9 percent (relative to Professor Noll's benchmark) or device prices would not have decreased by an equivalent amount.[228]

128. After incorporating these corrections, damages to consumers were no larger than approximately 1.9 percent of e-book sales by Publisher Defendants—which would imply damages of approximately $28 million ($30 million including sales to "unidentified" locations).[229] In Appendix C, Table C-1, I apply Professor Noll's methodology to allocate these damages by state:

- Consumers who reside in and are represented by the states and territories that are plaintiffs in this litigation account for 55.4 percent ($16.8 million) of damages.

---

Penal Ties & As Parens Patriae on Behalf of Consumers, *State of Texas, et al., v. Penguin Group (USA) Inc., et al.*, No. 12-cv-3394-DLC (S.D.N.Y. May 17, 2012).

[227] Specifically, Professor Noll includes in his estimate of total damages $19.5 million to consumers whose location is "unidentified." (*Noll Report*, Exhibit 3.) Professor Noll incorrectly assumes that these represent sales to U.S. residents temporarily living abroad (*Noll Report*, at 29, and Exhibit 3, n. 3.) ████████████████ ██████████ See E-mail from Marjorie Walter, Kipling Law Group, re: Ebooks Data follow up HIGHLY CONFIDENTIAL, February, 1, 2013, 5:47 PM.) ████████████████████████ ████████████

[228] See supra, paragraphs 87-92 and n. 156.

[229] This estimated figure does not include any deduction to reflect offsets associated with Publisher Defendants' settlements, which I understand provided for monetary payments to consumers, to the extent that any consumer has received a settlement payment.

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

- Consumers who reside in other states and territories account for 37.9 percent ($11.5 million) of damages.

- Armed forces personnel stationed overseas account for 0.3 percent ($0.1 million) in damages.

- Consumers in the unidentified category (including non-U.S. residents) account 6.3 percent ($1.9 million) in damages.

- Residents of Micronesia, Palau, and the Marshall Islands (who are not represented in this litigation) account for $320 in damages.

129. This $28 million damages estimate is conservative because it does not take into account other offsetting factors from benefits to consumers that would not have occurred, at least not to the same extent, in the absence of Apple's iBookstore and the agency contracts, including (i) the substantial increase in self-published titles; (ii) the increased availability of free e-books; (iii) e-book sales through Apple's iBookstore; and (iv) e-book sales through Barnes & Noble's e-bookstore (see Section VII).

I declare that the foregoing is true to the best of my knowledge and belief.

Jonathan Orszag

Executed on November 25, 2013, in West Palm Beach, FL.

58

**Appendix A**

# COMPASS LEXECON

November 2013

## CURRICULUM VITAE

## Jonathan M. Orszag

PRINCIPAL OFFICE:    Compass Lexecon, LLC
777 S. Flagler Drive
Suite 1500
West Palm Beach, Florida 33401
(561) 515-1900 main
(561) 515-1915 direct

OTHER CONTACT INFORMATION:
(202) 253-9306 cell
jorszag@compasslexecon.com

PROFESSIONAL EXPERIENCE:

- **Senior Managing Director**, Compass Lexecon, previously Competition Policy Associates, Inc. ("COMPASS") and FTI Consulting, Inc. January 2006-Present; Competition Policy Associates, Inc./Sebago Associates, Inc., March 2000-January 2006. Manage economic consulting firm specializing in antitrust, economic policy, and litigation matters. Member of the firm's Executive Committee. Conduct economic and financial analysis on a wide range of complex issues in policy and regulatory for corporations and public-sector entities. Serve as expert witness in proceedings before U.S. and international courts and administrative agencies and the European Court of First Instance on competition policy issues, including industry structure, vertical relationships, and intellectual property rights. Consult on international projects in Argentina, Australia, The Bahamas, Canada, Ecuador, the European Union, New Zealand, South Korea, Trinidad and Tobago, and the United Kingdom.

- **Assistant to the Secretary and Director of the Office of Policy and Strategic Planning,** U.S. Department of Commerce (Washington, D.C.), March 1999-March 2000. Served as the Secretary of Commerce's chief policy adviser. Responsible for coordinating the development and implementation of policy initiatives within the Department. Worked on a wide range of issues, from implementing the steel loan guarantee program to telecommunications and e-commerce issues. Represented the Secretary of Commerce in meetings with other government officials and outside organizations, and testified before Congress on behalf of the Department on budget and Native American economic development issues.

- **Economic Policy Advisor**, National Economic Council, The White House (Washington, D.C.), August 1997-March 1999; Assistant Director, January 1996-November 1996. Coordinated policy processes on a wide range of issues, from Social Security reform to job training reform, unemployment insurance reform, homeownership and low-income housing issues, the minimum wage, and Individual Development Accounts. Responsible

1

for helping to coordinate the Administration's daily economic message and to promote (and defend) President Clinton's economic record.

- **Economics Teacher,** Phillips Exeter Academy Summer School (Exeter, New Hampshire), June 1997-August 1997. Taught introductory economics at Phillips Exeter Academy Summer School.

- **Economic Consultant,** James Carville (Washington, D.C.), August 1995-January 1996. Helped James Carville, President Clinton's 1992 campaign strategist, research and write his *New York Times* #1 best-selling book, *We're Right, They're Wrong: A Handbook for Spirited Progressives.*

- **Special Assistant to the Chief Economist**, U.S. Department of Labor, (Washington, D.C.), August 1994-August 1995. Served as an economic aide to the Chief Economist (Alan B. Krueger) and the Secretary of Labor (Robert B. Reich).

### Volunteer Positions

- **Director of Policy Preparations for Vice Presidential Debate,** Gore-Lieberman Presidential Campaign, September 2000-October 2000. Oversaw policy preparations for Democratic Vice Presidential candidate before his debate with the Republican Vice Presidential candidate.

- **Weekly Commentator,** *Wall Street Journal Online,* September 2004-November 2004. Commented on economic issues during the 2004 presidential campaign. Topics of weekly commentary included jobs, health care, energy, trade, taxes, tort reform, appointments, and fiscal policy.

## EDUCATION:

- Oxford University, M.Sc. in Economic and Social History, 1997

- Princeton University, A.B. *summa cum laude* in Economics, 1996

- Phillips Exeter Academy, graduate with High Honors, 1991

## HONORS, PROFESSIONAL ASSOCIATIONS, AND APPOINTMENTS:

- Phi Beta Kappa, inducted June 1996

- Marshall Scholar, 1996

- *USA Today* All-USA College Academic Team, 1996

- Corporation for Enterprise Development Leadership Award for "Forging Innovative Public Policies to Expand Economic Opportunity in America," 1999

- *Who's Who in America*, 2001-Present; Also, *Who's Who in the World*; *Who's Who in Science and Engineering*; *Who's Who in Finance and Business*; and *Who's Who of Emerging Leaders*

- California Workforce Investment Board, 2000-2003

- California Governor's Technology Advisory Group, 2000-2003

2

- Adjunct Lecturer, University of Southern California (Los Angeles, CA), January 2002-June 2002.

- *Global Competition Review*'s "40 under 40: The World's 40 Brightest Young Antitrust Lawyers and Economists," 2004

- *Global Competition Review*'s "Best Young Competition Economists," 2006

- *The International Who's Who of Competition Economists*, 2007-Present

- LawDay Leading Competition Economics Experts, 2009-Present.

- Expert Guides, Best of the Best USA, 2011-Present.

- Fellow, University of Southern California's Center for Communication Law & Policy, 2007-Present.

- FTI Consulting Inc., Founders Award, 2008.

- Senior Fellow, Center for American Progress, 2009-Present

- Board of Directors, Sebago Associates, Inc., 2000-2007; Competition Policy Associates, Inc., 2003-2006; The First Tee of Washington, DC, 2005-2011; Ibrix, Inc. (Sold to Hewlett-Packard), 2006-2007; JMP Securities, Inc. (NYSE: JMP), 2011-Present; Tiger Woods Foundation, Board of Governors, 2012-Present; Children's Golf Foundation, 2013-Present.

- Clinton Global Initiative, Member, 2008-Present; The Grassroot Soccer, Ambassadors Council, 2010-Present; The First Tee, Trustee, 2013-Present.

- Member of the American Economic Association, the Econometric Society, the American Finance Association, and the United States Golf Association.

**REPORTS, PAPERS, AND NOTES:**

- "The Impact of Federal Revenues from Limiting Participation in the FCC 600 MHz Spectrum Auction," with Philip Haile and Maya Meidan, Commissioned by AT&T, October 30, 2013.

- "The Definition of Small Business in the Marketplace Fairness Act of 2013," Commissioned by eBay, Inc., October 8, 2013.

- "The Benefits of Patent Settlements: New Survey Evidence on Factors Affecting Generic Drug Investment," with Bret Dickey, Commissioned by the Generic Pharmceutical Association, July 23, 2013.

- "The Liftoff of Consumer Benefits from the Broadband Revolution," with Mark Dutz and Robert Willig, *Review of Network Economics,* Volume 11, Issue 4, Article 2, 2012.

- "Antitrust Guidelines for Private Purchasers Engagedin Value Purchasing of Health Care," with Tim Muris and Bilal Sayyed, Commissioned by Buying Value, July 2012.

- "The Economic Benefits of Pharmacy Benefit Managers," with Kevin Green, Commissioned by Express Scripts and Medco, December 5, 2011.

- "An Analysis of the Benefits of Allowing Satellite Broadband Providers to Participate Directly in the Proposed CAF Reverse Auctions," with Bryan Keating, Commissioned by ViaSat, Inc., April 18, 2011.

- "A Preliminary Economic Analysis of the Budgetary Effects of the Proposed Restrictions on 'Reverse Payment' Settlements," with Bret Dickey and Robert Willig, August 10, 2010.

- "An Economic Assessment of Patent Settlements in the Pharmaceutical Industry," with Bret Dickey and Laura Tyson, Volume 10, Issue 2, *Annals of Health Law*, Winter 2010.

- "An Economic Analysis of Consumer Harm from the Current Retransmission Consent Regime," with Michael Katz and Theresa Sullivan, Commissioned by the National Cable & Telecommunications Association, DIRECTV, and DISH Network, November 12, 2009.

- "Intellectual Property and Innovation: New Evidence on the Relationship Between Patent Protection, Technology Transfer, and Innovation in Developing Countries," with Mark Dutz and Antara Dutta, October 2009.

- "Intellectual Property and Innovation: A Literature Review of the Value of Patent Protection for Developing Countries," with Mark Dutz and Antara Dutta, October 2009.

- "An Economic Perspective on the Antitrust Case Against Intel," with Robert Willig and Gilad Levin, October 2009.

- "The Substantial Consumer Benefits of Broadband Connectivity for U.S. Households," with Mark Dutz and Robert Willig, July 2009.

- "An Economic Assessment of the Homeowners' Defense Act of 2009," with Doug Fontaine, July 2009.

- "A Preliminary Economic Analysis of FTC Chairman Leibowitz's June 23rd Speech," with Robert Willig, June 24, 2009.

- "Assessment of Microsoft's Behaviour in the Browser Market," with Assaf Eilat, Gilad Levin, Andrea Lofaro, and Jan Peter van der Veer, Submitted to the Commission of the European Communities, COMP/C-3/39.530, May 27, 2009.

- "An Economic Perspective on the Microsoft Internet Explorer Tying Case," with Assaf Eilat, Gilad Levin, Andrea Lofaro, and Jan Peter van der Veer, Submitted to the Commission of the European Communities, COMP/C-3/39.530, April 24, 2009.

- "The Empirical Effects of Collegiate Athletics: An Update Based on 2004-2007 Data," with Mark Israel, February 2009.

- "An Econometric Analysis of the Matching Between Football Student Athletes and Colleges," with Yair Eilat, Bryan Keating, and Robert Willig, January 2009.

- "An Economic Assessment of Regulating Credit Card Fees and Interest Rates," with Susan H. Manning, October 2007.

- "An Assessment of the Competitive Effects of the SKY-Prime Merger: Lessons from the Recent News Corp.-DIRECTV Merger," with Cristian Santesteban, Submitted to New Zealand Commerce Commission, January 23, 2006.

- "Closing the College Savings Gap," with Peter Orszag and Jason Bordoff, November 2005.

- "Putting in Place An Effective Media Player and Media Server Remedy," with Joseph E. Stiglitz, Submitted to the Korean Fair Trade Commission, October 10, 2005.

4

- "An Economic Analysis of Microsoft's Tying of the Windows Media Player to the Windows Operating System and Its Impact on Consumers, Competition, and Innovation," with Joseph E. Stiglitz, Submitted to the Korean Fair Trade Commission, September 12, 2005.

- "Economic Analyses of Microsoft's Abusive Tie and Its Impact on Consumers, Competition, and Innovation," with Joseph E. Stiglitz and Sangin Park, Submitted to the Korean Fair Trade Commission, September 12, 2005.

- "The Empirical Effects of Division II Intercollegiate Athletics," with Peter R. Orszag, June 2005.

- "An Economic Analysis of Microsoft's Abusive Tie and Its Impact on Consumers, Competition, and Innovation," with Joseph E. Stiglitz and Jason Furman, Submitted to the European Court of First Instance, Case T-201/04 R, May 12, 2005.

- "The Physical Capital Stock Used in College Athletics," with Peter R. Orszag, April 2005.

- "The Empirical Effects of Collegiate Athletic Spending: An Update," with Peter R. Orszag, April 2005.

- "Putting in Place An Effective Media Player Remedy," with Joseph E. Stiglitz, Submitted to the Commission of the European Communities, April 27, 2005.

- "The Empirical Effects of Collegiate Athletic Spending: An Interim Report," with Robert E. Litan and Peter R. Orszag, the National Collegiate Athletic Association and Sebago Associates, Inc., August 2003 (reprinted in *The Business of Sports*, edited by Scott Rosner and Kenneth Shropshire (Jones and Bartlett Publishes, 2004)).

- "Learning and Earning: Working in College," with Peter R. Orszag and Diane M. Whitmore, *Journal of Student Employment*, Volume IX, Number 1, June 2003.

- "The Impact of Asbestos Liabilities on Workers in Bankrupt Firms," with Joseph E. Stiglitz and Peter R. Orszag, *Journal of Bankruptcy Law and Practice*, Volume 12, Issue No. 1, February 2003.

- "The Process of Economic Policy-Making During the Clinton Administration," with Peter R. Orszag and Laura D. Tyson, in *American Economic Policy in the 1990s*, edited by Jeffrey Frankel and Peter R. Orszag (Cambridge, Massachusetts: MIT Press, 2002).

- "The Implications of the New Fannie Mae and Freddie Mac Risk-Based Capital Standard," with Joseph E. Stiglitz and Peter R. Orszag, *Fannie Mae Papers*, Volume I, Issue 2, March 2002 (reprinted in *Housing Matters: Issues in American Housing Policy*).

- "Hispanics and the Current Economic Downturn: Will the Receding Tide Sink Hispanics?" with Alan B. Krueger, Pew Hispanic Center, January 2002.

- "Aging in America: A Policy Perspective," with Jonathan Gruber and Peter R. Orszag, The Pew Charitable Trusts and Sebago Associates, Inc., January 2002.

- "An Economic Analysis of Spectrum Allocation and Advanced Wireless Services," with Martin N. Baily, Peter R. Orszag, and Robert D. Willig, Cellular Telecommunications and Internet Association and Sebago Associates, Inc., October 2001.

- "A New Look at Incentive Effects and Golf Tournaments," in *The Economics of Sports*, edited by Andrew Zimbalist (London: Edward Elgar Publishing, 2001). Original version in *Economics Letters*, 46, March 1994, p. 77-88.

5

- "Learning and Earning: Working in College," with Peter R. Orszag and Diane M. Whitmore, UPromise, Inc. and Sebago Associates, Inc., August 2001.

- "The Impact of Potential Movie and Television Industry Strikes on the Los Angeles Economy," with Ross C. DeVol, Joel Kotkin, Peter R. Orszag, Robert F. Wescott, and Perry Wong, The Milken Institute and Sebago Associates, Inc., April 19, 2001.

- "Would Raising IRA Contribution Limits Bolster Retirement Security for Lower- and Middle-Income Families?" with Peter R. Orszag, Center on Budget and Policy Priorities, April 2, 2001.

- "Computers in Schools: Domestic and International Perspectives," California Technology, Trade, and Commerce Agency and Sebago Associates, Inc., March 2001.

- "The Impact of Paying for College on Family Finances," with Laura D. Tyson, Joseph E. Stiglitz, and Peter R. Orszag, UPromise, Inc. and Sebago Associates, Inc., November 2000.

- "A Simple Analysis of Discarded Votes by Precinct in Palm Beach," with Peter R. Orszag, Sebago Associates, Inc., November 10, 2000.

- "Analysis of Votes for Buchanan by Precinct within Palm Beach and Broward Counties," with Peter R. Orszag, Sebago Associates, Inc., November 9, 2000.

- "A Statistical Analysis of the Palm Beach Vote," with Peter R. Orszag, Sebago Associates, Inc., November 8, 2000.

- "The Role of Government in a Digital Age," with Joseph E. Stiglitz and Peter R. Orszag, Computer and Communications Industry Association and Sebago Associates, Inc., October 2000.

- "Quantifying the Benefits of More Stringent Aircraft Noise Regulations," with Peter R. Orszag, Northwest Airlines and Sebago Associates, Inc., October 2000.

- "All That Glitters Is Not Gold: The Feldstein-Liebman Analysis of Reforming Social Security with Individual Accounts," with Peter R. Orszag, Center on Budget and Policy Priorities, April 26, 2000.

- "Would Raising IRA Contribution Limits Bolster Retirement Security For Lower- and Middle-Income Families or Is There a Better Way?" with Peter R. Orszag, Center on Budget and Policy Priorities, April 12, 2000.

- "The Economics of the U.S.-China Air Services Decision," with Peter R. Orszag, and Diane M. Whitmore, United Parcel Service and Sebago Associates, Inc., March 2000.

## OP-EDS/LETTERS TO THE EDITOR:

- "Jack Welch Could Help Improve U.S. Jobs Data," with Peter Orszag, *Bloomberg,* October 9, 2012.

- "Giving Credit Where Credit Is Due," *The Hill,* December 2, 2011.

- "PBMs Save Us Billions," *The Hill,* November 28, 2011.

- "Drug Patent Settlements," with Robert Willig, *New York Times,* July 19, 2010.

- "Homeowners Defense Act Could Lower Insurance Premiums," *Treasure Coast Palm*, September 24, 2009.

- "Katrina Teaches Us To Financially Prepare Today for the Catastrophe of Tomorrow," *San Angelo Standard-Times*, September 23, 2009.

- "A Catastrophe Waiting To Happen," *The Daily Citizen*, September 15, 2009.

- "Broadband: Now A 'Necessity'," *Multichannel News*, August 10, 2009.

- "Forget the Estate Tax: America Needs An Inheritance Tax," *Ideas Primary*, January 23, 2008, available at http://www.ideasprimary.com/?p=442

- "Credit Where It's Due," *Wall Street Journal*, October 25, 2007.

- "Congress Grounds Delivery Competition," Sebago Associates, Inc., April 17, 2003.

- "Paul O'Neill Doesn't Cry for Argentina," Sebago Associates, Inc., August 3, 2001.

- "Do You Recognize The Clinton West Wing in *The West Wing*?" *The Atlantic Monthly* Online, March 2001.

### SPEECHES AND PRESENTATIONS:

- "An Economic Perspective on Reverse Payment Settlements in the Pharmaceutical Sector," Speech to the Generic Pharmaceutical Association 2013 Annual Meeting, Orlando, Florida, February 21, 2013.

- "Navigating Our Economic Challenges and the Role of Public Policy," Speech to the South Carolina Manufacturers Alliance Fourth Annual Textile Summit, Spartanburg, South Carolina, January 10, 2013.

- "Upward Price Pressure and Merger Analysis: What Is UPP's Proper Role and How Can UPP Deal With Real-World Issues?" Presentation to Gilbert + Tobin, Sydney, Australia, December 4, 2012.

- "Obama's Second Term: What It Means for the U.S. and World Economies," FTI Consulting, Inc., Brisbane, Australia, December 3, 2012.

- "Merger Substance: How to Conduct a Proper Anaylsis of a Merger's Competitive Effects, and How to Frame Related Legal Standards?" Panelist at Antitrust in Asia, American Bar Association, New Delhi, India, December 1, 2012

- "Financial Issues in College Sports," Panelist at the Third Annaul Sports Law Symposium: What is the Proper Role of Sports in Higher Education?, Institute of Sports Law and Ethics, Santa Clara University, September 6, 2012.

- "Pricing and Bundling of IT Products: Drawing The Line Between Lawful and Unlawful Behaviour," Panelist on GCR Live's Antitrust and Technology 2012, London, England, March 14, 2012.

- "The Role of Economic Evidence in Cartel Enforcement," Speaker on ABA Section of International Law Teleconference, February 28, 2012.

- "Reverse Payment Settlements in the Pharmaceutical Industry," Presentation to the House Energy and Commerce Committee Staff, July 15, 2011.

- "Increased Government Intervention: The Good, The Bad, and the Ugly," Panelist, Association of Management Consulting Firms, New York, NY, December 2, 2010.

- "The Economic Challenges and Trade-Offs Facing the Obama Administration," Remarks to RBS Citizens, Boston, MA, June 8, 2010.

- "Competition Policy As Innovation Policy," Panelist, Computer & Communications Industry Association, Washington DC, October 27, 2009.

- "State of the Market: Regulatory Evolution and Policy," Moderator, Youth, I.N.C. and Piper Jaffray, New York, NY, September 29, 2009.

- "The Empirical Effects of Collegiate Athletics," Presentation to the NCAA Leadership Advisory Board, Detroit, Michigan, April 4, 2009.

- "The Economic Challenges and Trade-Offs Facing the Obama Administration," Remarks to the Junior Capital Group, Proskauer Rose, LLP, New York, NY, February 10, 2009.

- "Managing Communications During Unprecedented Economic Times," Panelist, The California Club, Los Angeles, CA, January 27, 2009.

- Presentation to the Computer & Communications Industry Association's Antitrust Summit on Innovation and Competition Policy in High-Tech Markets, Washington DC, October 24, 2008.

- Presentation to the Center for American Progress Action Fund Session on the "Avoiding the Pitfalls of Credit Card Debt," Washington, DC, February 25, 2008.

- "Distribution Fund Planning and Management: Lessons Learned from the Global Research Analyst Settlement," with Francis McGovern, Presentation to the Securities and Exchange Commission, Washington, DC, January 31, 2006.

- "The Empirical Effects of Division II Intercollegiate Athletics," Presentation to the National Collegiate Athletic Association 2006 Annual Convention, Indianapolis, Indiana, January 8, 2006.

- "Rules of the Game: Defining Antitrust Markets in Cases Involving Sports," Presentation to the Wilmer, Cutler, Pickering, Hale & Dorr Antitrust Lunch, Washington, DC, December 8, 2005.

- "Competition Policy, Antitrust, and The High-Tech Economy," Keynote Address to the Computer & Communications Industry Association TechSummit 2005, Laguna Beach, CA, October 26, 2005.

- "The Empirical Effects of Division II Intercollegiate Athletics," Presentation to the Division II Chancellors and Presidents Summit, Orlando, FL, June 25, 2005.

- "The Empirical Effects of Collegiate Athletic Spending: An Update and Extension," Presentation to the President's Task Force on the Future of Intercollegiate Athletics, Tucson, AZ, June 9-10, 2005.

- "The Empirical Effects of Collegiate Athletic Spending: An Update and Extension," Presentation to the NCAA Division I Board of Directors, Indianapolis, IN, April 28, 2005.

- "An Analysis of Division II Athletic Expenditures: Preliminary Findings," Presentation to the NCAA Division II Board of Directors, Indianapolis, IN, April 28, 2005.

8

- "An Analysis of Division II Athletic Expenditures: An Overview of Study Design," Presentation to the National Collegiate Athletic Association 2005 Annual Convention, Grapevine, Texas, January 8, 2005.

- "The Empirical Effects of Collegiate Athletic Spending: An Interim Report," Presentation to the National Association of State Universities and Land Grant Colleges Annual Conference, November 17, 2003.

- "The Impact of Asbestos Liabilities on Workers in Bankrupt Firms," *South Texas Law Review,* "Symposium: Asbestos Litigation," Fall 2003.

- "The Impact of Asbestos Liabilities on Workers in Bankrupt Firms," Presentation to the Conference on "Understanding Asbestos Litigation: The Genesis, Scope, and Impact," U.S. Chamber of Commerce, Washington, DC, January 23, 2003.

- "The Process of Economic Policy-Making During the Clinton Administration," Presentation to the Conference on "American Economic Policy in the 1990s," Center for Business and Government, John F. Kennedy School of Government, and Harvard University, Cambridge, MA, June 29, 2001.

- "The Impact of Paying for College on Family Finances," Presentation to the Conference on "Funding Excellent Schools and Colleges for All Students," National Conference of State Legislatures, Savannah, Georgia, February 17, 2001.

- "China and the Internet," Remarks on Entertainment and the Internet in China at the EMASIA 2000 Forum, The Asia Society, Los Angeles, CA, May 23, 2000.

- "Is It The Star or Just an Extra? The Role Government Plays in a Digital Economy," Remarks on the Regulation of Global Electronic Commerce at the eCommerce and Global Business Forum, The Anderson School at UCLA and the University of Washington Business School, Santa Cruz, CA, May 18, 2000.

- "Lessons Learned from the Emergency Loan Guarantee Programs," Keynote Address at the Government Guaranteed Lending 2000 Conference, Coleman Publishing, Inc., May 4, 2000.

- "Don't Just Think, Believe," Remarks to the Assembly of Phillips Exeter Academy, Exeter, New Hampshire, February 9, 1999.

## TESTIMONY:

- Hearing on "Pay-for-Delay Deals: Limiting Competition and Costing Consumers," Testimony to the Senate Judiciary Committee, Subcommittee on Antitrust, Competition Policy, and Consumer Rights, July 23, 2013.

- *Federal Trade Commission v. Actavis, Inc., et al.,* Signatory, Brief of Antitrust Economists as *Amici Curiae* before the Supreme Court, No. 12-416, February 28, 2013.

- *VOOM HD Holding LLC v. EchoStar Satellite LLC,* In the Supreme Court of the State of New York, County of New York (Index No. 600292/08) (Expert Report: December 4, 2009; Deposition Testimony: March 5, 2010; Supplemental Expert Report: August 10, 2012; Supplemental Deposition Testimony: September 14, 2012; Jury Trial Testimony: October 11-12, 2012).

- *Hewlett-Packard Company v. Oracle Corporation,* In the Superior Court of the State of California, County of Santa Clara (Case No 1-11-CV-203163) (Expert Report: March 26,

2012; Rebuttal Report: April 9, 2012; Deposition Testimony: April 19, 2012, February 5, 2013; Supplemental Expert Report: December 10, 2012; Trial Testimony: March 18, 2013).

- *In The Matter of Game Show Network, LLC v. Cablevision Systems Corporation*, in File No. CSR-8529-P, Before the Federal Communications Commission (Expert Report: December 12, 2011; Reply Declaration: February 9, 2012; Expert Report: December 14, 2012; Deposition Testimony: February 7, 2013; Direct Testimony: March 12, 2013).

- Hearing on "The Express Scripts/Medco Merger: Cost Savings for Consumers or More Profits for the Middlemen?" Written Testimony to the Senate Judiciary Committee, Subcommittee on Antitrust, Competition Policy, and Consumer Rights, December 6, 2011.

- *In the Matter of Applications of AT&T Inc. and Deutsche Telekom AG For Consent To Assign or Transfer Control Licenses and Authorization,* in WT Docket No. 11-65, with Robert D. Willig and Jay Ezrielev, Submitted to the Federal Communications Commission, Commissioned by AT&T, June 9, 2011.

- *In The Matter of The Tennis Channel v. Comcast Cable Communications, LLC*, in File No. CSR-8258-P, Before the Federal Communications Commission (Declaration: February 11, 2010; Reply Declaration: April 13, 2010; Expert Report: February 25, 2011; Deposition Testimony: March 8, 2011; Written Direct Testimony: April 15, 2011; Rebuttal Declaration: April 26, 2011; Courtroom Testimony: April 27, 2011; Supplemental Deposition Testimony: May 1, 2011; Supplemental Rebuttal Declaration, May 12, 2011).

- "Response to Supplementary Comments of Hubert Horan," Submitted to the Department of Transportation, *Joint Application of Delta Airlines, Inc.; Virgin Blue Airlines PTY LTD; Virgin Blue International Airlines PTY LTD d/b/a V Australia; Pacific Blue Airlines (NZ) LTD; and Pacific Blue Airlines (Aust) PTY LTD*, with Mark Israel, Bryan Keating, and Robert Willig, Docket DOT-OST-2009-0155, Commissioned by Delta Air Lines, October 22, 2010.

- "Measuring Consumer Benefits from Antitrust Immunity for Delta Air Lines and Virgin Blue Carriers," Submitted to the Department of Transportation, *Joint Application of Delta Airlines, Inc.; Virgin Blue Airlines PTY LTD; Virgin Blue International Airlines PTY LTD d/b/a V Australia; Pacific Blue Airlines (NZ) LTD; and Pacific Blue Airlines (Aust) PTY LTD*, with Mark Israel, Bryan Keating, and Robert Willig, Docket DOT-OST-2009-0155, Commissioned by Delta Air Lines, October 13, 2010.

- *In the Matter of Implementation of Section 224 of the Act; A National Broadband Plan for Our Future,* with Allan Shampine, Submitted to the Federal Communications Commission (WC Docket No. 07-245; GN Docket No. 09-51), Commissioned by the Edison Electric Institute, Declaration Submitted on October 4, 2010; Supplemental Declaration, Submitted on December 14, 2010.

- *In Re: Cable Subscribership Survey For the Collection of Information Pursuant to Section 612(g) of the Communications Act*, with Michael Katz and Theresa Sullivan, Submitted to the Federal Communications Commission (MB Docket No. 07-269), Commissioned by the National Cable & Telecommunications Association, DIRECTV, and DISH Network, December 16, 2009.

10

- *Caroline Behrend, et al. vs. Comcast Corporation, et al.*, In the United States District Court for the Eastern District of Pennsylvania (Civil Action No. 03-6604) (Declaration: August 21, 2009; Deposition: September 29, 2009).

- *In The Matter of TCR Sports Broadcasting Holding, LLP d/b/a Mid-Atlantic Sports Network v. Comcast Corporation*, in MB Docket No. 08-214, File No. CSR-8001-P, Before the Federal Communications Commission (Declaration with Jay Ezrielev: July 31, 2008; Expert Report: March 19, 2009; Deposition Testimony: April 23, 2009; Courtroom Testimony: May 26, 2009; Reply Declaration: June 1, 2009).

- *In The Matter of NFL Enterprises LLC v. Comcast Cable Communications, LLC*, MB Docket No. 08-214, File No. CSR-7876-P, Before the Federal Communications Commission (Declaration with Jay Ezrielev: June 20, 2008; Expert Report: March 13, 2009; Deposition Testimony: April 1, 2009; Written Direct Testimony: April 6, 2009; Courtroom Testimony: April 16, 2009).

- *In The Matter of Applications for the Transfer of Control of Licenses and Authorizations From Centennial Communications Corp. to AT&T*, with Robert D. Willig and J. Loren Poulsen, Submitted to the Federal Communications Commission, Commissioned by AT&T, November 21, 2008.

- *In The Matter of Implementation of the Cable Television Consumer Protection and Competition Act of 1992; Development of Competition and Diversity in Video Programming Distribution: Section 628(c)(5) of the Communications Act; Sunset of Exclusive Contract Prohibition; Review of the Commission's Program Access Rules and Examination of Programming Tying Arrangements,* Filed in Conjunction With Reply Comments Submitted to the Federal Communications Commission (MB Docket No. 07-29; MB Docket No. 07-198), Commissioned by Discovery Communications, Inc., February 12, 2008.

- *In Re: Intel Corp. Microprocessor Antitrust Litigation; Phil Paul et al v. Intel Corporation*, In the United States District Court for the District of Delaware (MDL Docket No. 05-1717 (JJF) and C.A. No. 05-485 (JJF) (Declaration: August 10, 2007; Declaration: April 23, 2007).

- *In The Matter of Applications for the Transfer of Control of Licenses and Authorizations From Dobson Communications to AT&T*, with Robert D. Willig, Submitted to the Federal Communications Commission, Commissioned by AT&T, July 12, 2007.

- *Microsoft Corporation v. Commission of the European Communities*, European Court of First Instance, Case T-201/04 R, April 24-25, 2006.

- *In The Matter of Satellite Home Viewer Extension and Reauthorization Act of 1994,* with Jay Ezrielev, Submitted to the Library of Congress, Copyright Office (Docket No. RM 2005-07), Commissioned by EchoStar Satellite L.L.C., September 1, 2005.

- *In The Matter of Rainbow DBS Company, LLC, Assignor, and EchoStar Satellite L.L.C., Assignee, Consolidated Application for Consent to Assignment of Space Station and Earth Station Licenses, and related Special Temporary Authorization*, with Simon J. Wilkie, Submitted to the Federal Communications Commission (IB Docket No. 05-72), Commissioned by EchoStar Satellite L.L.C. and Rainbow DBS Company, LLC, April 12, 2005.

- *In The Matter of Applications for the Transfer of Control of Licenses and Authorizations From Western Wireless Corporation to ALLTEL Corporation*, with Robert D. Willig and

11

Yair Eilat, Submitted to the Federal Communications Commission (WT Docket No. 05-50), Commissioned by ALLTEL Corporation and Western Wireless Corporation, March 29, 2005.

- *In The Matter of A La Carte and Themed Tier Programming and Pricing Options for Programming Distribution on Cable Television and Direct Broadcast Satellite Systems*, with Robert D. Willig and Jay Ezrielev, Filed in Conjunction With Comments Submitted to the Federal Communications Commission (MB Docket No. 04-207), Commissioned by Discovery Communications, Inc., July 15, 2004.

- "An Economic Assessment of the Exclusive Contract Prohibition Between Vertically Integrated Cable Operators and Programmers," with Peter R. Orszag and John M. Gale, Filed in Conjunction With Reply Comments Submitted to the Federal Communications Commission (CS Docket No. 01-290), Commissioned by EchoStar Satellite Corporation and DIRECTV, Inc., January 7, 2002

- Hearing on "The Department of Commerce Fiscal Year 2001 Budget and Its Native American Initiatives," Testimony to the United States Senate Indian Affairs Committee, February 23, 2000.

- Hearing on "Testimony on S. 614: The Indian Tribal Regulatory Reform and Business Development Act," Testimony to the United States Senate Indian Affairs Committee, May 19, 1999.

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

# Corrected Appendix B
# Materials Relied Upon

## Legal Filings

First Amended Class Action Consolidated Complaint, *In Re Electronic Books Antitrust Litigation*, No. 11-md-02293-DLC (S.D.N.Y. Oct. 23, 2013).

Second Amended Complaint for Injunctive Relief, Civil Penal Ties & As Parens Patriae on Behalf of Consumers, *State of Texas, et al., v. Penguin Group (USA) Inc., et al.*, 12-cv-3394-DLC (S.D.N.Y. May 17, 2012).

Opinion & Order, *United States v. Apple Inc., et al.*, No. 12-cv-02826-DLC; *State of Texas, et al., v. Penguin Group (USA) Inc., et al.*, No. 12-cv-03394-DLC (S.D.N.Y. July 10, 2013).

Complaint, *United States v. Apple Inc. et al.*, No. 12-cv-02826-DLC (S.D.N.Y. Apr. 11, 2012).

Declaration of John Lange in Support of Motion to Quash or Modify Subpoena Duces Tecum, *In Re Amazon.com*, No. 12-mc-00351-P1 (S.D.N.Y. Oct. 5, 2012).

Letter from Rebecca Fisher, Senior Assistant Attorney General, Texas, to The Honorable Denise L. Cote, *State of Texas, et al., v. Penguin Group (USA) Inc., et al.*, No. 12-cv-03394-DLC (S.D.N.Y. July 10, 2013).

Trial Transcript, *United States v. Apple Inc., et al., v., Penguin Group (USA) Inc., et al.*, No. 12-cv-02826-DLC; *State of Texas, et al., v. Penguin Group (USA) Inc., et al.*, No. 12-cv-03394-DLC (S.D.N.Y June 4, 10, 12, 17, and 18, 2013).

Trial Exhibit DX-463, *USA v. Apple Inc., et al.*, 12-CV-02826-DLC.

Trial Exhibit DX-719, *USA v. Apple Inc., et al.*, 12-CV-02826-DLC.

## Expert Witness Declarations & Testimony

Declaration of Abraham L Wickelgren, Ph.D. Regarding Damages to Eligible Consumers and the Proposed Plan of Allocation, August 27, 2012.

Declaration of Professor Kevin M. Murphy, April 26, 2013.

Corrected Declaration of Roger G. Noll, October 18, 2013.

Declaration of Joseph P. Kalt, Ph.D., November 15, 2013.

Direct Testimony of Jonathan B. Baker, Ph.D., April 25, 2013.

Direct Testimony of Orley C. Ashenfelter, Ph.D., June 6, 2013.

1

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

Direct Testimony of Richard J. Gilbert, Ph.D., April 25, 2013.

Expert Report of Daniel L. Rubinfeld, February 8, 2013.

Expert Rebuttal Report of Professor Daniel L. Rubinfeld, March 1, 2013.

Rebuttal Expert Report of Dr. Michelle Burtis, March 1, 2013.

Rebuttal Report of Jonathan B. Baker, March 1, 2013.

Rebuttal Report of Orley Ashenfelter, March 1, 2013.

Report of Orley Ashenfelter, February 8, 2013.


## Fact Witness Declarations & Testimony

Declaration of Eddy Cue (Apple), April 26, 2013.

Declaration of John Sargent (Macmillan), April 26, 2013.

Declaration of Madeline McIntosh (Random House), April 25, 2013.

Declaration of Theresa Horner (Barnes & Noble), April 26, 2013.

Direct Testimony of David Naggar (Amazon), April 23, 2013.

Direct Testimony of Laura Porco (Amazon), April 24, 2013.

Direct Testimony of Russell C. Grandinetti (Amazon), April 24, 2013.


## Depositions

Deposition of Benjamin Klein, Ph.D., March 26, 2013.

Deposition of Brian Murray (HarperCollins), August 25, 2010.

Deposition of Dennis Eulau (Simon & Schuster), January 11, 2011.

Deposition of Eddy Cue (Apple), January 25, 2011.

Deposition of Jonathan B. Baker, Ph.D., April 3, 2013.

Deposition of Keith Moerer, December 13, 2012.

Deposition of Richard J. Gilbert, April 10, 2013.

Deposition of Robert G. Noll, November 1, 2013.

Deposition of Russell Grandinetti (Amazon), January 28, 2013.

Deposition of William Lynch (Barnes & Noble), June 23, 2011.


## Previously Produced Documents

2

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

AMZN-D-00000024-35.

AMZN-DOJ-000023-38.

AMZN-DOJ-000302-67.

AMZN-DOJ-001023-32.

AMZN-DOJ-002453-95.

AMZN-DOJ-002496-536.

AMZN-MDL-0003711-58.

AMZN-MDL-0042974-75.

AMZN-MDL-0088298.

AMZN-MDL-0153831-55.

AMZN-MDL-0153986-89.

AMZN-MDL-0154848-49.

AMZN-MDL-0161098-103.

AMZN-TXCID-0000345-65.

AMZN-TXCID-0000436-63.

AMZN-TXCID-0000468-85.

AMZN-TXCID-0000486-97.

AMZN-TXCID-0000543-60.

AMZN-TXCID-0000771-98.

AMZN-TXCID-0000799-832.

AMZN-TXCID-0002410-13.

AMZN-TXCID-0003759-98.

AMZN-TXCID-0005308-22.

AMZN-TXCID-0007031-46.

AMZN-TXCID-0009369-92.

AMZN-TXCID-0009984.

AMZN-TXCID-0018298-302.

AMZN-TXCID-0019428-42.

APLEBOOK-00013025-39.

APLEBOOK-00013040-65.

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

APLEBOOK-00013066-81.

APLEBOOK-00013082-100.

APLEBOOK-00013101-23.

APLEBOOK-03345078-88.

APPLETX00018016.

BN00037065-66.

BN00044796-800.

BN00044959-62.

BN00046926-41.

BN00093250-81.

BN00104150-66.

BN00104167-89.

BN00104191-229.

BN00104230-52.

BN00109051.

BN00111903-38.

BN00117468.

BN00117977-8025.

BN00118061-154.

BN00118217-30.

BN00118633-37.

BN00120696-744.

BN00120819-36.

BN00120840.

BN00120841.

BN00121697-99.

BN00512546-62.

BN00530423-24.

BN00530426.

BN00663317.

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

BN00808211-78.

HC-TXAG-0906440-58.

MAC0038365-402.

MCMLN-LIT-00106678-81.

MCMLN-LIT-00321918-57.

PEN379983-86.

PEN-LIT-00159549-68.

PEN-LIT-00172856.

PEN-LIT-00188802-06.

RH-MDL-00052068-70.

RH-USDOJ-00025408-30.

RH-USDOJ-00040780-81.

SEL00033107-08.

SEL00059764-68.

SEL00060359-63.

SEL00063904-91.

SEL00093124-44.

SEL-R-0001126-44.

SEL-R-0013029-41.

SEL-R-1357315-19.

SEL-R-1697218-37.

SS-MDL-000032558-99.

## Data

01_Add_Amazon_to_bookData.sas.

01_Amazon_price.sas.

02_Add_Apple_to_bookData.sas.

02_Apple_price.sas.

03_Add_BnN_to_bookData.sas.

03_Google_price.sas.

5

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

04_Add_BAM_to_bookData.sas.

04_BN_price.sas.

05_Add_Google_to_bookData.sas.

05_Sony_price.sas.

06_Add_Kobo_to_bookData.sas.

06_Kobo_price.sas.

07_Add_Sony_to_bookData_eBookData.sas.

07_BAM_price.sas.

08_Combine_bookdata_datasets.sas.

08_ebookprice_merge.sas.

09_Create_Price_Datasets.sas.

10_Post_Weekly_01_Add_Amz_Genre.sas.

2010_ebooks.txt, (BAM).

2011_ebooks.txt, (BAM).

2012_ebooks.txt, (BAM).

amazonold_weekly_mapped.sas7bdat, from Burtis.

amznew_weekly_mapped.sas7bdat, from Burtis.

APLEXP00002.

APLEXP00003.

apple_weekly_mapped.sas7bdat, from Burtis.

Author_Eq_Publisher_Top200.txt

bam_weekly_mapped.sas7bdat, from Burtis.

bandn_weekly_mapped.sas7bdat, from Burtis.

cl_publisher_merge.

Create_Bam_purchases.sas.

Create_google_transactions.sas.

Damages.do

damages-mid.dta

DRBD_Transactional_Records.tsv, (Sony).

ebook_asin_map.sas7bdat, from Burtis.

6

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

eBook_Data_Build.sas.

ebook_eisbn_map.sas7bdat, from Burtis.

ebook_orders_2009.txt, (BN).

ebook_orders_2010.txt, (BN).

ebook_orders_2011.txt, (BN).

ebook_orders_2012.txt, (BN).

ebook_sales_2009.txt, (BN).

ebook_sales_2010.txt, (BN).

ebook_sales_2011.txt, (BN).

ebook_sales_2012.txt, (BN).

Ebook+Sales+Data+(Present+-+2011), (Amazon).

eBookData.txt, (BN).

eBookPrices.txt, (BN).

Ebooks+Data+(2008+-+2007), (Amazon).

Ebooks+Data+(2009+-+2008), (Amazon).

Ebooks+Data+(2010+-+2009), (Amazon).

Ebooks+Data+(2011-2010), (Amazon).

expandedNYT_withranges_top.dta.

fiscal_weekl.xls, (Kobo).

GOGEBKS-000580 - GOGEBKS-000600.csv, (Google).

GOGEBKS-001119.csv, (Google).

google_weekly_mapped.sas7bdat, from Burtis.

ibook_extract_20100403_20100430.txt, (Apple).

ibook_extract_20100501_20100531.txt, (Apple).

ibook_extract_20100601_20100630.txt, (Apple).

ibook_extract_20100701_20100731.txt, (Apple).

ibook_extract_20100801_20100831.txt, (Apple).

ibook_extract_20100901_20100930.txt, (Apple).

ibook_extract_20101001_20101031.txt, (Apple).

ibook_extract_20101101_20101130.txt, (Apple).

7

**CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER**

ibook_extract_20101201_20101215.txt, (Apple).

ibook_extract_20101216_20121231.txt, (Apple).

ibook_extract_20110101_20110131.txt, (Apple).

ibook_extract_20110201_20110228.txt, (Apple).

ibook_extract_20110301_20110331.txt, (Apple).

ibook_extract_20110401_20110430.txt, (Apple).

ibook_extract_20110501_20110531.txt, (Apple).

ibook_extract_20110601_20110630.txt, (Apple).

ibook_extract_20110701_20110731.txt, (Apple).

ibook_extract_20110801_20110831.txt, (Apple).

ibook_extract_20110901_20110930.txt, (Apple).

ibook_extract_20111001_20111031.txt, (Apple).

ibook_extract_20111101_20111130.txt, (Apple).

ibook_extract_20111201_20111231.txt, (Apple).

ibook_extract_20120101_20120131.txt, (Apple).

ibook_extract_20120201_20120229.txt, (Apple).

ibook_extract_20120301_20120331.txt, (Apple).

ibook_extract_20120401_20120411.txt, (Apple).

Import_Kindle_Catalog.sas.

Import_Old_Apple_Data.sas.

kcat_genreAsin.dta

kindle_book_catalog_v2.txt. (Amazon).

Kobo_Inc_US_historical_sales_details_(comma_delimited).csv, (Kobo).

kobo_weekly_mapped.sas7bdat, from Burtis.

New_Amz_Transactional.sas.

PCEgoods.dta

product_ebooks.txt, (BAM).

Publisher List.dta

Read_in_Kobo_Production.sas.

SEL00000011_CONFIDENTIAL.csv - SEL00000025_CONFIDENTIAL.csv, (Sony).

8

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

Self-Publishing Websites.xlsx

Sony_New_Transaction_Data_Import.sas.

Sony_Old_Transaction_Data_Import.sas.

sony_weekly_mapped.sas7bdat, from Burtis.

us_state.sas7bdat.

weekly_stack-1d.dta

zips.sas7bdat.


## Publicly Available Documents

Aaron Bartell and Dana Frix, "Time Warner Cable and CBS: Anatomy of a Retransmission Dispute," *TMT Perspectives*, August 5, 2013.

Aimin Yu, Yong Hu, and Ming Fan, 2011, "Pricing strategies for tied digital contents and devices," *Decisions Support Systems*, 51.

"Amazon Kindle Now Only $189," *Amazon.com press release*, June 21, 2010, http://phx.corporate-ir.net/phoenix.zhtml?c=176060&p=irol-newsArticle&ID=1440320&highlight=.

"Amazon Lowers Price on #1 Bestseller Kindle to $259 and Introduces New Addition to the Kindle Family of Wireless Reading Devices - Kindle with U.S. & International Wireless," *Amazon.com press release*, October 7, 2009, http://phx.corporate-ir.net/phoenix.zhtml?c=176060&p=irol-newsArticle&ID=1339431&highlight=.

"Amazon Takes on the High-End - Introducing the New Kindle Fire HD Family," *Amazon.com press release*, September 6, 2012, http://phx.corporate-ir.net/phoenix.zhtml?c=176060&p=irol-newsArticle&ID=1732546&highlight=.

Amazon, "Kindle Keyboard 3G, Free 3G + Wi-Fi, 6" E Ink Display – includes Special Offers & Sponsored Screensavers," http://www.amazon.com/gp/product/B004HZYA6E/ref=famstripe_kk3g.

Amazon, "Kindle," http://www.amazon.com/Kindle-eReader-eBook-Reader-e-Reader-Special-Offers/dp/B0051QVESA.

Andrea Nusca, "Sony, Google announce 1 million free books," *ZDNet*, July 29, 2009.

Andrew Rassweiler, "Amazon Kindle Fire Costs $201.70 to Manufacture," *iSuppli*, November 18, 2011.

"Announcing a New Generation of Kindle: The All-New Kindle is Smaller, Lighter, and Faster, with 50 Percent Better Contrast," *Amazon.com press release*, July 28, 2010, http://phx.corporate-ir.net/phoenix.zhtml?c=176060&p=irol-newsArticle&ID=1453463&highlight=.

"Apple Launches iPad," *Apple press release*, January 27, 2010, http://www.apple.com/pr/library/2010/01/27Apple-Launches-iPad.html.

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

"Apple Launches New iPad," *Apple press release*, March 7, 2012,
http://www.apple.com/pr/library/2012/03/07Apple-Launches-New-iPad.html.

Apple, "Shop iPad," http://store.apple.com/us/buy-ipad/ipad2, accessed October 18, 2013.

AuthorHouse, "About AuthorHouse," http://www.authorhouse.com/AboutUs/default.aspx.

Baker, "Mission Statement," http://bakerpublishinggroup.com/about.

Barb Dybwad, "Sony Reader details and pics," *Engadget.com*, January 6, 2006.

"Barnes & Noble Acquires Fictionwise," *Barnes & Noble press release*, March 5, 2009,
http://www.barnesandnobleinc.com/press_releases/2009_march_5_fictionwise.html.

"Barnes & Noble Announces Lowest Prices Ever on Award-Winning Nook Tablet and Nook Color Starting
Sunday," *Barnes & Noble press release*, November 3, 2012,
http://www.barnesandnobleinc.com/press_releases/11_3_12_nook_price_drop.html.

"Barnes & Noble Announces Lowest Prices Ever on Award-Winning Nook Tablet and Nook Color," *Barnes
& Noble press release*, August 13, 2012,
http://www.barnesandnobleinc.com/press_releases/08_13_12_bn_in_the_news.html.

"Barnes & Noble Introduces Nook Tablet, Its Fastest, Lightest Tablet with the Best in HD Entertainment,"
*Barnes & Noble press release*, November 7, 2011,
http://www.barnesandnobleinc.com/press_releases/2011_11_7_nook_tablet.html.

"Barnes & Noble Introduces Nook Wi-Fi and Lowers Nook 3G Price, Giving Book Lovers Greater Choice
and Even Greater Value" *Barnes & Noble press release*, June 21, 2010,
http://www.barnesandnobleinc.com/press_releases/2010_june_21_nook_wifi.html.

"Barnes & Noble Introduces nook, its Wireless eBook Reader with E Ink Display & First Color Touch
Screen for Navigation," *Barnes & Noble press release*, October 20, 2009,
http://www.barnesandnobleinc.com/press_releases/2009_oct_20_nook.html.

"Barnes & Noble Introduces the All-New Nook, The Simple Touch Reader," *Barnes & Noble press release*,
May 24, 2011, http://www.barnesandnobleinc.com/press_releases/2011_may_24_all-
new_nook_press_release.html.

"Barnes & Noble Launches World's Largest eBookstore; Introduces 'Every Device' Strategy; Upgrades
eReader Application," *Barnes & Noble press release*, July 20, 2009,
http://www.barnesandnobleinc.com/press_releases/2009_july_20_ebookstore.html.

"Barnes & Noble Slash Price on Nook 1st Edition to $89," *theeBookReader.com*, September 26, 2011,
http://blog.the-ebook-reader.com/2011/09/26/barnes-and-noble-slash-price-on-nook-1st-edition-to-
89/.

Barnes & Noble, "MVB E-Books," http://www.barnesandnoble.com/c/mvb-e-books.

10

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

BBC News, "Kindle Fire HD and Paperwhite sales Make Amazon no profit," October 11, 2012.

Beckham Publications, http://www.beckhamhouse.com/.

Black Diamond Publications, http://www.blackdiamondpublications.com/#!self-publishing/c1wax.

Bloomberg Businessweek, "As the Kindle Turns Five, Amazon Girds for a New Fight," November 26, 2012.

BookSurge, "About Us," http://www.booksurge.com/info/About_Us.

Brad Stone, "In Price War, E-Readers Go Below $200," *The New York Times*, June 21, 2010.

Brad Stone, 2013, *The Everything Store: Jeff Bezos and the Age of Amazon*, Little, Brown and Company.

Brent Rose, "Which Kindle Should You Buy?" *Gizmodo.com*, September 28, 2011, http://gizmodo.com/5844907/which-kindle-should-you-buy.

Brett Molina, "Apple Cuts price on old iPad, refunds recent buyers," *USA Today*, March 3, 2011, http://content.usatoday.com/communities/technologylive/post/2011/03/apple-drops-prices-on-first-generation-ipads/1.

Brian Heater, "Amazon: the Kindle Keyboard is Sticking Around," *Engadget.com*, September 6, 2012, http://www.engadget.com/2012/09/06/amazon-the-kindle-keyboard-is-sticking-around/.

Charles River Editors, http://www.charlesrivereditors.com/.

Charlie Sorrel, "Old Kindle Renamed 'Kindle Keyboard,' New Touch Just $10 Cheaper Than Fire," *Wired.com*, September 29, 2011, http://www.wired.com/gadgetlab/2011/09/old-kindle-renamed-kindle-keyboard-new-touch-just-10-cheaper-than-fire/.

CreateSpace, "About CreateSpace," https://www.createspace.com/AboutUs.jsp.

Daniel Cooper, "Amazon unveils new Kindle Fire with doubled RAM, 44 percent better performance and $159 price," *Engadget.com*, September 6, 2012, http://www.engadget.com/2012/09/06/amazon-kindle-fire-2012/.

David Carnoy, "Amazon Drops Price of Kindle 2 to $299," *CNET.com*, July 8, 2009, http://news.cnet.com/8301-17938_105-10282192-1.html.

David Carnoy, "Amazon ups author royalty Kindle, matching Apple," *CNET*, January 20, 2010.

Deborah Solomon, "Questions for Jeffrey P. Bezos, Book Learning," *The New York Times*, December 6, 2009.

Dell Magazines, "Our Company," http://www.pennydellpuzzles.com/about_us/default.aspx.

Dianna Dilworth, "Sony Releases iOS App For Reading," *Mediabistro.com*, November 6, 2012.

Disney Publishing, "About Us," https://www.disneyconsumerproducts.com/Home/display.jsp?contentId=dcp_home_ourbusinesses_company_overview_dpw&forPrint=false&language=en&preview=false&imageShow=0&pressRoom=DPW&translationOf=null&region=0.

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

Entertainment Close-Up, "Barnes & Noble Offers Weekly Series of Free Classic eBooks," July 22, 2010.

Entrepreneur Press, http://www.entrepreneur.com/page/220576.

ePublishing, "About ePublishing," http://www.epublishing.com/about-epublishing.

Eric Griffith, "How To Self-Publish Your Novel on the Amazon Kindle," *PCMag*, October 1, 2012.

Geoffrey A. Fowler and Jeffrey A. Trachtenberg, "'Vanity' Press Goes Digital," *The Wall Street Journal*, June 3, 2010.

Geoffrey A. Fowler, "Price Cuts Electrify E-Reader Market," *The Wall Street Journal*, June 22, 2010.

Geoffrey A. Fowler, "Publisher Delays E-Book Amid Debate on Pricing," *The Wall Street Journal*, July 13, 2009.

Hachette, "About Us," http://www.hachettebookgroup.com/about/.

Harlequin, "About Harlequin," http://www.harlequin.com/articlepage.html?articleId=36&chapter=0.

HarperCollins, "Company Profile," http://www.harpercollins.com/footer/companyProfile.aspx.

Headline, "About Us," http://www.headline.co.uk/Information/About%20Us.page.

Houghton Mifflin, "Company Overview: About HMH," http://www.hmhco.com/about-hmh.

Human Rights Watch, "About Us," http://www.hrw.org/about.

Hyperion, http://hyperionbooks.com/.

Indiebound, "Independent Bookstores Selling Kobo eReaders and eBooks," http://www.indiebound.org/ebooks.

Infinite Ideas, "About us," http://www.infideas.com/about-us/.

Infinity Publishing, "Is Print On Demand Publishing like Self-Publishing?," http://www.infinitypublishing.com/book-publishing-faqs/is-print-on-demand-publishing-like-self-publishing.html.

Internet Business News, "Borders offers free books to customers downloading Borders application," July 9, 2010.

"Introducing Amazon Kindle 2," *Amazon.com press release*, February 9, 2009, http://phx.corporate-ir.net/phoenix.zhtml?c=176060&p=irol-newsArticle&ID=1254544&highlight=.

"Introducing Amazon Kindle," *Amazon.com press release*, November 19, 2007, http://phx.corporate-ir.net/phoenix.zhtml?c=176060&p=irol-newsArticle&ID=1079388.

"Introducing Kindle DX – Amazon's Large Screen Addition to the Kindle Family of Wireless Reading Devices," *Amazon.com press release*, May 6, 2009, http://phx.corporate-ir.net/phoenix.zhtml?c=176060&p=irol-newsArticle_pf&ID=1285140&highlight=.

"Introducing the All-New Kindle Family: Four New Kindles, Four Amazing Price Points," *Amazon.com press release*, September 28, 2011, http://phx.corporate-ir.net/phoenix.zhtml?c=176060&p=irol-newsArticle&ID=1610968&highlight=KINDLE TOUCH.

12

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

"Introducing the New Kindle Paperwhite, the Most Advanced E-Reader Ever Constructed," *Amazon.com press release*, September 6, 2012, http://phx.corporate-ir.net/phoenix.zhtml?c=176060&p=irol-newsArticle&ID=1732545&highlight=.

"iPad 2 Arrives Tomorrow," *Apple press release*, March 10, 2011, http://www.apple.com/pr/library/2011/03/10iPad-2-Arrives-Tomorrow.html.

"iPad Arrives This Saturday," *Apple press release*, March 29, 2010, http://www.apple.com/pr/library/2010/03/29iPad-Arrives-This-Saturday.html

iUniverse, "About iUniverse," http://www.iuniverse.com/AboutUs/.

Jacqui Cheng, "Amazon hikes Kindle royalties to 70%, with a catch," *ArsTechnica*, January 20, 2010.

Jared Newman, "7-inch Tablet Wars: How Low Can Prices Go?" *Time.com*, August 14, 2012, http://techland.time.com/2012/08/14/cheap-tablet-wars-how-low-can-they-go/.

Jason Perlow, "The Coming eReader Apocalypse," *ZDNet*, December 21, 2012.

Jean Tirole, 1988, *The Theory of Industrial Organization*, The MIT Press.

Jeff Blagdon, "Amazon drops price of Kindle to $69, shipping September 14th," *TheVerge.com*, September 6, 2012, http://www.theverge.com/2012/9/6/3298072/amazon-69-kindle-update-announcement.

Jeffrey A. Trachtenberg and Geoffrey A. Fowler, "Publisher Delays E-Book Amid Debate on Pricing," *The Wall Street Journal*, July 13, 2009.

Jeffry Bartash, "Price war, iPad rapidly reshaping young e-book market; Analysis: Amazon, Barnes & Noble might lose profits, but gain market power," *Market Watch*, July 1, 2010.

Jesus Diaz, "Amazon Kindle Price Reduced to $359, Now Back in Stock," *Gizmodo.com*, May 27, 2008, http://gizmodo.com/393295/amazon-kindle-price-reduced-to-359-now-back-in-stock.

Jim Milliot, "B&N's Publt Newest Self-Publishing Entrant," *Publishers Weekly*, October 11, 2010.

Jim Milliot, "BEA 2013: The E-book Boom Years," *PublishersWeekly.com*, May 29, 2013.

Jim Milliot, "Trade Sales Rose 6.9% in 2012," *PublishersWeekly.com*, May 15, 2013.

Jonathan B. Baker, 1989, "The Antitrust Analysis of Hospital Mergers and the Transformation of the Hospital Industry," *Law and Contemporary Problems*, 51:2, 93:164.

Julianne Pepitone, "Amazon unveils $199 Kindle Fire tablet and $79 e-ink Kindle," *CNN.com*, September 28, 2011, http://money.cnn.com/2011/09/28/technology/amazon_tablet/index.htm.

"Just in Time for the Holidays: Barnes & Noble Announces New Low Price for Award-Winning NOOK Simple Touch Starting Sunday, December 9," *Barnes & Noble press release*, December 8, 2012, http://www.barnesandnobleinc.com/press_releases/12_8_12_nst_price_drop.html.

Kaplan, http://www.kaplan.com/.

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

Ken Auletta, "Paper Trail: Did Publishers and Apple Collude Against Amazon?" *The New Yorker*, June 25, 2012.

Kensington Publishing Corp., "About Us", http://www.kensingtonbooks.com/page.aspx/about.

Killian Bell, "Discounted First-Gen iPad Stock Now Running Out," *CultofMac.com*, April 1, 2011, http://www.cultofmac.com/88790/discounted-first-gen-ipad-stock-now-running-out/.

"Kindle 2 Ships Today," *Amazon.com press release*, February 23, 2009, http://phx.corporate-ir.net/phoenix.zhtml?c=176060&p=irol-newsArticle&ID=1259101&highlight=.

Kindle Direct Publishing Terms and Conditions, List Price Requirements, https://kdp.amazon.com/self-publishing/help?topicId=A301WJ6XCJ8KW0.

"Kindle for iPhone and iPod touch Now Available for Free From Apple's App Store," *Amazon.com press release*, March 4, 2009, http://phx.corporate-ir.net/phoenix.zhtml?c=176060&p=irol-newsArticle&ID=1262380&highlight=.

Kobo Café, "Kobo and Independent Bookstores Join Forces to Expand eReading Across the U.S., Kobo.com," August 29, 2012, http://cafe.kobo.com/press/releases/kobo-and-independent-bookstores-join-forces-to-expand-ereading-across-the-u-s.

Laurie Sullivan, "Google eBooks: A Digital Publishing ARM," *MediaPost.com*, May 25, 2011.

LearnToPlayMusic.com, "About Us," http://www.learntoplaymusic.com/about_us/.

Lulu, "About Lulu," http://www.lulu.com/us/en/about.

Macmillan, http://us.macmillan.com/.

Matthew Shaer, "New Amazon royalty terms could be tied to release of Apple Tablet," *The Christian Science Monitor*, January 20, 2010.

Michael Kozlowski, "Sony Abandons the eReader Market in the United States," *GoodE-Reader.com*, September 26, 2013.

Michael L. Katz, Jonathan Orszag, and Theresa Sullivan, "An Economic Analysis of Consumer Harm from the Current Retransmission Consent Regime," *Study Commissioned by the National Cable & Telecommunications Association, DIRECTV, and DISH Network*, November 12, 2009.

Mike Farrell, "Study: Retrans Fees Boost B'cast Revenue," *Multichannel News*, January 5, 2009.

Mobile Read, "Kindle Keyboard discontinued?," http://www.mobileread.com/forums/showthread.php?t=178286.

MobileReference, http://www.mobilereference.com/index.html.

Motoko Rich and Brad Stone, "Publisher Wins Fight With Amazon Over E-Books," *The New York Times*, January 31, 2010.

Motoko Rich, "Amazon Increases Royalty Rate for Books on Its Kindle E-Reader," *The New York Times*, January 20, 2010.

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

Nathan Olivarez-Giles, "Barnes & Noble Book Simple Touch e-reader drops to $99," *Los Angeles Times*, November 7, 2011, http://latimesblogs.latimes.com/technology/2011/11/barnes-noble-drops-nook-simple-touch-ereader-to-99-dollars.html.

Nicholas Kolakowski, "Amazon Kindle Features Hint at Future Direction," *eWeek*, July 29, 2010.

Nicholas Kolakowski, "Sony Follows Amazon, Slashes E-Reader Prices," *eWeek*, July 6, 2010.

Norton, "Norton History," http://books.wwnorton.com/books/aboutcontent.aspx?id=4386.

Outskirts Press, http://www.outskirtspress.com/.

Penguin Group (USA), "Overview", http://www.us.penguingroup.com/static/pages/aboutus/index.html.

Perseus Books, "About the Perseus Books Group," http://www.perseusbooksgroup.com/perseus/about_us.jsp.

Peterson's Publishing, http://www.petersonspublishing.com/.

PhoneArena, "Amazon will rake in $136 additional revenue from each Kindle Fire sold, claims study," January 19, 2012.

Powell's Books, "Kobo," http://www.powells.com/kobo.

"Price reduction on Kindle Keyboard 3G," *Amazon.com Forums*, September 8, 2012, http://www.amazon.com/forum/kindle?_encoding=UTF8&cdForum=Fx1D7SY3BVSESG&cdThread=Tx25X9RQHMJT9CS.

Princess of Patterns, http://princessofpatterns.com/.

ProQuest, "About Us," http://www.proquest.com/en-US/aboutus/default.shtml.

PRWeb, "SNL Kagan Projects Growth in TV Station Ad Revenue in 2010," August 19, 2009.

PublishAmerica, "Author Information," http://www.publishamerica.com/authorinfoform.htm.

*Publishers Weekly*, "Random House, Penguin Merger Completed," July 1, 2013.

Pure Sheet Music, http://www.puresheetmusic.com/en/.

Randal C. Picker, 2011, "The Razors-and-Blades Myth(s)," *The University of Chicago Law Review*, 78.

Random House, "Facts & Figures," http://www.randomhouse.biz/about/factsandfigures/.

Rich Brown, "Amazon's new Kindles: Everything you need to know (FAQ)," *CNET.com*, September 6, 2012, http://reviews.cnet.com/8301-3126_7-57507546/amazons-new-kindles-everything-you-need-to-know-faq/.

Robin S. Lee, 2013, "Vertical Integration and Exclusivity in Platform and Two-Sided Markets," *The American Economic Review, forthcoming*.

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

Roger Cheng, "To Apple: Thanks for making my 'new iPad' obsolete," *CNET.com*, October 23, 2012, http://news.cnet.com/8301-13579_3-57538470-37/to-apple-thanks-for-making-my-new-ipad-obsolete99-353581.

Samhain Publishing, http://www.samhainpublishing.com/.

Sarah Weinman, "Publishers Try to Protect E-Book Prices from Apple, Amazon," *InvestorCenter*, January 20, 2010.

Scholastic, "About Scholastic," http://www.scholastic.com/aboutscholastic/bookpublishing.htm.

Scribd, "About us", http://www.scribd.com/about.

Seth Fiegerman, "Exclusive: Amazon's $79 Kindle Costs $84 to Make," *The Street Network*, November 9, 2011.

Shmoop, "FAQ," http://www.shmoop.com/help/faq/#faq_cred.

Simon & Schuster, "Simon & Schuster Overview," http://www.simonandschuster.biz/corporate/corporate-overview.

Smashwords, "About Smashwords," https://www.smashwords.com/about.

Sony Reader PRS-505," http://gdgt.com/sony/reader/prs-505/specs/.

Stephen Shankland, "Compact new Nook gets touch screen, lower price," *CNET.com*, May 24, 2011, http://news.cnet.com/8301-30685_3-20065678-264.html.

Suzanne Choney, "iPad 2 starting price drops to $399," *NBCNews.com*, March 7, 2012, http://www.nbcnews.com/technology/ipad-2-starting-price-drops-399-353581.

Tate Publishing, https://www.tatepublishing.com/.

The Joint Commission, "About The Joint Commission," http://www.jointcommission.org/about_us/about_the_joint_commission_main.aspx.

Therese Poletti, "How Amazon really declared war on Apple; Commentary: Bezos says he's aligned with the customer," *Market Watch,* September 11, 2012.

Thomas Nelson, "Thomas Nelson Company History," http://www.harpercollinschristian.com/info/thomas-nelson-company-history/.

Thomas Reuters, "About Us," http://legalsolutions.thomsonreuters.com/law-products/about.

Trafford, "The Trafford Advantage," http://www.trafford.com/TraffordAdvantage/default.aspx.

WDG Communications, http://www.wdgcom.com/wdg_cstmpublsh.html.

Wheatmark, "About Wheatmark," http://www.wheatmark.com/company/.

"Where Have All the Wi-Fi Kindle Keyboards Gone?" *theeBookReader.com*, December 31, 2011, http://blog.the-ebook-reader.com/2011/12/31/where-have-all-the-wifi-kindle-keyboards-gone/.

16

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

Wiley, "Core Businesses," http://www.wiley.com/WileyCDA/Section/id-301695.html.

William H. Greene (2012), *Econometric Analysis*, 7th Ed., Prentice Hall: Boston, MA.

William Kidd, "iPad Spurs eBook Reader Price War," *iSuppli*, June 23, 2010.

World Politics Review, "About World Politics Review," http://www.worldpoliticsreview.com/about.

Xlibris, "Self-Publishing Your Book with Xlibris," http://www2.xlibris.com/.

Xulon Press, "About Xulon Press," http://www.xulonpress.com/about-xulon-press/.

Zondervan, "Zondervan Mission, Values and Publishing Philosophy,"
http://zondervan.com/about/mission.

## Other

E-mail from Marjorie Walter, Kipling Law Group, re: Ebooks Data follow up HIGHLY CONFIDENTIAL (Feb. 1, 2013, 5:47 PM).

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

# Appendix C

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

Figure C-1: E-Books Sold by Retailer (Paid e-books sold over 4-week periods, June 2008 – March 2012)



Source: Professor Noll's transaction data.

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

**Figure C-2: Shares of Paid e-Book Unit Sales by Publisher Group**

Source: Professor Noll's transaction data.

3

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

Figure C-3: Average e-Book Price, by Publisher

Source: Professor Noll's transaction data.

4

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

**Figure C-4: Apple's Agency Commissions and Plaintiffs' Proposed Damages (April 2010 – May 2012)**



Source: Professor Noll's transaction data and *Noll Report*, Exhibit 2.

Note: Apple's commission revenues calculated as 30% of Apple's total e-book revenues during the damages period. Revenues for April 1, 2012, to May 21, 2012, estimated as the average weekly revenue for March 2012, multiplied by seven. This is similar to the methodology in *Noll Report*, at 25.

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

### Table C-1: Damages Attributable to Each State

| State/Territory | Percent of Sales | Damages ($M) |
|---|---|---|
| Alabama | 1.1 | $0.3 |
| Alaska | 0.5 | $0.14 |
| American Samoa | 0.0 | $0.0 |
| Arizona | 2.1 | $0.6 |
| Arkansas | 0.7 | $0.2 |
| California | 10.8 | $3.3 |
| Colorado | 2.1 | $0.6 |
| Connecticut | 1.5 | $0.5 |
| Delaware | 0.3 | $0.1 |
| District of Columbia | 0.4 | $0.1 |
| Florida | 5.8 | $1.7 |
| Georgia | 2.7 | $0.8 |
| Guam | 0.0 | $0.0 |
| Hawaii | 0.4 | $0.1 |
| Idaho | 0.5 | $0.1 |
| Illinois | 3.7 | $1.1 |
| Indiana | 1.5 | $0.5 |
| Iowa | 0.8 | $0.3 |
| Kansas | 0.8 | $0.2 |
| Kentucky | 0.9 | $0.3 |
| Louisiana | 1.1 | $0.3 |
| Maine | 0.4 | $0.1 |
| Maryland | 2.2 | $0.7 |
| Massachusetts | 2.7 | $0.8 |
| Michigan | 2.4 | $0.7 |
| Minnesota | 1.7 | $0.5 |
| Mississippi | 0.5 | $0.2 |
| Missouri | 1.5 | $0.5 |
| Montana | 0.3 | $0.1 |
| Nebraska | 0.5 | $0.1 |
| Nevada | 0.8 | $0.3 |
| New Hampshire | 0.6 | $0.2 |
| New Jersey | 3.2 | $1.0 |
| New Mexico | 0.6 | $0.2 |
| New York | 6.4 | $1.9 |

6

**CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER**

| | | |
|---|---|---|
| North Carolina | 2.5 | $0.8 |
| North Dakota | 0.2 | $0.1 |
| North Mariana Islands | 0.0 | $0.0 |
| Ohio | 2.7 | $0.8 |
| Oklahoma | 1.0 | $0.3 |
| Oregon | 1.3 | $0.4 |
| Pennsylvania | 3.8 | $1.1 |
| Puerto Rico | 0.1 | $0.0 |
| Rhode Island | 0.3 | $0.1 |
| South Carolina | 1.3 | $0.4 |
| South Dakota | 0.2 | $0.1 |
| Tennessee | 1.6 | $0.5 |
| Texas | 7.6 | $2.3 |
| U.S. Virgin Islands | 0.0 | $0.0 |
| Utah | 0.8 | $0.3 |
| Vermont | 0.2 | $0.1 |
| Virginia | 3.3 | $1.0 |
| Washington | 3.0 | $0.9 |
| West Virginia | 0.4 | $0.1 |
| Wisconsin | 1.4 | $0.4 |
| Wyoming | 0.2 | $0.1 |
| Armed Forces Americas | 0.0 | $0.0 |
| Armed Forces Africa, Canada, Europe, Middle East | 0.2 | $0.1 |
| Armed Forces Pacific | 0.1 | $0.0 |
| Federated States of Micronesia | 0.0 | $0.0 |
| Marshall Islands | 0.0 | $0.0 |
| Palau | 0.0 | $0.0 |
| Unidentified | 6.3 | $1.9 |
| Subtotal for Plaintiff States | 55.4 | $16.8 |
| Subtotal for Class States | 37.9 | $11.5 |
| Subtotal for Armed Forces | 0.3 | $0.1 |
| Subtotal for Unidentified | 6.3 | $1.9 |
| Excluded Territories | 0.0 | $0.0 |
| Total Excluding Unidentified and Excluded Territories | 93.7 | $28.3 |

Source: Percent of sales obtained from backup to Professor Noll's Exhibit 3 (Revised).

# EXHIBIT B

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

This Document Relates to:       No.   11-MD-02293  (DLC)

IN RE ELECTRONIC BOOKS

ANTITRUST LITIGATION.

Videotaped Deposition of Jonathan Orszag

Washington, D.C.

Saturday, December 7, 2013

9:00 a.m.

Reported by:
Laurie Bangart, RPR, CRR
Job No: 32651



DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099



DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099





DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099



DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099



DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099



298

quantification of damages if you remove from your

301)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

308

CERTIFICATE OF SHORTHAND REPORTER -- NOTARY PUBLIC

        I, Laurie Bangart, Registered Professional Reporter, Certified Realtime Reporter, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my supervision; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

        IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 9th day of December, 2013.

My commission expires:  March 14th, 2016

_____

LAURIE BANGART
NOTARY PUBLIC IN AND FOR
THE DISTRICT OF COLUMBIA

# EXHIBIT C

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

--------------------------------x

UNITED STATES OF AMERICA,

                Plaintiff,     CASE NO.

                vs.          12-CV-2826(DLC)

APPLE INC., et. al,

                Defendants.

--------------------------------x

HIGHLY CONFIDENTIAL

VIDEOTAPED DEPOSITION

RUSSELL GRANDINETTI

JANUARY 28, 2013

1918 Eighth Avenue

Seattle, Washington

REPORTED BY:
PAUL J. FREDERICKSON, CCR, CSR
JOB NO. 28636

RUSSELL GRANDINETTI - HIGHLY CONFIDENTIAL



RUSSELL GRANDINETTI - HIGHLY CONFIDENTIAL



RUSSELL GRANDINETTI - HIGHLY CONFIDENTIAL

339

C E R T I F I C A T E

I, Paul J. Frederickson, Notary Public in and for the State of Washington, hereby certify that the proceedings occurred before me at the time and place indicated and were stenographically recorded by me and subsequently transcribed by me;

I further certify that I am in no way related to any party to this cause of action, nor to any counsel, nor do I have a financial interest in the outcome of this cause of action;

I further certify that the foregoing is a true, accurate and correct transcript from the record of proceedings contained herein.

My commission expires 11-19-2014.

_____

PAUL J. FREDERICKSON, CCR, CSR
Certified Court Reporter
Washington CCR #2419
California CSR #13164
pfRealtime@comcast.net

# EXHIBIT D

Plaintiffs' Exhibit
US v Apple
12-cv-02826

PX-0835

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | Civil Action No. 12-cv-2826 (DLC) |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| APPLE, INC., et al., ) | |
| ) | |
| Defendants. ) | |

| | |
|---|---|
| THE STATE OF TEXAS; ) | |
| THE STATE OF CONNECTICUT; et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 12-cv-03394 (DLC) |
| ) | |
| PENGUIN GROUP (USA) INC. et al., ) | |
| ) | |
| Defendants. ) | |

DIRECT TESTIMONY OF RUSSELL C. GRANDINETTI (AMAZON.COM)

1

1.      My name is Russell C. Grandinetti. I am employed by Amazon.com ("Amazon"); my current position is Vice President – Kindle.

2.      After earning a Bachelor of Science in engineering from Princeton University, I worked in London at a children's psychiatric clinic. When I returned to New York, I worked at Anderson Consulting for two years writing software and building systems, and then I spent almost two years at Morgan Stanley in equity research following technology companies, which is how I was introduced to Amazon.

## My Duties and Responsibilities at Amazon

3.      I have worked for Amazon for the last 15 years. Immediately prior to joining the Kindle team, I was Vice President in charge of Amazon's book business (now known as the print books business) in North America. In that role I reported to Jeff Wilke, who reported to Jeff Bezos, CEO of the company.

4.      I joined the Kindle team in October 2009 and reported to Steve Kessel, who reported to Mr. Bezos. Mr. Kessel went on sabbatical in late fall 2011; since that time I have reported directly to Mr. Bezos. In my role as VP-Kindle, I have overall responsibility for Kindle content worldwide.

## The Launch of Kindle and the Early Years

5.      After more than three years of work on the project, the Kindle store opened in November 2007, with most of the books then on the *New York Times* bestseller list and 90,000 others available to customers. Prior to that time, digital books and digital book readers had been sold by other companies, such as Sony and RocketBook, but electronic reading hadn't yet really caught on with consumers.

6.      Although I was the head of Amazon's print books business when Kindle launched, I was involved in and familiar with the company's goals and the principles that drove the Kindle business. Amazon's mission is to be earth's most customer-centric company and to help people find and discover anything they want to buy online. Especially in the early years when we were creating the Kindle store, the print books team and the Kindle team had to work

2

together to build a great website experience where a customer could easily find a book, see what our pricing and delivery options looked like, and then choose between the Kindle format or the print format. In addition, the work we did to negotiate with publishers to make books available for Kindle in advance of the launch went hand-in-hand with some of the work we were doing in the print book part of the business, so I was also involved in that aspect of the Kindle launch.





10.

11.     In our effort to reinvent reading, we also included from the beginning things like an in-line dictionary, highlighting and note-taking capability, and the ability to change font size. We also had to figure out how to create the ability to sync between devices, so customers could read on a variety of devices without losing their place in the book or their highlights and notes.

12.     Of course we also had to do a lot of work to ensure that the content customers wanted would be available to them in the Kindle store. We worked very hard with publishers to get their new releases and backlist titles digitized and to negotiate new contracts that would allow us to sell digital editions. We also invested quite a bit ourselves in digitizing books so that

4

when we launched Kindle, a large percentage of the bestselling books was available. This required a huge investment of time and money before the Kindle store even opened, and we continued to invest in the store after launch to add new titles and improve the customer experience.

13. We were surprised by the early success of the Kindle. In fact, the first Kindle sold out within a few hours and remained out of stock for months. We were encouraged by the response, so we redoubled our efforts to get more titles into the Kindle store. One thing we did early on to help the publishers prioritize the process of digitizing their catalogs was to create a widget that allowed customers to tell them what they wanted to read. A customer who found a listing for a print book on our site that wasn't available yet in digital form could click to tell the publisher that they wanted to read the book on their Kindle. We would send publishers reports that showed the ranked order of the most requests for one of their books so they could see where latent demand existed that they could capture if they digitized the book.

14. We also reached out directly to authors to introduce them to the Kindle and encourage them to work with their publishers and agents to make their books available digitally. We literally had folks just go visit authors and have them look at a Kindle and flip through some pages to take some of the uncertainty out of what this thing was. Our experience was that as soon as someone actually sat and used the device they realized it wasn't as much of a departure from what they knew reading to be as they might have conceived, and it took a lot of the anxiety about the change out of the way.

15. We knew that now that we had established a successful and growing ebooks business, more competition would be coming, and quickly. We didn't know from where, but when something gets that kind of customer excitement and enthusiastic adoption, competitors are sure to follow, so we felt a lot of pressure to continue to digitize more books, introduce ourselves to customers, improve the device, and expand beyond the U.S.

16. We also started to add reading apps so people could read Kindle books without a Kindle device and also could sync between reading options. People read a variety of different

5

kinds of books and like to read in different contexts, so reading a book on a computer screen, or on an e-ink reader, or on a phone or some other device may all be useful, even to the same customer. What we wanted to do was recapture as many minutes of the day as possible for a customer to read. So, if you kept your e-ink device by your bedside and you read in the morning and at night, and then you read on your phone when you had 20 minutes in a doctor's waiting office, we saw that as 20 minutes where you got through more of a book and you made reading more a habit. That was just great for readers — they would email us over and over again (we would literally get hundreds or thousands of feedback emails each week, and many of us read them regularly) about how digital books had either renewed or improved their time spent reading.

17.    Our first Kindle app, which was for the iPhone, came out in early 2009. Others quickly followed and as of today, free Kindle apps are available for a lot of different devices, including iOS, Android, Windows tablets and smartphones, Blackberry, and Mac and Windows computers. The Kindle Cloud Reader allows for reading in a browser.

18.    We don't see it as inconsistent to work on trying to build the best reading device in the world, and also to recognize that people are going to want to read on different devices at different times, and to support that. ███████████████████████████

███████████████████████████████

███████████████████████████

███████████████████████████████

█████████████████  We have a healthy business selling Kindle books to people who don't own a hardware device that we built, and we like that.

19.    As noted above, there had been other companies offering digital reading options when we launched Kindle, but as consumer interest in ebooks grew, more competitors began offering ebooks options, including Barnes & Noble, Google, Kobo, and Apple. Barnes & Noble released their first Nook ereader in 2009. We took all this competitive entry seriously. Barnes & Noble is a large, successful bookseller with a lot of stores, and a lot of traffic in those stores; they

have a great ability to introduce people to their own products. We're a customer-focused company, not necessarily competitor-focused. But if you're a customer-focused company, it's important to see what other choices customers have and evaluate what you're doing in that context. So of course we paid attention to the other ereaders and digital bookstores and tried to see what else we could do to make the Kindle and Kindle content as attractive as possible to customers in terms of pricing and features. (AMZN-TXCID-0009533 – 35; AMZN-TXCID-0009536)

20.

### Amazon's Pricing for Kindle Ebooks

21. From the beginning of Kindle, we took an approach to pricing ebooks very similar to what we had done successfully in pricing print books, by which I mean both that the pricing was attractive to customers and we knew we had a ███████ sustainable business. We started with those two important points, and developed our ebook pricing the same way.

22. Until agency, ebooks were sold on the wholesale model, just as print books had been sold for many years. In a wholesale model, the publisher sets a list price and then sells books to Amazon at a discount off of list; Amazon then decides how to price the book to the consumer. When we launched Kindle, many publishers were setting digital list prices about 20% lower than the equivalent print list price.

23. We have always thought that ebooks should generally be priced lower than physical books. This makes logical sense, because the costs of manufacturing, freight, warehousing, delivery to consumers and returns are taken out of the process of delivering a digital book. And so we looked at our discounts and we looked at our customer pricing and we looked at what we thought the mix would be between bestsellers and backlist books as more

7

books were digitized, and we arrived at a pricing approach that in many ways mirrored the success that we had in print books.

24.    As a company, even beyond books, our goal is always to pass on as much of the efficiency and innovation that we can deliver to customers by lowering prices, because by lowering prices over time we think that we can attract customers and also have a great business. We are always seeking a really good balance between great customer value and a healthy long-term business ██████████████████████████████████████

██████

25.    I participated in the decision to establish Amazon's price for the Kindle version of most current *New York Times* best sellers and some other new releases at $9.99. In many cases early on, $9.99 was a breakeven price. For example, on a hard cover new release with a list price of $25, the digital list price was 20% less, or $20. Trade terms are usually in the range of a 50% purchase discount, which meant the cost to us was $10. This is what I mean when I say that selling at $9.99 was often a roughly breakeven price. In any event, having some titles as loss leaders is quite common in both book-selling and retailing generally. ████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████ And of course prices on many ebooks that we sold varied widely. ████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████

26.    We also have never used sales of ebooks directly to subsidize the Kindle device. We don't think of it simplistically as one part of the business subsidizing another part of the business. Rather, our goal has been to have both parts of the business sustainable in their own right. But we're also not blind to the fact that they're related businesses and so there have been various times where we looked at the business holistically as the sum of what the device business and the content business provide together. We have thought about some trade-offs with that

8

concept, but never solely in that context and never absent that context. And it's important to keep in mind that there may be people who buy our Kindle Fire device who don't really read much, so the ebook business may not apply to those customers at all. Conversely, there are many people who don't own any Kindle hardware but who buy Kindle books from us. And both of those cases are big business opportunities so we can't just look at it as one subsidizing the other.

### Complaints About Kindle Ebook Prices

27.     From the beginning, publishers complained about our pricing. They repeatedly complained about our $9.99 pricing for *New York Times* bestsellers and other new releases, and at any number of turns, encouraged us to raise our prices. These complaints came from many publishers, including Hachette, HarperCollins, Penguin, Macmillan, and Simon & Schuster. We refused to raise prices in response to these complaints; we always set our prices unilaterally until the agency model was introduced.

28.     We did this even when many of the large publishers raised their digital list prices significantly, in an apparent attempt to force us to raise our consumer prices. In some cases, certain publishers even set them higher than the corresponding physical list prices. ████

████████████████████████████████████████████████

████████████████     Also, building and maintaining customer trust is critical to Amazon's long term success, and we had made a commitment to customers from the earliest days of the Kindle that most bestsellers would be priced at $9.99.

29.     Some of the publishers argued with us that our pricing for ebooks wasn't sustainable, or that we must have a plan to gain control of the market and then raise prices. None of these claims were true, and we told them that repeatedly. There never has been any plan or assumption that at some point in the future consumer prices could or should be higher. We were completely convinced based upon our experience in print books and what we knew about our terms in digital that our pricing approach to Kindle books allowed us to run a very successful business without raising our prices.

9

30. While we didn't need to get lower list prices from publishers to sustain our pricing approach, we did suspect that list prices for digital would have some rational relationship with the print list prices over time; this is just logical. Some publishers had digital list prices the same as print and there were any number of publishers that had digital list prices that were a bit lower than print, which felt like the more logical place to us and if we had to bet, I think we would have bet that that's where things would go over time. Of course, we asked for better terms every year, as I suspect customers of suppliers always do. It's good for our business to negotiate better terms, and like any other bookseller we worked hard to achieve them. ███████ ███████████████████████████████████████ Our pricing model did not require any kind of reduction in list prices from where they were when we started the Kindle business in order to succeed.

### Windowing Ebooks

31. We have always strongly believed that offering ebooks for sale at the same time that the print book was published was the best approach, not just for consumers, but for publishers and authors, too. In the early days after the launch of the Kindle, publication of some ebooks was delayed because there was no digital version. In those early days, it took quite a bit of time and effort to digitize all the print books in the catalogue and many new books were being released before they were available in digital form. As systems were put in place to manage the digitization process, however, and as the ebook business grew it became the norm for publishers to release ebooks at the same time as the print version.

32. During the summer and fall of 2009, certain publishers began to experiment with "windowing," a practice in which the release of the digital version of a new book is delayed for some time after the print book is published. This happened with a few high profile bestsellers, such as Stephen King's *Under the Dome*, published by Simon & Schuster. We told the publishers that this was a very bad idea for them and their authors. Based on my years in the book business, I felt the publishers' decision made no economic sense, would alienate customers and result in lost sales. At the time, the publishers involved told us that their decision to window

10

was done on a book-by-book basis and that there was no plan for widespread windowing of ebooks.

33.     In early December 2009, however, several publishers raised the prospect of delaying ebooks across-the-board. Hachette was the first to announce their plans; this happened immediately following an in-person breakfast meeting between Hachette CEO Arnaud Nourry and my colleague, David Naggar, ███████████████████████████████

████████████████████████████████████

34.     The next day, December 4, I reviewed an email that Nourry sent to Jeff Bezos, telling him that the Hachette board had met and that his team would be in touch with the Amazon Kindle team about the decisions that had been made; he invited Jeff to contact him if he thought it would be helpful. Jeff responded that weekend that he would be interested in getting together to discuss matters "before any decisions are finalized or positions become hardened." Nourry responded that it made no sense to meet in person because he had the feeling that "Amazon's decision to price best sellers at 9$99 (*sic*) is a hard point for you." (AMZN-TXCID-0018798) I understood Nourry to mean that unless we were willing to raise prices, Hachette's decision to withhold digital versions of their new titles from us would stand.

35.     The following week, Simon & Schuster announced it would delay release of the ebook versions of new hardcovers beginning in January 2010; a few days later, HarperCollins told the *Wall Street Journal* that it would be delaying five to ten new hardcover releases every month. Less than a week later, Macmillan announced that it also would delay digital versions of new releases for several months after the print release, unless the digital version had enhanced content (and would, presumably, sell for a higher price). Amazon told these publishers that delaying the release of ebooks was bad for consumers, authors and for them. Amazon was also opposed to raising its consumer prices to avoid windowing.

### Five Large Publishers Simultaneously Demanded the Agency Model

36.     In mid-January 2010, we learned that the big publishers were planning to move away from the traditional reseller model for ebooks and that Apple was apparently involved in

11

this move. This was a huge change in the way books in all formats had always been sold, and we saw nothing about the digital nature of ebooks that made the agency model more appropriate for them than the traditional wholesale model.

37. On January 18, my colleague Laura Porco reported that Madeline Macintosh, from Random House, told her that the other largest publishers were going to enter into deals with Apple that would allow the publishers to control prices, and that they would delay titles for any retailer that didn't go along with the new model. Madeline expressed concern that Random House would be the only one of the Big Six publishers not included in the Apple store. (AMZN-MDL-0160969 – 971)

38. That same evening, David Naggar forwarded an email from Michael Cader, of the trade publication *Publishers Lunch*, asking if we'd heard about a new "Apple and beyond" model for selling ebooks. (AMZN-MDL-0077424) The following day, *Publishers Lunch* ran a long and detailed article reporting that the six largest publishers all were negotiating terms with Apple, and that this gave publishers an opportunity to impose agency on the entire industry and raise prices.

39. We were very concerned about this news because it would mean higher prices for our customers, or, if we refused to go along with agency terms, ebooks from our major publishers wouldn't be available in the Kindle store. Either option would be a bad customer experience and could hurt the attractiveness of Kindle.

40. A few days later, David Naggar and I were in New York to meet with publishers. We met with Brian Murray at HarperCollins on January 20. During the meeting, Brian again expressed concern over our pricing practices, and raised the concept of agency. We made it very clear that we did not want to move to agency and strongly preferred to continue to do business on the wholesale model, and I recall that the meeting was somewhat contentious. I also met with John Sargent of Macmillan on January 20. John told me he was working on an agency model, but planned to offer both an agency and reseller model. ████████████████████

12

███████████████████████████████████████

██████████████████████

41.     The next day, January 21, I got a call on my cell phone from John Sargent while I was on Eighth Avenue in New York with David Naggar. John told me that he wasn't sure he'd be able to keep us on reseller terms after all, because he was about to sign a contract that required him to offer only the agency model. Based on everything we had heard and read in the last week, it was clear to me that he was talking about Apple.

42.     On January 22, Brian Murray sent an email outlining HarperCollins' proposed agency terms. (AMZN-MDL-035986 – 987) That same day, I got a call from Carolyn Reidy of Simon & Schuster, who told me that they were planning to move their entire business to agency terms. Again, I was clear in telling her that we did not want to move to agency terms.

43.     The next Wednesday, January 27, Apple held an event to announce the iPad. During that event, Steve Jobs revealed that five of the largest publishers would all be in the iBookstore. Immediately afterwards, Jobs told an interviewer that ebook prices would be the same for all retailers, and that the publishers were withholding books from Amazon because they didn't like our pricing. (AMZN-MDL-0142728) Immediately following the Apple announcement, John Makinson of Penguin called to tell me that they had moved to agency with their first customer (from the timing, that was clearly Apple), and that he wanted to discuss agency with us when they visited in mid-February. I told John I did not understand why they were working so hard to have us send them less money on each sale while at the same time, reducing total sales and frustrating us. That same day, Brian Murray of HarperCollins wrote to tell me that they had decided to move their new releases to an agency model, and that they had reached an agreement with Apple the night before. (AMZN-MDL-0035988)

44.     My team started preparing a document that summarized Amazon's communications with publishers to date on or about January 27, 2010. (AMZN-MDL-0161084 – 087) I reviewed and edited that draft the following day, prior to our meeting with Macmillan (described below). (AMZN-MDL-0161098 – 103) My edits were intended to focus the

13

publisher update section on the current status of discussions; I did not believe the information in the earlier version was inaccurate.

45.    On January 28, John Sargent and Brian Napack of Macmillan came to Seattle to meet with us and John delivered an ultimatum: we would either move to agency terms with them, or they would withhold Kindle versions of all new releases for seven months. We clearly expressed our view that this was a terrible move for them, for customers, and for authors; it made no sense for them economically. John was not open to discussing the option of staying on reseller terms with us, so the meeting was cut short. Later that night, we decided to stop selling Macmillan titles – both print and Kindle – in an attempt to convince them to reconsider their position.

46.    By that time it had been made clear to us by Simon and Harper and Macmillan and Hachette and Penguin that they were all going to require us to move to agency. And because we faced having to make that change with all of them simultaneously, we tried with Macmillan, who was the first to give us a hard ultimatum, to see if we could get them to relent. But that weekend, as we looked over all of the communications from publishers and assessed the situation, it became obvious that the odds of that strategy working were very, very low, and it was highly likely that we would lose ebooks from those publishers unless we moved to agency with all of them. If it had been only Macmillan demanding agency, we would not have negotiated an agency contract with them. But having heard the same demand for agency terms coming from all the publishers in such close proximity, Amazon was concerned that the publishers were acting illegally. In response, Amazon's lawyers drafted a letter to the FTC describing the situation, a letter I contributed to and reviewed. ██████████████████

### Agency Negotiations

47.    Much as we disagreed with the publishers' decision to move to agency and wanted to forestall it, we could not have new titles from five of our biggest publishers unavailable to our customers, so we really had no choice but to negotiate the best agency contracts we could with these five publishers.

14

48. It was already clear from our conversations with publishers and their public statements that the publishers were going to raise prices. And, given the apparent coordination among the publishers and our sense that we were the target of their efforts, we were concerned about retaliation that would make things even worse for Kindle customers. Several of the publishers were quite public in expressing their displeasure with the success of Kindle and their desire to slow down both the transition to digital and the success of Kindle. Several of them said as much openly in the press. So we were worried that if this move to agency didn't give them the results they were seeking, we could reasonably expect additional changes that would have been much more directly discriminatory against us relative to other agents. We didn't want to be in a position where publishers could threaten to withhold selection, charge higher prices for items sold on the Amazon platform, or offer reseller terms to another retailer without offering reseller terms to Amazon, which would have resulted in Kindle customers having a worse experience than other ebook buyers.

49. To avoid these problems, we negotiated to include certain parity provisions in the agency contracts. There were price parity provisions to protect us against publishers giving higher prices to us than to other agents, and business model parity so that if a publisher offered a reseller relationship with another retailer, they would have to go back to reseller with us. We also insisted on selection parity, so that publishers couldn't withhold titles from Amazon and our customers would be able to find all the books they wanted in the Kindle store. This was especially important in light of the fact that across-the-board windowing of new titles was the leverage some of the publishers had tried to use to influence us in the past.

50. After we negotiated agency contracts with Macmillan, HarperCollins, Hachette and Simon & Schuster, we worked to reach an agreement with Penguin, even though their contract with us could not be terminated for another few months. Penguin had been as clear as the others that our only option for a new agreement with them would be one on agency terms. They stopped adding new books to the Kindle store starting April 1, 2010, so every new Penguin release was in other ebook stores but was not available for Kindle customers. It was clear that

15

delaying negotiations with Penguin would gain us nothing, and cause a great deal of pain in the meantime in the form of lost sales and unhappy customers.  We had no choice but to negotiate early with Penguin.

## Effects on Consumers

51.    After agency, consumers saw an immediate double-digit percentage price increase on ebooks pretty much across the board.  The higher prices appeared not only on best-selling ebooks, but even on backlist titles. ███████████████████████████████████████

████████████████████████████████████████████████████████████

And I think one of the effects was that when you looked at the bestseller list, it started to tilt toward lower priced ebooks after agency, which is what you'd expect the market to do in the face of significant price increases on some meaningful segment of the catalog.  So, it's very deceiving to look just at best-selling books during some period after agency, because consumer choices were being made in the context of what they were presented with.  But if you actually look at best-selling books from *these publishers* and the prices before and after on Amazon, that will tell you a very clear story about what happened.

52.    We put a statement on our website page for each agency title that said, "This price was set by the publisher."  We did this for two reasons.  First, we thought consumers had a right to understand, particularly in those cases where you'd see illogical things like a digital book having a higher price than a print book, what was going on.  We wanted to make it clear that this wasn't our choice (though, unfortunately, many customers still blamed us for the higher prices).  Second, the publisher was now the seller of record (which has specific tax and other implications), and we wanted to make that clear.

53.    ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████

████████████

54.    The prices under agency were not only higher than they had been under the traditional wholesale model; they often were downright nonsensical. In many cases, the agency price set by the publisher for a digital book was several dollars more than for the print book. This included current bestsellers (AMZN-MDL-0142151) but older books were also affected. For example I recall that Penguin raised the digital price of *Atlas Shrugged* by Ayn Rand to something like $19 or $20 – the paperback sold for under $10.

55.    Prices also rarely changed after agency. Amazon, by contrast, has invested significantly in developing thoughtful and sophisticated algorithms about how to price and when to move prices up or down, which we do dynamically all the time on the site, not just for books. It was clear that the publishers had done nothing to develop systems for setting prices. I was surprised and disappointed by the lack of sophistication that they brought to the pricing question.

56.    Agency also limited innovation and promotional options – we were unable to attempt even standard retail approaches like points systems or "buy one get one" offers – ██████████████████████████. One particular example is the Kindle Owners' Lending Library. We did eventually launch that program, which allows Amazon Prime members to borrow up to one book a month free of charge. But there weren't any agency titles in the program, despite having made significant financial offers to the publishers to include their books, and, after launch, we showed them data about the benefits to them and their authors of participation, but they refused.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on April 24 2013.

Russell C. Grandinetti

17

# EXHIBIT E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>    v.<br><br>APPLE INC., *et al.*,<br><br>              Defendants. | 12 Civ. 2826 (DLC) |
| THE STATE OF TEXAS,<br>THE STATE OF CONNECTICUT, *et al.*,<br><br>              Plaintiffs,<br><br>    v.<br><br>PENGUIN GROUP (USA) INC., *et al.*,<br><br>              Defendants. | 12 Civ. 03394 (DLC) |

## DECLARATION OF DAVID YOUNG

I, DAVID YOUNG, pursuant to 28 U.S.C. § 1746, declare:

1.     From 2006 to March 31, 2013, I served as Chairman and Chief Executive Officer at Hachette Book Group, Inc. ("Hachette"). I continue to serve as Chairman of the Board of Directors of Hachette Book Group. Except as otherwise stated below, I have personal knowledge of the following facts, and if called to do so, could and would competently testify to such matters under oath.

2.     During my seven years as CEO of Hachette, I reported to the Board of Directors of Hachette Book Group and to Arnaud Nourry, the Chairman of the Board and CEO of Hachette


USA v. Apple Inc., et al.
12-CV-02826-DLC
DX-702

Livre SA, which is based in France. I had twelve primary direct reports, who were the members of the Executive Management Board. As part of my responsibilities, I, in consultation with the Executive Management Board and Mr. Nourry, developed Hachette's business strategies and structures, including negotiating major contracts with retailers.

3.      In January 2010, Hachette signed a contract with Apple for Apple to act as Hachette's agent and sell Hachette's e-books on Apple's iBookstore. Under this contract, Hachette set the sales prices for its e-books and paid Apple a percentage of each sale in exchange for various services Apple performed as our agent.

4.      I, in consultation with Hachette's Executive Management Board and Arnaud Nourry, directed the negotiations and made the final decision to sign the agency e-book contract with Apple. From Hachette's point of view, there are two things that are perfectly clear to me based on everything I did and observed: first, Apple negotiated vigorously with Hachette and second, Apple did not conspire with us to force resellers to switch to agency or to raise e-book prices. To the contrary, as I explain below, Apple made clear throughout its negotiations with Hachette that its position and our position were fundamentally at odds on key terms, and Hachette accepted Apple's terms only after much consideration, based on our hope that Apple's entry into the e-book business would have long-term benefits to Hachette.

**Background**

5.      Hachette's history goes back to 1837, when one of our current imprints, Little, Brown and Company, was founded. In 2006, Hachette Book Group, then known as Time Warner Book Group, was acquired by Lagardere, the French parent of Hachette Livre SA, a global publishing company based in France. Throughout our history we have continued to evolve and expand to include imprints focused on a wide audience of readers. Hachette now

2

publishes over a thousand book titles a year, and last year we had a record 214 print books and 61 e-book-only titles on the *New York Times* Bestseller List, including *The Casual Vacancy* by J.K. Rowling and titles by best-selling writers such as James Patterson, David Baldacci, and Nicholas Sparks. E-readers have existed since the mid-1990s, but e-books did not become a regular commercial business until 2006 when Sony released its dedicated e-reading device, followed by Amazon's release of the Kindle e-reader in 2007. E-book sales continue to grow every year. At the end of 2012, e-book sales accounted for approximately 26% of Hachette's U.S. book sales.

6.     Prior to January 2010, Hachette distributed e-books through the wholesale model: Hachette sold e-books on the same terms as physical print format books; e-books constituted a minuscule part of our business and the sales model was not afforded a great deal of consideration. As with the sales of physical print books, we sold our e-books at a set wholesale price and the retailers set the price for resale to consumers.

7.     By late 2009, Amazon accounted for approximately 80% of Hachette's U.S. e-book sales and 8.1% of its U.S. print book sales. Hachette sold e-books to Amazon (and its other e-book retailers at that time) for the same wholesale price as the corresponding hardcover or paperback books (whichever was the most recently published physical print format at the time), which was roughly half of the publisher's list price. Traditionally, the hardcover format was released first, with a suggested list price of approximately $24-$30, and the cheaper paperback version was released a year later at a much lower suggested list price. Accordingly, when a physical book was available in the U.S. only in hardcover format, we sold the e-book versions to Amazon and other retailers for $12-$15. Amazon, in turn, sold most *New York Times* hardcover bestseller e-books for $9.99 to purchasers of its Kindle e-reader device, meaning that Amazon

3

was losing from $2-$5 on each of these sales with its below-cost prices. Amazon's price also bore no relationship to the price of the corresponding physical book; instead, all books were treated the same regardless of author, creative effort, research, type of book, length of book, content of book or publisher cost.

8.      By 2009, Hachette was concerned that Amazon's approach to e-books, including its below-cost pricing of e-books to purchasers of its Kindle e-reader device, would have a long-term detrimental effect on Hachette's business as well as Hachette's primary stakeholders: authors and readers. One of Hachette's key concerns was that Amazon's uniform pricing of e-books treated them as homogeneous products. The value of a work varies dramatically in the marketplace based on many factors, including the author's profile and career, the author's time and investment in writing the book, the nature of the book, public interest in the book, and the length and format of the book. Amazon's pricing did not take into account these critical differences between individual books and authors. We firmly believe (and, to my knowledge, have believed since the middle of the last century) that each book is an independent product and must be handled, promoted, and priced differently based on its unique value. Hachette believes that this ability to differentiate is necessary to maintain our ability to compete effectively for authors and for consumers, and to offer a wide range of high-quality books in different genres. Another Hachette concern was that Amazon's pricing of e-books at $9.99 not only would devalue books, but also would decrease demand for hardcover versions of the same texts sold through brick-and-mortar bookstores.

9.      The publishing industry is highly competitive. In order to stand out and sell books, publishers must offer and effectively promote unique and outstanding content. We compete intensely on a day-to-day basis to differentiate our books in the market from books of

4

other publishers, and for the rights to work with authors and distribute titles. In order to sign authors, we must convince each one that we will carefully tailor the way we handle each of their books to make it a success. Each book that is published is treated as a new product, and many have an individually planned-for "launch," with a publication process that typically takes place over a year to 18 months, and dozens of people contributing to each individual book. To compete effectively for authors and readers, we must be willing to invest substantial resources to promote every particular book we launch. In order for Hachette to justify and recoup our investments, and promote each book successfully based on its unique characteristics, we must be able to price books based on their particular value.

10. Price differentiation is also important to Hachette as a matter of principle. We are passionate about our work, and through our dedication we have cultivated an impressive library of varied titles and authors, like David Foster Wallace, James Patterson, Stephenie Meyer, and Tom Wolfe. Because we care about our authors, we strive to protect the value of their works. Some books take years to research and write, and may take months for us to edit, and we do not want to lump the value of that author's exceptional dedication, renown and effort into the same pricing pile as, for example, a how-to book, a quick page-turner, or a new author's book.

11. Amazon's uniform e-book price point treated books like they were cans of beans—one size fits all. We believed Amazon's below-cost pricing in order to sell Kindle devices had the effect of developing a consumer mindset that all books have the same value, and that eventually consumers would not accept price differentiation. The price of a hardcover book reflects the publisher's projected return on its multi-year investment in an author and book: the publisher invests time and money for years before the book gets published, and the initial sales period (when the book is in hardcover format) is the period when we have the best chance to

5

recoup that investment. Decline on the return on that multi-year investment made in each book, would result in lack of investment in future books, and decreased competition, thereby diminishing the dynamic marketplace of ideas and the wide variety of books available to consumers. We believed that if we were going to preserve competition and the value of literature and books as had been recognized for centuries, it was crucial for digital prices to bear a relationship to the list prices of the physical print version that Hachette set based on the true value of each book. However, Amazon's commoditized approach to e-books failed to differentiate prices based on quality, demand, or actual creative effort.

12.     Hachette was also concerned that Amazon's homogeneous pricing was limiting the growth potential of the e-book business. To compete with Amazon's below-cost e-book pricing, retailers had to be willing to lose money on new releases. We were concerned that many retailers did not have the resources and/or desire to sustain these losses and so they could not remain competitive or enter and compete for the sale of e-books.

13.     This concern was not theoretical. The two other established e-book retailers, Barnes & Noble and Sony (who together accounted for a very small percentage of our e-book sales), told Hachette that they were losing money on e-books by matching Amazon's below-cost $9.99 price. By 2009, Barnes & Noble and Sony each began to express serious doubt to us about the sustainability of their e-book businesses. We were concerned that Amazon's uniform below-cost pricing, which commoditized books while driving Kindle sales, would solidify its dominance in both the e-book hardware device market and the content market—and this would effectively prevent any major competition in e-books.

14.     Our concerns were long term, not short term. Because Amazon was paying Hachette a wholesale price above the $9.99 it charged consumers, we were not losing money

6

from Amazon's below-cost pricing at that point. But we knew that Amazon was a sophisticated company, and believed that it would not be willing to continue to lose money on every new e-book for very long. We believed that Amazon eventually would demand substantially lower wholesale prices so that it could make money selling e-books. Arnaud Nourry informed me that, at the 2009 Frankfurt Book Fair, Amazon told him that it would demand substantially lower e-book wholesale prices from Hachette in the U.S. These factors, along with the others I have described above, would be ruinous for Hachette's business and its primary stakeholders: authors and readers.

15. Nevertheless, even with these concerns, we thought of Amazon as a very important partner and worked with it to address our business concerns about how it sold our content. Amazon had created an online bookselling business that we thought was brilliant and that had benefited us a great deal. We understood that Amazon's pricing was based on its business objectives to offer consumers low prices. But as publishers who feel passionately about cultivating and supporting great works, we strongly rejected a business model that we believe threatened our ability to fulfill our fundamental business mission to provide diverse and outstanding content to our readers. We felt that it was critical to expand distribution competition at the e-book reseller level and preserve and enhance consumer choice.

**Barnes & Noble Suggests Agency**

16. In November 2009, Barnes & Noble operated bookstores in cities across the country and was our largest brick-and-mortar retailer. Around this time it also launched a digital e-book business that it operated on its Nook e-reader platform. Barnes & Noble made clear to us that Amazon's below-cost pricing raised serious concerns that could drive Barnes & Noble out of the e-book business, and we believed them. Around late-November 2009, Barnes & Noble

7

approached Hachette and suggested that we work with it under an agency model, where Hachette would set the price of e-books sold on the Nook and, in return for Barnes & Noble marketing and distributing our books, we would pay it an agency commission. At this time we were not aware that Apple was creating its own digital bookstore and had had no discussions with Apple about digital books.

17.    Our discussions with Barnes & Noble about agency were at a general level and did not result in an agency agreement. At about this time, Hachette considered moving to agency as a potential business model for selling e-books. We were already selling e-books as apps on iTunes under an agency model. As part of regular internal strategy discussions, we determined that agency could maintain and expand our e-book business by promoting price diversity and an even playing field for e-book sellers. Agency appealed to us because it would allow Hachette to set prices according to the different values of our books, which, as I described above, we believed was crucial to competition and a dynamic marketplace of ideas in the publishing industry. We also believed that if we used the agency model for all of our e-book business, we could create a level playing field for retailers; if they were not required to lose money on e-books and instead received a reasonable agency commission for each sale, they would have far greater ability and incentives to enter and invest in e-books, e-reading devices, and promotion. At no time during these internal discussions did we share our internal thinking about agency with any other publishers. Relying on this initial internal analysis, Hachette concluded that agency was an attractive and viable business model for selling its e-books.

**Hachette's Windowing Strategy**

18.    During the second half of 2009, we considered windowing selected e-book titles. Windowing in the e-book business means delaying the release of an e-book after its

8

corresponding hardcover release. Publishers have used windowing in the book business for decades, releasing a lower-priced trade paperback months after an initial hardcover release, and sometimes releasing the even lower-priced pocket-sized paperback later. Our decisions regarding windowing were not based on knowledge that Apple was considering entering the e-book market. On principle, it was always our strong preference to expand offerings. We thought it was possible that by windowing Hachette might lose market share and damage our relationships with authors, agents, and consumers.

19.    On September 10, 2009, after intense internal discussions and consultation with Senator Edward Kennedy, his family, and his agent, Hachette announced that it would window the e-book release of *True Compass*, Senator Kennedy's autobiography. Throwing *True Compass* into Amazon's one-size-fits-all pricing struck us as fundamentally wrong. *True Compass* was an exceptional book. It was also a significant work because it was written by Senator Kennedy, who is an important historic figure. The hardcover was also a beautifully rendered work that included previously unavailable photographs and artwork from the Senator's life. And so despite the drawbacks of windowing, we felt that delaying the e-book release for *True Compass* and other works like it was our only immediate option to address our concerns about Amazon's monolithic pricing under the wholesale model. Amazon objected to Hachette's decision and resisted it, albeit unsuccessfully, by threatening not to sell the hardcover version. This incident perfectly illustrated our dilemma. Without Amazon selling the book, we would be severely limited in our ability to share the book with readers. We hoped that windowing would be only a short-term approach that would bring change and improve the long-term viability of Hachette's e-book business.

**December 2009 Meetings with Apple**

9

20.     In December 2009, Apple scheduled a meeting with Hachette, and on December 15, Maja Thomas and I met with Eddy Cue and other Apple representatives at Hachette's New York office. At the time, Hachette was selling a select number of e-books under the agency model in Apple's App Store, but Apple did not yet have a dedicated e-bookstore or competitive e-reading device like Kindle or Nook. Apple certainly had a great track record for creating innovative and exciting content platforms and I hoped that it would enter the digital book business. In our experience, the more retailers selling our books, the better for everyone.

21.     At the December 15 meeting, Mr. Cue told us Apple would soon announce a new device that could be used as an e-reader. As we hoped, Apple wanted to learn about the book business because it was exploring the idea of launching an e-bookstore.

22.     I was excited by the prospect of a new major player coming into the e-book business. Leading up to this time, the e-book business was in flux and we had been working to implement a business model that would serve each of Hachette's primary stakeholders, including readers and authors. We thought that Apple's entry could change our business for the better, because it would introduce a unique device and promote competition among e-book retailers. With the door open for competition, we expected expansion of the business, even beyond Apple's entry, which we hoped would spur dramatic improvements in the e-book reading experience, more titles and formats, and an increased marketing and customer base. In particular, popular, non-dedicated devices promised to expand the potential base of e-book purchasers. We were enthusiastic at the prospect of working with Apple in particular because of its proven history of success, particularly in digital content businesses. We had not seen Apple's new device, but we knew that Apple made great, user-friendly products that presented content in innovative ways. I looked forward to having Apple's tablet as a platform to share with

10

consumers books that previously had been available only in print formats, like cookbooks and photography books. We had not been able to release these in e-book format on the black-and-white e-ink based e-readers.

23.     As mentioned above, Hachette had evaluated the possibility of selling e-books based on an agency model, like apps, even before Apple sought a meeting with Hachette. ███

█████████████████████████████████████████████████████████

███████████████████████████████████████████████████████At

our initial meeting, Mr. Cue told us that Apple was still deciding whether it would enter the e-book business at all, but he made clear from the start that, consistent with its approach to other digital content businesses, Apple would only launch an e-bookstore if it could build a profitable business. For this reason, Apple made clear that it had no interest in buying books from Hachette and selling them to consumers at a loss. Under the wholesale model, e-book new releases priced at $9.99 were significantly below cost.

**The January 2010 Negotiations with Apple**

24.     █████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████████

25.     On January 4, 2010, Mr. Cue began the negotiations by emailing me an initial list of proposed terms for a deal with Apple. Before Mr. Cue's email we had not discussed these points with Apple. In the subsequent negotiations with Apple, we found that it was largely inflexible on these terms.

11

26. ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

Once Apple proposed agency, we were open to the idea because we had identified agency as a viable option for all our e-book sales, even before Apple contacted us in December.

27.    Although both Hachette and Apple agreed that agency might be a viable model, we did not agree about a number of Apple's major proposed terms and we sought to modify or exclude them from our contract with Apple.

28.    On January 11, 2010, Apple sent us its first draft contract. During the next 13 days, we engaged in intense negotiations with Apple over the terms of this proposed contract. At all times, this was a one-to-one negotiation. We negotiated independently with Apple; we did not negotiate in concert with any other publisher. We also understood the January 11 draft contract to include all of the terms for an agreement with Apple; at no point did we have a separate agreement or understanding on terms outside of Apple's proposed written contract.

29.    Apple's proposed contract prohibited windowing of e-book formats or newly released hardcovers. As discussed previously, in September 2009, Hachette windowed the e-book version of *True Compass*, the autobiography of Senator Edward Kennedy. At the time of its negotiations with Apple, Hachette's windowing views were informed by that experience. Because e-books were in a state of flux and uncertainty and because certain texts are less susceptible to presentation as e-books, Hachette thought it was important to retain its ability to window. Apple would not allow windowing on its e-bookstore. Apple explained that it believed a digital content store must have a broad selection of content to be successful, and in particular it must match the availability of physical content. Apple stated that it strictly followed this

12

principle in all of its content stores, and it would not make an exception for an e-book store. Ultimately, we conceded this point to Apple.

30.     Apple's contract also included a limited MFN that required Hachette to match on Apple's e-bookstore the lowest available retail price for a particular book, with exceptions for special promotions. I do not recall personally discussing this term with Mr. Cue, but my team reported to me that Apple believed it needed the MFN to ensure that it could compete on pricing with other retailers. Hachette would have preferred not to have any MFN. Hachette had already considered agency and concluded that implementation of an agency contract with each e-book seller would allow Hachette to price consistent with demand. Although we understood Apple's underlying business concern as legitimate, we believed that, under agency, we would price our books appropriately to promote the success of Apple's bookstore. For this reason, when we sent a proposed contract to Apple on January 21, just days before we signed our final agreement, we proposed striking the MFN and asked Apple to sign the agreement without the MFN. In correspondence related to the negotiation with Apple, after Hachette's lawyers struck the MFN provision from the draft, Apple wrote in response, "THIS IS A MUST." [DX-213 at APLEBOOK-00430005.] Apple would not drop the MFN from its contract because, as I understand it, it wanted protection against finding itself as an agent in an uncompetitive position vis-a-vis other retailers.

31.     The MFN demanded by Apple ensured that Apple would offer the lowest e-book price available through any other retailer—whatever that price was, whether $5.99, $9.99, or $14.99—and whether the other retailer was Hachette's reseller or agent. Before Apple contacted Hachette, we had envisaged that any move to agency would have to apply to all e-book sellers.

13

At the time we decided to sign the Apple agreement, we had decided to move to the agency model with all e-book sellers.

32.     Hachette's consideration of agency prior to December 2009 reflects that we felt agency was viable based on Hachette's own business reasons, and not based on an agreement with any other company. While I am aware that Apple's initial January 4, 2010, terms had a bullet point that indicated that all e-book sellers must move to agency, I am not aware of any discussion of this term. I also have no recollection of discussing this issue with Mr. Cue. For Hachette, this bullet point was irrelevant because, in our consideration of the agency model, which Hachette had been discussing for some months by then internally, we had always envisaged that the agency model would have to apply to all online booksellers in order to achieve Hachette's goals in moving to agency. In our view, moving all e-book sellers to agency would be necessary to achieve the goal of allowing Hachette to price its e-books to consumers across a diversity of price points consistent with consumer demand and ensure a competitive, level playing field for e-book sellers.

33.     Apple's proposed contract also included price tiers that set maximum e-book prices tied to corresponding physical prices. Mr. Cue explained Apple's belief that, in order for a content store to be successful, digital content must be priced less than its physical counterpart. He said that Apple followed this principle in all of its content businesses without exception, and that the price tiers and maximums were meant to keep e-books priced accordingly. Hachette was strongly against Apple's maximum price tiers. As with the MFN, we opposed any limitation on our ability to determine our own pricing. We agreed with Apple that the consumer price for our digital products should be less than physical products; however, we believed that consumers would be willing to pay more than the price caps Apple proposed, and that Hachette could set

14

appropriate prices. Hachette also opposed the price tiers because, with Apple's caps, Hachette would make less money under agency than wholesale for some titles. Apple refused to drop the price caps, and ultimately Hachette conceded on this point as well.

34.     As discussed above, our negotiations with Apple were intense and, at times, frustrating. Apple came to the bargaining table with a firm set of business goals and demands. Throughout the negotiations we tried to convince Apple to change its terms, but, for the most part, Apple would not budge. Apple's primary modification was to include higher price points on the price tiers, but Hachette felt it was a relatively minor concession compared to what we wanted. We understood that Apple had its own independent business goals and that it wanted to apply the same business strategies it had used successfully in other content businesses. We understood why, as a new entrant in e-books, Apple would want to protect its ability to price competitively with a dominant, established retailer. But in Hachette's own business judgment, we did not think all of the terms were necessary, and preferred different terms.

35.     We knew that Apple was scheduled to announce the launch of the iPad to the public soon. If we were going to sign a deal with Apple, we wanted to be included in that exciting announcement. But it was not clear until the very last moment that we would be able to get comfortable enough with Apple's terms to go forward. As the iPad launch neared, Apple made clear it would only enter an agreement that included the prohibition against windowing, the MFN, and the maximum price tiers. Hachette was left with the choice of accepting Apple's terms or not being part of the Apple bookstore. Balancing all of our short term and long term concerns, we decided it was in our best interest to sign with Apple. It was a tough decision. The effective term of the agreement was less than a year, which meant if it there was a problem, we could renegotiate. We also felt it was critical to have competition in e-book sales, and we

15

thought that signing with Apple might be our best opportunity in the foreseeable future to support a new retailer. At the time, Barnes & Noble and Sony's e-book businesses were struggling, and the need for increased competition was greater than ever. Thus, while we would have preferred different terms, we believed that, on balance, signing with Apple on its conditions was the best business outcome for Hachette and its stakeholders.

36.    Through my involvement in the negotiations, I had the impression that Apple aimed to be even and straightforward, and that it was offering all of the publishers the same basic terms. To my knowledge, Apple never told us about another publisher's position on terms. Apple only told us how many publishers had signed or seemed likely to sign with Apple, but it did not tell us which publishers. This information was, of course, important for us because we knew that a broad range of content was important to the success of the e-bookstore and Apple's bookstore wouldn't succeed unless it had books from three to four of the larger publishers. While Hachette hoped that we were getting favorable terms compared to other publishers, and we hoped that other publishers would sign with Apple, ultimately we had to evaluate Apple's contract solely based on Hachette's unilateral interests.

**Amazon's Decision to Move to Agency**

37.    On March 31, 2010, we signed agency agreements with Amazon, Barnes & Noble, and Sony. We found that the other retailers insisted on many of the major terms that we had negotiated with Apple. For example, Amazon required an MFN, price tiers with caps, and a prohibition on windowing. Amazon was absolutely adamant about the MFN, telling us, "Our primary concern, above everything else, is that in an agency model there be assurances that Amazon never find itself in a situation where an e-book be available anywhere else that is not available on Amazon (Selection Parity) and that said e-books be available at the same price anywhere that a consumer may see them (price parity)." [DX-303.]

16

38.     I strongly believe that by signing an agency agreement with Apple, and moving to agency with our other retailers, Hachette made significant progress in moving toward a more sustainable, robust book and e-book business. By agreeing to Apple's terms, Hachette helped support a new entrant coming into a business that largely lacked competition, the growth of which would be constrained by a single device and a single retailer. Apple's entry and innovations have spurred competition, and as a result, consumers have a much more diverse and higher quality selection of available e-books and e-readers from which to choose. With our ability to set prices, Hachette has priced books at all different levels, in line with the value of each individual book.

39.     The move to agency has fostered competition for the sale of e-books. Without agency, Apple would not have entered, other e-book sellers likely would have exited and new competing retailers would not be positioned to compete for the sale of e-books. ▮

40. ▮

17

... Apple's tablet also meaningfully improved the

... the iBooks technology allowed us to show illustrated books, artwork and

... digitally, something that was not possible on black-and-white e-readers. The iPad's

... also led to the introduction of portable tablets, non-dedicated e-reader devices. The

iPad tablet held the great promise of introducing e-books to a new group of consumers who were

not frequent book readers, which was beneficial to us and to consumers.

I declare under penalty of perjury, under the laws of the United States, that the foregoing

is true and correct.

Executed on Dated: 4/26/, 2013

DAVID YOUNG

18

# EXHIBIT F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,

               Plaintiff,

     v.

APPLE INC., et al.,

               Defendants.

               12 Civ. 2826 (DLC)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

THE STATE OF TEXAS,
THE STATE OF CONNECTICUT, et al.,

               Plaintiffs,

     v.

PENGUIN GROUP (USA) INC., et al.,

               Defendants.

               12 Civ. 03394 (DLC)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## DECLARATION OF CAROLYN REIDY

I, CAROLYN REIDY, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.     I am the President and Chief Executive Officer of Simon & Schuster, Inc. ("Simon & Schuster"). Except as otherwise stated below, I have personal knowledge of the information contained in this declaration, and, if called to do so, could and would testify competently to its contents under oath.

USA v. Apple Inc., et al.
12-CV-02826-DLC
**DX-552**

1

## Introduction

2.      I have worked at Simon & Schuster for over 20 years. I became President and CEO of Simon & Schuster in 2008. I am responsible for all the publishing and operations of Simon & Schuster's numerous divisions, including adult publishing; children's publishing; audio; Simon & Schuster digital; and our international business in Australia, Canada, India, and the United Kingdom. My job also includes at times taking the lead on the development of new partnerships and discussing and/or negotiating the core terms of our agreements with major retailers.

3.      Simon & Schuster was founded in 1924. Simon & Schuster is now a division of CBS Corporation. I report to Leslie Moonves, President and CEO of CBS. Simon & Schuster offers an extensive selection of print, digital and audio content to readers around the world, and we publish approximately two thousand titles a year. In 2012, we had 317 titles on the *New York Times* bestseller list, including thirty-five #1 bestsellers. These titles included *Team of Rivals* by Doris Kearns Goodwin, *The Wind Through the Keyhold* by Stephen King, *My Year in Meals* by Rachael Ray, and *The Perks of Being a Wallflower* by Stephen Chbosky.

4.      Simon & Schuster has been a leader in bringing its works to consumers in digital format, with over 14,000 Simon & Schuster titles available as e-books. E-books accounted for 24% of Simon & Schuster's revenue in the fourth quarter of 2012.

## The E-Book Business Prior to December 2009

5.      Our e-book business began in 2003, and grew in late 2007 after Amazon introduced its first Kindle device. At that time, we sold e-books to retailers at wholesale prices, and the retailers set the price of the e-books for consumers. Prior to 2009, we priced e-books at a 20% discount off list prices for hardcovers to reflect the modest cost savings from electronic publication.

6. Beginning with the Kindle's launch, Amazon priced *New York Times* bestsellers and many new release e-books at $9.99, no matter what they actually paid us for those books. This meant that for any bestseller or popular new release e-book that we sold to them at over $10 (and this was most of our volume of sales), Amazon was selling the e-book to consumers at a loss. [DX-036.]

7. We were concerned about Amazon's below-cost pricing strategy and its impact on our long-term business interests. [DX-036.] In the short run, we were not losing money on our e-book sales. But we viewed this as unhealthy for Simon & Schuster's business for a number of reasons.

8. First, we believed that Amazon would eventually refuse to sell e-books below their wholesale cost and would demand lower wholesale prices. Second, we were concerned that if Amazon established $9.99 as the expected price for the most popular e-books, e-book sales would discourage hardcover sales or put downward pressure on physical book cover prices, thus driving down overall profits, and decreasing the amounts available for author advances. Third, Amazon's policy of charging $9.99 for all bestselling and new release e-books treated very different books as if they were identical. We thought that retail pricing of e-books should account for differences between books, including their length, the author's popularity, and the investment of time and effort necessary to bring a book to market. Doris Kearns Goodwin's *Team of Rivals*, a biography of President Lincoln and some of his cabinet members, was a serious, scholarly undertaking of significant length that should be valued differently than a book rushed to market to take advantage of a pop culture fad. Amazon's uniform pricing strategy made it harder to market new releases and bestsellers in a way that reflected these crucial differences. Finally, we were hearing from other e-book retailers, and especially Barnes &

3

Noble, that they could not match Amazon's below-cost pricing without losing money and that as a result, their businesses were suffering.

9.    In addition, over the years consumers had shown a willingness to pay more for popular new titles. We did not think it was necessary to lower prices on the most valuable books (best sellers) as low as Amazon did, ultimately decreasing income for a publisher, whose economics demand as much income as possible from its most highly priced books and for authors, who want the highest possible income.

10.    The bottom line was that Amazon's e-books pricing strategy led to unhealthy and unstable market conditions. We believed those conditions would harm our business and our customers. [DX-036.]

11.    I spent many hours thinking about how to make the e-books business work for Simon & Schuster. We considered multiple different strategies and implemented two of them in 2009: eliminating the discount from our digital list prices and windowing.

### No Discount For Digital List Price

12.    In January 2009, Simon & Schuster made digital list prices equal to print format list prices, which meant the wholesale prices were also the same. Despite the higher wholesale prices, Amazon continued with its $9.99 pricing for *New York Times* bestsellers and many new release e-books.

### Windowing

13.    For as long as I can remember, publishers have made paperback versions of books available for sale only after hardcover editions have been on the market for several months. This is known in the publishing industry as "windowing." I began to think about delaying e-book releases in spring 2009, especially after Amazon was unmoved by our raising digital list prices. I had concerns about windowing because I did not want to alienate digital customers. But we

4

experimented with windowing e-books as an effective way to encourage Amazon to change its below-cost pricing strategy.

14.    Simon & Schuster took its first step toward windowing when we decided, in consultation with Stephen King, to window his new novel, *Under the Dome*, until after the holiday season. That book was scheduled for a November 2009 release. *Under the Dome* was a massive, 1,000-plus-page work from one of the world's great authors and had a $35 hardcover list price. We felt that charging $9.99 for the e-book version undervalued Mr. King's substantial creative and intellectual efforts, would reduce our overall returns on the book, and could insult consumers who paid a significantly higher price for the physical book. [DX-036.]

15.    Later, we decided to take a broader approach to windowing. Specifically, on December 9, 2009, we announced that we would delay the e-book versions of 35 new books scheduled for release in hardcover between January and April 2010. We chose those books because we believed they all had the potential to be bestsellers. We hoped that our windowing plan would encourage Amazon to adopt a new strategy for e-books pricing. Our windowing plans were developed before we were aware of Apple's interest in potentially starting an e-bookstore, and Apple's interest did not impact those plans one way or the other.

### Pre-Apple Agency Discussions

16.    In November 2009, Barnes & Noble approached us to ask for our help in supporting it as an e-book retailer. Barnes & Noble was very concerned about its ability to match Amazon's below-cost, uniform $9.99 pricing for certain new releases and *New York Times* bestsellers and was seeking ways to improve its revenue from e-book sales. Barnes & Noble proposed that they could sell books for a "fee," with Simon & Schuster responsible for setting the prices. I do not remember Barnes & Noble describing their proposal as "agency."

17.    Effective June 2009, S&S entered into a deal with the online company Scribd whereby S&S set the price and Scribd was paid a fee. This was akin to an agency model. Scribd's primary business was not retail—they were an online library—and it was a relatively small deal. As of January 2010, looking back, we saw the idea of the agency model taking hold well before Apple proposed it to Simon & Schuster and industry participants gravitating toward this different way of selling. [DX-142.]

### Introductory Meeting with Apple in December 2009

18.    In December 2009, Apple reached out to Simon & Schuster to discuss Apple's interest in opening an e-bookstore. I was thrilled that Apple was considering entering the e-books market. I wanted to distribute our books as widely as possible and felt that Apple would help us entice consumers to try digital books. Overall, my view was that Apple had what it would take to succeed: a history of innovation, a huge customer base, and marketing success. I thought Apple's entry could seriously change the dynamics of the e-books market for the better.

19.    Eddy Cue and others from Apple met with me and key members of my team, including Michael Selleck, Ellie Hirschorn, and Dennis Eulau, on December 16, 2010. That was the first time I had ever met Mr. Cue. During our meeting, Mr. Cue told us that Apple was considering launching an e-bookstore and wanted to learn more about the publishing industry, particularly the e-books business. Mr. Cue made very clear that Apple had a very short window to get any potential e-bookstore up and running. Mr. Cue said Apple did not discuss the details of future devices, but told us that any Apple e-bookstore would support color e-books and audio and video content, allow web browsing, and operate through touchscreen technology. He told us that Apple's technology platform would be ideal for reading e-books.

20.    I understood from press reports that Apple would likely be introducing a revolutionary new tablet device, and we were very excited about a new Apple product that could

6

transform the e-reading experience for consumers. Apple had created some of the best handheld consumer products in the world. We assumed that any new tablet device would be no less innovative.

21.    Mr. Cue said if Apple launched a new e-bookstore, it would have to have a large amount of content from multiple publishers to attract customers. That made sense to me. We knew from the lackluster sales of e-books on our own website that customers would not be as interested in shopping at an e-bookstore that only sold Simon & Schuster books.

22.    We also discussed wholesale and retail pricing in general. Apple was obviously just learning about the e-books business and said that it did not know how it would price books. I do not recall discussing agency with Apple during our first meeting. But Mr. Cue made clear that Apple did not intend to sell at a loss. Mr. Cue also explained that Apple expected that digital content would sell for less than physical content.

23.    We were excited about Apple. We believed that Apple's e-reading platform would be a big improvement over the e-reading experiences then available. Amazon's Kindle, Barnes & Noble's Nook, and the Sony Reader only displayed books in black and white. On Apple's platform, as Mr. Cue described it, we would be able to sell books in color and with important enhancements. For example, we thought that a partnership with Apple would allow us to sell digital versions of illustrated children's books for the first time. We also understood that Apple would allow us to link our e-books to other books by the same author or outside web pages, including author pages on our website S&S.com.

24.    Several days later, on December 21, I spoke with Mr. Cue by phone. He told me he wanted to share some broad ideas for a potential deal. He described to me an agency model, with the publisher setting the e-book price to the consumer and Apple taking a 30% commission.

7

He emphasized that for Apple to make the investment in starting an e-bookstore, it needed to make a profit. He also explained that it was important to Apple to offer prices that were below physical book prices. He said that he intended to propose a price cap—at that time he suggested $12.99—on any e-book sold in the Apple e-bookstore. He told me that he thought the only exceptions might be specialized books, like books with color in them.

25. Following up on our conversation, on January 4, 2010, Mr. Cue sent me an email that outlined his initial ideas for how an agency agreement might work. That e-mail mostly tracked our pre-Christmas conversation. For example, during both our late December phone call and his January 4 e-mail, Mr. Cue mentioned the idea that all resellers of new releases would need to sell on an agency model for Apple's proposal to work.

26. One week later, on January 11, 2010, Apple sent us its first draft contract. Unlike his prior e-mail, the draft agreement did not contain a provision requiring that all resellers of new titles be on an agency model. If it had, I would have rejected the deal outright because it would have been Apple telling us how to run our business.

### Negotiations with Apple in January 2010

27. After we received Apple's draft contract, the real work of negotiation on business terms began—and those negotiations were difficult. The draft contract had several major deal points that Apple characterized as essential to its moving forward with an e-bookstore. These terms were the "day and date" provision requiring e-books to be available at the same time as physical books, a 30% agency commission, a most favored nation ("MFN") provision on consumer pricing for new releases, and a series of pricing tiers tied to the price of physical books that set the upper limit for how much Simon & Schuster could charge for e-books. In reviewing those terms, I was concerned that Simon & Schuster's business interests did not match Apple's own interests, and we strongly opposed several terms. [DX-163.] Two of my biggest issues

8

were with Apple's 30% commission and its proposed pricing tiers—and their effect on Simon & Schuster's ability to afford its author royalties and cover the costs of production.

28.    First, we thought the 30% commission was too high. Mr. Cue assured me that the 30% commission was the same commission Apple got in the iTunes store and App Store. He explained that a 30% commission allowed Apple to make a low single-digit profit and that to change it for the e-bookstore would disrupt Apple's other content businesses. I wanted to see whether there was any room to negotiate, so I reached out to contacts at companies in the music and film industries that sold digital content through Apple. They confirmed that their contracts with Apple effectively gave Apple a 30% gross margin across the board on every type of content. [DX-125; DX-183.] I came to the conclusion that Apple would not compromise on a term that it saw as critical to its other content businesses, and we ultimately agreed to the 30% agency commission.

## Pricing Tiers and Caps.

29.    I also strongly objected to the pricing tiers and caps in Apple's proposal. Apple made clear that it believed publishers' pricing expectations for e-books were generally too high. Mr. Cue told me that the purpose of the price tiers and caps was to give us some flexibility to set our own prices while ensuring that we could not raise prices beyond what Apple considered reasonable. Apple also made clear that we would have the freedom to price our e-books below the price caps and within any lower tier. I understood Apple's points. But I believed that the pricing caps were actually too low for some types of e-books—namely serious works from famous authors—that would support higher prices. Apple ultimately added one more higher tier (at $14.99) for e-books, and made small concessions to us by allowing us either higher tiers or exemptions for limited categories of e-books, such as enhanced e-books, works published only in e-book form, and backlist hardcovers. [DX-231.]

9

## The Retail Price MFN

30.    Throughout our negotiations. Simon & Schuster sought significant revisions to Apple's proposed MFN. Apple told me that they wanted the MFN to ensure that its customers would get the best price for an e-book new release if that release was sold at a lower price by any other retailer. I understood that for Apple, the MFN was about its ability to compete. I knew why this mattered to Apple, but I was concerned about what the MFN would mean for Simon & Schuster. We were concerned about potentially having to match Amazon's prices on Apple's e-bookstore, and we did not know how Apple's entry would affect Amazon's pricing strategy. While my preference was to move our existing e-book retailers, like Amazon, to an agency model, I did not know whether they would be willing to do an agency deal with us.

31.    If Simon & Schuster was going to do an agency deal with Apple, I wanted to at least minimize some of the risks to Simon & Schuster of the MFN. So we asked for several "carve-outs" from the MFN. We proposed that we would not match any lower retail price that was set in breach of Simon & Schuster's contracts with other retailers — and Apple agreed. We also asked Apple for and got an exception for promotional activity. This meant that we would not have to match the prices for new releases on any other retailer if that price was a temporary promotion or was not available on an "a la carte" basis (e.g., was only available as a bundled offer to a book club). We also negotiated for the right to only lower new release prices to match another retailer's price for as long as the other retailer offered that price. And we demanded a provision that allowed our authors to delay an e-book's release on Apple's e-bookstore or refuse to sell it on Apple's e-bookstore at all. This gave our authors the freedom to choose whether or not to sell on Apple's platform; for example, if they believed that the price for their e-book — and the related royalties they would get — were below what the author thought he or she deserved or if they simply wanted to release their print book first, they had the freedom to not sell their e-

10

book on Apple's platform. In the end, we felt more comfortable about agreeing to an MFN with those "carve outs."

32.    Simon & Schuster gave serious thought to whether we should sign any agreement with Apple, even with the concessions described above. Ultimately, I decided that the benefits of selling our e-books on Apple's e-bookstore outweighed the potential downsides, including not knowing how our existing retailers—and especially Amazon—might react. I signed the contract with Apple on January 25, 2010 because I believed that Apple's entry into the e-books market would provide significant benefits to our digital books business.

### Amazon's Decision to Move to Agency

33.    After we signed our agency agreement with Apple, I personally felt that Simon & Schuster had an economic incentive to adopt agency agreements with other retailers. But I did not believe that the MFN "forced" us to do so. In fact, from the first draft on, Apple's contract never required us to take any action with respect to other retailers. Had Apple put language in the contract dictating how Simon & Schuster should do business with other retailers, I would have rejected the deal outright.

34.    On January 22, 2010, and as we were wrapping up our negotiations with Apple, I called Russell Grandinetti of Amazon to tell him that we intended to move to agency terms for all e-book sales. Mr. Grandinetti asked whether Simon & Schuster might be open to windowing new release e-books for two to three months and then selling on wholesale terms. I told him we would consider it, although privately I did not think it would be practical. [DX-233]

35.    Ultimately, after our deal with Apple was made public, Amazon and Simon & Schuster agreed to an agency agreement, which was signed on March 23, 2010.

36.    I do not recall ever discussing Apple's MFN clause or pricing tiers with Amazon. The terms of Amazon's agency agreement were similar to the terms that Apple had insisted on.

11

For instance, Amazon received a 30% agency commission and required that with limited exceptions, e-books must be available at the same time as physical books. In addition, our agency agreement with Amazon went further than the Apple agreement in some areas. Amazon negotiated a retail price MFN that required Simon & Schuster to match the lowest price available for any e-book. [DX-333.] Apple's MFN only covered new releases. [DX-246.]

37.    I understand that plaintiffs argue that the alleged conspiracy between Apple and the publishers resulted in higher e-book prices. In fact, our agency contract with Apple contained some pricing tiers that were more restrictive than those in the Amazon agreement. The Amazon agreement allowed us to set the price for any hardcover, non-*New York Times* best seller e-book new release with a physical list price of $27.50 or lower as high as $12.99. Our Apple agreement had four different price tiers for the same new release e-books with physical list prices below $27.51, and capped the e-book prices for many of these books at $9.99, $10.99, or $11.99.

### Apple's Entry Was Good for the E-book Business

38.    Apple has made e-book reading relevant to millions of new customers who purchased the iPad, but had not previously been interested in e-reading. Apple also enabled other retailers to successfully compete in the market, or enter the market in the first place. Apple's e-reading software opened up a world of possibilities—from children's books and cookbooks to enhanced e-books. Thanks to Apple, we can sell multiple formats that had never before been available electronically that could now be read in vivid color and with other features

like audio and video. I believe that none of that would have been possible in the old, black-and-white world.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 26th day of April, 2013 at New York, New York.

_____
CAROLYN REIDY

# EXHIBIT G

| | |
|---|---|
| **From:** | Bezos, Jeff |
| **Sent:** | Thursday, December 10, 2009 8:52 AM |
| **To:** | Grandinetti, Russell; Anthony, Felix; Kessel, Steven; Freed, Ian |
| **Cc:** | Hart, Greg |
| **Subject:** | DTP |

How about we do a bigger rev share on DTP at the same time we require DTP books to be lendable (good rules -- not like bn), to be bundlable with hardcover, and to be rentable, and to be clubable, subscribable, and to be libraryable (where we are the library).

Basically, everything we wish publishers would do, we require in dtp and then give them 70 percent of revs.

Who owns?

1

AMZN-MDL-0044064
HIGHLY CONFIDENTIAL

# EXHIBIT H



AMZN-MDL-0154056
HIGHLY CONFIDENTIAL



AMZN-MDL-0154057
HIGHLY CONFIDENTIAL



3

AMZN-MDL-0154058
HIGHLY CONFIDENTIAL

# EXHIBIT I

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

--------------------------------x

UNITED STATES OF AMERICA,

                Plaintiff,    CASE NO.

              vs.         12-CV-2826(DLC)

APPLE INC., et. al,

                Defendants.

--------------------------------x

**HIGHLY CONFIDENTIAL**

VIDEOTAPED DEPOSITION OF ANTHONY ASTARITA

New York, New York

Wednesday, February 27, 2013

9:30 a.m.

Reported by:
LYNN VAN DEN HENDE
JOB NO:  28806

ANTHONY ASTARITA - HIGHLY CONFIDENTIAL





HIGHLY CONFIDENTIAL - A. ASTARITA

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

ANTHONY ASTARITA - HIGHLY CONFIDENTIAL



139

HIGHLY CONFIDENTIAL - A. ASTARITA

196

HIGHLY CONFIDENTIAL

C E R T I F I C A T E

STATE OF NEW YORK)

:ss

COUNTY OF NEW YORK)

I, LYNN VAN DEN HENDE, a Certified Shorthand Reporter and Notary Public, within and for the State of New York, do hereby certify:

That ANTHONY ASTARITA, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

In witness, whereof, I have hereunto set my hand this 5th day of March, 2013.

_____

LYNN VAN DEN HENDE, RPR-CSR-RMR-CRR-CLR

# EXHIBIT J

UNITED STATES DISTRICT COURT

SOUTHER DISTRICT OF NEW YORK

-----------------------------------x

UNITED STATES OF AMERICA,

         Plaintiff,          CASE NO.

vs.                      12-CV-2826(DLC)

APPLE INC., et al

         Defendants.

-----------------------------------x

Videotaped Deposition of

KEITH MOERER

THURSDAY, DECEMBER 13, 2012

Palo Alto, California

9:13 a.m.

Reported by:
KIMBERLEE SCHROEDER, CSR, RPR, CCRR
Job No.:  28217



DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585



DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

KEITH MOERER - HIGHLY CONFIDENTIAL

300

REPORTER'S CERTIFICATE

I, PATRICIA L. HUBBARD, do hereby certify:

That I am a duly qualified Certified Shorthand Reporter in and for the State of California, holder of Certificate Number 3400, which is in full force and effect, and that I am authorized to administer oaths and affirmations;

That the foregoing deposition testimony of the herein named witness, to wit, KEITH MOERER was taken before me at the time and place herein set forth;

That prior to being examined, KEITH MOERER was duly sworn or affirmed by me to testify the truth, the whole truth, and nothing but the truth;

That the testimony of the witness and all objections made at the time of examination were recorded stenographically by me and were thereafter transcribed by me or under my direction and supervision;

KEITH MOERER - HIGHLY CONFIDENTIAL

301

That the foregoing pages contain a full, true and accurate record of the proceedings and testimony to the best of my skill and ability;

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, nor am I a relative or employee of such attorney or counsel, nor am I financially interested in the outcome of this action.

IN WITNESS WHEREOF, I have subscribed my name this 20th day of February 2013.

_____
PATRICIA L. HUBBARD, CSR #3400