CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------- x
:
THE STATE OF TEXAS, :
:
Plaintiffs, :
:
v. :   12-CV-03394 (DLC)
:
PENGUIN GROUP (USA), INC., et al., :
:
Defendants. :
:
:
------------------------------------------------- x

------------------------------------------------- x
:
IN RE ELECTRONIC BOOKS ANTITRUST :
LITIGATION :   11-MD-02293 (DLC)
:
------------------------------------------------- x

This Document Relates to:

------------------------------------------------- x
:
ALL ACTIONS :
:
:
------------------------------------------------- x

## DEFENDANT APPLE INC.'S CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO CLASS PLAINTIFFS' AND PLAINTIFF STATES' MOTIONS TO EXCLUDE EXPERT OPINIONS OFFERED BY JONATHAN ORSZAG

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................................................... 1

ARGUMENT ..................................................................................................... 2

I.    Mr. Orszag's Testimony on "Offsetting Benefits" Resulting from the Complementary Nature of e-Books and e-Readers is Admissible ................................... 3

    A.    The District Court's Finding that Apple Entered an Unlawful Price-Fixing Conspiracy Does Not Relieve the Plaintiffs of Their Burden to Show the Extent of Antitrust Injury ....................................................................... 6

    B.    Apple is Not Estopped from Introducing Mr. Orszag's Offset Opinion ...................... 10

    C.    Mr. Orszag's Offset Opinion is Reliable ................................................. 12

        1.    Mr. Orszag's Offset Calculation Is Reliable ...................................... 12

        2.    Mr. Orszag's Opinion About Amazon's Pricing Strategy is Reliable ............... 15

        3.    There Is No Evidence in the Record that Amazon Would Have Negotiated Lower Wholesale e-Book Prices Absent the Conspiracy ................. 19

II.    Mr. Orszag's Opinions that Agency Agreements Accelerated Growth in Self-Publishing and Increased Distribution of e-Books are Reliable ................................... 21

    A.    Mr. Orszag's Opinion About the Growth in Self-Publishing Is Reliable .................... 21

    B.    Mr. Orszag's Opinion About the Growth in Free e-Books Is Reliable ...................... 24

    C.    Mr. Orszag's Opinion that Some eBook Sales on the iBooks Store Would Not Have Occurred in the But-for World Is Admissible .................................... 25

    D.    Mr. Orszag's Opinion that the Alleged Conspiracy Enabled Barnes & Noble to Remain in the e-Books Market is Reliable ................................................ 26

III.    Mr. Orszag's Criticisms of the Time Period and Control Group in Dr. Noll's Analysis are Economically Justified and Are Not Barred by Judicial Estoppel .......... 29

IV.    To The Extent that Plaintiffs' Motions to Exclude Mr. Orszag's Opinion Apply to Issues Other than Class Certification, They are Premature ........................... 33

CONCLUSION ................................................................................................. 33

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Atl. Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990) ................................................................................................. 6, 9

*Bear, Stearns & Co. v. 1109580 Ontario, Inc.*,
409 F.3d 87 (2d Cir. 2005) .......................................................................................... 10

*Bigelow v. RKO Radio Pictures, Inc.*,
327 U.S. 251 (1946) ...................................................................................................... 3

*Boucher v. U.S. Suzuki Motor Corp.*,
73 F.3d 18 (2d Cir. 1996) ............................................................................................ 17

*Cobb v. Pozzi*,
363 F.3d 89 (2d Cir. 2004) ...................................................................................... 2, 10

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) ................................................................................................... 2, 3

*Filmline (Cross-Country) Prods., Inc. v. United Artists Corp.*,
662 F. Supp. 798 (S.D.N.Y. 1987) ............................................................................... 11

*Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*,
386 F.3d 485 (2d Cir. 2004) ........................................................................................ 11

*Guenther v. Holmgreen*,
738 F.2d 879 (7th Cir. 1984) ....................................................................................... 10

*Hanover Shoe v. U.S. Shoe Mach. Corp.*,
392 U.S. 481 (1968) ....................................................................................................... 8

*Illinois Tool Works Inc. v. Ind. Ink, Inc.*,
547 U.S. 28 (2006) ......................................................................................................... 7

*In re Blood Reagents Antitrust Litigation*,
283 F.R.D. 222 (E.D. Pa. 2012) ..................................................................................... 7

*In re Cardizem CD Antitrust Litigation*,
200 F.R.D. 297 (E.D. Mich. 2001) ................................................................................. 9

*J. Truett Payne Co. v. Chrysler Motors Corp.*,
451 U.S. 557 (1981) ............................................................................................... 3, 6, 11

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Kohen v. Pac. Inv. Mgmt. Co.*,
   571 F.3d 672 (7th Cir. 2009) ................................................... 4

*Kottaras v. Whole Foods Market, Inc.*,
   281 F.R.D. 16 (D.D.C. 2012).............................................. 4, 12

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999)............................................................... 3

*Kypta v. McDonald's Corp.*,
   671 F.2d 1282 (11th Cir. 1982) ......................................... 3, 4, 7

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*,
   791 F.2d 1356 (9th Cir. 1986) ..................................... 1, 3, 4, 12

*Minpeco, S.A. v. Conticommodity Serv's, Inc.*,
   676 F. Supp. 486 (S.D.N.Y. 1987) ............................... 4, 6, 11, 21

*Repub. of Ecuador v. Chevron Corp.*,
   638 F.3d 384 (2d Cir. 2011) ................................................ 33

*Sullivan v. Gagnier*,
   225 F.3d 161 (2d Cir. 2000) ................................................ 10

*United States v. Apple*,
   No. 12 Civ. 2826, 2013 WL 3454986 (S.D.N.Y. July 10, 2013) .......................... 10, 20, 22, 32

*United States v. Valencia*,
   600 F.3d 389 (5th Cir. 2010) ............................................... 14

**Other Authorities**

18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4422 (2d ed.)
   (2013)............................................................................ 10

Former Deputy Assistant Attorney General for Economics at the Antitrust Division of the
   U.S. Department of Justice, Carl Shapiro, "Aftermarket and Consumer Welfare:
   Making Sense of Kodak," 1995 *Antitrust Law Journal*.............................. 8

Jonathan B. Baker "The Antitrust Analysis of Hospital Mergers and the Transformation
   of the Hospital Industry," 1989 *Law and Contemporary Problems* ..................... 8

Neil Hughes, *Tablet rumors: February production start, 10-inch LCD screen* (Dec. 9,
   2009), http://appleinsider.com/articles/09/12/09/
   tablet_rumors_february_production_start_10_inch_lcd_screen ....................... 23

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

## TABLE OF AUTHORITIES
(continued)

Page(s)

Philip Elmer-DeWitt *Apple tablet set for spring launch?* (Dec. 9, 2009),
   http://tech.fortune.cnn.com/2009/12/09/apple-tablet-set-for-spring-launch ........................... 23

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

## PRELIMINARY STATEMENT

Apple's expert, Jonathan Orszag, has offered his opinion that the damages analysis of Plaintiffs' expert, Dr. Roger Noll, is flawed and overstates wildly any damages resulting from Apple's allegedly unlawful conduct.  *See* Corrected Declaration of Jonathan Orszag ("Orszag Decl."), November 25, 2013.  He also offers certain improvements on the econometric model proffered by Professor Orley Ashenfelter, taking into account important market dynamics that Dr. Noll ignores, and concludes that damages to consumers resulting from Apple's allegedly anticompetitive conduct were not more than $30 million.  Orszag Decl. ¶ 10.  Other illustrative calculations by Mr. Orszag demonstrate additional offsetting benefits to consumers and indicate that his estimate of damages *still* likely overstates any harm to consumers.  *Id.*

Class Plaintiffs and Plaintiff States (collectively "Plaintiffs") have each filed motions seeking to exclude Mr. Orszag's opinions under Federal Rule of Evidence 702 and the doctrines of res judicata and judicial estoppel.[1]   But, as explained below, Mr. Orszag's opinions are economically sound, grounded in the factual record, and legally relevant to the ultimate issue of damages.

*First*, Mr. Orszag's opinion that the alleged conspiracy lowered the price of e-readers, and that this benefit to consumers should offset total damages, is admissible because "[a]n antitrust plaintiff *may recover only to the 'net' extent of its injury.*"  *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1367 (9th Cir. 1986) (emphasis added).  Mr. Orszag's opinion addresses benefits of the alleged conspiracy that must be calculated when

---

[1]  The Class Plaintiffs seek to exclude all of Mr. Orszag's opinions, whereas the State Plaintiffs seek to exclude opinions set forth in paragraphs 10, 42-123, and 126-127.  Since the only issue currently before the Court is whether to certify the proposed class under Federal Rule of Civil Procedure 23, the States' motion is premature.  And to the extent that the Class Plaintiffs' motion addresses issues beyond class certification, it too is premature.

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

determining the "net" extent of Plaintiffs' alleged injury.  There is no price-fixing exception to the applicability of this principle.  Nor does the Court's conclusion that Apple engaged in an unlawful conspiracy under the rule of reason preclude Apple from offering Mr. Orszag's opinions.  Any findings in the Court's July 10 Opinion related to the pro-competitive effects of Apple's entry (or lack thereof) were reached under a different burden of proof and are therefore not entitled to collateral estoppel effect.  *See Cobb v. Pozzi*, 363 F.3d 89, 113 (2d Cir. 2004).  And Mr. Orszag's opinion is economically and mathematically sound and consistent with the evidence in the record.

*Second*, Mr. Orszag's opinions that Apple's conduct created other offsetting effects—an increase in self-publishing, broader distribution of free e-books, and sales of e-books to iPad users that would not otherwise have occurred—are also supported by the evidence in the record. And the fact that Mr. Orszag does not quantify these benefits does not render the opinions inadmissible because Apple does not bear the burden of proving damages—Plaintiffs do.  Mr. Orszag's opinions on offsetting effects are admissible to show the flaws in Dr. Noll's damages analysis.

*Third*, Mr. Orszag's opinions regarding Dr. Noll's use of an inappropriate control group and unrepresentative time periods in his regression are neither barred by judicial estoppel nor economically unjustified.

In short, there is no basis for excluding Mr. Orszag's opinions.

## ARGUMENT

Under Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993), trial courts are gatekeepers responsible for "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  *Id.* at 597.  The Court "is to make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). There must be a "fit" to be admissible, meaning the expert's testimony must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591.

Mr. Orszag's opinion satisfies Rule 702 and *Daubert*'s strict standard. His opinions are tied to the facts and law applicable to this case, and he employed the same level of intellectual rigor that characterizes the practice of an expert economist. Further, his opinion is the product of reliable economic principles and methods. Accordingly, his expert opinion should not be excluded.

**I.      Mr. Orszag's Testimony on "Offsetting Benefits" Resulting from the Complementary Nature of e-Books and e-Readers is Admissible**

Because the Clayton Act is "essentially a remedial statute," a "plaintiff must make some showing of actual injury attributable to something the antitrust laws were designed to prevent." *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 562 (1981). To calculate a damages award, the fact-finder must compare "profits, prices and values as affected by the conspiracy, with what they would have been in its absence under freely competitive conditions." *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946). This means that "the ultimate relief awarded must take into account any benefits which would not have been received by plaintiff 'but for' the defendant's anticompetitive conduct, or amounts a plaintiff would have expended in the absence of the violation." *L.A. Mem'l Coliseum*, 791 F.2d at 1367. "An antitrust plaintiff may recover only to the 'net' extent of its injury; if benefits accrued to it because of an antitrust violation, those benefits must be deducted from the gross damages caused by the illegal conduct." *Id.*; *see also Kypta v. McDonald's Corp.*, 671 F.2d 1282, 1285 (11th Cir. 1982) (the measure of damages "consist[s] of net economic loss suffered by the plaintiff"). Put differently,

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

"a plaintiff both injured and enriched by illegal activity cannot choose to recover for his injuries yet retain his windfall." *Minpeco, S.A. v. Conticommodity Serv's, Inc.*, 676 F. Supp. 486, 488 (S.D.N.Y. 1987).

Courts have applied this principle in a broad spectrum of Section 1 cases. For example, in *Los Angeles Memorial Coliseum*, the court applied the offset principle to an unlawful agreement to divide market territories. 791 F.2d at 1367; *see also L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 726 F.2d 1381, 1392 (9th Cir. 1984) (prior opinion describing restraint at issue in the case as a division of markets). The principle has also been applied to tying cases, where "injury resulting from a tie-in must be shown by establishing that payments for both the tied and tying products exceeded their *combined* fair market value." *Kypta,* 671 F.2d at 1285 (emphasis added); *see also id.* ("A determination of the value of the tied products alone would not indicate whether the plaintiff indeed suffered any net economic harm, since a lower price might conceivably have been exacted by the franchisor for the tying product."). Similarly, when examining damages allegedly caused by a merger, "gains from a defendant's unlawful conduct must be counted against losses." *Kottaras v. Whole Foods Market, Inc.*, 281 F.R.D. 16, 24 (D.D.C. 2012) (citing *Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 678-79 (7th Cir. 2009).

This principle is no less applicable to this case where increases in prices of one good (e-books) are inextricably linked to price decreases of another good (e-readers). As Mr. Orszag explains and as Dr. Noll agreed, "e-books and e-readers are complementary products whose prices are inextricably linked." Orszag Decl. at 10; *see also* Sur-Reply Declaration of Jonathan Orszag ("Orszag Sur-Reply Decl.") ¶ 38 n.79, filed concurrently herewith; Dkt. 428, Corrected Declaration of Roger Noll ("Noll Decl.") at 13-15; Richman Decl. Ex A, Deposition of Roger Noll ("Noll Dep."), 38:19-39:4 ("inextricably intertwined means in this case … [that] the

4

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

demand for e-readers is dependent upon what's going on in the e-books market.  The price of e-books and availability of e-books determine the value of an e-reader."); *id.* at 43:12-44:1, 44:13-23.  "When a price-fixing agreement increases the price of one good, multiproduct retailers have a strong incentive to lower the price of the complementary good for consumers willing to buy both goods from the same retailer.  Competition on the complementary good will make the cartel less effective and reduce harm to consumers relative to the scenario in which retailers fix the price of a good that has no complements."  Orszag Decl. ¶ 78.  For example, suppose firms separately priced left shoes and right shoes and the price of left shoes increases as a result of collusion.  Orszag Sur-Reply Decl. ¶ 35.  This increase would create an incentive for manufacturers of right shoes to decrease the price of their products.  *Id.*  From the point of view of the consumer, it is the combined price of a left shoe and a right shoe that matters, so the welfare benefit resulting from the decrease in the price of right shoes must be taken into account when calculating total damages.  *Id.* ¶ 37.  Accordingly, under the offset principle articulated in the cases cited above, any actual damage incurred by any individual plaintiff from a rise in e-book prices must take into account the offsetting benefit (if any) of lower e-reader prices.

Mr. Orszag calculates this benefit.  He first observes that, ███████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████ Orszag Decl. ¶ 88.  Mr. Orszag explains that ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████ (*id.* ¶ 89).  He then calculates that ████████████████████

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████ *Id.* ¶ 92.   Because Plaintiffs' expert, Dr. Noll, does not

account for this offsetting benefit, Mr. Orszag concludes that "Professor Noll substantially

overstates the harm to consumers from Apple's actions."  *Id*. at ¶ 10.

Plaintiffs offer several arguments in favor of excluding Mr. Orszag's opinion that

damages resulting from the increased price of e-books must be offset by the benefits consumers

received as a result of the move to agency.  These arguments all fail.

### A.   The District Court's Finding that Apple Entered an Unlawful Price-Fixing Conspiracy Does Not Relieve the Plaintiffs of Their Burden to Show the Extent of Antitrust Injury

The Class Plaintiffs argue that "Apple is not entitled to any of the offsets that Orszag

posits" because the Court previously found that Apple "participated in and facilitated a

horizontal price-fixing conspiracy."   Memorandum of Law ISO Class Plaintiffs' Motion to

Exclude the Expert Opinions Offered by Apple's Expert Jonathan Orszag ("Pls' Mem.") at 3; *see*

*also* Plaintiff States' Memorandum of Law ISO Their Motion to Exclude Opinions By Jonathan

Orszag at 8-11 ("States' Mem.").   However, the finding that a "contract, combination, or

conspiracy" violates Section 1 does not relieve a plaintiff of its burden to prove antitrust injury

and the amount of damages.  *See Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 339-45

(1990) (plaintiff must demonstrate antitrust injury even when defendant has engaged in unlawful

price-fixing scheme); *J. Truett Payne*, 451 U.S. at 568 (recognizing plaintiff's "burden of

proving antitrust injury and damages").  And because the plaintiff "bears the burden of proving

its claim for damages," it "also bears the burden of proof with regard to the offset."  *Minpeco*,

676 F. Supp. at 490.

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

The rule that benefits resulting from the unlawful restraint must be offset against harms applies even when the restraint constitutes a *per se* violation of the antitrust laws.  For example, tying arrangements where a seller has market power are *per se* unlawful (*see Illinois Tool Works Inc. v. Ind. Ink, Inc.*, 547 U.S. 28, 36 (2006)), but courts have nevertheless applied the offset principle in tying cases.  *See, e.g.*, *Kypta,* 671 F.2d at 1285.

Plaintiffs rely primarily on *In re Blood Reagents Antitrust Litigation*, 283 F.R.D. 222 (E.D. Pa. 2012), for the proposition that offsets are never allowed in horizontal price-fixing cases.  But *Blood Reagents* does not support their position.  There, the plaintiffs alleged that two defendants, duopolists in the relevant market, conspired to raise prices of traditional blood reagents ("TBR").  In opposing class certification, the non-settling defendant claimed that the plaintiffs had "overlook[ed] the prospect that higher prices for traditional reagents led to lower prices or lower price increases for proprietary reagents and equipment."  *Id.* at 239 (internal quotation marks omitted).  The defendant's theory was that "the alleged conspiracy might have caused the prices of some TBR or ABR products to decrease because it gave defendants an incentive to 'cheat' on the cartel by cutting prices on products not subject to the conspiracy."  *Id.* at 240.  The court found that "[t]he argument that defendants were cheating on the cartel [was] speculative, at best" because the defendant "merely suggested that it [was] a possibility."  *Id.* The court held that "[w]ithout stronger evidence that a price-fixing conspiracy did, indeed, have offsetting benefits to consumers, plaintiffs in this type of case should not be saddled with analyzing whether a price-fixing conspiracy might possibly have had any negative effect on the price of any product sold by the defendants."  *Id.*

Unlike the defendant's expert in *Blood Reagents*, Mr. Orszag does not merely "suggest" that there *might have* been consumer benefits resulting from the move to agency.  Rather, he has

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

offered "strong[] evidence" of such a benefit by calculating the precise amount of the benefit received by consumers: █████████████████████████████████████

████████████████   Orszag Decl. ¶ 91.  Mr. Orszag's theory of offset is not "speculative." The antitrust literature recognizes that "[w]hen the profit margin on content increases, companies have an incentive to lower prices for digital devices in order to facilitate content sales." *Id.* ¶ 77 (citing Aimin Yu, Young Hu, and Ming Fan, 2011, "Pricing Strategies for tied digital contents and devices," *Decisions Support Systems*, 51, 405-412).  It is also accepted that "[w]hen a price-fixing agreement increases the price of one good, multiproduct retailers have a strong incentive to lower the price of the complementary good for consumers willing to buy both goods from the same retailer." *Id.* ¶ 78 (citing Plaintiffs' expert Jonathan B. Baker, "The Antitrust Analysis of Hospital Mergers and the Transformation of the Hospital Industry," 1989 *Law and Contemporary Problems*, 51:2, 93:164, at 135-136, and n.201).  Moreover, when analyzed in the context of equipment and aftermarket services, the antitrust literature shows that the "decrease in the effective equipment price offsets a price increase in the aftermarket and substantially reduces the net impact on consumer welfare." Orszag Sur-Reply Decl. ¶ 38 (citing former Deputy Assistant Attorney General for Economics at the Antitrust Division of the U.S. Department of Justice, Carl Shapiro, "Aftermarket and Consumer Welfare: Making Sense of Kodak," 1995 *Antitrust Law Journal*, 63, 483-511, at 505).  Dr. Noll has also recognized the linkage between e-books and e-readers.  *See* Noll Decl. at 13-15; Noll Dep. at 38:19-39:4, 43:12-44:1, 44:13-23. Given the complementary nature of e-books and e-readers, Mr. Orszag's opinion addresses the direct consequences of Apple's alleged conspiracy, not "remote circumstances" in an unrelated market.  States' Mem. at 11 (quoting *Hanover Shoe v. U.S. Shoe Mach. Corp.*, 392 U.S. 481, 488 n.6 (1968)).

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

The Plaintiff States also point to *In re Cardizem CD Antitrust Litigation*, 200 F.R.D. 297 (E.D. Mich. 2001), in support of their argument that Mr. Orszag's offset opinion should be excluded.  States' Mem. at 10-11.   In *Cardizem*, the defendants presented evidence that at least some of the class members received offsetting benefits resulting from the illegal price-fixing scheme.  200 F.R.D. at 311.  The court explained that defendants' "'offsetting benefits' argument concerns the computation of damages," (*id.* at 312), a position entirely consistent with Mr. Orszag's opinion, which goes squarely to the issue of damages.  Mr. Orszag testifies that because Dr. Noll fails to account for the offsetting benefits resulting from the alleged conspiracy, Dr. Noll overstates Plaintiffs' *total damages*.   The reasoning of *Cardizem* thus does not support exclusion of Mr. Orszag's opinion.

Plaintiffs' apparent belief that a finding of liability under the *per se* rule relieves them of their burden to prove actual damages conflicts with well-settled Supreme Court precedent.   In *Atlantic Richfield*, the Court explained that the "[t]he *per se* rule is a method of determining whether § 1 of the Sherman Act has been violated"—it "does not indicate whether a private plaintiff has suffered antitrust injury and thus whether he may recover damages under § 4 of the Clayton Act."  495 U.S. at 341-42.  "*Per se* and rule-of-reason analysis are but two methods of determining whether a restraint is 'unreasonable,' *i.e.*, whether its anticompetitive effects *outweigh* its procompetitive effects."  *Id.* at 342 (emphasis added).  A finding of *per se* liability does not imply the non-existence of all procompetitive effects; nothing in the two district court opinions cited by Plaintiffs holds otherwise.  Thus, the Court's finding of *per se* liability does not preclude Apple (through Mr. Orszag) from providing evidence of offsetting benefits.

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

### B.       Apple is Not Estopped from Introducing Mr. Orszag's Offset Opinion

Class Plaintiffs contend that Apple is estopped from introducing Mr. Orszag's offset opinion because the Court previously found that the procompetitive effects of Apple's conduct did not outweigh its anticompetitive effects.  Pls' Mem. at 4.  The party asserting collateral estoppel bears the burden of demonstrating, *inter alia*, that "the identical issue was raised in a previous proceeding."[2] *Bear, Stearns & Co. v. 1109580 Ontario, Inc.*, 409 F.3d 87, 91 (2d Cir. 2005) (internal quotation marks omitted); *see also Sullivan v. Gagnier*, 225 F.3d 161, 166 (2d Cir. 2000) (the burden of showing that an issue raised in a subsequent proceeding "is identical to one that was raised and necessarily decided in the prior action rests squarely on the party moving for preclusion").  "Courts and commentators alike have recognized that a shift or change in the burden of proof can render the issues in two different proceedings non-identical, and thereby make collateral estoppel inappropriate."  *Cobb*, 363 F.3d at 113; *see also Guenther v. Holmgreen*, 738 F.2d 879, 888 (7th Cir. 1984) ("It is, of course, well established that issue preclusion may be defeated by shifts in the burden of persuasion …."); 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4422 (2d ed.) (2013) ("Failure of one party to carry the burden of persuasion on an issue should not establish the issue in favor of an adversary who otherwise would have the burden of persuasion on that issue in later litigation.").

Here, the Court found that any pro-competitive effects of Apple's conduct were outweighed by its anticompetitive effects under the rule of reason.  *United States v. Apple*, No. 12 Civ. 2826, 2013 WL 3454986, at *44 (S.D.N.Y. July 10, 2013).  Under the rule of reason,

---

[2]   Because Plaintiffs are unable to prove that an "identical issue was raised in a previous proceeding," Apple does not address the other elements of collateral estoppel that Plaintiffs would be required to prove.  *See Bear, Stearns*, 409 F.3d at 91 (setting forth elements).  Apple does not concede that Plaintiffs would be able to prove any of the required elements.

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

"the factfinder must engage in a careful weighing of the competitive effects of the agreement—both pro and con—to determine if the effects of the challenged restraint tend to promote or destroy competition."  *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 507 (2d Cir. 2004).  In other words, it is the overall impact—not the precise amount of the impact—that matters when deciding whether a conspiracy violates Section 1 under the rule of reason.  And, under the rule of reason, the *defendant* has the burden of demonstrating "the pro-competitive effects of their agreement" once the plaintiff has established that the agreement had an "adverse effect on competition as a whole in the relevant market."  *Id.* at 506-07.  At the damages stage, by contrast, the *plaintiff* has the burden of proving the amount of damages it suffered.  *J. Truett Payne*, 451 U.S. at 568; *see also Minpeco*, 676 F. Supp. at 490 (plaintiff "bears the burden of proving its claim for damages"); *Filmline (Cross-Country) Prods., Inc. v. United Artists Corp.*, 662 F. Supp. 798, 813 (S.D.N.Y. 1987) (holding that plaintiff was required to prove offsetting costs that were saved as a consequence of the defendant's unlawful conduct).  Because the burden of proof has shifted from Apple to Plaintiffs, the previously litigated issue (whether the pro-competitive effects outweighed anti-competitive effects) is not "identical" to the issue of whether pro-competitive benefits should be offset from damages caused by the alleged conspiracy.

If sustained, Plaintiffs' position would lead to the perverse result of forbidding offsets from *ever* being considered when a defendant is found to have entered into an agreement in violation of Section 1.  After all, Plaintiffs claim that offset is improper where the relevant Section 1 restraint is subject to the *per se* rule.  Pls' Mem. at 2-3.  And the finding of an antitrust conspiracy under the rule of reason *always* entails concluding that pro-competitive effects do not outweigh anticompetitive effects.  But, as explained, the application of the offset principle in

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

Section 1 cases, including cases involving restraints analyzed under the rule of the reason, is well settled.  *See, e.g., L.A. Mem'l Coliseum*, 791 F.2d at 1367; *Kottaras*, 281 F.R.D. at 24.  Simply put, there is no inconsistency between a finding that anticompetitive effects outweigh pro-competitive effects on balance, and there being a procompetitive offset as to each individual regarding damages.  Accordingly, Apple is not estopped from offering Mr. Orszag's expert opinion on offsets.

### C.     Mr. Orszag's Offset Opinion is Reliable

Plaintiffs contend that Mr. Orszag's opinions are "essentially worthless" because he "fails to control for and test critical variables, ignores alternative explanations that are contrary to his results-driven conclusions, and predicates his opinions on faulty assumptions."  Pls' Mem. at 7. These arguments are without merit.  Plaintiffs fail to identify the variables that Mr. Orszag allegedly ignores, the alternative explanations posited by Plaintiffs are belied by the record, and Mr. Orszag's opinion is not predicated on any faulty assumptions.  Furthermore, Mr. Orszag's opinion is based on Amazon's internal ordinary-course-of-business documents, witness testimony, third-party analysis, economic literature, and the statements from Dr. Noll.  *See* Orszag Decl. § VI.

### 1.     Mr. Orszag's Offset Calculation Is Reliable

Mr. Orszag opines that the alleged conspiracy conferred a benefit on consumers—namely, ███████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████████████████████ *Id.* ¶ 92.

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

Plaintiffs urge the Court to exclude Mr. Orszag's opinion because he admitted that he could not precisely allocate the price effects between e-reader and e-book sales.  Pls' Mem. at 9-10.   But the economic principles underlying Mr. Orszag's calculation are unassailable. Furthermore, Dr. Orszag does not "guess" that e-books prices would have risen between ███ ███████ in the "but for" world.  *Id.* at 10.  Rather, he calculates that the benefit to consumers from Apple's alleged conspiracy ███████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████

More disturbing is that Dr. Noll does not account for this offsetting benefit and overstates wildly any damages resulting from Apple's allegedly unlawful conduct.  Dr. Noll acknowledges that consumers are paying less for the complementary product, but now argues they also are deriving less net benefit from this product even though its price has fallen.  Reply Declaration of Roger G. Noll ("Noll Reply Decl.") at 69.  To return to Mr. Orszag's simple example, if firms separately priced left shoes and right shoes and the price of the left shoes increased, this increase would create an incentive for manufacturers of right shoes to decrease the price of their products. Dr. Noll, however, ignores the right shoe entirely.  By his logic, Professor Noll would conclude that if a retailer offered a deal in which the price of the left shoe increased by $1 and the price of the right shoe decreased by $1, resulting in a price for the pair that is unchanged, consumers would nonetheless be harmed by $1.  *See* Orszag Sur-Reply Decl. ¶ 36.

Plaintiffs also argue that Mr. Orszag's offset opinion should be excluded because he did not conduct an econometric model to estimate if, or by how much, Kindle device prices would have been higher without Apple's alleged conspiracy.  Pls' Mem. at 10-11.  Plaintiffs apparently

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

believe that the only type of economic analysis that is admissible is econometric analysis. But although regression analysis is one "tool for understanding the relationship between a dependent and an explanatory variable," it "is not a mandatory feature in all applications of economics or statistics." *United States v. Valencia*, 600 F.3d 389, 427 (5th Cir. 2010). Mr. Orszag employs rigorous economic analysis, abundant evidence from this case, and accurate mathematical calculations, to arrive at his opinion. *See* Orszag Decl. ¶¶ 83-92. █████████████████

██████████████████████████████████████████████████████████

███████████████████████ *Id.* ¶ 88. Mr. Orszag explains that ████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████ *Id.* at 89. Mr. Orszag then conservatively assumes

that "the useful life of the Kindle is four years," (*id.* ¶ 90), and calculates that ███████████

██████████████████████████████████████████████████████████

(*id.* ¶ 91). ███████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████ *Id.* ¶ 92. To

ensure accuracy, Mr. Orszag conducted "a series of sensitivity checks to measure how changes in the main parameters of [his] model affect [his] calculation."[3] *Id.* ¶ 92 n.155. Mr. Orszag's assumptions are conservative, and Plaintiffs have not shown any deficiency in his calculations.

It is not the case that Mr. Orszag failed to account for "'but-for' market effects" in calculating offsets. *See* Pls' Mem. at 11. Based on Amazon's internal ordinary-course-of-

---

[3]   He "included in the sensitivity analyses further losses in profits from competition, a shorter useful life for the Kindle, a discount rate for future revenues, positive growth in e-book revenue, and additional revenues from physical books or unrelated content." Orszag Decl. ¶ 92 n.155.

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

business documents, testimony from Amazon's executives, and the statements from Dr. Noll (see Orszag Decl. § VI), Mr. Orszag specifically calculates that ███████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████ Orszag Decl. ¶ 88.  He then finds that ███████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████ *Id*.  Plaintiffs also contend that Mr. Orszag ignores the decreasing cost of manufacturing e-readers and that he therefore overstates the impact of the agency model in reducing the price of e-readers.  Pls' Mem. at 10-11.  That is incorrect.  In order to incorporate device manufacturing costs, Mr. Orszag's analysis relies on profits, which nets out manufacturing costs and focuses on the profit margin obtained by Amazon and other retailers after reducing device prices in response to manufacturing costs. *See, e.g.,* Orszag Decl. ¶¶ 50, 54-55, 84, Figure VI-1, Table VI-1.  As such, his model takes into account and controls for the reduction in device prices caused by technological improvements and increased competition that would have occurred regardless of the conspiracy.  Mr. Orszag also relies on third-party evidence on device manufacturing costs.  *See id.* ¶ 92 and n. 158, n. 215, n. 220.

## 2.   Mr. Orszag's Opinion About Amazon's Pricing Strategy is Reliable

Mr. Orszag's opinion is that before Apple entered the e-books market Amazon engaged in a strategy of ██████████████████████████████████████████████████

15

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

██████.[4]  Orszag Decl. ¶ 50.  After Apple entered the market, "Amazon responded by cutting its device prices substantially, ████████████████████████████████████  But after the move to agency contracts with the Publisher Defendants, Amazon's retail prices on certain e-books increased ███████████████████████████"[5]  *Id.* ¶ 54; *see also id.* ¶ 58 ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

Consistent with the economic data, numerous industry observers agreed that Amazon changed its pricing structure in reaction to Apple's entry (Orszag Decl. ¶¶ 57-58 and notes 94-99).  Nonetheless, Plaintiffs fault Mr. Orszag for not "consider[ing] the possibility that Amazon" was following a strategy of ██████████████████████████  Pls' Mem. at 13; *see also* States' Mem. at 14-15.  They also suggest that Amazon was following a strategy of ████████████████████████████████████████.  Pls' Mem. at 13-14.  As an initial matter, Plaintiffs' arguments about the appropriateness of Mr. Orszag's assumptions go to the weight, not admissibility, of his testimony and are thus irrelevant to the *Daubert* inquiry under Rule 702.  *See Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d

---

[4]  Mr. Orszag explains that ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████  Orszag Decl. ¶ 50 (citing Kindle 2011 OP1, October 1, 2010, AMZN-DOJ-000023-28 (Richman Decl. Ex. K)).

[5] ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████  Orszag Decl. ¶ 54.

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

Cir. 1996) (a party's "contentions that the assumptions [of the expert] are unfounded go to the weight, not the admissibility, of the testimony") (citations and internal quotation marks omitted).

And to the extent that Plaintiffs are arguing that Mr. Orszag's opinion does not "fit" the facts of the case, their proposed alternative possibilities find no support in the record.  Indeed, ██████████████████████████████████████████████████ directly contradicts the testimony offered by Russell Grandinetti, Amazon's Vice President for Kindle, who stated that Amazon did not cross-subsidize its various businesses.  *See* Pls' Mem. at 12 (quoting Grandinetti).  It also contradicts Dr. Noll's assumption that Amazon and other retailers had to be profitable in the e-books business.  Noll Dep. at 75:25-76:15.  Plaintiffs do not cite any record evidence suggesting that Amazon decided to sell devices at ████████ in order to ███████████████████████████████████████  Rather, the evidence showed that Amazon dramatically reduced the price of the Kindle a mere two months after the introduction of the iPad and the opening of the iBooks Store,[6] and that "Amazon had not implemented price reductions of this magnitude before the introduction of the iPad."[7]  Orszag Decl. ¶ 56 and n.91. Plaintiffs' assertion that Amazon *might have been* pursuing other strategies when it dramatically lowered the price of its Kindle and ██████████████ is rank speculation.

Moreover, Plaintiffs simply ignore the fact that Mr. Orszag's conclusion—that Amazon changed its pricing strategy in response to agency agreements—was based on ████████ ████████  *See* Orszag Decl. § VI.B.  The data conclusively show that Amazon ████████

---

[6]  In June 2010, a mere two months after the introduction of the iPad and iBooks Store, Amazon reduced the price of its Kindle device by 27 percent.  Orszag Decl. ¶ 56.  In August 2010, it introduced a new Kindle at an even lower price.  Later, in September 2011, Amazon further reduced the price of the Kindle by 42 percent . . . ."  *Id.*

[7]  "Amazon had reduced the Kindle price by 10 percent in May 2008, by 17 percent in July 2009, and by 13 percent in October 2009."  Orszag Decl. ¶ 56 n.91 (citation omitted).

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

███████████████████████████████████████████████

███████████████████████. *See id.* Figure VI-1 and Table VI-1 (based on ██████████

████████████████████████████ [Richman Decl. Ex. K]).

Plaintiffs criticize Mr. Orszag for positing that "███████████████████

█████████████████████████████████████████████████

Pls' Mem. at 11.  According to Plaintiffs, ████████████████████████████.

*Id.* at 13.  But this critique misses the distinction between economic profits and accounting

profits.  In 2010, Amazon had ██████████████████████████████

████████████████████ Orszag Decl. ¶ 55.  Plaintiffs therefore claim that █████

██████████████████ Pls' Mem. at 13 n.46.  But ████████████████████████

███████████████████████ is an investment.  Mr. Orszag conservatively assigns a

useful life of four years to this investment.  *See* Orszag Decl. ¶ 90.  Thus, as an economic matter,

Amazon ██████████████████████████████████████████

██████████████████████████████████████ *See id.*

¶ 50 n.77; *see also* Richman Decl. Ex. F, Deposition of Jonathan Orszag ("Orszag Dep.") at

241:2-242:14.  Plaintiffs are therefore incorrect that Amazon suffered *economic* losses in 2010.

Plaintiffs also contend that Mr. Orszag overlooked the fact that ███████████████

█████████████████████" Pls' Mem. at 13.  But Mr. Orszag incorporates this very

assumption into his analysis.  *See* Orszag Decl. ¶ 50 █████████████████████

████████████████████████████████████████████████

███████████████████").  And Mr. Orszag's opinion implies that Amazon would make less

money in the "but for" world than in the actual world.  Moreover, while Mr. Orszag's opinions

are based on careful analysis of actual data from Amazon's ordinary-course-of-business

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

documents, Plaintiffs' expert Dr. Noll did not undertake any analysis of Amazon's financial condition on e-books. Noll Dep. at 76:20-77:14. This omission "renders his damage calculation incomplete and leads to the unrealistic and incorrect conclusion that retailers would have earned low or even negative margins on e-books *and* e-reader devices." Orszag Decl. ¶ 43.

Furthermore, Plaintiffs contradict themselves with respect to Amazon's strategy. They first criticize Mr. Orszag for assuming that ███████████████████████████████

███████ Pls' Mem. at 11. But they turn around and admit that Amazon's Grandinetti stated that both parts of the business "had to be sustainable in their own right." *Id.* at 12. Plaintiffs cannot have it both ways.

There are no grounds for excluding Mr. Orszag's opinion that the opening of the iBooks Store fundamentally transformed Amazon's business model.

### 3. There Is No Evidence in the Record that Amazon Would Have Negotiated Lower Wholesale e-Book Prices Absent the Conspiracy

Plaintiffs also criticize Mr. Orszag for ignoring the "obvious and most likely alternative to Amazon raising e-book or device prices" in the "but for" world: "Amazon would have eventually negotiated lower wholesale e-book prices had Amazon retained control over retail e-book prices." Pls' Mem. at 16; *see also* States' Mem. at 16. This argument too goes to the weight, not admissibility, of Mr. Orszag's opinion. Moreover, what Plaintiffs characterize as an "obvious and most likely alternative," is speculation unsupported by any evidence, including the testimony of Plaintiffs' expert. Dr. Noll's model of the but-for world assumed "a continuation of the [pricing model] that was in place prior to the institution of the collusive agreement." Noll Dep. at 84:10-20. And Dr. Noll even testified that in the "but for" world, wholesale prices would, in some instances, have been *higher* than in the actual world because the conspiracy lowered effective wholesale prices. Noll Dep. at 161:23-162:7. He did not make any changes in

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

his revised model to incorporate this "obvious and more likely alternative."  It is therefore puzzling that Plaintiffs fault Mr. Orszag for rejecting a theory that their own expert declined to adopt.

More to the point, the record evidence showed that ████████████████████████

████████████  ██████████████████████████████████████

████████████████████████████  Richman Decl. Ex. C, Deposition of Laura Porco at 80:14-21.  ████████████████████████████████████████

████████████████████████  *Id.* at 179:12.  ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████ █

Richman Decl. Ex. D, Deposition of David Naggar at 44:1-7.   Furthermore, Plaintiffs cite no evidence that Amazon reduced compensation to any of the independent publishers that remained on the wholesale model after the Publisher Defendants moved to agency.  Neither have they presented any evidence that Random House, who remained on the wholesale model with Amazon after the five Publisher Defendants moved to agency, experienced a reduction in wholesale prices.  It is true that the publishers "were concerned that, should Amazon continue to dominate the sale of e-books to consumers, it would start to demand even lower wholesale prices for e-books and might begin to compete directly with publishers by negotiating directly with authors and literary agents for rights."  *Apple*, 2013 WL 3454986 at *5.  But there is simply no evidence that Amazon was actually contemplating such a strategy or that it would have been able to implement such a strategy had it tried to do so.  Even Dr. Noll admits that the "accuracy of [the publishers'] expectations is debatable."  Noll Reply Decl. at 82.

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

Furthermore, the argument that Amazon could have simply increased it profits by reducing its costs makes no economic sense. Amazon could not unilaterally decrease the wholesale prices it pays to publishers simply because it would like to increase its profits. If that were the case, it would have done so in the pre-conspiracy period when it had a larger share of the e-books market. Therefore, the Court should not exclude Mr. Orszag's opinion on the ground that he ignored an "obvious" alternative explanation.

## II.  Mr. Orszag's Opinions that Agency Agreements Accelerated Growth in Self-Publishing and Increased Distribution of e-Books are Reliable

Mr. Orszag's expert opinion is that "Apple's entry facilitated the expansion of self-published titles and increased e-book offerings, including free e-books and paid e-books that may not have been purchased in the absence of Apple's iBookstore." Orszag Decl. ¶ 93. Plaintiffs argue that these opinions should be excluded because they are "illustrative" only and because Mr. Orszag supposedly failed to employ sound empirical methodologies. Pls' Mem. at 19; *see also* States' Mem. at 19. But the illustrative nature of Mr. Orszag's opinions are not a basis for exclusion, particularly here, where Plaintiffs bear the burden of establishing the amount of damages. The purpose of these opinions is to illustrate some of the key variables that Dr. Noll's damages analysis fails to take into account. If Mr. Orszag's opinions are valid (and they are), then it is Plaintiffs who have the burden of quantifying the impact of self-publishing, free e-books, and books that would not have been purchased in the "but for" world. *See Minpeco*, 676 F. Supp. at 490. Plaintiffs' criticisms of Mr. Orszag's methodology therefore miss the mark.

### A.  Mr. Orszag's Opinion About the Growth in Self-Publishing Is Reliable

Mr. Orszag states that ███████████████████████████████████

███████████████████████████████████████████████████████████

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

█████████████████████████████ ”[8]  Orszag Decl. ¶ 94 (citation omitted).  Although Mr. Orszag does not attempt to quantify these benefits, he opines that "ignoring the consumer benefits from an increase in self-published titles between the but-for and actual worlds overstates damages—and may overstate damages by a significant amount." *Id.* ¶ 103.  Dr. Noll failed to account for these benefits in his damages calculation.  *Id.* ¶ 94.  Plaintiffs argue that Mr. Orszag's conclusion is based on a false premise because Amazon supposedly decided to increase the royalty paid to self-publishers *before* it learned about the 70 percent royalty in Apple's agency agreements.  Pls' Mem. at 20; *see also* States' Mem. at 20.  But the Court found that Amazon's implementation of the new self-publishing royalty was *in response* to agency contracts.  *Apple*, 2013 WL 3454986 at *24 (describing Amazon's January 20 announcement of a new 70 percent royalty option as a response to the news that publishers were entering agency agreements with Apple).  And the Court's finding is supported by the evidence.

By December 9, 2009, Amazon was aware of rumors that Apple would be entering the e-books market with a 70 percent royalty because CNN Money ran an article that day reporting that Apple was close to launching a tablet and that "Apple ha[d] been approaching U.S. book publishers with … 'a very attractive proposal' for distributing their content: an App Store-type

---

[8]  The economic theory supporting this conclusion is straightforward.  In response to Apple's impending entry, Amazon increased its royalty to self-publishers from 35 percent to 70 percent. Orszag Decl. ¶ 95.  Apple also offered self-publishers a 70 percent royalty.  *Id.* ¶ 96.  Not surprisingly, ████████████████████████████████████████████ ████████████ *Id.* ¶ 97; Figure VII-1 (citation omitted).  "The increased royalties made self-publishing more attractive for authors relative to the traditional model from publishing houses." *Id.* ¶ 100.  Mr. Orszag illustrates the consumer welfare benefits from the increase in self-publishing by considering the impact on consumers if between 25 and 50 percent of the increment in the share of self-publishing is due to Apple's entry with the agency model.  *Id.* ¶ 103.  Assuming an elasticity of -1.01 (calculated by Dr. Ashenfelter) to characterize the demand curve for e-books, Mr. Orszag shows that the benefit to consumers from the increased supply of self-published e-books was approximately $15 million to $30 million.  *Id.*

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

30/70 split (30% for Apple) with no exclusivity requirement." Philip Elmer-DeWitt *Apple tablet set for spring launch?* (Dec. 9, 2009), http://tech.fortune.cnn.com/2009/12/09/apple-tablet-set-for-spring-launch. This article was circulated internally at Amazon to Grandinetti, Naggar, and Porco. Richman Decl. Ex. L. That same day, Apple Insider ran a similar story reporting that "Apple has been reaching out to book publishers with a 'very attractive proposal' for offering content on a forthcoming ebook platform." Neil Hughes, *Tablet rumors: February production start, 10-inch LCD screen* (Dec. 9, 2009), http://appleinsider.com/articles/09/12/09/ tablet_rumors_february_production_start_10_inch_lcd_screen. When this article was circulated to Grandinetti, he responded that "[w]e need to take this seriously." Richman Decl. Ex. N. Jeff Bezos then circulated an email on December 10, 2009, contemplating a 70 percent royalty to self-publishers. Richman Decl. Ex. M. The chronology of events demonstrates that Amazon began considering a 70 percent royalty *after* it became aware of speculation regarding Apple's potential entry on similar terms.

Amazon learned on January 18, 2010, that several publishers were likely to ink a deal with Apple on the agency model. Richman Decl. Ex. O (email from Michael Cader to David Naggar asking if Naggar had "gotten wind yet of the Apple-and-beyond ebook selling model that publishers are working on"). On January 19, PublishersLunch reported that "Apple ha[d] agreed in principal to do business with publishers under what is called the agency model." Richman Decl. Ex. S, Michael Cader, *Big Six Negotiate with Apple, Ready New Business Model for eBooks* (Jan. 19, 2010). Amazon announced its launch of a 70 percent royalty the very next day. Richman Decl. Ex. P.

In light of this chronology, Plaintiffs' theory—that Amazon decided to move to a 70 percent royalty for self-publishers before it learned of the agency agreements—is implausible.

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

Indeed, Plaintiffs' argument in favor of their theory is based on a selective, and misleading, recital of the evidence.  Mr. Orszag did not err in concluding that ███████████████ ████████████████████████████████████████████████████████████████ ████████████████  Orszag Decl. ¶ 94.

### B.   Mr. Orszag's Opinion About the Growth in Free e-Books Is Reliable

Mr. Orszag also explains that Apple's entry increased the availability of free e-books. Orszag Decl. ¶¶ 104-110.  "The increase in promotions of free e-books was in large part driven by the competitive threat from Apple's iBookstore, which the evidence shows would not likely have been launched in the but-for world."[9]  Id. ¶ 105.  Again, Dr. Noll failed to "factor into his analysis of damages that some free e-books would not have been available or would not have been offered for free in a but-for world without agency agreements and without Apple's iBookstore."  Id. ¶ 110.  Dr. Noll does not dispute Mr. Orszag's opinion regarding free e-books; his reply is entirely silent on the issue.

Thus, unsupported by expert analysis, Plaintiffs argue that Mr. Orszag's opinions regarding free e-books must be excluded because the free e-books offered by Apple were all provided by Project Gutenberg and because Mr. Orszag does not support his opinion

---

[9]  Mr. Orszag explains that the "increased profitability of e-books under the agency agreements (from higher retail prices and lower wholesale prices to publishers on certain e-books) gave retailers the incentive to lower device prices.  The same logic suggests that retailers would have the incentive to invest in their platforms by expanding the selection of free e-book titles." Orszag Decl. ¶ 104.  "The logic is straightforward: Free e-books, much like low-priced devices, attract more customers to the Kindle platform and increase Amazon's profits on future sales of paid e-books."  Id.  To illustrate the potential impact of the increase in free e-books, Mr. Orszag assumes that between 25 and 50 percent of the share increase is attributable to Apple's entry with the iBooks Store and that consumers are willing to pay $.50 for each of these free e-books.  Id. ¶ 110.  Under these assumptions, he finds that "consumer welfare increased, all else equal, by $20 million to $41 million as a result of the increased supply of free e-books."  Id.

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

econometrically.[10]  Pls' Mem. at 22; *see also* States' Mem. at 21.  Not true.  Using Dr. Noll's data, Mr. Orszag demonstrated that Apple introduced free e-books that were not previously available to consumers.  Orszag Decl. ¶ 107; ¶ 96 n.166.  Mr. Orszag's backup materials provide numerous examples of such free e-books.  *See* Orszag Decl. ¶ 96 n.166.  Rather than suffering from any analytic infirmities, this aspect of Mr. Orszag's opinion highlights one of the many deficiencies in Dr. Noll's damages analysis: Dr. Noll's damages model is inadmissible because it fails to consider the obvious benefits of the alleged conspiracy, such as the increased availability of free e-books.

**C.    Mr. Orszag's Opinion that Some eBook Sales on the iBooks Store Would Not Have Occurred in the But-for World Is Admissible**

Mr. Orszag also points out that Dr. Noll's damages model wrongly assumes that all of Apple's sales of e-books would have occurred on other platforms in the but-for world.  Orszag Decl. ¶ 113.  Because Apple would not have launched the iBooks Store absent the agency agreements, and because some iPad owners who did not have another e-reader would not have downloaded the Kindle or Nook apps for the iPad, some of the purchases made on the iBooks Store would not have been made in the but-for world.  *Id.* ¶ 114-115.  Dr. Noll "has neither conducted an analysis of this factor nor has he even provided a methodology to assess the extent to which these customers would have purchased any e-books in the absence of the iBookstore." *Id.* ¶ 115.  Rather, "his damages estimates assumes an overcharge on 100 percent of Apple's e-book sales, which would overstate damages in the likely scenario that some of those sales would

---

[10]   Project Gutenberg is an online library that has been publishing public domain works since 1971.  *See* Project Gutenberg, http://www.gutenberg.org.

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

not have occurred in the but-for world."[11]   *Id.*   Plaintiffs contend that this opinion should be excluded because Mr. Orszag does not "support the opinion econometrically."  Pls' Mem. at 22; *see also* States' Mem. at 22-23.  But again, Mr. Orszag's opinion does not attempt to (and does not need to) calculate the actual amount of offset; rather, it merely points out failings in Dr. Noll's damages analysis that render Dr. Noll's opinion incomplete and inadmissible on the issue of individual and aggregate damages.

### D.   Mr. Orszag's Opinion that the Alleged Conspiracy Enabled Barnes & Noble to Remain in the e-Books Market is Reliable

Mr. Orszag explains that the "evidence shows that the increase in e-book prices under the agency agreements allowed Barnes & Noble to stay in business and continue to invest in new devices and other services."  Orszag Decl. ¶ 117.  In the "but for" world, "Barnes & Noble would not have been profitable and likely would have reduced its operations."  *Id.*  Dr. Noll ignores the fact that "[t]he reduced market presence from Barnes & Noble and other retailers, together with the absence of a competing iBookstore from Apple, would have changed the structure of the e-book market."  *Id.* ¶ 122.   Rather, he assumes that every Barnes & Noble sale would have occurred in the "but for" world.  *Id.* ¶ 123.  This erroneous assumption led Dr. Noll to further overstate damages resulting from the alleged conspiracy.[12]

Plaintiffs accuse Mr. Orszag of ignoring the possibility that Barnes & Noble could have benefitted from lower effective wholesale prices resulting from Amazon using its leverage or

---

[11]  To illustrate the potential impact, Mr. Orszag assumes that ▮ percent of Apple's e-book sales may not have occurred in the but-for world.  Orszag Decl. ¶ 116.  Under that assumption, Dr. Noll's damages model "would overstate damages by approximately $4 million.  *Id.*

[12]  To illustrate the potential impact, Mr. Orszag conducts a similar calculation as the one he uses for iBooks and estimates that Dr. Noll's failure to take into account the possibility that Barnes & Noble would have exited the e-book market led him to overstate damages by $6 million to $18 million.  Orszag Decl. ¶ 123.

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

that Barnes & Noble could have entered into strategic partnerships to keep its business viable. Pls' Mem. at 23; *see also* States' Mem. at 23-24.  But, as already discussed, there is no evidence that Amazon would have been successful in lowering its wholesale payments to publishers or that Barnes & Noble would have obtained the benefit of Amazon's bargain.  And Plaintiffs do not provide even a hint of specificity as to what type of "strategic partnerships" could have saved Barnes & Noble from continuing to lose money on its e-books business.

Plaintiffs' speculative theories are also contradicted by the factual record.  Barnes & Noble's CEO, William Lynch, testified during his deposition that, pre-agency, the "economics of the business in e-books led to severe losses for us, in fact, us hemorrhaging money."  Richman Decl. Ex. H, Deposition of William Lynch at 136:4-8, June 23, 2013.  He testified that Barnes & Noble was "very, very concerned with [their] ability to sustain a presence in retailing e-books and selling Nooks, given the current economics … primarily because of Amazon's below-cost pricing."  *Id.* at 136:11-15.  When asked if Barnes & Noble would have exited the e-books space had it not moved to agency, Lynch responded, "Likely, or put it on a sustaining mode where we would have had little to no chance of succeeding."  *Id.* 231:9-11.  According to Lynch, without agency agreements, Barnes & Noble wouldn't be operating "anywhere near the scale we operate at now."  *Id.* 231:22-232:1.  In a similar vein, Teresa Horner, Barnes & Noble's Vice President of Digital Content, testified at trial that Barnes & Noble would not have been able to sustain losses to its e-book business.  *See* No. 12-cv-2826, Dkt. 320 at 2172:7-9 ("We expressed to all the publishers that if we had to meet competition and sell eBooks at a loss, that it would be difficult for us to sustain our business.").  Horner explained that because Barnes & Noble was forced to match Amazon's below-cost pricing in order to stay competitive (*id.* at  2173:14-21), launching the Nook e-Reader actually had a "negative impact" on Barnes & Noble's business

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

since Barnes & Noble lost money on every additional sale (*id.* at 2174:5-17). When asked directly if Barnes & Noble "believe[d] that it could sustain losses … indefinitely selling books at a loss," Horner responded "No." *Id.* at 2175:9-13. Horner also testified that "the existing … content revenue model wasn't going to be acceptable," even over "the next 12 months." *Id.* at 2178:18-25; *see also id.* at 2179:3-7 ("[W]e understood that we were losing money on certain titles where we had to price below cost, and the more consumers we had buying those titles, the more we would lose. And so if you had a greater audience of consumers buying those books, we would be conceivably losing money.").

Notwithstanding the testimony of Barnes & Noble's CEO and the current VP of Digital Content, Plaintiffs contend that Anthony Astarita, former VP of Digital, gave testimony supportive of their theories. But Mr. Astarita's deposition testimony actually confirmed that Barnes & Noble considered the pre-agency pricing model to be unsustainable. Richman Decl. Ex. E, Deposition of Anthony Astarita at 133:8-17, Feb. 27, 2013 ("it was clear that the pricing … Amazon was doing with respect to building market share by selling e-books at below cost was going to be a big problem. … [I]n my view it wasn't going to be something that was sustainable"). Mr. Astarita testified that he ran projections for Barnes & Noble on the wholesale model "but they weren't sustainable." *Id.* at 134:22-24.

Plaintiffs speculate that Barnes & Noble might *somehow* have survived in the "but for" world, even though all of the evidence indicates that Barnes & Noble could not compete with Amazon's below-cost pricing and that it was not willing to take losses indefinitely. Mr. Orszag's opinion that Barnes & Noble would likely have exited the e-books market in the "but for" world is firmly based on the record and is therefore reliable. Because Dr. Noll failed to take into

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

account the likely impact of Barnes & Noble's exit in his analysis of the "but for" world, it is Dr.

Noll's opinion that should be excluded, not Mr. Orszag's.

### III.   Mr. Orszag's Criticisms of the Time Period and Control Group in Dr. Noll's Analysis are Economically Justified and Are Not Barred by Judicial Estoppel

Plaintiffs contend that Mr. Orszag's opinion regarding Dr. Noll's time period and control

group are not economically justified and are barred by judicial estoppel.  Pls' Mem. at 24-25.

These assertions are baseless.

Mr. Orszag's opinion is that Dr. Noll's econometric model uses an inappropriate and

unjustified control group that incorrectly includes publishers that faced different supply and

demand conditions than those faced by the Big 6 publishers.[13]   Orszag Decl. ¶¶ 29-34.   Mr.

Orszag therefore adjusted the control group and ran his own regressions by modifying Dr. Noll's

computer code.   *Id.* ¶ 37.   Mr. Orszag also modified the pre-agency time period utilized by Dr.

---

[13] As Mr. Orszag explains, "Professor Noll's econometric analysis also relies on the assumption that changes in demand for e-books were also reflected in the prices of e-books in his control group," but he "performed no analysis to verify this assumption."   Orszag Decl. ¶ 30.   Mr. Orszag notes that Dr. Noll's control group "consists of tens of thousands of unique publishers." *Id.*   But these "other" publishers (mostly specialty publishers and self-published titles) are substantially smaller than the Big 6 publishers and "tend to specialize in particular genres," unlike the Big 6 publishers which "publish a broad range of different types of e-books."   *Id.* These differences were evident in the pre-agency period.   *Id.* ¶ 31 ("The average price of e-books published by the Big 6 in the pre-agency period was nearly $2 higher than the average price of the e-books sold by 'other' publishers.").   Mr. Orszag concludes that "[t]he differences in prices and quantities between e-books published by the Big 6 and e-books published by 'other' publishers reflect different supply and demand conditions."   *Id.* ¶ 32.   Thus, there is no basis for Dr. Noll's assumption that "books in the 'other' category would respond in the same way to changes in competitive conditions facing e-books."   *Id.*   To the contrary, as Dr. Noll acknowledges, "there exists product differentiation in the market for trade e-books and the degree of substitutability varies among books within that market."   *Id.*   Although some of the publishers in the other category might be "appropriate to include in the control group," Dr. Noll "makes no attempt to determine which publishers or titles are appropriate controls and which ones are not.   He simply assumes, without any analysis, that any title published by a non-Big 6 publisher is appropriately included, which is a deeply flawed assumption."   *Id.* ¶ 33.   Mr. Orszag ran a regression limiting "Professor Noll's analysis to the Big 6 publishers following the approach used by Professor Ashenfelter."   *Id.* ¶ 38.

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

Noll to more accurately reflect the facts of the case.[14]  *Id.*  ¶¶ 35-36.  By running a regression with a representative control group and more appropriate time periods, Mr. Orszag determined that the "likely average agency effect" is "in the range of 15 percent (excluding other factors that cannot possibly be included in the econometric analysis), in line with Professor Ashenfelter's results and the range Professor Ashenfelter determined was 'reasonable' at trial," (*id.* ¶ 41), but *not* in line with Dr. Noll's 19.9 percent estimate (Noll Decl. Ex. 2).

Plaintiffs assert that Mr. Orszag erred by excluding other publishers besides the Big 6 from his control group because those publishers "are in the relevant market."[15] Pls' Mem. at 24. But Mr. Orszag is not engaging in a market definition exercise; rather, he is attempting to identify a "control group" that is identical to the "treatment group" in all respects except the impact of the treatment (i.e., the switch to agency).  "Market definition is based on substitution patterns between products.  Products are considered to be in the same relevant market if they are sufficiently close substitutes for each other.  Nothing in the market definition exercise implies that all products in the relevant market must respond in the same way to competitive stimulus." Orszag Sur-Reply Decl. ¶ 17.  Moreover, Mr. Orszag's regression demonstrates that different products in the same market respond differently to competitive stimuli.  *See* Orszag Decl. ¶¶ 37-

---

[14]  Mr. Orszag explains that Dr. Noll, unlike Dr. Ashenfelter, "uses data as far back as June 2008, when the e-book industry was in its incipiency and sales volumes were very small relative to the damages period."  Orszag Decl. ¶ 35.  This is an inappropriate period because "[t]otal e-book revenue from July-December 2008 was approximately $27 million, while total e-book revenue from July-December 2011 was approximately $1.1 billion, an increase of approximately 4000 percent."  *Id.*  After calculating the "residuals" generated by Dr. Noll's econometric model, Mr. Orszag concludes that "the data suggest that the pattern in the second-half of 2008 and early 2009 is substantially different from the rest of the sample, calling into question the validity of using this portion of the sample as part of the pre-agency control period."  *Id.* ¶ 36.

[15]  Dr. Noll now introduces the new argument that "products that are in the same relevant market necessarily do respond in the same way to changes in market condition."  Noll Reply Decl. at 45. However, "[i]t is unclear what this statement is based upon and Professor Noll cites to no economic literature supporting this conclusion."  Orszag Sur-Reply Decl. ¶ 17.

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

41.   If all products in the same market responded similarly—as Plaintiffs contend—then the econometric results would not be sensitive to the definition of the control group—the *opposite* of what Mr. Orszag demonstrated.  Plaintiffs' *ipse dixit* that Dr. Noll's control group is appropriate because the publishers are within the relevant market is without merit.

Plaintiffs also assert that "a two-year damages estimate is plainly more reliable where it examines the entire period than just the first few months, and analysis of titles that did not appear until later in the time period is improved by including those titles in the dataset."  Pls' Mem. at 24.   But Mr. Orszag's specifications that limited the time period are consistent with Dr. Ashenfelter's approach.  Orszag Sur-Reply Decl. ¶ 7.  Dr. Gilbert also testified that an empirical study that looks at a one-year or longer period is not a "reliable approach."  Deposition of Richard J. Gilbert, April 10, 2013 at 350:14-16 and 353:8-11.  Also, if one uses Random House as the control group, the agency effect can only be identified up to the point at which Random House switched to agency, as even Dr. Noll recognizes.  Orszag Decl. ¶ 38 and n.66; Noll Reply Decl. at 44.   Mr. Orszag's choice of a post-conspiracy time period is thus reliable and appropriate.  With respect to the pre-agency period, Mr. Orszag rightly points out that the first quarter of 2010 (which was the period immediately preceding the move to agency) may not be representative of pre-agency prices because "the average prices of the Big 6 publishers declined during the first quarter of 2010, just prior to the introduction of the agency contracts and the iPad's entry."  Orszag Decl. ¶ 40 and Figure V-1.[16]

Finally, Plaintiffs assert that Apple is estopped from offering Mr. Orszag's opinions because Apple's expert, Dr. Michelle Burtis, testified at the first-stage trial "that an analysis

---

[16]  This reduction in price most likely occurred because "the iPad's imminent arrival and Apple's negotiations with publishers were both known at least by the end of January 2010."  Orszag Decl. ¶ 40.

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

could not 'get at the issue of but-for prices in a relevant market' without accounting for the prices of all publishers in the market."  Pls' Mem. at 24 (citing No. 12-cv-2826, Dkt. 320 at 2263:8-2265:8).  However, as Mr. Orszag explains in his reply, "Dr. Burtis was referring to an analysis of the *average but-for price* in the entire relevant market.  Such an analysis differs from the one that Professor Noll and Professor Ashenfelter undertake, which focus on the prices of the Publisher Defendants relative to some control group."[17]  Orszag Sur-Reply Decl. ¶ 21.  Mr. Orszag "agree[s] with Dr. Burtis that if one wants to examine average prices … in the entire relevant market, then one should examine prices of all products" in that relevant market.  *Id.*  But to examine the prices of the Publisher Defendants, one must use "an appropriate control group in a difference-in-differences regression analysis."  *Id.*  Thus, there is no inconsistency between Mr. Orszag's analysis and Dr. Burtis's.

But even if there were an inconsistency, the Court rejected Dr. Burtis's model and accepted Dr. Ashenfelter's.  *See Apple*, 2013 WL 3454986 at *36 and n.57.  In light of that decision, Mr. Orszag "follow[s] Professor Ashenfelter's approach of limiting the pre-period to 24 weeks prior to April 1, 2010 and limiting the post-period to 24 weeks after April 1, 2010."  Orszag Decl. ¶ 39.  Judicial estoppel only applies when a party asserts "a factual position …

---

[17]  Dr. Burtis testified that that Plaintiffs' experts had

> not performed a regression analysis to enable us to know what the price, average price or any eBooks price would have been but for agency.  The annual regression analyses in this case were performed based on the defendant publishers' data only, not the market.  Or Professor Ashenfelter did a regression where he tried and he said it was, I think, a baby step towards trying to understand what would happen if you took out the effects of the entry of new publishers.  And my contention is you shouldn't take them out.  He admitted very clearly that he did not do a regression that could be used to get at the issue of but-for prices in a relevant market.

No. 12-cv-2826, Dkt. 320 at 2263:8-20.

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

adopted by … the court in some manner." *Repub. of Ecuador v. Chevron Corp.*, 638 F.3d 384, 397 (2d Cir. 2011) (internal quotation marks omitted).  Because the Court did not adopt Dr. Burtis's model, Apple is not estopped from offering Mr. Orszag's opinion as to the relevant time period.

## IV.    To The Extent that Plaintiffs' Motions to Exclude Mr. Orszag's Opinion Apply to Issues Other than Class Certification, They are Premature

The only issue currently before the Court is the Class Plaintiffs' motion to certify a class under Rule 23.  The Court has established a schedule for filing motions *in limine* dealing with other pre-trial matters.  Because the States have not asked the Court to certify a class action, their motion addressing Mr. Orszag's opinion is out of order and should be disregarded.  Further, to the extent Plaintiffs are seeking to exclude Mr. Orszag or his opinion for purposes going beyond the class certification opposition, that effort too is premature.

## CONCLUSION

For all of these reasons, this Court should deny the motions to exclude expert opinions offered by Jonathan Orszag.

Dated: January 21, 2014                    By:     /s/ Theodore J. Boutrous, Jr.

                                        Theodore J. Boutrous, Jr.

                                        GIBSON, DUNN & CRUTCHER LLP
                                        Theodore J. Boutrous, Jr.
                                        Daniel G. Swanson
                                        333 South Grand Avenue
                                        Los Angeles, California  90071
                                        Telephone:  213.229.7000

                                        Cynthia E. Richman
                                        1050 Connecticut Avenue NW
                                        Washington, D.C. 20036
                                        Telephone:  202.955.8500

CONTAINS MATERIAL DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

O'MELVENY & MYERS LLP
Howard Heiss
Edward Moss
7 Times Square
New York, NY 10036
Telephone:  212.326.2000

*Attorneys for Defendant Apple Inc.*