# EXHIBIT A

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

THE STATE OF TEXAS, et al.,

Plaintiffs,

vs. Case No. 12-CV-03394 (DLC)

PENGUIN GROUP (USA), INC., et al.,

Defendants.

---

This Document Relates to: Case No. 11-MD-02293 (DLC)

IN RE ELECTRONIC BOOKS ANTITRUST LITIGATION.
~~~~~~~~~~~~~~~~~~~~~~~~~

VIDEOTAPED DEPOSITION OF

ROGER G. NOLL, Ph.D.

November 1, 2013

Palo Alto, California

8:34 a.m.

By Reported:
WENDY E. ARLEN, CSR #4355, RMR, CRR
Job No: 32239
~~~~~~~~~~~~~~~~~~~~~~~~~

38

09:16:05 MR. FRIEDMAN: Objection, form.
09:16:06 THE WITNESS: In terms of analyzing anticompetitive impact, I did discuss the -- the e-reader issue. There's little in here about physical copies other than what it had to do with the objective of a collusive agreement.
09:16:29 But, again, there's -- the analysis is based on the information in the opinion. It's not based on anything else.
09:16:35 **Q. MR. SWANSON: Do you agree that a market that is inextricably intertwined with the market in which anticompetitive harm is alleged can be relevant for purposes of analyzing anticompetitive harm?**
09:16:51 A. Of course. I mean, that's -- when markets are linked, they can have spillover. One activity in one market can have a spillover effect in another even though they're not in the same market. That's what the whole e-reader analysis is about.
09:17:06 **Q. So in your view, the e-reader business is inextricably intertwined with the trade e-books business?**
09:17:14 A. Well, let me say what inextricably intertwined means in this case, which is, the demand for e-readers is dependent upon what's going on in the e-books market. The price of e-books and

39

09:17:28 availability of e-books determine the value of an e-reader.
09:17:31 **Q. Does the linkage work in both directions?**
09:17:36 A. Yes.
09:17:37 **Q. I take it you'd agree that it's not generally possible to read an e-book without an electronic device that can function as an e-reader?**
09:17:45 A. Yes, although not all such devices are called e-readers.
09:17:50 **Q. Can a consumer with a Nook e-reader buy e-books to read on that device from Amazon?**
09:17:58 MR. FRIEDMAN: Objection, form.
09:18:01 THE WITNESS: I think now they can, but I'm not absolutely certain of that. I haven't examined that. I've done no independent analysis of what you can -- what the story of a Nook is. I'm just trying to recollect from my background information on having read trade press articles about e-readers, but I -- there is -- nothing in my report hinges on that, and I did nothing in connection with preparing the report that addresses that issue.
09:18:33 **Q. MR. SWANSON: I take it you don't have a Nook.**
09:18:36 A. No, I do not have any e-reader.
09:18:39 **Q. We'll have to change that.**

40

09:18:41 A. No, we won't. There are some things that are just too far.
09:18:52 **Q. We know where the limits are.**
09:18:55 **Professor, what does an economist mean by the term complementary products?**
09:19:02 A. It's sort of opposite of a substitute. It's -- for a substitute, if the price of product A goes up, demand for product B goes up. It's the opposite. If the price goes up for complements, then the demand for the complement goes down because people are buying them in pairs, if you will. Like left shoes and right shoes are perfect complements. What you want to do is pay a certain amount for a pair of shoes.
09:19:32 **Q. So if the price of a left shoe goes up, the demand for right shoes goes down.**
09:19:38 A. Right, because left shoes and right shoes are sold in perfect -- they're fixed proportions for most people.
09:19:45 **Q. Are e-books and e-reading devices complementary products?**
09:19:50 MR. FRIEDMAN: Objection, form.
09:19:51 THE WITNESS: Yes, they are. I have done -- again, they are, but I have done no independent analysis to try to estimate that. The problem here

41

09:20:00 is that e-reader in the initial definition of the term was a specialized device, and as time has progressed, they've become tablet computers.
09:20:14 So the degree to which there is a complementarity has diminished. Whether it's still true I don't know, and I've done no independent analysis to reach a conclusion on that. But if it were a completely specialized device, then it would be a complement. But as it becomes more generic, it becomes just another kind of computer, then that complementarity diminishes.
09:20:40 **Q. At least during the class period, do you view the Kindle device and Amazon e-books as complementary products?**
09:20:54 MR. FRIEDMAN: Objection, form.
09:20:55 THE WITNESS: At the beginning Kindles were complementary products. I suspect they still are, but I've done no independent analysis to be able to justify that conclusion.
09:21:06 **Q. MR. SWANSON: During the class period, were Amazon e-books and the iPad complementary products?**
09:21:11 MR. FRIEDMAN: Objection, form.
09:21:13 THE WITNESS: I have done no independent analysis to be able to answer that question. The iPad is a multiuse electronics device and you don't

have to be someone who wants to use it as an e-reader to buy one. In fact, you know, my grandchildren have iPads and they don't use them as e-readers.

So I don't -- there is reasons to believe that if the complementarity exists it's de minimis between an iPad and e-books.

**Q. Does the price of an e-reader device affect the demand for e-books?**

MR. FRIEDMAN: Objection, form.

THE WITNESS: I'm sorry. Ask it again. I got waylaid here.

**Q. MR. SWANSON: No problem. I'm glad to repeat a question.**

A. It just went out of my mind.

**Q. Not a problem. Does the price of an e-reading device affect the demand for e-books?**

MR. FRIEDMAN: Objection, form.

THE WITNESS: If it is used significantly in reading e-books, then an increase in the price of that device might affect the demand for e-books, but it would depend on what was happening to the prices of substitutes for that device.

If somebody wanted to read e-books on a tablet computer, then a change in the relative price of one e-reader versus another would just cause them

to switch which one they bought. So it might not have a measurable effect, but it could in principle have such an effect. If in general prices of e-readers went up, then they would have a depressing effect on the demand for e-books.

**Q. MR. SWANSON: And if in general the price of e-readers declined, would that have a stimulating effect on the demand for e-books?**

MR. FRIEDMAN: Objection, form.

THE WITNESS: Again with all the caveats I just said, yes.

**Q. MR. SWANSON: In setting e-reading device prices, how would you expect retailers to take e-book prices into account?**

MR. FRIEDMAN: Objection, form.

THE WITNESS: What kind of retailer?

**Q. MR. SWANSON: A retailer that is selling an e-reading device.**

A. They would -- retailers that are -- that are integrated to the degree they have any market power would obviously take -- price them jointly, but if the market is competitive, then they wouldn't have any ability jointly to have any discretion. They would be setting -- the price would be the market price determined through the competitive interactions

of the firms.

**Q. Let's take Amazon as a specific concrete example. How would you, during the class period, expect Amazon to take account of the price of e-books when it is setting the price of a Kindle device?**

MR. FRIEDMAN: Objection, form.

THE WITNESS: First of all, I have done no independent analysis of that. All right? So I can't give you an answer based on work I've done in this case. I just don't have an opinion about how they actually take into account, if at all, Kindle's prices when setting e-books prices.

**Q. MR. SWANSON: You agree, though, don't you, that the price of e-books and the price of e-reading devices are related as an economic matter?**

MR. FRIEDMAN: Objection, form.

THE WITNESS: I agree they could be related, yes. That's the point of the discussion in -- in this report. In principle, yes, they are related. But to say that they're related in a market sense is not the same thing as to say that any given firm has any firm specific discretion in how those prices are set.

**Q. MR. SWANSON: Have you analyzed how long consumers on average use the same e-reading device?**

**In other words, until they replace it or stop using it?**

A. Not in the context of this case. I don't recall having -- but I have seen such information, but none of that information plays any role in my damages model.

**Q. So if consumers on average use e-reading devices for two years, three years, that assumption would not play any role in your analysis in this case?**

MR. FRIEDMAN: Objection, form.

THE WITNESS: No, it has no role in what I did for this case.

**Q. MR. SWANSON: Do you, based on the general information that you have, have an understanding as to what the range is for average use of an e-reading device?**

MR. FRIEDMAN: Objection, form.

THE WITNESS: Yes, which is it's actually my understanding is that in the -- in terms of the devices that are used for e-readers, the more specialized device, the shorter the half-life.

And so, you know, at one extreme personal computers have a long half-life, like three years. For specialized devices like the original Kindle and

**discussed it in the Court's decision, are you taking that as a predicate fact for your modeling?**

A. No, it's -- the -- what I'm taking as a predicate fact is are there pro-competitive justifications for the collusive agreement, and the Court found there were none. So, therefore, I didn't have to get into an analysis of the potential pro-competitive justifications.

**Q. Would Amazon have implemented a 70 percent royalty option under the Kindle direct publishing platform for self-publishers in the but-for world?**

MR. FRIEDMAN: Objection, form.

THE WITNESS: I have no idea what they would have adopted in the but-for world in terms of the specific contract form with independent publishers. The issue is not -- that I'm addressing is what the price would be of those books, not what the impact for the publisher would be.

**Q. MR. SWANSON: Did you investigate how retailers determine their pricing under the wholesale model?**

A. Yes, I reference the discovery material from Amazon and I think Barnes & Noble within the report about how they did pricing, and that fed into how I constructed the econometric model of pricing. I

wanted to make it consistent with Amazon's model.

**Q. And are you aware that Amazon invested substantial time and money in developing a system for setting the retail price of e-books?**

MR. FRIEDMAN: Objection, form.

THE WITNESS: I -- obviously it takes time and money to develop a pricing algorithm, yes. That fact played no role in anything I did.

**Q. MR. SWANSON: You do refer at multiple points in your report to Amazon's pricing formula or pricing algorithm, don't you?**

A. Yes.

**Q. And what do you mean by that?**

A. What I mean by that is a way of classifying books by how long they've been out, what kind of book they are, what their retail price is and mapping that into an e-book price on Amazon.

**Q. Does your model attempt to reflect then Amazon's pricing algorithm?**

A. It wouldn't be Amazon's pricing algorithm, no. It would -- it's a model that takes into account the factors that Amazon took into account. So it's not intended to be anybody's pricing algorithm, because price in a market is the result of competitive interactions among firms, and one of the

elements in Amazon's model is what's the price at Barnes & Noble, like just as at Barnes & Noble one of the elements is what's the price at Amazon.

So it isn't -- the model is a reduced form pricing model that has both supply and demand characteristics in it. It isn't intended to be -- it is intended to be a marketing, delivery and price estimated through a reduced form model. It's not intending to be anybody's pricing algorithm.

**Q. Have you ever had access to the algorithms used by Amazon for e-book pricing?**

A. I don't have -- I have not seen the actual algorithms, no.

**Q. Are you aware whether Amazon produced any document showing its precise methodology for determining e-book prices?**

A. I don't remember whether they did or didn't. I mean, it would be irrelevant anyway since they base it on Barnes & Noble prices. So that tells me that whatever their algorithm spits out, if the price that's spit out is higher than Barnes & Noble, they will set the price equal to Barnes & Noble price.

So for my purposes recreating their pricing formula wouldn't be accurate. It would tend to produce an imprecise and incorrect estimate of

pricing because it wouldn't be just the book characteristics that were taken into account. It would be market conditions as well.

**Q. Are you aware that Amazon considers its methodologies for determining e-book prices to be among its most closely guarded trade secrets?**

MR. FRIEDMAN: Objection, form.

THE WITNESS: I'm not surprised that that would be true, but I don't recall having known that and it doesn't play any role in my analysis.

**Q. MR. SWANSON: Are you aware that access to such information is restricted even within Amazon?**

MR. FRIEDMAN: Same objection.

THE WITNESS: Again, I'm not surprised that's true. I don't recall ever having read those words, but if you would have asked me do I think they keep this stuff confidential, I would have said yes, because almost everybody keeps their pricing algorithm confidential, including Apple.

**Q. MR. SWANSON: Do you claim to understand how Amazon's pricing formula operated during the period from 2008 through 2012?**

A. Only insofar as revealed in the report, which is to identify variables that they claimed to take into account and then to see if they in fact do

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123 (212)705-8585

09:52:45 **same title?**
09:52:46 MR. FRIEDMAN: Objection, form.
09:52:48 THE WITNESS: I am not aware of that being
09:52:52 true for e-books. I'm not aware of data that suggest
09:52:58 it's true, other than what I've discussed before,
09:53:00 which is the presence of some short-term discounts
09:53:03 for specific things.
09:53:04 **Q. MR. SWANSON: Let's take backlist pricing.**
09:53:07 **You've got data that show all the prices that Amazon**
09:53:10 **charged, correct?**
09:53:11 A. Yes.
09:53:11 **Q. And you can look at any given day and find**
09:53:14 **out if Amazon charged all the consumers who bought a**
09:53:17 **particular title the exact same price, correct?**
09:53:20 A. In principle, you could do a histogram of
09:53:23 that, yes. In practice, the number of data points is
09:53:25 so large, in the time frame I had I couldn't do that.
09:53:28 **Q. Have you looked at any of those questions as**
09:53:30 **to whether or not Amazon charges the same price to**
09:53:33 **the same consumers for the same title?**
09:53:35 A. I don't know the answer to the question, do
09:53:38 they engage in price differences in the same day for
09:53:41 different consumers. I do not know the answer to
09:53:44 that.
09:53:44 **Q. That's an easy question to answer given the**

09:53:47 **data you have?**
09:53:48 A. No, it's a very hard question to answer
09:53:50 because the data is so large. Yes, in principle one
09:53:54 could do it, but because of the size of the data set,
09:53:57 it's difficult.
09:53:57 **Q. Was that an important question for purposes**
09:53:59 **of your opinions here?**
09:54:01 A. No, because if what they give is certain
09:54:04 people in certain circumstances get percentage
09:54:07 discounts, it's still -- it's still a percentage
09:54:11 discount off of an elevated list price. So there
09:54:14 would still be elevation of price.
09:54:16 **Q. What leads you to speak in terms of**
09:54:20 **percentage discounts in that response?**
09:54:22 A. Because that's what I'm aware of
09:54:24 independently, the kinds of things that Amazon does.
09:54:28 But, again, I've seen nothing in the record that
09:54:34 systematic gives me an insight into the extent to
09:54:40 which there is anything other than just that
09:54:43 occasional percentage discount offers to specific
09:54:45 customers.
09:54:46 **Q. So you, for example, don't know if the Amazon**
09:54:50 **pricing algorithm adds two or three cents to a**
09:54:54 **particular consumer's price compared to another**
09:54:57 **consumer's price as opposed to a percentage?**

09:55:00 MR. FRIEDMAN: Objection, form.
09:55:01 THE WITNESS: I have no clue what's inside
09:55:03 the Amazon pricing algorithm because it's not -- it's
09:55:07 proprietary.
09:55:09 Can we take a break soon?
09:55:10 MR. SWANSON: Oh, yeah. We can take it at
09:55:13 any time.
09:55:15 VIDEOGRAPHER: This now marks the ending of
09:55:18 tape labeled as number one of Roger Noll. We are now
09:55:22 going off the record. The time is 9:54.
10:02:47 (Deposition recess taken.)
10:09:55 VIDEOGRAPHER: This now marks the beginning
10:10:09 of tape labeled number two in the videotaped
10:10:13 deposition of Roger Noll. We are now going back on
10:10:16 the record, the time is 10:09.
10:10:18 **Q. MR. SWANSON: Professor, do you understand**
10:10:20 **that Amazon priced its e-books based in part on the**
10:10:26 **title's digital list price?**
10:10:36 A. Digital list price. By that you mean the
10:10:43 list price of an e-book by the publisher?
10:10:53 **Q. Correct.**
10:10:54 A. Well, I think there is a relation -- the
10:11:08 physical copy price and the list price are related to
10:11:11 each other. So the answer would have to be yes. And
10:11:15 if there is no physical copy price, then it would be

10:11:18 the e-book list price, yes.
10:11:21 So -- but that's, again -- I haven't done
10:11:27 a -- I don't know what they actually do inside their
10:11:29 algorithm, so I can't answer to what they actually
10:11:32 do.
10:11:33 **Q. Did you have access to digital list price**
10:11:37 **data?**
10:11:37 A. I don't remember whether we had digital list
10:11:42 price data or not. It's too long ago.
10:11:45 **Q. Did you include digital list prices in your**
10:11:51 **model?**
10:11:51 A. I don't believe we did.
10:11:52 **Q. Do you have an understanding as to whether**
10:11:55 **digital list prices generally changed when a title**
10:11:59 **shifted from a hard cover to a trade paperback**
10:12:02 **version?**
10:12:03 A. Yes, we do have that shift in the model, yes.
10:12:07 So that would be -- to the extent the price did
10:12:11 depend on the existence of a paperback edition, yes,
10:12:14 we have that in the model.
10:12:15 **Q. And do you understand that digital list**
10:12:20 **prices generally changed when a title shifted from a**
10:12:23 **trade paperback to a mass market version?**
10:12:26 MR. FRIEDMAN: Object to form.
10:12:28 THE WITNESS: I believe that -- I believe

A. The collusive version of the agency model became effective for some publishers on April 1st.

**Q. And the agency agreements between the defendant publishers and Apple were signed in January 2010, correct?**

MR. FRIEDMAN: Objection, form.

THE WITNESS: I haven't memorized the dates. They're in the record, and I will let the record speak for itself. It plays no role in my analysis.

**Q. MR. SWANSON: Was the 9.99 price point for new releases under the wholesale model generally above or below incremental cost?**

MR. FRIEDMAN: Objection, form.

THE WITNESS: Sometimes above, sometimes below.

**Q. MR. SWANSON: Under what circumstances do economists expect rational, profit-maximizing retailers to set prices below incremental cost?**

A. Promotional.

**Q. Any other circumstances that you can think of?**

A. Why don't you ask me a question? I mean, pricing has to do with costs and pricing has to do with advertising, and so I would expect both of those things to affect how pricing was set.

**Q. Right. And understand that for promotional reasons a rational, profit-maximizing retailer could set price below incremental cost. Are there any other reasons or circumstances you can think of as an economist why such a retailer would do that?**

A. The defendants in this case claimed that Amazon was engaged in predatory pricing, but that was rejected by the Court.

**Q. Any other circumstances you can think of other than promotional reasons or predatory pricing?**

A. Not that I -- I'm aware of. Maybe I'm just forgetting something that you can tell me about. I don't know that it would play any role in my report, but if you want to ask me a question about something else, I can, A, say whether I've thought about it and, B, say whether it would play any role in estimating damages.

**Q. Are you assuming that Amazon would continue to price some e-books below incremental cost in the but-for world to the same extent that it had in the actual world?**

A. I see no reason to believe that there would be a change in Amazon's pricing policy on April 1st other than the implementation of the agency model.

**Q. Overall, would Amazon make money on e-books**

**in the but-for world?**

MR. FRIEDMAN: Objection, form.

THE WITNESS: I would expect that people who are engaged in e-book retailing would make money on the fact they were e-book retailing or get out of the business, yes.

**Q. MR. SWANSON: And is it your expectation that in the but-for world Amazon's profitability would be positive with respect to the sale of trade e-books?**

MR. FRIEDMAN: Objection, form.

THE WITNESS: I would expect them to be profitable selling e-books in general. With respect to any specific product, no, I wouldn't expect anything about whether that product was profitable or not.

**Q. MR. SWANSON: Any specific title?**

A. Or even specific category. Yes, overall profitability. No with respect to any specific thing.

**Q. Have you analyzed whether Amazon was losing money on e-books before April 1st, 2010?**

MR. FRIEDMAN: Objection, form.

THE WITNESS: I have undertaken no independent analysis of the financial condition of Amazon's e-book business.

**Q. MR. SWANSON: Did you analyze whether Amazon was making money on Kindle devices before the conspiracy period?**

A. I have undertaken no independent analysis of the profitability of their device business for the purposes of writing my report.

**Q. Would you take issue with the characterization that Amazon before the agency agreements was at best breaking even on e-books?**

MR. FRIEDMAN: Objection, form.

THE WITNESS: I have again taken no -- done no independent analysis of whether they were or were not making money on Kindles before and after the agency agreement.

**Q. MR. SWANSON: Or e-books?**

A. Or e-books.

**Q. Would you expect Amazon's pricing strategy with respect to e-books sold on the wholesale model to be different in the but-for world than in the actual world?**

MR. FRIEDMAN: Objection, form.

THE WITNESS: I have no clue what that question means. What do you mean by actual world? The but-for world is supposed to be a guess about what the actual world would look like in the absence

**good with assumptions.**

**So if you assumed that Barnes & Noble could not continue to match Amazon's prices in the but-for world, how would that affect your modeling?**

MR. FRIEDMAN: Objection, form.

THE WITNESS: If I assume that and I also assume that the market is competitive, then I would be predicting that Barnes & Noble would exit the industry and the only firm left would be Amazon and it would be true of everybody else. So Amazon would start to be a complete monopolist because the -- it's the competitive process that determines the price, and Barnes & Noble would be unsuccessful if it systematically priced above Amazon.

**Q. MR. SWANSON: Have you made any evaluation as to whether or not Barnes & Noble's e-book business would be profitable in the but-for world?**

MR. FRIEDMAN: Objection.

THE WITNESS: I have undertaken no independent analysis of Barnes & Noble's profitability, and it's irrelevant to anything I did in my report.

**Q. MR. SWANSON: So if under the prices that would prevail in the but-for world Barnes & Noble would be losing substantial amounts of money, in your**

**view, that's irrelevant to the assessment of damages?**

A. Yes.

**Q. In your view, did the agency model eliminate all retail price competition in the trade e-books market?**

MR. FRIEDMAN: Objection, form.

THE WITNESS: It didn't eliminate competition among publishers that were not part of the conspiracy. It probably reduced its intensity and caused prices to be somewhat higher. So I haven't modeled that. So I underestimate damages.

**Q. MR. SWANSON: Would the publisher defendants have competed with each other on the wholesale price of release e-books in the but-for world?**

MR. FRIEDMAN: Objection, form.

THE WITNESS: Again, I haven't done an independent analysis of the intensity of competition, but I presume that in the absence of collusion they have competed as they had before the collusion started, yes.

**Q. MR. SWANSON: So would you expect lower wholesale prices in the but-for world?**

A. Actually, the nature of the competition was different in this case because they made a sacrifice in wholesale prices of e-books in order to induce --

and as part of the deal to generate a minimum retail price margin because their objective here, as stated in my report derived from the opinion, was to protect sales of hard copies.

So their profit calculation is based in part on the price of e-books and in part on the sales and prices of hard copies. What they wanted to do was protect -- arrest the decline in the sale of hard copies.

**Q. MR. SWANSON: And so you understood that in the actual world as part of the unlawful conduct the publisher defendants took wholesale prices to a lower level?**

MR. FRIEDMAN: Objection, form.

THE WITNESS: No, that's not what I said. I said that in some cases they actually cut the price as part of the collusive agreement. So the pricing model I'm assuming is the one that -- a continuation of the one that was in place prior to the institution of the collusive agreement.

**Q. MR. SWANSON: I think one of us may have misunderstood the other. I said took wholesale prices to a lower level. That is, I think, what you're saying.**

A. You said under competition in the but-for

world. The answer to that, if the prices were lowered because of the collusive agreement for some books, obviously they wouldn't be lower still in the absence. Maybe some e-book prices at the wholesale level would have been higher in the absence of a collusive agreement. But our interest here is not what the wholesale price was. Our interest here is what the retail price was.

**Q. In the real world, what you call the collusive world, did wholesale prices drop for nondefendant publishers as well?**

MR. FRIEDMAN: Objection, form.

THE WITNESS: The model takes into account a general declining trend in e-book prices by having a time variable in there, yes.

**Q. MR. SWANSON: And would the market wholesale price have been that low absent the collusion?**

MR. FRIEDMAN: Objection, form.

THE WITNESS: What wholesale market price? Again, it's a very vague and general question, and I want to know what exactly you're talking about.

**Q. MR. SWANSON: So there is no market wholesale price, in your view, for trade e-books?**

MR. FRIEDMAN: Objection, form.

THE WITNESS: There's market wholesale prices

13:02:44 is the variation of the -- of the individual
13:02:46 transactions for prices around the predicted price.
13:02:50 And the within is measuring the latter, not the
13:02:53 former.
13:02:53 **Q. Is the within measuring the extent to which**
13:02:58 **you're accounting for the variation in individual**
13:03:00 **title prices over time?**
13:03:03 A. Well, it's about the extent to which
13:03:08 predicting an average in a category predicts the
13:03:13 individual observations in a category.
13:03:16 **Q. Let me ask you to turn to page 19 of your**
13:03:23 **report, Exhibit 1. And let me find it. Oh, I'm**
13:03:38 **starting from the first sentence of the bottom**
13:03:41 **paragraph where you say: "To make analysis of these**
13:03:46 **data more tractable, the weekly data were aggregated**
13:03:49 **into four-week periods for use in econometric**
13:03:54 **estimation."**
13:03:55 **See that? What was intractable about using**
13:03:57 **nonaggregated data?**
13:03:57 A. The amount of computer power and time
13:04:00 required to run a regression. That the more
13:04:04 observations you have to run the regression on, the
13:04:07 more computer power it takes. And you would have to
13:04:10 have -- well, there's two aspects to the problem.
13:04:19 The first is the regression -- the underlying



13:04:22 data, you have to pay attention at the level of
13:04:26 individual observations to errors to a much greater
13:04:29 extent. If a very tiny fraction of the observations
13:04:33 are wrong, you want to clean the data of those before
13:04:36 you would do any individual level regression, even if
13:04:40 they're a small fraction, because outliers can have a
13:04:43 huge effect on a regression model.
13:04:46 You are much less concerned about a small
13:04:48 number of outliers if you are using averages. So you
13:04:52 don't have to devote the same amount of time to
13:04:54 cleaning the data, which can take literally months
13:04:57 for a large data set.
13:04:59 And then the second -- the second issue has
13:05:01 to do with the amount of computer power it takes to
13:05:05 estimate the regression coefficients when you have
13:05:07 billions of observations as contrasted to thousands
13:05:11 or hundreds of thousands or something like that. To
13:05:13 do a regression on a huge data set can take linking
13:05:18 together multiple computers and then running it for
13:05:21 two days to get a single regression result.
13:05:25 **Q. And did you give consideration to using other**
13:05:29 **periods of time for your aggregation or averaging of**
13:05:33 **the price data?**
13:05:34 A. Well , consideration, yes. But the
13:05:39 four-month stuff was already done. So in the time



13:05:42 horizon I had --
13:05:44 MR. HUBBARD: Four-week.
13:05:45 THE WITNESS: Excuse me. Four-week. Yes, it
13:05:47 wasn't four months. The aggregation to four weeks
13:05:49 had already been done. So that meant that I didn't
13:05:52 have to construct some other aggregation mechanism
13:05:54 within the time frame I had.
13:05:56 **Q. MR. SWANSON: Did you examine individual**
13:06:01 **transaction prices at any point?**
13:06:04 A. Well, the damage calculation is the actual
13:06:10 price minus the predicted price. So in that sense,
13:06:16 yes.
13:06:17 **Q. The -- the actual price --**
13:06:20 A. I guess I don't understand the question.
13:06:22 Maybe I missed the question. What are you -- what
13:06:24 are you asking me?
13:06:25 **Q. I was asking is there any statistical work**
13:06:28 **you've done on -- on --**
13:06:31 A. Oh, okay.
13:06:31 **Q. -- individual -- individualized transaction**
13:06:34 **data.**
13:06:35 A. No, I have not analyzed the individual
13:06:37 transactions data. Actually, that's not quite true.
13:06:47 Remember, the -- the method for allocating the
13:06:51 damages among states is based upon assigning



13:06:53 individual transactions to a state. So, yes, we've
13:06:58 done that, but we haven't run regressions on
13:07:01 individual transactions data.
13:07:02 **Q. Are the only important characteristics for**
13:07:08 **pricing an e-book title for any given publisher the**
13:07:13 **ones for which you've introduced variables into your**
13:07:18 **model?**
13:07:19 A. In principle, I could imagine there could be
13:07:22 other characteristics. In practice, I don't what I
13:07:25 would use that I haven't used.
13:07:33 **Q. Would you agree that the transaction data**
13:07:35 **upon which your model relies includes more genres**
13:07:39 **than the categories you use?**
13:07:41 A. Yes, remember, we aggregated some into
13:07:45 puddles. There's the other genre puddle and there's
13:07:48 the we don't know what it is puddle.
13:07:50 **Q. The Amazon data contained genres such as**
13:07:54 **romance, mystery and thriller, science fiction and**
13:07:58 **fantasy, literature and fiction and sports, correct?**
13:08:03 A. That's correct.
13:08:04 **Q. Did you use those genres as separate**
13:08:07 **categories in your model?**
13:08:08 A. No.
13:08:09 **Q. Have you aggregated -- well, I think you've**
13:08:17 **said you've aggregated some different genres into a**


158

13:08:22 **single category or several different categories. Is**
13:08:23 **that -- is that a proper interpretation?**
13:08:24 A. I'm not sure I understand the question.
13:08:26 **Q. Okay.**
13:08:26 A. If it's not -- if the answer isn't apparent
13:08:29 from the list of the variables, then I don't
13:08:31 understand the question.
13:08:32 **Q. Well, for example, do you aggregate romance,**
13:08:36 **mystery and science fiction into a broad science**
13:08:40 **fiction category?**
13:08:41 A. It would be aggregated into the other
13:08:44 category, yes.
13:08:44 **Q. That would be other and not fiction?**
13:08:47 A. Well, if it's something that can appear on
13:08:50 the fiction best seller list, it's in that category.
13:08:54 If it's not something that can appear in the fiction
13:08:57 best seller category, it would be in the other.
13:08:59 **Q. So that was the basis on which you did that**
13:09:02 **aggregation?**
13:09:03 A. Well, the -- yeah, notice that all the
13:09:07 categories we have other than children's are
13:09:09 associated with the New York Times best seller list.
13:09:13 **Q. Is it your testimony that the price of two**
13:09:19 **e-books in the same category and produced by the same**
13:09:23 **publisher were impacted in the same manner by the**

159

13:09:26 **change from a wholesale business model to an agency**
13:09:29 **business model?**
13:09:30 MR. FRIEDMAN: Objection, form.
13:09:31 THE WITNESS: Well, they would have to be.
13:09:33 Two titles have the same impact if the values of all
13:09:37 the independent variables were identically the same
13:09:39 for both of them.
13:09:40 **Q. MR. SWANSON: So if they were in the same**
13:09:45 **category and they were published by the same**
13:09:50 **publisher, what other variables --**
13:09:52 A. Sold by the same retailer, status with regard
13:09:55 to the New York Times best seller list, observation
13:09:58 at the same point in time. All those phenomena would
13:10:03 have to be the same. Every single variable that's in
13:10:06 the regression would have to take the same value for
13:10:09 the two titles.
13:10:10 **Q. And to the extent that all those variables**
13:10:12 **did take the same value, then two books would have**
13:10:15 **the same impact, according to your model from the --**
13:10:20 **from the conduct at issue in the case?**
13:10:22 A. Yes, the R squared of .9 is not 1.0 because
13:10:27 there's going to be something out there that isn't in
13:10:31 the regression that might have explained that.
13:10:33 That's the unexplained variance. I don't know what
13:10:35 it is, but that would be something.

160

13:10:39 **Q. Do you agree that the standard approach to**
13:10:44 **proving that collusion raised prices is to construct**
13:10:48 **an econometric model of product pricing and taking**
13:10:54 **into account all of the other factors that affect**
13:10:57 **price including costs, market concentration and**
13:10:59 **market demand, prices were higher due to collusion?**
13:11:02 MR. FRIEDMAN: Objection, form.
13:11:03 THE WITNESS: Those are the things taken into
13:11:06 account, yes.
13:11:06 **Q. MR. SWANSON: Does your regression model take**
13:11:09 **account of costs?**
13:11:10 A. Well, the cost that we're interested in is
13:11:14 the cost to the retailer, right? Because we're
13:11:17 interested in retail prices. And these, as you know,
13:11:23 the categories depend on hard cover prices which are
13:11:26 related to the cost to the retailer.
13:11:31 So they're indirectly taken into account, but
13:11:34 what they -- what they actually paid for them is not
13:11:38 actually a variable in the model.
13:11:40 **Q. Does your regression model take account of**
13:11:43 **market concentration?**
13:11:44 A. It does not take into account market
13:11:48 concentration except insofar as that's taken into
13:11:50 account for the indicator variables for the specific
13:11:54 firms because the market concentration would -- the

161

13:11:57 coefficient for Amazon.com, to the extent it differed
13:12:01 from the coefficient for somebody else, would take
13:12:04 account of all the attributes of Amazon, including
13:12:07 market concentration differences.
13:12:09 **Q. Do economists believe that changes in the**
13:12:12 **wholesale prices are relevant to the level of retail**
13:12:14 **prices for the same product?**
13:12:15 A. Of course.
13:12:16 **Q. Are you aware that the defendant publishers**
13:12:21 **had changed wholesale e-book pricing in the preagency**
13:12:25 **period?**
13:12:25 MR. FRIEDMAN: Objection, form.
13:12:28 THE WITNESS: I'm not sure to what you're
13:12:30 referring. I mean, prices change, yes, but I don't
13:12:34 know what you're referring to in the question.
13:12:36 **Q. MR. SWANSON: Are you aware of generally how**
13:12:40 **the defendant publishers priced e-books at wholesale**
13:12:46 **under the wholesale model?**
13:12:47 MR. FRIEDMAN: Objection, form.
13:12:49 THE WITNESS: I recall having seen that
13:12:50 information, but it played no role in how I modeled
13:12:53 the damages.
13:12:55 **Q. MR. SWANSON: In the but-for world, would**
13:12:59 **wholesale prices for e-books be different than in the**
13:13:01 **actual world?**

162

13:13:02 MR. FRIEDMAN: Objection, form.
13:13:03 THE WITNESS: You asked me that this morning, and one of the features of the agency model was that some prices were reduced at the wholesale level.
13:13:12 **Q. MR. SWANSON: And you would not expect to see that in the but-for world?**
13:13:16 A. That's correct.
13:13:17 **Q. Focusing on a single transaction for a single title at a given point in time, how do you identify the overcharge associated with that single transaction for that single title?**
13:13:43 A. That's the difference between the price that was charged for that title in that period versus the competitive benchmark price.
13:13:54 **Q. And the actual price that's charged is in your data?**
13:14:04 A. Well, the transactions records are actual prices. The data constructs the averages for each four-week period for each title.
13:14:16 **Q. Is it fair to say that in your regression model you compute 12 overcharge coefficients for each publisher corresponding with the 12 categories we covered earlier today?**
13:14:38 A. There are more than those variables in the model. I guess I don't understand the question. All

163

13:14:45 the variables affect the estimated price for every publisher. So I guess I don't understand the question.
13:14:50 **Q. Well, you compute overcharge coefficients that for each publisher that are associated with each of those 12 categories that we --**
13:15:01 A. Yes.
13:15:01 **Q. -- spoke of earlier, correct?**
13:15:03 A. Yes, but other variables are still affecting the price. It's not that those other variables disappear in some sense.
13:15:11 **Q. Did you compute a set of overcharge coefficients for Random House?**
13:15:17 A. Well, somebody's excluded from the data. So I don't remember precisely which one is. But in any case, one could do that calculation with it, yes. You could estimate the departure of the competitive price from the competitive benchmark price for Random House in the data. Yes, you could do that.
13:15:44 **Q. But that's not something you've done?**
13:15:46 A. No.
13:15:46 **Q. Did you evaluate whether all of your overcharge coefficients were statistically significant?**
13:15:54 A. I don't think that's the relevant question at

164

13:16:00 the level of individual coefficients. I mean, first of all, it's not clear what's the appropriate test for statistical significance. All right? And, secondly, the goal is to explain as much of the data as possible without including the effect of the collusive agreement.
13:16:19 So it's more like how you would do the first stage of a two-stage least squares model. You want to do the best job you can of forecasting the dependent variable with the data you have, and there you don't evaluate things on the basis of their statistical significance of a coefficient. You evaluate instead the quality of the regression on the basis of the difference by adding the collusion indicator.
13:16:54 **Q. Well, it's fact, isn't it, that a number of your overcharge coefficients are not statistically significant?**
13:17:03 A. I haven't -- I didn't look at that because that's not the point of a forecasting model. The point of a forecasting model is do the best job of explaining the noncollusive prices and then add to that the effect of collusion. And there's all kinds of reasons why you might get specific variables being statistically insignificant but you still would want

165

13:17:26 them in the equation because of possible interaction with the effect you're measuring.
13:17:29 So the question is premised on an incorrect conceptualization of what the forecasting model is supposed to do and how you construct it.
13:17:38 **Q. Well, if one of your coefficients is not statistically significant, can you reject the hypothesis as an academic economist that purchasers of e-books in that category were not injured?**
13:17:54 A. No, because -- not unless the coefficient is not statistically significant. If it -- the only way you could do that is if the effect of the collusion period itself were statistically insignificant. And since that interacts with a whole bunch of things, you can't do it on the basis of each individual coefficient.
13:18:09 That's the whole point of a forecasting model. You evaluate on the basis of the equation, not on the basis of a coefficient.
13:18:16 **Q. So you would have concerns about statistical significance only if all of the coefficients were not statistically significant?**
13:18:25 A. No, you could have that for multiple collinearity among the data. The question is is the equation explaining variance in the object of

13:39:41 A. 50 percent.
13:39:42 **Q. A little bit over 50?**
13:39:44 A. Yeah.
13:39:45 **Q. Do any of your formulaic predictions predict precisely 9.99 but-for pricing?**
13:39:57 A. I don't recall what the precise predictions for anything are. Don't remember. I, you know, I don't recall what those numbers are.
13:40:10 **Q. Is it your view that the scenario of a 9.99 but-for price and a 12.99 actual price is a very common one as the plaintiffs' damage expert?**
13:40:26 MR. FRIEDMAN: Objection, form.
13:40:27 THE WITNESS: What do you mean by common?
13:40:30 **Q. MR. SWANSON: Do you think that was the most common instance of overcharge?**
13:40:34 MR. FRIEDMAN: Objection, form.
13:40:36 THE WITNESS: I don't know whether it was the most common. I mean, to begin with, the prices you're quoting are for new releases. They're less than half of the transactions. And then there are differences in the prices of new releases. So I don't know how to characterize most or more common. Those are too vague for me.
13:40:56 **Q. MR. SWANSON: Are these overcharge scenarios that are common at all, in your view?**

13:40:59 MR. FRIEDMAN: Objection, form.
13:41:00 THE WITNESS: You have to be more precise about what common means. I mean, there are some that happen more often than others, but I don't know what you mean by common.
13:41:09 **Q. MR. SWANSON: Well, what percentage of but-for pricing as predicted by your damage model are $9.99?**
13:41:19 A. I don't know what percentage of them are. I don't regard it as an important question, but I don't know what they are.
13:41:25 **Q. Is it less than ten percent?**
13:41:27 A. Is there something about I don't know you don't understand?
13:41:30 **Q. Is there something about I'm a lawyer that you don't understand?**
13:41:34 A. I'm not going to give a Clintonesque definition of I don't know. I'm just going to say I don't know.
13:41:42 **Q. Well, I don't know, in my sad experience as a lawyer, sometimes gets qualified when the numbers get bandied about.**
13:41:55 **So you don't know if it's zero percent.**
13:41:58 A. Oh, it would be extremely unlikely to be zero percent, but I don't know what it is.

13:42:04 Nothing -- nothing -- the probably of anything being a particular number is not zero, but I don't know what it is. I haven't looked at the distribution of predicted prices, so I can't tell you the frequency of various prices.
13:42:15 **Q. Well, you just told me something that somewhat belied the fact that you didn't know anything. Now --**
13:42:21 MR. FRIEDMAN: Objection, form.
13:42:22 **Q. MR. SWANSON: How likely is it that the number of prices that your model predicts in the but-for world are in less than five percent of the instances 9.99?**
13:42:38 MR. FRIEDMAN: Objection, form.
13:42:39 THE WITNESS: I haven't -- I haven't calculated that number. I don't -- I don't know.
13:42:44 **Q. MR. SWANSON: If your model predicted only one percent of the prices in the but-for world were 9.99, would that cause you to reexamine the reliability of your model?**
13:42:54 A. No.
13:42:55 MR. FRIEDMAN: Objection, form.
13:42:56 THE WITNESS: Not necessarily. I'd have to know a lot more.
13:42:58 **Q. MR. SWANSON: Zero percent? What if it were**

13:43:01 **zero percent?**
13:43:01 A. No, that's not -- that's not a valid measure of reliability. All right? The issue is not that. The issue is the extent to which it's doing a good job predicting the overcharge.
13:43:15 It could be, you know, small differences in the predicted but-for price. Like, suppose we got every single one of them that should have been 9.99 as 9.98. That's not important. All right? If every single one that was supposed to be 9.99 was $2.36, then that would be important, or if it was $27.14, that would be important. But just knowing what fraction of them was exactly 9.99 is not relevant to any known or suspected question that I would have about the quality of the model.
13:43:50 **Q. So absolutely unimportant to you what percentage are 9.99.**
13:43:53 MR. FRIEDMAN: Objection, form.
13:43:54 THE WITNESS: I don't know why I would care to know the percentage of them that predicted 9.99, yes. I can't think of a good reason to do that. You could do it, but I don't know what the point would be.
13:44:07 **Q. MR. SWANSON: Would your answers be different if I asked you the same questions but specified a**

186

13:44:10 **range of from, say, 9.75 to 10.25?**
13:44:15 A. That comes closer to being something that
13:44:19 matters, yes. I mean, but you're leaving out the
13:44:22 other shoe, which is what actually was the category
13:44:26 of the book that's not being 9.99. Is it one that
13:44:30 you really should have predicted in the, say, the
13:44:35 Amazon data prior to the institution of the agency
13:44:39 problem model.
13:44:40 If you haven't done a good job of identifying
13:44:43 the books they would have set the price at 9.99, then
13:44:48 that's important; but if that's true, then I don't
13:44:50 know how you get an R square of .90.
13:44:55 So, you know, it's -- the question has to be
13:44:58 answered in the context of a regression that's
13:45:01 explaining 90 percent of the variance, and the
13:45:04 average prices for the books that were 9.99 is going
13:45:08 to be 9.99. So if you're not explaining that, I
13:45:12 don't know how get an R square of .90 if they
13:45:15 constitute more than a trivial fraction of the sales.
13:45:19 **Q. What happens when you get a within R squared**
13:45:26 **of .12? What does that tell you?**
13:45:28 A. What that's telling me is that within a
13:45:30 month-long period, there's lots of variation in price
13:45:34 around the average price; and, of course, you're not
13:45:37 explaining it because you're not dealing -- you don't

187

13:45:40 have a transactions model.
13:45:41 If you did estimate a transactions model with
13:45:46 even the same variables, your ability to explain
13:45:49 individual transactions would be better than that,
13:45:52 because you're just not -- you're not giving the
13:45:55 model the chance to even try to explain those because
13:45:58 that's not the input to the model.
13:46:00 **Q. Well, do people purchase at average prices or**
13:46:06 **do they purchase at actual individual prices --**
13:46:09 MR. FRIEDMAN: Objection, form.
13:46:10 **Q. MR. SWANSON: -- at a given point in time?**
13:46:12 A. Well, some do, some don't. The -- the range
13:46:16 of prices being charged obviously is not something
13:46:21 where every single price is right at the average.
13:46:24 Most of them are not at the average or else you
13:46:27 wouldn't have the variation that you do within --
13:46:31 within the four-month period.
13:46:33 MR. FRIEDMAN: Four-week.
13:46:34 THE WITNESS: Four-week period. Excuse me.
13:46:36 **Q. MR. SWANSON: Are there e-book prices that**
13:46:56 **predictably change within a four-week period that**
13:46:59 **your model is not taking account of?**
13:47:01 A. Well, to the extent that indicator variable
13:47:04 changes its stripe in the middle of the period, then,
13:47:08 you know, there's a -- it's not completely

188

13:47:10 representative. Like the 90-day expiration date, all
13:47:14 right, can happen after two weeks of the four weeks.
13:47:17 So what you're reducing is the power of that variable
13:47:20 to explain variation in price.
13:47:23 **Q. Suppose a consumer comes forward and presents**
13:47:32 **evidence that in the middle of the book -- in the**
13:47:36 **middle of the month they bought a book that was --**
13:47:45 **had just come off its 90-day period, new release that**
13:47:50 **had just come off its 90-day period. Typically**
13:47:55 **coming off the 90-day period for Amazon would result**
13:47:58 **in a higher e-book price, would it not?**
13:48:01 A. Typically, yes.
13:48:02 **Q. And the approach of your model will use data**
13:48:07 **based on averaging all of the transactions in that**
13:48:09 **month, correct?**
13:48:10 A. That's correct.
13:48:11 **Q. So as you just pointed out, it could be that**
13:48:16 **two weeks in the price might have gone up under the**
13:48:20 **Amazon pricing model, but your model will treat the**
13:48:25 **average price of that book throughout the month which**
13:48:28 **will give weight to the lower price before the price**
13:48:34 **hike kicks in.**
13:48:36 A. It will give weight to both, but the average
13:48:39 will be in between. So those who bought before the
13:48:43 change occurred, their damages will be

189

13:48:46 underestimated; and for ones that bought after, their
13:48:49 damages will be overestimated. But on average,
13:48:51 they'll cancel out.
13:48:53 **Q. And some consumers who will not have been**
13:48:59 **injured directly under your methodology as a result**
13:49:01 **of that be in line to collect damages, correct?**
13:49:04 MR. FRIEDMAN: Objection, form.
13:49:05 THE WITNESS: Well, that -- that's only true
13:49:08 if the predicted price in the next four-week period
13:49:11 would have been at or above the price they actually
13:49:14 paid. Because, you know, in the next period, nothing
13:49:20 else will have changed except now we have the full
13:49:22 effect of the post 90-day thing. So you're going to
13:49:25 have a different predicted price there. And they are
13:49:29 going to have zero damages as opposed to what they
13:49:33 get only if in that period you would have predicted
13:49:36 no anticompetitive harm for that category, and yet in
13:49:42 reality what the model is about is saying that there
13:49:45 will be anticompetitive harm for everybody. It just
13:49:48 will differ depending whether you're before 90 days
13:49:51 or after 90 days.
13:49:53 **Q. Are you planning on taking that into account**
13:49:55 **or can you take that into account?**
13:49:57 A. The way to take it into account, which would
13:50:02 require more work, a lot more time, would be to

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123 (212)705-8585

190

13:50:05 reduce the -- the time period for which the average
13:50:09 was taken down to a week or something like that, down
13:50:13 to something closer to the frequency of the changes
13:50:16 in the variables.
13:50:17 **Q. And that is something that you could do.**
13:50:28 A. It's something you can do with enough time,
13:50:30 sure. You have to reconstitute the aggregation of
13:50:35 the data. Rather than just rely on stuff that was
13:50:37 done in the liability phase, you'd have to actually
13:50:41 go back and reconstitute the aggregation from the
13:50:44 transactions record to average periods and do that.
13:50:47 MR. FRIEDMAN: Would you like to have us
13:50:48 incur that cost in the distribution phase? Just give
13:50:52 me a heads-up.
13:50:56 MR. SWANSON: I don't know what phase you get
13:50:58 to unless you meet the requirement of moving
13:51:01 something up. But we can debate that offline.
13:51:08 **Q. Sitting here right now, obviously you don't**
13:51:14 **have your computer, nor would Mr. Friedman allow me**
13:51:19 **to make you run some calculations here live, but if I**
13:51:23 **gave you some hypothetical information about a**
13:51:25 **particular consumer purchasing on a particular day,**
13:51:29 **all of the information that corresponds to the**
13:51:33 **variables that you've used, would you be able to**
13:51:35 **figure out how your methodology calculates the**

191

13:51:39 **overcharge for that consumer as you sit here without**
13:51:42 **using your computer?**
13:51:43 A. I have no idea until you ask the question
13:51:46 because the question was sufficiently vague that I'm
13:51:48 not sure what's coming. So I'd hate to answer yes
13:51:52 and then not be able to answer the question or no and
13:51:56 then be able to answer it. So maybe you should try
13:51:58 and I can tell you whether that's sufficient
13:52:00 information for me to be able to answer it.
13:52:02 **Q. Well, I mean, if I bought Ted Kennedy's book**
13:52:07 **True Compass on April 1st, 2010, and I bought it from**
13:52:10 **Apple, could you tell me what my -- how much I was**
13:52:15 **overcharged?**
13:52:15 A. Yes.
13:52:16 **Q. How much?**
13:52:17 A. By plugging in the values associated with
13:52:21 that title into the regression equation, producing a
13:52:25 but-for price and then subtracting that from the
13:52:28 price you actually paid.
13:52:29 **Q. If I told you what price hypothetically I**
13:52:33 **paid for that book, can you sitting here point me to**
13:52:35 **numbers in your report that would allow us to figure**
13:52:38 **that out? Or do you need a computer to do that?**
13:52:41 A. Depends. There's nothing in the report that
13:52:46 would enable you to calculate it, but if I produce

192

13:52:49 for you the 10,000-page computer dump of the but-for
13:52:55 price of every title in every month, then you could
13:52:59 just look at that and do it yourself.
13:53:01 **Q. Well, you've answered my question. I**
13:53:03 **appreciate that.**
13:53:05 A. Shall we take a break?
13:53:06 MR. SWANSON: Yeah.
13:53:07 VIDEOGRAPHER: We are now going off the
13:53:09 record, the time is 1:52.
14:16:07 (Deposition recess taken.)
14:16:07 VIDEOGRAPHER: We're now going back on the
14:16:19 record. The time is 2:15.
14:16:22 **Q. MR. SWANSON: Professor Noll, you state in**
14:16:25 **your report that:**
14:16:27 **"Anticompetitive conduct by the**
14:16:28 **defendants caused prices to be higher for**
14:16:30 **e-books that account for 99.5% of e-book**
14:16:36 **sales by the publisher defendants."**
14:16:40 **Do you recall that?**
14:16:40 A. Yes.
14:16:40 **Q. How did you compute the 99.5 percent figure?**
14:16:44 A. It's a fraction that are accounted for by the
14:16:49 actual price being above the predicted price.
14:16:51 **Q. And did you make that computation at the**
14:16:54 **level of individual transactions?**

193

14:16:56 A. At the level of the four-week periods.
14:17:00 **Q. And did you make that computation at the**
14:17:04 **level of the individual title?**
14:17:06 A. It would be the -- let's see. What did we
14:17:15 do.
14:17:16 I've just forgotten sitting here whether it
14:17:27 was at the title or category level. I think it
14:17:30 was -- I just don't remember for sure.
14:17:32 **Q. Let me assert that it was at the category**
14:17:35 **level.**
14:17:35 A. I think it was, but I'm just having a main
14:17:39 memory block. I don't remember for sure.
14:17:40 **Q. And if you calculated it at the category**
14:17:44 **level, in effect, what you did was compute the**
14:17:47 **average price effect within a category, and then to**
14:17:51 **the extent there was a price effect, you added up the**
14:17:55 **percentage of each of those categories to come up**
14:17:59 **with a 99.5 percent figure?**
14:18:01 A. I think that the 99.5 percent figure is based
14:18:10 on the volume of sales, as I remember, as opposed to
14:18:13 a count of categories. You said a count of
14:18:15 categories, and I don't think it was.
14:18:16 **Q. I agree it's not a count of categories.**
14:18:19 A. Right.
14:18:20 **Q. I was not being very precise. I think we're**

transaction in every day over the entire class period, and that's the amount we get as the wealth transfer.

**Q. Is that the equivalent to the aggregate damage figure of $307 million you've reported?**

A. That's right.

**Q. And --**

A. Is that the right number? I think -- it's not 307, is it? Isn't it a little less?

MR. FRIEDMAN: No, I think it is.

THE WITNESS: Is it 307?

MR. FRIEDMAN: Yeah.

MR. SWANSON: Back me up there.

MR. FRIEDMAN: Silly number, I know.

THE WITNESS: See what I have to put up with?

MR. SWANSON: You have to put up with.

**Q. So focusing on that sentence, do you in your work ever measure the elevation and price on a specific day due to the collusive agreement model?**

A. Well, I'm saying this is an in principle statement. When you went back to the transactions records to calculate damages for every single person, you look at every single transaction on every single day. You know, that's -- ultimately it's the transactions record of a particular customer that

determines that customer's damages.

**Q. Let me ask you, if I can, about that process of calculating specific individual damages. You start out with a but-for price predicted by your regression, correct?**

A. Correct.

**Q. And then you subtract that from the actual transaction price.**

A. The actual average transactional price in that period, yes.

**Q. And is that the way you're telling the Court and the jury that individual damages should be calculated in this case?**

A. That's -- it could be done that way. It could also be done at the individual transaction level. Once you have the regression, you can do either way. I mean, the regression is the formula. Then how you choose to apply the formula can be either at the level of the four-week period or at the level of an individual transaction. That's just up to how you decide to do it.

**Q. The level of the individual transaction would require a further computational exercise.**

A. No, it's exactly the same computational exercise. It's purely what value you're using as the

transaction price, whether you're using the average value or the individual transaction value.

You have a number that is calculated for every book for every four-week period, and then what you subtract it from for each person can be from the transactions records or can just be for the actual average price during that period.

**Q. You were talking about the identification of what the, quote/unquote, actual price is.**

A. Yes. Not only that, but the starting place is what books does somebody have. And you can either look at the average price versus predicted price or you can look at the actual transaction price versus predicted price, either one.

**Q. If you take a look at Footnote 21 on page 25, you refer there to another procedure for calculating damages.**

A. I'm sorry.

**Q. It's on page 25, Footnote 21.**

A. What happened here?

**Q. That's my question.**

MR. FRIEDMAN: I think there is a pagination issue, but anyway, go ahead.

THE WITNESS: Yes.

**Q. MR. SWANSON: So what is that other**

**procedure? Is that one you just referred to, taking the average?**

A. You use the model to predict the price with and without collusion and look at the difference between those two predicted prices as to damages.

**Q. And did you use this method of calculating damages?**

A. No, I'm just describing what you could have done, what could be done. This requires some computational effort that we didn't undertake, but it's fairly simple to do.

**Q. Now, going back to the way you did do it, your regression will give you a but-for price if you throw the data in that correspond with a particular transaction.**

A. I'm sorry. It's late in the day.

**Q. If you -- if we give you the necessary data about a particular individual transaction, your regression will spit out a but-for price, correct?**

A. That's correct.

**Q. And then you would then suggest that that but-for price be compared to the actual transaction price. The difference is the overcharge damage.**

A. Yes, or you could use the predicted value as well as the basis for calculating the damage.

15:18:10 A. I was aware that reports on that issue had been submitted, but I wouldn't have been able to give you his name had you asked me for it.

15:18:20 **Q. Are you familiar with Professor Wickelgren's work as an economist?**

15:18:27 A. No.

15:18:27 **Q. Have you heard of him before in the academic context?**

15:18:31 A. No.

15:18:32 **Q. I take it you have no insight as to whether he's an expert on anything?**

15:18:44 A. I'm sure he's a fine fellow and kind to his mother. Okay? I don't know him. So I can't really say anything one way or the other about them.

15:18:58 **Q. That means you haven't read any of his billion academic papers.**

15:19:04 A. Regardless. Not even his guffaws. I'm not familiar with the name. That doesn't mean that if I looked at his CV I wouldn't recognize something. It just means that I don't know. What is there about I don't know --

15:19:18 **Q. You can only do that once. It loses its force.**

15:19:32 **So you have no knowledge as to whether or not Professor Wickelgren has developed a reliable basis**

15:19:47 **for estimating damages in this case.**

15:19:51 A. No.

15:19:51 **Q. And you're not the least bit curious about what he's done?**

15:19:56 MR. FRIEDMAN: Objection, form.

15:19:57 THE WITNESS: Yeah, I don't know -- no, I'm not curious, no. Curious is the wrong word.

15:20:16 MR. FRIEDMAN: I think you've answered the question.

15:20:19 THE WITNESS: I don't have any great desire to study his work, no.

15:20:26 **Q. MR. SWANSON: And if -- if I represent to you that there is a 40 percent difference in the calculated damages, that doesn't stimulate you to look further into his work?**

15:20:39 MR. FRIEDMAN: Objection, form.

15:20:41 THE WITNESS: I mean, if someone asked me to undertake a study of his report to figure out why he got the number he did, I would do that. But I have not been asked to do it and I don't have any great desire to do it. But if somebody asked me to do it, I'd do it.

15:21:06 **Q. MR. SWANSON: If you were told that another economist had studied the same issues that you had and had come up with a wildly different estimate of**

15:21:14 **damages, would that lead you to be more concerned about your own methodology at all?**

15:21:23 MR. FRIEDMAN: I'm going to object and I also don't think, Dan, in fairness, that that's an accurate representation and a fair one, given the fact that the doctor has not looked at it and I don't think it's accurate.

15:21:36 So if you're representing that Dr. Wickelgren was doing the exact same thing for the exact same purposes, which was the implication of question, I think that's misleading. And I don't think you intended to, but I just don't think that's a fair presentation to Roger. Excuse me. To Dr. Noll.

15:21:56 THE WITNESS: I forgot the question.

15:21:57 **Q. MR. SWANSON: Well, my question is as an economist, if you learned that another economist had looked at the same issue that you had and had come up with a conclusion that was 40 percent off of the number that represented your own conclusion, would that give you any pause, leading you to reconsider your own methodology?**

15:22:22 MR. FRIEDMAN: Objection, form.

15:22:24 THE WITNESS: Only if they had done exactly the same thing in exactly the same context. I mean, how could they possibly have done the same thing a

15:22:32 year before the opinion was offered? All right? I mean, I'm relying upon the outcome of the liability phase. He's not.

15:22:44 So he's in a -- he's in a state of much different information than I am. So it would be irrelevant what he did at that state of information.

15:22:51 **Q. MR. SWANSON: As an academic economist, when you work in a particular area and form opinions or theories, do you normally canvass the work of other economists in the area first?**

15:23:07 MR. FRIEDMAN: Objection, form.

15:23:08 THE WITNESS: In peer reviewed journals, yes. In expert reports in antitrust cases, no. I don't read people's antitrust declarations to inform my research that I'm going to try to publish in an economics journal.

15:23:21 **Q. MR. SWANSON: If Dr. Wickelgren was an economist whose work you were familiar with, would that make you more likely to review the work on damages he's done in this case?**

15:23:37 MR. FRIEDMAN: Objection, form.

15:23:39 THE WITNESS: My lack of interest in what he has to do is not with respect to his name. It's with respect to the timing and circumstances, that what happened then before the record was developed in the

234

15:29:56 **subject of dead-weight loss, you made reference to**
15:30:01 **Dr. Ashenfelter's finding that the average increase**
15:30:04 **in prices for the publisher defendants relative to**
15:30:07 **Random House titles was 16.8 percent and the relative**
15:30:11 **decline in unit sales was 14.5 percent.**
15:30:14 **Do you recall that?**
15:30:14 A. Yes.
15:30:15 **Q. And for purposes of that discussion, you**
15:30:19 **assumed that Random House provides a competitive**
15:30:23 **benchmark for prices of sales in e-books that were**
15:30:27 **sold by the publisher defendants during the agency**
15:30:30 **period?**
15:30:30 A. Yes.
15:30:30 **Q. Is that anything more than an assumption for**
15:30:35 **purposes of discussing dead-weight loss or --**
15:30:38 A. No, that discussion is premised on sort of
15:30:40 average values. It wouldn't apply to any particular
15:30:46 publisher, any particular title or any particular
15:30:50 thing. It's just an average across all of them.
15:30:53 **Q. You state in your report, and I think this is**
15:31:02 **at page 12, that:**
15:31:03 **"...the Court found that 'it is**
15:31:05 **abundantly clear, and not surprising, that**
15:31:07 **each of the Publisher Defendants lost sales**
15:31:10 **of e-books due to the price increases.'"**

235

15:31:12 A. Where are you?
15:31:13 **Q. I am at page 12.**
15:31:28 MR. FRIEDMAN: Last sentence, page 12.
15:31:30 MR. SWANSON: Hmm?
15:31:31 MR. FRIEDMAN: Last sentence page 12.
15:31:33 MR. SWANSON: Thank you.
15:31:33 MR. FRIEDMAN: You're welcome.
15:31:34 THE WITNESS: You're reading a quote from the
15:31:36 opinion.
15:31:36 **Q. MR. SWANSON: Yes, where you're --**
15:31:39 A. I'm quoting the opinion here and you read the
15:31:41 quote. I didn't recognize those as the way I would
15:31:43 write something. So that's why I asked for the
15:31:46 citation because it sounded to me like I was quoting
15:31:49 somebody else.
15:31:49 **Q. Yeah, I appreciate that. Now, is it your**
15:31:52 **understanding that the Court quantified the amount of**
15:31:55 **sales of e-books that were lost by the publisher**
15:31:58 **defendants?**
15:31:58 A. No, the reason I didn't proceed to this
15:32:01 exercise is to use the data that the Court cited to
15:32:04 produce an illustrative calculation.
15:32:07 **Q. And are you able to identify a particular**
15:32:11 **quantity of lost sales for purposes of your analysis?**
15:32:16 A. I don't understand the question. The

236

15:32:19 calculation is an overall estimate of the decline in
15:32:23 sales arising from the price increase based on the
15:32:25 data in the opinion. It's nothing more and nothing
15:32:29 less. So I don't know what beyond that you think it
15:32:31 might be that I was attempting here.
15:32:34 **Q. Let me ask you to turn back to Exhibit 4.**
15:32:50 A. Back to the computer program.
15:32:52 **Q. Right. Can you confirm that this is the**
15:32:58 **Stata code that runs your model?**
15:33:00 A. Well, it's been represented to me as such.
15:33:03 I'm not the one who actually ran the model, so --
15:33:08 but, yes, I've been told that it is.
15:33:10 **Q. Can you program in this software language?**
15:33:12 A. I could. I don't know that I could do it
15:33:14 today because I now rely upon my research assistants
15:33:17 to do it.
15:33:17 **Q. When was the last time you coded in this**
15:33:20 **software language?**
15:33:21 A. A while. A long time ago. Several years.
15:33:24 **Q. Let me ask you to turn to line 77. Do you**
15:33:42 **see the merge command in there?**
15:33:43 A. Yeah.
15:33:44 **Q. Your program is merging the data here,**
15:33:47 **correct?**
15:33:47 A. That's right. Creating a larger data set

237

15:33:50 from smaller data sets.
15:33:51 **Q. Can you identify what kind of data was merged**
15:33:54 **here?**
15:33:54 A. No, I don't remember what all these mnemonics
15:34:00 refer to. There was a time when I knew, but I don't
15:34:06 remember what the mnemonics mean now.
15:34:09 **Q. Let me ask you to turn to line 181. Can you**
15:34:29 **tell me what that does?**
15:34:34 A. Well, this is simply stating all the
15:34:36 variables that are to be included in a regression;
15:34:39 and if, again, you're going to ask me how the
15:34:49 mnemonics correspond to the actual variables, I don't
15:34:53 remember.
15:34:53 **Q. So you can't -- is it true you just don't --**
15:34:56 **you don't know or you don't remember? I mean, in**
15:34:58 **other words, did you -- were you involved in --**
15:35:01 A. In naming the variables, no. I was involved
15:35:04 in telling them what variables to include, and some
15:35:06 of them are obvious. Like under 90 days is a fairly
15:35:10 obvious mnemonic, but others are not obvious. Again,
15:35:15 I'm not going to remember from memory what they all
15:35:19 are.
15:35:19 What my role was to describe in words the
15:35:23 variables to go in the regression and then to be
15:35:25 certain that that's what the regression output

238

15:35:28 contained. It wasn't to write the code and to name
15:35:30 the variables in the code.
15:35:31 **Q. Can you tell me what calculation is being**
15:35:36 **performed in line 1 and 2?**
15:35:37 A. I think -- I'm not sure, but I think what
15:36:22 they're doing here is calculating the difference in
15:36:26 the predicted collusive price and the but-for
15:36:32 collusive price.
15:36:34 **Q. How uncertain are you?**
15:36:36 A. I don't know what -- I said I'm doing the
15:36:39 best I can, but obviously I cannot remember what this
15:36:42 particular line of code does. I don't remember -- I
15:36:47 don't even think I may have ever known what
15:36:50 particular line of code made which particular
15:36:53 calculation. So I've never examined this code on a
15:36:56 line-by-line basis to try to figure out what every
15:36:59 single line does.
15:37:00 **Q. This -- this is the implementation of your**
15:37:05 **regression model, correct?**
15:37:07 A. Yes.
15:37:08 **Q. And this is what a jury would have to endorse**
15:37:11 **in order to calculate on your view individual damages**
15:37:15 **for the members of the class and the consumers in the**
15:37:18 **plaintiff states?**
15:37:19 MR. FRIEDMAN: Objection, form.

239

15:37:21 THE WITNESS: This code implements the
15:37:24 regression model that I instructed the people working
15:37:28 for me at Ashenfelter & Ashmore to undertake.
15:37:35 Remembering the specific names -- what all the
15:37:38 specific names refer to, I'm not going to be able to
15:37:40 do that and I'm not going to attempt to. It's not
15:37:45 that -- in my task.
15:37:47 **Q. MR. SWANSON: So if I go through line 209 or**
15:37:50 **any of the other hundred and 20 possible variables**
15:38:00 **that are reflected in here --**
15:38:05 A. A lot of them are obvious. You're picking
15:38:07 things that are especially inobvious. All right?
15:38:11 And so -- of course. You know, you hand me something
15:38:15 with a long list of variables in it, I'm not going to
15:38:19 remember everything in it by memory. I'd be foolish
15:38:21 to even try.
15:38:22 **Q. What is 209?**
15:38:24 A. I haven't looked at it yet. I have no idea
15:38:46 what that is.
15:38:47 **Q. Going back to line 192, you testified that**
15:38:53 **you calculated actual minus predicted price, right?**
15:38:57 A. Yeah, that -- the actual minus predicted is
15:39:03 what's in the report because I told you earlier there
15:39:06 is this alternative way that this was an estimate of
15:39:10 it. There was also an estimate of it made, but it

240

15:39:13 wasn't the correct way to do it. So it's not
15:39:16 reported.
15:39:16 **Q. Well, isn't line 192 but-for minus predicted?**
15:39:22 A. Yeah, but the but-for is a prediction. I
15:39:27 mean the but-for price is the price that would
15:39:30 pertain in the absence of collusion, and so it has to
15:39:35 be estimated.
15:39:35 **Q. Yes. And I said is this not calculating the**
15:39:39 **but-for price minus the predicted actual price.**
15:39:43 A. Predicted is the crucial word. It's not the
15:39:47 actual price. It's the predicted price. I mean, I'm
15:39:51 not certain that that mnemonic refers to this because
15:39:56 I don't know what mnemonic was assigned to, A, the
15:40:00 actual price or, B, the predicted actual price after
15:40:04 collusion. So I don't know what terminology was used
15:40:07 in communicating with the computer to convey the
15:40:13 notion of calculating the damages.
15:40:15 So I just don't remember what -- and I -- I
15:40:19 did see such a list a long time ago, but I certainly
15:40:23 didn't attempt to memorize it.
15:40:24 **Q. Is it possible that the coding implemented**
15:40:27 **your methodology in a different way than you**
15:40:29 **intended?**
15:40:30 A. It's perfectly conceivable, but -- I can
15:40:36 certainly ask them and find out if they screwed up

241

15:40:39 and didn't do what I told them to do. That's
15:40:42 certainly a possibility.
15:40:43 **Q. And who would be the person to ask that?**
15:40:47 **Would that be Mr. Ashmore?**
15:40:49 A. Well, would be three or four people, but he'd
15:40:52 be the one I asked first, yes.
15:40:54 **Q. And he was the one you relied upon to**
15:40:56 **faithfully implement your methodology?**
15:40:58 A. Well, they're all being relied on. I mean,
15:41:01 that's not fair. Everybody's relied on, including
15:41:06 Orley Ashenfelter. He was involved with this as
15:41:10 well.
15:41:10 **Q. Do you hold any opinions to which you intend**
15:41:19 **to testify at trial that were not set forth in your**
15:41:22 **declaration or discussed in this deposition?**
15:41:23 A. I don't think so. You might try me, but I
15:41:26 think I've expressed all my opinions.
15:41:29 **Q. It has been your intent to disclose them all**
15:41:31 **in your report and answer my questions obviously**
15:41:35 **today.**
15:41:36 A. Yes, I have attempted to answer -- to
15:41:39 disclose everything that I have done, all the
15:41:41 opinions that I have.
15:41:43 **Q. Do you have any plans to revise your**
15:41:46 **declaration as you sit here today?**

15:41:48 A. No.
15:41:50 **Q. Do you have any other plans in connection**
15:41:53 **with your assignment in this case?**
15:41:55 A. Well, my expectation is I'll be asked to
15:42:00 comment on the reports of your experts, but I don't
15:42:03 know that for certain until it happens.
15:42:05 **Q. Have you seen any economic evidence that**
15:42:09 **contradicts any of your opinions in this case?**
15:42:10 A. I've seen statements by your economist that
15:42:16 contradicts some of the things in here, but aside
15:42:19 from that -- also things in legal briefs that
15:42:22 contradict it, but I've never -- that's the extent of
15:42:25 it.
15:42:25 **Q. Do you know of any way to test the validity**
15:42:28 **of your opinions other than the work that you've**
15:42:29 **already done?**
15:42:30 MR. FRIEDMAN: Objection, form.
15:42:32 THE WITNESS: That's a really broad question.
15:42:46 I don't know how to answer that. It's too broad. It
15:42:49 would have to be more specific. I'm not sure how to
15:42:52 answer it.
15:42:52 **Q. MR. SWANSON: Is there any data or**
15:42:54 **information suggested by economic theory that you**
15:42:56 **would like to have assembled before reaching your**
15:43:00 **opinions but which was simply not available?**

15:43:02 MR. FRIEDMAN: Objection, form.
15:43:08 THE WITNESS: Well, all economists always
15:43:09 want more data, and certainly data linking customers
15:43:14 would be valuable.
15:43:19 Are there any independent variables that are
15:43:26 not available that I wish I had? I can't think of
15:43:29 any sitting here. I don't recall having asked for
15:43:31 any that where they didn't show up or there was said,
15:43:41 no, well, that's available but we don't have it or
15:43:44 something like that, no. I think we've done as good
15:43:46 a job as we can given the data we have.
15:43:48 MR. SWANSON: Can we take a last pause? What
15:43:54 the heck.
15:43:55 VIDEOGRAPHER: We are now going off the
15:43:57 record, the time is 3:43.
15:58:34 (Deposition recess taken.)
15:58:35 VIDEOGRAPHER: We're now going back on the
15:58:47 record. The time is 3:58.
15:58:49 **Q. MR. SWANSON: Professor Noll, I just wanted**
15:58:51 **to make sure we had a complete list of the economists**
15:58:56 **who supported you in your work in this case. We**
15:59:01 **talked about that at the beginning. I think you**
15:59:03 **mentioned in a recent response that Professor**
15:59:08 **Ashenfelter was also someone who gave you some**
15:59:11 **assistance in this matter.**

15:59:13 A. I wouldn't call him support. Orley's an old
15:59:17 friend and I talked to him about it, yes. And he
15:59:20 provided input to the -- in responding to my ideas
15:59:25 about estimating models.
15:59:27 **Q. Say hello to him for me, by the way.**
15:59:30 A. Okay.
15:59:31 **Q. Is there anyone else, whether support or**
15:59:35 **input that --**
15:59:39 A. Well, there are several peoples in both firms
15:59:42 who have been involved in it, but I had people in
15:59:45 each one that I relied upon as the person that I
15:59:47 would talk to, and that was David and Jeff. So there
15:59:54 were others that would be involved, but those are the
15:59:57 ones I communicated through.
15:59:59 MR. SWANSON: All right. That is it for me.
16:00:01 MR. FRIEDMAN: No questions.
16:00:02 MR. SWANSON: Thank you.
16:00:03 VIDEOGRAPHER: This now concludes the
16:00:07 videotaped deposition of Roger Noll on November 1st,
16:00:14 2013. We are now going off the record. The time is
16:00:20 4:00 o'clock.

--o0o--

(Whereupon, the deposition was adjourned at deposition adjourned at 4:00 p.m.)

STATE OF ______________ )
) :ss
COUNTY OF ______________)

I, ROGER G. NOLL, Ph.D., the witness herein, having read the foregoing testimony of the pages of this deposition, do hereby certify it to be a true and correct transcript, subject to the corrections, if any, shown on the attached page.

______________________
ROGER G. NOLL, Ph.D.

Sworn and subscribed to before me, this ________ day of __________, 201_.

_______________________________
Notary Public