UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

IN RE ELECTRONIC BOOKS ANTITRUST
LITIGATION

No.  11-md-02293 (DLC)
ECF Case

---

This Document Relates to:

ALL ACTIONS

CLASS ACTION

---

**MEMORANDUM OF LAW IN SUPPORT OF CLASS PLAINTIFFS'
MOTION TO EXCLUDE OPINIONS OFFERED BY DR. JOSEPH KALT**

SUBMITTED UNDER SEAL
Pursuant to Protective Order

010260-11  662383 V1

## TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     ARGUMENT .........................................................................................................3

        A.      Dr. Kalt's Opinion Is Not "Based on Sufficient Facts or Data" Due
                to His Ignorance of the Facts of the Conspiracy and Publishers'
                Pricing Methods .......................................................................................3

                1.      Dr. Kalt Mislabels Agency Prices as "Pre-Agency Prices,"
                        Massively Overstating the Number of Sales at or Below True
                        Pre-Agency Prices.........................................................................4

                2.      Dr. Kalt Ignored Evidence of a Pricing Structure, then Opined
                        That None Existed Without Econometric Analysis and Suggested
                        Variables at Odds with Publishers' Pricing Practices.................8

                3.      Dr. Kalt's Opinion on the Average Number of E-Book Purchases
                        Is Based on Editing and Ignoring His Sources ..........................14

        B.      Dr. Kalt's Opinions Based on Modal Pricing, Including His "Churn" and
                "Dispersion" Analyses, Are Based On Unreliable Principles and Methods..........16

        C.      Because Dr. Kalt's Opinions About Impact and Damages Are Contrary
                to Law and This Court's Findings, They Are Irrelevant and Could Only
                Confuse a Jury.........................................................................................18

        D.      Dr. Kalt's Offset Opinions Are Irrelevant and Merely Repeat Mr. Orszag's
                Flawed Testimony, and Should be Excluded for the Same Reasons.....................23

III.    CONCLUSION....................................................................................................25

010260-11 662383 V1

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Abuan v. Gen. Elec. Co.,*
  3 F.3d 329 (9th Cir. 1993) ...................................................................21

*Advent Sys. Ltd. v. Unisys Corp.,*
  925 F.2d 670 (3d Cir. 1991)................................................................21

*Allen v. Dairy Farmers of America,*
  2012 WL 5844871 (D. Vt. Nov. 19, 2012).............................................1

*Amorgianos v. Nat'l R.R. Passenger Corp.,*
  303 F.3d 256 (2d Cir. 2002)............................................................4, 12

*Boucher v. U.S. Suzuki Motors Corp.,*
  73 F.3d 18 (2d Cir. 1996)...................................................................24

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,*
  509 U.S. 209 (1993)........................................................................3, 8

*Catalano, Inc. v. Target Sales, Inc.,*
  446 U.S. 643 (1980).........................................................................23

*Comcast Corp. v. Behrend,*
  133 S. Ct. 1426 (2013)......................................................................21

*El Aguila Food Prods., Inc. v. Gruma Corp.,*
  301 F. Supp. 2d 612 (S.D. Tex. 2003) ..................................................3

*Fuesting v. Zimmer, Inc.,*
  421 F.3d 528 (7th Cir. 2005) .............................................................15

*Gaskin v. Sharp Elecs. Corp.,*
  2007 U.S. Dist. LEXIS 65532 (N.D. Ind. Aug. 31, 2007)........................13

*Gen. Elec. Co. v. Joiner,*
  522 U.S. 136 (1997)..........................................................................15

*Gutierrez v. Johnson & Johnson,*
  2006 WL 3246605 (D.N.J. Nov. 6, 2006) .............................................14

*Herbert v. Lisle Corp.,*
  99 F.3d 1109 (Fed. Cir. 1996)............................................................19

*Hickory Secs. Ltd. v. Repub. of Arg.,*
  493 F. Appx. 156 (2d Cir. 2012).....................................................19, 20

*Ho Myung Moolsan, Co. Ltd. v. Manitou Mineral Water, Inc.,*
    2010 WL 4892646 (S.D.N.Y. Dec. 2, 2010) ........................................................8

*In re Blood Reagents Antitrust Litig.,*
    283 F.R.D. 222 (E.D. Penn. 2012)....................................................................23

*In re Chocolate Confectionary Antitrust Litig.,*
    289 F.R.D. 200 (M.D. Penn. 2012)....................................................................21

*Kohen v. Pac. Inv. Mgmt. Co. LLC,*
    571 F.3d 672 (7th Cir. 2009) ...........................................................................19

*Leverette v. Louisville Ladder Co.,*
    183 F.3d 339 (5th Cir. 1999) ...........................................................................19

*Messner v. Northshore Univ. HealthSystem,*
    669 F.3d 802 (7th Cir. 2012) ...........................................................................19

*Story Parchment Co. v. Paterson Parchment Paper Co.,*
    282 U.S. 555 (1931)........................................................................................21

*Tse v. Ventana Med. Sys., Inc.,*
    123 F. Supp. 2d 213 (D. Del. 2000)....................................................................8

*United States v. Apple Inc.,*
    2013 U.S. Dist. LEXIS 96424 (S.D.N.Y. July 10, 2013) ..........................5, 9, 15, 23

*Wal-Mart Stores, Inc. v. Dukes,*
    _U.S._, 131 S. Ct. 2541 (2011)........................................................................19

## FEDERAL RULES

Federal Rule of Evidence 702........................................................................2, 3

## OTHER AUTHORITIES

ABA, Econometrics: Legal, Practical, and Technical Issues 11 (2005)..................13, 16

## I.    INTRODUCTION

Dr. Kalt's work in this case is not economics but obfuscation.[1] Dr. Kalt offers opinions on pricing within the e-book industry without any understanding of how e-book prices are set or even who was setting them during key periods in his analysis.[2] Dr. Kalt's errors are so fundamental that he treats prices *set by the Publisher Defendants after the onset of agency* as "pre-agency" prices – producing an estimate of supposed undercharges that is demonstrably off by a full order of magnitude. His methodology is as unreliable as his facts, mislabeling outlier sales on a single day as "weekly modal prices," wishing away price increases if an e-book didn't sell any copies the day that Publisher Defendants raised prices, and excluding e-books without price changes to support his conclusion that e-book prices "churn." And he seeks to offer opinions that are squarely at odds with controlling law – including the proposition that

---

[1] Although this memorandum will focus on the specific and numerous methodological failings in Dr. Kalt's work in this case, the Court should be aware Dr. Kalt has *never* concluded in testimony or an expert report that a plaintiff can show impact or damages through common proof, despite addressing that issue in numerous cases. Exhibit 8 to the Declaration of Steve W. Berman in Further Support of Class Plaintiffs' Motion for Class Certification and *Daubert* Motions ("Berman Declaration") at 176:16-177:21. For example, he recently opined in *Allen v. Dairy Farmers of America*, No. 09-cv-230, 2012 WL 5844871 (D. Vt. Nov. 19, 2012), that impact and damages could not be demonstrated by common proof, making the exact same arguments as here (that churning, dispersion, and benefits to some class members foreclosed use of common proof). Notwithstanding his opinion, the court concluded that the class plaintiffs had demonstrated that common proof could be used and certified the subclasses at issue. *Id.*, at *16. In reaching that conclusion, the court specifically noted that it was "concerned with relying upon the analysis of Dr. Kalt who has purportedly *never* found common antitrust impact when it undisputedly has been found in scores of cases that have been upheld on appeal." *Id.*, at *11 n.9. A motion to exclude Dr. Kalt's testimony in that case is currently pending.

Dr. Kalt is being paid *$1,350* per hour for his testimony (in addition to a percentage of billings generated by the large staff assisting him), but he was unable to testify about the number of hours he has worked in this case or the amount he has been compensated, declining to say even whether it is more than $25,000 or less than $500,000. Ex. 8 at 69:2-74:20. Similarly, while "virtually all" of his income for the past two years has been received for expert testimony, Dr. Kalt claimed he could not say whether the payments he has earned over that period was somewhere between $500,000 and $5,000,000. *Id.* at 77:16-80:20.

[2] Ex. 8 at 287:7-311:21.

"sometimes illegal price-fixing conspiracies benefit many consumers."[3] The result is an unreliable and misleading report that cannot possibly help the Court or a jury assess the issues in this case and is the rare exception that fails Federal Rule of Evidence 702.

Dr. Kalt offers five subsidiary opinions, each of which is fundamentally unreliable. First, he claims that some e-book sales occurred at or below the pre-agency price, including 75% of sales in the first month of agency.[4] This opinion is based on an erroneous mislabeling of agency sales as pre-agency sales, massively inflating Dr. Kalt's findings; it also depends on Dr. Kalt's unorthodox and unjustifiable use of modal prices. Second, he claims that e-book prices lack any price structure and display "churning" and "dispersion,"[5] opinions that are based on Dr. Kalt's complete ignorance of industry pricing practices and unreliable methodological choices that preordain his results. Third, he testifies that e-books exhibit no pricing structure and that Dr. Noll should have incorporated variables for "buzz" and various subgenres in his multiple regression analysis, despite having no idea how e-book prices are set.[6] Fourth, he claims that it is possible to predict or identify some number of transactions that occurred below but-for prices in the actual world,[7] an opinion that fundamentally misuses Dr. Noll's econometric analysis and, in any event, simply proves that any uninjured class members can be isolated in distribution proceedings. Fifth, he adopts the flawed opinions of Mr. Orszag and claims that damages should be offset by lower e-reader prices and increased availability of self-published e-books despite doing no

---

[3] *Id.* at 213:15-20.

[4] *See* Declaration of Joseph P. Kalt, Ph.D. ("Kalt Decl.), ¶¶ 77-93 & Figures 17-20, filed under Seal on Nov. 15, 2013.

[5] *See* Kalt Decl., ¶¶ 57-76.

[6] *See id.*, ¶¶ 29(a)-(b), 58-59, 119(b)(2), 121, 124(a)-(b).

[7] *See id.*, ¶¶ 106-140 & Figures 25-35.

010260-11  662383 V1

econometric analysis of these issues, ignoring obvious alternative possibilities.[8] His proposed offsets are also legally irrelevant. Dr. Kalt's ultimate conclusions are unreliable due to the flaws in these subsidiary steps, his inability to quantify the magnitude of his claims, and his legally incorrect belief that Dr. Noll's damage opinions are unreliable if they are off by a single cent. Accordingly, the Court should strike Dr. Kalt's opinion in its entirety, give it no weight in assessing Plaintiffs' class certification motion, and preclude Dr. Kalt from testifying at trial.

## II.    ARGUMENT[9]

### A.    Dr. Kalt's Opinion Is Not "Based on Sufficient Facts or Data" Due to His Studied Ignorance of the Facts of the Conspiracy and Publishers' Pricing Methods

Rule 702(b) requires that an expert's testimony be "based on sufficient facts or data."[10] "When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict."[11] Here, Dr. Kalt's unawareness of and disinterest of how e-books were priced during and before the conspiracy – the sole relevant issue –renders his opinion wholly unreliable. Although Dr. Kalt's demonstrably false assumptions and baseless inferences pervade his entire opinion, they are most pronounced in three areas: his calculation of titles sold "at or below their pre-agency price levels,"[12] his opinion that e-book prices exhibited no price

---

[8] *See id.*, ¶¶ 94-105.

[9] The legal standards applicable to this motion are set out in the concurrently filed Memorandum of Law in Opposition to Defendant Apple's Motion to Exclude Opinions Offered by Dr. Roger Noll in Support of Motion for Class Certification ("Class Pls.'*Daubert* Opp'n"), at 4-6.

[10] *See, e.g.*, *El Aguila Food Prods., Inc. v. Gruma Corp.*, 301 F. Supp. 2d 612, 623-24 (S.D. Tex. 2003) *aff'd*, 131 Fed. Appx. 450 (5th Cir. 2005) ("Reliability means that the expert opinion is based on and supported by what is real and known. . . . [H]is opinion seizes on the abstract and is based on strong opinions that do not relate to market reality. Herein lies a credibility gap.").

[11] *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993).

[12] *See, e.g.*,  Kalt Decl.,¶¶ 81-82, 90, 93 & Figs. 17, 19D, 19E, 20D, 20E.

- 3 -

structure,[13] and his extrapolations from tiny fractions of the class.[14] Dr. Kalt's misunderstanding

of indisputable facts creates flaws "large enough that the expert lacks 'good grounds' for his . . .

conclusions" and renders his opinions fatally unreliable.[15]

> **1.    Dr. Kalt Mislabels Agency Prices as "Pre-Agency Prices," Massively
> Overstating the Number of Sales at or Below True Pre-Agency Prices**

First, Dr. Kalt opines that common adverse impact is implausible because, among other

things, the majority of Publisher Defendants' titles and "approximately 60% of units sold within

the four weeks after the shift to agency did not experience pricing above pre-agency levels," a

figure that he later increased to 75%.[16] This calculation is irreconcilable with Dr. Gilbert's

testimony, unchallenged during the liability phase, that more than 80% of agency sales were of

titles for which the price increased after agency.[17] How does Dr. Kalt arrive at this higher figure?

By treating *agency prices* as "pre-agency" prices.[18]

Dr. Kalt's most significant error is simple: he sets the date for each Publisher Defendant's

"shift to agency" at the date of the "move to agency with last retailer."[19] He considers prices in

the month after that date to be "post-agency" and prices in the week before that date to be "pre-

---

[13] *See id.,* ¶¶ 57-61.

[14] *See, e.g., id.,* ¶¶ 91, 94-96 & Fig. 8.

[15] *Amorgianos v. Nat'l R.R. Passenger Corp.,* 303 F.3d 256, 267 (2d Cir. 2002).

[16] Kalt Decl., ¶ 81.

[17] Ex. 2, ¶ 158. Dr. Kalt testified that he did not recall Dr. Gilbert's finding and "didn't try to study it." Ex. 8 at 277:10-23.

[18] *See* Reply Declaration of Roger G. Noll ("Noll Reply Report") at 28-34, concurrently filed herewith.

[19] Kalt Decl., Fig. 17. Dr. Kalt does not actually select the date of the move to agency with the *last* retailer, which would be Google for all Publisher Defendants; rather, he uses the last among Amazon, Barnes & Noble, Sony, Apple, Kobo, and Books-a-Million.

agency."[20] Dr. Kalt uses May 28, 2010 for Penguin, the date that it began selling on an agency model through Amazon, and April19, 2010 for Simon & Schuster, the date that it began selling on an agency model through Sony.[21] By selecting the date of the move to agency with the *last* retailer, Dr. Kalt has created so-called "pre-agency" prices that are actually prices *set by Publisher Defendants after the move to the agency model*. In other words, he compares these two publishers' title's "post-agency" prices at any given retailer to prices mandated by that publisher at that same retailer – and, unsurprisingly, finds that many prices did not change.

At his deposition, Dr. Kalt grudgingly acknowledged the inarguable fact that his "pre-agency" prices were actually *agency* prices,[22] but insisted that his use of these prices was appropriate because they were "still being governed by the fact that Amazon was not on agency."[23] This is false. Simon & Schuster switched to agency at Amazon on April 3, 2010, and made no sales at Sony between April 3 and April 18, meaning that *all* of its sales in Dr. Kalt's fallacious "pre-agency period" were agency sales.[24] Similarly, Penguin refused to sell new release e-books through Amazon between April 3, 2010 and May 28, 2010.[25] This undisputed fact was discussed at trial and in the Court's July 10 Opinion and Order,[26] but Dr. Kalt was

---

[20] As discussed below, Dr. Kalt's use of a daily modal price in this analysis is methodologically unsound and misleadingly described; for the purposes of this discussion, however, this defect will be ignored.

[21] Ex. 8 at 266:23-267:10, 274:18-25.

[22] *Id.* at 274:8-9 ("That would be a tautology in your question, yes, that's true . . . .")

[23] *Id.* at 274:15-16; *see generally id.* at 272:10-274:16.

[24] Noll Reply Report at 30-31.

[25] *Id.* at 30, 32.

[26] *United States v. Apple Inc.*, Nos. 12-cv-2826, 2013 U.S. Dist. LEXIS 96424, at *108 (S.D.N.Y. July 10, 2013). As the Court noted, Penguin formally signed its contract on June 2, 2010. The parties agree that Penguin switched to the agency model with Amazon and restarted its sale of new release e-books with Amazon a few days earlier.

- 5 -

completely unaware of it.[27] For all of Penguin's new release titles, the *only* sales Dr. Kalt registers are agency sales through other retailers, and Amazon could have no price discipline effect because it was not selling those titles. And even for those backlist titles that Amazon was able to carry and price, it placed limited downward pressure on its agency competitors: as Dr. Ashenfelter calculated during the liability phase, more than 95% of Penguin e-books that were available at Amazon during this eight-week period were priced higher in the iBookstore and the Nook Store, with an average differential of $1.67 at Barnes & Noble and $2.00 at Apple.[28]

Dr. Kalt's error distorts his results on a massive scale. His revised Figure 20D (provided to Plaintiffs one day before his deposition) calculates that approximately 18 million Penguin sales occurred below their pre-agency prices. The actual number, applying Dr. Kalt's methodology to genuinely pre-agency prices, is approximately 1.8 million.[29] This cannot be emphasized enough: ***Dr. Kalt overestimated the number of sales "at or below their pre-agency price" at the largest Publisher Defendant by an order of magnitude.*** For Simon & Schuster, Dr. Kalt's numbers fall from more than 3.5 million to approximately 700,000, revealing a five-fold overestimate. This fundamental methodological error leads Dr. Kalt to conclude erroneously that Penguin had five to ten times as many sales at or below "pre-agency" pricing at Hachette, Macmillan, or HarperCollins, with the ratio of Simon & Schuster to those publishers nearly as large.[30] This disparity, unexplained by the documentary or testimonial evidence, illustrates that

---

[27] Ex. 8 at 267:13-17 ("Q: Now, is it your understanding that during the period May 21 to May 28, Amazon wasn't selling any e-books that had been released by Penguin after April 1, 2010? A: No, that's not my understanding.").

[28] Ex. 58 at Table A-6; Noll Reply Report at 32.

[29] Noll Reply Report at 33. Note that Plaintiffs' recalculated Figures 17 and 20 are plagued by Dr. Kalt's unreliable use of modal prices; Plaintiffs include them only to show where Dr. Kalt's methodology ***should*** lead him, not to offer an accurate estimate of the number of unit sales at prices without an immediately observed increase.

[30] *Compare* Kalt Decl., Fig. 20D-E *with* Kalt Decl., Fig. 20A-C.

Dr. Kalt is inaccurately and unreliably analyzing the data.

Given that Simon & Schuster and Penguin together account for more than half of Publisher Defendants' sales,[31] this leads to an egregious overestimate for the entire conspiracy. When corrected, Dr. Kalt's estimates fall from approximately 25 million to approximately 7.8 million. In other words, even under Dr. Kalt's (corrected) methodology, fewer than 8 million transactions over the entire class period were below true pre-agency prices, out of nearly 49 million transactions where the e-book sold at least one copy in the week before the launch of the iBookstore – and that is before appropriate adjustments are made for the predictable decline in e-book prices over their shelf life. Dr. Kalt's revised Figure 17 similarly overestimates the number of unit sales that went down in the first month after agency by a factor of at least three, before considering price declines due to the passage of time. Plaintiffs' recalculation of Dr. Kalt's Figure 17 is generally consistent with Dr. Gilbert's opinion during the liability phase,[32] an opinion with which *none* of Apple's three previous experts took issue. "[W]hen an expert purports to apply principles and methods in accordance with professional standards, and yet reaches a conclusion that other experts in the field would not reach, the trial court may fairly suspect that the principles and methods have not been faithfully applied."[33]

This goes far beyond a mere disagreement among experts. "[T]he trial court must scrutinize not only the methods used by the expert, but also whether those principles and

---

[31] Dr. Gilbert estimated that Penguin and Simon & Schuster accounted for 26.8 percent of all e-books sold as of April 1, 2010; Hachette, HarperCollins, and Macmillan combined for 22.1 percent. Ex. 2, ¶ 36, Table 1.

[32] Ex. 2, ¶ 158.

[33] Fed. R. Evid. 702 Notes of Advisory Committee on 2000 Amendments.

methods have been properly applied to the facts of the case."[34] By treating agency prices as "pre-agency prices," Dr. Kalt has improperly applied his methodology (whatever its merits) to the facts of his case, basing his opinions on "demonstrably false assumptions."[35] His erroneous opinions would mislead the jury into believing that prices set entirely by the conspirators after the onset of the conspiracy were actually competitive, free-market prices. His testimony is based neither on sufficient facts nor reliable application of his methods to the facts of the case. He thus should be precluded from opining about pre-agency prices or post-agency prices.

### 2.  Dr. Kalt Ignored Evidence of a Pricing Structure, then Opined That None Existed Without Econometric Analysis and Suggested Variables at Odds with Publishers' Pricing Practices

As a central plank of his opposition to class certification, Dr. Kalt opines that the differentiated nature of e-books "would not be expected to produce a 'price structure,'" but instead "would be expected to produce highly dispersed and unstable pricing."[36] Dr. Kalt's hypothesis is wrong as a matter of fact and economic theory: the documentary and statistical evidence shows that e-books were subject to a price structure both before and after the inception of the conspiracy, and prices during the conspiracy exhibited an elevated pricing structure across the board. As with Dr. Kalt's "pre-agency" prices, his erroneous conclusion is based not on a legitimate dispute for a jury to decide but a complete lack of understanding of record facts.

As noted in Dr. Noll's opening report, the Court found the Publisher Defendants' pricing during the conspiracy exhibited a pricing structure, with "the Publisher Defendants collectively

---

[34] *Id.*; *accord Ho Myung Moolsan, Co. Ltd. v. Manitou Mineral Water, Inc.*, No. 07-cv-7483, 2010 WL 4892646, at *5-6 (S.D.N.Y. Dec. 2, 2010) (excluding opinion where the "factual basis for the opinion . . . did not exist").

[35] *Tse v. Ventana Med. Sys., Inc.*, 123 F. Supp. 2d 213, 227 (D. Del. 2000); *see also, e.g., Brooke Group*, 509 U.S. at 242 ("[W]hen indisputable record facts contradict or otherwise render [an expert] opinion unreasonable, it cannot support a jury's verdict.").

[36] Kalt Decl., ¶¶ 58-59.

pric[ing] 85.7% of their New Release titles sold through Amazon and 92.1% of their New

Release titles sold through Apple within 1% percent of the price cap. This was also true for

99.4% of the NYT Bestseller titles on Apple's iBookstore, and 96.8% of NYT Bestsellers sold

through Amazon."[37] Neither Dr. Kalt nor Mr. Orszag disputes these calculations, nor did Apple

contradict them in the liability phase.[38] Dr. Kalt offers no opinion on their accuracy.[39]

So how did Dr. Kalt conclude that there is no price structure in the industry, when new

releases and bestsellers were priced almost unfailingly at (or within 1% of) the explicit caps in

the conspiratorial agency agreements? By ignoring documentary and statistical evidence that

establishes definitively that the Publisher Defendants intentionally created price structures for all

of their e-books as one of their first steps in implementing the conspiracy.

First, take the documentary evidence. As one of their first steps in implementing the

conspiracy, the Publisher Defendants developed precise algorithms to set their e-book prices.

Every one of the five Publisher Defendants imposed a pricing grid to set both frontlist and

backlist e-book prices formulaically.[40] These categorical pricing rules set each title's price based

on (1) the list price of the corresponding title in physical format; (2) the available physical

formats of the title (i.e., hardcover, trade paperback, or mass market paperback); (3) the age of

the title (i.e., whether it was "frontlist" or "backlist"); and (4) whether the title was on a *New

York Times* Best Seller list. In many instances, backlist prices were actually **higher** than prices

---

[37] *Apple*, 2013 U.S. Dist. LEXIS 96424, at *109-110.

[38] *See* Ex. 8 at 51:2-53:7.

[39] *Id.* at 59:6-60:21.

[40] *See* Ex. 33 (Hachette "Agency TOS Pricing Matrix" as of April 8, 2010); Ex. 34 (HarperCollins "Price Range" grid as of Mar. 18, 2010); Ex. 35 (Macmillan "Agency Model Day 1 Pricing Recommendation" as of May 20, 2010); Ex. 36 (Penguin "Suggested eBook Pricing as of March 15, 2010"); Ex. 37 at SS00001073 ("S&S eBook Pricing Cheat Sheet" as of Apr. 9, 2010); *see also, e.g.*, Ex. 38 at PEN00072031 (October 2010 Penguin Board discussion paper: "Our current methodology for e-book pricing is essentially an algorithm of print prices (front list grid or discount off backlist print price).").

for new release e-books with a physical equivalent at the same price.[41] Contemporaneous

evidence suggests Publisher Defendants intended these pricing grids to be followed closely.[42]

Dr. Kalt claims that he reviewed this evidence but decided that it wasn't "pertinent to

[his] analysis."[43] Asked about publishers' price grids, he admitted having "read about things like

that," and acknowledged that some evidence in the data was "consistent with some kind of

formula, grid, or rule," but stated that he did not find it necessary to explore the issue further.[44]

In other words, he saw documentary evidence on the precise issue about which he was opining,

and saw that statistical evidence was consistent with that documentary evidence – but then

disregarded that evidence and formed the opposite conclusion. He displayed almost complete

ignorance of how the Publisher Defendants actually set prices, admitting that he has no idea what

variables any Publisher Defendant or publishers generally uses in setting list prices or retail

---

[41] *See, e.g.*, Ex. 34 (compare adult backlist paperbacks to adult frontlist or new release titles); Ex. 36 at PEN00006604 (compare backlist hardcovers to frontlist hardcovers for titles with print price ≥ $12.95; compare backlist paperbacks to frontlist paperbacks for titles with print price ≥ $11.95); Ex. 37 at SS00001073 (compare backlist to frontlist for titles with pBook MSRP ≥ $13.00).

[42] *See, e.g.*, Ex. 39 (Penguin President Susan Kennedy: "If the [imprint] publisher wishes to consider a different price from the one recommended, you would talk to me or [CEO] David [Shanks]."); Ex. 40 (Macmillan Senior Executive: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); Ex. 59 (Simon & Schuster Director of Business Intelligence Bill Kinneman: "We agreed that the lowest ebook price would be $5.99, so I applied that as a floor price."; Simon & Schuster Executive Vice President and Publisher, Simon & Schuster Children's Publishing Division: "I think we go with using the backlist pricing model on all existing children's titles whether they're frontlist or backlist."); Ex. 33 (Hachette Senior Vice President Maja Thomas: "The short answer is no: No HBG ebooks will be priced less than the mass market edition."); *see also, e.g.*, Mar. 21, 2013 Penguin 30(b)(6) deposition (David Shanks), at 159:24-25 ("[W]e definitely raised the prices on our trade paperback books when we could.").

[43] *See, e.g.*, Ex. 8 at 295:9-13; *see generally id.* at 282:7-311:21. He also revealed a fundamental misunderstanding of the price caps in the agency agreements, believing the caps to be "keyed off list prices, digital list prices, for example." *Id.* at 60:8-11. The caps were keyed off *hardcover* list prices, not digital list prices.

[44] *See id.* at 306:10-23; 309:23-310:8; *see also id.* at 238:12-239:5 (acknowledging that Fig. 9 shows that between 55 percent and 60 percent of e-book transactions prior to agency occurred in just two price bands).

prices, or when in the life of a book or e-book publishers set those prices.[45] Dr. Kalt's complete lack of understanding of even the most basic facts about how e-book prices were actually set – both in the pre-agency and agency periods – is striking and revealing. The only information he relied on to understand publishers' price-setting practices was his "knowledge that they're . . . profit-seeking enterprises."[46] As Mr. Orszag acknowledged, the Publisher Defendants have "more expertise and expertise in the pricing of digital media and digital content" than an economist with no background in the e-book industry,[47] but Dr. Kalt neglected to even consider the evidence that could be gleaned from their knowledge and conduct.

Dr. Kalt's complete disinterest in the Publisher Defendants' pricing formulae is inexplicable in light of his assertion that *Amazon's* precise pricing algorithm is indispensable to an understanding of pre-conspiracy pricing. Dr. Kalt opines that "[a]bsent detailed knowledge of the operation of Amazon's pricing system, a reliable understanding of the economics underlying Amazon's pricing of e-book titles during the pre-agency period, i.e., the time over which Amazon's practices dominated the retail pricing of e-books, is not realistically possible."[48] This is utterly irreconcilable with Dr. Kalt's repeated insistence that Publisher Defendants' pricing formulae are not pertinent to his analysis, and suggests that one or both of his arguments are outcome-driven. It is also inconsistent with Dr. Kalt's utter failure to consider the summary of Amazon's pricing formula that was produced during the litigation and cited by Dr. Noll in his opening declaration.[49] Despite his supposed need for information of this sort, Dr. Kalt does not

---

[45] *Id.* at 282:7-311:21.

[46] *Id.* at 301:14-21.

[47] Ex. 9 at 231:4-15, 232:22-233:2.

[48] Kalt Decl., ¶ 43(a).

[49] *See* Corrected Declaration of Roger G. Noll at 10 n.3, Oct. 21, 2013, ECF No. 428 (citing AMZN-TXCID-0009667-8 (Ex. 59)).

even attempt to show that pre-agency pricing deviated materially from this summary. Where an expert opines that certain information is essential to a proper assessment, but then inexplicably ignores that information, his opinion cannot be reliable.[50]

Handicapped by his ignorance of Publisher Defendants' *actual* price-setting methods and considerations, Dr. Kalt is unable (or unwilling) to see the unmistakable structure in Defendants' pricing. Dr. Kalt compounds the problem by refusing to work with data that could reveal the price structure. Asked about the Court's previous findings regarding the correspondence of actual price caps to the stated price caps, Dr. Kalt asserted that "[t]he data were not complete enough . . . for me to do a systematic measurement of that."[51] This is a curious response, given that Apple's counsel previously described the dataset as "the largest and most comprehensive database of transactional eBook sales"[52] ever compiled, that Apple's own expert Dr. Michelle Burtis was able to testify to the percent of new release e-book sales at or below the price caps,[53] and that Apple declined to challenge the accuracy or reliability of Dr. Gilbert's calculations, which the Court previously accepted. Nor is the data remotely incomplete on this point. The only information needed to calculate Publisher Defendants' adherence to the price caps is (a) the date and price of each sale; (b) the historical *New York Times* bestseller lists; (c) the release date of each title; and (d) the list price of the equivalent physical book then available in the market. All of this data was provided in discovery. If any of this data were missing from the transactional data produced by retailers, it was easily available from other sources. Perhaps the data would not be perfect – but it would be vastly preferable to Dr. Kalt's approach, which is to forego any

---

[50] *See Amorgianos*, 303 F.3d at 268-69.

[51] Ex. 8 at 60:11-13.

[52] Ex. 11.

[53] Ex. 63, ¶¶ 51-52 & Table 8.

econometric analysis at all.[54] Having intentionally blinded himself to the forest, Dr. Kalt should not be permitted to inform the jury that there are only trees.

Despite his avowed disinterest in how publishers set prices and his decision not to construct an alternative model, Dr. Kalt opines that Dr. Noll's selection of variables in his regression is flawed and suggests alternative variables.[55] These suggestions have no basis in how publishers and retailers *actually* set e-books prices.[56] Dr. Kalt's testimony makes clear that he does not have the slightest idea how the Publisher Defendants actually set prices – and, in particular, what variables they actually consider so he has no reliable basis for offering expert testimony on this subject.[57] "Without some theory about which variables are likely to matter, throwing a great number of variables into the hopper is likely to lead to spurious results."[58]

Moreover, Dr. Kalt ignores the fact that Dr. Noll's regression model *already* incorporates a buzz variable. Dr. Noll utilizes an indicator variable for each title that accounts for a title's idiosyncratic characteristics.[59] Unless Dr. Kalt is implying that some titles would have been more favorably reviewed in the but-for world, or some movie tie-ins less popular (an absurdly speculative assumption), his criticism has already been answered. Dr. Kalt refuses to acknowledge that a fixed effects model such as Dr. Noll uses is designed to account for heterogeneity unrelated to a variable of interest.[60] Instead, he ridicules the very idea of a fixed

---

[54] *See, e.g., Gaskin v. Sharp Elecs. Corp.*, No. 05-cv-0303, 2007 U.S. Dist. LEXIS 65532, at *24-25 (N.D. Ind. Aug. 31, 2007) ("[T]his Court is troubled that Dyl did not conduct any scientific tests or experiments to bolster his theory . . . .").

[55] Kalt Decl., ¶¶ 29(a)-(b), 119(b)(2), 121, 124(a)-(b).

[56] The flaws in Dr. Kalt's suggestions are detailed in Class Plaintiffs' *Daubert* Opp'n at 13-18.

[57] *See* Ex. 8 at 287:4-311:21 and, in particular *id.* at 310:9- 311:21.

[58] ABA, Econometrics: Legal, Practical, and Technical Issues 11 (2005) (quoting *In re Polypropylene Carpet Antitrust Litig.*, 996 F. Supp. 18, 28 (N.D. Ga. 1997)).

[59] Noll Reply Report at 14-15.

[60] Noll Decl. at 24, 25 n.1.

effects model,[61] which is a "standard, peer-reviewed test[] with acknowledged reliability."[62] Dr. Kalt does not even attempt to explain how an econometric model could account for "buzz" in any other way, much less design and employ such an econometric model.

### 3. Dr. Kalt's Opinion on the Average Number of E-Book Purchases Is Based on Editing and Ignoring His Sources

Dr. Kalt repeatedly makes sweeping generalizations on the basis of insufficient or nonexistent data. One glaring example is his opinion that "substantial numbers of class members are likely to have purchased one or a small number of e-books during the damage period,"[63] an assertion central to his opinion that many class members may not have been injured. Dr. Kalt bases this proposition on two facts: that many iBookstore purchasers, who account for less than 10 percent of sales during the agency period, purchased only one or two titles *from the iBookstore*, and that Russell Grandinetti testified that "there may be people who buy our Kindle Fire device who don't really read much."[64] Dr. Kalt sees this as sufficient indication "that substantial numbers of consumers buy relatively few numbers of books."[65] To Dr. Kalt, the possibility that consumers buying few books from the iBookstore could be explained by a preference to get their books from the Kindle Store "would not be consistent with what we know from Amazon, where I quote you from Amazon where they say they're aware relatively – there's some customers they have that buy relatively few numbers of books."[66] As is the case throughout Dr. Kalt's report, "there is simply too great an analytical gap between the data and the opinion

---

[61] Kalt Decl., ¶¶ 119(c) n.138, 122 n.141, 133.

[62] *Gutierrez v. Johnson & Johnson*, No. 01-cv-5302, 2006 WL 3246605, at *8 (D.N.J. Nov. 6, 2006).

[63] Kalt Decl., ¶ 91.

[64] *Id.*, ¶¶ 91-91(b), Fig 8.

[65] Ex.8 at 219:14-17.

[66] *Id.* at 220:3-10.

proffered."[67]

As an initial matter, Dr. Kalt badly elides Mr. Grandinetti's testimony. Mr. Grandinetti's full testimony on that point reads "there may be people who buy our Kindle Fire device who don't really read much, *so the ebook business may not apply to those customers at all.*"[68] Mr. Grandinetti is not saying many Kindle e-books consumers purchase relatively few books; he is saying many Kindle Fire consumers *are not e-book purchasers at all*. This is unsurprising; the Kindle Fire is a multipurpose tablet used for video, music, games, email, and social media. If anything, this quote supports an obvious alternative to Dr. Kalt's hypothesis: that owners of multi-purpose tablets are unrepresentative of e-book consumers generally. It does nothing at all to refute the possibility that Dr. Kalt's group of consumers purchasing only "one or two" e-books are actually purchasing many e-books from other sources such as Amazon or Barnes & Noble.[69]

In fact, the available data shows that the majority of e-book consumers purchase one or two books *per month* on average – not one or two books over the entire two-year period, as Dr. Kalt concludes ████████████████████████████████████████

████████████████████████████████████[70] Dr. Kalt ignored this evidence,

---

[67] *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also, e.g., Fuesting v. Zimmer, Inc.*, 421 F.3d 528, 536 (7th Cir. 2005), *vacated in part on other grounds*, 448 F.3d 936 (7th Cir. 2006) ("Another indicator of unreliability is the unjustifiable extrapolation from an accepted premise to an unfounded conclusion.").

[68] Ex. 15, ¶ 26.

[69] Nor does it rule out alternatives with record support, such as customers returning to other stores after discovering the iBookstore lacked the breadth of other e-bookstores – a proposition that deeply worried Apple executives when they were pursuing Random House. *See, e.g., Apple*, 2013 U.S. Dist. LEXIS 96424, at *116 ("It was Cue's assessment that the iBookstore was not as successful as Apple had hoped because e-books from Random House, the largest of the Big Six, were not being sold there. Cue believes that consumers expect all the books they may want to buy to be available in a bookstore and when they cannot find what they want, they go elsewhere and may never return.").

[70] *See* Ex. 60 at AMZN-TXCID-0003795; Ex. 61 at AMZN-MDL-0003716.

*despite citing these very documents.*[71] Dr. Kalt claims that "to determine how many e-books the average Kindle owner downloads, he has "read the record, and even quote[d] to some of the record on what Amazon has said about it."[72] But if he has done so, he has done so in an unreliably selective fashion, ignoring evidence in his possession that refutes his conclusions.

**B.    Dr. Kalt's Opinions Based on Modal Pricing, Including His "Churn" and "Dispersion" Analyses, Are Based On Unreliable Principles and Methods.**

Where Dr. Kalt does purport to use economic techniques, rather than armchair speculation, his testimony is not based on "reliable principles and methods."[73] In offering opinions about alleged "churning" and "dispersion,"[74] Dr. Kalt used an unreliable and biased methodology by relying on modal prices, doing so inconsistently, and excluding large portions of the relevant data. These errors produce highly exaggerated and inaccurate results. Other portions of his testimony, including Figures 17 and 20 are defective for similar reasons.

Dr. Kalt's pervasive use of modal prices as the measure of e-book prices, without explanation, is simply baffling: the mode (as opposed to the mean or median), is "almost never" used in statistical analysis because it "is a poor indicator of price trends" and less reliable than standard measures of common price tendencies.[75] Indeed, one of the very sources he relies on explains that statistical analysis is ordinarily based on mean or median prices.[76]

---

[71] *See* Kalt Decl., ¶ 36(a) n.37.

[72] Ex. 8 at 236:3-9.

[73] Fed.R.Civ. P. 702(c)

[74] Kalt Decl., ¶¶ 57-76.

[75] Noll Reply Report at 28.

[76] *See supra* note 58 ABA, Econometrics: Legal, Practical, and Technical Issues at 207-08 ("In [common impact] disputes, economists have looked at both mean and median prices."); *id.* at 208 n.90 ("Economists use three different measures of central tendency: mean, median, and mode. . . . It is common to use either the difference in means or medians."). *See also* Noll Reply Report at 24-25.

Dr. Noll explains at length the problems with use of modal prices,[77] but the problem can be summed up easily in lay terms: Dr. Kalt's method virtually guarantees that outliers will skew his results. The vast majority of e-books sell few copies in their lives, let alone on any given day.[78] By focusing on daily modal prices, Dr. Kalt gives weight to every inaccuracy or anomaly in the data–every error of data entry, every delay in applying price changes, every glitch in a pricing algorithm, every customer credit input as a reduced price, and every storewide discount.

These "daily" modal prices are also useless for many of Dr. Kalt's purposes, given that most days for most books have *zero* transactions. Figure 14A and 14B, for example, purport to show that e-books do not necessarily change price at the same time or in the same direction. But Dr. Kalt ignores "days with no transaction," carrying through "the most recent prior transaction price."[79] In other words, the price changes attributed to specific days could have occurred days, weeks, or even months earlier.[80] Consider a title whose price was raised by Publisher Defendants on April 3, 2010, but did not sell any copies until sometime later. Dr. Kalt's Figures 14A and 14B report these titles as experiencing no change in price on April 3, 2010. Similarly, his Figure 17 simply omits titles that did not sell any copies for a month after April 3, 2010, drastically undercounting the number of titles that increased in price. This methodological error allows Dr. Kalt to misreport that "almost 90% of e-book titles' prices [did] not chang[e] at that time."[81]

Asked to justify this methodological decision, Dr. Kalt explained that these prices were "not in the market"– that "no one was willing to buy it" and "it's not a real price that anyone is

---

[77] Noll Reply Report at 24-28.

[78] Dr. Kalt reports that "the 96% of titles comprising just 20% of sales typically sell approximately 25 units." Kalt Decl., ¶ 53(a).

[79] Kalt Decl., Fig. 14A.

[80] *See*. Ex. 8 at 250:25-254:23.

[81] Kalt Decl., ¶ 69.

- 17 -

buying."[82] This is an incredible statement. Dr. Kalt is saying, essentially, that a conspiratorial price hike does not exist if consumers do not buy the product, and that a conspiracy that raises prices so high that consumers forgo purchases or switch to inferior substitutes (such as free public domain e-books) has no impact on consumers. Dr. Kalt's choice of an inappropriate methodology thus leads to manifestly inappropriate conclusions.

Dr. Kalt compounds this fundamental flaw by repeatedly mischaracterizing modal prices on *a single day* as "weekly modal prices" or even *monthly* modal prices. The phrase "weekly modal price" literally means the most commonly charged price that week. But rather than apply the phrase's actual meaning, Dr. Kalt identifies highest and lowest "weekly modal prices" by taking the highest or lowest *daily* modal price during that week and attributing it to the entire week.[83] Thus his "weekly" or "monthly" modal price could be a price sold only once.

Dr. Kalt's calculations of churn are also flawed because he has excluded *all titles with no price changes*, preordaining his preferred conclusion that churn exists.[84] This excludes a massive group of e-books: 27% of titles pre-agency, 30% post-agency, and 15% of titles for the entire period.[85] Dr. Kalt's methodology is thus unreliable for showing what it claims to prove.

**C.   Because Dr. Kalt's Opinions About Impact and Damages Are Contrary to Law and This Court's Findings, They Are Irrelevant and Could Only Confuse a Jury**

Even if his methodological and evidentiary flaws could be fixed, Dr. Kalt should be precluded from testifying about damages at trial for another overarching reason: An expert cannot help the trier of fact determine an issue of fact if he does not assess the legally relevant

---

[82] Ex. 8 at 254:10-20.

[83] *Id.* at 281:3-18.

[84] *See* Kalt Decl., Fig. 16A & 16B Note (chart only includes "title-pairs *that have varying prices*") (emphasis added).

[85] *See* Noll Reply Report at 38.

question.[86] A trial court should exercise its authority to exclude testimony "when parties proffer, through purported experts, not only unproven science . . . but markedly incorrect law."[87] Dr. Kalt's opinions (and, in particular, Figures 34A through 35B) are intertwined with propositions that are incorrect as a matter of law and answer legally irrelevant questions.

At this stage of the case, Plaintiffs must prove two elements of their claim: impact and damages.[88] As explained in Plaintiffs' reply brief, the standards for these two elements in a class case are well-established. Impact may be shown even if "some of the class members probably were net gainers from the alleged" misconduct,[89] so long as the class does not include a great many persons who "*could not* have been harmed."[90] And damages may be proven on an aggregate class-wide basis, so long as the estimated damages "roughly reflect the aggregate amount owed to class members."[91] Dr. Kalt's opinion is wholly irrelevant to these two inquiries.

As to damages, Dr. Kalt's reasoning and calculations say nothing about whether Dr. Noll's estimate "roughly reflect[s] the aggregate amount owed to class members";[92] they speak only to the reliability of *individual* calculations. Dr. Kalt pays lip service to the relevant question

---

[86] *See, e.g., Leverette v. Louisville Ladder Co.*, 183 F.3d 339, 341 (5th Cir. 1999).

[87] *Herbert v. Lisle Corp.*, 99 F.3d 1109, 1117 (Fed. Cir. 1996).

[88] Plaintiffs believe that impact will be proven by collateral estoppel at the summary judgment stage, but for purposes of this motion they are assuming that they will need to show impact at trial.

[89] *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 678 (7th Cir. 2009).

[90] *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825-26 (7th Cir. 2012); *cf. Wal-Mart Stores, Inc. v. Dukes*, _U.S._, 131 S. Ct. 2541, 2554 (2011) ("'[W]hether 0.5 percent or 95 percent of the employment decisions by Wal-Mart might be determined by stereotyped thinking' is the essential question on which respondents' theory of commonality depends."); *see generally* Class Plaintiffs' Reply in Support of Motion for Class Certification ("Class Cert. Reply") at 4-5, concurrently filed herewith.

[91] *Hickory Secs. Ltd. v. Repub. of Arg.*, 493 F. Appx. 156, 159 (2d Cir. 2012); *see generally* Class Cert. Reply at 8-10.

[92] *Id.* at 158.

- 19 -

in his opening summary,[93] but never explores it in his analysis. The thrust of Dr. Kalt's critique of Dr. Noll's regression analysis is that his methodology "has no other option but to measure *average* percent overcharges," thereby "obscur[ing] the diversity of variation in titles' pricing."[94] He concludes that Dr. Noll's model is not "able to reliably identify the fact and magnitude of damages for *individual* e-book buyers."[95] But he notably does not opine that the aggregate amount is incorrect. Instead, he merely posits that Dr. Noll's methodology could produce errors at the individual level in either direction.[96]

The most Dr. Kalt attempts to do is show that Dr. Noll's estimates may not be precise *to the penny*. In Figures 34 through 35, he estimates (unreliably, as described below) that some 10 to 15 million of the 150 million transactions in the class period occurred below Dr. Noll's but-for price. As he conceded at his deposition, Dr. Kalt did not calculate the effect on revenue – or even how many of the supposed misestimates were off by a single cent.[97] That was simply not "pertinent" to Dr. Kalt; to Dr. Kalt, an estimate off by even "1 cent" is "unreliable."[98]

Dr. Kalt's one-cent standard is irreconcilable with the Second Circuit's rule that damages need only "roughly reflect the aggregate amount owed to class members."[99] It flies in the face of decades of unbroken precedent explaining that "[t]he wrongdoer is not entitled to complain that

---

[93] Kalt Decl., ¶ 17 ("I further find that Prof. Noll's methodology and conclusions (whether related to injury or damage, individual or aggregate) are speculative, unreliable, or otherwise unreasonable as a matter of economics.").

[94] *Id.*, ¶¶ 117, 119.

[95] *Id.*, V.G (internal capitalization omitted; emphasis added).

[96] *See, e.g., id.*, Figs. 22, 34B, 35A, 35B; Ex. 8 at 156:19-24.

[97] Ex. 8 at 149:19-24, 150:5-22, 156:12-24.

[98] *Id.* at 150:20; 156:12-24.

[99] *Hickory Secs*, 493 F. Appx. at 159.

[damages] cannot be measured with . . . exactness and precision."[100] Because of Apple's conduct, we cannot know the exact pricing of the but-for world; Apple and its co-conspirators prevented Apple's competitors from setting those prices and prevented consumers from buying at them. To require accuracy *down to the penny* is the exact kind of "mathematical certainty"[101] that courts unanimously reject, and rightly so; it would mean the end to damages for every antitrust case and countless other torts. Dr. Kalt's belief that any under- or overestimate is unacceptable "is so all-encompassing and amorphous that it is of no utility in the context of this lawsuit."[102] Dr. Kalt appears to mean that a defendant cannot be made to pay out a cent in damages until plaintiffs have collected and analyzed every single transaction that has ever occurred by any plaintiff, defendant, or third party in not only the market at issue but all related markets. Indeed, Dr. Kalt seemed to testify that his report uses the phrase "common impact" to mean that *all* class members were injured.[103] This is not the law, and allowing Dr. Kalt to present his opinion to the jury on that basis could only confuse and mislead.

Moreover, the jury could only incorporate Dr. Kalt's opinion into a damages figure by pure guesswork, as Dr. Kalt makes *no* effort to calculate aggregate damages or the effect of his analysis on those damages.[104] Because "a verdict may not be based on speculation, whether the testimony comes from the mouth of a lay witness or an expert."[105] Apple may not encourage the jury to guess at a damages number based on Dr. Kalt's amorphous, unquantified opinion.

---

[100] *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931); *see also, e.g.*, *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013) ("Calculations need not be exact.").

[101] *In re Chocolate Confectionary Antitrust Litig.*, 289 F.R.D. 200, 223 (M.D. Penn. 2012); *see generally* Class Cert. Reply at 11.

[102] *Abuan v. Gen. Elec. Co.*, 3 F.3d 329, 333 (9th Cir. 1993).

[103] Ex. 8 at 16:25-20:9.

[104] *Id.* at 160:6-161:14.

[105] *Advent Sys. Ltd. v. Unisys Corp.*, 925 F.2d 670, 682 (3d Cir. 1991).

Dr. Kalt's opinion on impact is legally irrelevant for similar reasons. In his final four figures, he seeks to identify transactions where class members were not injured, but does so by manipulating elements of Dr. Noll's model in methodologically senseless ways. The simplest to explain is Figure 34B, which purports to identify individual transactions that occurred below a so-called "but-for price."[106] In this Figure, however, the "but-for price" is a meaningless number of Dr. Kalt's creation. He is subtracting out the percent overcharge from the *average* price for a given title, and the identifying transactions that occurred below that point. All that this can show is that individual titles did not always sell at the exact same price, and some transactions were more than the percent overcharge away from the mean. Take, for example, a title with an average price[107] of $6.99 and a percentage overcharge of 8%. *Any* purchase of that title below $6.47 would appear in Dr. Kalt's Figure 34B, no matter what the title sold for pre-agency. As explained above and in Dr. Noll's Rebuttal Report, this merely shows that there are some discounts or other price effects irrelevant to the conspiracy, and is incapable of identifying individuals or transactions that did not experience price increases.

Figures 34A, 35A, and 35B are variations on this theme: not attempts to show that transactions were free of the effect of the conspiracy, but obscure ways of observing that individual titles were not always sold at the same price. As Dr. Noll explains, this tells us nothing about the conspiracy's impact on individual transactions; it merely tells us that we are dealing with a complex market that does not lend itself to simplistic calculations like Dr. Kalt's.[108] They provide no evidence as to the relevant question: how widespread the conspiracy's impact is.

---

[106] Kalt Decl., ¶¶ 138-140(d).

[107] For some reason, Dr. Kalt uses average prices here, but not elsewhere in his report.

[108] *See* Noll Reply Report at 17-19.

**D.      Dr. Kalt's Offset Opinions Are Irrelevant and Merely Repeat Mr. Orszag's Flawed Testimony, and Should be Excluded for the Same Reasons**

Dr. Kalt believes "that sometimes illegal price-fixing conspiracies benefit many consumers," and that Apple's price-fixing conspiracy is among those procompetitive conspiracies.[109] This position is anathema to American antitrust law. "[P]rice-fixing agreements have been adjudged to lack any 'redeeming virtue . . . .'"[110] As explained in Plaintiffs' reply in support of class certification, no court has *ever* "required plaintiffs to account for potential decreases in the price of some products as the result of an alleged horizontal price-fixing conspiracy."[111]

Dr. Kalt wishes to testify in direct contradiction to both settled law and the conclusive findings of the liability case. This testimony could only serve to encourage the jury to disregard the Court's instructions on the law of antitrust and damages.  Dr. Kalt should be precluded from presenting any opinion to the jury about offsetting procompetitive benefits supposedly brought about by the conspiracy.

Furthermore, Dr. Kalt's testimony about offsets is facially unreliable. Dr. Kalt stated that neither he nor Mr. Orszag can offer a reliable estimate of whether 1 percent or 99 percent of the class, or any amount in between, was benefited by the alleged reduction in e-reader prices,[112] rendering both Dr. Kalt's and Mr. Orszag's opinions on this subject wholly speculative and inadmissible.[113] He similarly could not say whether it was probable that even 1% of the growth

---

[109] Ex. 8 at 213:18-20.

[110] *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 650 (1980).

[111] *In re Blood Reagents Antitrust Litig.*, 283 F.R.D. 222, 239 (E.D. Penn. 2012); *see generally* Reply Brief.

[112] Ex. 8 at 198:19-204:17.

[113] *See Boucher v. U.S. Suzuki Motors Corp.*, 73 F.3d 18, 21 (2d Cir. 1996).

in self-publishing was due to the iBookstore.[114] This bears emphasizing: ***Despite being pressed repeatedly, Dr. Kalt declined to offer an opinion that even one percent of the class was probably benefitted by the conspiracy.***[115] Moreover, in making his claims, Dr. Kalt simply echoes the opinions of Mr. Orszag.[116] His report sets forth no independent analysis on these issues, let alone econometric support for these "pro-competitive" benefits. As such, his testimony should be excluded on the same grounds that dictate exclusion of Mr. Orszag's views.[117]

      **Self-Publishing.** Dr. Kalt concedes that the percentage of Amazon e-book sales involving self-publishers ▮▮▮▮▮▮▮ between January 1, 2009 and January 1, 2010.[118] Not only does Dr. Kalt fail to perform any multivariate analysis to distinguish this growth from growth due to the iBookstore, he misunderstands foundational facts of his own argument – believing, for example, that Amazon was copying "Apple's terms for self-publishing, which were a component associated with the launching of the iBookstore," when in fact Apple did not announce self-publishing terms until months later.[119] And, notwithstanding Mr. Orszag's attempt to "illustrate" the amount of the growth in self-publishing during the agency period that was caused by the iBookstore, Dr. Kalt was unable to opine that even 1% of that growth was probably attributable to the iBookstore.[120] To the contrary, he testified that both he and Mr.

---

[114] Ex. 8 at 117:22-136:23.

[115] *Id.* at 198:19-204:17.

[116] *See, e.g., id.* at 185:5-188:13.

[117] *See* Memorandum of Law in Support of Class Plaintiffs' Motion to Exclude Expert Opinions Contained in the Declaration of Jonathan Orszag at 2-24, concurrently filed herewith; Noll Reply Report at 49-83.

[118] Ex. 8 at 107:17-109:24.

[119] *Id.* at 87:17-21; *see* Brian X. Chen, *Apple Invites Authors to Self-Publish on iPad Bookstore, Wired* (May 28, 2010), http://www.wired.com/business/2010/05/apple-invites-indie-authors-to-self-publish-on-ipad-bookstore/.

[120] Ex. 8 at 119:2-120:6 (it would be "speculating" to attribute even one percent of the growth in self-publishing to the illegal conspiracy); *see also id.* at 123:19-124; 135:22-136:23.

Orszag lack any reliable basis to quantify it.[121]

**Purchases Through the iBookstore.** Dr. Kalt concedes that (a) less than 10% of e-book purchases are through the iBookstore; (b) of these purchasers, 81% had a Kindle application on their iPad that they could have used; and (c) 33-40% of iPad owners also owned a Kindle (Dr. Kalt offers no opinion on the percentage that owned some other device, such as the Nook).[122] Of the tiny fraction that remain, Dr. Kalt has no opinion as to how many would not have simply downloaded a Kindle app to purchase e-books onto their iPad if the iBookstore had not been launched.[123] Mr. Orszag has testified that he assumes all iPad owners would have had access to the Kindle application absent the conspiracy.[124]

**E-Devices.** As explained in the *Daubert* motion relating to Mr. Orszag, his analysis of device pricing and e-book prices absent the conspiracy simply disregards the obvious response of Amazon if it had the profitability concerns Mr. Orszag asserts: it would have sought to reduce Publishers' wholesale margins, just as the Defendant Publishers anticipated. In the same manner, Dr. Kalt parrots Mr. Orszag's conclusions. Dr. Kalt has done no independent work on the issue and simply repeats Orszag's hopelessly flawed – and legally irrelevant – analysis.[125]

## III.    CONCLUSION

For the foregoing reasons, the court should strike Dr. Kalt's report, give his opinions as to class certification no weight, and preclude from testifying before the jury.

---

[121] Ex. 8 at 118:20-119:7; 133:6-16.

[122] *Id.* at 223:15-227:22.

[123] *Id.* at 231:8-20.

[124] Ex. 9 at 178:11-14.

[125] *Id.* at 185:5-188:13.

DATED:  December 18, 2013

HAGENS BERMAN SOBOL SHAPIRO LLP

By _____
STEVE W. BERMAN (*Pro Hac Vice*)

George W. Sampson (GS-8973)
Sean Matt
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
george@hbsslaw.com

Jeff D. Friedman (*Pro Hac Vice*)
Shana Scarlett (*Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone:  (510) 725-3000
Facsimile:  (510) 725-3001
jefff@hbsslaw.com
shanas@hbsslaw.com

Kit A. Pierson (*Pro Hac Vice*)
Emmy L. Levens
Jeffrey Dubner (JD4545)
COHEN, MILSTEIN, SELLERS & TOLL, PLLC
1100 New York Avenue, N.W.
South Tower, Suite 500
Washington, D.C.  20005
Telephone:  (202) 408-4600
Facsimile:  (202) 408-4699
kpierson@cohenmilstein.com
elevens@cohenmilstein.com
jdubner@cohenmilstein.com

- 26 -

Douglas Richards (JR6038)
COHEN, MILSTEIN, SELLERS & TOLL, PLLC
88 Pine Street, 14th Floor
New York, NY 10005
Telephone: (212) 838-7797
Facsimile: (212) 838-774
DRichards@cohenmilstein.com

*Co-Lead Counsel for Plaintiffs*

010260-11 662383 V1