# EXHIBIT 2



# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>APPLE, INC., et al., )<br>)<br>Defendants. )<br>) | Civil Action No. 12-cv-2826 (DLC) |

## Direct Testimony of Richard J. Gilbert, Ph.D.

Penguin Group, Random House, Inc., and Simon & Schuster, Inc. (collectively, the "Big Six"). Random House is the only member of the Big Six that is not a defendant publisher.

36. Table 1 displays the Big Six publishers' shares of revenue from retail sales of trade e-books in the United States during the first quarter of 2010.[11] The titles of the defendant publishers collectively account for 48.8% of all U.S. retail trade e-book sales, averaged over this quarter.

Table 1: Publishers' revenue shares of U.S. e-book sales, First Quarter, 2010

| Publisher[12] | Revenue Share, 1st Quarter, 2010[13] |
|---|---|
| Penguin | 19.5% |
| Random House | 18.2% |
| HarperCollins | 9.3% |
| Hachette | 8.1% |
| Simon & Schuster | 7.3% |
| Macmillan | 4.7% |
| All others ("non-majors") | 33.0% |

37. The largest U.S. retailers of trade e-books are Amazon, Apple, Barnes & Noble, Google, Kobo, and Sony. Each of these companies also sells devices that can be used to read e-books—either dedicated reading devices that feature black-and-white e-ink screens ("e-readers") or multipurpose tablet devices with color LCD screens ("tablets"), or both. Table 2 displays, during the first quarter of 2010, each retailer's share of revenue from retail e-book sales in the United States.

---

[11] In all of my analyses with retailer data, I eliminated from consideration any title whose genre metadata indicated it was not a trade book.
[12] The defendant publishers are indicated by shading in Table 1.
[13] The publishers' shares were calculated for the period Sunday, January 3, 2010 through Saturday, March 27, 2010, from sales data from Amazon, Barnes & Noble, Kobo, and Sony. (Apple and Google were not e-book retailers during this period.).

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

9

### V.B.1. Defendant publishers successfully negotiated agency agreements with Amazon.

110. In the four months following the unveiling of the iPad, all five defendant publishers successfully negotiated agency agreements with Amazon. Amazon would have been better able to resist demands that it surrender retail pricing authority to an individual defendant publisher than it was to resist essentially simultaneous, identical demands from all five.[70] Individually, each defendant publisher accounted for less than 20% of Amazon's total e-book sales. Indeed, Amazon's top Kindle executive has testified that if Amazon had believed "that Macmillan was the only publisher that was going to require agency terms, we would not have negotiated the agency contract with them at the time."[71]

111. The five defendant publishers together, however, accounted for approximately 50% of Amazon's e-book sales. And Amazon understood that all five were committed to seeking agency agreements. As the same Amazon executive testified:

> it was made clear to us by Simon and Harper and Macmillan and Hachette and Penguin, they were all going to require to us move to agency. And because we faced having to make that change with all of them simultaneously, . . . we knew that once the precedent was established, we were going to have to reach agency agreement with all five.[72]

112. In achieving agency at Amazon, defendant publishers achieved one of their primary goals and removed one of the drivers of Amazon's popularity with consumers: Amazon's low prices for just-released and bestselling e-books. This had two effects that would further the defendant publishers' other goals that I discussed in Section IV. First, a reduction in

---

[70] Google was similarly unable to resist the collective group of publishers demanding agency. Turvey Direct ¶ 5 ("Although Google would prefer to obtain ebooks from publishers under the wholesale model, it accepted agency terms from the largest trade publishers because these publishers produce works that account for a significant percentage of the most popular new books in the U.S. book trade (including a large percentage of titles from the New York Times Bestseller List), representing a large percentage of a retailer's revenue.").
[71] Russell Grandinetti Dep. (Jan. 28, 2013), 291:4–7.
[72] Russell Grandinetti Dep. (Jan. 28, 2013), 290:5–14.

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

and bestselling titles.)

**Table 5: Summary of e-book price increases at Amazon and Barnes & Noble by defendant publishers from shortly before to shortly after agency[106]**

Amazon Average Per Unit Price Increases

| Publisher | All e-books | New Releases | NYT Bestsellers | Backlist |
|---|---|---|---|---|
| Hachette | 33.0% | 14.1% | 37.9% | 37.5% |
| HarperCollins | 13.6% | 12.5% | 44.0% | 15.2% |
| Macmillan | 11.6% | 14.0% | - | 11.2% |
| Penguin | 18.3% | 19.5% | 43.6% | 17.6% |
| Simon & Schuster | 18.0% | 15.1% | 28.7% | 19.8% |
| Defendant Publishers | 18.6% | 14.2% | 42.7% | 19.6% |
| Random House | 0.01% | 1.9% | 0.2% | 0.3% |
| Non-Majors | -0.2% | -0.9% | 1.1% | -0.1% |

Barnes & Noble Average Per Unit Price Increases

| Publisher | All e-books | New Releases | NYT Bestsellers | Backlist |
|---|---|---|---|---|
| Hachette | 36.0% | 16.5% | 38.2% | 34.4% |
| HarperCollins | 23.6% | 42.5% | 43.4% | 18.2% |
| Macmillan | 11.3% | 7.2% | - | 13.6% |
| Penguin | 14.4% | 9.7% | 9.3% | 15.4% |
| Simon & Schuster | 20.0% | 17.1% | 30.0% | 22.4% |
| Defendant Publishers | 19.9% | 19.0% | 15.8% | 19.5% |
| Random House | -0.2% | 0.5% | 0.0% | 1.2% |
| Non-Majors | 2.3% | -3.1% | 1.1% | 3.7% |

150. These results show that the average per unit retail prices at Amazon and Barnes & Noble of the titles of each defendant publisher increased significantly between the defendant publisher's pre-switch week and post-switch week.

151. The increase in average prices for e-books that I found in my analysis of retail transaction data also is reflected in market participants' contemporaneous documents. Both

---

consumers.)  I then calculated the percentage change in prices for each title between these two weeks and computed a weighted average percentage change in price across all titles sold in both weeks using their units in the post-agency week as weight.

[106] The weeks ending March 20, 2010, and April 17, 2010, are used to compute price changes, with the exception of Penguin at Amazon, for which the weeks ending May 15, 2010, and June 12, 2010.  Free units are excluded.

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

53

158.     Defendant publishers and Apple contend that while retail prices of some of defendant publishers' e-books increased following the switch to agency pricing, others decreased or remained the same.  While there were some sales of titles for which defendant publishers set lower prices post-agency, Figure 6 shows that these amounted to no more than 12.2% of unit sales; 4.9% of sales were of titles whose price did not change post-agency.  The vast majority of post-agency sales (more than 80%) were of titles for which the price increased after agency—the weighted average price increase on defendant publishers' titles was 18.6%.  Additional histograms of the price distribution of each defendant publisher are attached to my February 8, 2013 report in Appendix C.



**Figure 6: Distribution of price changes (from pre- to post-switch) for defendant publishers combined show that prices increased significantly after the switches to agency**

**VII.B.1.   Dr. Burtis's empirical findings also show that average retail prices of defendant publishers' e-books increased following the switch to agency and remained high.**

159.   Consistent with my findings, defendants' expert Dr. Burtis found that "average prices for Publisher Defendants' eBooks increased—in varying amounts—in the period after the [initial implementation of the][113] Apple agency agreements."[114, 115] Graph 1 in Dr. Burtis's initial report showed that the elevations in average prices of defendant publishers' e-books were

---

[113] It is clear from the context of Dr. Burtis's statements that she intended the phrase "after the Apple agency agreements" to refer to a period beginning approximately April 1, 2010, as opposed to a period after the Apple Agency Agreements are no longer in effect. *See, e.g.*, the vertical dashed line in Dr. Burtis's Graph 1.
[114] Burtis Report ¶ 25.
[115] Dr. Burtis calculated the average prices over transactions at Sony, Amazon, Barnes & Noble, Apple, Google, Books-A-Million, and Kobo. Burtis Report, Graph 1.

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER          60

effect—embodies two distinct errors.

172. First, Dr. Burtis used the average price of *all publishers'* e-books to measure harm to consumers who paid higher prices on defendant publishers' e-books, regardless of whether publishers of those e-books adopted agency pricing at Amazon or other e-book retailers.

173. It is appropriate to look at the prices of only the defendant publishers' titles because there is a clearly identified hypothesis that the adoption of the Apple Agency Agreements led to higher prices for defendant publishers' titles. In fact, Dr. Burtis agreed that the agency agreements caused the price increases.[128] Furthermore, there is no reason to expect that other publishers' prices should fall as a consequence of the adoption of the Apple Agency Agreements by the defendant publishers. Thus it is sufficient to show that defendant publishers' titles increased in price in order to show consumer harm. My analysis, however, also shows that the average price of all trade e-books rose significantly after the adoption of the agency agreements. At the time of their adoption, the defendant publishers accounted for approximately 50% of the trade e-book market. Table 5 shows that their average price rose more than 18% while Random House and independent publishers were little changed. That implies a price increase over all trade e-books of approximately 9%. Because, as discussed below, Dr. Burtis used a long window and failed to control for any other factors affecting pricing of e-books, incorporating the prices of non-defendant publishers only has the effect of biasing her results.

174. Second, Dr. Burtis used very long time periods before and after the implementation of the Apple Agency Agreements to evaluate its effect. Each window is approximately two years in duration, it is inappropriate to use such long time periods to determine the effect of the initial implementation of the Apple Agency Agreements, an event that

---

[128] Michelle Burtis Dep. (Apr. 5, 2013), 76:2–21.

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER

self-published authors would make Amazon a more attractive place for self-published authors to distribute their works and perhaps encourage more output from self-published authors, but the Apple Agency Agreements had the opposite incentives. The Apple Agency Agreements lowered the compensation to both publishers and authors and increased prices for existing e-books.[212] To the extent that Amazon's self-publisher contract encouraged an increase in output by increasing self-published author compensation, the Apple Agency Agreements likely discouraged additional output because it limited compensation to both publishers and authors.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on April 25, 2013, in Oakland, California.

Respectfully,

*Richard J. Gilbert*

Richard J. Gilbert, Ph.D.

---

[212] *See* Section IV.C.3, *infra*.

CONTAINS MATERIALS DESIGNATED AS HIGHLY CONFIDENTIAL PER PROTECTIVE ORDER