# EXHIBIT 6

Gibson Dunn & Crutcher LLP
200 Park Avenue, 47th Floor
New York, New York 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

Attorneys for Defendant Apple Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- x

UNITED STATES OF AMERICA,

        Plaintiff,

  v.

APPLE INC., *et al.*,

        Defendants.

12 Civ. 2826 (DLC)

------------------------------------- x

------------------------------------- x

THE STATE OF TEXAS,
THE STATE OF CONNECTICUT, *et al.*,

        Plaintiffs,

  v.

PENGUIN GROUP (USA) INC., *et al.*,

        Defendants.

12 Civ. 03394 (DLC)

------------------------------------- x

USA v. Apple Inc., et al.
12-CV-02826-DLC

**DX-721**

opinions rest on an evaluation of competitive indicia, including changes in output and prices, in the alleged relevant market <u>as a whole</u>.

16.     Through my analysis of these data, I sought to convey all of the information that was available to me about the alleged relevant market.  Thus, I looked at the full range of transactional data produced in this litigation and compared price and output trends in the pre-agency period (from February 2008 through March 2010) with the post-agency period (from April 2010 through March 2012).

17.     It is also my opinion that the shift from the wholesale model to the agency model represented a significant change in the business model for selling eBooks.  Some of the effects of this change in business model, including any procompetitive benefits, would not be immediately apparent in the transactional data.  Analysis by Plaintiffs' experts, who for the most part evaluate indicia of competition over shorter durations of time, is incapable of measuring any longer-term effects of the competition and innovation in the alleged relevant market post-agency.

### III. Average Prices of eBooks in the Alleged Relevant Market Fell Following the Agency Agreements

#### A. Average Retail Prices of eBooks in the Alleged Relevant Market Declined

18.     The average retail price of eBooks in the *alleged relevant market* was *lower* during the post-agency period than during the pre-agency period.  The weighted-average retail price for an eBook was <u>$7.97</u> between February 2008 and March 2010 (the period prior to the adoption of agency for which comparable transactional data were produced), compared with <u>$7.34</u> between April 2010 and March 2012 (the period after the initial adoption of agency for which comparable transactional data were produced).  I have prepared several demonstrative exhibits to illustrate my conclusions.  Tab 4 illustrates that the average retail price in the relevant

statistically significant difference in the growth rate of eBook sales after the agency agreements compared to prior to the agreements.

37. Professor Ashenfelter further concedes that he cannot conclude that Publisher Defendants sold fewer eBooks (relative to his Random House benchmark) in the post-agency period. As he testified during his deposition, Professor Ashenfelter has not ruled out the possibility that relative output of Publisher Defendants' titles did not decrease post-agency, because, rather than buying fewer books, consumers could simply have purchased a "different mix" of titles. (Snyder Decl., Ex. B at 121:20–123:3.) Professor Ashenfelter's analysis has a number of additional flaws: he examined only six months of sales after the first agency agreement, examined only certain of Publisher Defendants' titles, and used Random House as a benchmark, even though he admitted that his results may have been biased by Amazon's heavy promotion of Random House titles at the time. (*Id*. at 110:15–111:17.)

███████████████████████████████████████████████████

**V. Consumers Benefited from an Increase in Low-Priced Books Following the Agency Agreements**

39. The empirical evidence shows that eBook consumers benefitted from the tremendous growth in the independent publisher and self-publisher segments of the alleged relevant market following implementation of the agency agreements. Many of these publishers offered low-priced alternatives to eBooks published by Publisher Defendants. Plaintiffs' experts agree that eBooks published by independent publishers and self-published authors are substitutes for those titles published by Publisher Defendants. (Snyder Decl., Ex. A at 335:2–14; Ex. C at 91:2–25.)

Additionally, an increased number of eBook retailers sold an increased number of eBook titles in the post-agency period.

Dated: May 29, 2013

_____
DR. MICHELLE BURTIS