UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE ELECTRONIC BOOKS ANTITRUST LITIGATION | No. 11-md-02293 (DLC)<br>ECF Case |
| This Document Relates to:<br><br>ALL ACTIONS | <u>CLASS ACTION</u> |

**MEMORANDUM IN SUPPORT OF CLASS COUNSEL'S MOTION FOR AWARD OF
ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES
<u>RELATED TO APPLE SETTLEMENT</u>**

**TABLE OF CONTENTS**

I.    INTRODUCTION ......................................................................................................1

II.   THE WORK UNDERTAKEN BY CLASS COUNSEL......................................2

      A.    Apple Has Repeatedly Tried to Frame this Case as Involving Unique and
            Novel Issues.............................................................................................2

      B.    Coordinated and Civil Discovery.............................................................3

      C.    The Apple Trial with the Governmental Entities......................................4

      D.    Litigation of Class Certification...............................................................5

      E.    Class Certification Order, *Daubert* Rulings and Appellate Proceedings
            Relating to Class Certification .................................................................7

      F.    Summary Judgment and Litigation over Venue .......................................8

      G.    Class Notice and Appellate Proceedings ................................................9

      H.    Settlement Discussions with Apple ......................................................11

III.  ARGUMENT........................................................................................................12

      A.    Apple Has Agreed to Pay Class Counsel Attorney's Fees and Expenses
            Equivalent to a Reasonable Percentage of the Benefit Conferred on
            Consumers..............................................................................................12

      B.    Class Counsel's Request for Fees and Expenses Is Supported by Each
            *Goldberger* Factor................................................................................15

            1.    The Time and Labor Expended by Class Counsel Support the
                  Requested Fee .............................................................................15

            2.    The Magnitude and Complexity of the Litigation Supports the
                  Requested Fee .............................................................................15

            3.    The Risks Entailed in the Litigation Support the Requested Fee .............16

                  a.    No Governmental Actions Had Been Filed or Appeared
                        Likely to Be Filed When Plaintiffs Filed Their Action .................16

                  b.    Class Counsel's Resources Committed to the Case......................17

                  c.    Risks Arising from Substantive Issues ..........................................17

4.     The Quality of Representation Measured by the Outstanding Result Supports the Requested Fee ..................................................................18

       a.     The Results for Class Members Are Outstanding..........................18

       b.     Quality of Class Counsel ................................................................20

       c.     Quality of Defendants' Counsel.....................................................21

5.     The Requested Fee Is Consistent with the Size of the Settlement and Payments to the States.........................................................................22

6.     Public Policy Considerations Support the Requested Fee .........................23

C.     The Requested Fee Is Presumptively Reasonable in Light of Class Counsel's Lodestar...................................................................................................23

D.     Class Counsel's Expenses Are Reasonable .........................................................24

IV.     CONCLUSION...........................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Alpine Pharm., Inc. v. Chas. Pfizer & Co., Inc.*,
    481 F.2d 1045 (2d Cir. 1973)............................................................................12

*Beckman v. KeyBank, N.A.*,
    2013 U.S. Dist. LEXIS 60894 (S.D.N.Y. Apr. 29, 2013).......................................23

*Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan, Inc.*
    203 F.3d 1028 (8th Cir. 2000) ...........................................................................17

*Brennan v. N.Y. Law Sch.*,
    2012 U.S. Dist. LEXIS 135095 (S.D.N.Y. Aug. 15, 2012)....................................24

*City of Detroit v. Grinnell Corp.*,
    495 F.2d 448 (2d Cir. 1974)........................................................................16, 17

*Dewey v. Volkswagen of Am.*,
    728 F. Supp. 2d 546 (D.N.J. July 30, 2010) ......................................................14

*Goldberger v. Integrated Res., Inc.*,
    209 F.3d 43 (2d Cir. 2000)...............................................................12, 15, 16

*Hawaii v. Standard Oil Co. of Cal.*,
    405 U.S. 251 (1972)........................................................................................12

*Hess v. Sprint Comm'cns Co. L.P.*,
    No. 11-cv-35, 2012 WL 5921149 (N.D. W. Va. Nov. 26, 2012) ...........................13

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
    2009 WL 3077396 (E.D.N.Y Sept. 25, 2009) ....................................................22

*In re Am. Bank Note Holographics, Inc.*,
    127 F. Supp. 2d 418 (S.D.N.Y. 2001)................................................................17

*In re Baby Food Antitrust Litig.*,
    166 F.3d 112 (3d Cir. 1999)............................................................................17

*In re Carbon Dioxide Indus. Antitrust Litig.*,
    229 F.3d 1321 (11th Cir. 2000) .......................................................................17

*In re Citric Acid Litig.*,
    191 F.3d 1090 (9th Cir. 1999) .........................................................................17

*In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig*,
    2010 WL 3341200 (W.D. Ky. Aug. 23, 2010) ...............................................................13, 22

*In re Currency Conversion Fee Antitrust Litig*.,
    263 F.R.D. 110 (S.D.N.Y. 2009) ...........................................................................................19

*In re Enron Corp. Sec., Derivative & ERISA Litig*.,
    586 F. Supp. 2d 732 (S.D. Tex. 2008) ..................................................................................24

*In re Folding Carton Antitrust Litigation*,
    84 F.R.D. 245 (N.D. Ill. 1979)..............................................................................................19

*In re Freddie Mac Sec. Litig*.,
    No. 03-CV-4261 (JES), slip. op. (S.D.N.Y. Oct. 27, 2006) ..................................................22

*In re Initial Pub. Offering Sec. Litig*.,
    671 F. Supp. 2d 467 (S.D.N.Y. 2009)....................................................................................22

*In re Linerboard Antitrust Litig*.,
    321 F. Supp. 2d 619 (E.D. Pa. 2004) ....................................................................................19

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig*.,
    246 F.R.D. 156 (S.D.N.Y. 2007) .....................................................................................12, 21

*In re The Mills Corp. Sec. Litig*.,
    265 F.R.D. 246 (E.D. Va. 2009) ...........................................................................................22

*In re NASDAQ Market-Makers Antitrust Litig*.,
    187 F.R.D. 465 (S.D.N.Y. 1998) ...........................................................................12, 19, 21, 24

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig*.,
    986 F. Supp. 2d 207 (E.D.N.Y. 2013) ...................................................................................19

*In re TFT-LCD (Flat Panel) Antitrust Litig*.,
    2013 U.S. Dist. LEXIS 49885 (N.D. Cal. Apr. 1, 2013) .......................................................19

*In re Towers Fin. Corp. Noteholders Litig*.,
    1996 U.S. Dist. LEXIS 2311 (S.D.N.Y. Jan. 17, 1996) ........................................................24

*In re Visa Check/Mastermoney Antitrust Litig*.,
    297 F. Supp. 2d 503 (E.D.N.Y. 2003) ...................................................................................15

*In re Vitamin C Antitrust Litig*.,
    2012 U.S. Dist. LEXIS 152275 (E.D.N.Y. Oct. 23, 2012).............................................24, 25

*In re Warfarin Sodium Antitrust Litig*.,
    391 F.3d 516 (3d Cir. 2004)..................................................................................................19

*In re WorldCom, Inc. Sec. Litig.*,
   388 F. Supp. 2d 319 (S.D.N.Y. 2005)...................................................................23

*In re WorldCom, Inc. Sec. Litig.*,
   No. 02 Civ. 3288, 2004 U.S. Dist. LEXIS 22992 (S.D.N.Y. Nov. 12, 2004) ........................23

*J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc.*,
   485 F.3d 880 (6th Cir. 2007) ...............................................................17

*Loudermilk Servs., Inc. v. Marathon Petroleum Co. LLC*,
   623 F. Supp. 2d 713 (S.D. W. Va. 2009)...................................................22

*McDaniel v. Cnty. of Schenectady*,
   595 F.3d 411 (2d. Cir. 2010).................................................................23

*Muhammad v. Nat'l City Mortg., Inc.*,
   2008 WL 5377783 (S.D. W. Va. Dec. 19, 2008).........................................22

*Perma Life Mufflers, Inc. v. Int'l Parts Corp.*,
   392 U.S. 134 (1968)...............................................................................12

*Pillsbury Co. v. Conboy*,
   459 U.S. 248 (1983)...............................................................................12

*Ramirez v. Lovin' Oven Catering Suffolk, Inc.*,
   2012 U.S. Dist. LEXIS 25060 (S.D.N.Y. Feb. 24, 2012).........................24

*Reiter v. Sonotone Corp.*,
   442 U.S. 330 (1979)...............................................................................12

*Shaw v. Toshiba Am. Info. Sys., Inc.*,
   91 F. Supp. 2d 942 (E.D. Tex. 2000)......................................................12

*Superior Offshore Int'l, Inc. v. Bristow Grp, Inc.*,
   490 Fed. Appx. 492 (3d Cir. 2012).........................................................17

*Wal-Mart Stores, Inc. v. Dukes*,
   131 S. Ct. 2541 (2011)..............................................................................6

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
   396 F.3d 96 (2d Cir. 2005)..........................................................12, 16, 23

*Williamsburg Fair Hous. Comm. v. N.Y. City Hous. Auth.*,
   2005 U.S. Dist. LEXIS 5200 (S.D.N.Y. Apr. 4, 2005).............................24

*Williamson Oil Co., Inc. v. Philip Morris USA*,
   346 F.3d 1287 (11th Cir. 2003) .............................................................17

010260-11 712824 V1

## FEDERAL STATUTES

28 U.S.C. § 1407(a) ...................................................................................................................9

## FEDERAL RULES

Federal Rules of  Civil Procedure 23 .....................................................................................7, 10

Federal Rules of  Civil Procedure 30(b)(6).................................................................................4

Federal Rules of Evidence 403 ...................................................................................................7

Federal Rules of Evidence 702 ...................................................................................................7

## SECONDARY AUTHORITIES

David B. Wilkins, *Rethinking the Public-Private Distinction in Legal Ethics: The
    Case of 'Substitute' Attorneys General*, 2010 Mich. St. L. Rev. 423, 469-70
    (2010) ...............................................................................................................................21

## I.     INTRODUCTION

Much as this Court found that Apple played a central role in facilitating and executing a conspiracy with the Publisher Defendants, so too did it play a core role in the defense of this civil action.[1] From the filing of the first motion to dismiss all the way through the settlement, Apple has required plaintiffs and the Court to expend significant resources responding to Apple's ill-disguised efforts to escape liability for classic price-fixing behavior by attempting to transform its behavior into pro-competitive conduct.    Along the way, Apple has been the leader in raising, at best, unique and novel arguments.  Apple was the sole defendant to oppose class certification or file motions to strike plaintiffs' expert, and the last defendant to settle.  And Apple filed a host of motions in an effort to seed the record for its appeal, ensuring that plaintiffs would incur expend greater resources than otherwise.

The proposed settlement represents an outstanding recovery to class members. In negotiating this settlement, the parties crafted a settlement that recognized the unique circumstances in this case:  Apple has unlimited resources to spend on the litigation, and the size of its total exposure – even after trebling – was less than one-half of one percent of Apple's cash on hand.  Thus, Apple could easily shoulder the risk of any jury verdict and, indeed, Apple could potentially benefit from years of delaying the class from receiving compensation, even if the class prevailed completely at trial and on appeal.  Apple's jury risk therefore was small, even if it lost.  And Apple has proven itself equally committed to its appeal of this Court's July 10, 2013 Opinion & Order which could potentially impact the class's claims after trial. In recognition of

---

[1] "Publisher Defendants" refers to Hachette Book Group, Inc., HarperCollins Publishers L.L.C., Holtzbrinck Publishers, LLC d/b/a Macmillan and Macmillan Publishers, Inc., Penguin Group (USA) Inc. and Simon & Shuster, Inc.

this, Class Counsel and Plaintiff States negotiated a settlement agreement with three possible outcomes.

- *Scenario #1*: If the Liability Finding[2] is upheld on appeal, consumers will recover $400 million and Apple will pay $20 million to Plaintiff States and $30 million to Class Counsel for attorneys' fees and expenses;

- *Scenario #2*: If the Liability Finding is sent back to this Court for a new trial or for reconsideration of whether Apple violated the antitrust laws, consumers will recover $50 million and Apple will pay $10 million to Plaintiff States and $10 million to Class Counsel for attorneys' fees and expenses.

- *Scenario #3*: If the Liability Finding is reversed and the case is dismissed, Apple will make no payments to consumers, Plaintiff States or Class Counsel.

Respectfully Class Counsel request that this Court award attorneys' fees and expenses as outlined in the Settlement Agreement.

## II.     THE WORK UNDERTAKEN BY CLASS COUNSEL

### A.     Apple Has Repeatedly Tried to Frame this Case as Involving Unique and Novel Issues

From the start, Apple sought to distinguish itself from the other defendants. To do so, Apple has tried to position itself as only engaging in pro-competitive behavior, instead of acting as the key organizer of the price-fixing conspiracy.  Thus, Apple set itself apart from the Publisher Defendants, raising defenses unique to Apple.  For example, in response to plaintiffs' complaint, Apple was the only defendant to file a separate motion to dismiss the class complaint, arguing that: (i) Class Plaintiffs had failed to plead Apple's individual participation in the conspiracy; (ii) Apple's actions were consistent with lawful independent action; and (iii) Apple's actions should be subject to rule of reason treatment, not *per se*, and plaintiffs had failed to plausibly allege agreements that violated the rule of reason. This Court denied Apple's motion to

---

[2] "Liability Finding" refers to the Opinion  and Order, *United States v. Apple Inc.*, Case No. 12-cv-02826 (S.D.N.Y. July 10, 2013), ECF No. 326.

dismiss on May 15, 2012 in a fifty-six page order. Apple's answer to the class's complaint numbered 285 paragraphs and raised seven separate affirmative defenses.[3]

## B.    Coordinated and Civil Discovery

Once the pleadings were settled, discovery began in earnest. Apple proposed to "delink" class certification discovery from the DOJ case. Plaintiffs opposed this broken schedule, and instead proposed a joint schedule with the DOJ and State Attorneys General, resulting in efficient, but expedited, discovery. Class Plaintiffs actively participated in all discovery with the governmental entities, mindful to coordinate their actions at every step. The negotiation of discovery limits, ESI protocols, custodians, and search terms required extensive discovery conferences with all parties. Although coordinated with the DOJ and the State Attorneys General, Class Counsel actively reviewed the 13 million pages of documents produced by the defendants. Class Counsel prepared memoranda, digests and summaries to identify critical documents, analyzed the emerging conspiratorial record, and shared their findings with the governmental plaintiffs. These documents eventually became deposition exhibits, trial exhibits, and exhibits to various motions filed with the Court.[4]

Class Plaintiffs also propounded and responded to significant numbers of written discovery – 55 interrogatories, 6 requests for admission and 133 requests for production of documents in total. And Class Plaintiffs led the way on behalf of all plaintiffs in the collection of the transactional data from both defendants and third parties, amassing the largest databases of e-book prices ever compiled, a database critical to the success both the expert analysis presented in the liability trial and of Dr. Noll's regression model. Class Counsel's efforts also helped secure

---

[3] Decl. of Steve W. Berman in Support of Class Counsel's Mot. for Award of Attys' Fees and Reimbursement of Expenses Related to Apple Settlement ("Berman Decl."), ¶ 2, filed concurrently herewith.

[4] *Id.* ¶ 3.

robust documentary evidence from third parties in addition to the transactional data – over 3.3 million pages of documents – describing pricing strategy, as well as market information potentially relevant to the alleged conspiracy.[5]

Class Counsel actively participated in nearly all of the depositions. In all, 47 party depositions and 9 third-party depositions took place. As this Court instructed at the outset, merits and class discovery proceeded in tandem, and Class Counsel was well aware that no fact witness would be re-deposed absent an extremely strong showing. Class Counsel attended all but eight of these depositions and questioned the witnesses at nearly half of the depositions. Class Counsel also took the lead on several critical depositions, including the depositions of Penguin and Macmillan's expert economist, Dr. Daniel Rubinfeld; David Shanks, Penguin's Chief Executive Officer (both in his personal capacity and as a Rule 30(b)(6) witness testifying about Penguin's pricing policies); John Makinson, Chairman and Chief Executive Officer of Penguin's parent company, Pearson PLC; Tim McCall, Penguin's Vice President of Online Sales; and Alex Gigante, Penguin's General Counsel. As with the other areas of discovery, Class Counsel assisted in preparing for depositions, shared work product with the other plaintiffs' groups and ensured as much as possible the efficient conduct of the depositions.[6]

## C.   The Apple Trial with the Governmental Entities

In June 2013, this Court conducted a trial on liability in which the DOJ, thirty-three states and U.S. territories, and Apple participated. This Court held that the governmental plaintiffs had shown that the Publisher Defendants conspired with each other to eliminate retail price competition to raise e-book prices, and that Apple played a central role in facilitating and executing that conspiracy. Without Apple's orchestration of the conspiracy, it would not have

---

[5] *Id.*, ¶ 4.

[6] *Id.*, ¶¶ 5-6.

succeeded as it did in the Spring of 2010. The Court indicated that a damages trial would
follow.[7]

## D.      Litigation of Class Certification

After the completion of the trial, despite being found liable for violations of the antitrust
laws, Apple maintained its resolve to defeat the class's claims. This Court ordered the parties to
submit a report and proposed stipulation addressing issues of collateral estoppel. The Class and
Apple vastly disagreed on the impact of this Court's Liability Finding on the class's claims.
Unable to reach agreement, the impact of the Liability Finding became the subject of plaintiffs'
summary judgment motion.[8]

On October 11, 2013, plaintiffs moved for certification of a class of e-book purchasers
from 23 states. With their motion, plaintiffs submitted a detailed expert report from Dr. Roger
Noll, a Professor *Emeritus* of Economics at Stanford University and a Senior Fellow in the
Stanford Institute for Economic Research. Dr. Noll conducted a multivariate regression analysis
on transaction records for more than 149 million sales of 1.3 million different e-book titles. Dr.
Noll used prices prior to the agency period and prices during the agency period of e-books not on
the agency model as benchmarks. Dr. Noll's multivariate regression model controlled for key
market variables (including retailers, price, time since release, popularity, and genre). Dr. Noll
found an overcharge for more than 99.6 percent of e-books sales by the Publisher Defendants.
Dr. Noll estimated damages to consumers between $280 to $307 million.[9]

Apple vigorously contested the class certification, opposing the class certification motion,
filing a 236-page declaration of Dr. Joseph Kalt, a 96-page declaration from Jonathan Orszag,

---

[7] *Id.*, ¶ 7.

[8] *Id.*, ¶ 8.

[9] *Id.*, ¶ 9.

and a motion to strike the declaration of Dr. Noll. Apple argued that rather than harming

consumers uniformly, the introduction of the agency model had resulted in a disparate pricing

impact and supposedly benefited many consumers. Apple accused plaintiffs of relying on a

"trial-by-formula," suggesting that the Supreme Court had decisively rejected such methods in

*Wal-Mart Stores, Inc. v. Dukes*.[10] That Apple was willing to spare no expense was evidenced by

the massive class certification record, including its payments to Dr. Kalt of $1,350 per hour for

his testimony.[11]

In response, Class Plaintiffs moved to exclude the opinion of Dr. Kalt, including his

flawed analysis where he treated prices set by the Publisher Defendants after the onset of agency

as "pre-agency" prices. Along with the reply in support of class certification, Class Plaintiffs also

moved to exclude the opinion of Jonathan Orszag, arguing that his offset opinions were

unreliable and not based on the facts in this case. The Class Plaintiffs also opposed Apple's

motion to exclude the opinion of Dr. Noll. In response to Apple's experts' attacks on his

proposed methods to measure impact and damages, Dr. Noll produced a reply report. To respond

to Apple's criticisms regarding the use of averages and aggregate data, Dr. Noll used a

supercomputer to run his regression models at the individual transaction level (requiring over 14

hours of computing time). The results only further confirmed plaintiffs' damages estimates.[12]

Although this Court allowed Apple to file sur-replies that were limited to "new opinions

that could not have been anticipated" by Apple's experts, Apple filed a sur-reply in opposition to

class certification with accompanying sur-reply declarations from Dr. Kalt and Mr. Orszag

totaling 64 pages, 171 paragraphs and about 30 tables. Class Plaintiffs and Plaintiff States

---

[10] 131 S. Ct. 2541, 2561 (2011).

[11] Berman Decl., ¶ 10. In contrast, Dr. Noll was compensated at a rate of $800 per hour. *Id.*

[12] *Id.*, ¶ 11.

requested that this Court strike portions of the expert sur-reply declarations and the entirety of its sur-reply opposing class certification.[13]

## E.   Class Certification Order, *Daubert* Rulings and Appellate Proceedings Relating to Class Certification

On March 28, 2014, this court granted certification of a class of e-book consumers in twenty-three states, granted plaintiffs' motion to exclude the testimony of Apple's expert Dr. Kalt in its entirety, and excluded most of the testimony of Mr. Orszag. The Court also granted, in large part, plaintiffs' request to strike portions of Apple's sur-reply memorandum and sur-reply expert declarations.[14]

In certifying the class, this Court agreed that this was a "paradigmatic antitrust class action" where virtually all class members paid inflated prices for e-books as a result of a centralized price-fixing conspiracy. In an 86-page order, this Court outlined why the class met the elements of Rule 23 and addressed each of the litany of arguments raised by Apple against class certification. The Court commented that "[i]f certification were not appropriate here, no antitrust class action could be certified." The Court denied Apple's motion to exclude the testimony of Dr. Noll.[15]

The Court also granted plaintiffs' motion to strike most of the testimony of Apple's experts pursuant to Federal Rules of Evidence 702 and 403. This Court agreed that Dr. Kalt had committed several fundamental errors in his analysis, including by classifying prices that were set by the e-book publishers under the terms of an agency agreement, as "pre-agency," so long as one e-tailer was still selling the same books under a wholesale model. This Court also excluded Dr. Kalt's opinion that supposed "dispersion" and "churning" among e-book prices meant that

---

[13] *Id.*, ¶ 12.

[14] *Id.*, ¶ 13.

[15] *Id.* ¶ 14.

there was no "standard, stable e-book pricing structure" because it was unreliable and would tend to mislead and confuse a jury. This Court also excluded Dr. Kalt's opinion that Dr. Noll's model produced "false positives" as his analysis comparing average but-for prices to actual prices could not aid the trier of fact in determining any relevant issues. *Finally*, this Court excluded Dr. Kalt's opinion regarding offsets for certain supposed pro-competitive effects of price-fixing as based on "guesswork rather than analysis."[16]

The Court also excluded the bulk of Mr. Orszag's opinions, particularly those concerning offsets to the class's damages namely: (1) but for the conspiracy, Amazon would have lowered e-reader prices less than it did; (2) the price-fixing conspiracy increased the availability of self-published and free e-books; and (3) some e-books purchased through the iBookstore and Barnes & Noble's Nook Book Store would not have been purchased in the but-for world.[17]

## F.     Summary Judgment and Litigation over Venue

During the flurry of class certification briefing, Class Plaintiffs moved for summary judgment on each of the three elements of their antitrust claims against Apple. *First*, plaintiffs moved for an order collaterally estopping Apple from re-litigating any legal conclusion or factual finding adjudicated at the government trial. *Second*, plaintiffs requested summary judgment on the impact on class members, arguing that the Court's factual finding on the effect of the conspiracy on industry prices in its Liability Finding and Dr. Noll's analysis showing that ninety-nine percent of Defendant Publishers' e-book sales were sold at supra-competitive levels during the class period unequivocally demonstrated that no reasonable juror could find that the Class did not suffer widespread injury. *Third*, the Class requested summary judgment on the amount of damages to consumers, given that one of Apple's experts, Dr. Burtis, testified at the liability trial

---

[16] *Id.*, ¶ 15.

[17] *Id.*, ¶ 16.

to a 17-percent overcharge caused by the conspiracy and a second expert, Mr. Orszag, Apple's expert witness for the damages trial, estimated an average agency effect of 14.9 percent. Plaintiffs argued that there could be no dispute that the amount of overcharges attributable to the conspiracy was at least that amount. Apple filed 256 pages of briefs and declarations opposing the motion.[18]

After two and a half years of litigation, and at the same time it opposed summary judgment, Apple also requested that this Court remand plaintiffs' class actions to the transferor courts (for the Class, the Northern District of California) under 28 U.S.C. § 1407(a). Class Plaintiffs opposed this motion. In its Opinion & Order dated April 24, 2014, this Court denied Apple's motion on multiple grounds, including that pretrial proceedings were still ongoing, that class actions were filed in this District and logically were able to be tried here, and that Apple had waived any right to seek remand of the actions.[19]

## G.    Class Notice and Appellate Proceedings

Class Plaintiffs, working jointly with the State Attorneys General, prepared e-mail, postcard notice and detailed notice forms to be sent to class members apprising them of the certification of the class, and of their rights in the *parens patriae* actions. The Class and State Attorneys General jointly moved for approval of their proposed notices plans. The form of notice was approved on April 1 and the notice plan itself was approved on April 2, 2014.[20]

In late March, plaintiffs proposed a July 14, 2014 trial date which the Court ordered over Apple's opposition. On April 4, 2014, only 24 days before the notice administrator and retailers were to begin sending out 23 million class notices, Apple moved for a stay pending the outcome

---

[18] *Id.*, ¶ 17.

[19] *Id.*, ¶ 18.

[20] *Id.*, ¶ 19.

of its two appeals (on both its appeal on this Court's Liability Finding and Apple's Rule 23(f) appeal from class certification) or, in the alternative, an administrative stay of class notice pending the Court's ruling on Apple's request. Class Plaintiffs and Plaintiff States separately opposed this last-minute request for a stay. Apple waited another week before filing its Rule 23(f) petition with the Second Circuit Court of Appeals on April 11, 2014. Apple requested an emergency ruling by this Court before April 28, 2014, the last day to stop notice from being disseminated. On April 23, 2014, this Court denied Apple's motion for a stay pending appeal and denied Apple's request for an administrative stay, followed by a detailed opinion and order on April 24, 2014.[21]

Plaintiffs proceeded to oppose Apple's Rule 23(f) petition, filing a brief on April 21, 2014 under an expedited schedule. On April 23, 2014, Apple filed an emergency stay of class notification and the damages trial before the Second Circuit Court of Appeals with an additional twenty pages of argument. Class and Plaintiff States separately opposed the emergency motion to stay before the Second Circuit just two days later. Late in the afternoon on Friday, April 25, 2014, Judge Peter W. Hall of the Second Circuit Court of Appeals granted Apple's request for an administrative stay of class notice being distributed to consumers and referred Apple's stay motion to a three-judge panel. Apple's motion for leave to appeal the class certification order and for an emergency stay were heard by a motions panel on May 29, 2014. Within hours of that hearing, both motions were denied.[22]

At the same time as the Rule 23(f) and stay briefing, Apple also moved for reconsideration of this Court's ruling on plaintiffs' *Daubert* motions, its fifth effort to delay, escape, or relitigate proceedings before this Court. On April 11, 2014, Apple requested that the

---

[21] *Id.*, ¶ 20.

[22] *Id.*, ¶ 21.

Court reconsider its denial of a *Daubert* hearing and its exclusion of Dr. Kalt's testimony and much of Mr. Orszag's testimony. The Class and Plaintiff States jointly opposed this request.[23]

On June 2, 2014, the Class and Plaintiff States proposed an August 25, 2014 trial date, and Apple did not object. The next day, this Court ordered an August 25, 2014 trial date.[24]

On June 16, 2014, the parties wrote to inform the Court that the Class Plaintiffs, Plaintiff States and Apple had executed a binding agreement in principle to resolve the Class litigation and the damages phase of the States' litigation.[25]

## H.   Settlement Discussions with Apple

Plaintiffs' settlement discussions with Apple did not bear fruit until late in the litigation process. The State and Class Plaintiffs reached settlements with the five Publisher Defendants in 2013. Although this Court ordered Plaintiff States, DOJ, and Apple into mediation a month before the June 2013 trial, a mediation in which Class Plaintiffs participated, no settlement was reached.

After the Court issued its Liability Finding, the Court again directed the parties to mediate on the remaining issues, and the parties retained the widely respected and experienced mediator, Antonio Piazza. This mediation session did not result in an agreement. Indeed, until plaintiffs' motions on class certification and *Daubert* were granted, Apple adamantly rejected every effort to settle the case by any of the three plaintiff groups. The parties returned to mediation with Mr. Piazza in May 2014. While the parties did not reach agreement during the May mediation, the session provided the foundation for additional negotiations which resulted in the parties' execution of a Memorandum of Understanding on June 16, 2014. Counsel for

---

[23] *Id.*, ¶ 22.

[24] *Id.*, ¶ 23.

[25] *Id.*, ¶ 24.

Plaintiff States, Settlement Class, and Apple immediately began work to finalize the Apple

Settlement, using the prior settlements as a template. Counsel for the parties executed the Apple

Settlement Agreement on July 10, 2014.[26]

## III.    ARGUMENT

### A.    Apple Has Agreed to Pay Class Counsel Attorney's Fees and Expenses Equivalent to a Reasonable Percentage of the Benefit Conferred on Consumers

The Supreme Court recognizes the importance of private antitrust litigation as a

necessary and desirable tool to assure the antitrust laws' effective enforcement.[27] Substantial fee

awards in successful cases, such as this one, encourage meritorious class actions, for "[i]n the

absence of adequate attorneys' fee awards, many antitrust actions would not be commenced."[28]

Although this Court may use either the percentage or the lodestar methods to assess the

reasonableness of fees in common-fund cases, the trend is towards using the percentage

method.[29] The percentage method permits the judge to focus on the quality of the lawyers'

efforts and the benefits conferred to the class rather than on how many hours the attorneys

billed.[30] The hourly-rate approach frequently bears "little or no relationship to the value of the

services performed in anything but the most routine work. A flash of brilliance by a trial lawyer

may be worth far more to his clients than hours or days of plodding effort."[31]

---

[26] *Id.*, ¶¶ 25-26.

[27] *See, e.g., Pillsbury Co. v. Conboy*, 459 U.S. 248, 262-63 (1983); *Reiter v. Sonotone Corp.*, 442 U.S. 330, 331 (1979); *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 266 (1972); *Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 139 (1968), *overruled in part, Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984).

[28] *Alpine Pharm., Inc. v. Chas. Pfizer & Co., Inc.*, 481 F.2d 1045, 1050 (2d Cir. 1973).

[29] *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005); *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 50 (2d Cir. 2000); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 246 F.R.D. 156, 171 (S.D.N.Y. 2007).

[30] *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 485 (S.D.N.Y. 1998).

[31] *Shaw v. Toshiba Am. Info. Sys., Inc.*, 91 F. Supp. 2d 942, 964 (E.D. Tex. 2000).

In connection with prior settlements with the Publisher Defendants, this Court has previously awarded Class Counsel fees in the amount of $10,455,534.56 and reimbursement of expenses in the amount of $750,465.44, for a total of $11,206,000.[32] Class Counsel now move for an additional award of fees and costs, closely tied to the outcome for the class in any settlement.

There are three possible outcomes to this settlement. *First*, if the Court's Liability Finding is affirmed, Apple will pay $400 million for consumer compensation, $20 million to Plaintiff States, and $30 million to Class Counsel for fees and expenses. *Second*, if the Liability Finding is either vacated and remanded, or reversed and remanded with instructions for reconsideration or for retrial, Apple will pay $50 million for consumer compensation, $10 million to Plaintiff States and $10 million to Class Counsel for fees and expenses. (This contingency is not triggered by a remand on administrative or non-substantive grounds that could not implicate the Liability Finding.)  *Third*, if the Liability Finding is reversed, Apple will make no payments for consumer compensation or to Plaintiff States or Class Counsel.

Under each scenario, attorneys' fees and costs (or the absence of) were negotiated and Apple agreed to pay such amount separately from any compensation paid to consumers.

The following chart compares the percentage of fees that Apple has agreed to pay Class Counsel as a percentage of the benefit to be conferred first to all consumers, and second to just the twenty-three states represented by Class Counsel:[33]

---

[32] *See* Order Granting Class Pls.' Mot. for Award of Attorneys' Fees and Reimbursement of Expenses, Dec. 9, 2013, ECF No. 474.

[33] The percentage fees are calculated against the total amount paid by the defendant, including both consumer recoveries and all awards to counsel. As many courts have recognized, "[u]nder the percentage-of-the-fund method, it is appropriate to base the percentage on the gross cash benefits available for class members to claim, **plus** the additional benefits conferred on the class by [defendant's] separate payment of attorney's fees and expenses, and the expenses of administration." *Hess v. Sprint Comm'cns Co. L.P.*, No. 11-cv-35, 2012 WL 5921149, at *3 (N.D. W. Va. Nov. 26, 2012) (emphasis added); *see also, e.g.*, *In*

| Defendant | | Consumer Recovery | Recovery in Class States (approximately 40%) | Class Counsel's Fees and Expenses | Fees as Percentage of Benefit Conferred to Consumers* | Fees as Percentage of Benefit Conferred to Class States* |
|---|---|---|---|---|---|---|
| Macmillan | | $20,000,000 | $8,000,000 | $2,475,000 | 11% | 24% |
| Penguin | | $75,000,000 | $30,000,000 | $8,000,000 | 10% | 21% |
| HarperCollins, *et al.* (Minnesota) | | $2,119,000 | $2,119,000 | $731,000 | - | 26% |
| Apple | Scenario #1 | $400,000,000 | $160,000,000 | $30,000,000 | 7% | 17% |
| | Scenario #2 | $50,000,000 | $20,000,000 | $10,000,000 | 17% | 26% |
| | Scenario #3 | $0 | $0 | $0 | 0% | 0% |

*Excludes costs of administration of settlements.

Under any outcome of the Liability Appeal, when measured against the amount received by the class, Class Counsel would not receive an amount that exceeded 26 percent of the benefit conferred to the class states. This is the identical percentage that Class Counsel was awarded for their litigation of the Minnesota-only class against three of the Publisher Defendants. If this Court were to consider the total payments provided to consumers in the entire litigation, against the total payments to Class Counsel and Plaintiff States, the total amount of fees and expenses, measured as a percentage of the total payments by all defendants, would equal 12.2 percent under the first scenario and 18.4 percent under the second scenario.

Class Counsel's lodestar to date is $9,532,321.75 and unreimbursed expenses are $607,091.56.

---

*re Countrywide Fin. Corp. Customer Data Sec. Breach Litig*, No. 08-MD-01998, 2010 WL 3341200, at *9 (W.D. Ky. Aug. 23, 2010); *Dewey v. Volkswagen of Am.*, 728 F. Supp. 2d 546, 591 (D.N.J. July 30, 2010), *rev'd on other grounds sub nom Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170 (3d Cir. 2012).

**B.      Class Counsel's Request for Fees and Expenses Is Supported by Each *Goldberger* Factor**

Whether this Court examines Class Counsel's request for fees by measuring it as a percentage-of-the-fund or under the lodestar method, the fees awarded must be "reasonable" and "based on scrutiny of the unique circumstances of each case."[34] A reviewing court should consider the following six factors set forth in *Goldberger* in evaluating what constitutes a reasonable fee: (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of the representation measured by the result; (5) the requested fee in relation to the settlement; and (6) public policy considerations.[35]

**1.      The Time and Labor Expended by Class Counsel Support the Requested Fee**

As outlined above (*see* section II, *supra*), Class Counsel devoted significant time and labor not just to this litigation as a whole, but to the litigation against Apple ***in particular***. Class Counsel's lodestar – $9,532,321.75 – reflects the extraordinary effort and attention undertaken to get the results in this case. Both co-lead counsel, Hagens Berman and Cohen Milstein, have undertaken an audit of this time spent to ensure that all time billed to this case was reasonably necessary to effectuate the strategy and work in this case.

**2.      The Magnitude and Complexity of the Litigation Supports the Requested Fee**

The magnitude and complexity of this litigation is evident, particularly in the result. The "complexity of federal antitrust law is well known."[36] But here, an additional burden was present. Plaintiffs were required to show not only that the five publishers entered into a horizontal conspiracy, but that Apple, a vertical partner, knowingly participated in this

---

[34] *Goldberger*, 209 F. 3d at 47, 53.

[35] *Id.* at 50.

[36] *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 510 (E.D.N.Y. 2003), *aff'd*, *Wal-Mart Stores*, 396 F.3d at 96.

conspiracy. Class Plaintiffs were also required to demonstrate widespread impact and damage to a class of e-book purchasers. To demonstrate this, the class certification record alone numbered 2,018 pages. Summary judgment numbered another 751 pages.[37] Over the course of this litigation, Apple retained five different testifying experts (and an untold number of supporting economists). The volume of the pleadings filed in this case, the number of depositions, the breadth of document productions, and the complexity of the transactional database all confirm that this was extraordinarily complex litigation.[38]

### 3.    The Risks Entailed in the Litigation Support the Requested Fee

Class Counsel undertook significant risk when they filed this litigation, more than an ordinary case. The six defendants are each major multinational corporations, represented by some of the most well-heeled law firms in the country. The risks Class Counsel undertook in this case are consistent with the litigation's scope and complexity, and justify a substantial award.

### a.    No Governmental Actions Had Been Filed or Appeared Likely to Be Filed When Plaintiffs Filed Their Action

"[L]itigation risk must be measured as of when the case is filed."[39] The Second Circuit and district courts in this Circuit recognize the lack of previous government action as a key factor in assessing risk in this context.[40] As of August 9, 2011 when the Class Plaintiffs filed their original complaint, neither the DOJ nor the State Attorneys General had filed their actions, although the State Attorneys General had announced an investigation a year earlier. Plaintiffs' decision to commit the resources to prosecute a case of this magnitude against five of the largest

---

[37] Berman Decl., ¶ 27.

[38] *Id.*

[39] *Goldberger*, 209 F.3d at 55.

[40] *See, e.g.*, *Wal-Mart*, 396 F.3d at 122; *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 471 (2d Cir. 1974), *abrogated on other grounds by Goldberger*, 209 F.3d 43.

publishers in the world and Apple, one of the wealthiest companies in the world, carried

substantial risk and showed a willingness to commit tremendous resources.

### b.      Class Counsel's Resources Committed to the Case

Class Counsel collectively committed approximately 20,254 hours of their time and

$1,357,557 in expenses ($750,465.44 of which have been reimbursed in the settlements with the

publishers) without any assurance of compensation. The historical record is full of antitrust class

actions in which a court granted summary judgment for defendants, or where defendants

prevailed at trial or on appeal.[41] The Second Circuit has long recognized that the risk associated

with a case undertaken on a contingent basis is an important factor in determining an appropriate

fee award.[42] Here, the amount of resources committed to this case certainly supports the

requested fee award.

### c.      Risks Arising from Substantive Issues

The risks inherent in any antitrust class action were magnified in this litigation. From the

first motion to dismiss, Apple demonstrated its intent to vigorously defend its actions. Apple was

the only defendant to file a separate motion to dismiss the class complaint, arguing its unique

position in the conspiracy from its first filings in the case. *See* section II.A, *supra*.

After its trial against the DOJ and State Attorneys General on liability and injunctive

relief, Apple renewed its efforts to defeat the class's claims. Apple declined to stipulate on the

impact of the Liability Finding on the class's claims, leading eventually to summary judgment

---

[41] *See, e.g.*, *Superior Offshore Int'l, Inc. v. Bristow Grp, Inc.*, 490 Fed. Appx. 492 (3d Cir. 2012) (affirming summary judgment for defendants); *J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc.*, 485 F.3d 880 (6th Cir. 2007) (same); *Williamson Oil Co., Inc. v. Philip Morris USA*, 346 F.3d 1287 (11th Cir. 2003) (same); *Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan, Inc.*, 203 F.3d 1028 (8th Cir. 2000) (same); *In re Citric Acid Litig.*, 191 F.3d 1090 (9th Cir. 1999) (same); *In re Baby Food Antitrust Litig.*, 166 F.3d 112 (3d Cir. 1999) (same). *See also In re Carbon Dioxide Indus. Antitrust Litig.*, 229 F.3d 1321 (11th Cir. 2000) (jury verdict against opt-out plaintiffs).

[42] *Grinnell*, 495 F.2d at 470; *In re Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 433 (S.D.N.Y. 2001).

motions. Plaintiffs' class certification motion included a detailed expert report from Dr. Noll which conducted a multivariate regression analysis on more than 149 million sales of 1.3 million different e-book titles. Apple contested any demonstration of widespread impact to the class, filing hundreds of pages in expert reports and moving to strike the testimony of Dr. Noll under *Daubert*. In response, Dr. Noll used a super-computer to run his regression models at the individual transaction level – an event that Class Counsel believe is unique in the history of class actions. Although this Court eventually certified a class, the risk associated with the certification of a class, was not small. *See* section II.D, *supra*.

In addition to all of these risks, Apple's onslaught of motions created their own risks – not only that some argument might have some shred of merit but that Apple's relentless motions practice would draw valuable resources away from trial preparation and essential briefing. *See* section II.F-G, *supra*.

While plaintiffs viewed this as a traditional price-fixing case, a view confirmed by this Court's opinion in the liability phase, defendants consistently sought to portray their conduct as *sui generis* and subject to novel, uncharted analyses. Although plaintiffs were (and are) confident in the outcome of the proceedings, there was risk that defendants could have prevailed on at least some of their arguments.

### 4. The Quality of Representation Measured by the Outstanding Result Supports the Requested Fee

#### a. The Results for Class Members Are Outstanding

The settlement provides for three alternate outcomes, each of which supports the requested fee award.

*First,* in the event that this Court's Liability Finding is affirmed, Apple agrees to pay $400 million in consumer compensation, $20 million to Plaintiff States and $30 million to Class

Counsel in attorneys' fees and expenses. Under this scenario, consumers would receive $400 million from Apple, in addition to the $166 million recovered from the publishers in earlier settlements, for a total of $566 million.[43] Dr. Noll has estimated damages of approximately $280 million. This represents a recovery of more than ***200 percent*** of damages, placing this case among the exceedingly rare cases that provide consumers with double their estimated damages.

*Second*, in the event this Court's Liability Finding is vacated and remanded, or reversed and remanded with instructions for reconsideration or retrial, Apple agrees to pay $50 million in consumer compensation, $10 million to Plaintiff States, and $10 million to Class Counsel in attorneys' fees and expenses. Under this scenario, class members would receive $50 million in payments from Apple, in addition to the $166 million from the publisher settlements, for a total of $216 million. This represents a ***recovery of 77 percent of damages*** by consumers, still an outstanding recovery by any measure.[44] The payment of $50 million to consumer recovery still reflects an outstanding recovery for the class who, if this Court's Liability Finding was vacated or reversed on something more than administrative or non-substantive grounds, would face a

---

[43] This amount does not include payments for attorneys' fees and costs and payments to the States, which represent an additional benefit to consumers.

[44] *In re Warfarin Sodium Antitrust Litig*., 391 F.3d 516, 538 (3d Cir. 2004) (approving $44.5 settlement, recovery of 33% of single damages); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig*., 986 F. Supp. 2d 207, 229 (E.D.N.Y. 2013) (approving $7.25 billion settlement, recovery of 2.5% of single damages); *In re TFT-LCD (Flat Panel) Antitrust Litig*., No. 07-1827, 2013 U.S. Dist. LEXIS 49885 (N.D. Cal. Apr. 1, 2013) (approving $1 billion settlement, recovery of 50% of single damages) (*see also* Indirect-Purchaser Pls.' and Settling States' Joint Notice of Mot. and Mot. for Final Approval of Combined Class, *Parens Patriae*, and Governmental Entity Settlements with AUO, LG Display, and Toshiba Defendants; Mem. of Points and Authorities at 23, Case No. 3:07-MD-1827 (N.D. Cal. Nov. 15, 2012) ECF No. 7158); *In re Currency Conversion Fee Antitrust Litig*., 263 F.R.D. 110, 124 (S.D.N.Y. 2009) (approving $336 million settlement, recovery of 31% of single damages), *aff'd*, *Priceline.com, Inc. v. Silberman*, 405 Fed. Appx. 532 (2d Cir. 2010); *In re Linerboard Antitrust Litig*., 321 F. Supp. 2d 619, 633 (E.D. Pa. 2004) (approving $ 202.5 million in settlements, recovery of 55% of single damages); *In re NASDAQ*, 187 F.R.D. at 478 (approving settlements of $1.027 billion, recovery of 33%-41% of single damages); *In re Folding Carton Antitrust Litigation*, 84 F.R.D. 245, 254 (N.D. Ill. 1979) (approving what was, at the time, "the largest dollar settlement in the history of class action litigation at the time it was made" representing 118% of single damages to class members).

new and different battleground regarding (i) a motion to de-certify the class; (ii) motions for summary judgment; and (iii) the prospect of re-trying the entire liability case and damages under a different application of the governing legal standards.

*Third*, if this Court's Liability Finding is reversed, Apple will pay nothing pursuant to the settlement agreement, other than the costs of settlement administration. Under this scenario, class members would recover nothing from Apple, but have already recovered $166 million from the Publisher Defendants, representing recovery of 59 percent of damages. No further attorneys' fees would be paid.

Each of these scenarios represents an outstanding result for the case, given the risks that would be associated with each outcome. Plaintiffs, separately, negotiated a fee award commensurate to the recovery to consumers, ensuring that their payment is directly related to the results achieved on behalf of consumers.

### b. Quality of Class Counsel

Both Hagens Berman and Cohen Milstein have long-standing records of representing plaintiffs in complex cases with an enviable success rate. Hagens Berman is a sixty-lawyer firm, with offices in Seattle, Boston, Chicago, Colorado Springs, Los Angeles, New York, Phoenix, San Francisco and Washington, D.C. Since its founding in 1993, Hagens Berman has represented plaintiffs in a broad spectrum of complex, multi-party antitrust cases. Courts throughout the United States have recognized the firm for its ability and experience in handling major complex litigation.[45] The firm has litigated some of the most complex antitrust cases in recent decades, including as co-lead counsel in *In re Visa Check/Mastermoney Antitrust Litig.*, No. 96-cv-05238 (E.D.N.Y.), which settled for over $3 billion in cash and over $20 billion in injunctive relief,

---

[45] Berman Decl., Ex. A (firm résumé).

making it one of the largest antitrust settlements in history.[46]

Cohen Milstein has been one of the nation's leading plaintiff's class-action firms for more than forty years, and is particularly known for its expertise in complex antitrust litigation. Cohen Milstein has been recognized by both courts and leading commentators as one of the top plaintiffs' firms in the nation.[47] The firm has obtained substantial recoveries through settlement or trial in dozens of antitrust cases, including, most recently, winning a $400 million (pre-trebling) jury verdict against Dow Chemical Co. in *In re Urethane Antitrust Litig.*, No. 04-md-1616 (D. Kan.), on top of $139 million in settlements with other defendants. Additionally, Cohen Milstein has the country's leading practice representing State Attorneys General in affirmative litigation to redress injuries to the states and their citizens, experience that facilitated Class Counsel's working relationship with the State Attorneys General in this case.[48]

### c. Quality of Defendants' Counsel

The quality and zealousness of defense counsel similarly weighs in favor of the requested fee award.[49] Apple was represented by at least two of the country's largest law firms. The breadth of issues raised in this case – whether each defendant participated in the conspiracy,

---

[46] *See also* Appl. to Appoint Hagens Berman Interim Lead Counsel at 13-14, Dec. 19, 2011, ECF No. 19 (listing Hagens Berman's recent antitrust experience).

[47] Kit A. Pierson's Decl. in Support of Class Counsel's Mot. for Award of Attys' Fees and Reimbursement of Expenses Related to Apple Settlement ("Pierson Decl."), Ex. 1 (firm résumé); *see also* Appl. of Cohen Milstein Sellers & Toll PLLC Seeking Appointment to Represent Consolidated Putative Class at 7-11, Dec. 19, 2011, ECF No. 11 (providing additional examples of Cohen Milstein's cases and acclamations, as well as the biographies of its litigation team in this case).

[48] *See* David B. Wilkins, *Rethinking the Public-Private Distinction in Legal Ethics: The Case of 'Substitute' Attorneys General*, 2010 Mich. St. L. Rev. 423, 469-70 (2010) ("The fact that firms such as Cohen Milstein are developing government-representation practices that are largely staffed by former government lawyers . . . should be taken as a hopeful sign.").

[49] *See In re Merrill Lynch*, 246 F.R.D. at 174  ("'The quality of opposing counsel is also important in evaluating the quality of Class Counsels' work.'"); *In re NASDAQ*, 187 F.R.D. at 489 (awarding counsel 14 percent of $1 billion settlement where defendants' counsel included "the nation's biggest and best defense firms operating on a seemingly unlimited budget over a period of four years").

whether the class was subject to an arbitration agreement, how the conspiracy affected the e-book market, whether any of the many arguments made by Apple and other defendants had merit – alone demonstrates the formidable resources facing plaintiffs.

5.      **The Requested Fee Is Consistent with the Size of the Settlement and Payments to the States**

Contingency fees in cases where class members receive such a large benefit often fall between 20 to 33 percent.[50] Class Counsel's request here equates to 7 percent (scenario #1), 17 percent (scenario #2) or 0 percent (scenario #3) of the total recovery to consumers nationwide and is consistent with the settlement's size and the scope. It is also notable that the request is nearly equal to the payments sought by Plaintiff States under the settlement – in the first scenario, Plaintiff States would recover $20 million compared with Class Counsel's $30 million; and in the second scenario, Plaintiff States would recover $10 million compared with Class Counsel's $10 million.[51] Looking at the payments to Plaintiff States and the Class Counsel as a percentage of total payments by all defendants, the first scenario would result in a 12.2 percent payment to Plaintiff States and Class Counsel and 18.4 percent under the second scenario, well below the low end of typical awards. In total, the first scenario would result in a payment in total of $41.206 million to Class Counsel and $37.625 million to Plaintiff States. The second scenario

---

[50] *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467 (S.D.N.Y. 2009) (awarding 33.3%); *In re Air Cargo Shipping Servs. Antitrust Litig.*, MDL No. 1775, 2009 WL 3077396 (E.D.N.Y Sept. 25, 2009) (awarding approximately 25%); *In re Freddie Mac Sec. Litig.*, No. 03-CV-4261 (JES), slip. op. at 1 (S.D.N.Y. Oct. 27, 2006) (awarding 20%). *See also In re Countrywide*, 2010 WL 3341200, at *9 ("[T]he ordinary range for attorney's fees [has been] between 20-30%."); *In re The Mills Corp. Sec. Litig.*, 265 F.R.D. 246, 264 (E.D. Va. 2009) (collecting cases within Fourth Circuit and in other courts with fees of 18-33.3%); *Loudermilk Servs., Inc. v. Marathon Petroleum Co. LLC*, 623 F. Supp. 2d 713, 723-24 (S.D. W. Va. 2009) (summarizing studies finding median awards of between 20 and 30%); *Muhammad v. Nat'l City Mortg., Inc.*, No. 07-cv-0423, 2008 WL 5377783, at *9 (S.D. W. Va. Dec. 19, 2008) (collecting cases within Fourth Circuit with fees of 25-35%).

[51] Settlement Agreement by and Among Apple Inc., Pl. States and Class Pls. at 11, July 16, 2014, ECF No. 642-1.

would result in a payment of $21.206 million to Class Counsel and $27.625 million to Plaintiff States.

### 6. Public Policy Considerations Support the Requested Fee

Only a small number of firms have the expertise, resources, and inclination to lead the prosecution of cases such as this one, as the overwhelming majority of firms with the expertise and resources lack the inclination due to their defense orientation. And the number of those plaintiffs' firms who have proven their willingness and ability to carry such a case through trial is even smaller yet.[52] As this Court has recognized in other cases, undertaking representation on a fully contingent basis is a risk and effort that deserves to be compensated appropriately.[53]

### C. The Requested Fee Is Presumptively Reasonable in Light of Class Counsel's Lodestar

Class Counsel's current total lodestar in this case is $9,532,321.75. Under scenario one, the requested award would represent a 3.08 multiplier.[54] Under the second scenario, the award would represent a .99 negative multiplier. Combined with the previous fee award of $10,455,534.56, this would represent a multiplier of 4.18 and 2.08, respectively. In part, these multipliers reflect Class Counsel's efficiency in coordinating their efforts both between firms and with the various governmental participants. "The level of risk associated with litigation . . . is 'perhaps the foremost factor' to be considered in assessing the propriety of a multiplier."[55] The risk undertaken by Class Counsel in this case was at the highest level by virtue of their large

---

[52] *See In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 359 (S.D.N.Y. 2005) ("[i]n order to attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so, it is necessary to provide appropriate financial incentives").

[53] *In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288, 2004 U.S. Dist. LEXIS 22992, at *73 (S.D.N.Y. Nov. 12, 2004).

[54] These calculations of multipliers exclude payments for counsel's out-of-pocket expenses.

[55] *McDaniel v. Cnty. of Schenectady*, 595 F.3d 411, 424 (2d. Cir. 2010).

investments of time and money as well as the case's unique and formidable issues. Class

Counsel's request under either scenario falls within the acceptable range.[56]

Class Counsel's hourly rates are also reasonable. The proposed hourly rate of

compensation for paralegals is $250 to $280; associates fall within a range of $245 to $505; and

partners fall within a range of $500 to $900.[57] These rates are consistent with other awards in this

District and with the Court's prior award of attorneys' fees to Class Counsel.[58]

### D.      Class Counsel's Expenses Are Reasonable

Class Counsel requests reimbursement for $607,091.56 in additional expenses for which

they have not yet been reimbursed.[59] This is in addition to the $750,465.44 previously awarded

for expenses from the publisher settlements. Nearly half of these additional expenses ($298,740)

represents compensation to the class's experts. Class Counsel maintained substantial incentives

to control out-of-pocket expenses in this case due to the high risk they would not be reimbursed

---

[56] *Wal-Mart Stores*, 396 F.3d at 96 (finding 3.5 multiplier reasonable); *Beckman v. KeyBank, N.A.*, No. 12 Civ. 7836, 2013 U.S. Dist. LEXIS 60894, at *38 (S.D.N.Y. Apr. 29, 2013) (allowing 6.3 multiplier); *Ramirez v. Lovin' Oven Catering Suffolk, Inc.*, No. 11 Civ. 0520, 2012 U.S. Dist. LEXIS 25060, at *4 (S.D.N.Y. Feb. 24, 2012) (granting attorneys' fees equal to 6.8 times lodestar); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732, 803 (S.D. Tex. 2008) ("a multiplier of 5.2 is warranted, given the unmatched size of the [$7.2 billion] recovery, the obstacles and risks faced by [counsel] from the beginning, and the skill and commitment exhibited by counsel"); *In re NASDAQ*, 187 F.R.D. at 489 ("multipliers of between 3 and 4.5 have become common").

[57] Berman Decl., ¶ 32; Pierson Decl., ¶ 7.

[58] One source commonly used by Courts in this Circuit is the National Law Journal Survey to determine the fairness of fee rates. *See, e.g.*, *Williamsburg Fair Hous. Comm. v. N.Y. City Hous. Auth.*, No. 76 Civ. 2125, 2005 U.S. Dist. LEXIS 5200, at *35 (S.D.N.Y. Apr. 4, 2005) (observing that "a recent billing survey made by the National Law Journal shows that senior partners in New York City charge as much as $ 750 per hour and junior partners charge as much as $ 490 per hour"). The most recent National Law Journal survey for 2013 shows that New York had the highest average partner and associate billing rates at $882 and $520, respectively. Berman Decl., Ex. B at 3 (2013 National Law Journal Survey). *See also Brennan v. N.Y. Law Sch.*, No. 10 Civ. 0338, 2012 U.S. Dist. LEXIS 135095, at *13 (S.D.N.Y. Aug. 15, 2012) (Courts "should generally use 'the hourly rates employed in the district in which the reviewing court sits' in calculating the presumptively reasonable fee.").

[59] Berman Decl., ¶¶ 34-36; Pierson Decl., ¶¶ 10-11.

and the near certainty that many years would pass before Class Counsel could recoup the expenses.

Courts in the Second Circuit normally grant expense requests in common fund cases as a matter of course – even where, as here, the action continues against other defendants.[60] All of the expenses for which Class Counsel requests reimbursement here are of the type normally incurred in a complex action (expert-witness costs, deposition reporters and transcripts, copying, travel, research, court filings) and are appropriate for reimbursement here.[61]

## IV.    CONCLUSION

When Class Counsel filed this case, they were willing to undertake the entire burden of this risky litigation alone. Once joined with the DOJ and the State Attorneys General from thirty-three states, Class Counsel have worked efficiently to litigate this antitrust conspiracy claim against six sophisticated defendants. Plaintiffs jointly now request final approval of the settlement, and the approval of attorneys' fees and expenses as negotiated in the Apple Settlement.

DATED: October 17, 2014                     HAGENS BERMAN SOBOL SHAPIRO LLP


                                            By   /s/ Steve W. Berman
                                                STEVE W. BERMAN (*Pro Hac Vice*)

                                                1918 Eighth Avenue, Suite 3300
                                                Seattle, WA 98101
                                                Telephone: (206) 623-7292
                                                Facsimile: (206) 623-0594
                                                steve@hbsslaw.com

---

[60] *In re Vitamin C Antitrust Litig*., No. 06-MD-1738, 2012 U.S. Dist. LEXIS 152275, at *33 (E.D.N.Y. Oct. 23, 2012). *See also In re Towers Fin. Corp. Noteholders Litig.,* No. 93 Civ. 0810, 1996 U.S. Dist. LEXIS 2311, at *6 (S.D.N.Y. Jan. 17, 1996) ("[r]egardless of what happens in the balance of the litigation, counsel's efforts have benefitted the class, and there is no reason that part of counsel's expenses should not be reimbursed now").

[61] *Vitamin C Antitrust Litig*., 2012 U.S. Dist. LEXIS 152275, at *34-*35.

Jeff D. Friedman (*Pro Hac Vice*)
Shana Scarlett (*Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
jefff@hbsslaw.com
shanas@hbsslaw.com

Kit A. Pierson (*Pro Hac Vice*)
Jeffrey Dubner (JD4545)
COHEN, MILSTEIN, SELLERS & TOLL, PLLC
1100 New York Avenue, N.W.
South Tower, Suite 500
Washington, D.C. 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
kpierson@cohenmilstein.com
jdubner@cohenmilstein.com

Douglas Richards (JR6038)
COHEN, MILSTEIN, SELLERS & TOLL, PLLC
88 Pine Street, 14th Floor
New York, NY 10005
Telephone: (212) 838-7797
Facsimile: (212) 838-774
DRichards@cohenmilstein.com

*Class Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 17, 2014, I electronically filed the foregoing document using the CM/ECF system which will send notification of such filing to the e-mail addresses registered in the CM/ECF system, as denoted on the Electronic Mail Notice List, and I hereby certify that I have caused to be mailed a paper copy of the foregoing document via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice List generated by the CM/ECF system.

/s/ Steve W. Berman

STEVE W. BERMAN

010260-11  712824 V1